# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
### FORT WORTH DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>       Plaintiff,<br><br>       v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; UNITED STATES OF AMERICA; U.S. DEP'T OF HEALTH & HUMAN SERVICES; CENTERS FOR DISEASE CONTROL & PREVENTION; U.S. DEP'T OF HOMELAND SECURITY; U.S. CUSTOMS & BORDER PROTECTION; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; XAVIER BECERRA, Secretary, U.S. Dep't of Health and Human Services, in his official capacity; ROCHELLE WALENSKY, Director, Centers for Disease Control & Prevention, in her official capacity; ALEJANDRO MAYORKAS, Secretary, U.S. Dep't of Homeland Security, in his official capacity; TROY MILLER, Senior Official Performing the Duties of the Commissioner, U.S. Customs & Border Protection, in his official capacity; TAE JOHNSON, Acting Director, U.S. Immigration & Customs Enforcement, in his official capacity,<br><br>       Defendants. | Civil Action No. 4:21-cv-00579 |

## COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

### INTRODUCTION

1.    In a series of dangerous and inexplicable administrative actions, Defendants have abandoned the preexisting protections against the introduction into

Texas and the United States of aliens infected with the SARS-CoV-2 virus ("COVID-19" or "COVID") during a pandemic. In doing so, Defendants have violated the Immigration and Nationality Act ("INA"), the Public Health Service Act of 1944 ("PHSA"), and the Administrative Procedure Act ("APA"). By causing an influx of aliens who are or might be infected with COVID into the United States, Defendants' unlawful actions imperil the public health of Texas and the United States, and weaken the ability of the economies of Texas and the United States to recover, through reopening, from the effects of the pandemic. The State of Texas accordingly asks this Court to declare Defendants' actions unlawful and enjoin them.

2.      Less than six months ago, Defendants issued a Final Rule and a detailed Order (collectively commonly referred to as the "Title 42" process) through the Director of the Centers for Disease Control and Prevention ("CDC") to prevent the introduction into the United States across the land borders of all aliens potentially infected with COVID-19 who could end up in a congregate care setting—a rule that, in practice, resulted in the U.S. Department of Homeland Security ("DHS") rapidly expelling illegal aliens from the United States shortly after their unlawful entries.

3.      Despite taking these significant actions just six months ago—and using their authority to prevent the introduction of all covered aliens (a term explained later in this complaint that generally includes any alien likely to end up in a congregate care setting after violating the immigration laws) into the United States to the greatest extent possible until January—Defendants have since hastily and

2

unlawfully departed from their own rules for large numbers of illegal aliens and created an undeniable crisis on our southern border.

4.    Instead of using the CDC's authority to prevent the introduction of covered aliens into the United States during a pandemic, Defendants have chosen to take courses of action that have resulted in the release of tens of thousands of aliens into Texas and the United States. Absent this Court's intervention, such releases will continue for the foreseeable future.

5.    Defendants have done so without providing any meaningful justification or explanation for their actions, or for their departure from the final rule and order issued just six months ago.

6.    And in their haste to abandon their own detailed Title 42 process without any meaningful justification or explanation, Defendants have also failed to enforce the INA's backstop, a longstanding federal law requiring the detention of aliens arriving in the United States who might transmit diseases of public health significance. Through their failure to act, Defendants have ignored the plain language of the INA.

7.    The combination of Defendants' abandonment of their authority under the PHSA to prevent the introduction of aliens who might carry COVID-19 into the United States, and their failure to ensure the detention of those aliens whom they process under the INA, results in significant harms to Texas and its citizens. More Texans will be exposed to COVID-19, more Texans will contract COVID-19, more

Texans will die from COVID-19, and Texas will incur significant costs in terms of healthcare and law enforcement resources.

## I.     THE PARTIES

8.     Plaintiff State of Texas is a sovereign State, subject only to the Constitution of the United States. Tex. Const. art. I, § 1. Texas has the authority and responsibility to protect the health, safety, and welfare of its citizens, and to protect its public fisc.

9.     Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity only.

10.     Defendant United States of America is the federal sovereign.

11.     Defendant U.S. Department of Health and Human Services ("HHS") oversees the Centers for Disease Control and Prevention ("CDC") as a constituent agency of HHS. CDC conducts specified functions under the PHSA, including authorities delegated by HHS.

12.     Defendant U.S. Department of Homeland Security ("DHS") oversees Defendants U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE") as constituent agencies of DHS. DHS and its constituent agencies enforce the INA, and DHS has a duty to enforce orders issued by the CDC under the PHSA and its regulations.

13.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity only.

4

14. Defendant Rochelle Walensky is the Director of CDC. She is sued in her official capacity only.

15. Defendant Alejandro Mayorkas is the Secretary of DHS. He is sued in his official capacity only.

16. Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. He is sued in his official capacity only.

17. Defendant Tae Johnson is the Acting Director of ICE. He is sued in his official capacity only.

## II.   JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 5 U.S.C. §§ 702–703.

19. The Court may award the requested declaratory and injunctive relief under 5 U.S.C. § 705–706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

20. Venue lies in this district pursuant to 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

21. An actual case or controversy exists between Texas and Defendants.

22. The INA precludes courts from hearing certain claims "on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C. § 1252(g), but that provision does not apply because Texas is not suing "on behalf of any alien," *id.*; *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015).

5

## III.   BACKGROUND

A.   <u>The COVID-19 Pandemic</u>

23.     "COVID-19 is a severe acute respiratory syndrome, which is one of the diseases included in the 'Revised List of Quarantinable Communicable Diseases.'" Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,812 n.38 (Oct. 16, 2020).

24.     COVID-19 is highly contagious, spreading rapidly worldwide from its origin in Wuhan, China, through international travel by infected persons.

25.     COVID-19-infected people transmit the virus to uninfected people by direct contact, aerosol transmission, and surface contact with the virus.

26.     The CDC-recommended quarantine period for someone exposed to the COVID-19 virus is 14 days.

27.     COVID-19 has wreaked havoc on every facet of life in the United States over the last year.

28.     On March 13, 2020, Texas Governor Greg Abbott first declared a state of disaster for all counties in Texas based on the COVID-19 pandemic. Texas remains in a state of disaster to this day.

29.     More than 31 million U.S. residents have been infected with COVID-19—including more than 2.8 million in Texas—and more than 564,000 of them have died from COVID-related causes—including more than 48,000 in Texas. *See* Centers for Disease Control and Prevention, *COVID Data Tracker*, https://covid.cdc.gov/covid-

data-tracker/#datatracker-home (last visited Apr. 20, 2021); Texas Department of State Health Services, *DSHS COVID-19 Dashboard*, https://dshs.texas.gov/coronavirus/cases.aspx (last visited Apr. 20, 2021).

30.    The COVID-19 pandemic triggered a recession nationwide and in Texas.

31.    By decreasing the demand for energy and tourism, the COVID-19 pandemic has injured the Texas economy and the Southwest border region more than other parts of the United States.

B.    <u>The Use of Title 42 to Prevent the Spread of COVID-19 in the Border Environment</u>

32.    On September 11, 2020, the CDC published a final rule entitled "Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons From Designated Countries or Places for Public Health Purposes." 85 Fed. Reg. 56,424 (Sep. 11, 2020) ("Final Rule"). The Final Rule's effective date was October 13, 2020. *Id.* And it is still in effect today.

33.    The Final Rule, issued pursuant to the statutory authority provided in section 362 of the PHSA, 42 U.S.C. § 265, "establishe[d] final regulations under which the Director [of the CDC] may suspend the right to introduce and prohibit, in whole or in part, the introduction of persons into the United States for such period of time as the Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States." *Id.* (codified at 42 C.F.R. § 71.40).

34.    The Final Rule followed a similar CDC interim final rule promulgated in March 2020, 85 Fed. Reg. 16,559 (Mar. 24, 2020), as well as an initial 30-day order,

85 Fed. Reg. 17,060 (Mar. 26, 2020), which CDC subsequently extended for another 30 days, 85 Fed. Reg. 22,424 (Apr. 22, 2020), and then amended to cover the duration of the COVID-19 emergency subject to an internal 30-day review cycle, 85 Fed. Reg. 31,503, 31,507-08 (May 26, 2020).

35.     On October 13, 2020, the CDC Director issued an order entitled "Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists." 85 Fed. Reg. 65,806–12 (Oct. 13, 2020) ("October Order"). The CDC Director's October Order—although issued pursuant to the authority provided in the Final Rule—was the latest in a series of orders issued under the prior interim final rule and orders, all of which similarly prevented the introduction of covered aliens into the United States.

36.     Collectively, the Final Rule and the October Order work together in a process generally known as "Title 42."

37.     In the October Order, the CDC Director again suspended the introduction of covered aliens into the United States until the CDC determines that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health," 85 Fed. Reg. at 65,810 (Oct. 16, 2020), based on the following findings:

- COVID-19 is a communicable disease that poses a danger to the public health;
- COVID-19 is present in numerous foreign countries, including Canada and Mexico;
- There is a serious danger of the introduction of COVID-19 into the land POEs [Points Of Entry] and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID-19 exists

8

in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the land borders with Canada and Mexico;

- But for this suspension-of-entry order under 42 U.S.C. § 265, covered aliens would be subject to immigration processing at the land POEs and Border Patrol stations and, during that processing, many of them (typically aliens who lack valid travel documents and are therefore inadmissible) would be held in the congregate areas of the facilities, in close proximity to one another, for hours or days; and

- Such introduction into congregate settings of persons from Canada or Mexico would increase the already serious danger to the public health of the United States to the point of requiring a temporary suspension of the introduction of covered aliens into the United States.

*Id.*

38. The CDC does not, itself, have the personnel, equipment, or facilities to enforce the CDC Director's Order.

39. Accordingly, the CDC Director noted his consultation with DHS in issuing the October Order, stating that he "requested that DHS aid in the enforcement [of] this Order because CDC does not have the capability, resources, or personnel needed to do so." *Id.* at 65,812.[1] He further stated that "DHS's assistance with implementing the Order is necessary, as CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States." *Id.*

---

[1] Another provision of the PHSA, 42 U.S.C. § 268, provides that "[i]t shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations[.]"

40.     The CDC Director noted that his October Order should apply to *all* covered aliens—which he defined as those "seeking to enter the United States at POEs who lack proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended at or near the border seeking to unlawfully enter the United States between POEs." *Id.* at 65,807.

41.     Aside from exceptions not relevant here, the CDC Director specified that the October Order "does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.* In these limited circumstances, the CDC Director specified that "DHS shall consult with CDC concerning how these types of *case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments.*" *Id.* (emphasis added).

42.     In practice, in enforcing the CDC Director's October Order, DHS was able to rapidly expel covered aliens from the United States, thereby preventing their introduction into the United States and into congregate care settings.

43.     The CDC Director noted in his October Order that the prior orders "reduced the risk of COVID-19 transmission in POEs and Border Patrol Stations, and thereby reduced risks to DHS personnel and the U.S. health care system." *Id.*

44.     He further noted that "[t]he public health risks to the DHS workforce— and the erosion of DHS operational capacity—would have been greater absent the

March 20, 2020 Order[,]" adding that "DHS data shows that the March 20, 2020 Order has significantly reduced the population of covered aliens in congregate settings in POEs and Border Patrol stations, thereby reducing the risk of COVID-19 transmission for DHS personnel and others within these facilities." *Id.*

45.     As a result of the use of Title 42, the population of aliens processed under Title 8 (the ordinarily applicable immigration rules) declined sharply, meaning that the number of aliens rapidly expelled increased significantly over the last six months of Fiscal Year 2020. Of the 253,301 total southwest border encounters under Title 8 in Fiscal Year 2020, only 24,372 occurred in the last six months of the year (from April through September). *See* U.S. Customs and Border Protection, *Southwest Border Land Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Apr. 20, 2021). During roughly the same six-month period, 204,787 aliens were rapidly expelled pursuant to Title 42. *Id.*

46.     On November 18, 2020, Judge Emmett Sullivan issued a preliminary injunction in the matter of *P.J.E.S. v. Wolf*, No. 20-2245 (D.D.C. 2020). Judge Sullivan held that unaccompanied alien children (UAC) were improperly expelled pursuant to Title 42, and then enjoined the government from applying Title 42 to UAC encountered by DHS. *Id.*

47.     Between November 2020 and January 2021, the number of UAC encountered at the southwest border increased by roughly 27%, rising from 4,600 encounters in November 2020 to 4,993 in December, and to 5,852 in January. *See* U.S. Customs and Border Protection, *Southwest Border Land Encounters*,

https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Apr. 20, 2021).

48.    On January 29, 2021, the United States Court of Appeals for the D.C. Circuit issued an order staying Judge Sullivan's injunction. *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021).

49.    Despite obtaining a stay of Judge Sullivan's injunction from the D.C. Circuit and having the ability to apply Title 42 to UAC, the CDC Director subsequently announced an exception from the October Order for UAC effective January 30, 2021. *See* Notice of Temporary Exception From Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9,942 (Feb. 17, 2021) (the "February Order").

50.    The exception noted that while COVID-19 continued to pose a "highly dynamic public health emergency," the CDC was "*in the process of reassessing* the overall public health risk at the United States' borders and its 'Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists' based on the most current information regarding the COVID-19 pandemic *as well as the situation at the Nation's borders*." *Id.* (emphasis added). But other than those general statements, the CDC Director provided no explanation whatsoever of the decision not to apply Title 42 to UAC.

51.    Unsurprisingly, the number of UAC encountered at the southwest border increased to 9,431 in February (roughly a 105% increase over the number

encountered in November). *See* U.S. Customs and Border Protection, *Southwest Border Land Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Apr. 20, 2021). And the number of UAC encountered in March increased to 18,890 (roughly a 310% increase over the number encountered in November). *Id.*

52.     Defendants have also departed from their own rules pertaining to its processing of members of family units encountered along the southwest border—although in that context not only have they offered no explanation for any change in processing, but they have also not made any public announcement about a change in processing or an exception to the CDC Director's October Order.

53.     CBP encountered a total of 4,300 members of family units in November 2020, 4,404 in December 2020, 7,296 in January 2021, 19,587 in February 2021, and 53,623 in March 2021. *Id.* Of those total encounters, 3,639 were processed using Title 42 in November (roughly 85%), 3,332 in December (roughly 76%), 4,546 in January (roughly 62%), 9,223 in February (roughly 47%), and 17,345 in March (roughly 32%). *Id.* Thus, under Title 8 DHS processed 661 members of family units in November 2020, 1,072 in December 2020, 2,750 in January 2021, 10,364 in February 2021, and 36,278 in March 2021. *Id.*

54.     Put differently, encounters of members of family units have spiked by roughly 1,147% between November 2020 and March 2021, yet the use of Title 42 for those aliens encountered has plummeted as a percentage of total encounters.

55.    Among other things, to accommodate the surge in UAC, HHS has opened makeshift emergency shelters across the country, including in Texas at a converted oilfield workers' camp in Midland. *See* Joshua Skinner & Kate Porter, *Midland leaders blindsided by arrival of migrants at holding facility*, CBS7 (Mar. 14, 2021), https://www.cbs7.com/2021/03/14/gov-abbott-federal-hhs-sending-some-migrants-to-midland/. And another at the Hutchison Convention Center in Dallas. *See* Nomaan Merchant & Jake Bleiberg, *Immigrant teens to be housed at Dallas convention center*, ASSOCIATED PRESS (Mar. 15, 2021), https://apnews.com/article/dallas-health-coronavirus-pandemic-immigration-border-patrols-fa567f671faa0e9eb33e37f30746f1b6.

C.    Defendants' Responsibilities Under the INA When Not Exercising Authority on Behalf of the CDC Under Title 42

56.    When not rapidly expelling aliens using Title 42, DHS is directed by the INA to undertake certain actions when it encounters aliens who could potentially carry a communicable disease of public health significance.

57.    DHS is charged with enforcing the immigration laws pertaining to the admission of arriving aliens, including 8 C.F.R. Part 235, which governs the inspection of aliens applying for admission to the United States. In general, aliens who apply for admission to the United States must present themselves to an immigration officer at a POE or other designated location. 8 C.F.R. § 235.1(a).

58.    Section 212(a)(1)(A) of the INA renders aliens inadmissible if they are determined to have a "communicable disease of public health significance." 8 U.S.C. § 1182(a)(1)(A)(i).

14

59.   The INA defines a "communicable disease of public health significance" by reference to "regulations prescribed by the Secretary of Health and Human Services." 8 U.S.C. § 1182(a)(1)(A)(i).

60.   To determine whether an alien is inadmissible by reason of being infected with a communicable disease of public health significance—or is coming from a country where such diseases are prevalent—section 232(a) of the INA requires the detention of such aliens:

> For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes inadmissible under this Act, by reason of being afflicted with *any of the diseases or mental or physical defects or disabilities set forth in section 212(a)* [8 U.S.C. § 1182(a)], or whenever [DHS] has received information showing that any aliens are *coming from a country or have embarked at a place where any of such diseases are prevalent or epidemic*, such aliens shall be detained for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to inadmissible classes.

8 U.S.C. § 1222(a) (emphasis added).

61.   Regulations similarly permit detention of such aliens where there are "reasonable grounds for believing that persons arriving in the United States should be detained for reasons specified in section 232 of the Act [8 U.S.C. § 1222]." 8 C.F.R. § 232.3; *accord* 8 U.S.C. § 1222(a).

62.   DHS's policies and statistics prove that DHS does not meaningfully enforce the plain requirements of the INA to detain any such aliens for a "sufficient time to enable the immigration officers and medical officers to subject such aliens to

observation and an examination sufficient to determine whether or not" they could be carrying a communicable disease of public health significance, including COVID-19. 8 U.S.C. § 1222(a).

63.     CBP's medical policy "applies to the provision of enhanced medical support for individuals in CBP custody along the Southwest Border (SWB)." U.S. Customs and Border Protection, *CBP Directive No. 2210-004* at 1 (Dec. 30, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf ("the Directive.").

64.     The Directive "applies to CBP steady-state and surge operation and includes crisis-level operations," and states that "it is the policy of CBP that all individuals in custody will receive appropriate medical support in accordance with applicable authorities, regulations, standards, and policies." *Id.* And it states that "[c]onsistent with short-term detention standards and applicable legal authorities, individuals will not be detained in CBP facilities for the sole purpose of completing *non-emergency medical tasks.*" *Id.* (emphasis added).

65.     The Directive describes a "phased approach to the identification of potential medical issues in persons in custody." *Id.* at p. 4. The first phase involves observing persons in custody and proactively alerting CBP personnel about any medical issues of concern, and conducting health interviews or medical assessments for people with identified medical issues. The second phase involves a health interview for all individuals in CBP custody under the age of eighteen. And the third phase, "subject to the availability of resources and operational requirements," directs

16

a medical assessment to be conducted on tender-age children, any person who self-identified a medical issue during a screening, and "any other person in custody with a known or reported medical concern." *Id.* at pp. 4–5.

66.     The Directive makes no mention of detention for individuals under the circumstances required by 8 U.S.C. § 1222(a). Therefore, combined with the fact that CBP's own Directive states that "individuals will not be detained in CBP facilities for the sole purpose of completing non-emergency medical tasks," Defendants' compliance with the requirements of 8 U.S.C. § 1222(a) could only come through detention with ICE, the other immigration enforcement arm of DHS.

67.     And while ICE may have medical policies in place for individuals transferred to its custody depending upon the nature of the facility itself—*see, e.g.*, U.S. Immigration and Customs Enforcement, *Family Residential Standards 2020* § 4.3 (2020), https://www.ice.gov/doclib/frs/2020/4.3_HealthCare.pdf; U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011* § 4.3 (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf—ICE's own statistics demonstrate that the overwhelming majority of aliens in family units are not being transferred to ICE custody in the first instance, meaning that CBP is releasing family unit aliens directly from its custody at the border. Even those few transferred to an ICE Family Residential Center are being quickly processed and released into the interior of the United States—rather than detained as required by 8 U.S.C. § 1222(a).

68.   ICE publishes data on those aliens brought into its custody, those aliens it detains, and those aliens it releases. *See* U.S. Immigration and Customs Enforcement, *ICE Detention Data, FY21 YTD*, https://www.ice.gov/doclib/detention/FY21_detention-stats_0414.xlsx (at the Tab entitled "Detention FY21 YTD") (last visited Apr. 20, 2021).

69.   ICE's data prove that it is not detaining the overwhelming majority of members of family units whom CBP encounters at the border and is releasing the few it does process in Family Residential Centers in a matter of days.

70.   Indeed, Fiscal Year 2021 to date, ICE's data show that it has only processed a total of 2,107 aliens into Family Residential Centers. *Id.* It also shows that as of March 31, 2021, ICE was only detaining 1,562 aliens in family units in Family Residential Centers. *Id.* And the Average Length of Stay was 7.5 days in March, and 6.8 days in April. *Id.*

71.   Comparing ICE's reported total of 2,107 aliens being processed into a Family Residential Center so far in Fiscal Year 2021, *id.*, with the 51,651 total aliens CBP processed under Title 8 (as opposed to immediate expulsion under Title 42), *see* U.S. Customs and Border Protection, *Southwest Border Land Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Apr. 20, 2021), proves that ICE is also failing to detain the overwhelming majority of members of family units in accordance with the plain language of 8 U.S.C. § 1222(a).

72.   Defendants' failure to use Title 42, and their failure to follow the INA's requirements regarding the detention of aliens who potentially have communicable

diseases of public health significance, results in the release of aliens into Texas—threatening the health and safety of all Texans.

## IV.   IRREPARABLE HARMS TO TEXAS

73.    Texas has suffered and continues to suffer irreparable harm because of Defendants' actions.

74.    In fact, the CDC Director's October Order acknowledged as much, when it described that "several cities and states, including *several located at or near U.S. border*s, continue to experience widespread, sustained community transmission that has *strained their healthcare and public health systems*. Furthermore, continuing to slow the rate of COVID-19 transmission is critical as states and localities ease public health restrictions on businesses and public activities in an effort to mitigate the economic and other costs of the COVID-19 pandemic." 85 Fed. Reg. 65,812 (emphasis added).

75.    And the harms that Texas experiences will continue to increase as Defendants not only release more UAC from their custody and place them with sponsors throughout Texas, but also release family units and a higher percentage of aliens who do not qualify as either UAC or family units.

76.    According to data from the Office of Refugee Resettlement ("ORR") in HHS, Texas consistently receives more UAC than any other state—including 13.59% in FY2019 (9,900/72,837), 13.87% in FY2020 (2,336/16,837), and 13.78% through February in FY2021 (1,460/10,596), notwithstanding that Texas represents less than 8.9% of the U.S. population (29,360,759/329,484,123) in the U.S. Census Bureau's

most recent (2020) estimate. *See* U.S. Census Bureau, *2020 Vintage 2020 Population Estimates for the United States and States*, https://www.census.gov/programs-surveys/popest/technical-documentation/research/evaluation-estimates.html.    (last visited Apr. 20, 2021).

77.    Because of the lag time in processing UAC, the preliminary injunction that prevented Defendants' applying Title 42 to UAC from November 18, 2020, through the stay of that injunction on January 29, 2021, and Defendants' refusal to apply Title 42 since then, this number will exponentially increase in the coming weeks and months—imposing more costs on Texas.

78.    The release of illegal aliens—including UAC, family units, and other aliens—into Texas exposes Texas residents to COVID-19 and causes Texas to incur significant costs, including higher healthcare, law enforcement, and education costs. When Defendants do not remove or exclude illegal aliens in compliance with federal law, Defendants' inaction causes Texas to incur these higher costs, which are not recoverable at law.

79.    When DHS and CDC violate the statutory requirements to exclude or quarantine illegal aliens with communicable diseases such as COVID-19, Texas faces significant healthcare and related economic costs, Texas citizens face unwarranted risk, and Texas public-health and law-enforcement officials have their already difficult tasks compounded unnecessarily.

80.    Defendants' lax enforcement policy has caused increased numbers of illegal aliens to seek to enter the United States.

81.     The surge in COVID-19-infected aliens arriving illegally in Texas not only spreads COVID-19 to Texas residents with whom the illegal aliens come into contact but also infects Defendants' staff and contractors who come into contact with COVID-19-infected illegal aliens, and thus further expose their families and communities to COVID-19 when they leave work.

82.     The surge in COVID-19-infected aliens arriving illegally in Texas absorbs available healthcare resources that Texas has provided for Texas residents, including healthcare that Texas provides for indigent patients.

83.     If Defendants followed the October Order, and only considered exceptions on a case-by-case basis, Texas would not face such an overwhelming crush of UAC and members of family units who might have COVID-19—at a time when Texas is trying to reopen for business and ensure the distribution of COVID-19 vaccines among the general population.

## V.     CLAIMS

### COUNT I

**Arbitrary and Capricious Agency Action:
Lack of Reasoned Decision-Making**

84.     Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

85.     The February Order is arbitrary and capricious because it does not offer a reasoned explanation for exempting UAC from the Title 42 process.

86.     The APA provides that reviewing courts "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The February Order, which amends the October Order and Title 42 process, is a final agency action. 5 U.S.C. § 551(6), (13).

87.     The sole rationale given by the February Order is that the "CDC is in the process of reassessing the overall public health risk at the United States' borders and its [October Order] based on the most current information regarding the COVID-19 pandemic as well as the situation at the Nation's borders." Notice of Temporary Exception From Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9,942 (Feb. 17, 2021).

88.     This rationale is unreasonable and runs counter to the evidence before the agency.

89.     The February Order admits that the October Order "was based on the most current information at that time regarding the COVID-19 pandemic and the situation at the Nation's borders." *Id.*

90.     The October Order had concluded that suspending the introduction of UAC was "necessary to continue to protect the public health from an increase in the serious danger of the introduction [of COVID-19.]" Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,807 (Oct. 16, 2020).

91.     In the October Order, the CDC Director had stated that the CDC was conducting monthly reviews of "the latest information regarding the status of the

COVID-19 pandemic and associate public health risks to ensure that the [October] Order remains necessary to protect the public health." *Id.* at 65,809.

92.     The evidence before the agency at the time of the February Order consisted of the October Order's determination that suspending the introduction of UAC was necessary to protect public health, based on the most current information available at the time, and approximately four monthly reviews reaffirming the necessity of that policy in light of the most recent public health data regarding the COVID-19 pandemic.

93.     The February Order does not identify any new information arising after October 16, 2020, that would provide a well-reasoned explanation for the CDC's abrupt departure from the process outlined in the October Order. The rationale that CDC gives in the February Order—namely, that "CDC is in the process of reassessing the overall public health risk at the United States' borders and its [October Order] based on the most current information regarding the COVID-19 pandemic as well as the situation at the Nation's borders" 86 Fed. Reg. at 9,942—is no rationale at all: "On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 863–64 (1984). If CDC's "reassessment" rationale is non-arbitrary, agencies can suspend or amend rules at will.

94.     Even if there were some ex post facto way to explain or justify CDC's decision, that would not save CDC's action because it "is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that

23

the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020) (quotations omitted); *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (pre-APA); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (limiting APA review to "the basis articulated by the agency itself" in the record); *see also* 5 U.S.C. § 553(b)(B) (requiring agencies to incorporate a good-cause basis for exemption in the rule).

## COUNT II

### Arbitrary and Capricious Agency Action:
### Failure to Consider State Reliance Interests

95.     Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

96.     The February Order is arbitrary and capricious because defendants also did not consider the State of Texas's reliance interests in the continuation of the Title 42 policy.

97.     Defendants ignored the harms that ceasing to use Title 42 for UAC would cause, such as increased costs to Texas and other states, which always "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). As noted above, the February Order did not address such costs at all. This failure, too, was arbitrary and capricious. *See Michigan v. E.P.A.*, 576 U.S. 743, 751 (2015).

98.     Defendants particularly did not consider whether "there was 'legitimate reliance' on the" use of Title 42 for nearly a year—in the middle of a pandemic—that enabled Texas to devote resources to addressing the needs of its citizens, or to ease

24

economically-damaging pandemic-related restrictions on its citizens, thus improving Texas's economy and increasing the state's tax revenues. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). Instead, there was no consideration whatsoever of the decision's impact on available state resources. That failure was arbitrary and capricious; where, as here, "an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting another source)).

<u>**COUNT III**</u>

**Arbitrary and Capricious Agency Action:**
**Failure to Consider Alternative Approaches**

99.    Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

100.    The February Order is arbitrary and capricious because the Defendants failed to consider alternative approaches to their decision to except UAC from Title 42 altogether.

101.    Even if Defendants considered the costs to Texas—and they did not—they did not consider whether they could achieve their goals through a less-burdensome or less-sweeping means. This too made Defendants' resulting decision arbitrary and capricious.

102.    The February Order failed to consider alternative approaches that would allow at least the use of Title 42 in *some* cases for UAC, and that would have

25

accordingly imposed less-significant burdens on Texas. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 51). The February Order categorically eliminates the use of Title 42 for all UAC.

103.    By omitting any analysis of continuing at least some use of Title 42 for UAC, Defendants "failed to consider important aspects of the problem" before it. *Id.* at 1910 (alterations and citation omitted).

## COUNT IV

### Arbitrary and Capricious Agency Action:
### No Stated Basis for Agency Action

104.    Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

105.    The February Order is arbitrary and capricious because the Defendants provided no meaningful explanation or justification for it. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Because Defendants did not provide any grounds for the decision other than that they were reconsidering the matter, they are precluded from asserting new grounds before this Court—and therefore their cessation of the use of Title 42 is necessarily arbitrary.

106.    Because Defendants did not sufficiently explain their sudden departure from the use of Title 42 for UAC, the February Order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

## COUNT V

### Lack of Notice-and-Comment Rulemaking

107. Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

108. The Defendants failed to conduct the statutorily required notice and comment process for the February Order.

109. The APA provides that reviewing courts "shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

110. The APA requires agencies issuing rules to follow notice-and-comment rulemaking, 5 U.S.C. § 553(b)–(c), and to have rules take effect 30 or more days after promulgation, 5 U.S.C. § 553(d), unless an applicable exception applies.

111. The Title 42 process—including the October Order, 85 Fed. Reg. at 65,806–12, and the February Order, 86 Fed. Reg. at 9,942—is a substantive rule for APA purposes because the Title 42 process binds agency discretion. 5 U.S.C. § 551(4)–(5).

112. CDC previously argued that its orders in the Title 42 process were not rules, and argued in the alternative that APA exceptions applied, based on the public-health emergency of the COVID-19 pandemic. *See* 85 Fed. Reg. at 65,812 (Oct. 16, 2020); 85 Fed. Reg. at 31,509 (May 26, 2020).

113. In the February Order, Defendant CDC purports not only to have amended the Title 42 process by exempting UAC from the Title 42 process without

27

putting that amendment through notice-and-comment rulemaking, but also to have made the change effective immediately.

114.   In the February Order, CDC does not invoke any exceptions to the APA's notice-and-comment rulemaking or 30-day-notice requirements.

115.   CDC's February Order is not eligible for any exceptions to the APA's notice-and-comment rulemaking or 30-day-notice requirements.

116.   CDC's February Order violated the APA by purporting to amend the Title 42 process without either meeting the notice-and-comment rulemaking and 30-day-notice requirements or invoking an exception to those requirements.

## COUNT VI

### Failure to Follow Agency Rules

117.   Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

118.   The Defendants act unlawfully by not following their own rules for processing members of family units encountered at the southern border.

119.   While the APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), agencies' obligation to follow their own rules predates APA's enactment. *United States v. Macdaniel*, 32 U.S. (7 Pet.) 1, 15 (1833); *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942); *Service v. Dulles*, 354 U.S. 363, 372 (1957) (citing *Accardi v. Shaughnessy*, 347 U.S. 260 (1954)).

120.    As opposed to Defendants' exception of UAC from coverage under Title 42 in the February Order, Defendants have made no such comparable exception for members of family units. Yet Defendants' own statistics prove that they are not acting in accordance with their own rules, which require DHS to consult with CDC "concerning how [any] types of *case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments*." *See* 85 Fed. Reg. 65,806, 65,807–08 (Oct. 16, 2020) (emphasis added).

121.    As stated above, Defendants only applied Title 42 to 47% of encounters of family units in February and 32% in March. Case-by-case, individualized exceptions are neither case-by-case nor individualized when such exceptions applied to 53% of all encounters in February and 68% in March.

122.    By effectively excepting families from Title 42 without amending the applicable rules—and without following their detention requirements under the INA—Defendants actions are not in accordance with applicable law.

123.    And further, because Defendants' attempt to except UAC from Title 42's coverage was ineffective and unlawful for the reasons stated above, their present actions are therefore in violation of their own rules.

## COUNT VII

### Failure to Detain Aliens under 8 U.S.C. § 1222(a)

124.    Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

125.    The Defendants have failed to comply with applicable law requiring the detention of aliens under the terms required by 8 U.S.C. § 1222(a).

126.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, authorizes federal district courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

127.    COVID-19 is a "communicable disease of public health significance" for purposes of INA §§ 212(a), 232(a).

128.    COVID-19 is prevalent or epidemic in Mexico.

129.    DHS has a statutory obligation to detain and quarantine aliens arriving from Mexico before releasing such aliens into the United States.

130.    The CDC-recommended quarantine period for COVID-19 is 14 days, and that is at least the period necessary to determine whether someone has COVID-19 based on past contact or exposure.

131.    DHS's refusal to enforce 8 U.S.C. § 1222(a) is final agency action within the meaning of the APA, both as reviewable inaction and as a conscious policy of non-enforcement.

132.    Unless aliens arriving from Mexico are immediately returned to Mexico during an applicable pandemic, 8 U.S.C. § 1222(a) imposes a non-discretionary duty on the DHS Defendants to detain aliens arriving from Mexico who are inadmissible.

## COUNT VIII

### Violation of the Take Care Clause

133.   Plaintiff incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

134.   The Defendants have failed to take care that the laws applicable to the processing of aliens at the southwest border are faithfully executed.

135.   The Constitution requires the President to "take care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

136.   This constitutional limitation is binding on agencies and officers exercising executive power. *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President.).

137.   Unconstitutional agency action or inaction violates the APA. *See* 5 U.S.C. § 706.

138.   Defendants' actions here violate the Take Care Clause because they refuse to apply CDC's duly promulgated rules under the PHSA and refuse to enforce 8 U.S.C. § 1222(a)'s mandatory detention of aliens exposed to COVID-19, a communicable disease of public health significance.

139.   Defendants' actions thus violate the constitutional duty to "take Care that the Laws be faithfully executed."

140.   Defendants' actions therefore are unconstitutional and should be enjoined under the APA, 5 U.S.C. §706, or independent of the APA under the Take Care Clause itself.

## VI.   PRAYER FOR RELIEF

141.   For these reasons, Texas asks this Court to:

a.   Hold unlawful and set aside the CDC's February Order promulgated at 86 Fed. Reg. 9,942 (Feb. 17, 2021);

b.   Issue nationwide preliminary and permanent injunctive relief enjoining Defendants from enforcing the February Order promulgated at 86 Fed. Reg. 9,942 (Feb. 17, 2021), and order Defendants to continue to apply the rules in place on January 19, 2021 to all covered aliens until Defendants amend such rules pursuant to the APA's notice-and-comment rulemaking and 30-day-notice requirements or pursuant to a lawful exception from those requirements;

c.   Declare that Defendants have a nondiscretionary duty under the APA and the Take Care Clause either to (i) return all covered aliens to Mexico under Title 42 or (ii) detain and quarantine under 8 U.S.C. § 1222(a) all aliens who could carry a communicable disease of public health significance for at least fourteen days before releasing them into the United States;

d.   Issue nationwide preliminary and permanent injunctive relief under the APA and the Take Care Clause enjoining Defendants from not applying Title 42 to all covered aliens until Defendants amend such rules pursuant to the APA;

e.   Issue nationwide preliminary and permanent injunctive relief under the APA and the Take Care Clause enjoining Defendants from failing to detain, quarantine, and test under 8 U.S.C. § 1222(a) all aliens arriving who could carry a

communicable disease of public health significance before releasing them into the United States;

   f. Award Texas the costs of this action and reasonable attorney's fees; and

   g. Award such other and further relief as the Court deems equitable and just.

Respectfully submitted on April 22, 2021,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Aaron F. Reitz*
AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 936-1989
aaron.reitz@oag.texas.gov

*/s/ Gene P. Hamilton*
Gene P. Hamilton*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

* Pending *pro hac vice* admission

*/s/ Christopher J. Hajec*
Christopher J. Hajec*
District of Columbia Bar No. 492551
Matt A. Crapo*
District of Columbia Bar No. 473355
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(540) 205-7986
litigation@irli.org

* Pending *pro hac vice* admission

*Counsel for the State of Texas*