IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

STATE OF TEXAS,

      Plaintiff,

v.

JOSEPH R. BIDEN, JR. et al.,

      Defendants.

Civil Action No. 4:21-CV-579-P

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

PRERAK SHAH
Acting United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

**Table of Contents**

I.     Introduction ........................................................................................................ 1

II.    Background ........................................................................................................ 4

     A.    CDC exercises its Title 42 authority to prohibit the introduction of certain persons into the country due to the COVID-19 pandemic. ........................ 4

     B.    Unaccompanied children are placed in ORR custody where they are quarantined and tested for COVID-19. ........................................................ 6

     C.    DHS fully comports with the requirements of CDC's October order and employs various public health measures to detect and prevent the spread of COVID-19. ................................................................................ 7

     D.    Texas files its complaint in April, does not effect service for over two months, and then moves for a preliminary injunction in June. ...................... 8

     E.    Texas rolls back state COVID-19 protocols. .......................................... 9

III.    Argument and Authorities ................................................................................ 10

     A.    Legal standards for a preliminary injunction. ....................................... 10

     B.    Texas cannot establish jurisdiction and thus is not entitled to any preliminary relief. ............................................................................ 12

          1.    Texas lacks standing. ............................................................... 12

               a.    Texas's claimed financial injuries do not give rise to an Article III injury. ................................................... 13

               b.    Texas has no *parens patriae* standing based on an alleged increased risk of COVID-19 to its residents. .................. 17

          2.    Judicial review is not available under the Administrative Procedure Act. ............................................... 22

               a.    The February 2021 notice is not final agency action. .................. 22

               b.    The challenged actions are committed to agency discretion. ....... 24

     C.    Even if jurisdiction could be assumed, Texas has not shown a likelihood of success on the two claims for which it argues that element is satisfied. .......... 28

1.    Texas's arguments that the February 2021 notice fails for a lack of "reasoned decision-making" are based on a misconception of what the notice does. ............................................................. 28

2.    Texas's arguments about state "reliance interests" are unavailing. .......... 29

D.    Texas has waived any right to obtain a preliminary injunction on the claims it references in the background section of its brief but does not specifically argue it has a likelihood of success on, and in any event, Texas is unlikely to succeed on those claims ......................................... 30

1.    Texas does not argue that it is likely to prevail on the merits of any claim that DHS fails to comply with the October order by failing to expel more families, but even if it did, Texas is not likely to succeed on that claim. .................................................. 31

2.    Texas does not argue that it has shown a likelihood of success on its 8 U.S.C. § 1222(a) claim, but in any event this claim would not support preliminary-injunctive relief either. ........................... 34

E.    Texas fails to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction. ............... 36

IV.    Conclusion ..................................................................................... 39

## Table of Authorities

### Cases

*Abrams v. Heckler*,
    582 F. Supp. 1155 (S.D.N.Y. 1984)......................................................................18

*Alabama ex rel. Baxley v. Tenn. Valley Auth.*,
    467 F. Supp. 791 (N.D. Ala. 1979).....................................................................18

*Alabama ex rel. Graddick v. Tenn. Valley Auth.*,
    636 F.2d 1061 (5th Cir. 1981) ............................................................................18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982)............................................................................................17

*Am. Airlines, Inc. v. Herman*,
    176 F.3d 283 (5th Cir. 1999) ............................................................................24

*Anglers Conservation Network v. Pritzker*,
    809 F.3d 664 (D.C. Cir. 2016) .....................................................................32, 33

*Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*,
    779 F. Supp. 2d 542 (W.D. Tex. 2011)..............................................................36

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014) .....................................................................13

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) .............................................................................13

*Bennett v. Spear*,
    520 U.S. 154 (1997)......................................................................................22, 23

*Black Fire Fighters Ass'n v. City of Dallas*,
    905 F.2d 63 (5th Cir. 1990) ...............................................................................10

*Bragdon v. Abbott*,
    524 U.S. 624 (1998)............................................................................................38

*California v. Texas*,
    141 S. Ct. 2104 (2021) ..................................................................................14, 16

*Canal Auth. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) .....................................................................2, 10, 11

*Clapper v. Amnesty Int'l USA,*
        568 U.S. 398 (2013)..................................................................................20

*Crane v. Johnson,*
        783 F.3d 244 (5th Cir. 2015) ...........................................................13, 14

*Crane v. Napolitano,*
        920 F. Supp. 2d 724 (N.D. Tex. 2013) ..................................................13

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
        490 F. Supp. 3d 1048 (N.D. Tex. 2020) ................................................24

*Elec. Privacy Info. Ctr. v. IRS,*
        910 F.3d 1232 (D.C. Cir. 2018).............................................................32

*Ellison v. Connor,*
        153 F.3d 247 (5th Cir. 1998) .................................................................27

*Encino Motorcars, LLC v. Navarro,*
        136 S. Ct. 2117 (2016)...........................................................................29

*Florida v. Weinberger,*
        492 F.2d 488 (5th Cir. 1974) .................................................................18

*Franklin v. Massachusetts,*
        505 U.S. 788 (1992)................................................................................22

*GoNannies, Inc. v. GoAuPair.Com, Inc.,*
        464 F. Supp. 2d 603 (N.D. Tex. 2006) ..................................................38

*Hamama v. Adducci,*
        912 F.3d 869 (6th Cir. 2018) .................................................................34

*Hamama v. Adducci,*
        946 F.3d 875 (6th Cir. 2020) .................................................................34

*Heckler v. Chaney,*
        470 U.S. 821 (1985)..................................................................24, 26, 32

*Holland Am. Ins. Co. v. Succession of Roy,*
        777 F.2d 992 (5th Cir. 1985) ...........................................................10–11

*Kansas ex rel. Hayden v. United States,*
        748 F. Supp. 797 (D. Kan. 1990)...........................................................18

*Lujan v. Defs. of Wildlife,*
        504 U.S. 555 (1992)................................................................................12

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ................................................................................17, 18

*Martinez v. Mathews*,
    544 F.2d 1233 (5th Cir. 1976) ..............................................................11

*Matter of E-R-M & L-R-M*,
    25 I&N 520 (BIA 2011) ..........................................................................35

*Missouri v. Illinois*,
    180 U.S. 208 (1901) ...............................................................................17

*Natural Res. Def. Council v. EPA*,
    464 F.3d 1 (D.C. Cir. 2006) ...................................................................21

*Nevada v. Burford*,
    918 F.2d 854 (9th Cir. 1990) .................................................................18

*Nken v. Holder*,
    556 U.S. 418 (2009) ...............................................................................38

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...........................................................................32, 33

*Pace v. Mayorkas*,
    No. 2:21-CV-50-Z, 2021 WL 2678362 (N.D. Tex. Mar. 25, 2021) ...................3, 21, 37

*Palacios v. DHS*,
    434 F. Supp. 3d 500 (S.D. Tex. 2020) ..................................................30

*P.J.E.S. v. Pekoske*,
    No. 20-5357 (D.C. Cir. Jan. 29, 2021) ....................................................6

*P.J.E.S. v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ...............................................6, 23–24

*Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs*,
    No. 4:15-CV-817-A, 2016 WL 543209 (N.D. Tex. Feb. 9, 2016) ...................27

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) .......................................................20, 21

*Qorane v. Barr*,
    919 F.3d 904 (5th Cir. 2019) .................................................................24

*Qureshi v. Holder*,
    663 F.3d 778 (5th Cir. 2011) ...........................................................22, 23

*S. Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020) ............................................................................26

*Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Envtl. Quality,*
    968 F.3d 419 (5th Cir. 2020) ...............................................19–20, 20

*Sierra Club v. EPA,*
    322 F.3d 718 (D.C. Cir. 2003) ................................................................18

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ................................................................................18

*Suntex Dairy v. Block,*
    666 F.2d 158 (5th Cir. 1982) .................................................................27

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................12

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) .....................................................18

*Texas v. United States,*
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ..............................................18, 38

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................15, 16

*Tex. Health & Human Servs. Comm'n v. United States,*
    166 F. Supp. 3d 706 (N.D. Tex. 2016) ..................................................36

*United States v. Becton,*
    632 F.2d 1294 (5th Cir. 1980) ...............................................................18

*United States v. Texas,*
    136 S. Ct. 2271 (2016) ...........................................................................15

*Wash. Utils. & Transp. Comm'n v. FCC,*
    513 F.2d 1142 (9th Cir. 1975) ...............................................................18

*Webster v. Doe,*
    486 U.S. 592 (1988) ...............................................................................24

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...........................................................................22, 23

*Wyoming ex rel. Sullivan v. Lujan,*
    969 F.2d 877 (10th Cir. 1992) ...............................................................18

Statutes, Rules, and Other Authorities

5 U.S.C. § 551(13) ........................................................................................33

5 U.S.C. § 701(a)(2) ..............................................................................  24, 32

5 U.S.C. § 701(b)(2) ......................................................................................33

5 U.S.C. § 702 ...............................................................................................22

5 U.S.C. § 704 ...............................................................................................22

5 U.S.C. § 706(1) ..........................................................................................32

8 U.S.C. § 1222(a) ............................................................................34, 35, 36

8 U.S.C. § 1229a .........................................................................................35

8 U.S.C. § 1232(a)(1) ......................................................................................6

8 U.S.C. § 1252(f)(1) ...............................................................................  34

42 C.F.R. § 71.40 .............................................................................5, 27, 28

42 C.F.R. § 71.40(a) .....................................................................................27

42 U.S.C. § 265 ...............................................................................4, 24, 25, 26

85 Fed. Reg. 17,060 (Mar. 26, 2020) ..............................................................4

85 Fed. Reg. 56,424 (Sept. 11, 2020) .................................................4–5, 28, 30

85 Fed. Reg. 65,806 (Oct. 16, 2020).................................4, 5, 8, 17, 28, 30, 32

86 Fed. Reg. 9942 (Feb. 17, 2021) ...........................................................5, 23

Fed. R. Civ. P. 4(i)(1)(A)................................................................................3

## I.      Introduction

The Court should deny Texas's motion for a preliminary injunction.  Texas asserts in its brief that the government defendants have "abandon[ed] . . . their authority to prevent the introduction of aliens who might carry COVID-19 into the United States."  (Doc. 22 at 3.)  As explained below, however, there is no support for that assertion, and Texas cannot show any valid basis for injunctive relief.

Texas's motion principally focuses on a February 2021 notice issued by the Centers for Disease Control and Prevention (CDC) that excepts certain unaccompanied noncitizen children from expulsion, as otherwise would be required by an October 2020 order that CDC issued under its "Title 42" authority.  But as detailed herein, such children are subject to strict COVID-19 protocols, including repeated tests and quarantine periods to ensure that they are not COVID-19 positive when eventually released to their sponsors.  Tellingly, Texas identifies no evidence of any widespread COVID-19 outbreak tied to unaccompanied children during the nearly five months since the February notice was issued.  Although Texas also criticizes the government for not expelling certain "family units" under the October 2020 order, it again cites no evidence of increased COVID-19 infections tied to such families.  That is not surprising because various public health measures are in place to avoid any COVID-19 spread by these families.

Indeed, the state's own conduct contradicts any genuine concern that the government's challenged actions are somehow increasing the spread of COVID-19.  Over the last several months, Texas has loosened and now abolished virtually all COVID-19-related restrictions within the state, including any required precautionary measures like occupancy limits and mask requirements.  Per an executive order issued by Governor Greg Abbott on May 18, 2021, it is now *illegal* for state or local government entities to even require masks in their own facilities

(with limited exceptions for things like prisons).  Thus, Texas's own real-world actions—not to mention its substantial delay in filing its motion more than four months after the February notice and two months after filing suit—flatly contradict its assertion of public-health-related harm.

Texas also tries to rely on a generalized grievance that, even if true, would not be caused by the challenged actions.  The state essentially claims that, because of the government's actions, more noncitizens will reside in Texas, and their presence will increase Texas's expenses in providing various public benefits.  But Texas has not shown that to be the case.  Moreover, it is apparent from Texas's motion that Texas generally disagrees with much of federal immigration policy (or at least with Texas's own characterization of that policy), and would like to use this litigation as a means to contest those broader immigration policies.  The issue before this Court, however, is far narrower and represents a challenge to the execution of a CDC public-health-related order under Title 42—not federal immigration policy generally.  Notably, in requesting a preliminary injunction, Texas relies only on counts 1 and 2 of its complaint relating to the February notice in arguing for a likelihood of success on the merits.  In particular, Texas relies on its Administrative Procedure Act (APA) claims that (1) no "reasoned explanation" was provided for excepting unaccompanied children from expulsion, and (2) "state reliance interests" were not considered.[1]  (Doc. 22 at 16–20; *see also* Doc. 1, ¶¶ 84–98 (complaint).)

Neither ground supports the "extraordinary" and "drastic" remedy of a preliminary injunction.  *See Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).  At the outset, Texas faces serious jurisdictional obstacles, and has not shown a particularized injury that is fairly traceable to the challenged government action, as necessary to establish standing.  Texas

---

[1] Although Texas's preliminary-injunction brief further asserts that the government similarly failed to consider the state's reliance interest when it allegedly "ceas[ed] the Title 42 process for [noncitizen] family units," (Doc. 22 at 19), no such claim is included in the complaint.

also has not shown an imminent risk of suffering irreparable harm to be entitled to preliminary-injunctive relief, a showing that is significantly higher than its burden to show standing. Texas's motion can be denied on that ground alone. That is exactly the approach that Judge Kacsmaryk recently took in the very similar *Pace* litigation in the Amarillo Division. There, a county judge and two other Texas residents challenged CDC's February notice under theories very similar to Texas's—that the notice purportedly increases the public's (and thus those plaintiffs') risk of contracting COVID-19 and strains the local community's public health resources. Several months ago, Judge Kacsmaryk *sua sponte* denied the plaintiffs' motion for a temporary restraining order, explaining that the plaintiffs had not shown any irreparable harm to justify that "drastic remedy." *Pace v. Mayorkas*, No. 2:21-CV-50-Z, 2021 WL 2678362, at *3 (N.D. Tex. Mar. 25, 2021). The case is proceeding on a normal schedule, and the government's Rule 12(b)(1) motion to dismiss is now fully briefed and awaiting decision.

It is respectfully submitted that the same approach is appropriate here—Texas's motion should be denied based on Texas's failure to establish irreparable harm (or any of the other preliminary-injunction elements), and the case should proceed in the normal course. The absence of irreparable harm is highlighted by the fact that Texas only very recently even served a copy of the complaint on the U.S. Attorney and waited over two months after filing suit to file its preliminary-injunction motion. Furthermore, CDC continues its assessment of the ongoing changing conditions of the COVID-19 pandemic and is considering issuing an order addressing the subject of the February notice, which may materially impact this litigation. Any such development may occur before the government's responsive-pleading deadline.[2] Regardless, Texas has not met its burden to obtain a preliminary injunction.

---

[2] The U.S. Attorney has not been served with summons for any defendant. *See* Fed. R. Civ. P. 4(*i*)(1)(A).

## II.   Background

**A.   CDC exercises its Title 42 authority to prohibit the introduction of certain persons into the country due to the COVID-19 pandemic.**

Section 265 of Title 42 of the United States Code authorizes CDC[3] to prohibit the introduction into the United States of "such persons and property" determined by CDC to increase the serious danger of the spread of a communicable disease.  42 U.S.C. § 265.  In light of the COVID-19 pandemic, CDC exercised its Title 42 authority in March 2020 by issuing an interim final rule and an order temporarily suspending the introduction into the country of certain noncitizens traveling from Canada and Mexico.  *See* 85 Fed. Reg. 17,060 (Mar. 26, 2020).  The March 2020 order authorized the expulsion of covered noncitizens to the country from which they entered the United States, their country of origin, or another location as quickly as practicable.  *Id.* at 17,067.  With certain exceptions, the order applied to "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting" at or near the border—typically noncitizens "who lack valid travel documents."  *Id.* at 17,061.  Such individuals, the order explained, may spend hours or days in congregate settings while undergoing immigration processing, but the ports of entry and U.S. Border Patrol stations are "not designed for, and are not equipped to, quarantine, isolate, or enable social distancing."  *Id.*  The March 2020 order was subsequently extended multiple times.

In October 2020, CDC issued a new Title 42 order to replace the March 2020 order (as amended and extended).  *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020).  (A month earlier, CDC had promulgated a final rule to establish a new regulation governing the use of its Title 42 authority—the October order was then issued pursuant to that regulation.  *See* 85 Fed. Reg.

---

[3] The statute refers to the Surgeon General, but authority was later transferred to the CDC Director.

56,424 (Sept. 11, 2020) (establishing 42 C.F.R. § 71.40).)  The October order explained that it was "substantially the same as the amended and extended March 20, 2020 Order" and was necessary to continue to protect against the introduction of COVID-19 into the ports of entry and U.S. Border Patrol stations "at or near the United States borders with Canada and Mexico."  85 Fed. Reg. at 65,808.  The order also noted the "dynamic nature" of the COVID-19 pandemic and explained that CDC "retain[ed] the authority to extend, modify, or terminate the Order, or implementation of this Order, at any time as needed to protect public health."  *Id.* at 65,809 n.9, 65,812.

As was true under the March 2020 order, the October 2020 order contains several exceptions.  As relevant here, the order "does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  *Id.* at 65,808.  The order further provides that the Department of Homeland Security (DHS) "shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments."  *Id.*  The order also does not apply to any noncitizens who "must test negative for COVID-19 before they are expelled directly to their home country."  *Id.*

On February 11, 2021, CDC gave notice that it had decided to temporarily except one subcategory of noncitizens covered by the October order—unaccompanied children encountered in the United States—from expulsion from the country pending a forthcoming reassessment of the October order.  *See* 86 Fed. Reg. 9942 (Feb. 17, 2021).  CDC explained in the February notice that the COVID-19 pandemic continues to be a highly dynamic public health emergency,

and that CDC is in the process of reassessing the October order based on the most current information regarding the pandemic and the situation at the country's borders. *Id.* The expulsion of unaccompanied children under the October order previously had been enjoined by the U.S. District Court for the District of Columbia in November 2020. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020), *appeal pending*, No. 20-5357 (D.C. Cir.). That injunction was stayed by the D.C. Circuit on January 29, 2021. Order, *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021). As noted above, CDC then issued the challenged February 2021 notice.

The practical effect of the February notice is that unaccompanied children encountered in the United States are no longer subject to expulsion from the country under the October order and are, instead, processed under the immigration provisions in Title 8 of the U.S. Code. Specifically, such children are processed under the provisions of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), which, among other things, establishes a framework of "policies and procedures to ensure that unaccompanied alien children in the United States are safely repatriated to their country of nationality or of last habitual residence." 8 U.S.C. § 1232(a)(1). As the statutory language suggests, the TVPRA does not guarantee that such children will be permitted to stay in the United States permanently. The TVPRA instead puts in place certain requirements for the treatment of unaccompanied children, including a requirement that such children are generally transferred to the custody of the U.S. Department of Health and Human Services' Office of Refugee Resettlement (ORR) while they await placement with a suitable sponsor and further immigration proceedings. *See id.* § 1232; *see also P.J.E.S.*, 502 F. Supp. 3d at 502 (discussing the TVPRA's procedures).

**B.    Unaccompanied children are placed in ORR custody where they are quarantined and tested for COVID-19.**

In consultation with CDC, ORR has a number of public health protocols in place to detect

and prevent the spread of COVID-19 among unaccompanied children placed in its care.  When unaccompanied children initially enter ORR custody, they are quarantined and tested at least twice for COVID-19 prior to release from quarantine.  (App.[4] 014–15.)  Children who test positive for COVID-19 are kept in medical isolation until they meet CDC's criteria to discontinue isolation, and children with potential exposure to a COVID-19 case at any time are quarantined for seven days and are released from quarantine only upon the receipt of a negative test result after an observation period of at least five days.  (App. 015.)

As of May 23, 2021, there were 108 children in ORR's Texas permanent shelters who were in medical isolation due to a COVID-19 diagnosis, out of a total population in these shelters of 3,680.  (App. 016.)  In addition, as of June 29, 2021, there were 421 COVID-19-positive children in ORR's temporary "ICF/EIS" facilities located in Texas, out of a total population of 3,825 in these shelters.  (App. 017.)

**C.     DHS fully comports with the requirements of CDC's October order and employs various public health measures to detect and prevent the spread of COVID-19.**

DHS's processing of noncitizen families—including those families that cross between ports of entry—complies with the October order.  (App. 020.)  However, in some cases, expulsions are not possible or are not authorized by the order.  (*See* App. 020–21.)  Notably, DHS cannot carry out Title 42 expulsions without the cooperation of foreign governments to accept the return of the individuals whom the U.S. government intends to expel.  (App. 020.)  Along the southern border, Mexico has placed various limitations on the specific nationalities and demographics (e.g., families with young children) that it will accept for return, which has in turn limited DHS's ability to assist in enforcing the October order.  (App. 020.)  Such

---

[4] "App. __" citations refer by page number to the materials in the accompanying appendix.

determinations are made on a case-by-case basis, in accordance with the October order that—presumably in recognition of this reality—explicitly grants DHS the discretion to determine whether any noncitizen otherwise covered by the order should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests.

Other countries have similarly put in place limitations that effectively prevent the timely expulsion of persons to such countries pursuant to Title 42, for example by requiring travel documents or manifest requirements that can take weeks to satisfy.  (App. 021.)  Importantly, the October order does not apply to any noncitizens "who must test negative for COVID-19 before they are expelled to their home country."  85 Fed. Reg. at 65,807.  Many foreign countries have required testing as a condition for accepting families or other individuals.  (App. 021.)  The October order does not authorize expulsions pursuant to Title 42 in those cases—in other words, DHS lacks the authority to expel pursuant to Title 42 in these circumstances.

Pursuant to the discretionary authority granted by CDC in the October order, DHS also has excepted particularly vulnerable families from the order at ports of entry, based on the individual circumstances of those noncitizens.  (App. 021.)  Working with certain non-governmental organizations at specified ports of entry, DHS has established a process to identify, on a case-by-case basis, particularly vulnerable families and facilitate their processing at the border, and consulted with CDC to ensure compliance with public health guidance.  (App. 021.)  Noncitizens identified pursuant to this process are allowed to present at a port of entry only if they have first tested negative for COVID-19.  (App. 021–22.)

**D.    Texas files its complaint in April, does not effect service for over two months, and then moves for a preliminary injunction in June.**

In its complaint filed on April 22, 2021, Texas primarily asserts claims challenging the

February 2021 notice under the APA (counts 1–5), but also brings claims challenging DHS's decisions to except certain families from the October order and DHS's purported failure to detain arriving noncitizens at ports of entry as necessary to prevent the introduction of COVID-19 into the country (counts 6 and 7), as well as a claim under the Take Care Clause of the Constitution (count 8). (Doc. 1, ¶¶ 84–140.)

After filing suit, Texas allowed over two months to lapse without serving the U.S. Attorney, which would have triggered the 60-day clock for the government's response to the complaint. *See* Fed. R. Civ. P. 12(a)(2). On June 23, 2021, counsel for Texas reached out to lawyers at the Department of Justice (apparently known to Texas's counsel from work in other cases) to announce Texas's intention to seek a preliminary injunction. At that time, the U.S. Attorney had not even been served with the case, and it was only after undersigned counsel reached out to counsel for Texas that Texas served the complaint (but no summonses) on the U.S. Attorney later that same day. The preliminary-injunction motion was then filed that afternoon. (Doc. 22.) The motion relies on only counts 1 and 2 of the complaint—both focused on CDC's February notice—in attempting to show some likelihood of success on the merits. (*Compare* Doc. 22 at 16–20 (preliminary-injunction arguments that the February notice was arbitrary and capricious, and that the government did not consider "state reliance interests"), *with* Doc. 1, ¶¶ 84–98 (corresponding counts of the complaint for these issues).)

### E.  Texas rolls back state COVID-19 protocols.

Since CDC issued the challenged February notice, Texas has independently taken steps to relax or lift all COVID-19-related restrictions in the state. On March 2, 2021 (Texas Independence Day), Governor Greg Abbott announced that Texas is "OPEN 100%" and by executive order removed essentially all COVID-19-related limits on businesses and other

establishments within the state.  (App. 002–07.)  The following week, Texas Attorney General

Ken Paxton sued Travis County and the City of Austin to force them to rescind local mask

requirements.[5]  And more recently, on May 18, 2021, the governor issued a second executive

order that bars essentially all state or local government officials from requiring masks or face

coverings.  (App. 008–11.)  Since February 2021, new COVID-19 cases and deaths have

dramatically decreased across Texas, as shown by the charts below from the Texas Department

of Health and Human Services (red lines added to mark the beginning of February):

New Confirmed Cases                    Fatalities

 (App. 001 (printout of "trends" tab of TDHHS's COVID-19 online "dashboard," from which

these charts are excerpted).)

### III.   Argument and Authorities

#### A.   Legal standards for a preliminary injunction.

A preliminary injunction is an "extraordinary and drastic remedy."  *Canal Auth. v.*

*Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).  As such, it is "not to be granted routinely, but only

when the movant, by a clear showing, carries [the] burden of persuasion."  *Black Fire Fighters*

*Ass'n v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) (quoting *Holland Am. Ins. Co. v.*

---

[5] *See* Houston Keene, *Texas AG Paxton sues City of Austin for not lifting mask mandate*, Fox News,
https://www.foxnews.com/politics/texas-ag-paxton-sues-state-capital-and-county-for-not-lifting-mask-
mandate (Mar. 11, 2021).

*Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  "The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest."  *Canal Auth.*, 489 F.2d at 572.  A preliminary injunction should be granted only if the movant has "clearly" carried the burden of persuasion on all four of these prerequisites.  *Id.* at 573.

Moreover, the "primary justification" of a preliminary injunction is to "preserve the court's ability to render a meaningful decision on the merits."  *Id.*  That is relevant here because Texas is actually seeking a change in the status quo, i.e., a mandatory injunction that would not merely restrain or enjoin the government from doing something, but rather would require it to take specific action.  Among other things, Texas's proposed injunction would require the government to take the affirmative step of using CDC's Title 42 authority to expel all unaccompanied children encountered in the country (unless a case-by-case exception applied, presumably).  (*See* Doc. 21-1 at 1 (proposed-order language requiring the government to "resume activities in furtherance of [CDC's] October Order" including by "applying Title 42 to all covered aliens arriving at the United States Border, without categorically excepting classes of people, whether families, unaccompanied minors, or others").)  Such mandatory preliminary relief that goes beyond maintaining the status quo "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."  *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

**B.**     **Texas cannot establish jurisdiction and thus is not entitled to any preliminary relief.**

**1.**     **Texas lacks standing.**

Article III limits federal-court jurisdiction to actual "cases" or "controversies" by requiring a plaintiff to establish standing by showing "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood] that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In addition, when "the plaintiff is not himself the object of the government action or inaction he challenges, standing is . . . substantially more difficult to establish." *Defs. of Wildlife*, 504 U.S. at 562 (internal quotation marks and citation omitted).  This is relevant here because neither the October order nor the February notice governs Texas's conduct, nor does any immigration-related activity of the government referenced in the complaint operate directly upon Texas. Thus, Texas faces a "substantially more difficult" burden to establish standing.  *See id.*

Texas nonetheless asserts that it has standing under a two-fold theory.  It first says that the government's actions will cause a "financial injury to Texas itself in the form of increased costs from the influx of illegal aliens." (Doc. 22 at 27.)  And it next claims that there is a "public-health injury to citizens of Texas—and thus to Texas as *parens patriae*—in the form of unnecessary and unlawful exposure to COVID-19 from untested and unquarantined illegal aliens." (Doc. 22 at 27–28.)  But as explained below, neither alleged injury satisfies Article III.[6]

---

[6] The standing discussion herein focuses on the specific claims that Texas argues support the likelihood-of-success element for obtaining a preliminary injunction, i.e., Texas's claims that the February notice was not supported by a reasoned explanation and that the government failed to consider "state reliance interests."  (*See* Doc. 22 at 16–20.)  Elsewhere in its brief, Texas discusses alleged harms associated with its contentions that DHS is excepting families in purported noncompliance with the October order and is allegedly not properly detaining noncitizens arriving at the ports of entry to detect and prevent the

### a.   Texas's claimed financial injuries do not give rise to an Article III injury.

Texas first fails to allege any cognizable, non-speculative injury in fact based on its claims of threatened financial harm.  According to Texas, "[a]liens are coming across the border every single day at an ever-increasing rate" and "the number of aliens coming to Texas's southern border has only continued to grow since the February 2021 [notice], which necessarily increases costs to Texas."  (Doc. 22 at 22, 28.)  Texas cites various alleged costs in its brief, including for driver's licenses, state-supported healthcare services and education, and incarcerating "persons convicted of criminal offenses in Texas, including illegal aliens."  (Doc. 22 at 26.)  But Texas's attempt to base standing on increased state costs fails for two reasons.

First, this alleged budgetary injury is nothing more than a generalized grievance.  A "state official has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws."  *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).  Thus, generalized contentions that "illegal immigration is costing the state money" do not confer standing.  *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (emphasis removed), *aff'g Crane v. Napolitano*, 920 F. Supp. 2d 724 (N.D. Tex. 2013) (O'Connor, J.).

Second, Texas fails to show that any of its alleged financial harms arising from a generalized increase in illegal immigration, based on third-party actions and likely influenced by multiple factors, are fairly traceable to the February notice.  "[W]here a causal relation between

---

entrance of COVID-19-carrying noncitizens.  But because Texas's likelihood-of-success arguments do not actually include these claims, it is not necessary to discuss whether Texas has standing for them.

injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotation marks and citation omitted).

Texas's argument in this case is substantively identical to the generic budgetary complaints that the Fifth Circuit addressed—and rejected—in *Crane*, in which the State of Mississippi[7] challenged a specific federal immigration action under a theory that "the state provides social benefits to illegal immigrants," and that the costs of these benefits would increase. *Crane*, 783 F.3d at 252. Without "concrete evidence" that state "costs had increased or will increase *as a result*" of the particular action at issue, the alleged injury was "purely speculative," the Fifth Circuit explained, and Mississippi therefore lacked standing. *Id.* (emphasis added). The same is true here—Texas complains of alleged costs associated with illegal immigration generally, but a specific link to the February notice itself, or any other government action at issue in this litigation, is absent.

Notably, the Supreme Court just rejected—on causation grounds—very similar arguments urged by Texas and other states that were attempting to establish standing to challenge the Affordable Care Act's "individual mandate" under a theory that the mandate costs the states money in administering their healthcare systems. *California*, 141 S. Ct. at 2117–18. The Supreme Court found these claims insufficient because the states failed to trace any increased costs to the challenged provision (which no longer has any effect and is unenforceable) and because other factors likely motivated individual decisions to obtain health insurance and to access other state-supported services addressed by other portions of the law that were not being challenged. *Id.* at 2117–18. The same holds true here—Texas's fiscal-injury allegations in this

---

[7] Notwithstanding that Mississippi was a plaintiff, *Crane* was litigated in the Northern District of Texas.

case are no more specifically tied to the February notice than the allegations of additional healthcare costs were tied to the individual-mandate provision at issue in *California v. Texas*. It is also true, in the same way noted by the Supreme Court in *California v. Texas* that any number of factors drive individuals' decisions to enroll in state-subsidized healthcare programs, that myriad factors influence the ebbs and flows of migration into the United States and into Texas.

A comparison to the *Texas v. United States* litigation cited in Texas's brief is also instructive and actually shows why no cognizable injury traceable to the February notice exists here. (*See* Doc. 22 at 28 (citing *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016)).) Texas suggests that *Texas v. United States* stands for a broad proposition that "costs imposed by federal immigration policies give Texas standing to challenge the lawfulness of those policies." (Doc. 22 at 28.) But at issue in *Texas v. United States* was a DHS memo that made millions of undocumented noncitizens eligible to receive "lawful presence" classification. *Texas*, 809 F.3d at 148. This classification carried "significant legal consequences," the Fifth Circuit explained, including the ability to receive various federal and state benefits. *Id.* As a direct result of the challenged program, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), "at least 500,000 illegal aliens in Texas" would become eligible to receive driver's licenses, at a cost of "several million dollars" to the state because of how licenses are subsidized. *Id.* at 155. "DAPA would be the primary cause and likely the only one" of this "dramatic increase in the costs of the driver's-license program," and therefore the Fifth Circuit found these increased costs to be a sufficiently particularized and causally-connected injury creating standing. *Id.* at 160.

Here, in contrast, the February notice does not confer any form of immigration status on anyone. It merely reflects CDC's decision to except unaccompanied children encountered in the

United States from the group of persons subject to physical expulsion from the country under the October order, leaving the children to be processed under the immigration laws that would apply absent CDC's exercise of Title 42 authority.  This is a critical distinction with the DAPA program at issue in *Texas v. United States*—there, the recipients of DAPA relief obtained a tangible immigration benefit *from the program itself*, in the form of lawful presence.  The February notice provides no such benefit or change in the legal classification of unaccompanied children.  Such children instead remain subject to other longstanding immigration laws of general application, including the TVPRA and various provisions of the Immigration and Nationality Act (INA).  But Texas does not challenge these laws, and if any particular unaccompanied child does later gain some immigration status, it will be by operation of these laws and not the February notice.  In turn, if Texas is later obligated to provide some public service because of a changed immigration status, that obligation would arise from another provision of law and thus is not caused by the February notice.  *See California*, 141 S. Ct. at 2119 (no causation when "other provisions of [law], not the [challenged] provision, impose these other requirements" that affected the state's pocketbook).  Accordingly, the February notice can in no way be labeled "the primary cause and likely the only one" of any future, speculative costs that Texas might incur in connection with state services it provides to its residents.  *Texas*, 809 F.3d at 160.

Texas's inability to link its claimed injuries specifically and directly to the February notice implicates the Supreme Court's recent warning in *California v. Texas* that an Article III injury may not be manufactured by complaining of "pocketbook injuries" that arise not as a result of the law being challenged, but rather from "other provisions [that] operate independently."  *California*, 141 S. Ct. at 2119, 2119–20.  Texas's claims here suffer from this

same defect. It is evident from its briefing that Texas's real gripe is not with the February notice, but rather with federal immigration policy and enforcement decisions writ large—as well as the pocketbook impact stemming from the state's "constitutional obligation to provide free education to unlawfully present aliens" and other statutory mandates to provide various public services for and benefits to certain groups of people. (*See* Doc. 22 at 24–27.) Yet Texas does not challenge any of these laws. In sum, Texas cannot claim that its alleged injury is fairly traceable to the February notice.[8]

      **b.**      **Texas has no *parens patriae* standing based on an alleged increased risk of COVID-19 to its residents.**

Texas's second argument for standing is based not on any injury to itself but on an alleged increased risk of COVID-19 to Texas residents due to the "unnecessary and unlawful exposure to COVID-19 from untested and unquarantined illegal aliens." (Doc. 22 at 28.) As a threshold matter, while a state generally may sue to protect the health and well-being of its residents as *parens patriae*, the Supreme Court has made clear that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923), and *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)). As the Court explained in *Massachusetts v. Mellon*, "it is no part of [a state's] duty or power to

---

[8] Furthermore, even if Texas had sought to establish a likelihood of success on any claim relating to DHS's treatment of families, all of these same considerations also preclude Texas from establishing Article III standing based on that kind of claim. As discussed above, DHS is making case-by-case determinations to except some families from the October order and instead process them using Title 8 procedures that regularly apply outside of the Title 42 context. (*See* pp. 7–8, *supra*.) Not only is this entirely consistent with, and expressly allowed by, the terms of the October order, *see* 85 Fed. Reg. at 65,808, but in addition, for all of the same reasons that the use of Title 8 procedures for unaccompanied children does not confer standing on Texas, Texas also cannot show standing to challenge any of DHS's determinations to place specific families in Title 8 proceedings.

enforce [its citizens'] rights in respect of their relations with the federal government." 262 U.S. at 485–86; *see also id.* at 486 (explaining that "[i]n that field it is the United States, and not the state, which represents them as *parens patriae*"); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (state lacked *parens patriae* standing in suit against the government).[9]

Even if Texas could assert *parens patriae* standing against the government, Texas's own explanation of this alleged injury shows why that injury, even if assumed to exist, cannot support Texas's *parens patriae* standing to challenge the February notice. That is so because Texas can point to nothing in the February notice that causes any member of the public to be "expos[ed] to COVID-19 from *untested and unquarantined illegal aliens*." (Doc. 22 at 28 (emphasis added).) Instead, the opposite is true—children to whom the February notice applies *are* uniformly tested for COVID-19 and quarantined and/or isolated consistent with public health protocols.

Specifically, and as discussed above, the effect of CDC's decision announced in the February notice is that unaccompanied children are excepted from the Title 42 process and are

---

[9] Any confusion that existed before *Snapp* on this question, *see, e.g.*, *Alabama ex rel. Graddick v. Tenn. Valley Auth.*, 636 F.2d 1061, 1064 (5th Cir. 1981); *Florida v. Weinberger*, 492 F.2d 488 (5th Cir. 1974), "must, of course, give way to the Supreme Court's clear statement in *Snapp*." *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990). Texas relies on an opinion that declined to follow *Snapp*'s clear statement on the basis that it is dictum. *See Texas v. United States*, 328 F. Supp. 3d 662, 696 (S.D. Tex. 2018). However, "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003). Thus, the Fifth Circuit has recognized that while it is generally "not bound by dicta," "[d]icta of the Supreme Court are, of course, another matter." *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

Texas also relies on another decision finding *parens patriae* standing, *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015). But that decision also relied on cases that were not good law. For example, it cited *Washington Utilities & Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir. 1975), and district court cases relying on *Washington Utilities*, such as *Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984), and *Alabama ex rel. Baxley v. Tennessee Valley Authority*, 467 F. Supp. 791 (N.D. Ala. 1979). But the Ninth Circuit overruled *Washington Utilities* because of *Snapp*. *Burford*, 918 F.2d at 858. Similarly, two years after *Kansas ex rel. Hayden v. United States*, 748 F. Supp. 797 (D. Kan. 1990), another case cited in *Texas*, the Tenth Circuit followed *Snapp* and "accept[ed] the argument" that "the State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens." *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).

instead processed under the immigration laws that apply to them under Title 8, most notably the TVPRA. Under the terms of that law (which long predates the COVID-19 pandemic and which Texas does not challenge), certain unaccompanied children are transferred to the custody of ORR. Since the pandemic began, ORR has employed a number of testing and quarantining protocols to detect and prevent the spread of COVID-19 among children placed in its care. (*See* pp. 6–7, *supra* (citing App. 014–15).) Thus, even if Texas does believe that it or its residents are incurring some injury from exposure to "untested and unquarantined illegal aliens," (Doc. 22 at 28), no causal connection to the February notice is shown, and thus standing cannot be established on this basis. Indeed, despite the fact that unaccompanied children encountered in the United States largely have not been subject to Title 42 expulsions at all since November 2020 (due at first to the *P.J.E.S.* injunction and then the February notice), Texas pleads no facts showing that the presence of unaccompanied children in Texas who were processed under Title 8 during that time has caused any increase in the risk of COVID-19 in the state or has otherwise strained Texas's healthcare system. The same is also true to the extent Texas asserts an injury to its residents based on DHS's case-by-case decisions to process some families under Title 8 rather than Title 42. As discussed above, families who are evaluated and referred by non-governmental organizations are tested for COVID-19 before they are allowed to present at ports of entry. (*See* pp. 7–8, *supra*.)

Moreover, the claimed injury to Texas's residents is speculative at best and certainly not imminent and impending. Texas faces a heavy burden to establish standing based not on an actually sustained injury, but rather on an alleged increased risk of harm. The Fifth Circuit "do[es] not recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'—that is, an increased risk that equally affects the general public." *Shrimpers &*

*Fishermen of the RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020).

Quoting a D.C. Circuit decision by then-Judge Kavanaugh, the court explained why:

> "Much government regulation slightly increases a citizen's risk of injury—or insufficiently decreases the risk compared to what some citizens might prefer." "Opening the courthouse to these kinds of increased-risk claims would drain the 'actual or imminent' requirement of meaning," "expand the 'proper—and properly limited'—constitutional role of the Judicial Branch beyond deciding actual cases or controversies," and "entail the Judiciary exercising some part of the Executive's responsibility to take care that the law be faithfully executed."

*Id.* (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295

(D.C. Cir. 2007)) (internal citations omitted).  To guard against improper exercise of federal-

court jurisdiction beyond that allowed by Article III for actual cases and controversies, a

plaintiff's increased-risk-of-harm claim must, at a minimum, be concrete and particularized to

some particular person.  *See id.*  Here, though, Texas is at most claiming only "an increased risk

that equally affects the general public," which per the Fifth Circuit is insufficient.  *See*

*Shrimpers*, 968 F.3d at 424.  Moreover, Texas's own data shows that COVID-19 cases and

deaths have declined dramatically in recent months—and based on its recent actions, Texas's

own interpretation of the situation appears to be that the risk of COVID-19 in the state is

decreasing, not increasing.  (*See* pp. 9–10, *supra*; App. 001–11.)

Furthermore, even if Texas could show some concrete, particularized increased-risk-of-

harm, this alleged injury "also must be actual or imminent."  *Shrimpers*, 968 F.3d at 424

(citations omitted).  "The 'actual or imminent' requirement is satisfied only by evidence of a

'certainly impending' harm or a 'substantial risk' of harm."  *Id.* (quoting *Clapper v. Amnesty*

*Int'l USA*, 568 U.S. 398, 412 (2013)).  The "constitutional requirement of imminence as

articulated by the Supreme Court . . . necessarily compels a very strict understanding of what

increases in risk and overall risk levels can count as 'substantial'" so as to establish standing.

*Pub. Citizen*, 489 F.3d at 1296.

Texas has not identified any substantial or certainly impending COVID-19-related harm to its own residents associated with the February notice or any other government action challenged in the complaint.  To the contrary, Texas's claimed injury depends on a speculative chain of events, including that

- a child who otherwise would not have qualified for an exception to the October order but was excepted from expulsion under the February notice would need to

- enter ORR custody with COVID-19 or become infected while in ORR custody and then

- be released to a sponsor while COVID-19 positive and contagious (notwithstanding ORR's testing and quarantine procedures designed to prevent precisely that) and then

- behave in a way that exposes the Texas public to the virus, presumably through personal interaction, notwithstanding any other health precautions that members of the public might take.

Such speculation cannot confer an Article III injury on Texas.  And Texas needs to rely on a similar speculative chain of inferences to try to claim any injury from a family that has been excepted from the October order.  "Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury."  *Pub. Citizen*, 489 F.3d at 1294 (quoting *Natural Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006)).  Because Texas's claimed increased-risk-of-COVID-19 injury is speculative and not actual or imminent, no standing exists.  *Cf. Pace*, 2021 WL 2678362, at *3 (finding no irreparable harm because the plaintiffs' theory of an increased risk of contracting COVID-19 relied on an "unsupported proposition" and "*unsubstantiated* statements").

### 2.     Judicial review is not available under the Administrative Procedure Act.

Texas's two claims for which it argues for a likelihood of success—each relating to the February notice—are premised on the APA.  (*See* Doc. 22 at 16–20.)  But as discussed below, even if Article III standing were established, no review is available under the APA because no final agency action is shown and the matter at issue is committed to agency discretion.

### a.     The February 2021 notice is not final agency action.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  But such review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Thus, in this case where no other statute authorizes judicial review of Texas's challenges to the February notice, review under the APA is available only if the agency action at question is a "final" one.  *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

An agency action is considered final under the APA when two requirements are met.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  "First, the action must mark the 'consummation' of the agency's decisionmaking process," such that the action is not "merely tentative or interlocutory."  *Id.* (citation omitted).  Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* at 178 (citation omitted).  The Supreme Court has underscored that "[a]n agency action is not final if it is only . . . 'tentative,'" and that the "core question is whether the agency has completed its decisionmaking process."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (citation omitted).  "Only if the '[agency] has rendered its last word on the matter' in question . . . is its action 'final' and thus reviewable."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)

(citation omitted).  An intermediate step in an administrative process "cannot be viewed as a 'consummation' of agency decisionmaking."  *Qureshi*, 663 F.3d at 781.

Texas devotes only a single sentence to finality in its brief, asserting without any further explanation that the February notice "is a final agency action."  (Doc. 22 at 17.)  But the February notice makes clear on its face that, far from representing CDC's final decision, it is at most "tentative or interlocutory" and does not represent the consummation of any decisionmaking process.  *See Bennett*, 520 U.S. at 178.  The notice states that CDC "has decided to exercise its discretion to temporarily except from expulsion unaccompanied noncitizen children encountered in the United States pending the outcome of its forthcoming public health reassessment of the [October 2020] Order."  86 Fed. Reg. at 9942.  It further explains that the President had signed an executive order requiring a "review of the [October] Order to determine whether [that] Order should be terminated, rescinded, or modified," and that CDC would be "reassessing the overall public health risk at the United States' borders and its [October order] based on the most current information regarding the COVID-19 pandemic as well as the situation at the Nation's borders."  *Id.*  Simply put, the agency has not "rendered its last word on the matter."  *Whitman*, 531 U.S. at 478 (citation omitted).

Although the court need not proceed further since at least one of the two elements is not met, the second requirement for finality is not satisfied either.  Texas identifies no way in which the February notice determines any legal rights or obligations, or otherwise gives rise to legal consequences of the type that would support judicial review.  The notice does not guarantee any permanent or even temporary legal immigration status to any unaccompanied child covered by the order.  Instead, such children are subject to immigration proceedings and possible removal from the country under the existing sources of law that normally apply to them.  *See P.J.E.S.*,

502 F. Supp. 3d at 501–02.  Under Fifth Circuit precedent, an administrative decision that merely

has the effect of "prolonging the administrative process" is not considered a final agency action.

*See Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 490 F. Supp. 3d 1048, 1058 (N.D. Tex. 2020)

(O'Connor, J.) (discussing *Am. Airlines, Inc. v. Herman*, 176 F.3d 283 (5th Cir. 1999)).  That is

essentially what has occurred here—any unaccompanied child covered by the February notice is

subject to the normal immigration process, including Title 8 proceedings that may ultimately

result in his or her removal from the country.  No final determination of any legal rights or

obligations has occurred.

> **b.**      **The challenged actions are committed to agency discretion.**

Yet another reason that Texas's APA claims have no chance of success on the merits is

that the February notice represents an exercise of decisionmaking that is committed to agency

discretion.  The APA does not extend to the review of actions committed to agency discretion by

law.  5 U.S.C. § 701(a)(2); *see also Qorane v. Barr*, 919 F.3d 904, 911–12 (5th Cir. 2019).  As

explained by the Supreme Court, judicial review is not available "if the statute is drawn so that a

court would have no meaningful standard against which to judge the agency's exercise of

discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Determining whether a decision is committed to agency discretion and thus unreviewable

under the APA "requires careful examination of the statute on which the claim of agency

illegality is based."  *Webster v. Doe*, 486 U.S. 592, 600 (1988).  Here, the relevant statute is 42

U.S.C. § 265, which in its entirety reads as follows:

> Whenever [the CDC Director] determines that by reason of the
> existence of any communicable disease in a foreign country there
> is serious danger of the introduction of such disease into the United
> States, and that this danger is so increased by the introduction of
> persons or property from such country that a suspension of the
> right to introduce such persons and property is required in the

> interest of the public health, the [CDC Director], in accordance
> with regulations approved by the President, shall have the power to
> prohibit, in whole or in part, the introduction of persons and
> property from such countries or places as he shall designate in
> order to avert such danger, and for such period of time as he may
> deem necessary for such purpose.

42 U.S.C. § 265.

Several aspects of this statute and its accompanying regulation (discussed below) demonstrate that CDC's decisions on whether or not to issue, suspend enforcement of, or even terminate a Title 42 order are committed to the agency's discretion.  First, the statute does not require CDC to prohibit the entry of any persons or property at any time, even if the statutory predicates for such an order are satisfied.  Even if CDC "determines" that there is a "serious danger of the introduction of [a] communicable disease into the United States" that is "increased by the introduction of persons or property" from another country, CDC is not *required* to do anything.  Instead, under these circumstances CDC "shall have the power to prohibit" the introduction of the relevant persons or property.  In other words, the statute confers discretion upon CDC to act, but does not mandate that it do so—the statute does not say that upon occurrence of the triggering conditions CDC "shall prohibit" introduction, but only that it "shall have the power to prohibit" introduction.  And given the discretionary nature of any decision by CDC to issue, or instead decline to issue, a Title 42 order in the first place, the lesser power of temporarily not enforcing a Title 42 order against a specified class of individuals is also necessarily a discretionary one.  This makes sense because CDC's actions under Title 42 necessarily involve scientific and technical knowledge and experience regarding communicable diseases generally, and the application of such knowledge and experience to the specific communicable disease that threatens the public health.  Such expert judgments, at least where they do not implicate the exercise of constitutionally protected rights, are beyond the purview of

the Judiciary.  *Cf. S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020)

(Roberts, C.J., concurring in denial of application for injunctive relief) ("Our Constitution

principally entrusts '[t]he safety and the health of the people' to the politically accountable

officials of the States 'to guard and protect,'" and "[w]hen those officials 'undertake[] to act in

areas fraught with medical and scientific uncertainties,' their latitude 'must be especially

broad.'" (citations omitted)).

Second, although the statute does set forth certain criteria that must be satisfied for CDC

to be empowered to issue a Title 42 order, there is no comparable enumeration of standards that

can guide the Court's review of CDC's use of scientific expertise in deciding to temporarily

except a certain group of noncitizens from expulsion under that order pending further agency

review of the scope of the order.  To have the power to issue an order "to prohibit" the entry of

some persons or property, CDC must first "determine[] that by reason of the existence of any

communicable disease in a foreign country there is serious danger of the introduction of such

disease into the United States," and also determine "that this danger is so increased by the

introduction of persons or property from such country that a suspension of the right to introduce

such persons and property is required in the interest of the public health."  42 U.S.C. § 265.  Yet

the statute sets out no comparable requirements that must be assessed when the agency decides

to temporarily suspend its enforcement of an order as to a specified class of individuals.  There

simply is no "meaningful standard against which to judge the agency's exercise of discretion" in

this regard.  *Chaney*, 470 U.S. at 830; *see also id.* at 831 ("This Court has recognized on several

occasions over many years that an agency's decision not to prosecute or enforce . . . is a decision

generally committed to an agency's absolute discretion.  This recognition of the existence of

discretion is attributable in no small part to the general unsuitability for judicial review of agency

decisions to refuse enforcement." (citations omitted)).

The same is true of the relevant implementing regulation, found at 42 C.F.R. § 71.40. Section 71.40 specifies that CDC "may" prohibit the introduction of specified persons into the United States if certain criteria are satisfied, which criteria track the statutory standards requiring that the danger of a communicable disease be increased by the person's introduction into the United States. *See* 42 C.F.R. § 71.40(a). But like the statute, the regulation says nothing about what standards, if any, must be met in order for CDC to suspend the expulsion of a certain group of individuals under a Title 42 order while CDC undergoes a review of the scope of that order. Again, then, there are no meaningful standards supplied by the regulation to serve as the basis for judicial review of the February notice.

The Fifth Circuit has explained that a matter is committed to agency discretion, such that review under the APA is not available, if the relevant statutory or regulatory provision "[does] not require the consideration of specific factors, the making of findings or the development of any additional evidentiary record." *Ellison v. Connor*, 153 F.3d 247, 253 (5th Cir. 1998) (citing *Suntex Dairy v. Block*, 666 F.2d 158, 164–65 (5th Cir. 1982)). "[W]ithout these, the judiciary [is] in no position to gainsay the [agency's] determination as arbitrary, capricious or an abuse of discretion." *Id.* (citing *Suntex Dairy*, 666 F.2d at 166).

As in *Ellison*, the applicable statutory and regulatory language of this case "does not contain standards or evidentiary requirements" for the relevant agency decision, i.e., the decision not to enforce a Title 42 order to expel a specific group of individuals. *See id.* No review under the APA is available. *See also Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs*, No. 4:15-CV-817-A, 2016 WL 543209, at *3 & n.4 (N.D. Tex. Feb. 9, 2016) (same, where "plaintiffs have not cited any statute or regulation setting forth procedural requirements or specific

substantive factors the [agency] was required to take into account" when making its decision).

**C.     Even if jurisdiction could be assumed, Texas has not shown a likelihood of success on the two claims for which it argues that element is satisfied.**

Texas offers two arguments in an attempt to satisfy the likelihood-of-success prerequisite for a preliminary injunction.  It first argues that CDC failed to use "reasoned decision-making" in connection with the February notice and thereby violated the APA,[10] and it also argues that the government improperly failed to "consider[] the State of Texas's reliance interests in the continuation of the Title 42 policy."[11]  (Doc. 22 at 17, 19.)  As explained below, though, under neither argument has Texas carried its heavy burden to show a likelihood of success to support the extraordinary remedy of a preliminary injunction.

**1.     Texas's arguments that the February 2021 notice fails for a lack of "reasoned decision-making" are based on a misconception of what the notice does.**

Texas asserts that the February notice violates the APA because CDC purportedly "issued a final rule without any new data or reasoning" and the notice represents an "uncompleted process" that is "not enough to suspend an existing rule."  (Doc. 22 at 18.)  But in addition to the fact that the notice lacks all the attributes of a "final rule" and is indeed not a "final rule,"[12] this argument seems to concede that the February notice is not, in fact, a final agency action (but rather represents an intermediate step in an "uncompleted process"), and thus, is not subject to

---

[10] This argument corresponds to count 1 of the complaint.  (*See* Doc. 1, ¶¶ 84–94 (claim that the February notice fails under the APA for "Lack of Reasoned Decision-Making").)

[11] This argument corresponds to count 2 of the complaint.  (*See* Doc. 1, ¶¶ 95–98 (claim that the February notice fails under the APA because the government purportedly "did not consider the State of Texas's reliance interests in the continuation of the Title 42 policy").)

[12] *See also* 85 Fed. Reg. at 65,812 (explanation in the October order that the order "is not a rule subject to notice and comment" under the APA); *cf.* 85 Fed. Reg. at 56,424–54.460 ("final rule" promulgating 42 C.F.R. § 71.40).

judicial review.  Moreover, because the February notice was not a final agency action and instead addressed a matter committed to the agency's discretion, Texas cannot show that any requirement for the agency to provide a "reasoned decision-making" is applicable.

> **2.     Texas's arguments about state "reliance interests" are unavailing.**

The second of Texas's two arguments in support of the likelihood-of-success element is based on alleged state "reliance interests."  (Doc. 22 at 19.)  According to Texas, CDC's issuance of the February notice, along with DHS's alleged actions of "effectively ceasing the Title 42 process for family units," did not consider whether there was a "legitimate reliance" on the use of Title 42 "for nearly a year" by Texas.  (Doc. 22 at 19.)  As noted above, though, there is no claim in the complaint based on alleged state reliance on the Title 42 process for families, and accordingly this argument cannot form the basis for any entitlement to preliminary-injunctive relief.  (*See* p. 2 n.1, *supra*; *see also* Doc. 1, ¶¶ 95–98 (the only count of the complaint based on an alleged failure to consider state reliance interests, which makes no mention of families and instead focuses entirely on the February notice).)  Texas in any event fails to demonstrate a likelihood of success based on any "reliance interest" argument for several reasons.

First, the government did not need to take into account any of Texas's alleged "reliance interests."  Texas is not in any way regulated by the Title 8 and Title 42 processes at issue, much less governed by either the February notice or any individual decision that DHS might make to process a family under Title 8 rather than Title 42.  Thus, no "reliance interest" can arise in the typical manner by virtue of a relationship between regulator and regulated entities.  *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (faulting a regulation for failing to consider "serious reliance interests" in connection with changes to an overtime exemption rule that the "retail automobile and truck dealership industry had relied [on] since 1978").

More fundamentally, as already discussed above, CDC's decisions concerning when and how to exercise its authority under Title 42 are highly discretionary in nature.  (*See* pp. 24–28, *supra*.)  The final rule governing the exercise of CDC's Title 42 authority also noted that CDC "may, in its discretion, consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation."  85 Fed. Reg. at 56,444. Accordingly, no reliance interest can be shown.  *See Palacios v. DHS*, 434 F. Supp. 3d 500, 507 (S.D. Tex. 2020) (no reliance interest in a matter that is subject to "agency discretion").

Finally, the terms of the October order itself make clear that no reliance interest was thereby created.  The order expressly states that CDC "retain[s] the authority to extend, modify, or terminate the Order, or implementation of this Order, at any time as needed to protect public health."  85 Fed. Reg. at 65,812.  And to the extent Texas claims some reliance interest in having *all* families processed under the October order (i.e., under Title 42) rather than under the otherwise-applicable immigration provisions in Title 8, the October order also makes clear that no such reliance interest exists.  The order explicitly excludes from its ambit those noncitizens who are subject to a home-country requirement of testing before expulsion.  *Id.* at 65,808.  It also specifically explains that customs officers (as relevant here, DHS) have the discretion to except any noncitizens from the order on a case-by-case basis under the "totality of the circumstances" with approval from a supervisor.  *Id.*  Texas can hardly claim that it "relied" on some understanding that no exceptions to Title 42 expulsion would ever be available, when the October order specifies just the opposite.

**D.     Texas has waived any right to obtain a preliminary injunction on the claims it references in the background section of its brief but does not specifically argue it has a likelihood of success on, and in any event, Texas is unlikely to succeed on those claims.**

In the background section of its brief, Texas makes factual assertions relating to other

claims in its complaint, but fails to develop these in terms of arguing that it has a likelihood of success on any such claim to support preliminary relief.  Texas thus waived any right to pursue a preliminary injunction on these other grounds.  But even if the Court were inclined to review the undeveloped assertions in the background section of Texas's brief, Texas has no likelihood of success as to those clams.

> **1.**  **Texas does not argue that it is likely to prevail on the merits of any claim that DHS fails to comply with the October order by failing to expel more families, but even if it did, Texas is not likely to succeed on that claim.**

In the background section of its brief, Texas asserts that "Defendants also departed from their own rules pertaining to their processing of members of family units encountered along the southwest border," and that they have done so without explanation or public announcement. (Doc. 22 at 9.)  Texas therefore apparently accuses the government of "failure to act," as opposed to challenging any final agency action.  (*See* Doc. 1, ¶ 118 ("The Defendants act unlawfully by not following their own rules for processing members of family units encountered at the southern border.").)

As explained above, DHS is following the October order with respect to families, and Texas has not shown otherwise.  (*See* pp. 7–8, *supra*.)  Texas essentially argues that DHS should be expelling *more* families under Title 42 and thus placing fewer families in Title 8 immigration proceedings, but in making this argument Texas appears to be operating under a mistaken assumption that every family is covered by the October order and that DHS has no discretion to except families on a case-by-case basis.  Neither is true.  As previously discussed, the October order explicitly excludes from its ambit those persons who would be expelled to a country that requires testing as a condition of entry, and the order also gives DHS discretion to issue case-by-case exceptions pursuant to which noncitizens will be processed under the immigration

procedures provided by Title 8, rather than Title 42.  (App. 021); *see also* 85 Fed. Reg. at 65,808. Thus, Texas's assertions are factually incorrect, and Texas is ignoring the reality that in some cases expulsion simply is not possible either because the October order does not actually apply to the family in question, because Mexico will not accept the family, or because the home country has imposed practical limitations that effectively prevent a timely expulsion under Title 42.  (*See* App. 020–21.)

Texas's assertion suffers from two other fundamental flaws:  First, the very nature of the case-by-case exception in the October order is committed to the agency's discretion, allowing DHS to except otherwise covered persons from the October order based on a totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests.  There are no meaningful standards against which to judge the agency's decisions under this provision, *see Chaney*, 470 U.S. at 830, and thus, as discussed above, such decisions are unreviewable under the APA, *see* 5 U.S.C. § 701(a)(2).

Second, Texas cannot satisfy the requirements for a failure-to-act claim under the APA. Such claims are properly analyzed under 5 U.S.C. § 706(1), which allows a court to "compel agency action unlawfully withheld or unreasonably delayed."  While section 706(1) "permits judicial review of agency inaction," it does so "only within strict limits."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016); *see also*, *e.g.*, *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018) (authority to "compel agency action 'unlawfully withheld'" exists only "under narrow circumstances").  Specifically, a claim under section 706(1) can proceed only where an agency has "failed to perform a non-discretionary duty to act."  *Elec. Privacy*, 910 F.3d at 1244 (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)).  "This standard reflects the common law writ of mandamus, which the APA 'carried

forward' in § 706(1)." *Anglers*, 809 F.3d at 670 (citing *Norton*, 542 U.S. at 63).  "Thus, § 706(1) grants judicial review only if a federal agency has a 'ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'"  *Id.* (quoting *Norton*, 542 U.S. at 63–64). Under this well-established framework for "agency inaction" claims, a plaintiff must establish two elements—first, that "an agency failed to take a *discrete* agency action," and second, that the discrete action in question was "*required to [be] take[n].*" *Norton*, 542 U.S. at 64.

Texas cannot meet either prong of the analysis.  First, it identifies no discrete agency action that the agency failed to take.  As the Supreme Court has explained, "failure to act" in this context is "properly understood as a failure to take . . . one of the agency actions . . . defined in [5 U.S.C.] § 551(13)," *Norton*, 542 U.S. at 62—that is, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); *see* 5 U.S.C. § 701(b)(2) ("For the purpose of this chapter . . . 'agency action' ha[s] the meaning[] given . . . by section 551 of this title.").  Although Texas apparently believes that DHS should make fewer case-by-case exceptions, that is often not feasible for families encountered between ports of entry due to return restrictions imposed by Mexico and other governments.  (App. 020–21.)  Moreover, even if it were feasible, the "limitation to discrete agency action precludes . . . broad programmatic attack[s]" that "seek *wholesale* improvement of [an agency's operations] by court decree," of the type Texas envisions.  *Norton*, 542 U.S. at 64 (internal quotation marks and citation omitted).  Second, Texas cannot show that DHS must apply Title 42 to all families.  As already explained, the October order itself includes important carve-outs and also leaves to DHS the discretion to make case-by-case exceptions, and DHS has appropriately exercised that discretion.

    **2.**    **Texas does not argue that it has shown a likelihood of success on its 8 U.S.C. § 1222(a) claim, but in any event this claim would not support preliminary-injunctive relief either.**

Texas also suggests in the background section of its brief that DHS is failing to comply with 8 U.S.C. § 1222(a) (INA section 232(a)) by not detaining arriving noncitizens at ports of entry who might be carrying a communicable disease of public health significance, i.e., COVID-19. (Doc. 22 at 11–15.) But this claim fails at the outset because even if it were assumed that section 1222(a) operates in the manner that Texas suggests (and it does not), Texas would not be entitled to an injunction. Under 8 U.S.C. § 1252(f)(1), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Section 1222 falls within part IV of the subchapter within the United States Code to which section 1252(f)(1) applies.[13] And in section 1252(f)(1), "Congress stripped all courts, save for the Supreme Court, of jurisdiction to enjoin or restrain the operation of 8 U.S.C. §§ 1221–1232 on a class-wide basis." *Hamama v. Adducci*, 946 F.3d 875, 877 (6th Cir. 2020).

The section 1252(f)(1) bar applies here because Texas seeks what would amount to classwide relief that would limit and dictate how the government implements section 1222(a) in all circumstances. Texas seeks an injunction to "enforce the detention scheme required by 8 U.S.C. § 1222(a)" (or at least Texas's view of what sort of detention scheme ought to be used). (Doc. 21-1 at 2.) This kind of proposed injunction to "enforce" a plaintiff's view of what specific detention practices the statute purportedly requires is barred by section 1252(f)(1). *See Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018) (finding that section 1252(f)(1)

---

[13] Part IV of subchapter II of Title 8, United States Code, consists of sections 1221–1232.

barred a requested injunction "to ensure [that certain provisions within part IV] are correctly enforced," with an explanation that if placing "limitations on what the government can and cannot do under the removal and detention provisions are not 'restraints,' it is not at all clear what would qualify as a restraint").

Texas is in any event incorrect when it asserts that DHS "does not meaningfully enforce the plain requirements of the INA" with respect to detecting and protecting against the entry of COVID-19-positive noncitizens into the country.  (Doc. 22 at 12.)  As an initial matter, section 1222(a) applies only at ports of entry.  *See* 8 U.S.C. § 1222(a) (referring to noncitizens "arriving at ports of the United States").  And Texas fails to show that the statute requires any specific period of detention for any particular noncitizen.  To the contrary, the statute refers only to detaining individuals "for a sufficient time" to determine whether "they belong to inadmissible classes"—and as the opening clause of section 1222(a) notes, the provision exists "[f]or the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes inadmissible under this chapter" due to "diseases or mental or physical defects or disabilities," i.e., on a health-related ground.  *See id.*  The statutory language links any section 1222(a) detention to an investigation of possible grounds of inadmissibility due to "diseases or mental or physical defects or disabilities."  Thus, Texas's suggestion that such detention is required of *all* arriving noncitizens is incorrect because under well-settled principles of prosecutorial discretion in the immigration context, there is no requirement that DHS pursue any particular ground of inadmissibility against a noncitizen, let alone a health-related ground.[14]

---

[14] *See, e.g.*, *Matter of E-R-M & L-R-M*, 25 I&N 520, 521–22 (BIA 2011) (finding that DHS had discretion to place inadmissible noncitizens into removal proceedings under 8 U.S.C. § 1229a in lieu of placing them in expedited removal proceedings, notwithstanding language in the statute stating that such noncitizens "shall" be subject to expedited removal).  The *E-R-M & L-R-M* decision further explains:  "It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch

Section 1222(a) thus enables DHS to detain a noncitizen, as provided for in 8 U.S.C. § 1222(a), should DHS elect to pursue a health-related ground of inadmissibility—but DHS is not required to proceed using such a (possible) ground of inadmissibility and may instead use other procedures within Title 8 that do not trigger section 1222(a).

**E.**   **Texas fails to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction.**

As discussed above, Texas has not shown that jurisdiction exists or that it has a likelihood of success on any claim.  But if the Court desires, it may pretermit consideration of these issues and instead deny Texas's motion on the ground that Texas fails to show irreparable harm or that the public-interest factors favor relief.

To establish irreparable injury, Texas "must demonstrate that the harm is 'real, imminent, and significant—not merely speculative or potential—with admissible evidence and a clear likelihood of success.'"  *Tex. Health & Human Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016) (quoting *Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011)).  For several reasons, Texas fails to show any such imminent, irreparable injury.

For one, taking into account the injunction entered by the *P.J.E.S.* court in November 2020 and then CDC's subsequent February 2021 notice, unaccompanied children largely have not been subject to Title 42 expulsions for approximately seven months.  Yet despite this passage of more than half a year during which time thousands of unaccompanied children have been

---

of the Government on whether to charge an individual and on what charge or charges to bring.  For example, in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct 'shall' be imprisoned or otherwise punished.  But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute, or to mandate that where, as here, when multiple charges are possible, one or the other or all must be pursued."  *Id.* at 522.

processed under Title 8, Texas identifies no specific, concrete harm that has accrued to it by virtue of the presence of some unaccompanied children in the state.  Instead, Texas relies on speculation and statements about "illegal aliens" as a general matter, without demonstrating any specific link to the February notice and also without showing any cognizable injury.  (*See, e.g.*, Doc. 22 at 26 (asserting that "*if* the number of illegal aliens residing in Texas increases because of the Defendant's illegal policies at issue in this case, Texas will incur additional costs" (emphasis added)).)  What Judge Kacsmaryk said of the very similar alleged injuries offered by the plaintiffs in *Pace* when denying a TRO in that case is likewise true here—"unsupported proposition[s]" and "unsubstantiated statements" of such matters do not meet a plaintiff's high burden to obtain extraordinary relief based on an allegedly increased risk of contracting COVID-19.  *See Pace*, 2021 WL 2678362, at *3 (emphasis removed).

Thus, for all the same reasons that Texas cannot establish standing, it likewise cannot show any irreparable injury.  Notwithstanding Texas's rhetoric, the facts show that unaccompanied children subject to the February notice are transferred into ORR custody where they are quarantined and tested for COVID-19.  (App. 014–16.)  Similarly, testing regimes are used for those families (or individuals) encountered between ports of entry and processed via Title 8, rather than Title 42.  (App. 022.)  Moreover, those families that are referred to DHS by non-governmental organizations for case-by-case determinations whether they ought to be exempted from Title 42 are required to have a negative COVID-19 test prior to presenting at the port.  (App. 021–22.)  In short, the government is appropriately taking action to protect the public by guarding against the admission of COVID-19-positive noncitizens into the country.

Texas's delay in seeking preliminary relief from this Court further confirms the absence of any irreparable injury.  Texas waited over two months after the February notice to file this

suit, and then inexplicably waited over two more months before filing its motion for preliminary injunction. The timing of Texas's motion is not consistent with the notion that it is in danger of being irreparably harmed in any way. "The law is well-established that[] [d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *GoNannies, Inc. v. GoAuPair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (internal quotation marks and citation omitted); *see also Texas v. United States*, 328 F. Supp. 3d 662, 738–39 (S.D. Tex. 2018) (collecting cases).

Texas's public actions outside of this litigation likewise reflect that it is not suffering any irreparable injury. If Texas residents were being subjected to a substantial risk of harm via some "unnecessary and unlawful exposure to COVID-19 from untested and unquarantined illegal aliens,"[15] (Doc. 22 at 28), the state would not have lifted all COVID-19-related restrictions.

The remaining preliminary-injunction factors also weigh heavily against Texas. The interests of the government and the public "merge" in suits against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Texas is primarily challenging actions taken by CDC in the context of an ongoing pandemic, as part of CDC's responsibility as the federal agency charged with implementing and administering laws that protect the public health. *Cf. Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"). Texas, however, is seeking to tie the government's hands and prevent it from taking actions that CDC views to be appropriate and warranted, and by Texas's own admissions, Texas is doing so

---

[15] As noted previously, this scenario actually has nothing to do with unaccompanied children processed under Title 8 or arriving families referred by non-governmental organizations and then excepted on a case-by-case basis from the October order—both classes of individuals are required to undergo various COVID-19 prevention protocols.

**Defendants' Response to Plaintiff's Motion for Preliminary Injunction – Page 38**

largely for reasons *unrelated* to public health—it instead purports to be concerned with speculative increased costs associated with driver's licenses, public education, and other state services.  The balance of equities does not favor Texas under these circumstances.

In addition, a preliminary injunction would harm DHS's interests.  It would alter DHS's current border operations and require DHS to apply the October order to unaccompanied children and families that DHS has determined, in the exercise of discretion expressly allowed by the October order, may be processed under normal immigration procedures.  Moreover, as the October order contemplates, DHS must balance various competing important government interests, including the need to allow the admission of particularly vulnerable noncitizens who seek immigration relief or protections under the INA and to protect unaccompanied children as envisioned by Congress in the TVPRA.  By requiring the expulsion of unaccompanied children and families that the government has concluded cannot, need not, and/or should not be processed under Title 42, the injunction Texas seeks would harm the government and be contrary to the public interest.

## IV.    Conclusion

Texas's motion for preliminary injunction should be denied.

Respectfully submitted,

PRERAK SHAH
Acting United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

Certificate of Service

On July 6, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney