# United States District Court
## Northern District of Texas
### Fort Worth Division

| | |
|---|---|
| STATE OF TEXAS,<br>    *Plaintiff,*<br>v.<br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States;<br>UNITED STATES OF AMERICA;<br>U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES;<br>CENTERS FOR DISEASE CONTROL & PREVENTION;<br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>U.S. CUSTOMS & BORDER PROTECTION;<br>U.S. IMMIGRATION & CUSTOMS ENFORCEMENT;<br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services;<br>ROCHELLE WALENSKY, in her official capacity as Director of the Centers for Disease Control & Prevention;<br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security;<br>TROY MILLER, in his official capacity as Senior Official Performing the Duties of the Commissioner of U.S. Customs & Border Protection; and<br>TAE JOHNSON, in his official capacity as Acting Director of U.S. Immigration & Customs Enforcement;<br>    *Defendants.* | Civil Action No. 4:21-cv-00579-P |

## First Amended Complaint

1.      The COVID-19 virus has killed tens of thousands of Texans and hundreds of thousands of Americans. It is a global scourge the likes of which

have rarely been seen in the modern world. To protect against menaces such as this, the Immigration and Nationality Act and the Public Health Services Act require that the federal government ensure that those attempting to enter the United States are not carrying pandemic-causing communicable diseases.

2.     To put that requirement in to practice, the Defendants adopted procedures for the expedited removal of illegal aliens who might be carriers of the COVID virus. Despite the successful deportation of tens of thousands of such aliens after the implementation of those procedures, the Defendants began to backtrack—to backtrack on those procedures without amending them and to backtrack on their adherence to the INA's demands on how they protect the public from further exposure to the virus.

3.     The Defendants have accomplished this partly through neglect. They have refused to place many aliens into the expedited removal procedures—collectively known as Title 42, after the title of the U.S. Code covering public health—and they have refused to detain aliens whom the INA mandates that they detain. But they have also accomplished it partly through action. They have affirmatively exempted some aliens from the INA whom the statute does not permit to be exempted; they have affirmatively paroled into the United States aliens whom the INA's limited grant of parole authority does not permit them to parole.

4.     The Defendants' neglect and their affirmative action both are impeding Texas's ability to slow the spread of COVID-19 among its citizens—through their violations of the law, they are generally prolonging a global health emergency and specifically increasing the spread of the virus responsible for that emergency within Texas. To protect her citizens from federally enabled exposure to the novel coronavirus, Texas is entitled to an

injunction holding the Defendants to their legal obligations and their announced policies.

## Parties

### A. Plaintiff.

5.      Plaintiff State of Texas is a sovereign State of the United States of America. The Defendants' unlawful release of aliens injures Texas in multiple ways.

6.      First, the release of illegal aliens into Texas will cause it to "incur significant costs in issuing driver's licenses." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States are eligible for subsidized driver's licenses.[1] By increasing the number of aliens who can secure subsidized licenses, the Defendants impose significant financial harm on Texas. *See Texas*, 809 F.3d at 155.

7.      Second, Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. Releasing those who are otherwise required to be detained will injure Texas by increasing the number of illegal aliens receiving such services at its expense.

---

[1]   Tex. Dept. of Pub. Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

8.    Third, the State funds multiple healthcare programs that cover illegal aliens. Providing these services, which are used by illegal aliens, results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

9.    The Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

10.    The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

11.    The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

12.    Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

13.    Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. The Defendants' failure to detain thus increases education expenditures by the State of Texas each year.

14.    And DHS itself has previously recognized "that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Exhibit E § II (DHS-Texas agmt.). DHS agrees that "rules, policies, procedures,

and decisions that could result in significant increases to the number of people residing in a community" "result in concrete injuries to Texas." *Id.*

15.     These harms will only grow over time. As DHS and another bench of this Court have found, reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at *6, *18–19 (N.D. Tex. Aug. 13, 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting). ("An alien … has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.") The Defendants' refusal to enforce the immigration laws creates incentives to illegally cross the border by reducing the cost of being apprehended. Just as the Migrant Protection Protocols, by removing the carrot of admission into the United States, reduced the number of false asylum claimants by requiring potential asylees to remain in Mexico, *id.*, the Defendants, by removing the stick of mandatory detention, increase the number of illegal entries into the United States by erasing the possibility that an apprehension will result in anything other than the freedom to remain in the United States.

## B. Defendants.

16.     Defendant Joseph R. Biden, Jr., is the President of the United States. Texas sues him in his official capacity.

17.     Defendant United States of America is the federal sovereign.

18.     Defendant U.S. Department of Health and Human Services is a federal cabinet agency. Defendant Centers for Disease Control and Prevention is one of its constituent agencies. CDC conducts specified functions under the Public Health Service Act, including exercising authority delegated by HHS.

19.     Defendant U.S. Department of Homeland Security is a federal cabinet agency. Defendants U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement are two of its constituent agencies. DHS and its constituent agencies enforce the INA, and DHS has a duty to enforce orders issued by the CDC under the Public Health Safety Act and its regulations.

20.     Defendant Xavier Becerra is the Secretary of HHS. Texas sues him in his official capacity.

21.     Defendant Rochelle Walensky is the Director of CDC. Texas sues her in her official capacity.

22.     Defendant Alejandro Mayorkas is the Secretary of DHS. Texas sues him in his official capacity.

23.     Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. Texas sues him in his official capacity.

24.     Defendant Tae Johnson is the Acting Director of ICE. Texas sues him in his official capacity.

## Jurisdiction and Venue

25.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that Texas requests. Texas's claims are not subject to the INA's denial of jurisdiction for claims on behalf of an alien, 8 U.S.C. § 1252(g), because it is bringing this suit for the benefit of itself and its citizens.

26.     This district is a proper venue because the State of Texas resides here and a substantial part of the events or omissions giving rise to Texas's claims occurred here. 28 U.S.C. § 1391(e).

## Facts

### A. The INA's detention and enforcement requirements.

#### 1. Detention and enforcement generally.

27.     The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, charge DHS with enforcing the United States' immigration laws. Under the immigration laws, "several classes of aliens are 'inadmissible' and therefore 'removable.'" *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S.Ct. 1959, 1964 (2020), citing 8 U.S.C. §§ 1182, 1229a(e)(2)(A). Among these classes are aliens who lack a valid entry document when they apply for admission. 8 U.S.C. § 1182(a)(7)(A)(i)(l). This includes aliens who arrive in the United States and aliens who are present in the United States without having been lawfully admitted, who are deemed to have applied for admission. 8 U.S.C. § 1225(a)(1).

28.     An inadmissible alien may be removed; the usual process involves an evidentiary hearing before an immigration judge at which the alien may present evidence and argue against removal. *Thuraissigiam*, 140 S.Ct. at 1964. However, this process is slow, and while "removal is being litigated, the alien will either be detained, at considerable expense, or allowed to reside in this country, with the attendant risk that he or she may not later be found." *Id.*

29.     To address these problems, Congress created more expedited procedures that apply to aliens who are "present in the United States who [have] not been admitted" and to aliens "who arrive[] in the United States (whether or not at a designated port of arrival ...)[.]" 8 U.S.C. § 1225(a)(1).

These aliens are subject to expedited removal if they (1) are inadmissible because they lack a valid entry document; (2) have not "been continuously physically present in the United States for the two years preceding their inadmissibility determination; and (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer determines that such an alien is inadmissible, the alien must be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

30.    Whether subject to the standard removal process or the expedited process, aliens who intend to claim asylum or who claim a credible fear of persecution are not deportable while that claim is being investigated. *See* 8 U.S.C. §§ 1158, 1225(b)(1). But those aliens must be detained until their entitlement to asylum is determined. *Id.* § 1225(b)(2).

31.    It has been generally accepted that DHS has the discretion as to whether to place aliens, other than unaccompanied children, into the standard removal process or into expedited removal. *See, e.g.*, *Matter of M-S-*, 27 I&N Dec. 509, 510 (A.G. 2019); *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011); 8 U.S.C. § 1232(a)(5)(D) (exception). Whichever path DHS chooses, aliens placed in removal proceedings must be detained until DHS has finished considering the asylum application or the removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844–45 (2018), (citing 8 U.S.C. § 1225(b)(1), (2)). DHS may "for urgent humanitarian reasons or significant public benefit" temporarily parole these aliens, but it may do so "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A).

**2. Detention and enforcement to protect public health.**

32.    Another class of inadmissible aliens is those who have a "communicable disease of public health significance[.]" 8 U.S.C. § 1182(a)(1)(A)(i). The INA defines a "communicable disease of public health significance" by referring to "regulations prescribed by the Secretary of Health and Human Services." *Id.*

33.    There are two circumstances under which aliens must be detained to determine whether they are inadmissible for public-health reasons. First, they must be detained if DHS has reason to believe they are "afflicted with" such a disease. 8 U.S.C. § 1222(a). Second, they must be detained if DHS "has received information showing that any aliens are coming from a country or have embarked at a place" where such a disease is "prevalent or epidemic[.]" This detention must enable "immigration officers and medical officers" to conduct "observation and an examination sufficient to determine whether" the aliens are inadmissible. *Id.*

**B. The COVID-19 pandemic and the federal response.**

**1. The domestic response to COVID-19.**

34.    In the words of the CDC itself, COVID-19 "is a quarantinable communicable disease caused by the SARS-CoV-2 virus." Order Suspending the Right to Introduce Certain Persons, 86 Fed. Reg. 42,828, 42,830 (Aug. 5, 2021). Since it emerged in late 2019, "SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic." *Id.*

35.    The CDC recommends a 14-day quarantine for those who "have been in close contact (within 6 feet of someone for a cumulative total of 15 minutes or more over a 24-hour period) with someone who has COVID-19…." *Quarantine and Isolation*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html
(July 29, 2021) (last visited Aug. 23, 2021). While this "does not apply to those
who have been fully vaccinated … unless they have symptoms," even those
people "should get tested 3–5 days after their exposure, even if they don't have
symptoms," and they should "wear a mask indoors in public for 14 days
following exposure or until their test result is negative. *Id.*

36.     Since early 2020, more than 35 million U.S. residents have been
infected with COVID-19, including more than 2.6 million in Texas. More than
612,000 U.S. residents have died from COVID-related causes, more than
52,000 of them in Texas. *See* CTRS. FOR DISEASE CONTROL AND PREVENTION,
*COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker (last visited
Aug. 23, 2021); TEX. DEPT. OF STATE HEALTH SVCS., *DSHS COVID-19
Dashboard*, https://dshs.texas.gov/coronavirus/cases.aspx (last visited Aug. 23,
2021).

37.     COVID-19 has upended lives across the planet, with governments
imposing curfews, shuttering businesses,  and closing schools. Since COVID-
19 was first declared a public-health emergency in January 2020, "the U.S.
government and CDC have implemented a number of COVID–19 mitigation
and response measures since that time.

38.     "Other measures have focused on recommending and enforcing
COVID–19 mitigation efforts, including physical distancing and mask-
wearing. Recent concerns regarding the spread of the Delta variant prompted
CDC to release updated guidance calling for vaccinated persons to wear a mask
indoors in public when in an area of substantial or high transmission." *Id.*
(footnotes omitted). The "other measures" currently in effect include:

- Requiring the use of masks by federal employees and on federal
  property, *see* Exec. Order No. 13991, 86 Fed. Reg. 7,045 (Jan. 25, 2021);

- Recommending that teachers, staff, and students in K-12 schools wear masks, *see* CTRS. FOR DISEASE CONTROL AND PREVENTION, *Guidance for COVID-19 Prevention in K-12 Schools* (July 9, 2021);[2]

- Continuing to require individuals to wear masks while in airports and on airplanes, *see* TRANSP. SEC. ADMIN., *TSA extends face mask requirement at airports and throughout the transportation network* (Apr. 30, 2021);[3]

- Requiring that all civilian federal employees show proof of vaccination status, *see* THE WHITE HOUSE, *FACT SHEET: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant* (July 29, 2021);[4] and

- Ordering a moratorium on evictions for failure to pay rent, *see* Temp. Halt in Residential Evictions, 86 Fed. Reg. 43244 (Aug. 6, 2021).

## C. The COVID-19 response at the border.

### 1. International travel.

39.    Other mitigation measures have involved restrictions on international travel and migration." 86 Fed. Reg. at 42,831 (footnotes omitted). The Defendants have imposed or continued four Presidential Proclamations suspending the entry of individuals from thirty-three countries across the world based on the threat posed by the potential spread of COVID-19. *See*

---

[2]   https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html

[3]   https://www.tsa.gov/news/press/releases/2021/04/30/tsa-extends-face-mask-requirement-airports-and-throughout

[4]   https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-president-biden-to-announce-new-actions-to-get-more-americans-vaccinated-and-slow-the-spread-of-the-delta-variant/

*generally* U.S. DEPT. OF STATE, *COVID-19 Travel Restrictions and Exceptions* (June 24, 2021).[5]

40.     Another restriction has been to limit all but essential travel between the United States and Mexico. *See* Notif. of Temp. Travel Restrictions Between the U.S. and Mex., 86 Fed. Reg. 38,554 (July 22, 2021). In the latest notice continuing these restrictions, DHS stated that it had "determined that the risk of continued transmission and spread of the virus associated with COVID-19 between the United States and Mexico poses an ongoing 'specific threat to human life or national interests.'" *Id.* at 35,555. For that reason, both DHS and its Mexican counterparts had "determined that non-essential travel between the United States and Mexico … places the populace of both nations at increased risk of contracting the virus associated with COVID–19." *Id.* DHS additionally justified the continued suspension of non-essential travel to and from Mexico because "the sustained human-to-human transmission of the virus, coupled with risks posed by new variants, returning to previous levels of travel between the two nations [would place] the personnel staffing land ports of entry between the United States and Mexico, as well as the individuals traveling through these ports of entry, at increased risk of exposure to the virus associated with COVID–19." *Id.*

### 2. Title 42.

41.     On September 11, 2020, the CDC published a final rule that "establishe[d] final regulations under which the Director [of the CDC] may suspend the right to introduce and prohibit, in whole or in part, the introduction of persons into the United States for such period of time as the

---

[5]     https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/covid-19-travel-restrictions-and-exceptions.html

Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States." 85 Fed. Reg. 56,424 (Sep. 11, 2020) (codified at 42 C.F.R. § 71.40). This Final Rule, issued under the authority granted by the Public Health Service Act, 42 U.S.C. § 265, became effective on October 13, 2020.

42.    On October 13, the day the Final Order became effective, the CDC issued its Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists. 85 Fed. Reg. 65,806–12 (Oct. 13, 2020). Collectively, the Final Rule and this October Order work together in a process generally known as "Title 42."

43.    Though issued under the Final Rule, the October Order was the latest in a series of orders issued under the interim final rule.[6] As had the earlier orders, the October Order suspended introducing covered aliens into the United States, a suspension lasting until CDC determined that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health[.]" 85 Fed. Reg. at 65,810. The suspension was based on findings that:

- COVID-19 is a communicable disease that poses a danger to the public health;

- COVID-19 is present in numerous foreign countries, including Canada and Mexico;

- Because COVID-19 is so globally widespread, there is a serious danger that it will be carried into the land points of entry and Border Patrol

---

6   CDC issued an interim final rule on March 24. 85 Fed. Reg. 16,559 (Mar. 24, 2020). It also issued a series of orders that initially covered only 30 days apiece before being amended to require review every 30 days. *Id.*. at 17,060 (Mar. 26, 2020); 22,424 (Apr. 22, 2020); 31,503, 31,507–08 (May 26, 2020).

stations at or near the United States' borders with Canada and Mexico, and from there into the interior of the country;

- If their entry were not suspended, covered aliens would be go through immigration processing at the land points of entry and Border Patrol stations that would require many of them (typically aliens who lack valid travel documents and are therefore inadmissible) to be held in the congregate areas of the facilities, in close proximity to one another, for hours or days;

- Holding them in such settings would increase the already serious danger to the public health of the United States; and

- This increased danger rose to the level that it required a temporary suspension of the introduction of covered aliens into the United States.

*Id.*

44.     Customs and Coast Guard officers have the duty to "aid in the enforcement of quarantine rules and regulations," Public Health Service Act, 42 U.S.C. § 268, and the Order noted that CDC had requested "that DHS aid in the enforcement [of] this Order because CDC does not have the capability, resources, or personnel needed to do so." *Id.* at 65,812. CDC needed this assistance because of its own public health tools' not being "viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States." *Id.*

45.     The October Order applied to all covered aliens, defined as aliens "seeking to enter the United States … who lack proper travel documents," "whose entry is otherwise contrary to law," or "who are apprehended at or near the border seeking to unlawfully enter the United States." *Id.* at 65,807.

14

46.     Among other exceptions, the October Order did not apply to those "whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.* In those limited circumstances, DHS was required to "consult with CDC concerning how these types of case-by-case, individualized exceptions" were to be made to help "ensure consistency with current CDC guidance and public health assessments." *Id.*

47.     The October Order noted that expulsions under CDC's prior orders had "reduced the risk of COVID-19 transmission in [points of entry] and Border Patrol Stations, and thereby reduced risks to DHS personnel and the U.S. health care system." *Id.* It further noted that "[t]he public health risks to the DHS workforce—and the erosion of DHS operational capacity—would have been greater" without the initial suspension order. Further, the suspension orders "significantly reduced the population of covered aliens in congregate settings in [points of entry] and Border Patrol stations, thereby reducing the risk of COVID-19 transmission for DHS personnel and others within these facilities." *Id.*

48.     DHS began using its Title 42 authority to expel aliens in March 2020, and the population of aliens processed under Title 8 (the ordinarily applicable immigration rules) plummeted. Out of more than 253,000 total southwest border encounters under Title 8 in Fiscal Year 2020, fewer than 25,000 occurred in the last six months of the year.[7] During that same six-month period, nearly 200,000 aliens were rapidly expelled under Title 42.

---

[7]   The CBP statistics cited in this First Amended Complaint are available at *Sw. Border Land Encounters*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Aug. 23, 2021).

### 3. Use of Title 42 flags.

#### a. Unaccompanied children are placed outside Title 42.

49.     On November 18, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction that enjoined the Defendants from applying Title 42 to unaccompanied alien children. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020). The D.C. Circuit stayed that injunction in late January. *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021).

50.     The stay enabled the Defendants to once again apply Title 42 to unaccompanied children. Rather than do so, however, CDC announced that it would exempt unaccompanied children from the October Order, an exemption, backdated to the date the stay was lifted. Exh. B, Not. of Temp. Exception From Expulsion of Unaccompanied Noncitizen Children, 86 Fed. Reg. 9,942 (Feb. 17, 2021).

51.     The retroactive order noted that COVID-19 continued to pose a "highly dynamic public health emergency" and that the CDC was "in the process of reassessing the overall public health risk at the United States' borders and [the October Order] based on the most current information…." *Id.* Other than those general statements, the order did not explain why CDC had decided not to apply Title 42 to unaccompanied children.

52.     Unsurprisingly, after excepting them from Title 42, the number of unaccompanied children encountered at the southwest border increased, reaching roughly 9,500 in February (a 61% increase over the number encountered in January and 105% more than November). That rose sharply to 18,890 in March and has remained elevated ever since: more than 17,000 encounters in April; more than 14,000 in May; more than 15,000 in June; and nearly 19,000 in July.

**b. Those claiming to be family groups are de facto placed outside Title 42.**

53.     As unaccompanied children were placed outside the purview of Title 42, the Defendants slowly stopped applying Title 42 to members of family units. Unlike the exception for unaccompanied children, however, this was neither announced nor formalized. Instead, it happened *sub silentio*, becoming a *de facto* policy as Mexico's government began refusing to accept the return of certain aliens who would have been expelled from certain ports of entry. *See* Exh. F, Scott Decl., at ¶ 19–20

54.     The total encounters with family units spiked following January 2020. But rather than spiking along with it, the Defendants' application of Title 42 has cratered:

| Month | Family-unit encounters | Title 42 applications to family units | |
|---|---|---|---|
| | | Absolute | Percentage |
| November 2020 | 4,302 | 3,641 | 84.6 |
| December 2020 | 4,404 | 3,332 | 75.7 |
| January 2021 | 7,296 | 4,546 | 62.3 |
| February 2021 | 19,588 | 9,476 | 48.4 |
| March 2021 | 54,116 | 21,430 | 39.6 |
| April 2021 | 50,089 | 17,799 | 35.5 |
| May 2021 | 44,746 | 9,145 | 20.4 |
| June 2021 | 55,805 | 8,070 | 14.5 |
| July 2020 | 82,966 | 9,948 | 12.0 |

Put differently, between November 2020 and July 2021, the number of family-unit members rapidly expelled under Title 42 almost tripled—but encounters with members of family units increased more than six times as fast, growing *19-fold*.

55.     All told, between family-unit members and unaccompanied children, DHS has during the current fiscal year placed into Title 8 proceedings roughly 345,000 aliens who—but for its unexplained decisions to except them—otherwise would have been rapidly expelled under Title 42.

## D. Defendants violate their detention obligations.

### 1.  Mandatory detention generally.

56.     With limited exceptions, CBP generally does not detain aliens for the purposes of removal; that duty falls to ICE. ICE's own data shows that it is not complying with the requirement that it detain all persons who appear at the border without permission to enter into the United States. The overwhelming majority of family-unit members are not detained at all; the few who are detained are released into the United States in a matter of days.

57.     To date in Fiscal Year 2021, ICE processed roughly 9,500 aliens into Family Residential Centers.[8]. From March–July 2021, the average detainee in a Family Residential Center was there for approximately a week. And at the time of its last report, it was detaining only 1,118 aliens in family units in those centers.

58.     If CBP has processed nearly 236,000 family-unit aliens this fiscal year under Title 8 but ICE has processed only 9,500 of them into a Family Residential Center, DHS has released 96% of family-unit aliens into the United States rather than detaining them as the law requires. But DHS can release such aliens on a case-by-case basis for urgent humanitarian reasons or significant public benefit. 8 U.S.C. § 1182(d)(5)(A). Given the number of aliens

---

[8]   Statistics regarding ICE detentions are taken from *ICE Detention Statistics*, U.S. Immig. & Customs Enft., https://www.ice.gov/doclib/detention/FY21_detention Stats07222020.xlsx (downloaded Aug. 23, 2021).

released, for this case-by-case analysis to have occurred is all but impossible. CBP's medical policy.

### 2. Detention for public-health reasons.

59.     CBP's Directive 2210-004 guides the agency's "medical support for individuals in CBP custody along the [Southwest Border]." CBP Directive No. 2210-004, U.S. CUSTOMS AND BORDER PROT., at ¶ 2 (Dec. 30, 2019).[9] Under that directive, "[c]onsistent with short-term detention standards and applicable legal authorities," CBP does not detain individuals "in CBP facilities for the sole purpose of completing non-emergency medical tasks." *Id.* at ¶ 3.

60.     The Directive mentions neither screening for COVID-19 nor detention to screen for public-health inadmissibility. Given that CBP does not detain aliens so it can complete "non-emergency medical tasks," *Id.* at ¶ 2, those screenings must be accomplished elsewhere—for family-unit members, at least, at ICE. But given that ICE processed only 9,500 such aliens into its facilities, the other 225,000 of them—more than entire population of Amarillo; nearly the population of Irving or Garland—were certainly not detained for the CDC-recommended three-to-five days for even a vaccinated person to be tested for possible exposure to COVID-19.

## E. Texas sues, and the Defendants issue new orders.

### 1. The July Order.

61.     Texas filed this suit on April 22. ECF No. 1. The Court heard argument on Texas's motion for a preliminary injunction on July 13. ECF No. 49. Six days later, the CDC issued a new order excepting unaccompanied children from the October Order. *See* Exh. C, Pub. Health Determ. Regarding

---

9    https://www.cbp.gov/document/directives/directive-2210-004-cbp-enhanced-medical-efforts.

an Exception for Unaccompanied Noncitizen Children, 86 Fed. Reg. 38,717 (July 22, 2021) (signed July 19, 2021).

62.     The July Order stated that it was based on findings related to the mitigation measures DHS had put in place for unaccompanied children. *Id.* at 38,718–28,719. These measures included using masks, testing, cohorting unaccompanied children according to test status, vaccinating staff, making the vaccination available to unaccompanied children over 12 years of age, and expanding the capacity at facilities where unaccompanied children are held. According to the July Order, these were sufficient "to protect the children, caregivers, and local communities from elevated risk of COVID-19 transmission," and "U.S. healthcare resources" would therefore not be significantly affected by the need to furnish care to those unaccompanied children. *Id.* at 38,720.

63.     However, DHS simultaneously conceded that from more than 15,000 of the unaccompanied children in its care—either in its own facilities or those in which they had been placed by the Office of Refugee Resettlement—had tested positive for COVID-19. *Id.* at 38,719. And it simultaneously conceded that unaccompanied children are quarantined upon arriving at CBP facilities for only 7 days rather than the 14 recommended by the CDC; that children who test positive for COVID-19 are isolated for only 10 days, rather than the 14 recommended by the CDC; and that children exposed to COVID-19 are isolated for only 10 days, rather than the 14 recommended by the CDC. *Id.* fn. 19. It gave no reason for these deviations from the CDC's recommendations.

64.     More, DHS does not keep these children near the ports of entry where they are processed into DHS custody. Rather, they are transported across the country. HHS has opened makeshift emergency shelters across the country, including one at a converted oilfield workers' camp in Midland and

another at the Hutchison Convention Center in Dallas. *See* Joshua Skinner & Kate Porter, *Midland leaders blindsided by arrival of migrants at holding facility*, CBS7 (Mar. 14, 2021);[10] Nomaan Merchant & Jake Bleiberg, *Immigrant teens to be housed at Dallas convention center*, ASSOCIATED PRESS (Mar. 15, 2021).[11]

## 2. The August Order.

65.    On August 3, 2021, issued an order superseding the October Order and incorporating by reference the July Order excepting unaccompanied children. Exh. D, Pub. Health Reassessment and Order Suspending the Right to Introduce Certain Persons, 86 Fed. Reg. 48,828 (Aug. 5, 2021). The August Order included no further findings or conclusions regarding unaccompanied children. *See id.* at 42,838.

66.    The August Order summarized the current state of emergency and nature of the pandemic:

- "78 countries continue to experience high or substantial incidence rates (≥50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases." *Id.* at 42,831.

- In the week preceding the Order, Mexico—through which all aliens appearing for entrance at the southwest border must travel— "experienced a 30.2% increase in new cases" of COVID-19. *Id.* at 42,831.

- "Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a

---

[10]   https://www.cbs7.com/2021/03/14/gov-abbott-federal-hhs-sending-some-migrants-to-midland

[11]   https://apnews.com/article/dallas-health-coronavirus-pandemic-immigration-border-patrols-fa567f671faa0e9eb33e37f30746f1b6

heightened risk of COVID-19 outbreaks." *Id.* at 42,833. CBP facilities themselves have "[s]pace constraints [that] preclude implementation of cohorting and consequence management such as quarantine and isolation." *Id.* at 42,837.

- "The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States." *Id.* at 42,834.

- "Countries of origin for the majority of incoming covered [aliens] have markedly lower vaccination rates." Of the top five originating countries, El Salvador, at 22%, had the highest rate of vaccinated persons; Guatemala and Honduras, the two lowest, had 1.6% and 1.8%, respectively. *Id.* at 42,834 & n.57.

- "At the time [the order was issued], over 70% of U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission." *Id.* & fn. 61. None of Texas's 14 border counties were "experiencing low levels of community transmission." Two of them were "experiencing moderate levels of community transmission[.]" The other twelve? "[H]igh levels of community transmission[.]" *Id.*

67.     The August Order concedes that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." Exh. D at 42,835. It came only days after the Defendants released more than 1,500 COVID-positive illegal aliens into the city of McAllen, Texas. *See* Adam Shaw & Bill Melugin, *Texas*

*border city says more than 7,000 COVID-positive migrants released since February, 1,500 in last week*, Fox News (Aug. 4, 2021).[12]

68.    The August Order did not authorize or attempt to justify exempting family-unit members from the Title 42 expedited-removal proceedings. Indeed, it concluded that "the continued suspension of the right to introduce" family-unit members into the United States "is appropriate…." *Id.* at 42,838.

**F. Irreparable Harms to Texas.**

69.    Texas has suffered and continues to suffer irreparable harm because of the Defendants' actions. The October Order acknowledged as much: "[S]everal cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission that has strained their healthcare and public health systems. Furthermore, continuing to slow the rate of COVID-19 transmission is critical as states and localities ease public health restrictions on businesses and public activities in an effort to mitigate the economic and other costs of the COVID-19 pandemic." Exh. A at 65,812.

70.    Moreover, the Defendants expressly acknowledged in their agreement with Texas that Texas will suffer "concrete injuries" as a result of "a decrease in any immigration enforcement." *See* Exh. E, § II.A.1. In the same Agreement, DHS agreed to "[c]onsult with Texas before taking any action or making any decision that could … increase the number of removable or inadmissible aliens in the United States." *Id.* at § III.A.2.

71.    The harm to Texas will continue to increase as the Defendants release more aliens from their custody, particularly those who have not been

---

[12]    https://www.foxnews.com/politics/texas-border-city-covid-positive-migrants-released-february-last-week

screened for COVID-19. The August Order recognizes that this is a concrete harm—that this is not a potential or hypothetical harm that might occur at some point in the future: The "flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." Exh. D at 42,835.

72.    The release of illegal aliens into Texas causes Texas to incur significant costs, including higher healthcare, law enforcement, and education costs, none of which are recoverable at law. Additionally, the release of aliens who have not been treated or screened for COVID-19 furthers the spread of that pandemic throughout the United States in general and Texas in particular, increasing the risk to Texans of infection and compounding the difficulties already faced by Texas's public-health officials. Indeed, as the July Order admitted, more than 15,000 unaccompanied children have tested positive for COVID-19 while under the care of CBP or an Office of Refugee Resettlement facility. Exh. C at 38,719.

73.    McAllen alone has seen the Defendants release more than 7,000 COVID-positive aliens into the city since February—more than 1,500 of them during the last week of July, the week immediately before the August Order. *See* ¶ 68. In response to the "overwhelming number of immigrants stranded," there, the city commission approved the construction of a temporary emergency shelters. *See* Adam Shaw & Bill Melugin, *Texas border city puts up temporary shelters to cope with "rapidly escalating" migrant surge*, Fox News (Aug. 4, 2021).[13] Additional reporting indicates that DHS is releasing COVID-positive aliens into the United States on a daily basis. *See, e.g.,* Adam Shaw,

---

[13]   https://www.foxnews.com/politics/texas-mcallen-shelters-cope-escalating-migrant-surge

*Border Patrol union official warns COVID-positive migrants being released into US 'day in, day out,'* FOX NEWS (July 31, 2021);[14] Louis Casiano, *Texas police learn COVID-positive illegal immigrants sent to local hotels, after Whataburger encounter*, FOX NEWS (July 27, 2021).[15]

74.     In fact, just weeks ago, DHS's Assistant Secretary for Border and Immigration Policy, David Shahoulian, swore to the increased risk of COVID-19 infections posed by permitting illegal aliens into the United States from the southwestern border: Due to "the highly transmissible COVID-19 Delta variant," the "rates at which encountered noncitizens are testing positive for COVID-19 have increased significantly in recent weeks." And indeed, "the rate of infection among CBP officers … recently began increasing again, even though the percentage of officers and agents who have been fully vaccinated has grown significantly since January," leading "to increasing numbers of CBP personnel being isolated and hospitalized." Decl. of D. Shahoulian, ECF No. 113-1, *Huisha-Huisha v. Mayorkas*, No. 1:21-cv-00100-EGS (D.D.C. Aug. 2, 2021). The threat to Texas's residents and visitors is no less.

## Claims for Relief

### A.  Lack of notice-and-comment rulemaking.

75.     The Defendants did not conduct the statutorily required notice and comment process for the July and August Orders.

76.     Under the APA, reviewing courts must "hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

---

[14] https://www.foxnews.com/politics/border-patrol-official-covid-migrants-released-day-in-day-out

[15] https://www.foxnews.com/us/texas-police-covid-illegal-immigrants-whataburger

77.     Agencies issuing rules must follow notice-and-comment rulemaking, 5 U.S.C. § 553(b)–(c), and have rules take effect 30 or more days after promulgation, 5 U.S.C. § 553(d), unless an applicable exception applies.

78.     The July Order and the August Order constitute substantive rules for APA purposes because they bind agency discretion. 5 U.S.C. § 551(4)–(5). Further, they are final orders because they represent the culmination of the agency's consideration and affect the rights and obligations of those to whom they apply. Indeed, the title of the July Order itself refers to the "right" affected by the rule, specifically "the right to introduce certain persons from countries where a quarantinable communicable disease exists." Exh. C.

79.     The good-cause exception to the APA's notice-and-comment requirement does not apply. For example, there was ample time for DHS to notify the public of its intention to permanently exempt unaccompanied children from Title 42 and to gather and consider comments on that proposal, as demonstrated by the five months between the February Order and the July Order and the additional month until the August Order.

80.     Nor does the foreign-affairs exception to the APA's notice-and-comment requirement apply. Implementing the orders through notice-and-comment rulemaking would not have "provoke[d] definitely undesirable international consequences." *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (citation omitted), *superseded by statute on other grounds*, by 8 U.S.C. § 1101(a)(42). That the United States is engaged in "ongoing discussions with Canada and Mexico on how best to control COVID-19 transmission over our shared borders," Exh. D at 42,841, does not entitle the Defendants to except the August Order from the APA's procedures. There is no evidence that complying with the APA's rulemaking procedures would cause a diplomatic

incident, particularly given that restrictions similar to those in the August Order had been in place since the previous October.

**B. Arbitrary and capricious agency action.**

### 1. Failure to consider state reliance interests.

81.    The August Order is arbitrary and capricious because the Defendants also did not consider the State of Texas's reliance interests in the continuation of the Title 42 policy set forth in the October Order. In particular, the Defendants did not consider whether Texas relied on their announcement of the Title 42 procedures and their implementation of them when Texas determined how it would marshal and distribute its resources to address the public-health, safety, and economic effects of the COVID-19 pandemic. The failure to do so was arbitrary and capricious, requiring that the July and August Orders be set aside.

### 2. Failure to consider all relevant factors.

82.    The August Order is arbitrary and capricious because the Defendants did not consider all relevant factors or alternative approaches to their decision to except unaccompanied children from Title 42. The *de facto* policy of paroling family-unit members into the United States rather than detaining them is arbitrary and capricious for the same reason.

83.    The Defendants did not consider all relevant factors in deciding on a *de facto* policy of releasing family-unit members into the United States or in concluding that the mitigation measures put in place to accommodate unaccompanied children were sufficient to protect the public health. In particular, they did not consider the public health and public policy consequences of the emergence of new variants of the COVID-19 virus, nor how their policies encouraging illegal immigration including how their policies were

27

inconsistent with and could undermine the public-health rationale for travel restrictions on U.S. citizens and legal aliens or tourists from other countries.

84.     This inconsistency is demonstrated most starkly by DHS's renewed suspension of non-essential travel between the United States and Mexico, which occurred between DHS's issuance of the July Order and its issuance of the August Order and emphasized "that the risk of continued transmission and spread of the virus associated with COVID-19 between the United States and Mexico poses an ongoing 'specific threat to human life or national interests.'" 86 Fed. Reg. 38,554, 35,555. Similarly, the Defendants did not consider how their policies were consistent with the suspension of entries into the United States of individuals from countries suffering from similar outbreaks of COVID-19. *See*, *e.g.*, Pres. Proc. 10199 of April 30, 2021, 86 Fed. Reg. 24,297 (suspending entry of persons from India due to outbreak of Delta variant of COVID-19); Pres. Proc. 10143 of Jan. 25, 2021, 86 Fed. Reg. 7,467 (restricting travel to the United States for individuals from China, Iran, Brazil, South Africa, the European Schengen area, the United Kingdom, and Ireland).

85.     Nor did the defendants consider whether they could achieve the goals of the August Order through a less-burdensome or less-sweeping means. This too made the Defendants' resulting decision arbitrary and capricious. The July and August Orders did not consider alternative approaches that would allow the use of Title 42 in some cases for unaccompanied children (and for some family-unit members, in contrast to the *de facto* policy exempting them from Title 42) and that would have accordingly imposed less-significant burdens on Texas. This renders their decisions to implement those policies arbitrary and capricious.

**C. Unlawful withholding of required agency action.**

**1. Requirement to detain aliens pending completion of removal or asylum proceedings.**

86.    The Defendants acted unlawfully by disobeying the statutory and regulatory requirements for detaining unaccompanied children and family-unit members encountered at the southern border.

87.    Both the INA and the Defendants' express regulations require that family-unit members be detained until their removal or asylum proceedings have concluded. Yet the Defendants are not doing so. Indeed, they have adopted a *de facto* policy of paroling such aliens into the United States.

88.    Under the APA, the Court may compel the Defendants to undertake agency action that has been unlawfully withheld. In this case, it may—and should—compel the Defendants to detain all family-unit members pending completion of their removal or asylum proceedings unless they qualify, on the case-by-case basis permitted by the INA, for parole.

**2. Violation of requirement to determine inadmissibility based on public health.**

89.    DHS must detain aliens if it has reason to believe they are "afflicted with" such a "communicable disease of public health significance," such as COVID-19. 8 U.S.C. § 1222(a). It must also detain those aliens if it "has received information showing that [they] are coming from a country or have embarked at a place" where such a disease is "prevalent or epidemic[.]" *Id.* The detention must enable "immigration officers and medical officers" to conduct "observation and an examination sufficient to determine whether" the aliens are inadmissible. *Id.*

90.    Rather than doing so for unaccompanied children and family-unit members who arrive at the southwest border with Mexico—a country where

COVID-19 is prevalent or epidemic—the Defendants have released those aliens into the United States. Their doing so violates the law. To the extent that its doing so is the result of a policy, that policy is a final agency action.

91.     DHS has a mandatory duty to detain these aliens such that it can determine whether they are inadmissible for public-health reasons. The Court should order that it undertake that unlawfully withheld action. To the extent that its failure to comply with that mandatory duty is the result of a policy, it should find that the policy is arbitrary and capricious for conflicting with its statutory obligations and set it aside.

**D. Violation of the parole authority.**

92.     DHS's authority to parole aliens into the United States may be exercised only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). DHS has exercised its parole authority for tens of thousands of aliens in Fiscal Year 2021 alone, demonstrating that it grants parole on more than a truly "case-by-case" basis and grants parole for reasons other than "urgent humanitarian reasons or significant public benefit." *Id.*

93.     DHS's improper use of its parole authority conflicts with the statutory limits on DHS's power. As such, its exercises of that authority should be set aside as arbitrary and capricious, and the Court should render judgment confining DHS's use of that authority to its proper scope.

**E. Violation of agreement between DHS and Texas.**

94.     The Defendants, by agreement with Texas, assumed several duties. Among these are:

- The duty to "[c]onsult with Texas before taking any action or making any decision that could … increase the number of removable aliens in the United States," Ex. E, § III.A.2;

- The duty to "[p]rovide Texas with 180 days' written notice … of any proposed action listed in Section III.A.2 and an opportunity to consult and comment on the proposed action," *Id.*, § III.A.3; and

- The duty to "in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action listed in Section III.A.2," including, if there is "doubt as to whether DHS's action is implicated by this provision, … err[ing] on the side of consulting Texas before taking any such action." *Id.*, § III.A.3.

95.     The Defendants have violated each of these duties in the manners listed above by not giving Texas any notice of changes in immigration enforcement. Moreover, with respect to the Title 42 removals, the Defendants also breached their duties by taking actions that have resulted in an increase in the number of removable aliens in Texas and in the United States.

## F. Violation of the Take Care Clause.

96.     The Constitution requires the President, as well as those exercising power on his behalf, to "take care that the Laws be faithfully executed." U.S. CONST. art. II, § 3; *see also* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

97.     The Defendants' refusal to comply with the INA and their adoption of policies that conflict with that law's requirements violate their obligation to see that those laws are faithfully executed.

98.     Unconstitutional agency action or inaction violates the APA, *see* 5 U.S.C. § 706, and can be enjoined on that basis. However, violations of the Take Care Clause are actionable independent of the APA, and the Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## Prayer for Relief

For these reasons, Texas prays that the Court:

- Declare that the July and August Orders are unlawful and set them aside;

- Declare that the Defendants' *de facto* policy of paroling family-unit members is unlawful and set it aside;

- Enjoin the Defendants from enforcing the July and August Orders and enjoin them to continue to apply the October Order;

- Enjoin the Defendants to place into expedited removal proceedings under Title 42 all covered aliens, as defined in the Final Rule and the October Order;

- Enjoin the Defendants to detain until the completion of removal or asylum proceedings all aliens placed in either the Title 8 or Title 42 removal process, unless those aliens qualify for parole on the case-by-case basis set forth in the INA;

- Enjoin the Defendants to detain—until it has determined in accordance with CDC guidance whether they are inadmissible for carrying the COVID-19 virus, a communicable disease of public health significance— all aliens who arrive at the southwest border who are subject to

expedited removal under 8 U.S.C. § 1225(a)(1), unless those aliens qualify for parole on the case-by-case basis set forth in the INA;

- Hold unlawful and set aside Defendants' exercises of DHS's parole authority for all family-unit members who were paroled without the case-by-case determination required by the INA;

- Enjoin Defendants' future exercises of DHS's parole authority except on the case-by-case basis set forth in the INA;

- Award Texas its costs and reasonable attorney's fees; and

- Award all other and further relief as the Court deems equitable and just.

Dated August 23, 2021.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted,

*/s/ Aaron F. Reitz*

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

MATTHEW G. WHITAKER
Admitted *pro hac vice*
America First Legal Foundation
300 Independence Avenue SE
Washington, D.C. 20003
(202) 964-3721
info@aflegal.org

CHRISTOPHER J. HAJEC
Admitted *pro hac vice*
MATT A. CRAPO
Admitted *pro hac vice*

Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(540) 205-7986
litigation@irli.org

*Counsel for the State of Texas*

## Certificate of Service

I certify that on August 23, 2021, I filed this First Amended Complaint with the Court's CM/ECF system, which served a copy on all counsel of record.

/s/ Leif A. Olson