# United States District Court
## Northern District of Texas
## Fort Worth Division

STATE OF TEXAS,
  *Plaintiff,*

v.

JOSEPH R. BIDEN, JR., *et al.*;
  *Defendants.*

Case 4:21-cv-00579-P

## <u>Brief Supporting Renewed Motion for Preliminary Injunction</u>

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

*Counsel for the State of Texas*

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

MATTHEW G. WHITAKER
Admitted *pro hac vice*
America First Legal Foundation
300 Independence Avenue SE
Washington, D.C. 20003
(202) 964-3721
info@aflegal.org

CHRISTOPHER J. HAJEC
Admitted *pro hac vice*
MATT A. CRAPO
Admitted *pro hac vice*
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(540) 205-7986
litigation@irli.org

# Contents

**Introduction** .............................................................................. 1

**Facts** ......................................................................................... 1

    A.    Governing laws.................................................................. 1

        1.    Detention of aliens not lawfully admitted............... 2

        2.    Detention of aliens to protect public health. ........... 3

    B.    The COVID-19 pandemic and the federal response. ......... 3

        1.    Federal guidance on COVID-19. ............................. 4

        2.    Restrictions at the U.S.–Mexico border.................. 6

    C.    The Title 42 process. ......................................................... 7

        1.    The Final Rule.......................................................... 7

        2.    The scope of the October Order. ............................. 9

        3.    The Defendants' use of Title 42 slumps. .............. 10

    D.    Defendants violate their detention obligations. ............. 12

        1.    Mandatory detention generally. ............................ 12

        2.    Detention for public-health reasons. ..................... 13

    E.    Texas sues, and the Defendants issue new orders. ......... 14

        1.    The July Order. ..................................................... 14

        2.    The August Order................................................... 15

        3.    The Defendants' procedures. ................................. 17

    F.    The Defendants' refusal to detain aliens harms Texas... 18

        1.    Hidalgo County....................................................... 18

        2.    Webb County. ........................................................ 20

        3.    Texans' health. ...................................................... 20

        4.    Texas's healthcare spending. ................................. 21

        5.    Other harms to Texas. ........................................... 22

**Argument: Texas is entitled to a preliminary injunction requiring the Defendants to comply with their mandatory duties and prohibiting their abandonment of Title 42.** ...................................................................... 22

    A.    Preliminary injunction standard..................................... 22

    B.    Texas is likely to prevail on the merits........................... 23

        1.     The Defendants' decisions to turn their backs on the Title 42 process were unreasoned. ................... 23

        2.     The Defendants' refusal to detain aliens arriving at the southwest border to determine whether they carry the COVID-19 virus is not in accordance with law......................................................................... 27

   C.    Texas is suffering irreparable harm................................. 29

   D.    The public interest and the equities favor an injunction. 31

**Prayer for Relief** ................................................................................. **32**

## **Table of Authorities**

**Cases**

*Alabama Assn. of Realtors v. Dept. of Health & Human Services*
   No. 20-cv-3377, 2021 WL 1779282 (D.D.C. May 5, 2021)
   No. 21A23, 594 U.S. ___, 2021 WL 3783142 (Aug. 26, 2021) ........................6

*Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*
   458 U.S. 592 (1982) ........................................................................................30

*Arizona v. United States,*
   567 U.S. 387 (2012) ........................................................................................31

*Capital Area Immigrants' Rights Coalition v. Trump*
   471 F. Supp. 3d 25 (D.D.C. 2020) ..................................................................26

*Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*
   710 F.3d 579 (5th Cir. 2013) ....................................................................22, 23

*Dept. of Homeland Sec. v. Thuraissigiam*
   140 S.Ct. 1959 (2020) .......................................................................................2

*Janvey v. Alguire*
   647 F.3d 585 (5th Cir. 2011) ..........................................................................23

*Jennings v. Rodriguez*
   138 S. Ct. 830 (2018) ...................................................................................3, 28

*League of Women Voters v. Newby*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................31

*Natural Resources Defense Council v. Wheeler*
   955 F.3d 68 (D.C. Cir. 2020) ..........................................................................25

*Nken v. Holder*
   556 U.S. 418 (2009) ........................................................................................31

*P.J.E.S. v. Pekoske*
   No. 20-5357 (D.C. Cir. Jan. 29, 2021)............................................................10

*P.J.E.S. v. Wolf*
   502 F. Supp. 3d 492 (D.D.C. 2020) ................................................................10

*Sierra Club v. U.S. Environmetal Protection Agency*
  939 F.3d 649 (5th Cir. 2019) ..........................................................................23

*Texas Food Industry Assn. v. U.S. Dept. of Agriculture*
  842 F. Supp. 254 (W.D. Tex. 1993) ...............................................................26

*Texas v. Biden*, No. 2:21-cv-067-Z
  2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) ..............................................28

*Texas v. Biden*, No. 21-10806
  2021 WL 3674780 (5th Cir. Aug. 19, 2021) ..................................................28

*Texas v. United States*
  86 F. Supp. 3d 591 (S.D. Tex. 2015) .............................................................30

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) .........................................................................22

*Texas v. United States*, No. 6:21-cv-003
  ___ F. Supp. 3d ___, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021)..............27

*U.S. Steel Corp. v. Environmental Protection Agency*
  595 F.2d 207 (5th Cir. 1979) .........................................................................26

**Statutes**

42 U.S.C. § 265 ....................................................................................................7

42 U.S.C. § 268 ....................................................................................................9

5 U.S.C. § 553 ..............................................................................................25, 26

5 U.S.C. § 706(2)..........................................................................................23, 29

8 U.S.C. § 1158 ....................................................................................................3

8 U.S.C. § 1182 ....................................................................................2, 3, 13, 32

8 U.S.C. § 1222 ........................................................................................3, 27, 28

8 U.S.C. § 1225 ....................................................................................2, 3, 27, 28

8 U.S.C. § 1229a ..................................................................................................2

8 U.S.C. § 1231 ................................................................................28

Homeland Security Act of 2002
   Pub. L. 107-296, 116 Stat. 2135 ............................................................2

Immigration and Nationality Act
   8 U.S.C. § 1101 *et seq.* ..................................................................2

**Other Authorities**

Adam Shaw & Bill Melugin
   *Texas border city says more than 7,000 COVID-positive migrants released
   since February, 1,500 in last week*
   Fox News (Aug. 4, 2021) ..............................................................17

CBP Directive No. 2210-004
   U.S. Customs and Border Prot. (Dec. 30, 2019)................................13, 14

Centers for Disease Control and Prevention, *COVID Data Tracker*
   https://covid.cdc.gov/covid-data-tracker (last visited Sep. 7, 2021)..............4

*ICE Detention Statistics*, U.S. Immig. & Customs Enforcement
   https://www.ice.gov/doclib/detention/FY21_detentionStats07222020.xlsx
   (downloaded Aug. 23, 2021) .........................................................13

Joshua Skinner & Kate Porter
   *Midland leaders blindsided by arrival of migrants at holding facility*
   CBS7 (Mar. 14, 2021) ................................................................15

Julia Ainsley
   *18 percent of migrant families leaving Border Patrol custody tested positive
   for Covid, document says*
   NBC News (Aug. 7, 2021) ............................................................18

Nomaan Merchant & Jake Bleiberg
   *Immigrant teens to be housed at Dallas convention center*
   Associated Press (Mar. 15, 2021) ................................................15

*Southwest Border Land Encounters*
   U.S. Customs and Border Protection https://www.cbp.gov/newsroom/
   stats/southwest-land-border-encounters (last visited Sep. 7, 2021) ..........10

TEXAS DEPT. OF STATE HEALTH SERVICES, *DSHS COVID-19 Dashboard*
   https://dshs.texas.gov/coronavirus/cases.aspx (last visited Sep. 7, 2021) ..... 4

**Regulations**

1 TEX. ADMIN. CODE § 355.8201 *et seq.* ............................................................. 22

1 TEX. ADMIN. CODE § 366.903 ......................................................................... 22

42 C.F.R. § 34.7 .................................................................................................. 22

42 C.F.R. § 71.40 .................................................................................................. 7

**Constitutional Provisions**

U.S. CONST. art. II, § 3 ...................................................................................... 29

**Federal Register entries**

*Notice of Temporary Exception From Expulsion of Unaccompanied Noncitizen
   Children*
   86 Fed. Reg. 9,942 (Feb. 17, 2021) ........................................................ 11, 25

*Notification of Temporary Travel Restrictions Between the U.S. and Mexico*
   85 Fed. Reg. 16547 (Mar. 24, 2020) .............................................................. 6

*Notification of Temporary Travel Restrictions Between the U.S. and Mexico*
   86 Fed. Reg. 46,964 (Aug. 23, 2021) .......................................................... 6, 7

*Order Suspending the Right to Introduce Certain Persons From Countries
   Where a Quarantinable Communicable Disease Exists*
   85 Fed. Reg. 65,806 (Oct. 13, 2020) ..................................................... passim

*Public Health Determination Regarding an Exception for Unaccompanied
   Noncitizen Children*
   86 Fed. Reg. 38,717 (July 22, 2021) ..................................................... passim

*Public Health Reassessment & Order Suspending the Right to Introduce
   Certain Persons*
   86 Fed. Reg. 42,828 (Aug. 5, 2021) ...................................................... passim

## Introduction

Agencies must justify their actions with reason. And they must comport with the strictures that Congress has placed on them and perform the duties Congress has demanded of them. The Defendants have failed these tests. They have not justified the exceptions they have written into a generally applicable rule, and they have not obeyed the mandate that Congress has given them. The Court should hold them to the law and require them to act as they should have been acting since before this case was filed.

## Facts

### A. Governing laws.

DHS is charged with enforcing the United States' immigration laws. This case concerns DHS's obligations to detain aliens in accordance with those laws—to detain them during the removal process and to detain them to determine whether they are carrying the COVID-19 virus into Texas from abroad. At issue are:

- Portions of the *Immigration and Nationality Act* requiring that DHS detain aliens pending their removal and to determine whether they pose a threat to public health;

- A *Final Rule*, *see* Appx. 1–3, adopted by the CDC allowing it to exclude from the country aliens who pose a serious threat of introducing a communicable, quarantinable disease;

- An *October Order,* *see* Appx. 4–10, putting that rule into effect and allowing for rapid removal of covered aliens;

- A *February Order,* *see* Appx. 11–12, excepting unaccompanied alien children from the October Order;

- A ***de facto policy*** excepting members of alien family units from the October Order;

- A ***July Order,*** *see* Appx. 13–15, making the February Order permanent; and

- An ***August Order,*** *see* Appx. 16–29, largely confirming both the February and July Orders.

### 1. Detention of aliens not lawfully admitted.

The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*., charge DHS with enforcing the nation's immigration laws, including the removal of aliens who are not lawfully present in the United States. Among the aliens who "are 'inadmissible' and therefore 'removable'" are those who lack a valid entry document when they apply for admission. *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S.Ct. 1959, 1964 (2020) (citing 8 U.S.C. §§ 1182(a)(7)(A)(i)(l), 1229a(e)(2)(A)). Aliens who arrive in the United States without having been admitted, and aliens who are present in the United States without having been lawfully admitted, are deemed to have applied for admission, and there are expedited procedures for removing these aliens. 8 U.S.C. § 1225(a)(1). They are subject to expedited removal if they (1) are inadmissible because they lack a valid entry document; (2) have not been continuously physically present in the United States for the two years preceding their inadmissibility determination; or (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer determines that such an alien is inadmissible, the alien must be ordered "removed from the United States

without further hearing or review." *Id.* § 1225(b)(1)(A)(i). Otherwise, the standard removal procedures apply.

Whether subject to standard or expedited removal, aliens placed in removal proceedings must be detained until the proceedings are complete. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844–45 (2018) (citing 8 U.S.C. § 1225(b)(1), (2)). Similarly, aliens who intend to claim asylum or who claim a credible fear of persecution if deported must be detained until their entitlement to asylum is determined. *See* 8 U.S.C. §§ 1158, 1225(b)(1)–(2). DHS may "for urgent humanitarian reasons or significant public benefit" temporarily parole these aliens, but it may do so "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A).

### 2.  Detention of aliens to protect public health.

Also inadmissible are those aliens who have a "communicable disease of public health significance," as defined by "regulations prescribed by the Secretary of Health and Human Services." 8 U.S.C. § 1182(a)(1)(A)(i). Aliens must be detained to determine whether they are inadmissible for public-health reasons under two circumstances. First, they must be detained if DHS has reason to believe they are "afflicted with" such a disease. 8 U.S.C. § 1222(a). Second, they must be detained if DHS "has received information showing that [they] are coming from a country or have embarked at a place" where such a disease is "prevalent or epidemic[.]" This detention must enable "immigration officers and medical officers" to conduct "observation and an examination sufficient to determine whether" the aliens are inadmissible. *Id.*

### B. The COVID-19 pandemic and the federal response.

In the CDC's own words, COVID-19 "is a quarantinable communicable disease caused by the SARS-CoV-2 virus." *Pub. Health Reassessment & Order Suspending the Right to Introduce Certain Persons*, 86 Fed. Reg. 42,828, 42,830

(Aug. 5, 2021) (Appx. 18). Since it emerged in late 2019, "SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic." *Id.* It has upended lives across the planet, with governments imposing curfews, shuttering businesses, and closing schools. Since early 2020, more than 35 million U.S. residents have been infected with COVID-19, including more than 2.6 million in Texas. Nearly 645,000 U.S. residents have died from COVID-related causes, more than 57,000 of them in Texas. *See* CTRS. FOR DISEASE CONTROL AND PREVENTION, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker (last visited Sep. 7, 2021); TEX. DEPT. OF STATE HEALTH SVCS., *DSHS COVID-19 Dashboard*, https://dshs.texas.gov/coronavirus/cases.aspx (last visited Sep. 7, 2021).

### 1. Federal guidance on COVID-19.

The CDC recommends a 14-day quarantine for those who "have been in close contact (within 6 feet of someone for a cumulative total of 15 minutes or more over a 24-hour period) with someone who has COVID-19…." *Quarantine and Isolation*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (July 29, 2021) (last visited Sep. 7, 2021). This "does not apply to those who have been fully vaccinated … unless they have symptoms," but even those people "should get tested 3–5 days after their exposure, even if they don't have symptoms," and they should "wear a mask indoors in public for 14 days following exposure or until their test result is negative." *Id.*

Since COVID-19 was first declared a public-health emergency in January 2020, the federal government has implemented a number of COVID–19 mitigation and response measures. "Recent concerns regarding the spread of the Delta variant prompted CDC to release updated guidance calling for

vaccinated persons to wear a mask indoors in public when in an area of substantial or high transmission." Appx. 19 (footnotes omitted). The "other measures" currently in effect include:

- Requiring the use of masks by federal employees and on federal property, *see* Exec. Order No. 13991, 86 Fed. Reg. 7,045 (Jan. 25, 2021);

- Recommending that teachers, staff, and students in K-12 schools wear masks, *see* CTRS. FOR DISEASE CONTROL AND PREVENTION, *Guidance for COVID-19 Prevention in K-12 Schools* (July 9, 2021);[1]

- Continuing to require individuals to wear masks while in airports and on airplanes, *see* TRANSP. SEC. ADMIN., *TSA extends face mask requirement at airports and throughout the transportation network* (Apr. 30, 2021);[2]

- Requiring that all civilian federal employees show proof of vaccination status, *see* THE WHITE HOUSE, *FACT SHEET: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant* (July 29, 2021);[3] and

- Ordering a moratorium on evictions for failure to pay rent, *see Temp. Halt in Residential Evictions*, 86 Fed. Reg. 43244 (Aug. 6, 2021). *But see Ala. Assn. of Realtors v. Dept. of Health & Human Svcs.*, No. 20-cv-3377, 2021 WL 1779282 (D.D.C. May 5, 2021) (vacating moratorium); No.

---

[1]  https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html

[2]  https://www.tsa.gov/news/press/releases/2021/04/30/tsa-extends-face-mask-requirement-airports-and-throughout

[3]  https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-president-biden-to-announce-new-actions-to-get-more-americans-vaccinated-and-slow-the-spread-of-the-delta-variant/

21A23, 594 U.S. ___, 2021 WL 3783142 (Aug. 26, 2021) (denying stay of vacatur).

## 2. Restrictions at the U.S.–Mexico border.

"Other mitigation measures have involved restrictions on international travel and migration." Appx. 19 (footnotes omitted). The Defendants have imposed or continued four Presidential Proclamations suspending the entry of individuals from thirty-three countries across the world—including almost all of the nation's NATO allies—based on the threat posed by the potential spread of COVID-19. *See generally* U.S. DEPT. OF STATE, *COVID-19 Travel Restrictions and Exceptions* (June 24, 2021).[4]

Another restriction has been to limit all but essential travel between the United States and Mexico. *See Notif. of Temp. Travel Restrictions Between the U.S. and Mex.*, 85 Fed. Reg. 16547 (Mar. 24, 2020) (Appx. 30–31). In the latest notice continuing these restrictions, DHS reiterated that it had "determined that the risk of continued transmission and spread of the virus associated with COVID-19 between the United States and Mexico poses an ongoing 'specific threat to human life or national interests,'" *Notif. of Temp. Travel Restrictions Between the U.S. and Mex.*, 86 Fed. Reg. 46,964 (Aug. 23, 2021) (Appx. 32), and additionally observed that "the Delta variant is driving an increase in cases, hospitalizations, and deaths in the United States." *Id.* DHS and its Mexican counterparts had "determined that non-essential travel between the United States and Mexico … places the populace of both nations at increased risk of contracting the virus associated with COVID–19." Appx. 33. DHS additionally justified the continued suspension of non-essential travel to and from Mexico

---

[4]   https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/covid-19-travel-restrictions-and-exceptions.html

because "the sustained human-to-human transmission of the virus, coupled with risks posed by new variants, returning to previous levels of travel between the two nations [would place] the personnel staffing land ports of entry between the United States and Mexico, as well as the individuals traveling through these ports of entry, at increased risk of exposure to the virus associated with COVID–19." *Id.*

## C. The Title 42 process.

### 1. The Final Rule.

On September 11, 2020, the CDC published a final rule that "establishe[d] final regulations under which the Director [of the CDC] may suspend the right to introduce and prohibit, in whole or in part, the introduction of persons into the United States for such period of time as the Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States." 85 Fed. Reg. 56,424 (Sep. 11, 2020) (codified at 42 C.F.R. § 71.40). This Final Rule, issued under the authority granted by the Public Health Service Act, 42 U.S.C. § 265, became effective on October 13, 2020. The day the Final Order became effective, the CDC issued the October Order, which suspended the right of persons traveling from countries where COVID-19 is endemic to enter the United States. *See Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg. 65,806 (Oct. 13, 2020) (Appx. 4–10). Collectively, the Final Rule and this October Order work together in a process generally known as "Title 42."

Though issued under the Final Rule, the October Order was the latest in a series of orders issued under the interim final rule.[5] As had the earlier orders, the October Order suspended introducing covered aliens into the United States, a suspension lasting until CDC determined that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health[.]" Appx. 7. The suspension was based on findings that:

- COVID-19 is a communicable disease that poses a danger to the public health;

- COVID-19 is present in numerous foreign countries, including Canada and Mexico;

- Because COVID-19 is so globally widespread, there is a serious danger that it will be carried into the land points of entry and Border Patrol stations at or near the United States' borders with Canada and Mexico, and from there into the interior of the country;

- If their entry were not suspended, covered aliens would be go through immigration processing at the land points of entry and Border Patrol stations that would require many of them (typically aliens who lack valid travel documents and are therefore inadmissible) to be held in the congregate areas of the facilities, in close proximity to one another, for hours or days;

- Holding them in such settings would increase the already serious danger to the public health of the United States; and

---

[5]  CDC issued an interim final rule on March 24. 85 Fed. Reg. 16,559 (Mar. 24, 2020). It also issued a series of orders that initially covered only 30 days apiece before being amended to require review every 30 days. *Id.* at 17,060 (Mar. 26, 2020); 22,424 (Apr. 22, 2020); 31,503, 31,507–08 (May 26, 2020).

8

- This increased danger rose to the level that it required a temporary suspension of the introduction of covered aliens into the United States.

Appx. 8.

Customs and Coast Guard officers have the duty to "aid in the enforcement of quarantine rules and regulations," 42 U.S.C. § 268, and the Order noted that CDC had requested "that DHS aid in the enforcement [of] this Order because CDC does not have the capability, resources, or personnel needed to do so." Appx. 10. CDC needed this assistance because of its own public health tools' not being "viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States." *Id.*

### 2. The scope of the October Order.

The October Order applied to all covered aliens, defined as aliens "seeking to enter the United States … who lack proper travel documents," "whose entry is otherwise contrary to law," or "who are apprehended at or near the border seeking to unlawfully enter the United States." Appx. 5.

Among other exceptions, the October Order did not apply to those "whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.* In those limited circumstances, DHS was required to "consult with CDC concerning how these types of case-by-case, individualized exceptions" were to be made to help "ensure consistency with current CDC guidance and public health assessments." *Id.*

The October Order noted that expulsions under CDC's prior orders had "reduced the risk of COVID-19 transmission in [points of entry] and Border

Patrol Stations, and thereby reduced risks to DHS personnel and the U.S. health care system." *Id.* It further noted that "[t]he public health risks to the DHS workforce—and the erosion of DHS operational capacity—would have been greater" without the initial suspension order. Appx. 8. Further, the suspension orders "significantly reduced the population of covered aliens in congregate settings in [points of entry] and Border Patrol stations, thereby reducing the risk of COVID-19 transmission for DHS personnel and others within these facilities." Appx. 8.

DHS began using its Title 42 authority to expel aliens in March 2020, and the population of aliens processed under Title 8 (the ordinarily applicable immigration rules) plummeted. Out of more than 253,000 total southwest border encounters under Title 8 in Fiscal Year 2020, fewer than 25,000 occurred in the last six months of the year.[6] During that same six-month period, nearly 200,000 aliens were rapidly expelled under Title 42.

### 3. The Defendants' use of Title 42 slumps.

#### a. unaccompanied alien children are placed outside Title 42.

On November 18, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction that enjoined the Defendants from applying Title 42 to unaccompanied alien children. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020). The D.C. Circuit stayed that injunction in late January. *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021).

The stay enabled the Defendants once again to apply Title 42 to unaccompanied alien children. Rather than do so, however, CDC announced

---

[6]  The CBP statistics cited in this First Amended Complaint are available at *Sw. Border Land Encounters*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Sep. 7, 2021).

that it would except them from the October Order, and backdated the exception to the date the stay was lifted. *Not. of Temp. Exception From Expulsion of Unaccompanied Noncitizen Children*, 86 Fed. Reg. 9,942 (Feb. 17, 2021) (Appx. 11).

The retroactive order noted that COVID-19 continued to pose a "highly dynamic public health emergency" and that the CDC was "in the process of reassessing the overall public health risk at the United States' borders and [the October Order] based on the most current information…." *Id.* Other than those general statements, the order did not explain why CDC had decided not to apply Title 42 to unaccompanied alien children.

Unsurprisingly, after excepting them from Title 42, the number of unaccompanied alien children encountered at the southwest border increased, reaching roughly 9,500 in February (a 61% increase over the number encountered in January and 105% more than November). The number rose sharply to 18,890 in March and has remained elevated ever since: more than 17,000 encounters in April; more than 14,000 in May; more than 15,000 in June; and nearly 19,000 in July.

### b. Those claiming to be family groups are *de facto* placed outside Title 42.

As unaccompanied alien children were placed outside the purview of Title 42, the Defendants slowly stopped applying Title 42 to members of family units. Unlike the exception for unaccompanied alien children, however, this was neither announced nor formalized. Instead, it happened *sub silentio*, becoming a *de facto* policy as, among other things, Mexico's government began refusing to accept the return of certain aliens who would have been expelled from certain ports of entry. *See* Appx. 39 at ¶ 19–20.

The total encounters with family units spiked following January 2020. But rather than spiking along with it, the Defendants' application of Title 42 has cratered:

| Month | Family-unit encounters | Title 42 applications to family units | |
| --- | --- | --- | --- |
| | | Absolute | Percentage |
| November 2020 | 4,302 | 3,641 | 84.6 |
| December 2020 | 4,404 | 3,332 | 75.7 |
| January 2021 | 7,296 | 4,546 | 62.3 |
| February 2021 | 19,588 | 9,476 | 48.4 |
| March 2021 | 54,116 | 21,430 | 39.6 |
| April 2021 | 50,089 | 17,799 | 35.5 |
| May 2021 | 44,746 | 9,145 | 20.4 |
| June 2021 | 55,805 | 8,070 | 14.5 |
| July 2020 | 82,966 | 9,948 | 12.0 |

Put differently, between November 2020 and July 2021, the number of family-unit members rapidly expelled under Title 42 almost tripled—but encounters with members of family units increased more than six times as fast, growing *19-fold*.

All told, between family-unit members and unaccompanied alien children, DHS has during the current fiscal year placed into Title 8 proceedings roughly 345,000 aliens who otherwise would have been rapidly expelled under Title 42.

## D. Defendants violate their detention obligations.

### 1. Mandatory detention generally.

With limited exceptions, the duty to detain aliens pending removal falls not to CBP, but to ICE. ICE's own data shows that it is not complying with the requirement that it detain all persons who appear at the border without

permission to enter into the United States. The overwhelming majority of family-unit members are not detained at all; the few who are detained are released into the United States in a matter of days.

To date in Fiscal Year 2021, ICE processed roughly 9,500 aliens into Family Residential Centers.[7] From March–July 2021, the average detainee in a Family Residential Center was there for approximately a week. As of its last report, ICE was detaining only 1,118 family-unit aliens in those centers.

If CBP has processed nearly 236,000 family-unit aliens this fiscal year under Title 8 but ICE has processed only 9,500 of them into a Family Residential Center, DHS has released 96% of family-unit aliens into the United States rather than detaining them as the law requires. DHS can release such aliens only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. 8 U.S.C. § 1182(d)(5)(A). Given the number of aliens released, for this case-by-case analysis to have occurred is all but impossible.

### 2. Detention for public-health reasons.

CBP's Directive 2210-004 guides the agency's "medical support for individuals in CBP custody along the [Southwest Border]." CBP Directive No. 2210-004, U.S. CUSTOMS AND BORDER PROT., at ¶ 2 (Dec. 30, 2019) (Appx. 111). Under that directive, "[c]onsistent with short-term detention standards and applicable legal authorities," CBP does not detain individuals "in CBP facilities for the sole purpose of completing non-emergency medical tasks." *Id.* at ¶ 3.

The Directive mentions neither screening for COVID-19 nor detention to screen for public-health inadmissibility. Given that CBP does not detain aliens

---

[7]   Statistics regarding ICE detentions are taken from *ICE Detention Statistics*, U.S. Immig. & Customs Enft., https://www.ice.gov/doclib/detention/FY21_detentionStats 07222020.xlsx (downloaded Aug. 23, 2021).

so it can complete "non-emergency medical tasks," *id.*, those screenings must be accomplished elsewhere—for family-unit members, at least, at ICE. But given that ICE processed only 9,500 such aliens into its facilities, the other 225,000 of them—more than entire population of Amarillo; nearly the population of Irving or Garland—were certainly not detained for the CDC-recommended three-to-five days for even a vaccinated person to be tested for possible exposure to COVID-19.

**E. Texas sues, and the Defendants issue new orders.**

**1. The July Order.**

Texas filed this suit on April 22, and the Court heard Texas's motion for a preliminary injunction on July 13. ECF Nos. 1, 49. Six days later, the CDC issued a new order excepting unaccompanied alien children from the October Order. *See Pub. Health Determ. Regarding an Exception for Unaccompanied Noncitizen Children*, 86 Fed. Reg. 38,717 (July 22, 2021) (signed July 19, 2021) (Appx. 13–15).

The July Order stated that it was based on findings related to the mitigation measures DHS had put in place for unaccompanied alien children. Appx. 13–14. These measures included using masks, testing, cohorting unaccompanied alien children according to test status, vaccinating staff, making the vaccination available to unaccompanied alien children over 12 years of age, and expanding the capacity at facilities where unaccompanied alien children are held. According to the July Order, these were sufficient "to protect the children, caregivers, and local communities from elevated risk of COVID-19 transmission," and "U.S. healthcare resources" would therefore not be significantly affected by the need to furnish care to those unaccompanied alien children. Appx. 15.

14

DHS simultaneously conceded, however, that more than 15,000 of the children in its care—either in its own facilities or those in which they had been placed by the Office of Refugee Resettlement—had tested positive for COVID-19. Appx. 14. And it simultaneously conceded that unaccompanied alien children are quarantined upon arriving at CBP facilities for only 7 days rather than the 14 recommended by the CDC; that children who test positive for COVID-19 are isolated for only 10 days, rather than the 14 recommended by the CDC; and that children exposed to COVID-19 are isolated for only 10 days, rather than the 14 recommended by the CDC. Appx. 14 fn. 19. It gave no reason for these deviations from the CDC's recommendations.

More, DHS does not keep these children near the ports of entry where they are processed into DHS custody. Rather, they are transported across the country. HHS has opened makeshift emergency shelters across the country, including one at a converted oilfield workers' camp in Midland and another at the Hutchison Convention Center in Dallas. *See* Joshua Skinner & Kate Porter, *Midland leaders blindsided by arrival of migrants at holding facility*, CBS7 (Mar. 14, 2021);[8] Nomaan Merchant & Jake Bleiberg, *Immigrant teens to be housed at Dallas convention center*, ASSOCIATED PRESS (Mar. 15, 2021).[9]

### 2. The August Order.

On August 3, 2021, CDC issued an order superseding the October Order and incorporating the July Order by reference. *Pub. Health Reassessment and Order Suspending the Right to Introduce Certain Persons*, 86 Fed. Reg. 48,828

---

[8]   https://www.cbs7.com/2021/03/14/gov-abbott-federal-hhs-sending-some-migrants-to-midland

[9]   https://apnews.com/article/dallas-health-coronavirus-pandemic-immigration-border-patrols-fa567f671faa0e9eb33e37f30746f1b6

(Aug. 5, 2021) (Appx. 16–29). The August Order included no further findings or conclusions regarding those children. Appx. 26.

The August Order summarized the current state of emergency and nature of the pandemic:

- "78 countries continue to experience high or substantial incidence rates (≥50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases." Appx. 19.

- In the week preceding the August Order, Mexico—through which all aliens appearing for entrance at the southwest border must travel—"experienced a 30.2% increase in new cases" of COVID-19. *Id.*

- "Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID-19 outbreaks." Appx. 21. CBP facilities themselves have "[s]pace constraints [that] preclude implementation of cohorting and consequence management such as quarantine and isolation." Appx. 25.

- "The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States." Appx. 23.

- "Countries of origin for the majority of incoming covered [aliens] have markedly lower vaccination rates." Of the top five originating countries, El Salvador, at 22%, had the highest rate of vaccinated persons; Guatemala and Honduras, the two lowest, had 1.6% and 1.8%, respectively. Appx. 22 & n.57.

16

- "At the time [the order was issued], over 70% of U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission." *Id.* & fn. 61. None of Texas's 14 border counties were "experiencing low levels of community transmission." Two of them were "experiencing moderate levels of community transmission[.]" The other twelve? "[H]igh levels of community transmission[.]" *Id.*

The August Order concedes that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." Appx. 23. The Order came only days after the Defendants released more than 1,500 COVID-positive illegal aliens into the city of McAllen, Texas. *See* Adam Shaw & Bill Melugin, *Texas border city says more than 7,000 COVID-positive migrants released since February, 1,500 in last week*, Fox News (Aug. 4, 2021);[10] *see also* Facts § F.1.

The August Order did not authorize or attempt to justify excepting family-unit members from the Title 42 expedited-removal proceedings. Indeed, it concluded that "the continued suspension of the right to introduce" family-unit members into the United States "is appropriate…." Appx. 26.

### 3.  The Defendants' procedures.

As the Defendants routinely admit, they do not test any of the aliens they apprehend for COVID-19 unless the alien already shows symptoms of the disease. *See*, *e.g.*, Julia Ainsley, *18 percent of migrant families leaving Border Patrol custody tested positive for Covid, document says*, NBC News (Aug. 7,

---

10   https://www.foxnews.com/politics/texas-border-city-covid-positive-migrants-released-february-last-week

2021).[11] Rather, they "coordinate[] with NGOs upon the release" of aliens so the aliens "receive prompt COVID-19 testing prior to being released into the community[.]" Appx. 123 at ¶ 24. If an alien tests positive for COVID-19, they "coordinate[] with appropriate NGOs for the provision of non-congregate accommodations so that the family members released from CBP custody can properly isolate and/or quarantine[.]" *Id.*

## F. The Defendants' refusal to detain aliens harms Texas.

Texas has suffered and continues to suffer irreparable harm because of the Defendants' actions. The October Order acknowledged as much: "[S]everal cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission that has strained their healthcare and public health systems." Appx. 10. And the August Order recognized that the "flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." Appx. 23. The Defendants themselves agreed that Texas will suffer "concrete injuries" as a result of "a decrease in any immigration enforcement." Appx. 42 § II.A.1. These harms are most manifest along Texas's southwest border.

### 1. Hidalgo County.

Hidalgo County declared a state of disaster "because of the growing threat of COVID-19 that may be present among the ongoing surge" of illegal immigrants being released into the county. Appx. 51. That threat was due to DHS's "releasing an alarmingly substantial number of immigrants into the City of McAllen …, including individuals that are positive for COVID-19,"

---

[11]   https://www.nbcnews.com/politics/immigration/18-percent-migrant-families-leaving-border-patrol-custody-tested-positive-n1276244

which had "overwhelmed" the ability of local governments and aid organizations to "adequately feed, house, provide medical attention[,] or otherwise accommodate" them. Appx. 52. Among the overtaxed resources were local hospitals, which were dealing with COVID-19 hospitalization rates of more than 18 percent. Appx. 51. This came only a day before the City of McAllen itself built a temporary emergency shelter "for the overwhelming number of immigrants stranded in McAllen by U.S. Customs and Border Protection." Appx. 54–56. As the city noted in announcing the shelter, when these aliens "are released, the federal government does not test them for COVID-19 or provide assistance … to make arrangements for temporary housing." Appx. 54. From mid-February 2021 until August 4, when it announced the shelter, more than "7,000 confirmed COVID-19 positive immigrants [had been] released into the City of McAllen by CBP, including over 1,500 new cases in the past seven days." Appx. 55.

All of this followed a nationally reported incident on July 26. Appx. 57–62. That afternoon, police were called to a Whataburger in La Joya due to complaints about a family of four that was coughing, sneezing, and not wearing masks. Appx. 60. The family were illegal immigrants who were suffering from COVID-19, had been apprehended by DHS, and had been released to the care of Catholic Charities of the Rio Grande Valley. *Id.* The family was supposed to be quarantining in a nearby hotel, but had been told that they were free to leave if they wished, as others staying at the hotel said they had been told. Appx. 60–61. The hotel manager owner stated that the entire hotel had been rented by Catholic Charities and was used to house aliens with COVID-19; an employee stated that more than half of the people who had been placed at the hotel had left. Appx. 61. The DHS agent in charge of the Rio Grande Sector disclaimed any control over Catholic Charities or how it handled the sick

people remanded to its care. *Id.* The officer who investigated the hotel estimated that between 20 and 30 people were walking about the property, the majority without masks, *id.*, and was later informed that Catholic Charities would be placing security guards at the hotel to keep sick aliens from leaving the property. Appx. 62.

### 2. Webb County.

Webb County proclaimed a state of disaster as a result of DHS's "transportation of large numbers of individuals (refugees, immigrants and/or migrants, a significant portion of whom are unvaccinated, untested for the COVID-19 virus and COVID positive who have been apprehended from outside Webb County and [] transported into Webb County … for the purpose of processing and release into the community…." Appx. 63. This "unanticipated influx" of aliens by DHS had "overwhelmed local resources and services to the extent that they [could] no longer adequately feed, house, provide medical attention or otherwise accommodate" those aliens. *Id.* The City of Laredo estimated that 40 to 50 percent of the aliens bused into the city by DHS were positive for COVID-19. Appx. 68. More, its shelters cannot accommodate the number of aliens being sent to the city in a manner that is safe and consistent with CDC guidelines. *Id.*

### 3. Texans' health.

The release of aliens who have not been treated or screened for COVID-19 furthers the spread of that pandemic throughout the United States in general and Texas in particular, increasing the risk to Texans of infection and compounding the difficulties already faced by Texas's public-health officials. As the July Order admitted, more than 15,000 unaccompanied alien children

have tested positive for COVID-19 while under the care of CBP or an Office of Refugee Resettlement facility. Appx. 14.

One need not take Texas's word for this—DHS has confirmed it. Among the justifications for the October Order was the reduction in "the risk of COVID-19 transmission … to DHS personnel and the U.S. health care system." Appx. 8. Further, DHS's Assistant Secretary for Border and Immigration Policy, David Shahoulian, has sworn to the increased risk of COVID-19 infections posed by permitting illegal aliens into the United States from the southwestern border: Due to "the highly transmissible COVID-19 Delta variant," the "rates at which encountered noncitizens are testing positive for COVID-19 have increased significantly in recent weeks." Appx. 75. And indeed, "the rate of infection among CBP officers … recently began increasing again, even though the percentage of officers and agents who have been fully vaccinated has grown significantly since January," leading "to increasing numbers of CBP personnel being isolated and hospitalized." *Id.* The threat to Texas's residents and visitors is no less.

### 4. Texas's healthcare spending.

The most direct financial impact of the Defendants' non-enforcement of their detention obligations is on Texas's healthcare spending. Aliens seeking medical care from providers in Texas—particularly emergency medical care—cost Texas tens of millions of dollars per year. For Fiscal Year 2015—the last year that a report is available—the Texas Health and Human Services Commission estimated that Texas spent roughly $80 million on emergency Medicaid services for illegal aliens. Appx. 83.

These expenditures represent the most direct financial impact because DHS pays for aliens' medical care only while the aliens are actually in DHS's

custody. *See* 42 C.F.R. § 34.7(a). For released aliens, it is Texas—through Emergency Medicaid, *see* 1 TEX. ADMIN. CODE § 366.903, and other programs that reimburse healthcare providers for otherwise-unpaid services, *see id.* §§ 355.8201–355.8202, 355.8212–355.8215—that pays these costs.

### 5. Other harms to Texas.

In addition, releasing aliens who are not entitled to be released imposes upon Texas harms that have been regularly recognized. For example, Texas incurs costs to furnish drivers licenses to illegal aliens whose presence DHS has temporarily regularized; Texas incurs costs to furnish education to alien minors; and Texas incurs costs to incarcerate aliens who are convicted of crimes while they are not legally present in the United States. *See* Appx. 88–95 (education); Appx. 96–107 (driver's licenses); Appx. 108–110 (incarceration); *Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015).

### Argument:
### Texas is entitled to a preliminary injunction requiring the Defendants to comply with their mandatory duties and prohibiting their abandonment of Title 42.

## A. Preliminary injunction standard.

Texas is entitled to a preliminary injunction because it satisfies each factor of the familiar four-factor test. *See, e.g., Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013). First, it is likely to prevail on the merits; the Defendants have a mandatory duty to perform, and they aren't performing it. Second, there is a substantial threat—actually, an ongoing suffering—of irreparable injury; Texas and Texans are currently being exposed to a virulent disease as a result of the Defendants' inaction, and they cannot recover money damages for it. Finally, the balance of harms and the public interest favor the injunction Texas seeks; the public is always served by

holding the government to its legal obligations, and the benefit to the public of containing the potential spread of COVID-19 outweighs the benefit of allowing the Defendants to continue to shirk their duties.

## B. Texas is likely to prevail on the merits.

"Likely to prevail on the merits" is a term of art that merely requires that Texas make a prima facie case on each element of its claim. *See Daniels Health*, 710 F.3d at 582 (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). Texas easily clears that bar; the Defendants' decision was both unreasoned and contrary to the duties that Congress has mandated.

### 1. The Defendants' decisions to turn their backs on the Title 42 process were unreasoned.

Both the July Order (incorporated into the August Order) removing unaccompanied alien children from the purview of Title 42 and the *de facto* policy of not placing family-unit members into the Title 42 process are final agency actions. Both of them are arbitrary, capricious, abuses of discretion, and otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2)(A). To satisfy that requirement, the Defendants had to engage in "reasoned decisionmaking," meaning that their process had to be "logical and rational," with their decision being lawful "only if it rests on a consideration of the relevant factors" that "includ[es] a rational connection between the facts found and the choice made." *Sierra Club v. U.S. Envtl. Prot. Agency*, 939 F.3d 649, 664 (5th Cir. 2019) (cleaned up). Under this standard, unexplained inconsistencies in the rulemaking records are grounds for striking down the action. *Id.*

**a. The July Order is inconsistent with and not rationally connected to the concerns addressed in the October Order.**

It is inconsistency that dooms the July Order—in excepting unaccompanied alien children from the October Order, it answers a question that the October Order never asked. The October Order was "intended to help mitigate the continued risks of transmission and spread of COVID-19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the [ports of entry] and Border Patrol stations;" the "further transmission and spread of COVID-19 in the interior of the United States;" and the increased strain on the healthcare system that those transmissions and spreads would cause. Appx. 6. Protecting against those transmissions requires that aliens be removed from the United States "as rapidly as possible, with as little time spent in congregate settings as practicable," to minimize the risk of "introducing, transmitting, or spreading COVID-19 into [DHS facilities], other congregate settings, and the interior." Appx. 10.

Yet it is not these harms that the July Order claims to have overcome. Rather, the July Order proclaims that it is appropriate to except unaccompanied alien children from the October Order because DHS has gotten better at preventing those children from spreading COVID-19 *to each other*. Appx. 13. Indeed, the July Order concedes that the children still spend, on average, more than a day clustered at a DHS facility, where they are able to expose other detainees, DHS personnel, and American citizens and residents to whatever viruses they are carrying. Appx. 14. Rather than attempting to prevent any viruses the children are carrying from reaching the interior, the Defendants send the children away from facilities where they can monitor them and their health, sending them into the very interior of the country that the October Order is designed to protect. *Id.* And, again, CDC concedes that

24

more than 15,000 unaccompanied alien children have been diagnosed with COVID-19—roughly 8,500 of them in the custody of someone other than DHS. *Id.*

Testimony suggests that this lack of connection is because the July Order was not an explanation, but a justification used to backfill the conclusion on which the Defendants had already decided. Rodney Scott, the former Chief of the U.S. Border Patrol, attests that he was instructed to stand down from re-instating the Title 42 program for unaccompanied minors the day after the stay preventing that re-instatement was lifted—18 days before the February Order created a backdated exception for unaccompanied minors. Appx. 37–38 at ¶ 9. When he posed questions to the Acting Commissioner of CBP regarding that stand-down order, Appx. 38 at ¶ 10, he was met with silence—a "significant departure from well-established practices and protocols," which would have included the Chief "in detailed briefings and deliberations to facilitate informed decision-making prior to implementing a significant policy decision such as this." Appx. 38 at ¶ 12.

### b.  The July Order was promulgated without the necessary notice-and-comment period.

The July Order is additionally void because it was adopted without the required notice-and-comment proceedings, a failure for which the Defendants have no excuse. *See* 5 U.S.C. § 553(b)–(c). This "fundamental flaw … normally requires vacatur of the rule." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020).

- The press of time was not a concern. *Cf.* 5 U.S.C. § 553(b)(B). The five months that passed between the February Order's suspension and the July Order's permanent exception were more than enough time for the Defendants to field and consider input from the public, and the good-

25

cause exception to the APA's notice-and-comment requirement is intended for situations when there is true danger in not acting, not when the agency simply finds them inconvenient. *See U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (vacating air-quality determinations); *Tex. Food Indus. Assn. v. U.S. Dept. of Ag.*, 842 F. Supp. 254, 256–57 (W.D. Tex. 1993) (vacating labeling rules for un- and partially cooked meat).

- Nor does the July Order's purported relation to foreign affairs except it from the notice-and-comment rules. *Cf.* 5 U.S.C. § 553(a)(1). The July Order does not "involve the mechanisms through with the United States conducts relations with foreign states," nor was it the product of an "agreement between the United States and another country[.]" *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020). Downstream effects on foreign relations are not enough; to qualify for the exception, the July Order would have to directly target a foreign-affairs function of the federal government. *See id.* It does not.

### c. The *de facto* policy excepting family-unit members from Title 42 is inconsistent with the law and must be struck down.

For the same reasons, the Defendants' *de facto* policy of excepting family-unit members from the Title 42 procedures must be set aside. Far from announcing the proposed policy to the public and inviting comment, the Defendants have coasted into this policy through a course of action designed to avoid attention. The policy has necessarily not been justified through reasoned explanation, and the Defendants have in fact insisted that the policy does not exist—that its individualized, case-by-case analysis of each family-unit member's situation has resulted in a whopping *eighty-eight percent* of those

aliens being shunted out of Title 42. *Compare* ECF No. 28 at 31–32 *with* Facts § C.3.b.

**2. The Defendants' refusal to detain aliens arriving at the southwest border to determine whether they carry the COVID-19 virus is not in accordance with law.**

    **a. DHS's obligation to detain aliens is mandatory.**

The Immigration and Nationality Act does not mince words: If aliens arrive at the United States after DHS has received information that those aliens are coming from a country where a communicable, quarantinable disease is endemic, those aliens "shall be detained … for a sufficient time to enable the immigration officers and medical officers" to determine whether they are unadmissible because they carry that disease. 8 U.S.C. § 1222(a). "Shall" is mandatory; it imposes a duty, including—perhaps especially—where the government is being commanded to "to protect the public or private interests of innocent third parties." *See Texas v. United States*, No. 6:21-cv-003, ___ F. Supp. 3d ___, 2021 WL 2096669, at *34 (S.D. Tex. Feb. 23, 2021). Indeed, "Fifth Circuit—as well as sister Circuit—caselaw makes clear that 'shall' means *must*" in the nearby command to deport an alien who is subject to a final order of removal. *Id.* (citing cases). The upshot is that if DHS knows that an alien traveling to the United States is traveling through a country where a disease such as COVID-19 is endemic, DHS has no choice but to detain the alien when he arrives at the border seeking admission into the United States.

That Section 1222(a) is mandatory is also supported by multiple courts' interpretations of the identical "shall be detained" language in Section 1225. Just three years ago in *Jennings v. Rodriguez*, the Supreme Court observed that "[r]ead most naturally," the "shall be detained" language in both Section 1225(b)(1)(B)(ii) and Section 1225(b)(2)(A) "mandate[s] detention of applicants

for admission until certain proceedings have concluded." 138 S. Ct. 830, 842 (2018). The Court's majority commented of the dissent's attempt to construe "shall" as something other than a mandate, "The contortions needed to reach these remarkable conclusions are a sight to behold." *Id.* at 848.

And just last month, in denying a stay requested by many of these Defendants, the Fifth Circuit construed "shall" in two locations in Section 1225 as a restraint on DHS's authority. *Texas v. Biden*, No. 21-10806, 2021 WL 3674780, at *7 (5th Cir. Aug. 19, 2021). The district court in that case characterized the "shall be detained" language in yet another subsection of Section 1225 as imposing a mandatory obligation to detain. *Texas v. Biden*, No. 2:21-cv-067-Z, 2021 WL 3603341, at *16 (N.D. Tex. Aug. 13, 2021). There is no reason to treat the identical "shall be detained" language in Section 1222(a) any differently.

So it is when dealing with the Immigration and Nationality Act, where Congress has repeatedly demonstrated that it knows how to grant discretion when it wants to, a contrast the Supreme Court has specifically drawn. The "may be detained" language in Section 1231 might be ambiguous because it does not describe the extent of discretion conferred, but the same cannot be said about the "shall be detained" language in Section 1225, which "mandate detention until a certain point and authorize release prior to that point only under limited circumstances." *Jennings*, 138 S. Ct. at 844. Sections 1225(b)(1) and (b)(2), by using "shall be detained," are an "unequivocal[] mandate that aliens falling within their scope 'shall' be detained." *Id.* The demands of Section 1222(a) are similarly unequivocal.

The statute's history further compels this conclusion. As originally enacted in 1917, the precursor to Section 1222(a) granted discretion; it stated that "the Commissioner General of Immigration … may direct that such aliens shall be

28

detained." However, Congress stripped this discretion from the law in 1952, deleting the "may direct" language while leaving the phrase "such aliens shall be detained." Congress knows how to grant immigration discretion; here, it has affirmatively erased that discretion from the Executive's ambit.

### b. DHS is not complying with its mandatory duty to detain.

DHS's is obliged to detain subject aliens until it determines whether they are inadmissible due to COVID-19. It is not doing so. It frankly admits that it is not doing so. Even without that admission it would be obvious that it is not doing so; multiple municipalities in Texas have complained that the Defendants are dropping COVID-positive illegal aliens off in the middle of their cities and leaving them there to fend for themselves. A police officer in La Joya encountered a COVID-positive woman and her COVID-positive children unmasked, sneezing and coughing, in a Whataburger rather than in the care of the charity that was supposed to be watching over her.

The Defendants' refusal to detain aliens until they are clear of potential COVID-19 infections is not in keeping with the law. *See* 5 U.S.C. § 706(2)(A). Moreover, it is a dereliction of their duty to take care that the laws be faithfully discharged. *See* U.S. Const. art. II, § 3. They should be compelled to satisfy their legal obligation to ensure that aliens attempting to enter the United States are not carrying additional supplies of the virus that has caused the global pandemic that the nations of the world are trying to eradicate.

## C. Texas is suffering irreparable harm.

Texas has already described the millions of dollars it spends on healthcare for those illegally in the country, including the pools from which it is drawn and why COVID-positive aliens admitted into the state will be a drain on those pools. *See* Facts § F.4. That financial harm is irreparable—once Texas has

spent money to care for an alien with COVID-19, it is gone. The federal government is under no obligation to repay Texas for what it spends, and it cannot be forced to do so. The quintessential reparable harm—an ability to recover money damages—is absent.

But more vital and more delicate than that is Texas's *parens patriae* interest in Texans' health and well-being. *See Texas v. United States*, 86 F. Supp. 3d 591, 625 (S.D. Tex. 2015) ("states may rely on the doctrine of *parens patriae* to maintain suits against the federal government … to *enforce* the rights guaranteed by a federal statute") (emphasis in original). Texas cannot recover money damages from the federal government; neither can individual Texans who catch, suffer from, and perhaps die from COVID-19 that is passed to them by a COVID-positive alien who should have been detained by the Defendants until the viral incubation period had passed. Texas workers cannot recover the wages they lose as a result of missing work with a COVID infection; Texas business owners cannot recover the profits they lose due to absent employees (or their own absences); Texas healthcare workers cannot recover the time or emotional fortitude they must spend to treat each additional COVID patient.

This is in addition to the harms that Texas's local governments, each exercising Texas's delegated police power to ensure the health and welfare of their citizens, are suffering as a result of the Defendants' derelictions. *Cf. Texas*, 86 F. Supp. 3d at 627 (noting state's "quasi-sovereign interest 'in the health and well-being—both physical and economic—of its residents'") (quoting *Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). Expenditures to care for aliens who should have been rapidly expelled; shrinking availability of healthcare services because due to crowding out; and an increased number of hosts that the COVID-19 virus can use to launch itself

at new patients—these are all costs, monetary, psychic, and economic, imposed by the Defendants' refusal to enforce their laws.

This is not idle speculation by Texas; it is admitted by the Defendants. As DHS itself wrote earlier this year, its failure to enforce federal immigration laws results in "concrete injuries" to Texas. Appx.42. Just last month, CDC acknowledged that "healthcare systems in local communities" are victims of the surge of aliens across the southwest border. Appx. 18. At this point, it cannot be gainsaid that states "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012) .

## D. The public interest and the equities favor an injunction.

Because this is a case with a State on one side and the federal government on the other, the public-interest and balance-of-equities factors collapse into a single consideration. *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009). The balancing act here requires little delicacy: Congress has imposed an affirmative duty on the Defendants, and they aren't following it. "There is generally no public interest in the perpetuation of unlawful agency action"— or, in this case, inaction. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The harms to Texas and her citizens should an injunction not be granted are increased imposition on the resources of local governments, charities, and the State's fisc and the increased chance of the spread of one of the most virulent diseases of modern times. The imposition on the Defendants should the injunction be granted, on the other hand, are that they will be held to the duties that the law already imposes on them. Their preferences are irrelevant in the face of a Congressional command.

**Prayer for Relief**

Texas prays that the Court issue a preliminary injunction prohibiting the Defendants from excepting unaccompanied alien children from the Title 42 procedures solely on their status as unaccompanied alien children; prohibiting the Defendants from excepting from the Title 42 procedures those family-unit members who meet the definition of "covered aliens" given in the October Order; and requiring the Defendants to detain aliens arriving on the southwest border for a period sufficient to determine, in accordance with the requirements of 8 U.S.C. § 1182 and with the guidance of the Department of Health and Human Services, that those aliens are not carriers of the SARS-CoV-2 virus.

Dated September 7, 2021.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted,

/s/ Aaron F. Reitz
AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

MATTHEW G. WHITAKER
Admitted *pro hac vice*
America First Legal Foundation
300 Independence Avenue SE
Washington, D.C. 20003
(202) 964-3721
info@aflegal.org

CHRISTOPHER J. HAJEC

Admitted *pro hac vice*
MATT A. CRAPO
Admitted *pro hac vice*
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(540) 205-7986
litigation@irli.org

*Counsel for the State of Texas*