IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

STATE OF TEXAS,

      Plaintiff,

v.

JOSEPH R. BIDEN, JR. et al.,

      Defendants.

Civil Action No. 4:21-CV-579-P

**CONSOLIDATED BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
and
DEFENDANTS' RESPONSE TO PLAINTIFF'S
<u>RENEWED MOTION FOR PRELIMINARY INJUNCTION</u>**

PRERAK SHAH
Acting United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

**Table of Contents**

I.     Introduction ................................................................................................. 1

II.    Background ................................................................................................... 4

       A.     CDC exercises its Title 42 authority to suspend the right to introduce
              certain noncitizens into the country in order to avoid overcrowding at
              Ports of Entry and U.S. Border Patrol stations during the COVID-19
              pandemic. ...................................................................................................... 4

       B.     In a Title 42 order issued in July 2021, CDC determines that sufficient
              prevention and mitigation measures are in place to except unaccompanied
              children from the October 2020 order. .................................................. 6

       C.     CDC issues a superseding Title 42 order in August 2021 that continues the
              exception for unaccompanied children but otherwise concludes that Title
              42 restrictions remain necessary for single adults and family units. ..................... 9

       D.     Unaccompanied children are placed in ORR custody where they are
              quarantined and tested for COVID-19. .............................................. 10

       E.     DHS complies with CDC's Title 42 orders and employs various public
              health measures to detect and prevent the spread of COVID-19 among
              noncitizens in its custody. ...................................................................... 11

       F.     Texas files an amended complaint and a renewed motion for preliminary
              injunction. ................................................................................................ 13

III.   Argument and Authorities ........................................................................ 14

       A.     The Court should dismiss this action for lack of jurisdiction and because
              Texas's claims are barred in part by res judicata and otherwise fail to state
              a claim. ...................................................................................................... 14

              1.     Claims A and B—challenging CDC's July and August 2021 Title
                     42 orders—should be dismissed because Texas lacks standing, the
                     CDC decisions at issue are committed to agency discretion as a
                     matter of law, Texas's claimed injuries do not come within the
                     zone of interests regulated by Title 42, and Texas fails to state any
                     notice-and-comment claim ...................................................................... 15

                     a.     Texas lacks standing. ................................................................. 15

                     b.     CDC's public health determinations in the July and August
                            2021 orders are committed to agency discretion. ........................ 20

      c.     Texas's claimed pocketbook injuries do not come within the zone of interests protected by the Title 42 statute.................. 23

      d.     No claim is stated for a lack of notice-and-comment procedures. ................................................................................. 24

   2.    Claims C.1 and D—asserting that the government has not detained noncitizens during removal proceedings under 8 U.S.C. § 1225 and instead has improperly paroled such persons—are barred by res judicata; alternately, Texas lacks standing and 8 U.S.C. § 1252(f)(1) bars this claim..................................................... 26

   3.    Claim C.2—asserting that the government has violated 8 U.S.C. § 1222(a) by not detaining noncitizens to determine if they carry COVID-19—should be dismissed because the Court lacks jurisdiction under 8 U.S.C. § 1252(f)(1) and Texas lacks standing.......... 30

   4.    Claim E—based on an alleged agreement between DHS and Texas—is barred by res judicata and, regardless, the agreement in question would not be enforceable in this suit.......................................... 33

   5.    Claim F—asserting a violation of the Take Care Clause of the Constitution—is not justiciable in this Court............................................. 34

B.    Texas has not met its heavy burden to obtain a preliminary injunction. .............. 36

   1.    Texas fails to show a likelihood of success on the merits on the claims for which it seeks a preliminary injunction. ................................... 36

      a.     CDC's public health determination to except unaccompanied children from Title 42 in its July and August 2021 orders easily satisfies the APA's deferential standards. ................................................................................. 37

      b.     Notice-and-comment procedures were not required for the July and August 2021 orders......................................................... 41

      c.     Texas's argument about an alleged *de facto* policy to except families from Title 42 is barred by res judicata and, regardless, is factually unsupported.............................................. 43

      d.     Texas's section 1222(a) claim does not support injunctive relief. ........................................................................................ 46

C.    Texas fails to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction. ............... 48

IV.   Conclusion ................................................................................................................ 50

## Table of Authorities

Cases

*Abraham v. United States,*
    81 Fed. Cl. 178 (2008) .................................................................33

*Ala. Rural Fire Ins. Co. v. Naylor,*
    530 F.2d 1221 (5th Cir. 1976) ....................................................34

*Am. Postal Workers Union v. U.S. Postal Serv.,*
    707 F.2d 548 (D.C. Cir. 1983) ....................................................24

*Amino Bros. Co. v. United States,*
    372 F.2d 485 (Ct. Cl. 1967) .......................................................33

*Anglers Conservation Network v. Pritzker,*
    809 F.3d 664 (D.C. Cir. 2016) ....................................................45

*Arpaio v. Obama,*
    27 F. Supp. 3d 185 (D.D.C. 2014) ..............................................16

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .....................................................16

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
    397 U.S. 150 (1970) ..................................................................23

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
    715 F.2d 897 (5th Cir. 1983) .....................................................37

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) ..................................................................49

*California v. Texas,*
    141 S. Ct. 2104 (2021) .........................................................17, 19

*Canal Auth. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) .....................................................36

*Capital Area Immigrants' Rights Coalition v. Trump,*
    471 F. Supp. 3d 25 (D.D.C. 2020) ..............................................43

*Chambless Enters., LLC v. Redfield,*
    508 F. Supp. 3d 101 (W.D. La. Dec. 22, 2020) ...........................25

*Comer v. Murphy Oil USA, Inc.*,
   718 F.3d 460 (5th Cir. 2013) ........................................................................29

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ........................................................................16

*DeOtte v. Azar*,
   393 F. Supp. 3d 490 (N.D. Tex. 2019) ..........................................................29

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*,
   729 F. App'x 287 (5th Cir. 2018) .............................................................23, 24

*Ellison v. Connor*,
   153 F.3d 247 (5th Cir. 1998) ........................................................................22

*EEOC v. Exxon Corp.*,
   202 F.3d 755 (5th Cir. 2000) ........................................................................40

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................................38

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ......................................................................................35

*Friends of Animals v. Bernhardt*,
   961 F.3d 1197 (D.C. Cir. 2020) ...............................................................25, 26

*Flores-Ledezma v. Gonzales*,
   415 F.3d 375 (5th Cir. 2005) ........................................................................47

*Gayle v. Warden Monmouth Cty. Corr. Inst.*,
   --- F.4th ----, 2021 WL 4006189 (3d Cir. 2021) ..........................................31

*Goodeagle v. United States*,
   No. CIV-09-490-D, 2010 WL 3081520 (W.D. Okla. Aug. 6, 2010)................40

*Hamama v. Adducci*,
   912 F.3d 869 (6th Cir. 2018) ........................................................................32

*Hamama v. Adducci*,
   946 F.3d 875 (6th Cir. 2020) ........................................................................31

*Heckler v. Chaney*,
   470 U.S. 821 (1985).......................................................................20, 22, 45

*Hous. Prof'l Towing Ass'n v. City of Hous.*,
   812 F.3d 443 (5th Cir. 2016) ...................................................................27, 28

*Huisha-Huisha v. Majorkas,*
    --- F. Supp. 3d ----, 2021 WL 4206688 (D.D.C. 2021) .....................................................13

*Jubilant Draximage Inc. v. U.S. Int'l Trade Comm'n,*
    490 F. Supp. 3d 169 (D.D.C. 2020) ....................................................................................24

*Leal v. Azar,*
    No. 2:20-CV-185-Z, 2020 WL 7672177 (N.D. Tex. Dec. 23, 2020) ...............................29

*Liberty Ammunition, Inc. v. United States,*
    835 F.3d 1388 (Fed. Cir. 2016)...........................................................................................33

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).............................................................................................................15

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976) .............................................................................................36

*Matter of E-R-M & L-R-M,*
    25 I&N Dec. 520 (BIA 2011) ..............................................................................................47

*Meyers v. Textron, Inc.,*
    540 F. App'x 408 (5th Cir. 2013) .......................................................................................14

*Mississippi v. Johnson,*
    71 U.S. 475 (1866)..............................................................................................................35

*Morrison v. Olson,*
    487 U.S. 654 (1988)............................................................................................................35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).......................................................................................................38, 39

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) ...........................................................................................23

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004)..............................................................................................................45

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019)..........................................................................................................32

*Nken v. Holder,*
    556 U.S. 418 (2009)............................................................................................................49

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)..............................................................................................................25

*P.J.E.S. v. Wolf,*
    502 F. Supp. 3d 492 (D.D.C. 2020) ...................................................................6

*Printz v. United States,*
    521 U.S. 898 (1997) ...........................................................................................35

*Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs,*
    No. 4:15-CV-817-A, 2016 WL 543209 (N.D. Tex. Feb. 9, 2016) ...................22

*Qorane v. Barr,*
    919 F.3d 904 (5th Cir. 2019) ...........................................................................20

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ...........................................................................................47

*S. Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020) .......................................................................................21

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...........................................................................................15

*Test Masters Educ. Servs., Inc. v. Singh,*
    428 F.3d 559 (5th Cir. 2005) ...........................................................................28

*Tex. Health & Human Servs. Comm'n v. United States,*
    166 F. Supp. 3d 706 (N.D. Tex. 2016) .............................................................48

*Texas v. Biden,*
    --- F. Supp. 3d ----, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) ................27

*Texas v. United States,*
    --- F. Supp. 3d ----, 2021 WL 2096669 (S.D. Tex. May 24, 2021) .................23

*Texas v. United States,*
    --- F.4th ----, 2021 WL 4188102 (5th Cir. 2001) .....................................46, 47

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ......................................................................18, 19

*Texas v. U.S. Envtl. Prot. Agency,*
    983 F.3d 826 (5th Cir. 2020) ...........................................................................22

*Tucson Airport Auth. v. Gen. Dynamics Corp.,*
    136 F.3d 641 (9th Cir. 1998) ...........................................................................34

*United States v. Texas,*
    136 S. Ct. 2271 (2016) .......................................................................................18

*United States ex rel. Wright v. Agip Petrol. Co.*,
 No. 5:03-cv-264(DF), 2008 WL 11348433 (E.D. Tex. Mar. 28, 2008) ...........................40

*Warren v. Mortg. Elec. Registration Sys., Inc.*,
 616 F. App'x 735 (5th Cir. 2015) .....................................................................................14

*Webster v. Doe*,
 486 U.S. 592 (1988) ...........................................................................................................20

## Statutes, Rules, and Other Authorities

5 U.S.C. § 551(13) ...................................................................................................................45

5 U.S.C. § 553(a)(1) ................................................................................................................42

5 U.S.C. § 553(b)(3)(B) ..........................................................................................................42

5 U.S.C. § 701(a)(2) ................................................................................................................20

5 U.S.C. § 706(1) .....................................................................................................................45

6 C.F.R. § 5.49(a) ....................................................................................................................40

6 C.F.R. § 5.49(b) ....................................................................................................................40

8 U.S.C. § 1182(d)(5)(A) .........................................................................................................26

8 U.S.C. § 1222(a) ..............................................................................................................30, 46

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ............................................................................................26

8 U.S.C. § 1225(b)(2)(A) .........................................................................................................26

8 U.S.C. § 1226(a)(2) ...............................................................................................................26

8 U.S.C. § 1232(a)(1) .................................................................................................................7

8 U.S.C. § 1252(f)(1) ..........................................................................................................31, 32

18 U.S.C. § 207(j)(6)(A) ..........................................................................................................40

42 C.F.R. § 71.40 ...................................................................................................................5, 22

42 C.F.R. § 71.40(a) .................................................................................................................22

42 U.S.C. § 265 .............................................................................1, 4, 5, 20, 22, 23, 42

42 U.S.C. § 268 ........................................................................................................................12

85 Fed. Reg. 16,559 (Mar. 24, 2020) ..............................................................................4, 5

85 Fed. Reg. 17,060 (Mar. 26, 2020) ........................................................................4, 5, 42

85 Fed. Reg. 22,424 (Apr. 22, 2020) ...............................................................................5

85 Fed. Reg. 31,503 (May 26, 2020) ...............................................................................5

85 Fed. Reg. 65,806 (Oct. 16, 2020) ...........................................................................5, 12

86 Fed. Reg. 9942 (Feb. 17, 2021) .................................................................................6

86 Fed. Reg. 38,717 (July 22, 2021) ...............................................................................7

86 Fed. Reg. 42,828 (Aug. 5, 2021) .................................................8, 10, 11, 12, 37, 38, 39, 41, 49

## I.    Introduction

The Court should dismiss this case.  It can then deny Texas's renewed preliminary-injunction motion as moot—and even if the case is not dismissed at this time, Texas fails to meet its heavy burden to obtain a preliminary injunction.  This brief explains why.

<u>Challenges to CDC's Title 42 orders</u>.  Texas's first set of claims challenges the Centers for Disease Control and Prevention (CDC)'s recent July and August 2021 orders under Title 42, specifically, CDC's decisions in these orders to except unaccompanied noncitizen children from Title 42 procedures.  These claims should be dismissed because (a) Texas cannot establish standing, and (b) CDC's public health decisions regarding unaccompanied children, made in an exercise of its scientific and medical expertise, are committed to the agency's discretion as a matter of law and thus not reviewable under the Administrative Procedure Act (APA).

Aside from these jurisdictional bars, Texas's APA challenges to CDC's Title 42 orders fail as a matter of law for several independent reasons.  *First*, Texas's claimed immigration-related injuries stemming from alleged higher expenses associated with an increase in the number of noncitizens in the state do not fall within the zone of interests implicated by the public health statute at issue, 42 U.S.C. § 265, which is a prerequisite to obtaining APA review.

*Second*, CDC's decision to except unaccompanied children from Title 42 easily passes muster under the APA's deferential standard of review.  CDC's July and August 2021 orders make clear that, in an exercise of its scientific and medical judgment, CDC considered the relevant facts and circumstances and determined that applying Title 42 procedures to children is not necessary at this time.  As explained in the orders, this determination was based, among other things, on decreased processing times for these children in the Ports of Entry and Border Patrol stations as well as the COVID-19 prevention and mitigation protocols in place for children that,

in CDC's estimation, lessen the risk of COVID-19 spread into the country and any strain on community healthcare resources. Arbitrary-and-capricious review under the APA is not a vehicle for Texas to substitute its own policy preferences in place of CDC's public health determinations. And notably, although CDC did decide that Title 42 procedures are not currently necessary for unaccompanied children, it reached the opposite conclusion with respect to other categories of covered noncitizens (including single adults, the largest group encountered at the border). This confirms that CDC's decision to no longer apply Title 42 to such children is not simply a reflexive reversal of a prior administration's decision, as Texas appears to suggest, but rather is a careful exercise of CDC's scientific and medical judgment based on current circumstances and available government resources.

*Third*, Texas fails to show that notice and comment was required for CDC's July and August 2021 orders. The orders were issued pursuant to a regulation that was duly promulgated following notice and comment and, thus, there was no need for an additional round or rounds of notice-and-comment rulemaking procedures. This is particularly so because the regulation is designed to allow CDC to issue orders that flexibly respond to rapidly changing public health circumstances. Consistently, none of CDC's Title 42 orders—including the October 2020 order that Texas suggests should be the controlling order—was subject to notice and comment.

Challenges to immigration enforcement. Texas's second set of claims challenges perceived failures or deficiencies in the government's immigration-enforcement activities. At the outset, Texas's claims challenging the government's immigration detention-and-parole practices are barred by res judicata because they are duplicative of claims that Texas very recently litigated to judgment in the now-concluded Migrant Protection Protocols (MPP) case in front of Judge Kacsmaryk. That case is probably best known for Texas's APA challenges to the

rescission of the MPP program itself. But Texas also brought—and obtained relief on—a statutory claim under 8 U.S.C. § 1225 for alleged deficiencies in the government's immigration detention practices. Texas has now brought claims in this case based on the same alleged injury (in Texas's view, too many grants of parole and not enough detentions), including one claim based on the exact same immigration statute, section 1225. Res judicata applies.

Texas's contentions that the government has implemented a *de facto* policy to except families from Title 42, or is failing to prevent the admission of COVID-19-positive noncitizens at Ports of Entry, are also meritless and do not support any claim for relief. Not only has the government been applying Title 42 to families (and adults), it is actively litigating a challenge to its ability to do so, in the U.S. District Court for the District of Columbia. The district court there recently preliminarily enjoined the application of CDC's current Title 42 order to families, with a 14-day administrative stay. The government immediately appealed and has sought an emergency stay pending appeal so that it can continue to apply Title 42 to families during the pendency of appeal. If the D.C. court's injunction does go into effect, that will as a practical matter render Texas's claim about a purported *de facto* exception for families irrelevant, at least for the time being, because the injunction will control the issue of Title 42's application to families. Regardless, the fact that substantial numbers of families are still being processed and expelled under Title 42, not to mention the government's ongoing efforts to defend against litigation seeking to prevent these expulsions, confirm that no such *de facto* exception exists.

* * * * *

This case should be dismissed, and Texas's motion denied.

## II.    Background

**A.    CDC exercises its Title 42 authority to suspend the right to introduce certain noncitizens into the country in order to avoid overcrowding at Ports of Entry and U.S. Border Patrol stations during the COVID-19 pandemic.**

Section 265 of Title 42 of the United States Code authorizes CDC to prohibit the introduction into the United States of "such persons and property" determined by CDC to increase the serious danger of the spread of a communicable disease.  42 U.S.C. § 265.  In light of the COVID-19 pandemic, CDC exercised this authority in March 2020 by issuing an interim final rule and an accompanying Title 42 order temporarily suspending the introduction into the country of certain noncitizens.  *See* 85 Fed. Reg. 16,559 (Mar. 24, 2020) (interim rule); 85 Fed. Reg. 17,060 (Mar. 26, 2020) (order).  The order generally applied to "persons traveling from Canada or Mexico . . . who would otherwise be introduced into a congregate setting in a [] Port of Entry [] or Border Patrol station" near the border.  *Id.* at 17,061.  Such persons are most commonly noncitizens "who lack valid travel documents."  *Id.*

The March 2020 order focused on persons who would otherwise be held at a Port of Entry or U.S. Border Patrol station because such persons may spend hours or days undergoing immigration processing in these facilities, which are "not designed for, and are not equipped to, quarantine, isolate, or enable social distancing."  *Id.*  Thus, the order found a "serious danger of the introduction of COVID-19 into the . . . [Ports of Entry] and Border Patrol stations at or near the United States borders . . . and into the interior of the country as a whole."  *Id.*  The order also noted that COVID-19 outbreaks at Ports of Entry and Border Patrol stations could negatively impact local communities by "lead[ing] to transfers . . . to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare

workers to COVID-19." *Id.* In addition, the transmission of COVID-19 to other persons present

at the Ports of Entry and Border Patrol stations could cause "further transmission and spread of

COVID-19 in the interior" of the country. *Id.*

The March 2020 order explained that notice and comment was not required. *Id.* at

17,067. The order was subsequently extended and amended multiple times, *see* 85 Fed. Reg.

22,424 (Apr. 22, 2020); 85 Fed. Reg. 31,503 (May 26, 2020), and notice-and-comment

procedures were never used for these or any other similar Title 42 orders issued during the

COVID-19 pandemic.

Before the pandemic, CDC did not have any regulation in place governing, as a general

matter, the use of its Title 42 authority to suspend the right to introduce persons (as opposed to

property) into the country. *See* 85 Fed. Reg. at 16,560. This was significant because the Title 42

statute authorizes CDC to exercise Title 42 authority only "in accordance with regulations

approved by the President." 42 U.S.C. § 265. To satisfy this requirement, CDC issued an

interim final rule in March 2020 (shortly before issuing the March 2020 order) and invited the

public to submit comments on a proposed new final rule (regulation) to govern CDC's Title 42

activities with respect to persons. *See* 85 Fed. Reg. at 16,565. In September 2020, following the

receipt of public comments, CDC formally promulgated this new regulation, at 42 C.F.R.

§ 71.40. *See* 85 Fed. Reg. 56,424 (Sept. 11, 2020). Like the interim final rule, this regulation is

not specific to the COVID-19 pandemic, but instead provides a general regulatory framework for

CDC's use of Title 42 authority. *See* 42 C.F.R. § 71.40.

Next, in October 2020, CDC issued a new Title 42 order pursuant to the newly-

promulgated regulation at 42 C.F.R. § 71.40. *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020). The

October 2020 order explained that it was "substantially the same as the amended and extended

March 20, 2020 Order" and was necessary to continue to protect against the spread of COVID-19 into the Ports of Entry and Border Patrol stations. *Id.* at 65,808. As was true under the March 2020 order, the October 2020 order contained several exceptions. Among other things, the order did not apply to persons that U.S. Department of Homeland Security (DHS) officials determined "should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.* It also did not apply to anyone required by his or her home country to have a negative COVID-19 test in order to be returned to that country. *Id.*

**B.    In a Title 42 order issued in July 2021, CDC determines that sufficient prevention and mitigation measures are in place to except unaccompanied children from the October 2020 order.**

For purposes of CDC's various Title 42 orders, it is helpful to divide the universe of persons possibly subject to Title 42 into three categories: unaccompanied children, single adults (i.e., with no accompanying children), and "family units" consisting of adults and children together. With respect to the first group, unaccompanied children, an injunction issued in November 2020 in litigation in the U.S. District Court for the District of Columbia had halted application of Title 42 to such children. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020), *appeal pending*, No. 20-5357 (D.C. Cir.). That injunction was stayed pending appeal in late January 2021, *see P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), but shortly thereafter, CDC decided to temporarily pause the expulsion of unaccompanied children pending a reassessment of the October 2020 order. 86 Fed. Reg. 9942 (Feb. 17, 2021).

Thus, as a practical matter, unaccompanied children generally have not been subject to

expulsion under a Title 42 order for over ten months,[1] and instead have been processed under the immigration provisions in Title 8 of the U.S. Code.  Specifically, such children are processed in accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) (codified in principal part at 8 U.S.C. § 1232), which, among other things, establishes a framework of "policies and procedures to ensure that unaccompanied alien children in the United States are safely repatriated to their country of nationality or of last habitual residence."  8 U.S.C. § 1232(a)(1).  As the statutory language suggests, the TVPRA does not speak to whether such children will be permitted to stay in the United States permanently.  The TVPRA instead puts in place certain requirements for the *treatment* of unaccompanied children, including a requirement that such children are generally transferred to the custody of the U.S. Department of Health and Human Services' Office of Refugee Resettlement (ORR) while they await placement with a suitable sponsor and further immigration proceedings.  *See id.* § 1232; *see also P.J.E.S.*, 502 F. Supp. 3d at 502.

In July 2021, CDC completed a public health assessment regarding the processing of unaccompanied children and concluded that, given the measures in place to prevent and mitigate the transmission of COVID-19 within and among such children once in ORR care and the relatively short amount of time they spend in Ports of Entry and Border Patrol stations, it was appropriate to except such children from the October 2020 order.  *See* 86 Fed. Reg. 38,717 (July 22, 2021) (copy at App. 001).  In its July 2021 order announcing this determination, CDC explained that, "since November 18, 2020, [unaccompanied children] have generally been processed under regular immigration processes under Title 8 of the U.S. Code and therefore

---

[1] The only exception was a very brief window in time after the *P.J.E.S.* injunction was stayed by the D.C. Circuit but before CDC began excepting such children.

referred from U.S. Customs and Border Protection (CBP) to [ORR] . . . according to the usual legal framework governing such referrals." *Id.* at 38,719.  While noting that there had been an uptick in the number of unaccompanied children arriving at the U.S. border beginning in mid-2020, CDC found that ORR nonetheless possessed "sufficient capacity at ORR sites—both along the border and in the interior—significantly reducing the length of time that [unaccompanied children] remain in CBP custody." *Id.*  ORR's capacity to house such children enabled their expeditious transfer out of CBP facilities—i.e., out of the Ports of Entry and Border Patrol stations in which the potential for overcrowding has been the driving force behind CDC's Title 42 orders—in an average of 26 hours, which represented a "substantial improvement" over earlier average holding times of up to 131 hours. *Id.* at 38,719 & n.18.  (In contrast, single adults and families processed under Title 8 spend an average of 50 and 62 hours, respectively, in CBP facilities even *with* a Title 42 order currently in place to limit the number of adults and families so processed—and this is a key reason that CDC determined in its August 2021 order to keep Title 42 restrictions in place for these groups.  *See* 86 Fed. Reg. 42,828, 42,836–37 (Aug. 5, 2021) (copy at App. 005).)

CDC further found that the procedures in place at ORR's facilities "afford sufficient resources and time to identify [COVID-19] cases and implement environmental controls to attenuate the risk of COVID-19 infection and spread."  86 Fed. Reg. at 38,719.  "With CDC's assistance and guidance, ORR . . . has implemented COVID-19 testing regimes for [unaccompanied children] in its care and continues to practice other mitigation measures to further prevent and curtail" transmission of the virus, CDC explained.  *Id.*  CDC found that these measures "help reduce the spread of COVID-19 among [unaccompanied children] prior to being introduced into U.S. communities," that "the risk of overburdening the local healthcare systems

by [unaccompanied children] presenting with severe COVID-19 disease remains low," and that due to the "robust network of ORR care facilities and the testing and medical care available therein, as well as COVID-19 mitigation protocols . . . there is very low likelihood that processing [unaccompanied children] in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources." *Id.* at 38,719, 38,720. After considering these and other factors, CDC found that "*at this time*, there is appropriate infrastructure in place to protect the children, caregivers, and local communities from elevated risk of COVID-19 transmission as a result of the introduction of [unaccompanied children], and U.S. healthcare resources are not significantly impacted by providing [unaccompanied children] necessary care." *Id.* at 38,720 (emphasis added; citation omitted). That is, "the COVID-19-related public health concerns associated with [unaccompanied children] introduction can be adequately addressed without [these children] being subject to" Title 42 procedures. *Id.* As CDC made clear, the "situation could change based on an increased influx of [unaccompanied children], changes in COVID-19 infection dynamics among [such children], or unforeseen reductions in housing capacity." *Id.* at 38,720 n.22. At this time, though, it is CDC's considered judgment that Title 42 procedures are not necessary for unaccompanied children.

**C.**    **CDC issues a superseding Title 42 order in August 2021 that continues the exception for unaccompanied children but otherwise concludes that Title 42 restrictions remain necessary for single adults and family units.**

In August 2021, CDC issued a new Title 42 order that superseded its prior October 2020 order and continued the exception of unaccompanied children, and also determined that the relevant public health factors continue to support the use of Title 42 procedures for other groups of covered noncitizens (i.e., single adults and families). *See* 86 Fed. Reg. at 42,828. In this order, CDC expressly compared the relevant facts and circumstances relating to unaccompanied

children, on the one hand, and single adults and families, on the other, and explained why it had

determined that different treatments were appropriate for these different groups.  Unaccompanied

children "are differently situated than [single adults] and [families]," CDC explained, because

the government "has greater ability to care for [unaccompanied children] while implementing

appropriate COVID-19 mitigation measures" put in place by ORR (which has custody of only

unaccompanied children).  *Id.* at 42,837–38.  CDC noted that "[i]n light of these considerations,

there is very low likelihood that processing [unaccompanied children] in accordance with

existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare

resources," and that unaccompanied children "released to a vetted sponsor or placed in a

temporary or licensed ORR shelter do not pose a significant level of risk for COVID-19 spread

into the community" because they are "released only after having undergone testing, quarantine

and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate

medical and public health direction."  *Id.* at 42,838.  But "[w]hereas [unaccompanied children]

can be excepted from [Title 42 procedures] without posing a significant public health risk, the

same is not true of [single adults] and [families]," CDC concluded, because of the different ways

that these groups are processed at the Ports of Entry and Border Patrol stations and the related

public health effects (as discussed extensively in the August 2021 order).  *Id.*

**D.      Unaccompanied children are placed in ORR custody where they are quarantined and tested for COVID-19.**

As referenced in CDC's July and August 2021 orders, ORR has put a number of public

health protocols in place to detect and prevent the spread of COVID-19 among and by

unaccompanied children placed in its care.  When children initially enter ORR custody, they are

quarantined and tested at least twice for COVID-19 prior to release from quarantine.  86 Fed.

Reg. at 38,719 n.19; *see also* 86 Fed. Reg. at 42,838.  Children who test positive for COVID-19

are kept in medical isolation until they meet CDC's criteria to discontinue isolation, and children

with potential exposure to a COVID-19 case at any time are quarantined for seven days and are

released from quarantine only upon the receipt of a negative test result after an observation

period of at least five days.[2]  86 Fed. Reg. at 38,719 n.19; *see also* 86 Fed. Reg. at 42,838.

As CDC noted in its July 2021 order, "[a]lthough 8,435 [children] have tested positive for

COVID-19 while at ORR shelters during the period of March 24, 2020 to July 8, 2021, 8,081 of

those [children] have successfully completed medical isolation, with few requiring medical

treatment."  86 Fed. Reg. at 38,719.  Thus, CDC found a "low" risk that such children will strain

the U.S. healthcare system or healthcare resources and likewise found no significant risk of

community spread attributable to them.  *Id.* at 38,720.

**E.    DHS complies with CDC's Title 42 orders and employs various public health measures to detect and prevent the spread of COVID-19 among noncitizens in its custody.**

At all relevant times, DHS has been processing noncitizen families (and single adults) in

compliance with CDC's Title 42 orders—first the October 2020 order and now the August 2021

order.  (*See* App. 017–18, 193–207.)  However, in some cases, Title 42 expulsions are not

possible.  *See* 86 Fed. Reg. at 42,836.  DHS cannot carry out Title 42 expulsions without the

cooperation of foreign governments that must accept the return of the individuals whom the U.S.

government intends to expel.  Along the southern border, Mexico has placed various limitations

on the specific nationalities and demographics (e.g., families with young children) that it will

accept for return, which has in turn limited DHS's ability to carry out Title 42 expulsions under

both the October 2020 order and its successor August 2021 order.  *Id.*  And CDC has granted

---

[2] These practices are consistent with CDC guidance.  (*See* App. 026.)

discretion to DHS[3] to make case-by-case determinations whether any otherwise covered noncitizen should be excepted from Title 42 procedures based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. *Id.* at 42,840–81.

Other countries have similarly put in place limitations that effectively prevent timely Title 42 expulsions, for example by requiring travel documents or manifest requirements. 86 Fed. Reg. at 42,836. CDC's October 2020 order also did not apply to any noncitizens "who must test negative for COVID-19 before they are expelled to their home country," 85 Fed. Reg. at 65,807, and many foreign countries have required testing as a condition for return, 86 Fed. Reg. at 42,836. In other words, in many instances DHS has been unable to expel certain persons pursuant to Title 42, or for practical purposes cannot do so.

Pursuant to the discretionary authority granted by CDC in the October 2020 order and reaffirmed in the August 2021 order, DHS also has excepted certain particularly vulnerable families from Title 42 at Ports of Entry, based on the individual circumstances of those noncitizens. *See, e.g.*, 86 Fed. Reg. at 42,840. Working with certain non-governmental organizations, DHS has established a process to identify, on a case-by-case basis, particularly vulnerable families who may be excepted from Title 42 and processed under Title 8, and has consulted with CDC to ensure compliance with public health guidance. *Id.* Noncitizens identified pursuant to this process are required to test negative for COVID-19 before presenting at the Port of Entry. *Id.* When noncitizens potentially subject to Title 42 are encountered within the country (i.e., who did not enter lawfully through a Port of Entry) but are not expelled under

---

[3] DHS's involvement in the implementation of CDC's Title 42 orders is contemplated by 42 U.S.C. § 268, which directs "customs officers" to assist CDC in the enforcement of quarantine rules and regulations.

Title 42 (either because they are not a "covered noncitizen" under the Title 42 order or because of a case-by-case exception) and are released from DHS custody, testing is provided immediately prior to or after release.  (App. 206.)  DHS also has coordinated with state, local, and/or nongovernmental organizations for the provision of non-congregate accommodations so that such persons can properly isolate and/or quarantine.  (App. 206.)

Most recently, in ongoing litigation in the U.S. District Court for the District of Columbia in which the ACLU and other groups represent a class of plaintiffs challenging the application of Title 42 to families, the court granted a preliminary injunction prohibiting the government from "applying the Title 42 process" to the class of families as defined by the court.  *See Huisha-Huisha v. Majorkas*, --- F. Supp. 3d ----, 2021 WL 4206688 (D.D.C. 2021) (*see also* App. 131, 189).  The district court simultaneously granted a 14-day administrative stay, *see id.*, and the government immediately appealed (App. 192) and has moved for an emergency stay pending appeal, with a request that a stay be issued prior to expiration of the district court's stay, i.e., by September 30, 2021.  The D.C. Circuit has not yet acted on that motion.

## F.    Texas files an amended complaint and a renewed motion for preliminary injunction.

Texas's first amended complaint asserts various claims (discussed in more detail in the argument section below) challenging CDC's July and August 2021 Title 42 orders and certain of DHS's detention-and-parole practices, including with respect to an alleged *de facto* exception of families from the Title 42 process.  (*See* Doc. 62.)  In a renewed motion for preliminary injunction, Texas seeks relief on a subset of its claims—specifically, those challenging CDC's Title 42 orders and the alleged *de facto* exception of families from Title 42, as well as a claim that DHS has not complied with 8 U.S.C. § 1222(a).  (*See* Doc. 67 (motion); Doc. 67-1 (proposed order); Doc. 68 (brief).)  The government now responds to both filings, and asks that

the case be dismissed and Texas's preliminary-injunction motion denied.

## III.     Argument and Authorities

**A.     The Court should dismiss this action for lack of jurisdiction and because Texas's claims are barred in part by res judicata and otherwise fail to state a claim.**

The claims in Texas's amended complaint are designated by letter headings (A through

F) and can be grouped as follows:

> (1)   In claims A and B, Texas brings APA challenges to CDC's July and August 2021 Title 42 orders, under theories that notice-and-comment procedures were required and that CDC acted in an arbitrary and capricious manner.

> (2)   In claims C.1 and D, Texas asserts that the government has failed to detain noncitizens during removal proceedings and has instead improperly paroled such persons within the United States.

> (3)   In claim C.2, Texas asserts that the government has failed to detain noncitizens upon arrival in the country to determine if they are inadmissible by reason of carrying COVID-19.

> (4)   In claim E, Texas asserts that DHS has violated an alleged contract with Texas.

> (5)   In claim F, Texas asserts that the government has not complied with the Constitution's Take Care Clause.

(*See* Doc. 62, ¶¶ 75–98.)  As explained below, all claims should be dismissed under Rule

12(b)(1) (for lack of standing) and/or Rule 12(b)(6) (where res judicata applies or Texas

otherwise fails to state a claim[4]).

---

[4] Res judicata is an affirmative defense and therefore is generally pleaded and then addressed at the summary-judgment stage, but "there are times when it may be raised on a Rule 12(b)(6) motion." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 410 (5th Cir. 2013).  For example, "[w]hen all relevant facts are shown by the court's own records, of which the court takes notice, the defense [of res judicata] may be upheld on a Rule 12(b)(6) motion without requiring an answer." *Id.*; *see also Warren v. Mortg. Elec. Registration Sys., Inc.*, 616 F. App'x 735, 738 (5th Cir. 2015) (affirming grant of a Rule 12(b)(6) motion on the basis of res judicata).  Here, where the res judicata defense is based on a judgment recently issued in the MPP case in this district, all the relevant matters are properly the subject of judicial notice and thus amenable to resolution on a Rule 12 motion.

1.     **Claims A and B—challenging CDC's July and August 2021 Title 42 orders— should be dismissed because Texas lacks standing, the CDC decisions at issue are committed to agency discretion as a matter of law, Texas's claimed injuries do not come within the zone of interests regulated by Title 42, and Texas fails to state any notice-and-comment claim.**

Texas's claims A and B assert that CDC's July and August 2021 Title 42 orders do not comply with the APA because they were not issued using notice and comment and were arbitrary and capricious for allegedly failing to consider "state reliance interests" and other "relevant factors." (Doc. 62, ¶¶ 75–85.) No jurisdiction exists for either claim, though, because Texas lacks standing and the CDC decision at issue—to except unaccompanied children from an order under Title 42—is a discretionary matter that is not subject to judicial review under the APA. Texas additionally is not within the relevant "zone of interests" and fails to state any notice-and-comment claim.

a.     **Texas lacks standing.**

Article III limits federal-court jurisdiction to actual "cases" or "controversies" and requires a plaintiff to establish standing by showing "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood] that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In addition, when "the plaintiff is not himself the object of the government action or inaction he challenges, standing is . . . substantially more difficult to establish." *Defenders of Wildlife*, 504 U.S. at 562 (internal quotation marks and citation omitted). This is relevant here because CDC's Title 42 orders do not directly govern Texas's conduct. Thus, Texas faces a "substantially more difficult" burden to establish standing. *See id.*

Texas nonetheless asserts that it has standing under a theory that the allegedly "unlawful

release of aliens" (Doc. 62, ¶ 5) harms Texas in the form of increased financial costs.  In particular, Texas explains that it subsidizes the cost of driver's licenses that some noncitizens are eligible to obtain, and also spends money providing other services to noncitizens, including education and health care.  (Doc. 62, ¶¶ 6–15.)  But as explained below, Texas's claimed financial injuries do not give rise to any Article III injury—and certainly not any injury allowing Texas to challenge CDC's public-health-related orders issued under Title 42.

*First*, Texas's alleged budgetary injury is nothing more than a generalized grievance.  A "state official has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources," because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws."  *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).  Thus, generalized contentions that "illegal immigration is costing the state money" do not confer standing.  *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (emphasis removed).  Cases that Texas relies on in which it or other litigants have established standing to challenge changes in immigration policy (e.g., DACA or the MPP program) are also inapposite.  Title 42 orders are not immigration actions and do not represent the exercise of any form of immigration policymaking with an intended or expected effect to increase or decrease the long-term presence of noncitizens in the country.  Instead, such orders are temporary public health measures issued in an exercise of scientific and medical judgment, and, in this particular case, have been issued in an attempt to alleviate the effect of the COVID-19 pandemic, most primarily in connection with processing of noncitizens in congregate settings at Ports of Entry and Border Patrol stations.

Moreover, Texas ignores that CDC's currently operative Title 42 order from August 2021

leaves Title 42 restrictions in place for the two other categories of noncitizens, single adults and family units.  Vastly more single adults are expelled under Title 42 every month than the number of unaccompanied children who are processed under Title 8 procedures, yet Texas simply cherry-picks the portion of CDC's decision that it disagrees with, for unaccompanied children, and acts as though CDC's other Title 42 actions presumably meeting its approval do not exist. Indeed, if Texas has standing to challenge the portion of CDC's Title 42 orders excepting unaccompanied children from Title 42, under a theory that Texas believes additional noncitizens within its borders end up costing the state more money, then by that same logic another state believing that additional noncitizens on balance have a positive financial effect (through things like sales taxes paid) would be able to challenge CDC's decision to continue applying Title 42 to other groups like single adults.  It is respectfully submitted that Article III's injury-in-fact requirement and bar on the litigation of generalized grievances serves precisely the function of preventing the federal courts from being drawn into policy disagreements of this nature.

*Second*, Texas fails to show that any of its alleged financial harms arising from a generalized increase in the number of noncitizens in the country are fairly traceable to CDC's Title 42 orders.  "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish."  *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotation marks and citation omitted).  Notably, the Supreme Court in *California v. Texas* just rejected—on causation grounds—very similar arguments urged by Texas and other states seeking to challenge the Affordable Care Act's "individual mandate" under a theory that the mandate costs the states money in administering their healthcare systems.  *Id.* at 2117–18. The Court found these allegations insufficient to establish standing because the states failed to

trace any increased costs to the challenged provision. The same holds true here. To the extent Texas is arguing that it may incur costs because noncitizens choose to enroll in state programs or apply for things like driver's licenses, myriad factors influence such decisions and Texas fails to show that CDC's Title 42 orders are the sole or even primary cause of such injuries.

A comparison to the *Texas v. United States* "DAPA" litigation cited in Texas's brief is also instructive and actually shows why no cognizable injury traceable to the challenged Title 42 orders exists here. (*See* Doc. 68 at 22 (citing *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016)).) Texas previously suggested that *Texas v. United States* stands for a broad proposition that "costs imposed by federal immigration policies give Texas standing to challenge the lawfulness of those policies." (Doc. 22 at 28.) But at issue in *Texas v. United States* was a DHS memo that made millions of undocumented noncitizens eligible to receive "lawful presence" classification. *Texas*, 809 F.3d at 148. This classification carried "significant legal consequences," the Fifth Circuit explained, including the ability to receive various federal and state benefits. *Id.* As a direct result of the challenged program, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), "at least 500,000 illegal aliens in Texas" would become eligible to receive driver's licenses, at a cost of "several million dollars" to the state because of how licenses are subsidized. *Id.* at 155. "DAPA would be the primary cause and likely the only one" of this "dramatic increase in the costs of the driver's-license program," and therefore the Fifth Circuit found these increased costs to be a sufficiently particularized and causally-connected injury creating standing. *Id.* at 160.

Here, in contrast, CDC's Title 42 orders do not confer any form of immigration status on anyone. They instead allow unaccompanied children encountered in the United States to be

processed under the generally applicable immigration laws, just as they would be if no Title 42 order were in effect. This is a critical distinction with the DAPA program at issue in *Texas v. United States*. Unlike CDC's Title 42 orders, the DAPA program did not simply restore the status quo, as dictated by generally applicable immigration laws, to its recipients. Rather, DAPA conferred lawful presence on its recipients and thus changed the rights they were guaranteed under the immigration laws. So, the DAPA recipients obtained a tangible immigration benefit *from the program itself*. By contrast, CDC's Title 42 orders provide no such benefit or change in the legal classification of unaccompanied children. Such children instead remain subject to other longstanding immigration laws of general applicability, including the TVPRA and various provisions of the Immigration and Nationality Act. But Texas does not challenge these laws, and if any particular unaccompanied child is determined to have some immigration status, it will be by operation of these laws and not any CDC order. In turn, if Texas is later obligated to provide some public service because of a changed immigration status, that would arise from another provision of law and thus is not caused by any Title 42 order. *See California*, 141 S. Ct. at 2119 (no causation when "other provisions of [law], not the [challenged] provision, impose these other requirements" that affected the state's pocketbook). Accordingly, CDC's Title 42 orders can in no way be labeled "the primary cause and likely the only one" of any speculative costs that Texas might incur in connection with state services it provides. *Texas*, 809 F.3d at 160.

Texas's inability to link its claimed injuries specifically and directly to CDC's Title 42 orders implicates the Supreme Court's recent warning in *California v. Texas* that an Article III injury may not be manufactured by complaining of "pocketbook injuries" that arise not as a result of the law being challenged, but rather from "other provisions [that] operate independently." *California*, 141 S. Ct. at 2119, 2119–20. Texas's claims here suffer from this

same defect, and Texas cannot show that its alleged injuries are fairly traceable to CDC's July and August 2021 orders so as to satisfy Article III.

      **b.**    **CDC's public health determinations in the July and August 2021 orders are committed to agency discretion.**

There is a second reason Texas's claims challenging CDC's Title 42 orders should be dismissed:  the APA does not extend to the review of actions committed to agency discretion by law.  5 U.S.C. § 701(a)(2); *see also Qorane v. Barr*, 919 F.3d 904, 911–12 (5th Cir. 2019).  As explained by the Supreme Court, judicial review is not available "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Determining whether a decision is committed to agency discretion and thus unreviewable under the APA "requires careful examination of the statute on which the claim of agency illegality is based."  *Webster v. Doe*, 486 U.S. 592, 600 (1988).  Here, the statute provides:

> Whenever [the CDC Director] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [CDC Director], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.

Several aspects of this statute and its accompanying regulation (discussed below) demonstrate that CDC's public health determination to decline to extend a prior Title 42 order (as it relates to unaccompanied children) is squarely committed to the agency's discretion.  First,

the statute does not require CDC to prohibit the introduction of any persons or property at any time, even if the statutory predicates for such an order are satisfied. Even if CDC "determines" that there is a "serious danger of the introduction of [a] communicable disease into the United States," CDC is not *required* to do anything. Instead, under these circumstances CDC "shall have the power to prohibit" the introduction of the relevant persons or property. *See id.* In other words, the statute confers discretion upon CDC to act, but does not mandate that it do so—the statute does not say that upon occurrence of the triggering conditions CDC "shall prohibit" introduction, but only that it "shall have the power to prohibit" introduction. *See id.* And given the discretionary nature of any decision by CDC to issue, or instead decline to issue, a Title 42 order in the first place, the lesser power of lifting a Title 42 order against a specified class of individuals is also necessarily a discretionary one. This makes sense because CDC's actions under Title 42 necessarily involve scientific and technical knowledge and experience regarding communicable diseases generally, and the application of such knowledge and experience to the specific communicable disease that threatens the public health. Such expert judgments, at least where they do not implicate the exercise of constitutionally protected rights, are beyond the purview of the Judiciary. *Cf. S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect,'" and "[w]hen those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" (citations omitted)).

Second, there is no enumeration of standards that can guide the Court's review of CDC's use of scientific expertise in deciding to discontinue the application of Title 42 to some or all

persons previously subject to a Title 42 order.  The statute authorizes CDC to leave a Title 42

order in place for such period of time that CDC "may deem necessary."  42 U.S.C. § 265.  This

language is discretion-conferring.  *See Texas v. U.S. Envtl. Prot. Agency*, 983 F.3d 826, 837 (5th

Cir. 2020) (statute directing agency to make changes whenever the agency "deems necessary"

"delegated discretionary authority").  In addition, there simply is no "meaningful standard

against which to judge the agency's exercise of discretion" in this regard.  *Chaney*, 470 U.S. at

830.  The same is true of the relevant implementing regulation, found at 42 C.F.R. § 71.40.  The

regulation says nothing about what standards, if any, must be met in order for CDC to withdraw

a Title 42 order.  *See* 42 C.F.R. § 71.40(a).

The Fifth Circuit has explained that a matter is committed to agency discretion, such that

review under the APA is not available, if the relevant statutory or regulatory provision "[does]

not require the consideration of specific factors, the making of findings or the development of

any additional evidentiary record."  *Ellison v. Connor*, 153 F.3d 247, 253 (5th Cir. 1998).

"[W]ithout these, the judiciary [is] in no position to gainsay the [agency's] determination as

arbitrary, capricious or an abuse of discretion."  *Id.*

As in *Ellison*, the applicable statutory and regulatory language of this case "does not

contain standards or evidentiary requirements" for the relevant agency decision, i.e., the decision

to discontinue a Title 42 order with respect to a specific group of individuals.  *See id.*  Thus, no

review under the APA is available.  *See id.*; *see also Promiseland Metro, Inc. v. U.S. Army Corps

of Eng'rs*, No. 4:15-CV-817-A, 2016 WL 543209, at *3 & n.4 (N.D. Tex. Feb. 9, 2016) (same,

where "plaintiffs have not cited any statute or regulation setting forth procedural requirements or

specific substantive factors the [agency] was required to take into account").

### c. Texas's claimed pocketbook injuries do not come within the zone of interests protected by the Title 42 statute.

Texas's challenge to CDC's Title 42 orders also is subject to dismissal because Texas fails to satisfy the APA's zone-of-interests requirement. This test is satisfied if the plaintiff asserts an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[5] *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). On the other hand, the test is not met when the claimed injury is "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294 (5th Cir. 2018) (internal quotation marks and citation omitted). Put another way, "on any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

Here, Congress's purpose in conferring Title 42 authority on CDC could not be clearer—to allow CDC to take actions it believes are "required in the interest of the public health." 42 U.S.C. § 265. Texas, though, has not pleaded any public-health-related injury arising from CDC's Title 42 orders, but instead alleges only pocketbook injuries stemming from an alleged increase in the presence of "illegal aliens" in Texas. (*See* Doc. 62, ¶¶ 6–15.) These alleged injuries have no basis in or connection to the public health concerns that prompted Congress to enact the Title 42 statute, and instead are indistinguishable from the same claimed injuries that

---

[5] As this quotation's reference to the "statute or constitutional guarantee in question" suggests, the zone-of-interests test looks to the zone of interests created by the underlying statute applicable to the agency's actions—here, the Title 42 statute—and not the APA itself. *See, e.g.*, *Texas v. United States*, --- F. Supp. 3d ----, 2021 WL 2096669, at *22–*23 (S.D. Tex. May 24, 2021) (looking to the zone of interests relevant to an underlying immigration statute in connection with arbitrary-and-capricious and notice-and-comment challenges to an agency action).

Texas has asserted in other litigation (like the MPP case) challenging immigration policy decisions and the government's administration of non-public-health-related laws in the Immigration and Nationality Act.  Texas's alleged economic injuries are not within the zone of interests implicated by the Title 42 statute, and for this additional reason Texas's APA claims should be dismissed.  *See Ecosystem*, 729 F. App'x at 296 (finding that pocketbook injuries did not fall within the zone of interests to allow an APA claim challenging the government's actions under an environmental statute, where the statute's concern was with environmental protection and not with the types of economic injuries the plaintiff claimed as shown in the "precise allegations in the complaint").

### d.    No claim is stated for a lack of notice-and-comment procedures.

Texas also fails to state any claim that notice and comment was required for CDC's Title 42 orders.  The APA requires notice and comment for so-called "legislative" rules, which come into existence "if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue."  *Am. Postal Workers Union v. U.S. Postal Serv.*, 707 F.2d 548, 558 (D.C. Cir. 1983).  In contrast, when an agency is merely taking enforcement action it is not acting in a "legislative" capacity such that notice and comment is required, but instead the agency must be relying on an "already-specific statute or legislative rule" (i.e., a rule promulgated through notice and comment).  *See Jubilant Draximage Inc. v. U.S. Int'l Trade Comm'n*, 490 F. Supp. 3d 169, 186 (D.D.C. 2020).

Texas's own pleadings, including the attachments to its first amended complaint, make clear that the latter is what has occurred here.  CDC's July and August 2021 Title 42 orders did not purport to "legislate" some new general area of power for the agency, but rather these orders took specific public health enforcement-type action in the context of the COVID-19 pandemic

pursuant to an already-existing statute and a previously-promulgated legislative rule (42 C.F.R. § 71.40).  Notably, CDC did engage in notice-and-comment rulemaking when it promulgated the new *regulation* at 42 C.F.R. § 71.40, which governs CDC's use of its enforcement authority under Title 42 to prohibit the introduction of "persons" into the United States.  *See* 85 Fed. Reg. at 56,448–55 (culmination of this rulemaking in September 2020 with extensive analysis and review of public comments).  But CDC's subsequent Title 42 *orders* issued pursuant to this regulation in the specific context of the COVID-19 pandemic do not require additional notice-and-comment periods, where the parameters of such Title 42 orders are already set through the regulation that is the product of notice-and-comment rulemaking.  *See Chambless Enters., LLC v. Redfield*, 508 F. Supp. 3d 101, 117–18 (W.D. La. Dec. 22, 2020) (notice and comment was not required for a CDC eviction moratorium order issued pursuant to an existing regulation).

Texas's notice-and-comment challenge additionally fails as a matter of law because CDC's earlier Title 42 order from October 2020—the order that Texas evidently prefers as a policy matter and wants to effectively revive by having this Court nullify the later July and August 2021 orders—was not the product of notice and comment either.  "The Supreme Court has explained that [the APA] 'mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.'"  *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015)).  Thus, even if it were assumed that notice and comment is required for Title 42 orders, that would not translate to any claim in Texas's favor attacking only CDC's more recent orders (and even then only in part, since Texas does not challenge the August 2021 order's continued application of Title 42 to single adults and families).  The D.C. Circuit recently rejected a similar selective challenge to an agency decision in *Friends of Animals*, where the

plaintiffs' notice-and-comment claim sought to nullify a more recent agency decision in order to revert the state of affairs to that which existed under the prior decision, but where neither decision had gone through notice and comment.  *See id.* at 1201–02.  "[W]e do not see how a government action that illegally never went through notice and comment gains the same status as a properly promulgated rule such that notice and comment is required to withdraw it," the court explained.  *Id.* at 1206.  The theory of Texas's selective notice-and-comment claim suffers from the same flaw.

2. **Claims C.1 and D—asserting that the government has not detained noncitizens during removal proceedings under 8 U.S.C. § 1225 and instead has improperly paroled such persons—are barred by res judicata; alternately, Texas lacks standing and 8 U.S.C. § 1252(f)(1) bars this claim.**

Texas's claim C.1 is based on 8 U.S.C. § 1225, which provides that noncitizens subject to removal proceedings "shall be detained" while those proceedings are in progress.  8 U.S.C. § 1225(b)(1)(B)(iii)(IV), (b)(2)(A); (*see also* Doc. 62, ¶¶ 27–31).  Section 1225 detention is not absolute, though.  Under 8 U.S.C. § 1182(d)(5)(A), DHS may parole such persons "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[6]  Texas's claim D, however, asserts that DHS has used this parole authority improperly, essentially by paroling more people than Texas believes should be paroled.  (Doc. 62, ¶¶ 92–93.)  Thus, claims C.1 and D are two sides of the same coin.  Texas is ultimately complaining that too many noncitizens have been or are being released within the country as a result of DHS's practices under sections 1225 and 1182.  A person in removal proceedings initiated through section 1225(b)(2)(A) will generally be detained pursuant to section 1225 unless paroled under section 1182—and Texas asserts that DHS is violating both provisions.

---

[6] In addition, 8 U.S.C. § 1226(a)(2) also allows for certain noncitizens to be released on "bond" or "conditional parole" pending a decision on whether they are to be removed.

At the outset, the government disputes Texas's contention that it is violating either statute,[7] as well as Texas's underlying assumption that DHS's actions with respect to the detention and/or parole of noncitizens are subject to judicial review in an action such as this one. But the Court need not reach these issues, because Texas has already litigated similar allegations in the MPP case recently decided by Judge Kacsmaryk. *See Texas v. Biden*, --- F. Supp. 3d ----, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) (*see also* App. 077). Texas's claims C.1 and D in this action arise out of the same nucleus of operative facts at issue in that prior lawsuit. Thus, res judicata applies and bars Texas from relitigating these same claims here.

The Fifth Circuit's test for res judicata "has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Hous. Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (citations omitted). With respect to the first three elements, it is clear that the parties are the same or in privity in both suits,[8] that the U.S. District Court for the Northern District of Texas is a court of competent jurisdiction,[9] and that a final judgment was

---

[7] It is also worth noting that U.S. Immigration and Customs Enforcement's daily population count of detained individuals is consistently near its total rated capacity, and increasing detention capacity would require additional appropriations for that purpose from Congress. (*See* App. 208–09.)

[8] Texas was of course a plaintiff, and the defendants included the President, DHS, the Secretary of Homeland Security, the Commissioner of CBP, the Director of ICE, and the Director of USCIS—all of whom are also defendants in the instant lawsuit. (App. 044–45.) Additional defendants in the current suit include the United States, CBP, and ICE, who are in privity with the federal officials sued in their official capacities in the prior suit—an official-capacity suit is considered the same as a suit against the government itself. Still other defendants in the current suit include HHS, CDC, and officials associated with those agencies, but they are not relevant to Texas's claims that DHS is violating 8 U.S.C. §§ 1225 and 1182.

[9] To be clear, the government is now appealing the MPP decision and argued that jurisdiction was lacking for Texas's various claims there, but Judge Kacsmaryk concluded otherwise.

entered by Judge Kacsmaryk.  (App. 130.)

To determine whether two suits involve the same claim or cause of action, the Fifth Circuit uses a transactional test that "focuses on whether the two cases are based on the same nucleus of operative facts," with it being the "nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted[,] that defines the claim." *Hous. Prof'l*, 812 F.3d at 447 (internal quotation marks and citations omitted).  "[A] prior judgment's preclusive effect extends to all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005).

The same nucleus of operative facts relevant to Texas's claims in this lawsuit alleging that DHS is not properly detaining noncitizens was also present in the MPP case.  In that case, in addition to arguing that the government had violated the APA when terminating the MPP program, Texas also alleged that the government was improperly allowing noncitizens to be released (i.e., on parole under 8 U.S.C. § 1182) and "routinely fail[ing] to detain them" under the "Mandatory Detention" provisions of 8 U.S.C. § 1225.  (App. 060.)  In fact, one of the claims expressly pleaded by Texas was for "Violation of Section 1225."  (App. 071.)  That is the same immigration statute that forms the basis for Texas's claim C.1 and the related claim D in this litigation.  (*See* Doc. 62, ¶ 31 (relying on section 1225 to argue that noncitizens "must be detained until DHS has finished considering the asylum application or the removal proceedings").)  Moreover, in his decision issued at the conclusion of the MPP case, Judge Kacsmaryk discussed the relevant detention-and-parole provisions in sections 1225 and 1182 and expressly found that the government had violated section 1225.  (*See* App. 082, 118–20.)  Judge Kacsmaryk then ruled in Texas's favor on its "statutory claim" under section 1225.  (App. 120.)

Having just last month litigated to judgment a section 1225 claim in Judge Kacsmaryk's court, the doctrine of res judicata precludes Texas from proceeding on claims arising out of the same nucleus of operative facts and alleged injury here.  In both cases, Texas has asserted an injury arising from the government's actions in not detaining (and instead allegedly paroling) certain noncitizens pending the completion of their removal proceedings.  In this scenario, it does not matter if the plaintiff may be advancing a slightly different *theory* of recovery in the second case, because when the same basic alleged injury is at issue, the matters are inextricably intertwined.  *See Leal v. Azar*, No. 2:20-CV-185-Z, 2020 WL 7672177, at *7–*9 (N.D. Tex. Dec. 23, 2020) (finding that res judicata barred a lawsuit challenging the Affordable Care Act's "contraceptive mandate," notwithstanding that the plaintiffs were using a different theory than what had been employed in an earlier suit in which the plaintiffs had not challenged the statute itself but instead had challenged enforcement actions taken by executive-branch officials).  The *Leal* case is instructive.  As is true here with respect to Texas, the *Leal* plaintiffs had prevailed against the government in a prior lawsuit by obtaining a judgment in their favor (a permanent injunction in *DeOtte v. Azar*, 393 F. Supp. 3d 490 (N.D. Tex. 2019)).  *See Leal*, 2020 WL 7672177, at *1.  Apparently, though, the plaintiffs later decided that this judgment was "not enough," so they filed a second lawsuit seeking some additional form of remedy.  *See id.* at *2.  But because the same underlying alleged injury was at issue, this later suit was held barred by res judicata.  *Id.* at *7–*9.  The same is true here.  Res judicata bars Texas's claims C.1 and D in this action.[10]

Alternately, should the Court determine that res judicata does not apply, Texas lacks

---

[10] The fact that the government has appealed the judgment in the MPP case does not affect the analysis. A final judgment has preclusive effect even while on appeal, unless and until it is vacated or reversed. *See Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 467 (5th Cir. 2013).

standing for claims C.1 and D for essentially the same reasons, discussed above, that standing is absent for Texas's claims challenging CDC's Title 42 orders.  (*See* pp. 15–20, *supra*.)  Texas's claims about DHS's detention practices at most present a generalized grievance and Texas fails to show any particularized, causally-connected injury sufficient to confer Article III standing. Additionally, Texas's claims are barred by 8 U.S.C. § 1252(f) for the reasons discussed in the immediately following section of this brief.  Texas is seeking a classwide injunction that would dictate specific detention practices for the government to follow with respect to an entire category or categories of noncitizens encountered at the southwest border, but section 1252(f) does not allow for such claims in district court.

### 3. Claim C.2—asserting that the government has violated 8 U.S.C. § 1222(a) by not detaining noncitizens to determine if they carry COVID-19—should be dismissed because the Court lacks jurisdiction under 8 U.S.C. § 1252(f)(1) and Texas lacks standing.

Texas's claim C.2 alleges that DHS has failed to comply with 8 U.S.C. § 1222(a).  (Doc. 62, ¶¶ 32–33.)  Section 1222(a) provides as follows:

> For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes inadmissible under this chapter, by reason of being afflicted with any of the diseases or mental or physical defects or disabilities set forth in section 1182(a) of this title, or whenever the Attorney General has received information showing that any aliens are coming from a country or have embarked at a place where any of such diseases are prevalent or epidemic, such aliens shall be detained by the Attorney General for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to inadmissible classes.

8 U.S.C. § 1222(a).  Texas asserts that the government "is obliged to detain subject aliens until it determines whether they are inadmissible due to COVID-19" (Doc. 68 at 29) and asks the Court to enjoin the government to "detain aliens arriving on the southwest border . . . for a period

sufficient to determine, in accordance with the requirements of 8 U.S.C. § 1222 and with the guidance of the Department of Health and Human Services, that those aliens are not [COVID-19] carriers," (Doc. 67-1).

But this claim fails at the outset because 8 U.S.C. § 1252(f)(1) bars the requested injunctive relief.  Under section 1252(f)(1), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."  8 U.S.C. § 1252(f)(1).  Section 1222 falls within part IV of the subchapter within the United States Code to which section 1252(f)(1) applies.[11]  And in section 1252(f)(1), "Congress stripped all courts, save for the Supreme Court, of jurisdiction to enjoin or restrain the operation of 8 U.S.C. §§ 1221–1232 on a class-wide basis."  *Hamama v. Adducci*, 946 F.3d 875, 877 (6th Cir. 2020); *see also Gayle v. Warden Monmouth Cty. Corr. Inst.*, --- F.4th ----, 2021 WL 4006189, at *10 (3d Cir. 2021).

Notwithstanding that it is not entirely clear what specific relief Texas is seeking in terms of how long Texas believes arriving noncitizens ought to be detained,[12] the section 1252(f)(1) bar applies because Texas seeks what would amount to classwide relief that would limit and dictate how the government implements section 1222(a) with respect to all noncitizens at the southwest border.  Texas may respond by arguing that it is simply seeking to "enforce" (its view of) the statute, such that the section 1252(f)(1) bar should not be held to apply.  But as Justices Thomas and Gorsuch have explained, that reasoning is "circular and unpersuasive."  *Nielsen v.*

---

[11] Part IV of subchapter II of Title 8, United States Code, consists of sections 1221–1232.

[12] Texas's proposed preliminary injunction on this point lacks the specificity required by Rule 65(d)(1), and for this additional reason Texas fails to show any entitlement to relief.  (*See* Doc. 67-1.)

*Preap*, 139 S. Ct. 954, 975 (2019) (Thomas, J., concurring in part and concurring in the judgment); *see also Hamama v. Adducci*, 912 F.3d 869, 879, 880 (6th Cir. 2018) (finding that section 1252(f)(1) barred a requested injunction "to ensure [that certain provisions within part IV] are correctly enforced," with an explanation that if placing "limitations on what the government can and cannot do under the removal and detention provisions are not 'restraints,' it is not at all clear what would qualify as a restraint"). Section 1252(f)(1) broadly prohibits district courts from "enjoin[ing] or restrain[ing] *the operation of*" the specified provisions on a classwide basis, 8 U.S.C. § 1252(f)(1) (emphasis added), and clearly Texas is attempting to enjoin how the government conducts operations under section 1222(a). Section 1252(f)(1) therefore applies to bar the relief Texas seeks.

Moreover, in addressing a request for injunctive relief, the Court should be cognizant of the practical consequences of Texas's theory. If Texas can circumvent section 1252(f)(1) by asking the Court to "enforce" Texas's interpretation of the statute, then another state would equally be entitled to sue for an opposite interpretation, creating the potential for conflicting classwide injunctions on how DHS should administer immigration laws. This is precisely the kind of result that section 1252(f)(1) is designed to prevent, by limiting the district courts' consideration of immigration statutes like section 1222(a) to specific, case-by-case adjudications of individual disputes—as opposed to engaging in classwide determinations regarding those statutes.

Additionally, even without section 1252(f)(1)'s jurisdictional strip, Texas's claim C.2 would still be subject to dismissal because Texas lacks standing, for the same reasons that Texas does not have standing for its other claims. Texas's generalized grievance with the government's immigration practices does not give rise to a justiciable, concrete injury creating

Article III jurisdiction.  Texas is not challenging a discrete policy decision that allegedly harms it, but rather the outcomes of thousands of daily, individualized decisions on how to deal with the myriad different categories of noncitizens who arrive at the Ports of Entry every day—some by plane, some by foot or vehicle, some with entry documents, some without any documentation but claiming asylum, and on and on.  Texas has cited no authority, and the government is similarly aware of none, that would give a state or any other litigant standing to challenge these matters simply out of a desire to limit the number of noncitizens in the country.

4.    **Claim E—based on an alleged agreement between DHS and Texas—is barred by res judicata and, regardless, the agreement in question would not be enforceable in this suit.**

Texas's Claim E is based on a January 8, 2021 agreement signed by the "Senior Official Performing the Duties of the Deputy Secretary" of Homeland Security.  (Doc. 62, ¶¶ 94–95; Doc. 62-1 at PageID 770–77.)  The agreement purports to require DHS to exercise its immigration-related powers in certain ways and to "consult" with Texas and to provide at least 180 days' notice before taking various actions.  (*See* Doc. 62-1 at PageID 771–73.)  For any number of reasons, the agreement was not valid when it was signed and is not enforceable in a lawsuit like this one.[13]  However, this Court need not reach those issues because Texas has

---

[13] First of all, Texas cannot identify any legal authority that contemplates DHS entering into a contract to grant states power to review and delay federal agency policy decisions.  A long line of authority establishes that "[t]he Government cannot make a binding contract that it will not exercise a sovereign power."  *Amino Bros. Co. v. United States*, 372 F.2d 485, 491 (Ct. Cl. 1967).  Additionally, nothing in the relevant statutes at 6 U.S.C. § 361(b)(4) or 8 U.S.C. § 1103(a)(3) expressly authorizes such a contract; "[a]n employee of the Government possesses *express authority* to obligate the Government *only* when the Constitution, a statute, or a regulation grants it to that employee in unambiguous terms." *Abraham v. United States*, 81 Fed. Cl. 178, 186 (2008) (internal quotation marks and citation omitted).  Nor has Texas attempted to prove that Kenneth Cuccinelli, who signed the document for the government, had implied or actual authority to enter into the purported agreement.  *See Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1402 (Fed. Cir. 2016) ("[A]n employee of the Government has implied actual authority to enter an agreement only when that authority is an integral part of the duties assigned to [the] government employee." (internal quotation marks and citation omitted)).  Finally, an agreement placing an

already litigated a claim for breach of the agreement based on the same nucleus of operative

facts, in the MPP litigation.[14]  (*See* App. 070–71, 120.)  Thus, res judicata bars Texas's claim

based on the agreement in this lawsuit.  As discussed above in connection with Texas's

detention-and-parole-practices claims, this lawsuit and Texas's claimed injuries herein (which,

with respect to the agreement, Texas characterizes as stemming from "actions that have resulted

in an increase in the number of removable aliens in Texas" (Doc. 62, ¶ 95)) clearly arise from the

same nucleus of operative facts that were at issue in connection with Texas's agreement-based

claim in the MPP litigation.  (*See* pp. 27–29, *supra*.)  Additionally, even if the agreement were

assumed to be valid, Texas's position is that the agreement expired on August 1, 2021.  (App.

061–62, 120.)  Thus, as Judge Kacsmaryk noted, the agreement could not under any

circumstances be held to apply to any agency actions occurring after that date.  (App. 120.)

Alternately, even if res judicata did not apply and the agreement were not in Texas's view

expired, any claim based on it is subject to dismissal for the reasons noted in footnote 13, above.

### 5.    Claim F—asserting a violation of the Take Care Clause of the Constitution— is not justiciable in this Court.

Texas asserts in claim F that the government is not complying with the Immigration and

---

unreasonable restriction on the executive power of a future administration would be contrary to public policy, and therefore unenforceable.

Second, even if the agreement was valid, sovereign immunity would bar Texas's attempt to enforce it here because sovereign immunity has not been waived for contract claims seeking specific performance against the government (and it is Congress that has the authority to waive sovereign immunity).  *See Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1229–30 (5th Cir. 1976).  The Tucker Act also "impliedly forbids declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity" under the APA, given that any purported duty to consult with Texas or otherwise take actions under the agreement, "if it exists, derives from the contract."  *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646, 647 (9th Cir. 1998).

[14] Judge Kacsmaryk ultimately declined to award any relief in connection with the agreement after finding that Texas had obtained the full relief it was seeking on its APA and statutory claims and that any further relevant agency action would take place after the date Texas stated the agreement expired.  (App. 120.)

Nationality Act and that the defendants have thereby "violate[d] their obligation to see that those laws are faithfully executed."  (Doc. 62, ¶ 97.)  But as Texas's allegations make clear, this claim is duplicative of the other claims asserting violations of immigration statutes like sections 1222(a), 1225, and 1182, and is subject to dismissal for the same reasons noted above, including because Texas lacks standing and res judicata[15] and 8 U.S.C. § 1252(f)(1) bar these claims.

In any event, the Take Care Clause is not a basis for affirmative relief in an Article III court.  The Clause speaks only of a responsibility of the President, not his subordinates, *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988), and a subordinate officer cannot violate the President's duty to faithfully execute the laws.  Here, Texas has asserted no specific allegations against the President, and to the extent it challenges the other federal defendants' alleged actions, it must do so, if at all, through the APA.

Even if Texas had asserted specific allegations against the President, no court has found a Take Care Clause claim justiciable.  That is not surprising because the Supreme Court long ago made clear that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866).  The Clause falls under "the general principles which forbid judicial interference," and a claim to restrain executive action through this clause is not only "without a precedent," but there is "much weight against it."  *Id.* at 499–500.

---

[15] Texas asserted a claim under the Take Care Clause in the MPP litigation.  (App. 073.)

**B.      Texas has not met its heavy burden to obtain a preliminary injunction.**

This entire case should be dismissed as discussed above, and the Court thus need not consider Texas's renewed preliminary-injunction motion and can instead deny it as moot.  But Texas also fails to meet its heavy burden to obtain the "extraordinary and drastic remedy" it seeks.  *See Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).  To be entitled to a preliminary injunction, "the four prerequisites are as follows:  (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest."  *Id.* at 572.

Moreover, the "primary justification" of a preliminary injunction is to "preserve the court's ability to render a meaningful decision on the merits."  *Id.*  That is relevant here because Texas is actually seeking a change in the status quo, i.e., a mandatory injunction that would not merely restrain or enjoin the government from doing something, but rather would require it to take specific actions that Texas contends are required but that the government has not been doing.  Such mandatory preliminary relief that goes beyond maintaining the status quo "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."  *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

**1.      Texas fails to show a likelihood of success on the merits on the claims for which it seeks a preliminary injunction.**

Texas's likelihood-of-success arguments rely on claims A, B.2, C.1, and C.2, to argue that:

(a)     CDC's July and August 2021 Title 42 orders were arbitrary and capricious

under the APA (claim B.2[16]);

(b)   notice and comment was required for the July and August 2021 orders (claim A);

(c)   there is a *de facto* policy of excepting families from Title 42 (claim C.1); and

(d)   DHS is violating 8 U.S.C. § 1222(a) by not detaining aliens arriving at the southwest border to determine if they are carrying COVID-19 (claim C.2).

(*See* Doc. 68 at 23–29.)  But as explained below, no likelihood of success is shown with any of these arguments.

>   **a.    CDC's public health determination to except unaccompanied children from Title 42 in its July and August 2021 orders easily satisfies the APA's deferential standards.**

Texas first attacks CDC's exception of unaccompanied children from Title 42 in its July and August 2021 orders as "arbitrary, capricious, abuses of discretion, and not otherwise in accordance with the law."  (Doc. 68 at 23.)  But CDC's decision easily satisfies the APA's "highly deferential" standard.  *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983).  CDC fully explained its decision with citations to, and discussion of, various relevant factors and statistics, including:

- the expansion of capacity for unaccompanied children at ORR facilities which has allowed for a dramatic decrease in the processing time required for children at CBP facilities, i.e., at the Ports of Entry and Border Patrol stations in which the potential for overcrowding has been the driving force behind CDC's Title 42 orders, 86 Fed. Reg. at 38,719 & n.18;

---

[16] Although its first amended complaint contains a claim that CDC did not consider "state reliance interests," (Doc. 62, ¶ 81 (claim B.1)), Texas makes no likelihood-of-success argument about this claim, (*see* Doc. 68 at 23–25).  The supposed "state reliance interests" have in any event never been specified— Texas nowhere alleges any specific action that it claims to have taken in purported reliance on the indefinite continued application of Title 42 to unaccompanied children.  Moreover, CDC did expressly consider things like the potential impact and strain on community healthcare resources and the risk of possible community spread of COVID-19 attributable to unaccompanied children, and presumably any "state reliance interests" that Texas might identify would be these matters.

- the COVID-19 mitigation and prevention protocols in place for unaccompanied children at ORR facilities, which CDC determined "help reduce the spread of COVID-19 among [unaccompanied children] prior to being introduced into U.S. communities," with the corresponding result that, in CDC's estimation, "the risk of overburdening the local healthcare systems by [unaccompanied children] presenting with severe COVID-19 disease remains low," *id.* at 38,719, 38,720;

- CDC's finding that "[b]ased on the robust network of ORR care facilities and the testing and medical care available therein, as well as COVID-19 mitigation protocols including vaccination for personnel and eligible [unaccompanied children], there is very low likelihood that processing [unaccompanied children] in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources," *id.* at 38,720; and

- CDC's finding that unaccompanied children "do not pose a significant level of risk for COVID-19 spread into the community because they are released after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction," *id.*

CDC's July and August 2021 orders make clear that the agency has acknowledged the change in its position regarding unaccompanied children compared to under the October 2020 order—it has considered the relevant information and determined, in an exercise of its scientific and medical judgment, that changed circumstances support excepting such children from Title 42 at this time.  CDC's analysis in this regard satisfies the APA:  "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The APA merely requires that the agency "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).  That has occurred here.

Texas's preliminary-injunction argument to the contrary is unavailing.  Texas asserts that

CDC's October 2020 order was intended to mitigate the transmission and spread of COVID-19 in the Ports of Entry and Border Patrol stations, and also to decrease the risk of further spread into the interior of the country and any corresponding strains on local healthcare systems.  (Doc. 68 at 24.)  But Texas errs by suggesting that CDC's July 2021 order somehow did not address those issues and instead "answers a question that the October Order never asked" by purportedly never considering the risk factors noted in that prior CDC order.  (Doc. 68 at 24.)  The plain text of the July 2021 order belies this argument.  As described in the bullet points above, CDC expressly considered those matters.  CDC considered the potential for overcrowding at the Ports of Entry and Border Patrol stations—and found that this concern had been lessened by the quicker processing of children through these facilities as ORR's capacity had increased over time.  86 Fed. Reg. at 38,719 & n.18.  CDC also considered whether unaccompanied children might spread COVID-19 into communities or strain healthcare systems—but found that the protocols currently in place, including quarantine, testing, medical treatment, and vaccination (when possible), sufficiently mitigated these risks—both while children are in ORR custody and after they are released to sponsors.  *Id.* at 38,719–20.  Specifically, CDC found that there is a "low" risk that unaccompanied children will strain U.S. healthcare resources and no significant risk of community spread attributable to them.  *Id.* at 38,720.  It is not this Court's role under the APA to second-guess CDC's scientific and medical judgments in these regards.  *See State Farm*, 463 U.S. at 43 (in arbitrary-and-capricious review, a court "is not to substitute its judgment for that of the agency").  Because CDC considered the relevant factors and provided logical reasons for its decision, the APA is satisfied.[17]

---

[17] The government notes that Texas has offered a declaration from Rodney N. Scott, the former Chief of the U.S. Border Patrol, in which he offers several opinions about CDC's February 2021 notice that Texas initially challenged in this case and about the processing of family units. (Doc. 62-1 at PageID 780–87;

Finally, the Court's order denying Texas's initial preliminary-injunction motion as moot also noted a possible contradiction between CDC's treatment of unaccompanied children under Title 42 and other CDC public health "guidance" on matters such as masking. (*See* Doc. 54 at 6–7.) Texas does not pursue this kind of argument, but in any event, there is no such contradiction. CDC's guidance with respect to masking and other COVID-19 preventative measures for the public at large applies equally to unaccompanied children who have been released to sponsors (not to mention those still in ORR custody) and to the rest of the country. The difference is that numerous *additional* public health measures apply to children in ORR's custody, but these are designed to ensure that no children are transferred out of ORR custody to their sponsors while COVID-19 positive. The Court noted that CDC's July 2021 order discussed the number of children who have tested positive for COVID-19 in ORR facilities during the course of the pandemic. (*See* Doc. 54 at 6 n.6.) CDC explained that the overwhelming majority of these

---

Doc. 68 at 11, 25.) Aside from the fact that Mr. Scott's opinions about the February notice are irrelevant because the notice has been superseded, the Court should disregard all of his opinions because federal regulation and statute bar him from offering them in the circumstances here. Specifically, except in situations inapplicable here, 6 C.F.R. § 5.49(a) provides that "[DHS] employees shall not provide opinion or expert testimony based upon information which they acquired in the scope and performance of their official Department duties, except on behalf of the United States or a party represented by the Department of Justice." With regard to former employees, such testimony is excepted only to the extent the "testimony involves only general expertise gained while employed at the Department." *Id.* § 5.49(b). Mr. Scott's testimony clearly exceeded the bounds of "general expertise" in this instance. In addition, "the Ethics in Government Act permanently bars former Executive branch employees from making certain communications to a court or agency," *EEOC v. Exxon Corp.*, 202 F.3d 755, 757 (5th Cir. 2000), including the communications here, *see* 18 U.S.C. § 207(a)(1). A former employee, for example, "may not . . . serve as an expert witness for any other person (except the United States)" based on knowledge and experience gained while a federal employee. 18 U.S.C. § 207(j)(6)(A). Mr. Scott's opinions in the declaration are in the nature of such expert testimony barred by the statute. *Cf. Goodeagle v. United States*, No. CIV-09-490-D, 2010 WL 3081520, at *1, *3 (W.D. Okla. Aug. 6, 2010) (holding that a former government physician could not express the opinion that the plaintiff/former patient's treatment was "below accepted standards of medical care" or that her injury could have been avoided if proper care had been taken of her); *United States ex rel. Wright v. Agip Petrol. Co.*, No. 5:03-cv-264(DF), 2008 WL 11348433, at *1, *3, *5 (E.D. Tex. Mar. 28, 2008) (holding that a former agency official needed a court order to testify as to "how [the agency] operated and settled disagreements").

children had "successfully completed medical isolation," and of course at any given time there will still be some relatively small number of children in isolation or quarantine at ORR facilities. 86 Fed. Reg. at 38,719.  To be clear, the government is not "willfully admitting thousands of COVID-19 positive" children into the country, (Doc. 54 at 6 n.6), but rather has implemented a number of measures to detect COVID-19 among these children—many of whom are already in the country when first encountered by the government—and to isolate and quarantine them so that COVID-19 spread does not occur.

       **b.**     **Notice-and-comment procedures were not required for the July and August 2021 orders.**

Texas next argues that notice and comment was required before CDC could issue its July and August 2021 orders.  The government has already explained above, in the context of its Rule 12(b)(6) arguments, that Texas fails to state any notice-and-comment claim.  A further reason that no preliminary injunction should issue, though, is that Texas's argument, if accepted, would ultimately be self-defeating for Texas and extremely damaging to the public interest and to CDC's efforts to mitigate the effects of the pandemic.  That is because *none* of CDC's relevant Title 42 orders have been issued with notice and comment.  If the July and August 2021 orders are deficient in this respect, then so too is the October 2020 order—which Texas believes should be enforced more aggressively.  Over seven months passed between CDC's first issuance of a Title 42 order under an interim rule in March 2020 and the October 2020 order, during which time CDC solicited, gathered, and reviewed public comments on the proposed new regulation that was eventually codified at 42 C.F.R. § 71.40, but did not solicit comments on any proposed COVID-19-specific Title 42 order (such as the October 2020 order).  And if the October 2020 order is void for lack of notice and comment, that would leave no presently valid Title 42 order in existence.  CDC's initial March 2020 order was issued under an interim final rule that was

later superseded by the final rule that took effect in October 2020 to create 42 C.F.R. § 71.40,

and thus that order no longer has any regulatory basis to support it.  By statute, any Title 42 order

must be issued "in accordance with regulations approved by the President," 42 U.S.C. § 265, and

since October 2020 the only such regulation in effect has been the final rule codified at 42 C.F.R.

§ 71.40.

Furthermore, even if a Title 42 order were considered to be subject to the APA's notice-

and-comment requirement, CDC found "good cause" to dispense with any notice-and-comment

period "[g]iven the public health emergency caused by COVID-19" and CDC's judgment that "it

would be impracticable and contrary to public health practices and the public interest to delay"

issuing a Title 42 order that CDC believes to be warranted.  86 Fed. Reg. at 42,841.  This

provides a further, statutorily-authorized exception to any requirement to use notice and

comment.  *See* 5 U.S.C. § 553(b)(3)(B).  CDC's Title 42 orders also fall within the "foreign

affairs function of the United States" exception to the notice-and-comment requirement.  *Id.*

§ 553(a)(1).  As CDC explained in its initial March 2020 order and has reiterated in subsequent

orders, Title 42 orders issued in response to the COVID-19 pandemic "concern[] the ongoing

discussions with Canada and Mexico on how best to control COVID-19 transmission over our

shared border," and therefore "directly 'involve[] . . . a . . . foreign affairs function of the United

States,'" such that notice and comment is not required.  85 Fed. Reg. at 17067–68 (quoting 5

U.S.C. § 553(a)(1)).  This is manifestly correct given the nature of the Title 42 orders in

question.  These orders directly cause persons either to be denied entry to the country from

Mexico or Canada (thus resulting in those persons' continued presence in one of those

countries), or to be immediately physically expelled to Mexico, Canada, or some other country.

This is not a mere "downstream effect[]" on foreign affairs, as Texas suggests, (Doc. 68 at 26),

and Texas cites no authority establishing otherwise.[18]

        **c.**    **Texas's argument about an alleged *de facto* policy to except families from Title 42 is barred by res judicata and, regardless, is factually unsupported.**

Texas's third argument for a likelihood of success is that the government has a *de facto* policy excepting families from Title 42. (Doc. 68 at 26–27.) But this argument is a component of Texas's claim C.1, which relies on 8 U.S.C. § 1225 to challenge DHS's detention and parole practices. (*See* Doc. 62, ¶¶ 86–88.) According to Texas, DHS should "detain all family-unit members pending completion of their removal or asylum proceedings" (i.e., under section 1225), and the alleged "*de facto* policy of paroling such aliens into the United States" violates the law in this regard. (Doc. 62, ¶¶ 87, 88.) As discussed above, (*see* pp. 27–29, *supra*), Texas's section 1225 claim is barred by res judicata. It thus does not support a preliminary injunction.

Furthermore, even if res judicata did not apply, Texas's one-paragraph argument about an alleged *de facto* policy fails to carry Texas's heavy burden to obtain a preliminary injunction. (*See* Doc. 68 at 26–27.) Texas's theory is that because a "whopping" 88% percent of family-unit members were processed under Title 8 in July 2021 (with the remaining 12% expelled under Title 42), (*see* Doc. 68 at 26), there must be some kind of *de facto* policy in place to except families from Title 42. But Texas's interpretation of these statistics is mistaken. Texas appears to be assuming that Title 42 expulsions are possible for 100% of the noncitizen families encountered by DHS, so that in Texas's view statistics showing that 12% of family-unit

---

[18] In the one case Texas cites, *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020), a district court found that a regulatory change to one of the substantive standards applied in asylum cases did not implicate the foreign-affairs exception because the possible foreign-affairs effect, that the rule change might cause more people to apply for asylum in other countries, was at most an indirect effect. Similar reasoning does not apply here where, in contrast, the direct operation of a Title 42 order is that citizens of other countries are denied entry to the United States.

members were processed under Title 42 in a given month must mean that DHS issued discretionary exceptions to the remaining 88% of family-unit members. (*See* Doc. 62, ¶ 54.)

That is not correct. As already explained, approximately 80% of the families encountered along the southwest border *cannot* be immediately expelled to Mexico or their home country (if elsewhere) under Title 42—either because no Title 42 order applies to the persons in question, or because of return restrictions imposed by Mexico or the home country. (*See* App. 205); *see also* 86 Fed. Reg. at 42,836. Thus, the true number of discretionary case-by-case exceptions is in fact much lower, and there is no *de facto* policy to except families (or single adults) from Title 42. Indeed, thousands and thousands of family-unit members are still being expelled each month under Title 42, including 8,070 in June 2021 and 9,948 in July 2021. (Doc. 62, ¶ 54.) It is for this very reason that the *Huisha-Huisha* plaintiffs sued to enjoin these ongoing expulsions, and obtained a preliminary injunction—which the government has immediately appealed. (App. 131, 189, 192.) At this point, it is unclear whether the D.C. Circuit will extend the 14-day administrative stay issued by the district court (as the government has requested). If the injunction does go into effect, there would be no basis for an injunction here on the issue of any alleged *de facto* exception, since the *Huisha-Huisha* ruling will preclude application of Title 42 to families for the time being. And even if the injunction does not go into effect, the *Huisha-Huisha* litigation and the government's efforts therein are still proof that no *de facto* exception of families from Title 42 exists.

Texas's argument suffers from two other fundamental flaws: First, the very nature of the case-by-case exception in CDC's various Title 42 orders is committed to the agency's discretion, with the CDC allowing DHS to except otherwise covered persons from Title 42 procedures based on a totality of the circumstances. There are no meaningful standards against which to

judge the agency's decisions under this provision, *see Chaney*, 470 U.S. at 830, and thus they are unreviewable under the APA.  (*See* pp. 20–22, *supra*.)

Second, Texas cannot satisfy the requirements for a failure-to-act claim under the APA (to the extent Texas's main desire seems to be to have the government carry out more Title 42 expulsions of families).  Such claims are properly analyzed under 5 U.S.C. § 706(1), which allows a court to "compel agency action unlawfully withheld or unreasonably delayed."  A claim under section 706(1) can proceed only where an agency has failed to perform a non-discretionary duty to act.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).  "This standard reflects the common law writ of mandamus, which the APA 'carried forward' in § 706(1)."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (citing *Norton*, 542 U.S. at 63).  As the Supreme Court has explained, "failure to act" in this context is "properly understood as a failure to take . . . one of the agency actions . . . defined in [5 U.S.C.] § 551(13)," *Norton*, 542 U.S. at 62—that is, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Although Texas apparently believes that DHS should make fewer case-by-case exceptions, that is often not feasible for families encountered between Ports of Entry due to return restrictions imposed by Mexico and other governments.  *See* 86 Fed. Reg. at 42,836.  Moreover, even if it were feasible, the "limitation to discrete agency action precludes . . . broad programmatic attack[s]" that "seek *wholesale* improvement of [an agency's operations] by court decree," of the type Texas envisions.  *Norton*, 542 U.S. at 64 (internal quotation marks and citation omitted).  In addition, Texas cannot show that DHS must apply Title 42 to all families.  As already explained, CDC's Title 42 orders have consistently included important carve-outs and afforded DHS the discretion to make case-by-case exceptions, and DHS has appropriately exercised that discretion.

### d.      Texas's section 1222(a) claim does not support injunctive relief.

Texas's last likelihood-of-success argument is based on claim C.2, wherein Texas asserts

that DHS is violating 8 U.S.C. § 1222(a) by not detaining noncitizens arriving at the southwest

border to determine if they are carrying COVID-19.  (Doc. 62, ¶¶ 89–91.)  But as discussed

above, Texas is not entitled to any relief on this claim because 8 U.S.C. § 1252(f)(1) prohibits

the kind of class-wide injunctive relief that Texas seeks.

Texas is in any event incorrect when it asserts that DHS "is obliged to detain subject

aliens until it determines whether they are inadmissible due to COVID-19," but "is not doing

so."  (Doc. 68 at 29.)  As an initial matter, section 1222(a) applies only at the Ports of Entry.  *See*

8 U.S.C. § 1222(a) (referring to noncitizens "arriving at ports of the United States").  And Texas

fails to show that the statute requires any specific period of detention for any particular

noncitizen.  To the contrary, the statute refers only to detaining individuals "for a sufficient time"

to determine whether "they belong to inadmissible classes"—and as the opening clause of

section 1222(a) notes, the provision exists "[f]or the purpose of determining whether aliens

(including alien crewmen) arriving at ports of the United States belong to any of the classes

inadmissible under this chapter" due to "diseases or mental or physical defects or disabilities,"

i.e., on a health-related ground under 8 U.S.C. § 1182(a)(1).  *Id.*  Thus, Texas's suggestion that

such detention is required of *all* noncitizens arriving at the United States is incorrect because

under well-settled principles of prosecutorial discretion in the immigration context, there is no

requirement that DHS pursue any particular ground of inadmissibility against a noncitizen, let

alone a health-related ground.  *See Texas v. United States*, --- F.4th ----, 2021 WL 4188102, at *6

(5th Cir. 2001) (explaining that "we do not see a strong justification for concluding that the

[Illegal Immigration Reform and Immigrant Responsibility Act of 1996] detention statutes

override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings").[19]  Section 1222(a) thus enables DHS to detain certain noncitizens, should DHS elect to pursue a health-related ground of inadmissibility—but DHS is not required to proceed using such a (possible) ground of inadmissibility and may instead use other procedures within Title 8 that do not trigger a section 1222(a) detention.  *See, e.g.*, *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 379, 380 (5th Cir. 2005) (noting DHS's "unfettered discretion" to choose which form of removal proceedings to initiate against a particular individual); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–92 (1999) (holding that the Attorney General's exercise of his broad discretion in making immigration charging decisions was immune from judicial review); *Texas*, 2021 WL 4188102, at *3–*5 (underscoring broad authority of DHS to make immigration charging decisions).

Regardless, DHS has protocols in place to ensure that arriving noncitizens at Ports of Entry are not carrying COVID-19.  Working with certain non-governmental organizations at specified Ports of Entry, DHS has established a process to identify, on a case-by-case basis, particularly vulnerable families who may be excepted from the Title 42 process and instead processed under Title 8, but such noncitizens must first test negative for COVID-19 before

---

[19] *See also Matter of E-R-M & L-R-M*, 25 I&N Dec. 520, 521–22 (BIA 2011) (finding that DHS had discretion to place inadmissible noncitizens into removal proceedings under 8 U.S.C. § 1229a in lieu of placing them in expedited removal proceedings, notwithstanding language in the statute stating that such noncitizens "shall" be subject to expedited removal).  The *E-R-M & L-R-M* decision further explains: "It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of the Government on whether to charge an individual and on what charge or charges to bring.  For example, in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct 'shall' be imprisoned or otherwise punished.  But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute, or to mandate that where, as here, when multiple charges are possible, one or the other or all must be pursued."  *Id.* at 522.

presenting at a Port of Entry.  86 Fed. Reg. at 42,840; (*see also* App. 205–06).  Also as previously discussed, unaccompanied children are placed in ORR's custody and are subject to various COVID-19 protocols.  (*See* pp. 10–11, *supra*.)  Finally, while Texas references news accounts of allegedly COVID-19-positive noncitizens encountered at a Whataburger and of other individuals released into border communities, (Doc. 68 at 18–20, 29), Texas fails to show any link between these matters and section 1222(a).  It is unclear who exactly these individuals were, how long they had been within the country, and under what circumstances they arrived (i.e., through a Port of Entry or otherwise).  As discussed above, the vulnerable families who may be excepted from Title 42 must test negative for COVID-19 before they are allowed to present at the Port of Entry.  (*See* pp. 12, 46–47, *supra*.)  If such noncitizens later contract COVID-19, or if other noncitizens who did not enter through a Port of Entry are or become COVID-19 positive and interact with others in the community, the government recognizes that that is a serious matter.  However, it is not something that implicates section 1222(a), and it does not warrant a preliminary injunction of the type requested by Texas.

**C.**     **Texas fails to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction.**

As discussed above, Texas has not shown that jurisdiction exists or that it has a likelihood of success on any claim.  But Texas also fails to show the other factors favor relief.

First, to establish irreparable injury, Texas "must demonstrate that the harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence and a clear likelihood of success."  *Tex. Health & Human Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016) (internal quotation marks and citation omitted).  Yet, with respect to Texas's claims about unaccompanied children, such children generally have not been subject to Title 42 expulsions for approximately ten months (beginning when the *P.J.E.S.* court

first issued its injunction in November 2020).  Despite this passage of time during which

thousands of children have been processed under Title 8, Texas identifies no specific, concrete

harm that has accrued to it by virtue of the presence of some children in the state.  As CDC's

July 2021 order explains, unaccompanied children are processed through the Ports of Entry or

Border Patrol stations relatively quickly (mitigating the potential risks associated with

overcrowding of unaccompanied children in those facilities that CDC has consistently identified

as a key basis for its Title 42 orders) and transferred into ORR custody where they are tested,

quarantined, and/or isolated for COVID-19.  86 Fed. Reg. at 38,719 & n.18.

Similarly, testing regimes are used for those families (or individuals) encountered

between Ports of Entry and processed via Title 8, rather than Title 42.  (*See* App. 206); *see also*

86 Fed. Reg. at 42,836.  Moreover, those families that are referred to DHS by non-governmental

organizations for case-by-case determinations of whether they ought to be excepted from Title

42 for humanitarian reasons are required to have a negative COVID-19 test prior to presenting at

a Port of Entry.  (App. 205–06.)  In short, the government is appropriately taking action to guard

against the introduction of COVID-19-positive noncitizens into the country.

The remaining preliminary-injunction factors also weigh heavily against Texas.  The

interests of the government and the public "merge" in suits against the federal government.  *Nken*

*v. Holder*, 556 U.S. 418, 435 (2009).  Here, Texas is primarily challenging actions taken by CDC

in the context of an ongoing pandemic, as part of CDC's responsibility as the federal agency

charged with implementing and administering laws that protect the public health.  *Cf. Bragdon v.*

*Abbott*, 524 U.S. 624, 650 (1998) ("the views of public health authorities, such as the U.S. Public

Health Service, CDC, and the National Institutes of Health, are of special weight and authority").

Texas, however, is seeking to tie the government's hands and prevent it from taking actions that

CDC views to be appropriate and warranted, and by Texas's own admissions, Texas is doing so largely for reasons *unrelated* to public health—it instead purports to be concerned with speculative increased costs associated with driver's licenses, public education, and other state services or obligations that stem from authorities other than Title 42.  The balance of equities does not favor Texas under these circumstances.

In addition, a preliminary injunction of the type requested by Texas (*see* Doc. 67-1) would harm DHS's interests in carrying out an efficient and effective immigration system.  It would alter DHS's current border operations and require DHS to apply Title 42 to prohibit the introduction of unaccompanied children as well as to families that DHS has determined, in the exercise of discretion expressly allowed by CDC, may be processed under normal immigration procedures.  Moreover, as CDC's various Title 42 orders have contemplated, DHS must balance various competing important government interests, including the need to allow the entry into the country of particularly vulnerable noncitizens who seek immigration relief or protections under the Immigration and Nationality Act and to protect unaccompanied children as envisioned by Congress in the TVPRA.  By requiring the expulsion of unaccompanied children and families that the government has concluded cannot, need not, and/or should not be processed under Title 42, and otherwise interfering with DHS's immigration operations, the injunction Texas seeks would harm the government and be contrary to the public interest.

## IV.    Conclusion

This case should be dismissed, and Texas's renewed motion for preliminary injunction denied.

Respectfully submitted,

PRERAK SHAH
Acting United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

<u>Certificate of Service</u>

On September 21, 2021, I electronically submitted the foregoing document with the clerk

of court for the U.S. District Court, Northern District of Texas, using the electronic case filing

system of the court.  I hereby certify that I have served all parties electronically or by another

manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney