IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

STATE OF TEXAS,

      Plaintiff,

v.

JOSEPH R. BIDEN, JR. et al.,

      Defendants.

Civil Action No. 4:21-CV-579-P

---

**APPENDIX TO DEFENDANTS' MOTION TO DISMISS**
**and**
**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**RENEWED MOTION FOR PRELIMINARY INJUNCTION**

PRERAK SHAH
Acting United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

## Contents

1.   Centers for Disease Control and Prevention, Public Health
     Determination Regarding an Exception for Unaccompanied
     Noncitizen Children From the Order Suspending the Right To
     Introduce Certain Persons From Countries Where a Quarantinable
     Communicable Disease Exists,
     86 Fed. Reg. 38,717 (July 22, 2021) ........................................................ App. 001

2.   Centers for Disease Control and Prevention, Public Health Reassessment
     and Order Suspending the Right To Introduce Certain Persons
     From Countries Where a Quarantinable Communicable Disease Exists,
     86 Fed. Reg. 42,828 (Aug. 5, 2021) ............................................................ App. 005

3.   Declaration of Jallyn Sualog (July 2, 2021) .................................................. App. 019

4.   Centers for Disease Control and Prevention, COVID-19, Quarantine
     and Isolation (as of Sept. 19, 2021) .............................................................. App. 026

5.   First Amended Complaint, *Texas v. Biden*,
     No. 2:21-CV-67-Z (N.D. Tex. June 3, 2021) ............................................... App. 029

6.   Memorandum Opinion and Order, *Texas v. Biden*,
     No. 2:21-CV-67-Z (N.D. Tex. Aug. 13, 2021) ............................................ App. 077

7.   Judgment, *Texas v. Biden*,
     No. 2:21-CV-67-Z (N.D. Tex. Aug. 13, 2021) ............................................ App. 130

8.   Memorandum Opinion, *Huisha-Huisha v. Mayorkas*,
     No. 21-100 (EGS) (D.D.C. Sept. 16, 2021) ................................................. App. 131

9.   Order (with preliminary injunction), *Huisha-Huisha v. Mayorkas*,
     No. 21-100 (EGS) (D.D.C. Sept. 16, 2021) ................................................. App. 189

10.  Notice of Appeal, *Huisha-Huisha v. Mayorkas*,
     No. 21-100 (EGS) (D.D.C. Sept. 17, 2021) ................................................. App. 192

11.  Declaration of David Shahoulian (Aug. 2, 2021)
     (in *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS) (D.D.C.) .................... App. 193

12.  Declaration of David Shahoulian (July 6, 2021) .......................................... App. 203

13.  ICE Custody Management Division, Population Counts ........................... App. 208

Respectfully submitted,

PRERAK SHAH
Acting United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

<u>Certificate of Service</u>

On September 21, 2021, I electronically submitted the foregoing document with

the clerk of court for the U.S. District Court, Northern District of Texas, using the

electronic case filing system of the court.  I hereby certify that I have served parties of

record electronically or by another manner authorized by Federal Rule of Civil Procedure

5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

Exhibit 2—Estimated Annualized Cost Burden—Continued

| Form name | Number of respondents | Total burden hours | Average hourly wage rate | Total cost burden |
|---|---|---|---|---|
| **Electronic Health Record (EHR) Extracts** | | | | |
| Initial data pull for 10% of hospitals that do not confer rights to their NHSN data (once at baseline for ICU and non-ICU cohorts, 800 units total) ........ | 27 | 135 | ^35.17 | 4,747.95 |
| Initial data pull for hospital onset bacteremia (including MSSA) and MRSA-positive clinical cultures (not available in NHSN) (once at baseline for ICU and non-ICU cohorts, 800 units total) ......................................................... | 267 | 935 | ^35.17 | 32,866.37 |
| Initial data pull for 10% of units that submit point prevalence survey data (once at baseline for ICU and non-ICU cohorts, 800 units total) ................ | 27 | 14 | ^35.17 | 474.80 |
| Initial data pull for 20% of surgical settings that do not confer rights to NHSN data (once at baseline for Surgical cohort, 300 settings total) ........ | 20 | 10 | ^35.17 | 351.70 |
| Initial data pull (once at baseline for LTC cohort, 300 facilities total) ......... | 100 | 500 | ^35.17 | 17,585.00 |
| Quarterly data (quarterly during 18 months of implementation for ICU and non-ICU cohorts, 1,100 units total) ................................................................ | 267 | 801 | ^35.17 | 28,171.17 |
| Quarterly data collection of monthly data for 20% of hospitals that do not confer rights to their NHSN data (quarterly during 18 months of implementation for surgical cohorts, 300 units total) .......................................... | 20 | 60 | ^35.17 | 2,110.20 |
| Monthly data (monthly per facility during 18 months of implementation for LTC cohort, 100 facilities total) ........................................................................ | 100 | 900 | ^35.17 | 31,653.00 |
| Total ......................................................................................... | 13,429 | 11,552 | ........................ | 540,325.83 |

*This is an average of the average hourly wage rate for physician, nurse, nurse practitioner, physician's assistant, and nurse's aide from the May 2019 National Occupational Employment and Wage Estimates, United States, U.S. Bureau of Labor Statistics (https://www.bls.gov/oes/current/oes_nat.htm#00-0000).

^This is an average of the average hourly wage rate for nurse and IT specialist from the May 2019 National Occupational Employment and Wage Estimates, United States, U.S. Bureau of Labor Statistics (https://www.bls.gov/oes/current/oes_nat.htm#00-0000).

## Request for Comments

In accordance with the Paperwork Reduction Act, 44 U.S.C. 3501–3520, comments on AHRQ's information collection are requested with regard to any of the following: (a) Whether the proposed collection of information is necessary for the proper performance of AHRQ's health care research and health care information dissemination functions, including whether the information will have practical utility; (b) the accuracy of AHRQ's estimate of burden (including hours and costs) of the proposed collection(s) of information; (c) ways to enhance the quality, utility and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information upon the respondents, including the use of automated collection techniques or other forms of information technology.

Comments submitted in response to this notice will be summarized and included in the Agency's subsequent request for OMB approval of the proposed information collection. All comments will become a matter of public record.

Dated: July 19, 2021.

**Marquita Cullom,**

*Associate Director.*

[FR Doc. 2021–15621 Filed 7–21–21; 8:45 am]

**BILLING CODE 4160–90–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces an Order excepting unaccompanied noncitizen children (UC) from the Order Suspending the Right To Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). CDC finds that, at this time, there is appropriate infrastructure in place to protect the children, caregivers, and local communities from elevated risk of COVID–19 transmission as a result of the introduction of UC, and U.S. healthcare resources are not significantly impacted by providing UC necessary care. CDC believes the COVID–19-related public health concerns associated with UC introduction can be adequately addressed without the UC being subject to the October Order, thereby permitting the government to better address the humanitarian challenges for these children. Therefore, CDC is fully excepting UC from the October Order, and the Notice regarding the temporary exception of UC published February 17, 2021 is hereby superseded.

**DATES:** This Order went into effect July 16, 2021.

**FOR FURTHER INFORMATION CONTACT:** Tiffany Brown, Deputy Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@cdc.gov*.

**SUPPLEMENTARY INFORMATION:** As part of government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued the October Order,[1] suspending the right to

---

[1] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020. 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists,
Continued

introduce certain persons into the United States (U.S.) from countries or places where a quarantinable communicable disease exists to protect the public's health from an increase in risk of the introduction of COVID–19. The Order applied specifically to certain noncitizens as defined [2] who would otherwise be introduced into a congregate setting in land or coastal ports of entry (POE) or Border Patrol stations at or near the U.S. borders with Canada and Mexico. On February 17, 2021,[3] CDC published a notice announcing the temporary exception from expulsion of unaccompanied noncitizen children [4] (UC) encountered in the United States from the October Order.[5]

As detailed in the Order, CDC has reviewed the current situation with regards to the COVID–19 public health emergency and UC in immigrations facilities and has concluded that it is appropriate to fully except UC from the October Order given the measures in place to prevent and mitigate transmission of COVID–19 in this population. CDC finds that the robust network UC care facilities operated by the Office of Refugee Resettlement (ORR), a component of HHS, the testing and medical care available therein, as well as COVID–19 mitigation protocols including vaccination for personnel and eligible UC, result in very low likelihood that processing UC in accordance with existing immigration procedures under Title 8 of the U.S. Code will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a permanent ORR shelter do not pose a significant level of risk for COVID–19 spread into the community because they are released after having undergone testing, quarantine and/or isolation, and

vaccination when possible, and their sponsors are provided with appropriate medical and public health direction.

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf.*

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention (CDC)

### Order Under Sections 362 & 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40

### Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued an Order on March 20, 2020 (March Order), later replaced on October 13, 2020 (October Order),[6] suspending the right to introduce [7] certain persons into the United States from countries or places where a quarantinable communicable disease [8] exists in order to protect the

public health from an increase in risk of the introduction of COVID–19. The Orders applied specifically to covered noncitizens [9] who would otherwise be introduced into a congregate setting in land or coastal ports of entry (POE) or Border Patrol stations at or near the U.S. borders [10] with Canada and Mexico. On February 17, 2021, CDC published a notice [11] (February Notice) announcing the temporary exception of unaccompanied noncitizen children from the October Order; the February Notice stated that CDC would complete a public health assessment and publish an additional notice or a modified Order. As explained below, CDC has concluded that it is appropriate to except unaccompanied noncitizen children [12] (UC) from the October Order given the measures in place to prevent and mitigate transmission of COVID–19 in this population.

Under the March and October Orders, UC were included as part of the covered noncitizens for whom the right of introduction into the United States was suspended; however, UC largely have been excepted from the application of the Order, first pursuant to judicial

---

[2] *See* 85 FR 65806, 65807.

[3] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[4] CDC's understanding is that this class of individuals is similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. 279) for purposes of HHS ORR custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code.

[5] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[6] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020, extended on April 20, 2020, and amended May 19, 2020. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[7] "Suspension of the right to introduce" means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[8] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID–19), and influenza caused by novel or reemergent influenza viruses that are

causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 FR 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 FR 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 FR 45671 (July 31, 2014).

[9] This Order is using the term "covered noncitizens" to have the same meaning as "covered aliens" in the October Order. *See* October Order, 85 FR 65806, 65807 (defining "covered aliens" as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico," subject to certain exceptions. These persons "would typically be aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States between POEs.").

[10] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID–19.

[11] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[12] CDC's understanding is that this class of individuals is similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. 279) for purposes of HHS ORR custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code.

---

---

[1] 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

action,[13] and later under the February Notice. As a result, since November 18, 2020, UC have generally been processed under regular immigration processes under Title 8 of the U.S. Code and therefore referred from U.S. Customs and Border Protection (CBP), an agency within the U.S. Department of Homeland Security (DHS), to the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services' (HHS) Administration for Children and Families (ACF) for care and custody, according to the usual legal framework governing such referrals.[14] Pursuant to these requirements, UC encountered in the United States by CBP generally are transferred to ORR within 72 hours of intake at a POE or Border Patrol station.[15] Upon transfer to ORR custody, UC are transported to facilities that operate under cooperative agreements or contracts with HHS and must meet ORR requirements to ensure a high level of quality, child-focused care by appropriately trained staff. ORR operates 210 facilities in 22 states. At these facilities, case managers work to identify and ultimately place UC with vetted sponsors (usually family members within the United States).

Beginning in mid-2020, the United States began experiencing an increase in the number of UC arriving daily at the southern border. By February 2021, due to the record numbers of transfers to ORR, UC being held in CBP custody awaiting ORR transfer increased due to a lack of available space in ORR facilities. ORR and other government agencies responded to the influx of UC by rapidly expanding capacity and developing robust, safe COVID–19 protocols in consultation with CDC.

In conjunction with the Federal Emergency Management Agency (FEMA) and with the assistance of the Department of Defense, HHS and ORR opened temporary intake facilities along the U.S. southern border and in the interior to add capacity. A total of 14 Emergency Intake Sites (EIS)[16] were opened across the United States. CDC

assisted ORR by sending medical epidemiologists and other public health professionals to provide technical assistance on COVID–19 mitigation protocols. ORR now has a capacity of over 20,000 beds; currently, over 15,100 children are in its care. ORR has successfully processed and discharged over 55,000 UC since January 20, 2021. The successful efforts to expand capacity for UC have resulted in sufficient capacity at ORR sites—both along the border and in the interior—significantly reducing the length of time that UC remain in CBP custody. As of July 13, 2021, the current average time a UC remained in CBP custody before transferring to ORR custody was 26 hours, and four UC have been in CBP custody for over 72 hours.[17] This represents a substantial improvement from early 2021.[18] While the number of UC encountered may remain at elevated levels, expanded ORR capacity and improved processing methods have resulted in UC remaining in CBP custody for shorter periods of time.

The processes in place at the EIS and at ORR's regular facilities afford sufficient resources and time to identify SARS–CoV–2 cases and implement environmental controls to attenuate the risk of COVID–19 infection and spread.[19] With CDC's assistance and guidance, ORR also has implemented COVID–19 testing regimes for UC in its care and continues to practice other mitigation measures to further prevent and curtail any transmission of the SARS–CoV–2 virus among UC in its care. These strategies include universal and proper wearing of masks, physical distancing, frequent hand washing,

cleaning and disinfection, improved ventilation, staff vaccination, and cohorting UC according to their COVID–19 test status. Per CDC recommendation, ORR conducts serial testing of staff to allow early detection of a possible outbreak.[20] ORR contract staff working in facilities serving UC are encouraged to receive the COVID–19 vaccine.[21] As advised by CDC, ORR restricts movement of unvaccinated personnel between facilities to reduce potential outbreaks resulting from transfer of unvaccinated staff between shelters. These measures help reduce the spread of COVID–19 among UC prior to being introduced into U.S. communities.

In addition to the mitigation measures at EIS and ORR facilities outlined above, following FDA expansion of the emergency use authorization for the Pfizer-BioNTech COVID–19 vaccine for adolescents 12 to 15 years of age, CDC provided updated recommendations to ORR regarding the vaccination of UC ages 12 and older. ORR subsequently approved the administration of COVID–19 vaccine for age-eligible children. Under ORR care, children ages 12 and over are offered a COVID–19 vaccine as soon as possible, as long as there are no contraindications and vaccination does not delay unification of UC with sponsors. Of the total population of UC in ORR care, approximately 90% are eligible for vaccination and, as of July 12, 2021, ORR has administered at least one dose of the COVID–19 vaccine to 10,124 UC. CDC considers these vaccination efforts to be a critical risk reduction measure that supports excepting UC from the October Order.

Although 8,435 UC have tested positive for COVID–19 while at ORR shelters during the period of March 24, 2020 to July 8, 2021, 8,081 of those UC testing positive have successfully completed medical isolation, with few requiring medical treatment. Similarly, 6,590 COVID–19 cases have been reported among 14 EIS as of July 7, 2021; however only 14 (0.5%) of the UC in this group have required hospitalization (including two severe

---

[13] Dkt. No. 80, *P.J.E.S.* v. *Mayorkas et al.,* No. 1:20–cv–02245 (D.D.C. Nov. 18, 2020).

[14] *See* 8 U.S.C. 1232; Stipulated Settlement Agreement, *Flores* v. *Reno,* No. CV 85–cv–4544 (C.D. Cal. Jan. 17, 1997).

[15] 8 U.S.C. 1232(b)(3).

[16] EIS are intended to be a temporary measure providing a standard of care consistent with the best interest of children during an emergency situation. When fully operational with appropriate staffing and basic medical resources, EIS provide a safer, less crowded environment where UC are cared for, processed as quickly as possible, and are either released to a sponsor or transferred to an appropriate ORR facility for longer-term care. When no longer necessary, EIS facilities are demobilized.

[17] HHS Executive Leadership Information Brief (internal document). Published July 12, 2021.

[18] For comparison, on March 29, 2021, nearly 5,500 UC were in CBP custody, with 3,540 of those UC in custody for longer than 72 hours; as of March 31, 2021, the average time in CBP custody for UC was 131 hours.

[19] Specifically, ORR currently uses the following COVID–19 protocols for UC at EIS: UC are tested for COVID–19 by CBP prior to being transported to an EIS and then are also tested upon arrival to EIS. UC are required to quarantine for the first 7 days after admission to an EIS and can be released from quarantine on the morning of day 8 if they remain asymptomatic and had a negative COVID–19 test in the 48 hours prior. In addition to testing at admission and during quarantine, UC are routinely tested during their stay at EIS (*e.g.,* every three days), and any UC that develops symptoms consistent with COVID–19 infection is immediately tested. UC who test positive for COVID–19 are required to be isolated for 10 days from the date the positive test was collected, or 10 days from the date of symptom onset if asymptomatic. Contact tracing is conducted whenever anyone tests positive for COVID–19; UC exposed to COVID–19 are quarantined for seven days, tested on the 5th, 6th, or 7th day of their quarantine, and are released upon receiving a negative test result. ORR has also issued similar COVID–19 guidance to licensed facilities.

[20] In ORR facilities where the risk of transmission is moderate to high, public health officials working collaboratively with ORR facilities can determine the appropriateness of offering screening and repeat testing of randomly selected asymptomatic staff and children at the facility, as feasible, to identify cases and prevent secondary transmission.

[21] Additional criteria (*e.g.,* continued symptom monitoring and correct and consistent wearing of masks) should be met by ORR as outlined on CDC's website. *See* Science Brief: Options to Reduce Quarantine for Contacts of Persons with SARS–CoV–2 Infection Using Symptom Monitoring and Diagnostic Testing, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html* (last updated Dec. 2, 2020).

cases requiring intensive care). These numbers indicate that the risk of overburdening the local healthcare systems by UC presenting with severe COVID–19 disease remains low. Based on the robust network of ORR care facilities and the testing and medical care available therein, as well as COVID–19 mitigation protocols including vaccination for personnel and eligible UC, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a permanent ORR shelter do not pose a significant level of risk for COVID–19 spread into the community because they are released after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction.

CDC thus finds that, at this time,[22] there is appropriate infrastructure in place to protect the children, caregivers, and local communities from elevated risk of COVID–19 transmission as a result of the introduction of UC, and U.S. healthcare resources are not significantly impacted by providing UC necessary care. CDC believes the COVID–19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to the October Order, thereby permitting the government to better address the humanitarian challenges for these children. Based on the foregoing, CDC is fully excepting UC from the October Order,[23] and the February Notice is hereby superseded. This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so.[24]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by

COVID–19 and the highly unpredictable nature of its transmission and spread, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to UC. In addition, because this Order concerns the ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared borders, it directly "involve[s] . . . a . . . foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Notice and comment and a delay in effective date would not be required for that reason as well.

**Authority**

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

Dated: July 19,2021.

**Sherri Berger,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–15699 Filed 7–20–21; 4:15 pm]

**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**[Docket No. CDC–2021–0071; NIOSH–341]**

**World Trade Center Health Program; Request for Information**

**AGENCY:** Centers for Disease Control and Prevention, HHS.

**ACTION:** Request for information.

**SUMMARY:** The National Institute for Occupational Safety and Health (NIOSH), within the Centers for Disease Control and Prevention (CDC), is soliciting public comment on the scope of an upcoming funding announcement for FY2022 regarding the World Trade Center (WTC) Health Program's research priorities involving WTC survivors. The WTC Health Program's research program helps answer critical questions about potential 9/11-related physical and mental health conditions as well as diagnosing and treating health conditions on the List of WTC-Related Health Conditions.

**DATES:** Comments must be received by August 23, 2021.

**ADDRESSES:** Comments may be submitted through either of the following two methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov* (follow the instructions for submitting comments), or

• *By Mail:* NIOSH Docket Office, Robert A. Taft Laboratories, MS C–34, 1090 Tusculum Avenue, Cincinnati, Ohio 45226–1998.

*Instructions:* All written submissions received in response to this notice must include the agency name (Centers for Disease Control and Prevention, HHS) and docket number (CDC–2021–0071; NIOSH–341) for this action. All relevant comments, including any personal information provided, will be posted without change to *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Rachel Weiss, Program Analyst, 1090 Tusculum Avenue, MS: C–48, Cincinnati, OH 45226; telephone (855) 818–1629 (this is a toll-free number); email *NIOSHregs@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** Title I of the James Zadroga 9/11 Health and Compensation Act of 2010 (Pub. L. 111–347, as amended by Pub. L. 114–113 and Pub. L. 116–59), added Title XXXIII to the Public Health Service (PHS) Act,[1] establishing the WTC Health Program within the Department of Health and Human Services (HHS). The WTC Health Program provides medical monitoring and treatment benefits for health conditions on the List of WTC-Related Health Conditions (List)[2] to eligible firefighters and related personnel, law enforcement officers, and rescue, recovery, and cleanup workers who responded to the September 11, 2001, terrorist attacks in New York City, at the Pentagon, and in Shanksville, Pennsylvania (responders). The Program also provides benefits to eligible persons who were present in the dust or dust cloud on September 11, 2001, or who worked, resided, or attended school, childcare, or adult daycare in the New York City disaster area (survivors).

The Zadroga Act also requires that the Program establish a research program on health conditions resulting from the September 11, 2001, terrorist attacks, addressing the following topics:[3]

• Physical and mental health conditions that may be related to the September 11, 2001, terrorist attacks;

---

[22] This situation could change based on an increased influx of UC, changes in COVID–19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[23] *See* 86 FR 9942.

[24] 42 U.S.C. 268; 42 CFR 71.40(d).

---

[1] Title XXXIII of the PHS Act is codified at 42 U.S.C. 300mm to 300mm–61. Those portions of the James Zadroga 9/11 Health and Compensation Act of 2010 found in Titles II and III of Public Law 111–347 do not pertain to the WTC Health Program and are codified elsewhere.

[2] The List of WTC-Related Health Conditions is established in 42 U.S.C. 300mm–22(a)(3)–(4) and 300mm–32(b); additional conditions may be added through rulemaking and the complete list is provided in WTC Health Program regulations at 42 CFR 88.15.

[3] 42 U.S.C. 300mm–51(a).

state, local and courtroom requirements and seek a commitment to adhere to those requirements. The requirements apply to all attorneys, assistants, parties, and witnesses. The discussion will also address who may enter the courtroom, when, and what safety measures, such as masks and social distancing, must be implemented. No person may enter the courtroom, or the witness room without the permission of the Judge. The Judge may consider allowing persons who are not fully vaccinated to enter the courtroom, but they must wear masks and practice social distancing.

All court reporters will be notified that they must be vaccinated.

The Judge may consider all factors, in totality, in determining if a remote hearing will be held and who may be present for the hearing. No single factor is dispositive. These procedures shall be in place until December 31, 2021, unless extended or modified by order. The order shall be posted on the Commission's website (*www.fmshrc.gov*) and the contents of the order will be published in a notice appearing in the **Federal Register**.

*Authority:* 30 U.S.C. 823; 29 CFR part 2700.

Dated: July 30, 2021.

**Sarah L. Stewart,**

*Deputy General Counsel, Federal Mine Safety and Health Review Commission.*

[FR Doc. 2021–16661 Filed 8–4–21; 8:45 am]

**BILLING CODE 6735–01–P**

---

## FEDERAL RESERVE SYSTEM

## Solicitation of Statements of Interest for Membership on the Insurance Policy Advisory Committee

**AGENCY:** Board of Governors of the Federal Reserve System (Board).

**ACTION:** Notice.

**SUMMARY:** The Economic Growth, Regulatory Relief, and Consumer Protection Act established at the Board an Insurance Policy Advisory Committee (IPAC). This notice advises individuals who wish to serve as IPAC members of the annual opportunity to be considered for the IPAC.

**DATES:** Individuals that submit a Statement of Interest that is received by the Board from the first Monday in August through the first Monday in October of each year will be considered for appointments to the IPAC announced in the fourth calendar quarter of the same year. Statements of Interest received outside the period from the first Monday in August through the first Monday in October generally will not be considered.

**ADDRESSES:** Individuals seeking an appointment to the IPAC may send a Statement of Interest by email to *IPAC@ frb.gov*. The Statement of Interest contains only contact information. Candidates also may choose to provide additional information. Candidates may send this information by email to *IPAC@ frb.gov*. The Privacy Act Statement for IPAC Member Selection, which describes the purposes, authority, effects of nondisclosure, and uses of this information, can be found at *https:// www.federalreserve.gov/aboutthefed/ ipac-privacy.htm*.

Individuals also may mail Statements of Interest and any additional information to the Board of Governors of the Federal Reserve System, Attn: Insurance Policy Advisory Committee, 20th Street and Constitution Ave. NW, Washington, DC 20551.

**FOR FURTHER INFORMATION CONTACT:** Jan Bauer, Senior Insurance Policy Analyst, (202) 475–7697 or Thomas Sullivan, Senior Associate Director, (202) 452– 3000, Division of Supervision and Regulation; or *IPAC@frb.gov*.

**SUPPLEMENTARY INFORMATION:** The Economic Growth, Regulatory Relief, and Consumer Protection Act established at the Board an Insurance Policy Advisory Committee (IPAC) to advise the Board on international capital standards and other insurance matters. This notice advises individuals of the opportunity to be considered for appointment to the IPAC. To assist with the appointment of IPAC members, the Board considers information submitted by the candidate, public information, and any other relevant information the Board determines to consider.

## Council Size and Terms

The IPAC has at most 21 members. IPAC members serve staggered three-year terms. Members are appointed to three-year terms unless the Board appoints a member to fill a vacant unexpired term. A member that is appointed to serve a three-year term begins his or her service on the first January 1 occurring after his or her appointment. A member appointed to fill an vacant unexpired term serves for the remaining time of the term. The Board provides a nominal honorarium and reimburses members only for their actual travel expenses, subject to Board policy.

## Statement of Interest

A Statement of Interest must contain the following information:

- Full name;
- Address;
- Phone number; and

- Email address

At their option, candidates may provide additional information for consideration.

## Qualifications

IPAC candidates should be insurance experts. The Board provides equal appointment opportunity to all persons without regard to race, color, religion, sex (including sexual orientation, gender identity, and pregnancy), national origin, age, disability, genetic information, or military service. In addition, the Board is committed to a diverse committee and seeks a diverse set of expert perspectives from the various sectors of the U.S. insurance industry including life insurance, property and casualty insurance and reinsurance, agents and brokers, academics, consumer advocates, and experts on issues facing underserved insurance communities and consumers. The Board also seeks relevant actuarial, legal, regulatory, and accounting expertise, as well as expertise on lines of business underwritten by its currently supervised population of insurance institutions.

Members must be willing and able to participate in conference calls and prepare for and attend meetings in person. Membership and attendance is not delegable.

By order of the Board of Governors of the Federal Reserve System, acting through the Director of the Division of Supervision and Regulation under delegated authority.

**Ann Misback,**

*Secretary of the Board.*

[FR Doc. 2021–16669 Filed 8–4–21; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Disease Control and Prevention

## Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces an Order to replace and supersede the Order Suspending the Right to Introduce Certain Persons from

Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 ("October Order"). Following an assessment of the current status of the COVID–19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all "covered noncitizens" as defined in the order. Unaccompanied noncitizen children, already excepted under a July 16, 2021 order, remain excepted from the order's coverage. In addition, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

**DATES:** This Order went into effect August 2, 2021.

**FOR FURTHER INFORMATION CONTACT:** Tiffany Brown, Deputy Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** CDC has determined that an Order under 42 U.S.C. 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID–19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID–19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID–19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days. This Order continues the suspension of the right to introduce "covered noncitizens,"[1] into the United States

along the U.S. land and adjacent coastal borders. In recognition of the specific COVID–19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order[2] on July 16, 2021 (July Exception) and continues that exception herein.[3] In addition, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.*

---

(regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE.

[2] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order) and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[3] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf* (July 16, 2021); *see* 86 FR 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

[1] The term "covered noncitizens" is defined as persons traveling from Canada or Mexico

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)

**Order Under Sections 362 & 365 of the Public Health Service Act**

**(42 U.S.C. 265, 268) and 42 CFR 71.40**

**Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists**

### Executive Summary

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby replacing and superseding the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). The instant Order continues the suspension of the right to introduce "covered noncitizens," as defined herein,[4] into the United States along the U.S. land and adjacent coastal borders. In recognition of the specific COVID–19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order on July 16, 2021 (July Exception) and continues that exception herein.[5] Following an assessment of the current status of the COVID–19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all other covered noncitizens as described herein. As outlined below, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

CDC has determined that an Order under 42 U.S.C. 265 remains necessary

---

[4] *See infra* Section III.A.

[5] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf* (July 16, 2021); *see* 86 FR 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID–19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID–19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID–19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days.

Outline of Reassessment and Order

I. Background
   A. Current Status of COVID–19 Public Health Emergency
   B. Public Health Factors Related to COVID–19
   1. Manner of COVID–19 Transmission
   2. Emerging Variants of the SARS–CoV–2 Virus
   3. Risks of COVID–19 Transmission Specific To Congregate Settings
   4. Availability of Testing, Vaccines, and Other Mitigation Measures
   5. Impact on U.S. Communities and Healthcare Resources
II. Public Health Reassessment
   A. Immigration Processing and Public Health Impacts
   B. Public Health Assessment of Single Adults and Family Units
   C. Comparison to Unaccompanied Noncitizen Children
   D. Summary of Findings
III. Legal Basis for the Order
IV. Issuance and Implementation of the Order
   A. Covered Noncitizens
   B. Exceptions
   C. APA, Review, and Termination

I. Background

Coronavirus disease 2019 (COVID–19) is a quarantinable communicable disease[6] caused by the SARS–CoV–2

virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued an Order on October 13, 2020 (October Order), replacing an Order initially issued on March 20, 2020 (March Order),[7] suspending the right to introduce[8] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increase in risk of the introduction of COVID–19. The October Order applied specifically to covered noncitizens who would otherwise be introduced into a congregate setting in land or coastal POE or U.S. Border Patrol stations at or near the U.S. borders[9] with Canada and Mexico. On February 17, 2021, CDC published a notice announcing the temporary exception of unaccompanied noncitizen children (UC)[10] encountered in the United States from the October

Order.[11] The exception of UC from the October Order was confirmed with the publication of the July Exception.[12]

POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. The March and October Orders were intended to reduce the risk of COVID–19 introduction, transmission, and spread in POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens and residents, DHS/CBP personnel and noncitizens at the facilities, and the healthcare systems in local communities overall. Because of the congregate nature of these facilities and the sustained community transmission of COVID–19, including the highly transmissible B.1.617.2 (Delta) variant, in both the United States and migrants' countries of origin and transit, at this time, there continues to be a high risk of COVID–19 outbreaks in these facilities following the introduction of an infected person. Upon reassessment of the current situation with respect to the pandemic and the situation at the U.S. borders, CDC finds an Order under 42 U.S.C. 265 for Single Adults (SA)[13] and Family Units (FMU)[14] remains necessary at this time, as discussed in detail below. CDC also recognizes the availability of testing, vaccines, and other mitigation protocols can minimize risk in this area. As the ability of DHS facilities to employ mitigation measures to address the COVID–19 public health emergency increases, CDC anticipates additional lifting of restrictions.

A. Current Status of COVID–19 Public Health Emergency

Since late 2019, SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic. As of July 28, 2021, there have been over 195 million confirmed cases of COVID–19 globally, resulting in over 4.1 million deaths.[15] The United

---

[6] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID–19), and influenza caused by novel or reemergent influenza viruses that are

causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 FR 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 FR 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 FR 45671 (July 31, 2014).

[7] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[8] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[9] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or U.S. Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID–19.

[10] As stated in the July Exception, CDC's understanding is that UC are a class of individuals similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 FR 38717, 38718 at note 4.

[11] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[12] *Supra* note 2.

[13] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a "family unit," *see infra* note 11.

[14] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). Any statistics regarding FMU count the number of individuals in a family unit rather than counting the groups.

[15] *Coronavirus disease (COVID–19) pandemic,* World Health Organization, *https://covid19.who.int/* (last visited July 28, 2021).

States has reported over 34 million cases resulting in over 609,000 deaths due to the disease [16] and is currently averaging around 61,976 new cases of COVID–19 a day as of July 27, 2021 with high community transmission.[17] Although several of the key indicators of transmission and spread of COVID–19 in the United States improved during the first half of 2021, variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID–19 cases, hospitalizations, and deaths. COVID–19 cases increased approximately 400% between June 19 and July 28, 2021.[18]

Many countries have begun widespread vaccine administration; however, 78 countries continue to experience high or substantial incidence rates (≥50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases.[19] It is imperative that individuals and communities stay vigilant and that vaccination and other COVID–19 mitigation efforts are maintained. As the Delta variant continues to spread, both the United States and Mexico are experiencing high or substantial incidence rates with 137.9 and 68.6 daily cases per 100,000 persons over a seven-day average, respectively; in Canada, the incidence rate is 8.0. The United States saw a 91.0% increase in new cases over the past week, Mexico experienced a 30.2% increase in new cases. During the same time period, the incidence rate in Canada increased by 14.8%.[20]

COVID–19 was first declared a public health emergency in January 2020 [21] and the U.S. government and CDC have implemented a number of COVID–19 mitigation and response measures since that time. Many of these mitigation measures have involved restrictions on international travel and migration.[22] Other measures have focused on recommending and enforcing COVID–19 mitigation efforts, including physical distancing and mask-wearing.[23] Recent concerns regarding the spread of the Delta variant prompted CDC to release updated guidance calling for vaccinated persons to wear a mask indoors in public when in an area of substantial or high transmission.[24] Furthermore, CDC recommends that all individuals, including those fully vaccinated, continue to wear a well-fitted face mask in correctional and detention facilities.[25]

## B. Public Health Factors Related to COVID–19

As directed by Executive Order,[26] CDC conducted a comprehensive reassessment of the October Order to determine whether the suspension of the right to introduce certain persons into the United States remains necessary in light of the current circumstances, including the evolving understanding of the epidemiology of COVID–19 variants and available mitigation measures including testing and vaccination.[27] In conducting this reassessment, CDC examined a number of public health factors, and evaluated how these factors impact POE and U.S. Border Patrol stations and the personnel and noncitizens in those facilities. CDC also scrutinized whether the potential impacts varied by category of noncitizen: SA, FMU, and UC. In carrying out its reassessment, CDC evaluated the following public health factors: (1) The manner of COVID–19 transmission, including asymptomatic and pre-symptomatic transmission; (2) the emerging variants of the SARS–CoV–2 virus; (3) the risks specific to the type of facility or congregate setting; (4) the availability of testing and vaccines and the applicability of other mitigation efforts; and (5) the impact on U.S. communities and healthcare resources. CDC views this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID–19 concerns and immigration facilities' ability to implement mitigation measures.

[16] *COVID Data Tracker,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/ covid-data-tracker/#datatracker-home* (last visited July 28, 2021).

[17] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#cases_community* (last visited July 28, 2021).

[18] Christie A, Brooks JT, Hicks LA, et al. Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: *http://dx.doi.org/10.15585/mmwr.mm7030e2.*

[19] *See Global Trends, Epidemic Curve trajectory Classification,* WHO, as reported at *https:// covid.cdc.gov/covid-data-tracker/#global-trends* (last visited July 28, 2021).

[20] Low/Moderate incidence describes <50 cases per 100,000 people during the past 7 days. Increasing or Decreasing incidence is based on the percentage change in the number of cases reported in the past 7 days compared to the 7 days prior to that (Increasing: >0% change, Decreasing: <0% change).

[21] *Determination that a Public Health Emergency Exists,* U.S. Department of Health and Human Services (Jan. 31, 2020), *https://www.phe.gov/ emergency/news/healthactions/phe/Pages/2019-nCoV.aspx* (last visited July 21, 2021). The public health emergency determination has been subsequently renewed at 90-day intervals, most recently on July 28, 2021. *See https://www.phe.gov/ emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx* (last visited July 28, 2021).

[22] The President issued proclamations suspending entry into the United States of immigrants or nonimmigrants who were physically present within a number of countries during the 14-day period preceding their entry or attempted entry into the U.S. *See* Proclamation 9984 (Jan. 31, 2020); Proclamation 9992 (Feb. 28, 2020); Proclamation 10143 (Jan. 25, 2021); and Proclamation 10199 (Apr. 30, 2021). Since March 2020, Canada and Mexico have joined with the U.S. to restrict non-essential travel along land borders to prevent the introduction and spread of the virus that causes COVID–19; these restrictions are in place until at least August 21, 2021. Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Canada, 86 FR 38556 (July 22, 2021); Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Mexico, 86 FR 38554 (July 22, 2021). CDC has also issued orders to mitigate risk of further introducing and spreading SARS-CoV–2 and its variants into the United States. *See* Framework for Conditional Sailing and Initial Phase COVID–19 Testing Requirements for Protection of Crew, 85 FR 70153 (Nov. 4, 2020) (outlining the process for the phased resumption of cruise ship passenger operations); Requirement for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for all Airline or Other Aircraft Passengers Arriving into the U.S. from Any Foreign Country, 86 FR 7387 (Jan. 28, 2021); and *COVID-19 Travel Recommendations by Destination,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html#travel-1* (last updated July 26, 2021) (COVID–19-related travel recommendations, including 62 Level 4 Travel Health Notices for countries with very high COVID–19 rates).

[23] CDC's Order requiring the wearing of face masks by travelers while on a conveyance entering, traveling within, or departing the United States and in U.S. transportation hubs remains in place for all travelers at indoor settings on public transportation conveyances and at transportation hubs, regardless of vaccination. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 FR 8025 (Feb. 3, 2021). *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html* (last updated June 10, 2021).

[24] *Supra* note 15 (CDC also recommends fully vaccinated persons consider wearing a mask regardless of transmission level if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated (including children currently ineligible for vaccination)); *see also infra* page 11, section 5 (discussion of "high" and "substantial transmission").

[25] *Interim Public Health Recommendations for Fully Vaccinated People,* Centers for Disease Control and Prevention, *https://www.cdc.gov/ coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html* (last updated May 28, 2021).

[26] Exec. Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," 86 FR 8267 (Feb. 2, 2021).

[27] CDC's reassessment of the public health situation with respect to covered noncitizens and border facilities relies upon information and data provided by DHS, CBP, and HHS' Office of Refugee Resettlement, including information regarding those entities' policies and practices.

## 1. Manner of COVID–19 Transmission

SARS–CoV–2, the virus that causes COVID–19, spreads mainly from person-to-person through respiratory fluids released during exhalation, such as when an infected person coughs, sneezes, or talks. Exposure to these respiratory fluids occurs in three principal ways: (1) Inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.[28] Spread is more likely when people are in close contact with one another (within about 6 feet), especially in crowded or poorly ventilated indoor settings. Unvaccinated persons with asymptomatic and pre-symptomatic infection are significant contributors to community SARS–CoV–2 transmission and occurrence of COVID–19.[29] Asymptomatic cases are currently believed to represent roughly 30% of all COVID–19 infections and the infectiousness of asymptomatic individuals is believed to be about 75% of the infectiousness of symptomatic individuals. CDC's current best estimate is that 50% of infections are transmitted prior to symptom onset (pre-symptomatic transmission).[30] Although rare, as discussed below, breakthrough infections may occur in vaccinated individuals. Due to the variety of source of spread—transmission by asymptomatic, pre-symptomatic, symptomatic, and vaccinated individuals—testing is critical to identify those infected with COVID–19.

Among those who are not vaccinated, serious COVID–19 illness necessitating treatment occurs with greater frequency in older adults and those with certain pre-existing conditions.[31] Although children can be infected with SARS–CoV–2, get sick from COVID–19, and spread the virus to others, when compared with adults, children and adolescents who have COVID–19 are more commonly asymptomatic or have mild, non-specific symptoms. Children are less likely to develop severe illness or die from COVID–19.[32] They typically present with mild symptoms, if any, and have a good prognosis, recovering within one to two weeks after disease onset.[33]

## 2. Emerging Variants of the SARS–CoV–2 Virus

Like all viruses, SARS–CoV–2 constantly changes through mutation as it circulates, resulting in new virus variants over time.[34] Unchecked transmission of SARS–CoV–2 may result in increased viral mutations and the emergence of new variants. New variants of SARS–CoV–2 have emerged globally,[35] several of which have been identified as variants of concern,[36] including the Alpha, Beta, Gamma, and Delta variants. These variants of concern have evidence of an increase in transmissibility and more severe disease, which may lead to higher incidence, hospitalization, and death rates among exposed persons.[37] Furthermore, findings suggest variants may reduce levels of neutralization by antibodies generated during previous infection or vaccination, resulting in reduced effectiveness of treatments or vaccines, or increased diagnostic detection failures.[38] The ultimate concern is a variant that substantially decreases the effectiveness of available vaccines against severe or deadly disease.

Currently, the Delta variant is the predominant SARS–CoV–2 strain circulating in the United States, accounting for over 82% of cases as of July 17, 2021.[39] Of critical significance for this Order, the Delta variant has demonstrated increased levels of transmissibility among unvaccinated persons and might increase the risk of vaccine breakthrough infections in the absence of other mitigation strategies.[40] For the unvaccinated, Delta remains a formidable threat and rates of infection of the Delta variant are growing more rapidly in U.S. counties with lower vaccination rates.[41] Available evidence suggests all three vaccines currently authorized for emergency use in the United States provide significant protection against variants circulating in the United States.[42] However, a small

---

[28] *Scientific Brief: SARS–CoV–2 Transmission,* Centers for Disease Control and Prevention (May 7, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html; Science Brief: SARS–CoV–2 and Surface (Fomite) Transmission for Indoor Community Environments,* Centers for Disease Control and Prevention (Apr. 5, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.*

[29] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID–19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513–17515.10.1073/pnas.2008373117, available at *https://www.ncbi.nlm.nih.gov/pubmed/32632012; Johansson MA, Quandelacy TM, Kada S, et al. SARS–CoV–2 Transmission From People Without COVID–19 Symptoms. Johansson MA, et al. JAMA Netw Open.* 2021 January;4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[30] *COVID–19 Pandemic Planning Scenarios,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html* (last visited July 28, 2021).

[31] *People at Increased Risk and Other People Who Need to Take Extra Precautions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html* (last updated Apr. 20, 2021).

[32] *Science Brief: Transmission of SARS–CoV–2 in K–12 Schools and Early Care and Education Programs—Updated,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html* (last updated July 9, 2021).

[33] *See* Leeb RT, Price S, Sliwa S, et al. COVID–19 Trends Among School-Aged Children—United States, March 1–September 19, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1410–1415. DOI: *http://dx.doi.org/10.15585/mmwr.mm6939e2;* Leidman E, Duca LM, Omura JD, Proia K, Stephens JW, Sauber-Schatz EK. COVID–19 Trends Among Persons Aged 0–24 Years—United States, March 1–December 12, 2020. MMWR Morb Mortal Wkly Rep 2021;70:88–94. DOI: *http://dx.doi.org/10.15585/mmwr.mm7003e1;* Rankin DA, Talj R, Howard LM, Halasa NB. Epidemiologic trends and characteristics of SARS–CoV–2 infections among children in the United States. Curr Opin Pediatr. 2021 Feb 1;33(1):114–121. doi: 10.1097/MOP.0000000000000971. PMID: 33278112; PMCID: PMC8011299; and Castagnoli R, Votto M, Licari A, et al. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS–CoV–2) Infection in Children and Adolescents: A Systematic Review. JAMA Pediatr. 2020;174(9):882–889. doi:10.1001/jamapediatrics.2020.1467.

[34] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html* (last updated Apr. 2, 2021).

[35] Abdool Karim SS, de Oliveira T. New SARS–CoV–2 Variants—Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med.* 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362.

[36] *Id.*

[37] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS–CoV–2 B.1.617.2 (Delta) Variant COVID–19 Outbreak Associated with a Gymnastics Facility—Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: *http://dx.doi.org/10.15585/mmwr.mm7028e2* (describing a B.1.617.2 (Delta) Variant COVID–19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which might lead to increased incidence rates).

[38] *SARS–CoV–2 Variant Classifications and Definitions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern* (last updated June 29, 2021).

[39] *Variant Proportions,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#variant-proportions* (citing data for the two-week interval ending July 17, 2021).

[40] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html* (last updated June 28, 2021).

[41] COVID Data Tracker Weekly Review, Interpretive Summary for July 23, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html* (attributing rising numbers of COVID–19 cases in nearly 90% of U.S. jurisdictions to the rapid spread of the Delta variant).

[42] *Science Brief: COVID–19 Vaccines and Vaccination,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html* (last updated May 27, 2021). Other vaccines, particularly the one manufactured by AstraZeneca, show reduced efficacy against

proportion of people who are fully vaccinated may become infected with the Delta variant (known as breakthrough infection); emerging evidence suggests that fully vaccinated persons who do become infected with the Delta variant are at risk for transmitting it to others.[43]

CDC continues to monitor the situation and may adapt recommendations based on the epidemiology of variants of concern. Given the transmissibility of variant strains and the continued emergence of new variants, ongoing monitoring of vaccine effectiveness is needed to identify mutations that could render vaccines most commonly used in the United States less effective against more transmissible variants.[44]

### 3. Risks of COVID–19 Transmission Specific to Congregate Settings

Given the manner of transmission, including asymptomatic or pre-symptomatic transmission, the risk of spreading COVID–19 is particularly pronounced among those who are unvaccinated, partially vaccinated, or vaccinated with less effective vaccines.[45] This risk is acutely present in congregate settings, where a number of people reside, meet, or gather in close proximity for either a limited or extended period of time.[46] Facilities must often carefully weigh the risks of increased transmission not only in the facilities, but also in the local community, due to secondary transmission. These congregate facilities must also consider individual facility and community characteristics (*e.g.,* ability to maintain physical distancing, compliance with universal mask-use policies, ability to properly ventilate, proportion of staff and occupants vaccinated, numbers of those who are at increased risk for severe illness from COVID–19, the availability of resources for broad-based vaccination, testing, and outbreak response, and level of community transmission).[47]

Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID–19 outbreaks.[48] CDC has long recognized the risks specific to such settings, including homeless shelters, detention centers, schools, and workplaces and has provided a number of guidance documents to address the concerns in such spaces. Specifically, CDC developed interim guidance for law enforcement agencies that have custodial authority for detained populations, including civil and pre-trial detention settings. Among the recommendations are physical distancing strategies, isolation of individuals with confirmed or suspected COVID–19, quarantine of close contacts, cohorting of individuals when space is limited, testing, healthcare evaluations for individuals with suspected COVID–19, clinical care as needed for individuals with confirmed or suspected COVID–19, and addressing specific considerations for people who are at increased risk for severe illness.[49]

Vaccine coverage in congregate settings varies and infection risk is greater where there is sustained community transmission.[50] In light of this, CDC strongly recommends vaccination against COVID–19 for everyone who is eligible, including people who are incarcerated or detained and staff at correctional and detention facilities.[51] CDC is discussing additional guidance with DHS, highlighting the key metrics to consider before modifying COVID–19 prevention and mitigation measures in facilities that hold or detain migrants.[52]

### 4. Availability of Testing, Vaccines, and Other Mitigation Measures

The potential for asymptomatic and pre-symptomatic transmission makes testing an essential part of COVID–19 mitigation protocols. With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons so they can be isolated until they no longer pose a risk of spreading infections and their close contacts can be identified and quarantined.[53] Testing is especially important in congregate settings where even a single asymptomatic case can trigger an outbreak that may quickly exceed a facility's capacity to isolate and quarantine residents. Furthermore, if personnel are infected or exposed, the number of available staff members may be reduced, further stressing facility operations. Testing facility residents and personnel can help facilitate prompt mitigation actions.

COVID–19 vaccines are now widely available in the United States, and vaccination is recommended for all people 12 years of age and up. Three COVID–19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: Two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by

---

infection with certain variants but may still protect against severe disease; at the time of the issuance of this Order, the FDA has not authorized the AstraZeneca COVID–19 vaccine for use in the United States.

[43] *Supra* note 15.

[44] *See About Variants of the Virus that Causes COVID–19, supra* note 37.

[45] Vaccines with effectiveness of less than 50% against wildtype strains of COVID–19 are considered less effective.

[46] Notably, COVID–19 has disproportionately affected persons in congregate settings and high-density workplaces. Studies conducted prior to the availability of vaccines showed that a single introduction of SARS–CoV–2 into a facility can result in a widespread outbreak. Lehnertz NB, Wang X, Garfin J, Taylor J, Zipprich J, VonBank B, et al. Transmission Dynamics of Severe Acute Respiratory Syndrome Coronavirus 2 in High-Density Settings, Minnesota, USA, March–June 2020. Emerg Infect Dis. 2021;27(8):2052–2063. *https://doi.org/10.3201/eid2708.204838.* Whole genome sequencing of samples taken following an outbreak at a correctional facility demonstrated that 92.2% of the samples taken from patients were genetically related, indicating that a single case had likely led to the infection of 48 individuals. Similarly, phylogenetic analysis established that 29.6% of cases from an outbreak at a second correctional facility were closely related and genetically identical, indicating that the index case had led to the infection of approximately 60 others.

[47] *See Recommendations for Quarantine Duration in Correctional Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html* (last visited July 28, 2021).

[48] Since March 31, 2020, the U.S. Federal Bureau of Prisons and state departments of corrections have together recorded 416,854 COVID–19 cases among residents and 108,945 cases among staff in correctional and detention facilities, resulting in 2,911 deaths. *Confirmed COVID–19 Cases and Deaths in U.S. Correctional and Detention Facilities by State,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#correctional-facilities* (last visited July 28, 2021).

[49] *See* Guidance for Correctional & Detention Facilities, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html* (last updated June 9, 2021).

[50] Falk A, Benda A, Falk P, Steffen S, Wallace Z, Høeg TB. *COVID–19 Cases and Transmission in 17 K–12 Schools—Wood County, Wisconsin, August 31–November 29, 2020.* MMWR Morb Mortal Wkly Rep 2021;70:136–140. DOI: *http://doi.org/10.15585/mmwr.mm7004e3. See also* Link-Gelles R,

DellaGrotta AL, Molina C, et al. *Limited Secondary Transmission of SARS–CoV–2 in Child Care Programs—Rhode Island, June 1–July 31, 2020.* MMWR Morb Mortal Wkly Rep 2020;69:1170–1172. DOI: *http://dx.doi.org/10.15585/mmwr.mm6934e2.*

[51] *COVID–19 Vaccine FAQs in Correctional and Detention Centers,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/vaccine-faqs.html* (last updated June 1, 2021).

[52] *See* CDC memo to DHS "Considerations for modifying COVID–19 prevention and mitigation measures in Department of Homeland Security migrant holding facilities in response to declining transmission," Centers for Disease Control and Prevention (last updated June 11, 2021).

[53] *See* COVID–19 Testing and Diagnostics Working Group (TDWG). U.S. Department of Health and Human Services, *https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html* (last visited July 28, 2021) (defining the role of the COVID–19 TDWG, which develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

Johnson & Johnson/Janssen), each of which has been determined to be safe and effective against COVID–19. As of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) have been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) have received at least one dose.[54] After substantial vaccine uptake in the first months of 2021, however, vaccination uptake has plateaued, particularly in those under the age of 65 years.[55] The combination of reduced vaccine uptake and the extreme transmissibility of the Delta variant has resulted in rising numbers of COVID–19 cases, primarily and disproportionately affecting the unvaccinated population.

The availability of COVID–19 vaccines is rising globally but still dwarfed by the rates of vaccination in the United States and a handful of other countries.[56] Countries of origin for the majority of incoming covered noncitizens have markedly lower vaccination rates.[57] Given this, the increased movement of typically unvaccinated covered noncitizens into the United States presents a heightened risk of morbidity and mortality to this population due to the congregate holding facilities at the border and the practical constraints on implementation of mitigation measures in such facilities. Outbreaks in these settings increase the serious danger of further introduction, transmission, and spread of COVID–19 and variants into the country.

CDC is aware of a rising number of breakthrough SARS–CoV–2 infections[58] in vaccinated individuals; even without variants of concern, more vaccine breakthroughs are to be expected due to the rising number of vaccinated individuals. While the vaccines currently authorized by the FDA are successful in mitigating severe illness from the highly transmissible Delta variant, infection and even mild to moderate illness has been documented in a small percentage of vaccinated persons.[59] The emergence of these more transmissible variants increases the urgency to expand vaccination coverage for everyone and especially those in densely populated congregate settings.[60] Public health agencies and other organizations must collaboratively monitor the status of the pandemic in their communities. As widespread vaccination efforts continue, ongoing use of the full panoply of mitigation measures is nevertheless especially important in congregate settings and remains key to slowing introduction, transmission, and spread of COVID–19.

## 5. Impact on U.S. Communities and Healthcare Resources

COVID–19 cases are on the rise in nearly 90% of U.S. jurisdictions, and multiple outbreaks are occurring in parts of the country that have low vaccination coverage. A person's risk for SARS–CoV–2 infection is directly related to the risk for exposure to infectious persons, which is largely determined by the extent of SARS–CoV–2 circulation in the surrounding community. Emerging evidence regarding the Delta variant finds that it is more than two times as transmissible as the original strains of SARS–CoV–2 circulating at the start of the pandemic. In light of this, CDC recommends assessing the level of community transmission using, at a minimum, two metrics: New COVID–19 cases per 100,000 persons in the last 7 days and percentage of positive SARS–CoV–2 diagnostic nucleic acid amplification tests in the last 7 days. For each of these metrics, CDC classifies transmission values as low, moderate, substantial, or high. At the time of this Order's issuance, over 70% of the U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission.[61] In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

Between March and June 2021, rates of hospitalization due to COVID–19 decreased dramatically, easing long endured pressures on the U.S. healthcare system. However, in July 2021, with the rise of the Delta variant, the seven-day average for new hospital admissions in the United States increased 35.8% over the prior seven-day period.[62] Rates of hospitalization are rising most sharply in areas with low vaccination coverage.[63] CDC recommends continuous monitoring of the availability of staffed inpatient and intensive care unit beds, as data on usage of clinical care resources to manage patients with COVID–19 reflect underlying community disease incidence. This information can signal when urgent implementation of layered prevention strategies might be necessary to prevent overloading local and regional health care systems. Strains on

---

[54] *COVID–19 Vaccinations in the United States*, Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#vaccinations* (last updated July 28, 2021).

[55] Diesel J, Sterrett N, Dasgupta S, et al. COVID–19 Vaccination Coverage Among Adults—United States, December 14, 2020–May 22, 2021. MMWR Morb Mortal Wkly Rep 2021;70: 922–927. DOI: *http://dx.doi.org/10.15585/mmwr.mm7025e1*. The study found that the lowest vaccination coverage and the intent to be vaccinated among adults aged 18–24 years, non-Hispanic Black adults, and individuals with less education, no insurance, and lower household incomes. Concerns about vaccine safety and effectiveness were commonly cited barriers to vaccination. *See also supra* note 15 (finding that vaccine uptake has slowed nationally with wide variation in coverage by state (range = 33.9%–67.2%) and by county (range = 8.8%–89.0%)).

[56] *See* "PAHO Director calls for fair and broad access to COVID–19 Vaccines for Latin America and the Caribbean," Pan American Health Organization, *https://www.paho.org/en/news/7-7-2021-paho-director-calls-fair-and-broad-access-covid-19-vaccines-latin-america-and* (July 7, 2021) (noting the discrepancies in vaccine availability coverage among North, Central, and South American countries).

[57] Thus far in 2021, Ecuador, El Salvador, Guatemala, Honduras, and Mexico constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Ecuador: 11% fully vaccinated, 30% only partly vaccinated; El Salvador: 22% fully vaccinated, 17% only partly vaccinated; Guatemala: 1.6% fully vaccinated, 5.3% only partly vaccinated; Honduras: 1.8% fully vaccinated, 12% only partly vaccinated; Mexico: 18% fully vaccinated, 14% only partly vaccinated, *https://ourworldindata.org/covid-vaccinations* (last visited July 24, 2021).

[58] A vaccine breakthrough infection is defined as the detection of SARS–CoV–2 RNA or antigen in a respiratory specimen collected from a person ≥14 days after receipt of all recommended doses of an FDA-authorized COVID–19 vaccine. COVID–19 Vaccine Breakthrough Infections Reported to CDC—United States, January 1–April 30, 2021. MMWR Morb Mortal Wkly Rep 2021;70:792–793. DOI: *http://dx.doi.org/10.15585/mmwr.mm7021e3*.

[59] *COVID–19 Vaccine Breakthrough Case Investigation and Reporting*, Centers for Disease Control and Prevention, *https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html* (last updated July 15, 2021).

[60] *Supra* at note 55.

[61] Of the 22 U.S. counties along the U.S.-Mexico border, 13 counties are experiencing high levels of community transmission (San Diego County, CA; Hidalgo County, NM; Presidio County, TX; Brewster County, TX; Terrell County, TX; Val Verde County, TX; Kinney County, TX; Maverick County, TX; Webb County, TX; Zapata County, TX; Starr County, TX; Hidalgo County, TX; and Cameron County, TX) and four counties are experiencing substantial levels of community transmission (Imperial County, CA; Pima County, AZ; Santa Cruz County, AZ; and Luna County, NM;). Five counties are experiencing moderate levels of community transmission (Yuma County, AZ; Cochise County, AZ; Dona Ana County, NM; El Paso County, TX; and Hudspeth County, TX). No counties along the border are experiencing low levels of community transmission. *COVID–19 Integrated County View*, Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#county-view* (last updated July 28, 2021).

[62] COVID Data Tracker Weekly Review, Interpretive Summary for July 16, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07162021.html* (last visited July 28, 2021).

[63] COVID Data Tracker Weekly Review, Interpretive Summary for July 9, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07092021.html*.

critical care capacity can increase COVID–19 mortality while decreasing the availability and use of health care resources for non-COVID–19 related medical care.[64] Increased hospital admissions are forecasted in the coming weeks as the Delta variant continues to predominate.[65]

The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States.[66] Ultimately, the flow of migration directly impacts not only border communities and regions, but also destination communities and the healthcare resources of both. In light of this, the totality of the U.S. community transmission, health system capacity, and public health capacity, as well as local capacity to implement mitigation protocols, are important considerations when reassessing the need for this Order.[67]

## II. Public Health Reassessment

### A. Immigration Processing and Public Health Impacts

Noncitizens arriving in the United States who lack proper travel documents, whose entry is otherwise contrary to law, or who are apprehended at or near the border seeking to unlawfully enter the United States between POE are normally subject to initial immigration processing by CBP in POE facilities and U.S. Border Patrol stations. Absent CDC's issuance of an order under 42 U.S.C. 265 directing otherwise, immigration processing takes place pursuant to Title 8 of the U.S. Code. Although some number of inadmissible noncitizens present at POE, the vast majority are encountered by CBP between POE.[68] Upon such encounters, Border Patrol agents conduct an initial field assessment and transport the

individuals to a CBP facility for intake processing.[69]

CBP facilities are designed to provide this short-term intake processing and are thus space-constrained.[70] While undergoing intake processing under Title 8 at CBP facilities, noncitizens are regularly held in close proximity to one another anywhere from several hours to several days. Depending on the outcome of intake processing, a noncitizen is generally referred to the DHS' Immigration and Customs Enforcement (ICE), where they are often subject to longer-term detention.[71] [72]

Compared to CBP facilities, ICE facilities have space allocations similar to traditional long-term correctional facilities. Still, during migratory surges, capacity constraints hinder CBP and ICE operations and facilities alike. If downstream ICE operations and facilities reach capacity limits, ICE may be unable to take custody of additional noncitizens in a timely manner. When this movement of noncitizens from CBP to ICE custody is impeded or delayed, noncitizens may remain in CBP's densely populated, short-term holding facilities for much longer periods. Of note, the United States is currently experiencing such a migratory surge of noncitizens attempting to enter the country at and between POE at the southern border.[73] DHS has already recorded more encounters this fiscal year to date than the approximate 977,000 encounters in the whole of FY 2019.[74]

CBP has implemented a variety of mitigation efforts to prevent the spread of COVID–19 in POE and U.S. Border Patrol facilities based on the infection prevention strategy referred to as the

hierarchy of controls.[75] CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce. All noncitizens brought into CBP custody are subject to health intake interviews, including COVID–19 screening questions and temperature checks. If a noncitizen in custody displays symptoms of COVID–19 or has a known exposure, CBP facilitates referral to the local healthcare system for testing. Finally, in the event CBP decides to release a noncitizen prior to removal proceedings, the agency has coordinated with local governments and non-governmental organizations to arrange COVID–19 testing at release.[76]

In addition to these mitigation measures, enhanced physical distancing and cohorting remain key to preventing transmission and spread of COVID–19, particularly in congregate settings. To address this, as the pandemic emerged, CBP greatly reduced capacity in their holding facilities. While U.S. Border Patrol facilities along the southern border currently have a non-pandemic total holding capacity of 14,553 individuals, implementation of mitigation measures led to a 50–75% reduction in holding capacity depending on the design of a given facility, resulting in COVID-constrained holding capacity of 4,706.[77] However, the current surge has caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity.[78] From July 3 to July 24, 2021,

---

[64] *Supra* note 15.

[65] COVID–19 Forecasts: Hospitalizations, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/hospitalizations-forecasts.html* (last updated July 21, 2021).

[66] *See* COVID Data Tracker: New Hospital Admissions, *https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions* (last updated July 22, 2021) (showing HHS Regions 4, 6, and 9, encompassing all southern states, experiencing increased rates of new admissions of COVID–19-confirmed patients).

[67] *See Implementation of Mitigation Strategies for Communities with Local COVID–19 Transmission,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html* (last visited May 6, 2021).

[68] Fiscal year to date, 96% (1,076,242 of 1,119,204) of encounters of noncitizens occurred between POE.

[69] CBP facilities include POE, U.S. Border Patrol stations, and facilities managed by the Office of Field Operations.

[70] CBP facilities were designed for the immediate processing of persons and are statutorily designated as short-term (less than 72 hours) holding facilities. 6 U.S.C. 211(m).

[71] FMU transferred to ICE custody are generally held at a Family Staging Center (FSC). Following intake processing, UC are referred to the Office of Refugee Resettlement (ORR) within HHS' Administration for Children and Families (ACF) for care.

[72] While CBP policies regarding transfer and release decisions are the same across the Southwest Border, implementation varies based on local CBP capacity, and ICE capacity.

[73] According to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle countries of Central America (El Salvador, Honduras, Guatemala).

[74] *Southwest Land Border Encounters,* U.S. Customs and Border Protection, available at *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited July 28, 2021).

[75] *Hierarchy of Controls,* Centers for Disease Control and Prevention, available at *https://www.cdc.gov/niosh/topics/hierarchy/default.html* (last visited July 6, 2021). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment).

[76] This is also true of ICE facilities.

[77] Similarly, the operational holding capacity for SA in ICE facilities was reduced by 30% from a regular total capacity of 56,888 beds to 39,821 beds.

[78] Non-COVID–19 holding capacity was exceeded as recently as July 25, 2021.

CBP encountered an average of 3,573 SA and 2,479 FMU daily, over a 21-day period, even with the CDC Order in place. This extreme population density and the resulting increased time spent in custody by noncitizens presents a serious risk of increased COVID–19 transmission in CBP facilities.

CBP faces unique challenges in implementing certain COVID–19 mitigation measures. All individuals encountered by U.S. Border Patrol must be processed in CBP facilities. Not only does this involve close and often continuing contact between CBP personnel and noncitizens, but CBP is further constrained by requirements separate noncitizens within its holding facilities according to specific permutations.[79] These cohorting requirements significantly complicate CBP's ability to address COVID–19-related risks, as CBP facility capacity to accommodate COVID–19 mitigation protocols may not always align with the makeup of the incoming population of noncitizens and the categorical separations required of DHS.

Immigration Processing Under Title 8 of the U.S. Code

The vast majority of noncitizens attempting to enter the United States without proper travel documents are SA; SA account for 68% of overall CBP encounters this fiscal year as of July 26, 2021. Under normal Title 8 immigration processes, SA are transferred to ICE custody pending removal proceedings. As noted above, absent expulsions directed by an order under 42 U.S.C. 265, SA presenting at POE or attempting entry between POE would be processed and held in CBP facilities while awaiting transfer to ICE. Generally, CBP only releases SA into U.S. communities as a last resort, due to severe overcrowding and when all possible detention options have been explored.

A smaller percentage, 23%, of noncitizens encountered by CBP are members of an FMU.[80] As with SA, CBP has limited capacity to hold FMU. Under Title 8, due to court-ordered restrictions that largely prohibit the long-term detention of families, FMU are generally released from DHS custody pending removal proceedings. Prior to release, some FMU are transferred from CBP custody to Family Staging Centers (FSC) operated by ICE. Only a limited number of FMU may be held in an FSC, and time in custody for an FMU is

generally about 2–3 days before being released. FSC capacity is further limited by COVID–19 mitigation protocols.[81]

Releasing FMU to communities necessitates robust testing, vaccination where possible, and careful attention to consequence management (*e.g.,* facilities for isolation and quarantine). DHS has partnered with state and local agencies and non-governmental organizations to facilitate COVID–19 testing of FMU upon release from CBP custody. Pursuant to these arrangements, CBP generally transports FMU to release locations where partner agencies and organizations are on-site to provide testing and facilitate consequence management. Although the implementing partners and their capacities (including for consequence management such as housing) vary, the objectives are constant. These resources, however, are limited. They are already stretched thin, and certainly not available for all FMU who would be processed under Title 8 in the absence of an order issued under 42 U.S.C. 265. DHS has committed to supporting and, where possible, expanding these efforts, including exploring the incorporation of vaccination into this model. CDC strongly supports DHS efforts that include broad-based testing and vaccination.

Immigration Processing With an Order Under 42 U.S.C. 265

Following the issuance of the March and October Orders, covered noncitizens apprehended at or near U.S. borders, regardless of their country of origin, generally were expelled to Mexico or Canada, whichever they entered from, via the nearest POE, or to their country of origin. Where possible, SA and FMU eligible for expulsion based on the March and October Orders have been processed pursuant to the Title 42 authority, unless a case-by-case exception was made by DHS.[82]

Even with the March and October Orders in place, a significant percentage of FMU were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments.[83] For example, the Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept for return via the Title 42 expulsion process. With limited exceptions, the Mexican government will only accept the return of Mexican and Northern Triangle nationals. Moreover, along sections of the border, Mexican officials refuse to accept the return of any non-Mexican family with children under the age of seven, greatly reducing DHS' ability to expel FMU. In addition, many countries impose travel requirements, including COVID–19 testing, consular interviews, and identity verification that can delay repatriation. These added requirements often make prompt expulsion a practical impossibility. Conversely, DHS continues to be able to process the majority of SA under Title 42.[84] In those cases where Title 42 processing is not possible, SA and FMU are instead processed pursuant to Title 8. Processing noncitizens and issuing a Notice to Appear under Title 8 processes takes approximately an hour and a half to two hours per person. Conversely, processing an individual for expulsion under the CDC order takes roughly 15 minutes and generally happens outdoors.

The March and October Orders permitted noncitizens to be promptly returned to their country of origin, rather than being transferred to ICE custody or released into the United States, resulting in noncitizens spending shorter amounts of time in custody at CBP facilities. However, as the number of noncitizens attempting to enter the United States has surged and as individuals cannot be expelled pursuant to Title 42 given the restrictions in place, the time in custody at CBP facilities has increased for SA and FMU, even with the October Order in place. As of July 29, 2021, the current average time in custody at CBP facilities for SA

---

[79] For example, criminal cases must be held separately from administrative cases, SA must be separated by gender identity, FMU and UC must be separated from SA, and all vulnerable individuals must be protected from harm.

[80] Thus far this fiscal year, as of July 26, 2021.

[81] The total capacity for these FSCs is 3,230. However, due to COVID–19 mitigation protocols and family composition limitations, current operational capacity for the FSCs is approximately 2,400. In July 2021, due to an influx of single adults at the SWB, ICE ceased intake of family units at one of the FSCs and began to transition the facility to hold single adults. With this transition, the remaining COVID-adjusted FSC capacity for family units is approximately 1,800. Additionally, ICE has procured 1,200 additional beds at Emergency Family Staging Centers (EFSCs); this bed space is not limited by family composition or COVID–19.

[82] Some countries have put in place limitations that make expulsion pursuant to Title 42 inapplicable. The October Order excepted covered noncitizens "who must test negative for COVID–19 before they are expelled to their home country" and several countries refuse to accept the return of SA and FMU and other individuals unless DHS first secures a negative test result for each individual to be returned. These noncitizens are thus not covered

by the prior Order and thus cannot be expelled pursuant to Title 42. See 85 FR at 65807.

[83] Only 33% of FMU encountered fiscal year to date have been expelled under Title 42 and this percentage has fallen over time. In June 2021, only 14% of FMU were expelled under Title 42, an average of approximately 300 per day.

[84] Fiscal year to date, 89% of SA have been expelled under Title 42. This percentage has fallen slightly as the constraints on expelling individuals have increased. In June 2021, 82% of SA were expelled under Title 42, an average of over 3,000 per day.

not subject to expulsion under the October Order is 50 hours. FMU currently spend an average of 62 hours in CBP custody prior to release or transfer to ICE. If the CDC Order were not in place, both SA and FMU time in custody would likely increase significantly.

### B. Public Health Assessment of Single Adults and Family Units

Implementation of CDC's March and October Orders significantly reduced the length of time covered noncitizen SA and FMU are held in congregate settings at POE and U.S. Border Patrol stations, as well as in the ICE facilities that subsequently hold noncitizens.[85] By reducing congestion in these facilities, the Orders have helped lessen the introduction, transmission, and spread of COVID–19 among border facilities and into the United States while also decreasing the risk of exposure to COVID–19 for DHS personnel and others in the facilities. Implementation of the Orders has mitigated the potential erosion of DHS operational capacity due to COVID–19 outbreaks. The reduction in the number of SA and FMU held in these congregate settings continues to be a necessary mitigation measure as DHS moves towards the resumption of normal border operations.

The availability of testing, vaccination, and other mitigation measures [86] at migrant holding facilities must also be considered. While downstream ICE facilities may have greater ability to provide these measures, CBP cannot appropriately execute consequence management measures to minimize spread or transmission of COVID–19 within its facilities. Space constraints, for example, preclude implementation of cohorting and consequence management such as quarantine and isolation. Covered noncitizens housed in congregate settings who may be infected with COVID–19 may ultimately increase community transmission rates in the United States, especially among susceptible populations (*i.e.,* non-immune, under-vaccinated, and non-vaccinated persons). Mitigation measures, especially testing and vaccination, must be considered for the noncitizens being held, as well as for facility personnel. On-site COVID–19 testing for noncitizens at CBP holding facilities is very limited and the majority of testing takes place off-site. For example, if a noncitizen is transported to a community healthcare facility for medical care, testing is provided based on local protocols. Once transferred to ICE custody, testing for SA and FMU is more widely available.

Although COVID–19-related healthcare resources have substantially improved since the October Order was issued, emerging variants and the potential for a future vaccine-resistant variant mean the possible impacts on U.S. communities and local healthcare resources in the event of a COVID–19 outbreak at CBP facilities cannot be ignored. The introduction, transmission, and spread of SARS–CoV–2—including its variants—among covered noncitizens during processing and holding at congregate CBP settings remain a significant concern to the noncitizens, CBP personnel, as well as the community at large in light of transmission to unvaccinated individuals and the potential for breakthrough cases. Of particular note, POE and U.S. Border Patrol stations are ill-equipped to manage an outbreak and these facilities are heavily reliant on local healthcare systems for the provision of more extensive medical services to noncitizens.[87] Transfers to local healthcare systems for care could strain local or regional healthcare resources. Reliance on healthcare resources in border and destination communities may increase the pressure on the U.S. healthcare system and supply chain during the current public health emergency.[88] Of note, hospitalization rates are once again soaring nationally as the Delta variant spreads and the vaccination rate of the public lags. Ensuring the continued availability of healthcare resources is a critical component of the federal government's overall public health response to COVID–19.

Given the nature of COVID–19, there is no zero-risk scenario, particularly in congregate settings and with variants as transmissible as that of Delta in high circulation in the country. The ongoing pandemic presents complex and dynamic challenges relating to public health that limit DHS' ability to process noncitizens safely under normal Title 8 procedures. Processing a noncitizen under Title 8 can take up to eight times as long as processing a noncitizen under Title 42. Importantly, longer processing times result in longer exposure times to a heightened risk of COVID–19 transmission for both noncitizens and CBP personnel. Amid the ongoing migrant surge, both the COVID–19-reduced capacity and higher non-COVID holding capacity limits have been exceeded in CBP facilities. Complete termination of any order under 42 U.S.C. 265 would increase the number of noncitizens requiring processing under Title 8, resulting in severe overcrowding and a high risk of COVID–19 transmission among those held in the facilities and the CBP workforce.[89]

All of this is of particular concern as the Delta variant continues to drive an increase in COVID–19 cases. While scientists learn more about Delta and other emerging variants, rigorous and increased compliance with public health mitigation strategies is essential to protect public health.[90] Reducing the further introduction, transmission, and spread of these variants and future variants of concern into the United States is key to defeating COVID–19. CDC has concluded that SA and FMU should continue to be subject to the Order at this time pending further improvements in the public health situation.

### C. Comparison to Unaccompanied Noncitizen Children

As discussed in the July Exception, UC are differently situated than SA and

[85] For example, when processing noncitizens under Title 8, prior to referral to ICE or release into the community, CBP generally issues the noncitizen a "Notice to Appear" (also called an I–862), which is a charging document that initiates removal proceedings against the noncitizen and may include a court date or direct the noncitizen to report to an ICE office to receive a court date.

[86] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID–19) in Correctional and Detention Facilities,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/coronavirus/2019-ncov/community/ correction-detention/guidance-correctional-detention.html#correctional-facilities* (last visited July 28, 2021).

[87] *See* CBP Directive No. 2210–004, U.S. Customs and Border Protection, *https://www.cbp.gov/sites/ default/files/assets/documents/2019-Dec/CBP_ Final_Medical_Directive_123019.pdf* (Dec. 30, 2019). Many of the U.S. Border Patrol stations and POE facilities are located in remote areas and do not have ready access to local healthcare systems (which typically serve small, rural populations and have limited resources). 85 FR 56424, 56433. *See also* Abubakar I, Aldridge RW, Devakumar D, et al. The UCL-Lancet Commission on Migration and Health: the health of a world on the move. *Lancet.* 2018;392(10164):2606–2654. doi:10.1016/S0140–6736(18)32114–7.

[88] *See COVID–19 State Profile Report—Combined Set, HealthData.gov, https://healthdata.gov/ Community/COVID-19-State-Profile-Report-Combined-Set/5mth-2h7d* (last updated July 28, 2021).

[89] Throughout the course of the COVID–19 pandemic, CDC has observed numerous outbreaks in similar congregate settings. *See FAQs for Correctional and Detention Facilities,* Centers for Disease Control and Prevention, *https:// www.cdc.gov/coronavirus/2019-ncov/community/ correction-detention/faq.html* (last visited Apr. 15, 2021).

[90] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html* (last updated Apr. 2, 2021).

FMU. The Government has greater ability to care for UC while implementing appropriate COVID–19 mitigation measures. ORR has established a robust network of care facilities that provide testing and medical care and institute COVID–19 mitigation protocols, including vaccination for personnel and eligible UC. In light of these considerations, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a temporary or licensed ORR shelter do not pose a significant level of risk for COVID–19 spread into the community. UC are released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction. CDC thus finds that, at this time,[91] there is appropriate infrastructure in place to protect the children, caregivers, and local and destination communities from elevated risk of COVID–19 transmission. CDC believes the COVID–19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to this Order. As outlined in the July Exception and incorporated herein, CDC is fully excepting UC from this Order. The number of UC entering the United States is smaller than both the number of SA [92] and of FMU. Whereas UC can be excepted from the Order without posing a significant public health risk, the same is not true of SA and FMU, as described above.

*D. Summary of Findings*

Upon review of the various public health factors outlined above and in consideration of the circumstances at DHS facilities, it is CDC's assessment that suspending the right to introduce covered noncitizen SA and FMU who would otherwise be held at POE and U.S. Border Patrol stations remains necessary as the United States continues to combat the COVID–19 public health emergency. In making this determination, CDC has considered various possible alternatives (including but not limited to terminating the application of an order under 42 U.S.C. 265 for some or all SA and FMU,

modifying the availability of exceptions for individual SA and FMU in an order under 42 U.S.C. 265, and reissuing an order under 42 U.S.C. 265 for some or all UC); but for the reasons discussed herein, CDC finds that the continued suspension of the right to introduce SA and FMU under the terms set forth herein, combined with the exception for UC, is appropriate at this time. This temporary suspension pending further improvements in the public health situation and greater ability to implement COVID–19 mitigation measures in migrant holding facilities will slow the influx of noncitizens into environments at higher risk for COVID–19 transmission and spread.

DHS has indicated a commitment to restoring border operations in a manner that complies with applicable COVID–19 mitigation protocols while also accounting for other public health and humanitarian concerns. In light of available mitigation measures, and with DHS' pledge to expand capacity in a COVID-safe manner similar to expansions undertaken by HHS and ORR to address UC influx, CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID–19 mitigation protocols. HHS and CDC intend to support DHS in this effort and continues to work with DHS to provide technical guidance on COVID–19 mitigation strategies for their unique facilities and populations.[93] CDC understands that DHS intends to continue exercising case-by-case exceptions for individual SA and FMU based on a totality of the circumstances as CDC transitions away from this Order. CDC is also providing an additional exception to permit DHS to except noncitizens participating in a DHS-approved program that incorporates pre-processing COVID–19 testing in Mexico of the noncitizens, prior to their safe and orderly entry to the U.S. via ports of entry. Based on the incorporation of relevant COVID–19 mitigation measures in such programs, in consultation with CDC, CDC believes

such an exception is consistent with its legal authorities and in the public health interest.

**II. Legal Basis for This Order Under Sections 362 and 365 of the Public Health Service Act and 42 CFR 71.40**

CDC is issuing this Order pursuant to sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40. In accordance with these authorities, the CDC Director is permitted to prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an Order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[94]

CDC has authority under Section 362 and the implementing regulation to issue this Order to mitigate the further spread of COVID–19 disease, especially as the need to prevent proliferation of COVID–19 disease related to SARS–CoV–2 virus variants is heightened while vaccination efforts continue. Section 362 and the implementing regulation provide the Director with a public health tool to suspend introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.[95]

The term ''introduction into the United States'' is defined in 42 CFR 71.40 as ''the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States,

---

[91] This situation could change based on an increased influx of UC, changes in COVID–19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[92] Note, the total number of SA encounters may include repeat encounters with SA who attempt entry again following expulsion.

[93] CDC has advised DHS on best practices with regard to testing noncitizens at the point they are released to U.S. communities to await further immigration proceedings. In addition to enforcing physical distancing (as practicable), mask-wearing, and testing for both noncitizens and personnel alike in POE and U.S. Border Patrol stations, CDC advises vaccination of DHS/CBP personnel to further reduce the risk of COVID–19 introduction, transmission, and spread in facilities and communities and protect the federal workforce. Widespread vaccination of federal employees and other personnel in congregate settings at POE and U.S. Border Patrol stations is another layer of the strategy that will lead to the normalization of border operations.

[94] 42 U.S.C. 265; 42 CFR 71.40.

[95] 85 FR 56424 at 56425–26.

in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States.'' 42 CFR 71.40(b)(1). Similarly, the term ''serious danger of the introduction of such quarantinable communicable disease into the United States'' is defined as, ''the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease.'' 42 CFR 71.40(b)(3).

In promulgating § 71.40, CDC and HHS noted that '''introduction' does not necessarily conclude the instant that a person first steps onto U.S. soil. The introduction of a person into the United States can occur not only when a person first steps onto U.S. soil, but also when a person on U.S. soil moves further into the United States, and begins to come into contact with persons or property in ways that increase the risk of transmitting the quarantinable communicable disease.'' [96] This language recognizes that many quarantinable communicable diseases, including COVID–19, may be spread by infected individuals who are asymptomatic and therefore unaware that they are capable of transmitting the disease. Even when a communicable disease is already circulating within the United States, prevention and mitigation of continued transmission of the virus is nevertheless a key public health measure. In this case, although COVID–19 has already been introduced and is spreading within the United States, this Order serves as an important disease-mitigation tool to protect public health. This is particularly true as new variants of the virus continue to emerge. By continuing to suspend the introduction of persons from foreign countries into the United States, this Order will help minimize the spread of variants and their ability to accelerate disease transmission.

Section 71.40(b)(2) defines ''[p]rohibit, in whole or in part, the introduction into the United States of persons'' in Section 362 as ''to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting

movement into the United States, or physically expelling from the United States some or all of the persons.'' *See also* 42 U.S.C. 265 (authorizing the prohibition when the danger posed by the communicable disease ''is so increased by the introduction of persons from such country . . . or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health''). Pursuant to that provision, this Order permits expulsion of persons covered by it, as did the prior Orders issued under this authority.[97] CDC recognizes that expulsion is an extraordinary action but, as explained in the Final Rule, the power to expel is critical where neither HHS/CDC, nor other Federal agencies, nor state or local governments have the facilities and personnel necessary to quarantine, isolate, or conditionally release the number of persons who would otherwise increase the serious danger of the introduction of a quarantinable communicable disease into the United States.[98] In those situations, the rapid expulsion of persons from the United States may be the most effective public health measure that HHS/CDC can implement within the finite resources of HHS/CDC and its Federal, State, and local partners.[99]

As stated in the Final Rule for 42 CFR 71.40, CDC ''may, in its discretion, consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures.'' [100] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, specifically during processing and holding at CBP facilities, and the potential for disease spread to the community at large.[101]

As stated in 42 CFR 71.40, this Order does not apply to U.S. citizens, U.S. nationals, lawful permanent residents, members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States, and U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.[102]

In addition, this Order does not apply to those classes of persons excepted by the CDC Director. Including exceptions in the Order is consistent with Section 362 and 42 CFR 71.40, which permit the prohibition of introduction into the United States to be ''in whole or in part.'' As explained in the Final Rule for section 71.40, this language is intended to allow the Director to narrowly tailor the use of the authority to what is required in the interest of public health.[103] Pursuant to this capability, CDC is therefore excepting specific categories of persons from the Order, as described herein.

As required by Section 362, this Order will be in effect only for as long as it is needed to avert the serious danger of the introduction, transmission, and spread of COVID–19 into the United States and will be terminated when the continuation of the Order is no longer necessary to protect the public health. Finally, as directed by 42 CFR 71.40(c), the Order sets out the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States is being prohibited;

---

[96] *Id.* at 56425.

[97] *See id.* at 56425, 56433.
[98] *Id.* at 56425, 56445–46.
[99] *Id.* at 56425.
[100] *Id.* at 56444.
[101] *Id.* at 56434. Strain on healthcare systems was also cited as a factor in the Final Rule, specifically the additional strain that noncitizen migrant healthcare needs may place on already overburdened systems; the Final Rule described the

reduction of this strain as a result of CDC's previously issued orders. *Id.* at 56431.
[102] 42 CFR 71.40(e) and (f).
[103] 85 FR 56424, 56444.

(3) The conditions under which that prohibition on introduction will be effective, in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition will be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

## III. Issuance and Implementation of Order

Based on the foregoing public health reassessment, I hereby issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations under 42 CFR part 71,[104] which authorize the CDC Director to suspend the right to introduce persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order hereby replaces and supersedes the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order) [105] and affirms and incorporates the exception for UC published in the July Exception, such that UC are excepted from this Order.[106]

This Order addresses the current status of the COVID–19 public health emergency and ongoing public health concerns, including virus transmission dynamics, viral variants, mitigation efforts, the public health risks inherent to high migration volumes, low vaccination rates among migrants, and crowding of immigration facilities. In making this determination, I have considered myriad facts, including the congregate nature of border facilities and the high risk for COVID–19 outbreaks—especially now with the predominant, more transmissible Delta

variant—presented following the introduction of an infected person, as well as the benefits of reducing such risks. I have also considered epidemiological information, including the viral transmissibility and asymptomatic transmission of COVID–19, the epidemiology and spread of SARS–CoV–2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, as well as public health concerns with crowding at border facilities and resultant risk of transmission of additional quarantinable communicable diseases. I am issuing this Order to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol stations by reducing the introduction, transmission, and spread of the virus that causes COVID–19, including new and existing variants, in congregate settings where covered noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Based on an assessment of the current COVID–19 epidemiologic landscape and the U.S. government's ongoing efforts to accommodate UC, CDC does not find public health justification for this Order to apply with respect to UC, as outlined in the July Exception. Although CDC finds that, at this time, this Order should be applicable to FMU, CDC notes that there are fewer FMU than SA unlawfully entering the United States and many FMU are already being processed pursuant to Title 8 versus Title 42 given a variety of practical and other limitations on immediately expelling FMU. DHS has indicated that it plans to continue to partner with state and local agencies and nongovernmental organizations to provide testing, consequence management, and eventually vaccination to FMU who are determined to be eligible for Title 8 processing. CDC considers these efforts to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID–19 mitigation programs for FMU such that they may be excepted from this Order in the future. Although vaccination programs are not available at this time, CDC encourages DHS to develop such programs as quickly as practicable. While the migration of SA and FMU into the United States during the COVID–19 public health emergency continues and given the inherent risks that accompany holding these groups in crowded congregate settings with

insufficient options for effective mitigation, CDC finds the public health justification for this Order is sustained at this time.

DHS has indicated that it is committed to restoring border operations and facilitating arrivals to the United States in a manner that comports with CDC's recommended COVID–19 mitigation protocols. Given the recent migrant surge, DHS believes that an incremental approach is the best way to recommence normal border operations while ensuring health and safety concerns are addressed. To this end, DHS will work to establish safe, efficient, and orderly processes that are consistent with appropriate health and safety protocols and the epidemiology of the COVID–19 pandemic, in consultation with CDC.

CDC's expectation is that although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID–19 health and safety protocols and capacity allows. DHS will consult with CDC to ensure that the standards for such exceptions are consistent with current CDC guidance and public health recommendations. Based on this incorporation of relevant COVID–19 mitigation measures, CDC believes it is consistent with the legal authorities and in the public health interest to continue the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8. Additionally, DHS is working in coordination with nongovernmental organizations, state and local health departments, and other relevant facilitating organizations and entities as appropriate to develop DHS-approved processes that include pre-entry COVID–19 testing. Additional public health mitigation measures, such as maintaining physical distancing and use of masks, testing, and isolation and quarantine as appropriate, are included in such processes. DHS has documented these processes and shared them with CDC. CDC has consulted with DHS to ensure that the processes appropriately address public health concerns and align with relevant CDC COVID–19 mitigation protocols. Based on these plans and processes, CDC believes it is consistent with legal authorities and in the public health interest to permit an exception for noncitizens in such DHS-approved processes to allow for safe and orderly entry into the United States.

---

[104] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 FR 56424 (Sept. 11, 2020); 42 CFR 71.40.

[105] *Supra* note 4.

[106] *Supra* note 3.

## A. Covered Noncitizens

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE. For purposes of this Order, I refer to persons covered by the Order as ''covered noncitizens.''

## B. Exceptions

This Order does *not* apply to the following:

• U.S. citizens, U.S. nationals, and lawful permanent residents;[107]

• Members of the armed forces of the United States and associated personnel, U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, subject to required assurances;[108]

• Noncitizens who hold valid travel documents and arrive at a POE;

• Noncitizens in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE;

• Unaccompanied Noncitizen Children;[109]

• Noncitizens who would otherwise be subject to this Order, who are permitted to enter the U.S. as part of a DHS-approved process, where the process approved by DHS has been documented and shared with CDC, and includes appropriate COVID–19 mitigation protocols, per CDC guidance; and

• Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC guidance and public health recommendations.

## C. APA, Review, and Termination

This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so.[110] As part of the consultation, DHS developed operational plans for implementing this Order. CDC has reviewed these plans and finds them to be consistent with the language of this Order directing that covered noncitizens spend as little time in congregate settings as practicable under the circumstances. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered noncitizens involved, and the likelihood that covered noncitizens do not have homes in the United States.[111]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by COVID–19, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to all covered noncitizens. In addition, this Order concerns ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared borders and therefore directly ''involve[s] . . . a . . . foreign affairs function of the United States;''[112] thus, notice and comment and a delay in effective date are not required.

This Order shall remain effective until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or I determine that the danger of further introduction, transmission, or spread of COVID–19 into the United States has ceased to be a serious danger to the public health and continuation of this Order is no longer necessary to protect public health, whichever occurs first. At least every 60 days, the CDC shall review the latest information regarding the status of the COVID–19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. border, to determine whether the Order remains necessary to protect public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order. I retain the authority to modify or terminate the Order, or its implementation, at any time as needed to protect public health.

## Authority

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

Dated: August 3, 2021.

**Sherri Berger,**
*Chief of Staff, Centers for Disease Control and Prevention.*
[FR Doc. 2021–16856 Filed 8–3–21; 4:15 pm]
**BILLING CODE 4163–18–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

[Document Identifier: CMS–10148 and CMS–10784]

### Agency Information Collection Activities: Proposed Collection; Comment Request

**AGENCY:** Centers for Medicare & Medicaid Services, Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Medicare & Medicaid Services (CMS) is announcing an opportunity for the public to comment on CMS' intention to collect information from the public. Under the Paperwork Reduction Act of 1995 (the PRA), federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information (including each proposed extension or reinstatement of an existing collection of information) and to allow 60 days for public comment on the proposed action. Interested persons are invited to send comments regarding our

---

[107] 42 CFR 71.40(f).

[108] 42 CFR 71.40(e)(1) and (3).

[109] As excepted pursuant to the Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists. 86 FR 38717 (July 22, 2021).

[110] 42 U.S.C. 268; 42 CFR 71.40(d).

[111] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered noncitizens.

[112] 5 U.S.C. 553(a)(1).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| STATE OF TEXAS, | |
| Plaintiff, | |
| v. | Civil Action No.:  4:21-cv-579-P |
| JOSEPH R. BIDEN, JR. et al., | |
| Defendants. | |

**DECLARATION OF JALLYN SUALOG,**
**DEPUTY DIRECTOR, OFFICE OF REFUGEE RESETTLEMENT,**
**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Jallyn Sualog, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.      I am the Deputy Director of the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2.      I have held the position of Deputy Director since June 2018. I was previously the Director of Children's Services from September 2013 through June 2018. I have worked at ORR since February 2007. I have a Master's of Arts in Clinical Psychology. Before joining ORR, I worked as a mental health professional and managed the child welfare and social services programs for Hawaii's largest non-profit organization.

3.      As the Deputy Director of ORR, I have responsibility for the oversight of the Unaccompanied Children's (UC) program, including all aspects of operations, planning and logistics, medical services, and monitoring. My job duties include the formulation and

1

implementation of ORR's response to COVID-19 across its network of grantee care-provider facilities.

4.      My testimony in this declaration is based upon my personal knowledge of ORR's response to COVID-19, information obtained from records and systems maintained by ORR in the regular course of my employment, and CDC guidance documents regarding COVID-19. I am testifying in this declaration to the best of my knowledge, and understand that this declaration is for use in the above-captioned matter. I am familiar with the allegations in this matter, and submit this declaration in order to describe the COVID-19 protocols ORR has implemented across its network of care providers, including those operating in Texas, and the success of these measures in mitigating and containing the transmission of COVID-19 among UC.

5.      As an initial matter, ORR has significant historical experience with the identification, mitigation, and treatment of contagious diseases affecting UC, including seasonal influenza (flu), mumps, chicken pox (varicella), and tuberculosis. Accordingly, ORR has policies pertaining to infectious disease control that predate the COVID-19 pandemic. ORR's general, long-standing policies concerning the management of communicable disease require the routine assessment of travel history when a child arrives at a care-provider program; medical screenings and vaccinations within 2 business days of arriving at ORR shelters; the ability to isolate or quarantine individuals for the purpose of infectious disease control; hand hygiene and respiratory etiquette education efforts; and established communicable disease reporting to local health authorities.[1]

---

[1] *See* ORR Policy Guide § 3.4.6 Management of Communicable Diseases, § 3.4.7 Maintaining Health Care Records and Confidentiality, https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied-section-3.

App. 020

6.      Beginning in early 2021, ORR began receiving a significantly increased number of referrals of UC encountered by U.S. Customs and Border Protection (CBP) that outstripped ORR's available, licensed and Influx Care bed capacity. In order to transfer UC out of CBP facilities as quickly as possible and minimize the time UC spend in CBP custody, ORR established Emergency Intake Sites (EIS). EIS facilities are intended as a temporary (generally, under a 6-month period), emergency housing measure while ORR works to release UC directly to vetted sponsors, or transfer UC to a licensed shelter facility. EIS facilities are designed for mass care and offer basic standards of care for minors such as providing clean and comfortable sleeping quarters, meals, toiletries, laundry, and access to medical services.

7.      Since the first reports of COVID-19 in the United States, ORR has monitored the public-health reporting on COVID-19 in the jurisdictions in which grantee care-provider facilities operate, including Texas. Over the course of the pandemic, ORR has worked in close consultation with CDC to develop COVID-19 mitigation and containment protocols that are rooted in the latest public health science and balance the need to protect against the threat of COVID-19 with the need to ensure that the vulnerable children entering the United States spend as little time in CBP custody as possible. ORR's Division for Health for Unaccompanied Children (DHUC) meets regularly with CDC's Southwest Border Migrant Health Task Force (SWBMHTF), which provides technical support and guidance to Emergency Intake Sites (EIS) on the prevention and control of COVID-19 and other communicable diseases and troubleshoots site-specific issues that arise, such as adapting protocols based on the constraints of a particular site.

8.      ORR currently uses the following COVID-19 protocols for minors at EIS facilities, which are in line with SWBMHTF's current recommendations. Prior to a minor being transported to an EIS they are tested for COVID-19 by CBP. Minors are also tested upon arrival to the EIS.

3

Minors are required to quarantine for the first 7 days after admission to an EIS and can be released from quarantine on the morning of day 8 if they remained asymptomatic and had a negative COVID-19 test in the 48 hours prior. In addition to testing at admission and during quarantine, minors are routinely tested during stay at the EIS (e.g., every three days). Any minor that develops symptoms consistent with COVID-19 infection is immediately tested.

9.      Minors who test positive for COVID-19 are required to be isolated for 10 days from the date the positive test was collected, or 10 days from the date of symptom onset if asymptomatic. Contact tracing is conducted whenever anyone tests positive for COVID-19, and minors exposed to COVID-19 are quarantined for seven days and tested on the 5th, 6th, or 7th day of their quarantine. Minors are released from quarantine upon receiving a negative test result.

10.      In addition to robust testing, ORR adheres to strict COVID-19 reporting requirements. EIS facilities are required to report positive and negative COVID-19 rapid antigen test results to the local health department. SWBMHTF collects aggregate, non-identifiable positive COVID-19 test results for each EIS and reports them to ORR. EIS facilities are also required to complete the "Emergency Intake Site (EIS) Discharge and Transfer Record of Public Health and Medical Information" form for all minors discharged from an EIS. This form accompanies the minor to their final destination to ensure medical services are complete and not duplicated.

11.      ORR has also issued the following COVID-19 guidance to licensed facilities. UC entering a facility with no symptoms and no known exposures are quarantined for 7 days and monitored. They are also tested at intake or as part of their initial medical exam, and must receive a negative test 48 hours prior to release from quarantine. The process is the same for asymptomatic UC with a known exposure, except that they may only be cohorted with other UC who were part of the same exposure event.

4

12.     Minors who present symptoms at intake are medically isolated and tested for COVID-19 and other infectious diseases. If they test negative, medical isolation may be discontinued but they must remain quarantined for 7 days and must receive a negative test 48 hours prior to release from quarantine. Minors who test positive for COVID-19 are immediately medically isolated and monitored for at least 10 days. Medical isolation may be discontinued after at least 10 days have passed (on day 11) if at least 24 hours have passed since the resolution of fever without the use of fever-reducing medications and symptoms are improving.

13.     In the last year, more than 120,000 COVID-19 viral tests have been completed for the unaccompanied minors in ORR's licensed shelters.

14.     Implementation by ORR of these rigorous COVID-19 procedures has contributed to successfully minimizing the spread of SARS-CoV-2 among UC in ORR's licensed shelters, influx care facilities, and EIS facilities.  As stated in the below chart, as of May 23, 2021, there were a total of 108 UC in licensed shelters in Texas who were diagnosed with COVID-19 and who were currently in medical isolation:

| Program Name (Location) | Bed Capacity | Beds Occupied | Positive Minors |
|---|---|---|---|
| BCFS Driscoll (TX) | 119 | 119 | 3 |
| BCFS El Paso (TX) | 56 | 40 | 2 |
| BCFS Harlingen (TX) | 286 | 256 | 2 |
| BCFS Raymondville (TX) | 33 | 33 | 2 |
| BCFS San Antonio (TX) | 74 | 54 | 1 |
| Bokenkamp (TX) | 77 | 76 | 2 |
| Children's First Residential Sunnyside (TX) | 60 | 60 | 7 |
| CHS Loma Alta Shelter (TX) | 39 | 39 | 1 |
| CHS Stanford House (TX) | 327 | 159 | 6 |
| CHS Trail House Shelter (TX) | 185 | 111 | 9 |
| CHSI Casa Norma Linda (TX) | 455 | 423 | 6 |

App. 023

| | | | |
|---|---|---|---|
| CHSI Los Fresnos (TX) | 104 | 94 | 2 |
| CHSI San Benito (TX) | 57 | 53 | 2 |
| Grace House Children's Shelter (TX) | 69 | 65 | 2 |
| SWK Antigua (TX) | 138 | 110 | 4 |
| SWK Canutillo (TX) | 64 | 47 | 5 |
| SWK Casa Blanca (TX) | 19 | 19 | 1 |
| SWK Casa Houston (TX) | 39 | 37 | 5 |
| SWK Casa Montezuma (TX) | 136 | 129 | 3 |
| SWK Casa Padre (TX) | 900 | 900 | 3 |
| SWK Casa Sunzal (TX) | 200 | 143 | 1 |
| SWK Casita Del Valle (TX) | 58 | 18 | 1 |
| SWK El Presidente (TX) | 323 | 296 | 15 |
| SWK Nueva Esperanza (TX) | 126 | 116 | 11 |
| SWK Rio Grande (TX) | 137 | 111 | 5 |
| SWK Sueno (TX) | 38 | 28 | 2 |
| Sunny Glen Children's Home (TX) | 120 | 104 | 2 |
| SWK Processing Center (TX) | 40 | 40 | 3 |
| *Total* | - | - | 108 |

15.     As stated in the below chart, as of June 29, 2021, there were a total of 421 UC in Influx Care Facility (ICF) and EIS facilities in Texas[2] who have been diagnosed with COVID-19 and who were currently in medical isolation:

| ICF/EIS Name (Location) | Bed Capacity | Beds Occupied | Positive Minors |
|---|---|---|---|
| Carrizo Springs ICF (TX) | 830 | 787 | 115 |
| Delphi EIS (TX) | 1344 | 196 | 0 |
| Dimmit EIS (TX) | 440 | 223 | 14 |
| Ft Bliss EIS (TX) | 10000 | 802 | 104 |
| Pecos EIS (TX) | 1970 | 1817 | 188 |
| Total | - | - | 421 |

---

[2] The chart lists EISs currently in operation.  As stated above, EIS are intended to be temporary and several have already been closed as the need for EIS capacity continues to decline, including the two EIS facilities referenced in Plaintiff's complaint. The Kay Bailey Hutchinson Convention Center EIS closed on May 31, 2021 and the Midland EIS has not housed UC since June 25, 2021 and is scheduled to close on July 11, 2021. *See* Compl., Dkt. No. 1, at ¶ 55.

16.     Based on the foregoing, it is my assessment that all UC referred to ORR are appropriately tested for COVID-19 both prior to and during their time in care, and isolated or quarantined as necessary.

17.     ORR is also working to ensure that eligible UC and staff are vaccinated against COVID-19. At this time, care provider program staff who are eligible for the COVID-19 vaccine based on the CDC's Advisory Committee on Immunization Practices (ACIP) recommendations and the recommendations of their state and local jurisdictions may opt to receive the vaccine, which is now readily available to adults.

18.     On May 12, 2021, ACIP made an interim recommendation for use of the Pfizer-BioNTech COVID-19 vaccine in adolescents aged 12-15 years for the prevention of COVID-19. The Pfizer-BioNTech COVID-19 vaccine had previously been authorized for use in persons aged 16 years and older. Additionally, the Pfizer-BioNTech COVID-19 vaccine may now be co-administered with other childhood vaccines. In response to ACIP's recommendation, on June 4, 2021, ORR issued guidance to its care provider network (Field Guidance #17: COVID Vaccination of Unaccompanied Children in ORR Care) with instructions on how to administer COVID-19 vaccinations as an additional mitigation strategy. Wide-spread vaccination of eligible UC is occurring. As of June 28, 2021, 7,143 UC have received at least one dose of the Pfizer-BioNTech vaccine.

Executed on July 2, 2021.

Jallyn N.
Sualog -S

Digitally signed by Jallyn N.
Sualog -S
Date: 2021.07.02 10:06:19
-04'00'

Jallyn Sualog

7

Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™



# COVID-19

To maximize protection from the Delta variant and prevent possibly spreading it to others, get vaccinated as soon as you can and wear a mask indoors in public if you are in an area of substantial or high transmission.

## Quarantine and Isolation

Updated Sept. 18, 2021        Print

### Quarantine vs. Isolation

- You **quarantine** when you might have been exposed to the virus.

- You **isolate** when you have been infected with the virus, even if you don't have symptoms.

---

#### For Health Departments

For detailed CDC recommendations for public health agencies on the duration of quarantine, see Science Brief: Options to Reduce Quarantine.

## Quarantine

Quarantine if you have been in close contact (within 6 feet of someone for a cumulative total of 15 minutes or more over a 24-hour period) with someone who has COVID-19, unless you have been fully vaccinated. People who are fully vaccinated do NOT need to quarantine after contact with someone who had COVID-19 unless they have symptoms. However, fully vaccinated people should get tested 3-5 days after their exposure, even if they don't have symptoms and wear a mask indoors in public for 14 days following exposure or until their test result is negative.

### What to do

- Stay home for 14 days after your last contact with a person who has COVID-19.
- Watch for fever (100.4°F), cough, shortness of breath, or other symptoms of COVID-19.
- If possible, stay away from people you live with, especially people who are at higher risk for getting very sick from COVID-19.

### After quarantine

- Watch for symptoms until 14 days after exposure.
- If you have symptoms, immediately self-isolate and contact your local public health authority or healthcare provider.

### You may be able to shorten your quarantine

Your local public health authorities make the final decisions about how long quarantine should last, based on local conditions and needs. Follow the recommendations of your local public health department if you need to quarantine. Options they will consider include stopping quarantine

- After day 10 without testing
- After day 7 after receiving a negative test result (test must occur on day 5 or later)

## Isolation

**Isolation** is used to separate people infected with COVID-19 from those who are not infected.

People who are in isolation should stay home until it's safe for them to be around others. At home, anyone sick or infected should separate from others, stay in a specific "sick room" or area, and use a separate bathroom (if available).

### What to do

- Monitor your symptoms. If you have an emergency warning sign (including trouble breathing), seek emergency medical care immediately.
- Stay in a separate room from other household members, if possible.
- Use a separate bathroom, if possible.
- Avoid contact with other members of the household and pets.
- Don't share personal household items, like cups, towels, and utensils.
- Wear a mask when around other people if able.

Learn more about what to do if you are sick and how to notify your contacts.

**App. 026**

# When You Can be Around Others After You Had or Likely Had COVID-19

Most people do not require testing to decide when they can be around others; however, if your healthcare provider recommends testing, they will let you know when you can resume being around others based on your test results.

## For Anyone Who Has Been Around a Person with COVID-19

Anyone who has had close contact with someone with COVID-19 should quarantine for 14 days **after their last exposure** to that person, except if they meet the following conditions:

Someone who has been fully vaccinated and shows no symptoms of COVID-19 does not need to quarantine. However, fully vaccinated close contacts should:

- Wear a mask indoors in public for 14 days following exposure or until a negative test result.
- Get tested 3-5 days after close contact with someone with suspected or confirmed COVID-19.
- Get tested and isolate immediately if experiencing COVID-19 symptoms.

Someone who tested positive for COVID-19 with a viral test within the previous 90 days **and** has subsequently recovered **and** remains without COVID-19 symptoms does not need to quarantine. However, close contacts with prior COVID-19 infection in the previous 90 days should:

- Wear a mask indoors in public for 14 days after exposure.
- Monitor for COVID-19 symptoms and isolate immediately if symptoms develop.
- Consult with a healthcare professional for testing recommendations if new symptoms develop.

## I think or know I had COVID-19, and I had symptoms

You can be around others after:

- 10 days since symptoms first appeared **and**
- 24 hours with no fever without the use of fever-reducing medications **and**
- Other symptoms of COVID-19 are improving*

*Loss of taste and smell may persist for weeks or months after recovery and need not delay the end of isolation*

Note that these recommendations **do not** apply to people with severe COVID-19 or with weakened immune systems (immunocompromised).

## I tested positive for COVID-19 but had no symptoms

If you continue to have no symptoms, you can be with others after 10 days have passed since you had a positive viral test for COVID-19.

If you develop symptoms after testing positive, follow the guidance above for "I think or know I had COVID-19, and I had symptoms."

## I was severely ill with COVID-19 or have a weakened immune system (immunocompromised) caused by a health condition or medication.

People who are severely ill with COVID-19 might need to stay home longer than 10 days and up to 20 days after symptoms first appeared. People with weakened immune systems may require testing to determine when they can be around others. Talk to your healthcare provider for more information. Your healthcare provider will let you know if you can resume being around other people based on the results of your testing.

People who are immunocompromised should be counseled about the potential for reduced immune responses to COVID-19 vaccines and the need to continue to follow current prevention measures (including wearing a mask, staying 6 feet apart from others they don't live with, and avoiding crowds and poorly ventilated indoor spaces) to protect themselves against COVID-19 until advised otherwise by their healthcare provider. Close contacts of immunocompromised people should also be encouraged to be vaccinated against COVID-19 to help protect these people.

## For Healthcare Professionals

If you are a healthcare professional who thinks or knows you had COVID-19, you should follow the same recommendations listed above for when you can resume being around others outside the workplace. When you can return to work depends on different factors and situations. For information on when you can return to work, see the following:

Criteria for Return to Work for Healthcare Personnel with SARS-CoV-2 Infection (Interim Guidance)

| Digital Resources |
| --- |

I Think or Know I had COVID-19, and I had Symptoms. When can I be Around Others?

If you have or think you might have COVID-19, it is important to stay home and away from others. When you can be around others depends on different factors for different situations.





### I Think or Know I had COVID-19, but I had No Symptoms. When can I be Around Others?

If you have or think you might have COVID-19, it is important to stay home and away from others. When you can be around others depends on different factors for different situations.



### What's the difference between quarantine and isolation?

Last Updated Sept. 18, 2021

Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS and | § | |
| | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| *Plaintiffs*, | § | Case No. 2:21-cv-00067-Z |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## FIRST AMENDED COMPLAINT[1]

1.      In the first several hours following President Biden's inauguration, the incoming Administration discontinued implementing the successful Migrant Protection Protocols ("MPP").   These regulations required individuals who both lacked a legal basis to be present in the United States and who had passed through Mexico en route to the United States to remain in Mexico pending adjudication of their immigration claims. Prior to the MPP, individuals passing through Mexico could enter the United States, raise asylum claims, expect to be released into the United States in violation of statutory requirements mandating their detention, and stay in the U.S. for years pending the resolution of their claims—even though most were ultimately rejected in court.  MPP changed the incentives for economic migrants

---

[1] On June 3, 2021, Defendants advised through written correspondence that they "do not oppose amendment" of Plaintiffs' Complaint. *See* FRCP 15(a)(2).

with weak asylum claims, and therefore reduced the flow of aliens—including aliens who are victims of human trafficking—to the southern border.

2.     This lawsuit challenges the Administration's unexplained and inexplicable two-sentence statement suspending the MPP, as well as its latest memorandum permanently terminating MPP.  The result of these arbitrary and capricious actions has been a huge surge of Central American migrants, including thousands of unaccompanied minors, passing through Mexico in order to advance meritless asylum claims at the U.S. border.

3.     This migrant surge has inflicted serious costs on Texas as organized crime and drug cartels prey on migrant communities and children through human trafficking, violence, extortion, sexual assault, and exploitation.   These crimes directly affect Texas and its border communities, especially given Texas's strong focus on combating human trafficking both at the border and throughout the State.   The additional costs of housing, educating, and providing healthcare and other social services for trafficking victims or illegal aliens further burden Texas and its taxpayers.

4.     The effects of unlawful immigration do not stop at the southern border. Indeed, "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States[,]" which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).  With its intersection of major interstate highway routes, Missouri is a major destination and hub for human trafficking.  Missouri's ongoing fight against human trafficking—

2

**App. 030**

including the exploitation and trafficking of vulnerable migrants—likewise provides it with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy.  Indeed, irresponsible border-security policies that invite and encourage human traffickers to exploit vulnerable border-crossing victims irreparably injure Missouri and other States.

5.      Recently, Texas's and Missouri's interests in combating human trafficking have become more urgent.  By dismantling the MPP, the Administration has directly caused a massive uptick in illegal immigration through Central America, Mexico, and to the U.S. southern border.

6.      MPP is an exercise of DHS's express authority under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, to return those aliens temporarily to Mexico during the pendency of their removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(C).  The Secretary of Homeland Security implemented MPP to manage the large influx of aliens arriving on the southern border with no lawful basis for admission.  MPP proved to be enormously effective: it enabled DHS to avoid detaining or releasing into the United States more than 71,000 migrants during removal proceedings, and curtailed the number of aliens approaching or attempting to cross the southern border.[2]  The program served as an indispensable tool in the United States' efforts, working cooperatively with the governments of Mexico and other countries, to address the migration crisis by diminishing incentives for illegal

---

[2] *See, e.g.*, TRAC Immigration, *Details on MPP (Remain in Mexico) Deportation Proceedings*, https://trac.syr.edu/phptools/immigration/mpp/.

immigration, weakening cartels and human smugglers, and enabling DHS to better focus its resources on legitimate asylum claims.

7.    Nonetheless, the Biden Administration cast aside congressionally enacted immigration laws and discontinued MPP on its first day in office.  In a peremptory two-sentence, three-line memorandum, the Acting Secretary of Homeland Security issued a directive, effective January 21, 2021, that DHS would "suspend new enrollments in [MPP], pending further review of the program."  Exhibit A ("January 20 Memorandum").  This memorandum provided no analysis or reasoned justification for this abrupt suspension.  In doing so, the Biden Administration ignored the governing legal authority and basic requirements set forth in the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, 5 U.S.C. § 701 *et seq.*

8.    The Biden Administration's suspension "takes off the table one of the few congressionally authorized measures available to process" the vast numbers of migrants arriving at the southern border on a daily basis.  *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (per curiam).  Before MPP, U.S. officials encountered an average of approximately 2,000 inadmissible aliens at the southern border each day, and the rate at which those aliens claimed fear of return to their home countries surged exponentially.

9.    That huge influx imposes enormous, avoidable burdens on the United States' immigration system.  Most asylum claims are meritless.  For example, the Executive Office for Immigration Review ("EOIR") reported that between FY 2008 and FY 2019, only 14 percent of aliens who claimed credible fear were granted

4

asylum.[3]  Alongside the fact that immigration courts were faced with a backlog of over 768,000 cases at the end of FY 2018—a number that since has grown—it is clear the asylum system was and continues to be manipulated by aliens presenting at the border.[4] Further, though federal law mandates that aliens awaiting asylum hearings "shall" be detained, in fact DHS does not detain the vast majority of such asylum applicants, but releases them into the United States, where many simply abscond.

10.    MPP played a critical role in addressing this crisis.  By returning migrants to Mexico to await their asylum proceedings—in cooperation with the Mexican Government, which has permitted these aliens to remain in Mexico—MPP eased the strain on the United States' immigration-detention system and reduced the ability of inadmissible aliens to abscond into the United States.  Between FY 2008 and FY 2019, 32 percent of aliens referred to EOIR absconded into the United States and were ordered removed in absentia.[5]

11.    MPP also discouraged aliens from attempting illegal entry or making meritless asylum claims in the hope of staying inside the United States, thereby permitting the government to better focus its resources on individuals who legitimately qualify for relief or protection from removal.  In February 2020, for example, the number of aliens either apprehended or deemed inadmissible at the

---

[3] *See* Executive Office for Immigration Review Adjudication Statistics, *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019* (Oct. 23, 2019), https://www.justice.gov/eoir/file/1216991/download.

[4] *See* TRAC Immigration, *Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/.

[5] *See Credible Fear and Asylum Process*, *supra*, at n.2.

southern border was down roughly 40,000 from February 2019.[6]   The Biden Administration's termination of the MPP has imposed severe and ongoing burdens on Texas and Missouri because the government will not process into the MPP the tens of thousands of aliens who are resuming attempts to cross the southern border with no legal basis for admission, and the government will process the tens of thousands of aliens already admitted into the MPP into the United States.

12.     Additionally, the Biden Administration's suspension threatens damage to the bilateral relationship between the United States and Mexico.  Migration has been the subject of substantial discussion between the two countries and is a key topic of ongoing concern in their relationship.[7]   The unchecked flow of third-country migrants through Mexico to the United States strains both countries' resources and produces significant public safety risks—not only to the citizens of Mexico and the United States, but also to the migrants themselves, who are often targeted by criminals for human trafficking, violence, and extortion.  MPP played a key role in joint efforts to address the crisis, but the suspension of MPP upsets those efforts and undermines Mexican confidence in U.S. foreign policy commitments.  And like Texas and Missouri, the Mexican government intends to "crack down on migrant

---

[6] U.S. Customs & Border Protection, *Southwest Border Migration FY 2020*, https://go.usa.gov/xdhSh (last visited Apr. 9, 2020).

[7] *See, e.g.*, U.S. Department of Homeland Security, *Assessment of the Migrant Protection Protocols (MPP)* (Oct. 28, 2019), https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf; Declaration of Ambassador Christopher Landau, No. 19-15716, Doc. 92-3, ¶ 3 (9th Cir.).

**App. 034**

trafficking."[8]   But the suspension of MPP can only significantly delay those enforcement efforts given the constant flow of migrants.

13.    Texas contains more than half of the border between the United States and Mexico, and a large share of individuals crossing into the United States to claim asylum arrive through the Texas-Mexico border.  Likewise, human traffickers and their victims frequently arrive in Texas and either settle there, travel to one of Texas's major cities, or travel along Texas's state highways to proceed further into the United States.

14.    Missouri is a destination and transit state for many human traffickers, including human traffickers of migrants from Central American countries who have crossed the border illegally.  This is mainly due to the state's substantial transportation infrastructure and major population centers.  Indeed, St. Louis and Kansas City are major human-trafficking hubs connected by Interstate 70.

15.    As a direct result of the discontinuance of the MPP, and the corresponding increase in human-trafficking incidents involving vulnerable Central American migrants, both Texas and Missouri will be forced to spend significantly more resources in combating human trafficking.  Thus, the Biden Administration's unlawful suspension of the MPP will cause both States immediate and irreparable harm if it is not enjoined.

16.    Moreover, the influx of unlawful immigrants with meritless claims of

---

[8] Mark Stevenson et al., *Biden tries to reset relationship with Mexican president*, ASSOCIATED PRESS (Mar. 1, 2021), https://apnews.com/article/biden-obrador-us-mexico-migration-issues-edb25cf298b7c9a83d15ff4f6c7ea95f.

**App. 035**

asylum will result in additional unlawful migrants entering and remaining in Texas and Missouri, thus forcing both States to expend more taxpayer resources on health care, education, social services, and similar services for such migrants. There is no monetary remedy for these increased costs and thus they constitute irreparable injury to the State of Texas, the State of Missouri, and their taxpayers.

17. Because suspension of the MPP is invalid, it must be enjoined in its entirety. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (unlawful agency regulations are vacated); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]' "). Indeed, federal law contemplates a "comprehensive and unified" immigration policy. *Arizona*, 567 U.S. at 401. As the Fifth Circuit has held, "[t]he Constitution requires an uniform Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and uniformly; and the Supreme Court has described immigration policy as a comprehensive and unified system." *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016) (per curiam). Thus, "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (per curiam); *see also Texas v. United States*, No. 6:21-CV-00003,

**App. 036**

2021 WL 247877, at *8 (S.D. Tex. Jan. 26, 2021) (enjoining government from executing 100-day moratorium on the removal of aliens everywhere in the United States).

18.     Following the Biden Administration's suspension of new enrollments into the MPP—and, therefore, discontinued implementation of the program—in the January 20 Memorandum, Texas and Missouri ("Plaintiff States") filed this lawsuit on April 13, 2021, challenging the suspension as: (1) arbitrary and capricious agency action for a lack of reasoned decisionmaking, for a failure to consider state reliance interests, for a failure to consider alternative approaches to suspension, and for not stating a basis for the suspension; (2) a violation of notice-and-consultation requirements contained in an Agreement between DHS and Texas; (3) a violation of 8 U.S.C. § 1225, including DHS's obligation to detain migrants awaiting asylum hearings in the United States; and (4) a violation of the Take Care Clause of the United States Constitution. *See* ECF 1 at 31-39.

19.     The Original Complaint requested, in relevant part, that the January 20 Memorandum suspending new enrollments into the MPP be declared unlawful and set aside and that Defendants be enjoined "nationwide from enforcing or implementing the January 20 Memorandum suspending new enrollments into the MPP[.]" ECF 1 at 39.

20.     Exactly one month after filing the Original Complaint, Plaintiff States moved for a preliminary injunction demonstrating that they were likely to succeed on the merits of their claims, that they would suffer irreparable harm absent an

9

injunction due to significant, unrecoverable financial costs that would increase following the suspension of the MPP, and that the equities and public interest overwhelmingly favored an injunction due to the ongoing humanitarian crisis at the Southern border.  *See* ECF 30 at 15-37.

21.     After Plaintiff States filed their motion for a preliminary injunction, this Court entered a Scheduling Order: (1) requiring Defendants to produce the administrative record by May 31, 2021; (2) requiring Defendants to file their response to Plaintiff States' motion for a preliminary injunction by June 4, 2021; (3) requiring the parties to file, by June 9, 2021, a joint statement regarding whether expedited discovery and consolidation of trial under Fed. R. Civ. P. 65(a)(2) were appropriate; and (4) requiring Plaintiff States to file their reply brief by Friday June 18, 2021.  *See* ECF 37 at 1-2.

22.     On May 31, 2021, Defendants filed the administrative record, which consisted only of the two-sentence January 20 Memorandum.  *See* ECF 45 at 4.

23.     Less than 24 hours later, on June 1, 2021, DHS published a memorandum purportedly terminating the MPP and rescinding the January 20 Memorandum.  *See* Exhibit C ("June 1 Memorandum").

24.     In essence, DHS simply reaffirmed in the June 1 Memorandum what it previously did in the January 20 Memorandum:   it completely discontinued implementing MPP.

25.     The June 1 Memorandum cannot and does not cure the defects in the January 20 Memorandum. DHS's new justification is woefully insufficient to justify

App. 038

DHS's agency action under the APA, as it overlooks numerous important aspects of the problem, fails to consider important State reliance interests, disregards DHS's statutory obligations, and continues to violate the Take Care Clause, among other reasons.  And this belated justification only comes after Plaintiff States filed suit against Defendants and moved for a preliminary injunction, and after Defendants filed a thin administrative record that merely consists of the January 20 Memorandum.

26.    While the June 1 Memorandum does not announce or adopt any new policy, it broadcasts (yet again) to human traffickers, smugglers, and organized crime that the Southern border is open for business.  It threatens immediately to exacerbate the ongoing irreparable injury experienced by Plaintiff States from the discontinuation of MPP.

## PARTIES

27.    Plaintiffs incorporate by reference all preceding paragraphs.

28.    Plaintiff State of Texas is a sovereign State of the United States of America.

29.    Defendants' unlawful discontinuance of MPP injures Texas. MPP reduced both the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. Discontinuing MPP has increased and will increase the number of illegal aliens attempting to come to Texas and the percentage of illegal aliens released into Texas and the rest of the United States. That harms Texas in multiple ways.

App. 039

30.    Discontinuing MPP will cause Texas to "incur significant costs in issuing driver's licenses." *Texas*, 809 F.3d at 155. Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States, rather than enrolled in MPP, will be eligible for subsidized driver's licenses.[9] By enabling more aliens to secure subsidized licenses, discontinuing MPP will impose significant financial harm on the State of Texas. *See Texas*, 809 F.3d at 155.

31.    Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. Discontinuing MPP will injure Texas by increasing the number of illegal aliens receiving such services at Texas's expense.

32.    The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

33.    The Emergency Medicaid program provides health coverage for low-income children, families, seniors and the disabled. Federal law requires Texas to

---

[9] Tex. Dep't of Public Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

App. 040

include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

34.    The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

35.    The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

36.    Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

37.    Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' failure to detain criminal aliens increases education expenditures by the State of Texas each year for children of those aliens.

38.    DHS itself has previously recognized "that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement." Exhibit B § II (Agreement between Department of Homeland Security and the State of Texas). DHS agrees that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" "result in concrete

13

**App. 041**

injuries to Texas." *Id.*

39.    Plaintiff State of Missouri is a sovereign State of the United States of America.

40.    There is a well-documented and tragic connection between human trafficking in the Midwest and unlawful immigration from the southern border. Indeed, data makes it readily apparent that trafficking on the southern border is a contributing factor to overall rates of human trafficking in the United States—and such cross-border human trafficking activity directly affects the overall prevalence of human trafficking within Missouri.[10]   The prevalence of human trafficking in Missouri directly affects Missouri financially.

41.    Because "[h]uman trafficking is a form of modern slavery that occurs in every state, including Missouri[,]"[11] the Attorney General of Missouri has created a

---

[10] *See generally* U.S. Department of State, *Trafficking in Persons Report* (20th ed., June 2020), https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf; *U.S.-Mexico Bilateral Human Trafficking Enforcement Initiative*, U.S. DEPARTMENT OF JUSTICE, https://www.justice.gov/humantrafficking/special-initiatives#bilateral (last visited Mar. 30, 2021) ("Mexico is the country of origin of the largest number of foreign-born human trafficking victims identified in the United States."); Polaris Project, *Fighting Human Trafficking Across the U.S. – Mexico Border* (2018), https://polarisproject.org/wp-content/uploads/2016/10/Consejo-NHTH-Statistics-2018.pdf ("Every day, powerful criminal networks and individual traffickers on both sides of the border recruit people for labor or sexual exploitation."); U.S. Customs and Border Protection, *CBP Releases Fiscal Year 2020 Southwest Border Migration and Enforcement Statistics* (Oct. 14, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2020-southwest-border-migration-and; United Nations Office on Drugs and Crime, *Global Report on Trafficking in Persons* (2018), https://www.unodc.org/documents/data-and-analysis/glotip/2018/GLOTiP_2018_BOOK_web_small.pdf.
[11]    *Missouri*, NATIONAL HUMAN TRAFFICKING HOTLINE, https://humantraffickinghotline.org/state/missouri (last visited Apr. 11, 2021).

14

Human Trafficking Task Force that is designed and structured to identify, respond to, investigate, and ultimately eradicate human trafficking in Missouri.[12]

42. While one case of human trafficking in Missouri is tragic enough, Missouri has seen higher numbers just in the last few years. For example, of the 233 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2019, 21 were foreign nationals.[13] Of the 179 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2018, 18 were foreign nationals.[14] And of the 146 human trafficking cases reported in Missouri to the Human Trafficking Hotline in 2017, 17 were foreign nationals.[15]

43. Missouri annually expends funds on the Human Trafficking Task Force and Human Trafficking Hotline to combat human trafficking. Those amounts will increase should DHS be allowed to discontinue implementation of the MPP.

44. When DHS fails to implement the MPP and comply with federal law, Missouri faces other significant costs. Aside from the higher costs associated with fighting human trafficking, the Administration's decision to end MPP—and therefore allow more unlawfully present aliens to enter and remain in Missouri—requires Missouri to increase taxpayer expenditures for social and educational services for such aliens, resulting in irreparable injury.

---

[12] *Human Trafficking Task Force*, OFFICE OF THE MISSOURI ATTORNEY GENERAL, https://ago.mo.gov/home/human-trafficking/task-force (last visited Mar. 29, 2021).

[13] *Missouri*, *supra*, at n.10.

[14] *Id.*

[15] *Id.*

15

45.     The Biden Administration's unlawful discontinuance of the MPP will require Missouri to increase funding for its Human Trafficking Task Force, which will have to expend substantially more resources in order to combat a substantial increase in human trafficking efforts that arise out of the mass-migration surge.

46.     While the costs of combating human trafficking will vary from state to state, Texas and Missouri will inevitably face these costs.  For example, a report from 2016 concluded that Texas spends approximately $6.6 billion in lifetime expenditures on minor and youth sex trafficking victims, and that traffickers exploit approximately $600 million annually from victims of labor trafficking in Texas (i.e., lost wages), which necessarily results in corresponding lost tax revenue to the State.[16]  Missouri faces comparable costs.  Other States likewise suffer these costs proportional to their sizes and populations of trafficking victims.

47.     Defendants are officials of the United States government and United States governmental agencies responsible for the issuance and implementation of the challenged discontinuance of the MPP.

48.     Defendant Joseph R. Biden, Jr., is the President of the United States of America.  He is sued in his official capacity.

49.     Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-

---

[16] The University of Texas at Austin, School of Social Work: Institute on Domestic Violence and Sexual Assault, *Human Trafficking by the Numbers* (2016), https://globalinitiative.net/wp-content/uploads/2018/01/Human-trafficking-by-the-numbers.pdf.

**App. 044**

related statutes, policies, and directives, including the discontinuance of MPP.  DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 551(1).  DHS oversees Defendants' Office of Strategy, Policy, and Plans, United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

50.    Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS.  He authored the June 1 Memorandum.  He is sued in his official capacity.

51.    Defendant Kelli Ann Burriesci is the Acting Under Secretary for the Office of Strategy, Policy, and Plans.  She received the June 1 Memorandum.  She is sued in her official capacity.

52.    Defendant Troy A. Miller is the Acting Commissioner of the United States Customs and Border Protection.  He received the January 20 Memorandum and the June 1 Memorandum.  He is sued in an official capacity.

53.    Defendant Tae D. Johnson is the Acting Director of the United States Immigration and Customs Enforcement.  He received the January 20 Memorandum and the June 1 Memorandum.  He is sued in his official capacity.

54.    Defendant Tracy L. Renaud is the Acting Director of the United States Citizenship and Immigration Services.  She received the June 1 Memorandum.  She is sued in her official capacity.

## JURISDICTION AND VENUE

55.     Plaintiffs incorporate by reference all preceding paragraphs.

56.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201(a).  This action arises under the Constitution (art. II, §§ 1, 3), 5 U.S.C. §§ 702-703, and other federal statutes.

57.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e).  Defendants are United States agencies or officers sued in their official capacities.  The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Northern District of Texas.

58.     Texas and Missouri bring this action to redress harms to their sovereign interests, quasi-sovereign interests, proprietary interests, and interests as *parens patriae*; and to vindicate their interests under 5 U.S.C. § 702.  Plaintiffs' ongoing fight against human trafficking—including the exploitation and trafficking of vulnerable migrants—provides them with justiciable interests that fall within the zone of interests of federal statutes on immigration-related policy.  The injury to Texas's and Missouri's fiscal interests from the increase in unlawful migrants entering and remaining in Texas and Missouri provides them with redressable injuries in this case as well.

59.     This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

18

**App. 046**

## BACKGROUND

60.     Plaintiffs incorporate by reference all preceding paragraphs.

### Legal Framework

61.     Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully. 8 U.S.C. § 1225(a)(1).[17]

62.     An immigration officer must first inspect the alien to determine whether he is entitled to be admitted.  8 U.S.C. § 1225(a)(3); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836-37 (2018).

63.     Section 1225(b)(2)(A) provides that, if an immigration officer "determines" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then the alien "shall be detained for a proceeding under section 1229a of this title" to determine whether he will be removed from the United States.  8 U.S.C. § 1225(b)(2)(A); *see also id.* § 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV); *In re M-S-*, 27 I. & N. Dec. 509, 510 (A.G. 2019).  Section 1229a, in turn, sets out the procedures for a "full" removal proceeding, which involves a hearing before an immigration judge with potential review by the Board of Immigration Appeals.  *See* 8 U.S.C. § 1229a; 8 C.F.R. § 1003.1.  In a full removal proceeding, the government may charge the alien with any applicable ground of inadmissibility, and the alien

---

[17] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security.  *See Department of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

may seek asylum or any other form of relief or protection from removal to his home country.  *See* 8 U.S.C. § 1229a(a)(2), (c)(4).

64.    As an alternative to a full removal proceeding, an immigration officer may also determine whether an applicant for admission is eligible for, and should be placed in, the expedited removal process described in Section 1225(b)(1), which is designed to remove certain aliens quickly using specialized procedures.  *See Jennings*, 138 S. Ct. at 837; *M-S-*, 27 I. & N. Dec. at 510.  An alien is generally eligible for expedited removal when an officer "determines" that he engaged in fraud, made a willful misrepresentation in an attempt to gain admission or another immigration benefit, or lacks any valid entry documents.    8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (7).

65.    An alien subject to expedited removal will be "removed from the United States without further hearing or review," unless he expresses an intention to apply for asylum or a fear of persecution or torture.  8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4).  An alien who does so is referred to an asylum officer to determine whether he has a "credible fear of persecution" or torture; if so, he "*shall* be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii)  (emphasis added);  *see*  8  U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(4); *see also Jennings*, 138 S. Ct. at 842 (observing that aliens in expedited removal are subject to mandatory detention).  By regulation, the government has provided that an alien found to have a credible fear will be placed in a Section 1229a full removal proceeding.  *See* 8 C.F.R. § 208.30(f); *M-S-*, 27 I. & N.

**App. 048**

Dec. at 512.

66.    When DHS places an applicant for admission into a full removal proceeding under Section 1229a, the alien is subject to mandatory detention during that proceeding, *see* 8 U.S.C. § 1225(b)(2)(A), except that certain aliens may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A). *See Jennings*, 138 S. Ct. at 837.

67.    But Congress has also provided in the alternative that, "[i]n the case of an alien described in [Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, [DHS] may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C). This contiguous-territory-return authority enables DHS to avoid keeping aliens arriving on land from Mexico or Canada in the United States during their full removal proceedings, and instead to temporarily return those aliens to the foreign territory from which they just arrived pending those proceedings.

## Factual Background

68.    Plaintiffs incorporate by reference all preceding paragraphs.

69.    In 2018, the United States faced a surge of hundreds of thousands of migrants, many from the Northern Triangle countries of Central America (Honduras, El Salvador, and Guatemala), attempting to cross through Mexico to enter the United States despite having no lawful basis for admission. *See, e.g.*, 83 Fed. Reg. 55,934, 55,944-55,945 (Nov. 9, 2018).  By the fall of 2018, U.S. officials encountered an

App. 049

average of approximately 2,000 inadmissible aliens per day at the border.  *Id.* at 55,935.  This surge created a humanitarian, public safety, and security crisis on the southern border.

70.    Many of these inadmissible aliens were enticed to make the dangerous journey north by smugglers and human traffickers, who promoted the belief that, if the migrants simply claimed fear of return to their home country once they reached the United States (especially when traveling with children), they could gain release into the United States, even though their asylum claims overwhelmingly lacked merit.

71.    In fiscal year 2018, approximately 97,192 aliens in expedited removal were referred for a credible-fear interview because they expressed a fear of persecution or torture in their home country or else an intention to apply for relief or protection from removal (as compared to approximately 5,000 aliens referred in fiscal year 2008), and 65% of those were from Northern Triangle countries.  83 Fed. Reg. at 55,945.

72.    Yet among Northern Triangle aliens who claimed fear and were referred for a Section 1229a proceeding, and whose cases were completed in fiscal year 2018, they filed an asylum application only about 54 percent of the time, and they were granted asylum in only about nine percent of cases.  *Id.* at 55,946.  In 38 percent of cases, those aliens did not even appear for immigration proceedings.  *Id.*  Before MPP, detention-capacity constraints or court orders forced DHS to release tens of thousands of aliens into the United States, where many disappeared.  *See id.* at

**App. 050**

55,935, 55,946.

73.     Amid this crisis, the Secretary of Homeland Security announced MPP in December 2018.[18]  The Secretary explained that DHS would exercise its statutory authority in 8 U.S.C. § 1225(b)(2)(C) to "return[] to Mexico" certain aliens "arriving in or entering the United States from Mexico" "illegally or without proper documentation," "for the duration of their immigration proceedings."[19]  MPP aimed "to bring the illegal immigration crisis under control" by, among other things,

---

[18] *See, e.g.*, U.S. Department of Homeland Security, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration; *see also* 84 Fed. Reg. 6811 (Feb. 28, 2019); U.S. Immigration and Customs Enforcement, *Implementation of the Migrant Protection Protocols* (Feb. 12, 2019), https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ICE-Policy-Memorandum-11088-1.pdf; U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* (Feb. 12, 2019), https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/ERO-MPP-Implementation-Memo.pdf; U.S. Customs and Border Protection, *MPP Guiding Principles* (Jan. 28, 2019), https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf; U.S. Customs and Border Protection, *Implementation of the Migrant Protection Protocols* (Jan. 28, 2019); U.S. Customs and Border Protection, *Guidance on Migrant Protection Protocols* (Jan. 28, 2019); U.S. Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019), https://www.uscis.gov/sites/default/files/document/memos/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf; U.S. Department of Homeland Security, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf; *Migrant Protection Protocols*, U.S. DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols (last visited Mar. 29, 2021).

[19] *Nielsen Announces Historic Action to Confront Illegal Immigration*, *supra*, at n.17.

**App. 051**

alleviating crushing burdens on the U.S. immigration detention system and reducing "one of the key incentives" for illegal immigration: the ability of aliens to "stay in our country" during immigration proceedings "even if they do not actually have a valid claim to asylum," and in many cases to "skip their court dates" and simply "disappear into the United States."[20]

74.    MPP excluded several categories of aliens: "[u]naccompanied alien children"; "[c]itizens or nationals of Mexico"; "[a]liens processed for expedited removal"; "[a]liens in special circumstances" (such as returning lawful permanent residents or aliens with known physical or mental health issues); and "[o]ther aliens at the discretion of the Port Director."[21]  Even when an alien was eligible for MPP, the policy did not mandate return: "[o]fficers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis."[22]

75.    The Secretary also directed that MPP would be implemented consistent with non-refoulement principles—*i.e.*, DHS would avoid sending an alien to a country where he will more likely than not be persecuted on account of a protected ground (race, religion, nationality, membership in a particular social group, or political opinion) or tortured.[23]  "If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return

---

[20] *Id.*
[21] *MPP Guiding Principles*, *supra*, at n.17.
[22] *Id.*
[23] *Policy Guidance for Implementation of the Migrant Protection Protocols*, *supra*, at n.17.

App. 052

to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a [U.S. Citizenship and Immigration Services] asylum officer for screening ... [to] assess whether it is more likely than not that the alien will face" persecution on account of a protected ground, or torture, in Mexico.[24]  If so, then "the alien may not be" returned to Mexico.[25]   The screening interview is "non-adversarial" and is conducted "separate and apart from the general public," and officers are required to ensure that the alien "understand[s]" both "the interview process" and "that he or she may be subject to return to Mexico."[26]

76.     If an alien is eligible for MPP and an immigration officer "determines" that MPP should be applied, the alien "will be issued a[] Notice to Appear (NTA) and placed into Section [1229a full] removal proceedings," and then "transferred to await proceedings in Mexico."[27]   The alien is directed to return to a port of entry on the appointed date for immigration proceedings.[28]

77.     The Secretary further explained that the Government of Mexico has committed to "authorize the temporary entrance" of third-country nationals who are returned pending U.S. immigration proceedings; to "ensure" that returned migrants "have all the rights and freedoms recognized in the Constitution [of Mexico], the international treaties to which Mexico is a party, and its Migration Law"; to accord

---

[24] *MPP Guiding Principles*, *supra*, at n.17.
[25] *Id.*
[26] *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, *supra*, at n.17.
[27] *MPP Guiding Principles*, *supra*, at n.17.
[28] *Id.*

the migrants "equal treatment with no discrimination whatsoever and due respect …
paid to their human rights"; to permit the migrants "to apply for a work permit for
paid employment"; and to coordinate "access without interference to information and
legal services" for them.[29]

78.    DHS began processing aliens under MPP on January 28, 2019, first at a
single port of entry and gradually expanding across the southern border.  MPP proved
to be extremely effective at reducing the strain on the United States' immigration-
detention capacity and improving the efficient resolution of asylum applications.[30]
DHS reported that it had applied MPP to more than 60,000 aliens who would
otherwise have needed to be detained in the United States or else released into the
interior, and the EOIR reported that immigration judges had issued more than
32,000 orders of removal.  The program had also become a crucial component of the
United States' diplomatic efforts in coordination with the governments of Mexico and
other countries to deter illegal immigration.[31]

79.    The MPP, however, functionally came to an end on January 20, 2021,
when the Biden Administration immediately suspended new enrollments into the
program through a two-sentence memorandum.  The Biden Administration stated
that it intends to "rebuild fair and effective asylum procedures that respect human

---

[29] *Policy Guidance for Implementation of the Migrant Protection Protocols*,
*supra*, at n.17.
[30] *Assessment of the Migrant Protection Protocols (MPP), supra*, at n.6.
[31] *Id.*

App. 054

rights,"[32] yet the sudden shift in immigration-related policy and enforcement has led to a crisis on the southern border—as acknowledged by the White House Press Secretary.[33]

80.    For example, "[t]housands more migrants from Latin America have pushed their way toward Mexico[,]" many of whom "have told journalists that they are making their way north because they expect it to be easier to enter the U.S. under the Biden administration."[34]   Earlier this year, Border Patrol reported that "the number of migrants apprehended at the border in the month of January reached nearly 78,000, up from 36,679 in January 2020.  Single adult Mexican citizens accounted for more than 37,000 CBP encounters, a 119 percent increase from this time last year, according to the agency."[35]  "The Biden administration's undoing of Trump's border policies has prompted a flood of Central American and Mexican illegal migrants at the US border, including thousands of unescorted children.

---

[32] U.S. Department of Homeland Security, *Review of and Interim Revision of Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

[33] Sarah Kolinovsky, *White House Press Secretary Slips Up, Calls Border Migrant Surge a 'Crisis'*, ABC NEWS (Mar. 18, 2021), https://abcnews.go.com/Politics/white-house-press-secretary-slips-calls-border-migrant/story?id=76540202.

[34] Jaclyn Diaz, *Biden Suspends Deportations, Stops 'Remain In Mexico' Policy*, NPR (Jan. 21, 2021), https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy.

[35] Emily Jacobs, *Biden administration opens another tent city to detain surge of illegal migrants*, NEW YORK POST (Feb. 11, 2021), https://nypost.com/2021/02/11/biden-admini-opens-tent-city-to-detain-illegal-migrants/.

**App. 055**

Central Americans looking for refuge from the Northern Triangle countries—El Salvador, Honduras and Guatemala—have taken these policy moves, as well as the overwhelmingly more welcoming tone from Democrats, as a sign that this president is inviting them to cross the border."[36] More recently, the President of Mexico blamed President Biden for the migrant surge.[37]

81.    Like Texas and Missouri, the Mexican government intends to "crack down on migrant trafficking."[38]  But discontinuing MPP can only impede those enforcement efforts given the constant flow of migrants.   During the Trump Administration, "[t]he hardening of U.S. and Mexican immigration policies ... 'complicated' the business" of "handling the income from smuggling migrants across a 375-mile stretch of the U.S.-Mexico border."[39]  Just one territory "nets an average of $1 million per month.  But that's just a tiny piece of a multi-billion-dollar business that the United Nations Office on Drugs and Crime estimates involves $4 billion annually.  The Mexican government has calculated it could be as high as $6 billion."[40]  Indeed, "[a] migrant rarely crosses the U.S. border without paying someone."[41]

82.    The Biden Administration's discontinuance of the MPP has greatly

---

[36] Emily Jacobs, *Mexican President Andrés Manuel López Obrador Blames Migrant Crisis on Biden*, NEW YORK POST (Mar. 24, 2021), https://nypost.com/2021/03/24/mexican-president-obrador-blames-migrant-crisis-on-biden/.

[37] *See id.*

[38] Stevenson et al., *supra*, at n.7.

[39] Maria Verza & Christopher Sherman, *What crackdown? Migrant smuggling business adapts, thrives*, ASSOCIATED PRESS (Dec. 19, 2019), https://apnews.com/article/202a751ac3873a802b5da8c04c69f2fd.

[40] *Id.*

[41] *Id.*

**App. 056**

exacerbated the crisis at the southern border.  Indeed, "Mexico's government is worried the new U.S. administration's asylum policies are stoking illegal immigration and creating business for organized crime[.]"[42]  Moreover, "[p]reviously unreported details in the internal assessments, based on testimonies and intelligence gathering, state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.'"[43]  "One Mexican official familiar with migration developments, who spoke on condition of anonymity, said organized crime began changing its modus operandi 'from the day Biden took office' and now exhibited 'unprecedented' levels of sophistication. 'Migrants have become a commodity,' the official said, arguing they were now as valuable as drugs for the gangs."[44]

83.    "[A]s in previous years, migrants are being told to bring along children to make it easier to apply for asylum."[45]  Tragically, drug cartels in Mexico "are using helpless children as decoys to smuggle their members into the US" and "making a killing off the border crisis, jacking up their fees to smuggle the growing flood of people into the country—and now 'making more money on humans than they are on

---

[42] Dave Graham, *Exclusive: 'Migrant president' Biden Stirs Mexican Angst Over Boom Time for Gangs*, REUTERS (Mar. 10, 2021), https://www.reuters.com/article/us-usa-immigration-mexico-exclusive/exclusive-migrant-president-biden-stirs-mexican-angst-over-boom-time-for-gangs-idUSKBN2B21D8.

[43] *Id.*

[44] *Id.*

[45] *Id.*

the drug side[.]' "[46]  "[T]he cartels also are further exploiting the disastrous situation by splitting up kids from their wannabe immigrant parents, then having members pose as the children's relatives to  cross the border[.]"[47]  As a former U.S. marshal in El Paso explained, "Mexican drug cartels are taking advantage of the recent influx of migrants, using it as an opportunity to 'make money' " because  "it's more cost effective to be involved in human smuggling that it is to be in drug trafficking."[48]  And "human smuggling often also turns into human trafficking[.]"[49]

84.     Recently sources advised that "notorious drug gangs . . . are seizing upon [the Biden Administration's] reforms to ratchet up human trafficking operations."[50]  Indeed, the "mass-migration surge along the U.S. southern border has so overwhelmed Mexican cartel-associated smugglers that they are requiring their customers to wear numbered, colored, and labeled wristbands to denote payment and

---

[46] Gabrielle Fonrouge, *Mexican drug cartels using kids as decoys in to smuggle its members into US: sheriff*, NEW YORK POST (Mar. 22, 2021), https://nypost.com/2021/03/22/mexican-drug-cartels-use-kids-as-decoys-to-smuggle-members-into-us/.

[47] *Id.*

[48] Briana Chavez, *El Paso's former U.S. Marshal says Mexican cartels 'make money' from migrant influx*, KVIA (Mar. 18, 2021), https://kvia.com/news/border/2021/03/18/el-pasos-former-u-s-marshal-says-mexican-cartels-make-money-from-migrant-influx/.

[49] *Id.*

[50] Ben Ashford, *EXCLUSIVE: 'People are the new dope.' Mexican cartels are seizing on Biden's lax border policies to run multimillion-dollar human trafficking scheme and are using families as DECOYS to smuggle single adults and drugs from elsewhere*, DAILY MAIL (Mar. 22, 2021), https://www.dailymail.co.uk/news/article-9367713/Mexican-cartels-ratchet-human-trafficking-operations-amid-Bidens-relaxed-immigration-policy.html.

help them manage their swelling human inventory."[51]  However, if migrants " 'don't pay their debt then the cartel has the information about where they're going, but more importantly, they have the information on their families in home countries. ... 'From there, they can start the threats and hold them accountable through debt bondage, a form of human trafficking.  Either pay or we're going to come after your family.' "[52]

85.    Cooperation and coordination between federal and state officials are essential to the effective enforcement of federal immigration law—including in preventing human trafficking and the surge of violent crimes associated with cartel smuggling.

86.    To promote such cooperation and coordination, Texas and DHS entered into a mutually beneficial agreement. *See* Ex. B (hereinafter, the "Agreement"). The Agreement establishes a binding and enforceable commitment between DHS and Texas. *Id.* § II.

87.    The Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking" certain administrative actions. Ex. B § II.

---

[51] Todd Bensman, *Overwhelmed Mexican Alien-Smuggling Cartels Use Wristband System to Bring Order to Business*, CENTER FOR IMMIGRATION STUDIES (Mar. 2, 2021), https://cis.org/Bensman/Overwhelmed-Mexican-AlienSmuggling-Cartels-Use-Wristband-System-Bring-Order-Business.

[52] *Id.*

App. 059

88.     For example, DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. B § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect":

- "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement";

- "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country"; or

- "increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States."

Ex. B § III.A.2.a, c, f.

89.     The termination of MPP is an administrative action and decision that reduces immigration enforcement.  It likewise increases the number of removable or inadmissible aliens in the United States.

90.     The termination of MPP does so by removing a lawful means by which the Executive may prevent aliens without a clear basis for admission into the United States from absconding into the country pending appropriate removal proceedings. As noted above, 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), entitled "Mandatory Detention," states that aliens awaiting asylum hearings "shall be detained pending a final determination of credible fear of persecution," but Defendants routinely fail to detain them. *See also id.* § 1225(b)(1)(B)(ii), (b)(2)(A).

91.     To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice of any proposed action" subject to the

32

**App. 060**

consultation requirement. Ex. B § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the consultation requirement. *Id.*

92.    The Agreement authorizes adjudication of disputes about the Agreement "in a United States District Court located in Texas." Ex. B § VIII.

93.    To the extent DHS fails to comply with its obligations, the Agreement expressly provides for injunctive relief. It would "be impossible to measure in money the damage that would be suffered if the parties fail[ed] to comply with" the Agreement. Ex. B § VI. "[I]n the event of any such failure, an aggrieved party [would] be irreparably damaged and [would] not have an adequate remedy at law." *Id.* "Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law." *Id.*

94.    The Agreement provides mechanisms by which it can be modified or terminated. *See* Ex. B §§ XIV-XV. DHS purported to terminate the Agreement "effective immediately" by letter on February 2, 2021, but it did not provide the requisite 180 days' notice required for termination under the terms of the Agreement. Texas therefore treats DHS's letter as notice of intent to terminate, which will become

**App. 061**

effective after 180 days (*i.e.*, on August 1, 2021). The Texas Agreement remains binding until then.

## CLAIMS

### COUNT I
### (Arbitrary and Capricious Agency Action—Lack of Reasoned Decision-Making)

95.     Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

96.     The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

97.     The discontinuance of the MPP constitutes final agency action reviewable under the APA. *See* 5 U.S.C. § 701. Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of Defendants' discontinuance of the MPP. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

98.     Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

34

**App. 062**

99.   DHS has previously recognized the importance of the MPP.   The discontinuance of the MPP represents a sharp departure from DHS's previous policy. In a two-sentence memorandum published on January 20, DHS suspended the carefully crafted and assessed MPP program created during the prior Administration. DHS provided no reasoning, much less sufficient reasoning, for the immediate suspension of new enrollments into the program.   The current Administration failed to consider the benefits of the MPP program (and the costs of not having it), as detailed by the prior Administration.   Failing to consider important costs of a new policy renders that policy arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706 ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.' ").

100.   Then, in the June 1 Memorandum, DHS attempted to shore up its earlier decision. DHS's belated justification in the June 1 Memorandum was made only after Plaintiff States filed suit against Defendants and moved for a preliminary injunction, and after Defendants filed a thin administrative record that merely consists of the January 20 Memorandum.

101.   The June 1 Memorandum is still arbitrary and capricious, and woefully insufficient to justify DHS's action. As the June 1 Memorandum itself reveals, DHS still failed to consider many important aspects of the problem before it.  For example, DHS routinely fails to detain illegal immigrants in the interior, notwithstanding its statutory obligation to do so under 8 U.S.C. § 1225, and this is not mentioned at all in the June 1 Memorandum.  While DHS stated in the June 1 Memorandum that the United States is a "nation of laws" where its "immigration laws … will be enforced,"

35

**App. 063**

that statement is contradicted by the fact that discontinuing MPP will result in systematic violation of the detention requirements in Section 1225.  Nowhere in the June 1 Memorandum does DHS address that aspect of the problem, or acknowledge that, before MPP, detention-capacity constraints or court orders forced DHS to release tens of thousands of aliens into the United States, where many disappeared.  Nor does the June 1 Memorandum acknowledge the role of MPP in permitting DHS to avoid violating its statutory detention obligations under Section 1225.

102.   As an additional example, although the June 1 Memorandum refers to the impact of COVID-19 on the cost of maintaining MPP facilities, it fails to consider the public health risks and impact of admitting tens of thousands of potentially COVID-19 positive migrants into the United States, another important part of the problem left unaddressed by DHS.  While the June 1 Memorandum states that DHS has considered "the potential impact to DHS operations" if CDC's Title 42 restrictions are lifted, it does not state that DHS has given any consideration to the public health risks in border states and the United States' interior from releasing new waves of potentially COVID-19 positive migrants into communities.

103.   In addition, while the June 1 Memorandum discusses the impact of the closure of immigration courts due to COVID-19—i.e., from March 2020 to April 2021—it does not state that they remain closed, so this cannot be a relevant consideration to discontinue the MPP prospectively.  Immigration courts were not the only places that experienced delays and costs because of COVID-19 shutdowns during that period, so this consideration does not (and cannot) reflect poorly on the success

36

**App. 064**

of MPP, particularly when it was successfully implemented well before the COVID-19 pandemic.

104.    Furthermore, one of the most important points in favor of MPP was that it discouraged Northern Triangle migrants from making the dangerous trek across Mexico in the first place.  The prior Administration touted MPP's success on this critical point.  But the June 1 Memorandum does not consider or discuss this point, and it certainly provides no data to dispute the prior Administration's assessment the MPP deterred and discouraged Northern Triangle migrants from making the dangerous trek in the first place (and thus making themselves vulnerable to cartels and human traffickers).

105.    Even more, while the June 1 Memorandum discusses how the MPP failed to expeditiously process applicants for asylum waiting in Mexico, it merely talks about how this "raises questions," not any policy conclusions.  And DHS fails to consider more limited alternatives, such as accelerating the process for processing migrants.  In fact, the June 1 Memorandum talks about planning to accelerate consideration of asylum applications, including the "Dedicated Docket," but DHS fails to consider that as a more limited alternative to discontinuing MPP outright. Although the June 1 Memorandum lists the alternatives DHS considered— "maintaining the status quo" and "resuming new enrollments in the program"— nothing else was considered according to that Memorandum.

106.    The June 1 Memorandum is also arbitrary and capricious for failure to consider additional important aspects of the problem, failure to engage in reasoned

**App. 065**

decision-making, and failure to provide an adequate explanation for agency action, on other grounds as well.

## COUNT II
### (Arbitrary and Capricious Agency Action—Failure to Consider State Reliance Interests)

107.   Even had DHS considered the costs and benefits to the United States from the MPP, DHS was also obligated to consider the costs of ending the MPP to the States.  It transparently failed to do so, having made its decision without seeking input from Texas and Missouri and without inquiring about the costs Texas and Missouri bear from illegal immigration.  DHS ignored the harms that discontinuing the MPP will cause, such as increased costs to states, which "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.  Certainly, the January 20 Memorandum did not analyze those costs.  This, too, was arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706.

108.   DHS particularly failed to consider whether "there was 'legitimate reliance' on the" prior administration's method of using the MPP as an indispensable tool in bilateral efforts to address the migration crisis by diminishing incentives for illegal immigration, weakening cartels and human smugglers, and enabling DHS to better focus its resources on legitimate asylum claims. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  That was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered

38

**App. 066**

serious reliance interest that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting another source)).

109.    The June 1 Memorandum's belated justification is still arbitrary and capricious.

110.    Indeed, DHS still failed to consider State reliance interests, as there is no mention of such interests in the June 1 Memorandum.  On information and belief, DHS did not seek any input from States—including Plaintiff States—before adopting the June 1 Memorandum, and gave them no opportunity for comment or input. Instead, Plaintiff States found out about the June 1 Memorandum from DHS's litigation counsel after the memorandum was issued.

111.    The June 1 Memorandum discusses the impact on "border communities," but it cites only "interagency and nongovernmental partners," "nongovernmental organizations," and "local communities," and not States like Plaintiff States.  This strongly indicates that DHS did not consider the States' reliance interests.

112.    Because the June 1 Memorandum reflects no consideration of the States' interests in enforcement of immigration policy, it is arbitrary and capricious.

## COUNT III
### (Arbitrary and Capricious Agency Action—Failure to Consider Alternative Approaches)

113.    But even had the Administration considered the States' costs as well— and it did not—it failed to consider whether it could achieve its (unstated) goals through a less-burdensome or less-sweeping means.  This too rendered its resulting

**App. 067**

decision arbitrary and capricious.

114.   The January 20 Memorandum failed to consider alternative approaches that would allow at least some additional enrollments to continue, and that would have accordingly imposed less-significant burdens on the States.  The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued " 'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 51). The January 20 Memorandum categorically suspends *all* new enrollments into the MPP.

115.   By omitting any analysis of continuing at least some enrollments into the MPP, DHS "failed to consider important aspects of the problem" before it.  *Id.* at 1910 (alterations and citation omitted).

116.   The June 1 Memorandum, likewise, fails to meaningfully consider more limited policies than complete discontinuation of MPP.

117.   In fact, the June 1 Memorandum makes clear that DHS did not give meaningful consideration to more limited policies than complete termination of MPP. Though the Memorandum recites that the Secretary "considered various alternatives," the only alternatives actually identified are "maintaining the status quo [*i.e.*, no enrollments at all] or resuming new enrollments into the program."  Ex. C at 5.  No other more limited policy is identified as considered in the June 1 Memorandum.

118.   On information and belief, Defendants did not give any meaningful

**App. 068**

consideration to more limited policies before terminating the program.  Indeed, the June 1 Memorandum states that "termination is most consistent with the Administration's broader policy objectives," *id.* at 6, indicating that no more limited policies were given serious consideration.

## COUNT IV
### (Arbitrary and Capricious Agency Action—No Stated Basis for Agency Action)

119.   Even if there were some way to explain or justify DHS's decision, it would be irrelevant because DHS did not provide any such explanation or justification in the January 20 Memorandum.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").  Because DHS failed to provide *any* grounds for its decision, it is precluded from asserting new grounds before this Court—and therefore its termination of the MPP is necessarily arbitrary.

120.   Further, by suspending new enrollees into the MPP program, DHS is precluded from complying with the congressionally-enacted statutory framework detailed above and provides a key incentive for illegal immigration: the ability of aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and in many instances never appear for court dates and simply disappear into the United States.

121.   Because DHS does not sufficiently explain its sudden departure from implementing the MPP program, the January 20 Memorandum suspending new

**App. 069**

enrollees into the MPP is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

122.   Each of these numerous flaws renders DHS's decision legally invalid. Yet that invalid suspension will cause Texas and Missouri irreparable injury that cannot be remedied adequately at law. Texas and Missouri are therefore entitled to injunctive relief to enforce DHS's obligations under the applicable law.

123.   And DHS's explanation for discontinuing the MPP in the June 1 Memorandum cannot justify the January 20 Memorandum because it constitutes impermissible post hoc rationalization that should be given no consideration. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1908-10. Thus, it fails to cure the inadequacy of explanation in the January 20 Memorandum.

### COUNT V
### (Failure to Provide Notice to, and Consult with, Texas)

124.   DHS discontinued MPP without following the notice-and-consultation requirements contained in the Agreement.

125.   The Agreement is currently in effect and remains so until August 1, 2021.

126.   Discontinuing MPP is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

127.   Discontinuing MPP exceeds the authority DHS can delegate to Acting Secretary Pekoske, Secretary Mayorkas, and anyone charged with discontinuing implementation of the MPP and is therefore *ultra vires*.

42

**App. 070**

128.    As a result of the discontinuance of the MPP, Texas "will be irreparably damaged and will not have an adequate remedy at law." Ex. A § VI.  Texas is therefore "entitled ... to injunctive relief ... to enforce [DHS's] obligations" under the Agreement. *Id*. § VI.

## COUNT VI
### (Violation of Section 1225)

129.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

130.    Federal law directs the Executive to detain virtually all aliens applying for admission into the United States.  The Executive "shall ... detain[]" any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings. 8 U.S.C. § 1225(b)(2)(A).  In lieu of detention, a second subparagraph of the same section permits the Executive, for aliens "arriving on land ... from a foreign territory contiguous to the United States," to optionally "return the alien to that territory pending" removal proceedings.  8 U.S.C. § 1225(b)(2)(C). These provisions give the Executive an exclusive choice for aliens not "clearly and beyond a doubt entitled to be admitted" who "arriv[e] on land ... from a foreign territory contiguous to the United States:" either detain the alien pending removal proceedings, or otherwise return him to the country from which he arrived pending removal proceedings.

131.    Though it could create such capacity if it chose to do so, the Executive

**App. 071**

presently lacks the capacity to detain the vast majority of the tens of thousands of aliens arriving on land from Mexico, a foreign territory contiguous to the United States, who are not clearly and beyond a doubt entitled to admission to the United States. Through MPP, the Executive was capable of addressing this dilemma by electing to return aliens not clearly and beyond a doubt entitled to admission to Mexico pending removal proceedings.

132. Discontinuing the MPP will necessarily cause the Executive to fail to meet its statutory obligations to detain or otherwise return aliens pending removal proceedings. Because the Executive cannot detain many of these aliens, tens of thousands will instead abscond into the United States and fail to show up for statutorily required removal proceedings. 83 Fed. Reg. 55,946.

133. This release provides a key incentive for illegal immigration: the ability of aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and in many instances never appear for court dates and simply disappear into the United States—notwithstanding that these aliens have no legal entitlement to enter the country, much less remain in it.

134. The June 1 Memorandum confirms that Defendants will unlawfully prioritize alternatives to detention, unlawfully fail to detain illegal aliens, and unlawfully release illegal aliens into the interior of the United States, notwithstanding section 1225's directives and the ability to avoid these statutory violations through MPP.

135. Discontinuing MPP therefore violates 8 U.S.C. § 1225.

App. 072

## COUNT VII
## (Failure to Take Care that the Laws be Faithfully Executed)

136.    The Constitution requires the President to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.

137.    This constitutional limitation is binding on agencies and officers exercising executive power.  *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

138.    Discontinuing MPP violates the Executive's Take Care Clause obligations in two ways:  first, by placing the Executive in a position where it will necessarily violate a statutory framework obligating it to detain or otherwise return aliens, and second, by predictably allowing (and encouraging) more aliens to illegally enter into the United States and violate immigration-law requirements once released into the interior.

139.    The June 1 Memorandum confirms that Defendants will unlawfully prioritize alternatives to detention, and unlawfully fail to detain illegal immigrants, and unlawfully release illegal aliens into the interior of the United States, notwithstanding section 1225's directives and the ability to avoid these statutory violations through MPP.

140.    Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

141.    This constitutional violation is also actionable independent of the APA. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers.  *See Armstrong v.*

**App. 073**

*Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Hold unlawful and set aside Defendants' discontinuance of the MPP—whether through the January 20 Memorandum, the June 1 Memorandum, or both;

b.      Declare that Defendants' discontinuance of the MPP—whether through the January 20 Memorandum, the June 1 Memorandum, or both—is unlawful;

c.      Issue preliminary and permanent injunctive relief enjoining Defendants nationwide from enforcing or implementing the discontinuance of the MPP—whether through the January 20 Memorandum, the June 1 Memorandum, or both;

d.      Issue preliminary and permanent injunctive relief requiring Defendants nationwide to continue implementing the MPP, including, without limitation, resuming enrollments into the program;

e.      Issue preliminary and permanent injunctive relief requiring Defendants nationwide to enforce or implement the MPP;

f.      Award Texas and Missouri the costs of this action and reasonable attorney's fees; and

g.      Award such other and further relief as the Court deems equitable and just.

46

**App. 074**

Dated: June 3, 2021

ERIC S. SCHMITT
Attorney General of Missouri

/s/ D. John Sauer
D. JOHN SAUER, #58720MO*
Solicitor General

JESUS A. OSETE, #69267MO*
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-8870
Fax (573) 751-0774
John.Sauer@ago.mo.gov

Counsel for Plaintiff State of Missouri

*Admitted pro hac vice

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Texas Bar No. 24076720

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Texas Bar No. 00798537

/s/ William T. Thompson
WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Attorney-in-Charge
Texas Bar No. 24088531

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

Counsel for Plaintiff State of Texas

47

**App. 075**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 3, 2021, which automatically serves all counsel of record who are registered to receive notices in this case.

/s/ *William T. Thompson*
WILLIAM T. THOMPSON

48

**App. 076**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-067-Z |
| | § | |
| JOSEPH R. BIDEN, JR. *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

The Court enters the below-listed findings of fact and conclusions of law pursuant to Rule

52(a) of the Federal Rules of Civil Procedure after a consolidated hearing and trial on the merits

on Plaintiff States Texas and Missouri's various claims against the federal Defendants.[1] For the

reasons that follow, the Court **FINDS** and **CONCLUDES** that Plaintiffs are entitled to relief on

their APA and statutory claims against Defendants. The Court will therefore enter judgment in

favor of Plaintiffs. The Court also crafts injunctive relief to ensure Plaintiffs receive a full remedy.

I.     **PROCEDURAL BACKGROUND**

Only four months old, this case already has a complicated procedural history. Thus, the

Court will quickly summarize the record before entering its findings of fact and conclusions of

law.

On April 13, 2021, Plaintiffs filed this suit challenging the temporary suspension of the

Migrant Protection Protocols ("MPP"). ECF No. 1. MPP was a program implemented by the

---

[1] Defendants are the United States of America; President Biden in his official capacity; the Department of Homeland Security ("DHS") and DHS Secretary Mayorkas in his official capacity; the United States Customs and Border Protection ("CBP") and Acting Commissioner of CBP Troy Miller in his official capacity; the United States Immigration and Customs Enforcement "ICE" and Acting ICE Director Tae Johnson; and the United States Citizenship and Immigration Services ("CIS") and Acting CIS Director Tracy Renaud in her official capacity.

**App. 077**

Department of Homeland Security that returned some aliens temporarily to Mexico during the pendency of their removal proceedings. Specifically, Plaintiffs alleged that DHS's "two-sentence, three-line memorandum" that suspended enrollments in the Migrant Protection Protocols pending review of the program was a violation of the APA, 8 U.S.C § 1225, the Constitution, and a binding agreement between Texas and the federal government. *See* ECF No. 1 at 4; ECF No. 45 (showing the original administrative record to consist solely of the Secretary's January 20 Memorandum without any supporting documentation).

On May 3, Defendants made a motion to transfer this case to the Southern District of Texas. ECF No. 11. On June 3, the Court denied this motion in a written order. *See* ECF No. 47 at 9 ("Defendants' evidence, taken as a whole, does not establish that the convenience of the parties and witnesses will be enhanced by transferring this case.").

On May 14, Plaintiffs moved for a preliminary injunction. ECF No. 30. But before briefing was concluded, DHS completed its review of MPP and issued a new memorandum (the "June 1 Memorandum") that *permanently* terminated MPP.  ECF No. 46. The Court concluded the June 1 Memorandum mooted Plaintiffs' original complaint but allowed Plaintiffs to amend their complaint and file a new motion seeking to enjoin the June 1 Memorandum. *See* ECF No. 52 at 3 ("[T]he January 20 Memorandum expired upon the completion of DHS's review of the program.").

Accordingly, Plaintiffs amended their complaint and renewed their motion for a preliminary injunction.  *See* ECF Nos. 48, 53. On June 22, Defendants filed the administrative record. ECF No. 61. Three days later, Defendants filed their response to Plaintiffs' motion. ECF No. 63. Plaintiffs filed their reply on June 30.

But in addition to opposing Plaintiffs' Motion, Defendants also moved to strike the entire appendix attached to Plaintiffs' Motion because it arguably ran afoul of the "record rule." The

**App. 078**

Court expedited briefing on this motion and denied the motion by written order for the reasons stated in ECF No. 76.

Next, the parties agreed with the Court that this case involved mainly questions of law. Accordingly, the parties favored consolidating the preliminary injunction hearing with the trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). ECF No. 68. The Court ordered the consolidation, provided notice to the parties, and allowed each party to file a supplemental brief before the hearing. *Id.*

Lastly, on July 20, two days before the hearing, Defendants filed a notice of a "corrected administrative record." ECF No. 78. By this notice, Defendants added the 2019 DHS assessment of MPP to the administrative record — even though Defendants knew for at least three weeks that the document was *not* included in the certified administrative record. ECF No. 85 at 2. Plaintiffs moved to strike this last-minute addendum to the administrative record. The Court denied that motion by written order on July 21. ECF No. 85 ("The delay between the government's acquiring knowledge of the missing document and its filing of notice with the Court comes perilously close to undermining the presumption of administrative regularity. But the Court finds the presumption is not overcome in this case.").

On July 22, the Court held a consolidated hearing and bench trial on the merits. The parties filed their proposed findings of fact and conclusions of law on July 27. ECF Nos. 91, 92. The parties also filed supplemental briefs on the scope of relief available to Plaintiffs. ECF Nos. 90, 93. Pursuant to Fed. R. Civ. P. 52(a), the Court may now enter its findings of facts and conclusions of law.

App. 079

## II.    EVIDENTIARY OBJECTIONS[2]

**1.**      At the bench trial, Defendants made several objections to Plaintiffs' exhibits which the Court deferred ruling upon. Trial Tr. 8–30. The Court now overrules Defendants' objections under Fed. R. Evid. 401 as the exhibits are relevant to Plaintiffs' claims and overrules Defendants' objections under Fed. R. Evid. 403. "Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision." *Gulf States Util. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A Jan. 1981).

**2.**      The Court overrules Defendants' privilege objections as to Exhibits A10 and C. The content Defendants seek to protect has been in the public record for months. Even if Defendants were unaware of Exhibit A10 and C at the time the exhibits were published, Defendants have been on notice since June 8, 2021, when Plaintiffs filed their Appendix in Support. ECF No. 54. The Court finds Defendants' privilege objections to be untimely and moot.

**3.**      The Court sustains Defendants' hearsay objections under Fed. R. Evid. 802 as to Plaintiffs' Exhibits A-7, A-9, A-11, A-12, A-13, and A-15 to the extent the information within the exhibits is offered for the truth of the matters asserted.

**4.**      The Court overrules Defendants' objections under Fed. R. Evid. 702 as to Plaintiffs' Exhibits D, E, F, F-1, G, G-1, H, H-1, and I. Defendants object to these exhibits, generally arguing Plaintiffs impermissibly offered expert testimony. *See* ECF No. 92 at 28.  Defendants' objections fail to identify with specificity which declarants and which parts of each exhibit were

---

[2] Citations to Plaintiffs' Appendix in Support, found at ECF No. 54, are labeled App. ###. Citations to the administrative record, found at ECF No. 61, are labeled AR ###.

**App. 080**

impermissibly offered. Further, Defendants fail to state with specificity why each declarant is unqualified.

**5.**     Even so, the Court reviewed each declaration and finds Defendants' objections unpersuasive. For example, in reviewing Plaintiffs' Exhibit D, Declaration of Mark Morgan, the Court noted Mark Morgan served as the Acting Commissioner of the United States Customs and Border Patrol from 2019-2021. App. 390. Prior to that service, Mr. Morgan served as the Acting Chief of the United States Immigration and Customs Enforcement. *Id.* Prior to that assignment, Mr. Morgan served twenty years as an FBI agent. *Id.* The Court finds Mr. Morgan more than sufficiently qualified to opine and present testimony in the form of a declaration regarding immigration laws, policies, procedures, and practices.

**6.**     Any objections not previously discussed are overruled.

### III.     FINDINGS OF FACT[3]

**1.**     Because the Court consolidated the hearing on the motion with a trial on the merits, the proper standard for factual findings is the preponderance of the evidence.

#### A. Overview of the relevant statutory framework

**2.**     Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully. 8 U.S.C. § 1225(a)(1).

---

[3] In preparing this memorandum opinion and order, the Court carefully considered the trial arguments, the record, and the admitted exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the Court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *Id.* The Court instead has limited its discussion to those legal and factual issues that form the basis for its decision. *Id.*

Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.

App. 081

3.      An immigration officer must first inspect the alien to determine whether he is entitled to be admitted. § 1225(a)(3). Section 1225(b)(2)(A) provides that, if an immigration officer "determines" that an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," then the alien "shall be detained for a proceeding under Section 1229a of this title" to determine whether he will be removed from the United States.

4.      Alternatively, if an alien lacks valid entry documentation or misrepresents his identity, he shall be "removed from the United States without further hearing or review unless" he "indicates either an intention to apply for asylum . . . or a fear of persecution." § 1225(b)(1)(A)(i). If the alien makes such a showing, then he "shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii). Such an alien then would also be placed in a Section 1229a full removal proceeding. See 8 C.F.R. § 208.30(f).

5.      Under either route, Section 1229a proceedings involve a hearing before an immigration judge with potential review by the Board of Immigration Appeals. 8 U.S.C. § 1229a; 8 C.F.R. § 1003.1. In a full removal proceeding, the government may charge the alien with any applicable ground of inadmissibility, and the alien may seek asylum or any other form of relief or protection from removal to his home country. 8 U.S.C. § 1229a(a)(2), (c)(4).

6.      Most importantly for this case, when DHS places an applicant for admission into a full removal proceeding under Section 1229a, the alien is subject to *mandatory* detention during that proceeding. § 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under Section 1229a of this title.") (emphasis added). DHS does retain the discretion to parole certain aliens "for urgent humanitarian reasons or significant public benefit." § 1182(d)(5)(A).

6

**App. 082**

**7.**      But Congress allows DHS an alternative to mandatory detention in the United States: "In the case of an alien described in [Section 1225(b)(2)(A)] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, [DHS] may return the alien to that territory pending a proceeding under Section 1229a of this title." § 1225(b)(2)(C). This contiguous-territory-return authority enables DHS to avoid having to detain aliens arriving on land from Mexico (or Canada), and instead allows DHS to temporarily return those aliens to the foreign territory from which they just arrived pending their immigration proceedings.

### B.  MPP was created to combat an influx of illegal aliens during the Trump administration

**8.**      In 2018, the southern border of the United States experienced an immigration surge and a resulting "humanitarian and border security crisis." AR 186; App. 005. Federal officials encountered an approximately 2,000 inadmissible aliens each day in 2018. App. 005. By May 2019, that number had increased to 4,800 aliens crossing the border daily. AR 682.

**9.**      The resulting influx of immigrants had "severe impacts on U.S. border security and immigration operations." App. 302. But most aliens lacked meritorious claims for asylum — "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." App. 005. With so many "fraudulent asylum claims," "[t]he dramatic increase in illegal migration" was "making it harder for the U.S. to devote appropriate resources to individuals who [were] legitimately fleeing persecution." App. 302–03.

**10.**      The influx did not just divert resources from legitimate asylum seekers, but illegal aliens with *meritless* asylum claims were being released into the United States. "[M]any of these individuals . . . disappeared into the country before a judge denie[d] their claim and simply bec[a]me fugitives." App. 303. "Between Fiscal Year 2008 and Fiscal Year 2019, 32 percent of

**App. 083**

aliens referred to [the Executive Office for Immigration Review] absconded into the United States and were ordered removed *in absentia*." App. 005.

**11.**     In response, the Trump Administration implemented a program known as the Migrant Protection Protocols. On December 20, 2018, the Secretary of Homeland Security announced the MPP program, under which DHS would begin the process of invoking the authority provided at § 1225(b)(2)(C).[4] This statutory authority allows DHS to return to Mexico certain third-country nationals — *i.e.*, aliens who are not nationals or citizens of Mexico — arriving in the United States from Mexico for the duration of their removal proceedings under 8 U.S.C. § 1229a. AR 151.

**12.**     The goal of MPP was to ensure that "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." App. 303–04.

**13.**     The same day, the United States obtained the Government of Mexico's agreement to temporarily permit "entry of certain foreign persons from within the United States who have entered that country through a port of entry or who have been apprehended between ports of entry and interviewed by the authorities of migration authorities of that country, and have received a notice to attend a hearing before a judge." AR 149.

**14.**     On January 25, 2019, DHS issued guidance for implementation of MPP. Three days later, DHS began implementing MPP, initially in San Diego, California, then El Paso, Texas, and Calexico, California, and then nationwide. AR 155, 156, 684.

**15.**     Under the issued guidance, DHS officers determined whether aliens were amenable to the MPP process. If they were, the DHS officer could issue a Notice to Appear (NTA), place the alien

---

[4] Section 235(b)(2)(C) of the Immigration and Nationality Act (INA)

**App. 084**

into a removal proceeding under Section 1229a, and then return the alien to Mexico to await removal proceedings *unless* the alien affirmatively demonstrated a fear of persecution or torture in Mexico. AR 161.

16.     Certain categories of noncitizens were not amenable to MPP: unaccompanied alien children — as defined in 6 U.S.C. § 279(g); citizens or nationals of Mexico; noncitizens processed for expedited removal under 8 U.S.C. § 1225(b)(1); noncitizens "in special circumstances"; returning lawful permanent residents seeking admission; noncitizens with an advance parole document or in parole status; noncitizens with known physical or mental health issues; noncitizens with a criminal history or a history of violence; noncitizens of interest to the Government of Mexico or the United States; any noncitizen who demonstrated that they are more likely than not to face persecution or torture in Mexico; and other noncitizens at the discretion of the Port Director or Border Patrol counterpart. AR 161.

17.     On February 12, 2019, U.S. Immigration and Customs Enforcement issued guidance on MPP to its field offices, in anticipation of expansion of MPP across the border. AR 165–70. After June 7, 2019, DHS began constructing temporary structures at the southern border in Brownsville and Laredo, Texas, to hold immigration hearings for noncitizens subject to MPP, and notified Congress of their completion in August 2019. These temporary facilities functioned as virtual courtrooms, with immigration judges appearing by video connection from their courthouses within the United States. AR 208, 684.

### C.  The Department of Homeland Security found MPP to be effective

18.     Upon review, DHS found MPP to be effective. In its October 28, 2019, Assessment of the Migrant Protection Protocols, DHS stated that "MPP has demonstrated operational effectiveness." AR 683. DHS noted that it had "returned more than 55,000 aliens to Mexico under MPP" and that

**App. 085**

"MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system." *Id.*

19.     Specifically, DHS found "[s]ince a recent peak of more than 144,000 in May 2019, total enforcement actions . . . have decreased by 64% through September 2019." *Id.* Moreover, DHS found "[b]order encounters with Central American[5] families — who were the main driver of the crisis and comprise a majority of MPP-amenable aliens — have decreased by approximately 80%." *Id.*

20.     Additionally, DHS stated "although MPP is one among many tools that DHS employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border — including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP." *Id.*

21.     In addition to finding MPP effective at deterring border encounters and decreasing the number of illegal aliens present in the United States, DHS also found that "MPP is restoring integrity to the [immigration] system." *Id.* As examples of this restoration, DHS found that "MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States." *Id.* at 684. And "MPP returnees who do not qualify for relief or protection are being quickly removed from the United States. Moreover, aliens without meritorious claims — which no longer constitute a free ticket into the United States — are beginning to voluntarily return home." *Id.*

22.     DHS did recognize that there were some flaws in the original implementation of MPP. On October 25, 2019 — just three days before releasing its assessment of MPP — DHS released the

---

[5] These countries are also sometimes referred to as the "Northern Triangle." The Northern Triangle countries are Guatemala, Honduras, and El Salvador.

App. 086

Migrant Protection Protocols Red Team Report. AR 192. This report found several issues and recommended improvements — but not termination — of MPP. Some of these improvements included standardizing documents and protocols to ensure aliens received a fair process and hearing on their claims. AR 192–201.

23.     MPP also faced legal challenges. In *Wolf v. Innovation Law Lab*, a district court enjoined the implementation of MPP. 366 F. Supp. 3d 1110 (N.D. Cal. 2019). The Ninth Circuit stayed that injunction, but a separate panel affirmed the injunction on the merits. 951 F.3d 1073 (9th Cir. 2020). The Ninth Circuit then granted a stay as far as the district court's injunction applied outside the territorial limits of the Ninth Circuit but otherwise denied the government's request for a stay. 951 F.3d 986 (9th Cir. 2020).

24.     But the Supreme Court stayed the injunction in full granting the Trump Administration a legal victory. 140 S. Ct. 1564 (Mar. 11, 2020). The Supreme Court also granted certiorari. 141 S. Ct. 617 (Oct. 19, 2020).  The case was later dismissed from the merits docket as moot. *Wolf*, 2021 WL 2520313, at *1 (June 20, 2021) (citing *United States* v. *Munsingwear, Inc.*, 340 U.S. 36 (1950)).

25.     But throughout the legal challenges, DHS found MPP was meeting its intended goals. AR 554. First, DHS found "MPP provides a streamlined pathway for aliens to defensively apply for protection or relief from removal, while upholding *non-refoulement* obligations through screenings of fear in Mexico." *Id.* Second, DHS found "MPP provides a pathway for aliens to proceed efficiently through the U.S. immigration court processes, as compared to non-detained dockets." *Id.* at 555. Third, DHS found "MPP decreases the number of aliens released into the interior of United States for the duration of their U.S. removal proceedings." *Id.* And fourth, DHS found "MPP implementation contributes to decreasing the volume of inadmissible aliens arriving

App. 087

in the United States on land from Mexico — including those apprehended between the [ports of entry]." *Id.*

**26.**     By December 31, 2020, DHS had enrolled 68,039 aliens in the MPP program. *Id.*[6] DHS concluded its review of MPP and found it to be a "cornerstone" of DHS's efforts to restore integrity to the immigration system:

> These unprecedented [immigration] backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.
>
> This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners. In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.
>
> MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months. MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system — and of the United States' agreement with Mexico to address the crisis at our shared border.
>
> AR 687.

---

[6] The COVID-19 pandemic accounted for the markedly fewer aliens enrolled in MPP in 2020. Due to the pandemic, MPP removal proceedings began to be postponed on April 22, 2020. AR 466. Additionally, beginning in March 2020, DHS assisted in the enforcement of Title 42 — a statutory provision not relevant to this suit — to expel certain amenable noncitizens from Mexico and the Northern Triangle countries back to Mexico, and certain amenable noncitizens from other countries to their countries of origin if Mexico will not accept them, with limited exceptions. AR 621–22, 631. Title 42 expulsions accounted for 102,234 and 111,175 repatriations in 2020 and the first quarter of 2021. AR 660.

App. 088

**D. During the transition period, the outgoing Trump Administration entered into an Agreement with Texas and warned the incoming Biden Administration of the dangers of ending MPP**

*1. DHS and Texas enter into an Agreement*

**27.**     Shortly before leaving office, the Trump Administration entered into a Memorandum of Understanding (the "Agreement") between Texas and DHS. App. 317–26.  The Agreement was finalized on January 8, 2021. *Id.* at 325.

**28.**     The Agreement purportedly established "a binding and enforceable commitment between DHS and Texas," in which Texas agreed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions." *Id.* at 319.  In return, DHS agreed "to consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

> (1)     reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;
>
> (2)     decrease the number of ICE agents performing immigration enforcement duties;
>
> (3)     pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;
>
> (4)     increase or decline to decrease the number of lawful, removable, or inadmissible aliens;
>
> (5)     increase or decline to decrease the number of releases from detention;
>
> (6)     relax the standards for granting relief from return or removal, such as asylum;
>
> (7)     relax the standards for granting release from detention;
>
> (8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;
>
> (9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions

App. 089

for aliens; or

(10)    otherwise negatively impact Texas.

In case of doubt, DHS will err on the side of consulting with Texas." *Id.* at 319.

29.     To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with

180 days' written notice . . . of any proposed action" subject to the consultation requirement. *Id.*

at 320. That would give Texas "an opportunity to consult and comment on the proposed action."

*Id.* After Texas submitted its views, "DHS will in good faith consider Texas's input and provide a

detailed written explanation of the reasoning behind any decision to reject Texas's input before

taking any action" covered by the Agreement. *Id.*

30.     The parties agree DHS did not follow these procedures when it issued the June 1

Memorandum. But DHS did send a letter that purported to terminate the Agreement "effective

immediately" on February 2, 2021. *Id.* at 347–48. Texas avers that the termination letter also did

not comply with the Agreement and chose to interpret a letter as a notice of intent to terminate.

ECF No. 53 at 21. Accordingly, even under Texas's view, the Agreement is only "binding until

August 1, 2021." *Id.*

            *2. The Biden Administration was warned of the consequences of terminating MPP*

31.     During the latter half of 2020, the Biden transition team met with career staff from DHS.

According to Mark Morgan — who is former Acting Commissioner of CBP, former Acting

Director of ICE, and Marine — CBP "career employees . . . fully briefed the Biden transition

officials on the importance of MPP and the consequences that would follow a suspension of MPP."

App. 399. Morgan stated: "transition personnel were specifically warned that the suspension of the

MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally

enter our [southwest border]." *Id.* And officials were also "warned smuggling organizations would

14

exploit the rescission and convince migrants the U.S. borders are open. They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as HHS facilities." *Id.*

### E.  The Biden Administration first suspended, then terminated MPP.

**32.**    The incoming Biden Administration (1) knew MPP had been found effective by DHS as a matter of policy, (2) knew MPP had been successfully defended in court, and (3) had received warnings about the consequences that would attend the repealing of MPP. But the Biden Administration suspended new enrollments in MPP on its first day in office. On January 20, 2021, the Acting Secretary of DHS wrote that "[e]ffective January 21, 2021, the Department will suspend new enrollments in the Migrant Protection Protocols (MPP), pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." AR 581.

**33.**    Since that day, DHS has not offered a single justification for suspending new enrollments in the program during the period of review. Indeed, when the original administrative record was filed prior to the June 1 Memorandum's issuance, it contained only a single document — the January 20 Memorandum. *See* ECF No. 45. There was no cost-benefit analysis or any sort of reasoned decisionmaking for a court to review.

**34.**    But the flaws of the January 20 Memorandum were mooted when DHS completed its review and issued the June 1 Memorandum that terminated the MPP program. AR 1–7; ECF No. 52 at 3 ("[T]he January 20 Memorandum expired upon the completion of DHS's review of the program.").

35.     In the June 1 Memorandum, DHS Secretary Mayorkas found that his "review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges." AR 3.

36.     In particular, Secretary Mayorkas made several conclusions. First, the Secretary "determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls." *Id.*

37.     Second, the Secretary was concerned that MPP did not ensure that aliens waiting in Mexico were able to attend their immigration proceedings. "The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings." *Id.* at 4. The Secretary noted that "[i]n particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program." *Id.*

38.     Third, the Secretary found that MPP was "intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets." *Id.* The Secretary also added that "[a] number of the challenges faced by MPP have been compounded by the COVID-19 pandemic." *Id.* The Secretary concluded by stating "as a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents." *Id.*

39.     The June 1 Memorandum contained no discussion or analysis of DHS's previous assessment that MPP removed "perverse incentives" and decreased the number of aliens attempting to illegally cross the border.

40.     The June 1 Memorandum contained no discussion or analysis regarding DHS's ability to fulfill its statutory obligation to detain certain classes of aliens in the absence of MPP.

App. 092

**F.  The termination of MPP has and will continue to increase the number of aliens being released into the United States and has and will continue to impose harms on Plaintiff States Texas and Missouri**

*1.  The termination of MPP increases the number of aliens present in the United States*

41.      First, Defendants' termination of MPP necessarily increases the number of aliens present in the United States regardless of whether it increases the absolute number of would-be immigrants. MPP authorized the return of certain aliens to Mexico. Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute. App. 307 ("[R]esource constraints during the [May 2019] crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable."); App. 330 n.7 ("Continued detention of a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation.").

42.      Second, the termination of MPP has contributed to the current border surge. DHS previously acknowledged that "MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico." AR 555. MPP removed the "perverse incentives" which enticed aliens with "a free ticket into the United States." AR 684, 687; Trial Tr. 147:23–25 (Defense counsel: "I think it's fair to say that [MPP] probably deterred some individuals from coming to the United States.").

43.      Since MPP's termination, the number of enforcement encounters on the southwest border has skyrocketed. Defendants' data shows encounters jumping from 75,000 in January 2021, when MPP was suspended, to about 173,000 in April 2021, when this case was filed. AR 670. Since then, encounters have continued to increase: CBP data shows nearly 189,000 encounters occurred in June 2021. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP

**App. 093**

(Aug. 3, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters; FRE 201.[7]

**44.**     Even if the termination of MPP played *no* role in the increasing number of migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity.

**45.**     Texas is a border state. But Missouri also faces an increased number of aliens due to the termination of MPP. Statistically, for every 1,000 aliens who remain unlawfully in the United States, fifty-six end up residing in Missouri. App. 006.

>   2.   *Texas and Missouri have suffered injuries because of the increased numbers of aliens present in their states*
>
>   a.   Driver's Licenses

**46.**     As a result of the termination of MPP, some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will obtain Texas driver's licenses.

---

[7] Moreover, the Court takes judicial notice of the sworn statement of David Shahoulian, Assistant Secretary for Border and Immigration Policy at DHS — filed in the District Court of the District of Columbia in Title 42 related litigation. ECF No. 113-1 at 7–9, No. 1:21-CV-100-EGS (D.D.C. Aug. 2, 2021) (emphasis added). The Court finds David Shahoulian is a "source[] whose accuracy cannot reasonably be questioned." FRE 201.

>   In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border . . . These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations. As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type.
>
>   Based on preliminary data, the number of border encounters continued to increase in July 2021. Over the first 29 days of July, CBP encountered an average of **6,779** individuals per day, including 616 unaccompanied children and 2,583 individuals in family units. Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000. July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.
>   . . .
>   Based on current trends, the Department expects that total encounters this fiscal year are likely to be **the highest ever recorded**.

**App. 094**

AR555; AR587–588. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. App. 426. Each additional customer seeking a Texas driver's license imposes a cost on Texas. App. 427.

47.     Because "driving is a practical necessity in most of" Texas, "there is little doubt that many" aliens present in Texas because of MPP's termination would apply for driver's licenses. *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015). The Chief of the Texas Department of Public Safety's Driver License Division gave estimates of the costs of providing additional driver's licenses. App. 428.

48.     Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license. App. 006.

       b.   Education

49.     Some school-age child aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States. AR423; AR431; AR496; AR547; AR617. Texas estimates that the average funding entitlement for 2021 will be $9,216 per student in attendance for an entire school year. App. 440. For students qualifying for bilingual education services, it would cost Texas $11,432 for education per child for attendance for an entire school year. *Id.* The total costs to Texas (and Missouri) of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases. App. 442.

       c.   Healthcare

50.     Some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will use state-funded healthcare services or benefits in Texas and Missouri. AR555; AR587–588; App. 006. Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family

**App. 095**

Violence Program, and the Texas Children's Health Insurance Program. App. 450. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. App. 452. The total costs to the State will increase as the number of aliens within the state increases. *Id.*

51.     Missouri is similarly situated. App. 006.

        d.   Law enforcement and correctional costs

52.     Some aliens who would have otherwise been enrolled in MPP are being released or paroled into the United States and will commit crimes in Texas and Missouri. AR555; AR587–588; App. 006; App. 362–63; App. 372; App. 388. In one year alone, the Texas Department of Criminal Justice housed 8,951 illegal alien criminals for a total of 2,439,110 days at a cost of over $150 million, with less than $15 million reimbursed by the federal government. App. 460. "[T]o the extent the number of aliens in [Texas Department of Criminal Justice] custody increases, TDCJ's unreimbursed expenses will increase as well." App. 460.

53.     Some aliens who would have otherwise been enrolled in MPP are victimized by human traffickers in Texas. App. 406; App. 418. Aliens "are particularly susceptible to being trafficked." App. 419. Increasing the number of aliens "present in the United States, including those claiming asylum, is likely to increase human trafficking." App. 423; App. 409. Missouri is likewise a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally. App. 409–410.

54.     Human trafficking causes fiscal harm to Texas and Missouri. App. 418–19.

e.  *Parens patriae*

**55.**     Aliens who would have otherwise been enrolled in MPP are being paroled into the United

States. App. 307; App.330 n.7; AR 183–84. Aliens paroled into the United States are eligible for

work authorization thereby increasing the supply of workers by some amount. App. 337; App.

555. Some aliens who would have otherwise been enrolled in MPP will work for employers in

Texas or Missouri. AR 555; AR 587–88; App. 362–63; App. 372; App. 388.

**IV.     CONCLUSIONS OF LAW**

The Court's opinion proceeds in the following order: (1) the Court finds that it has

jurisdiction and Plaintiffs have established standing; (2) the Court concludes there are no other

jurisdictional or procedural hurdles to judicial review of Plaintiffs' claims; (3) the Court proceeds

to the merits of Plaintiffs' APA and statutory claims; (4) and then the Court declines to address

the merits of Plaintiffs' constitutional and Agreement-based claims.

**A. Plaintiffs have standing**

**1.**     Federal courts are courts of limited jurisdiction which possess only that power authorized

by Constitution and statute. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir.

2019). "The requirement that jurisdiction be established as a threshold matter spring[s] from the

nature and limits of the judicial power of the United States and is inflexible and without exception."

*Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).

**2.**     "[T]he states have the burden of establishing standing," *Texas*, 809 F.3d at 150, by showing

"(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct

complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

**App. 097**

**3.**     "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defender of Wildlife*, 504 U.S. 555, 561 (1992). "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Relators v. Village of Brentwood,* 441 U.S. 91, 115 n. 31 (1979)).

**4.**     Here, the Court consolidated the preliminary injunction hearing with trial on the merits, so the preponderance of evidence standard applies. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020).

> *1.  Texas and Missouri have suffered harms that are concrete, non-speculative, and are traceable to Defendants' conduct — and are redressable.*

**5.**     First, Texas and Missouri have both shown that they have suffered and will continue to suffer "concrete and particularized" injuries attributable to Defendants' actions. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

**6.**     Plaintiffs have established that the termination of MPP will increase the cost of providing driver's licenses to aliens released and paroled into the United States, inflicting on the States an actual and imminent injury. *See Texas*, 809 F.3d at 155 ("[L]icenses issued to beneficiaries would necessarily be at a financial loss.").

**7.**     Second, Plaintiffs' injuries are fairly traceable to the actions of Defendants. As stated above, the termination of MPP necessarily increases the number of aliens released and paroled into the United States and the Plaintiff States specifically.

**8.**     Paroled and released aliens seeking to obtain driver's licenses is the "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S.

**App. 098**

Ct. 2551, 2566 (2019); *Texas,* 809 F.3d at 156 ("[T]here is little doubt that many [aliens] would [apply for driver's licenses] because driving is a practical necessity in most of the state.").

**9.**     Third, the Court has the power to redress Plaintiffs' injuries. The APA allows the Court to "set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Additionally, injunctive relief authorizing DHS officers to return aliens to Mexico via the MPP program pending the resolution of their asylum claims would decrease the number of aliens paroled and released into the United States and into Plaintiff States specifically. Consequently, the amount of fiscal injury suffered by Plaintiffs would decrease.

**10.**    Accordingly, the Court finds Plaintiffs have more likely than not established Article III standing under the driver's license theory of injury approved by applicable Fifth Circuit precedent.[8]

**11.**    The same line of reasoning applies to the increased healthcare costs, education costs, and enforcement and correctional costs that Plaintiffs will suffer because of the termination of MPP.

> *2. Plaintiffs have not established parens patriae standing*

**12.**    Texas and Missouri have not established by a preponderance of the evidence that they are entitled to *parens patriae* standing.

**13.**    *Parens patriae* is a type of standing that allows a state to sue a defendant to protect the interests of its citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982).

---

[8] Even if Missouri has failed to establish standing, it does not prevent the Court from proceedings to the merits because Texas has standing.  *See, e.g.*, *Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *18 (S.D. Tex. July 16, 2021) (Hanen, J.) ("Texas has standing. Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff."); *Massachusetts*, 549 U.S. at 518.

App. 099

**14.** Preliminarily, in *Alfred L. Snapp*, the Supreme Court stated "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Id.* at 610 n. 16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)). This so-called *Mellon* bar does not sweep as widely as it may seem. In *Massachusetts v. EPA*, the Supreme Court crafted a distinction: "There is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n. 17 (citing *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 447 (1945)).

**15.** Here, Texas is asserting rights *under* the INA rather than attempting to protect its citizens from the *operation* of the INA. Accordingly, the *Mellon* bar does not apply. *See, e.g.*, *Texas v. United States*, 328 F. Supp. 3d 662, 694–98 (S.D. Tex. 2018).

**16.** "To have [*parens patriae*], standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp*, 262 U.S. at 601. The Supreme Court then articulated two general categories of "quasi-sovereign" interests: a state has an interest "in the health and well-being — both physical and economic — of its residents in general" and a state has an "interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

**17.** Plaintiffs aver that they have standing under the first category because they allege the termination of MPP forces their citizens to compete in distorted labor markets in which it is more difficult to obtain a job. ECF No. 53 at 27–28. The Court finds this is a valid "quasi-sovereign" interest. *Texas*, 328 F. Supp. 3d at 698.

**App. 100**

**18.**     Plaintiffs fail, however, to prove by a preponderance of the evidence that the termination of MPP caused or will cause a distorted labor market. Plaintiffs' entire argument rests on the proposition that "the basic economic law of supply and demand applies to the labor market, so an increase in the supply of illegal aliens authorized to work will harm the employment prospects of Texans and Missourians competing with them." ECF No. 53 at 28. There are no citations to studies, articles, analyses, or anything else that would allow the Court to conclude that the termination of MPP has distorted Texas's or Missouri's labor markets. *See, e.g.*, *Texas v. United States*, No. 1:18-CV-068, 2021 WL 3025857, at *15 (S.D. Tex. July 16, 2021) (discussing the addition of 114,000 work-eligible individuals who "Texas employers are financially incentivized under the [Affordable Care Act] to hire.").

**19.**     Plaintiffs' simple invocation of the law of supply and demand is not enough for the Court to conclude that Plaintiffs carried their burden at the *merits* stage.

> *3.  Plaintiffs are entitled to special solicitude*

**20.**     Texas and Missouri are entitled to special solicitude because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 at 518.

**21.**     The Fifth Circuit has identified two additional factors that must be present in a case for States to be entitled to special solicitude: the presence of a procedural right to challenge agency action and the invasion of a "quasi-sovereign" interest. *Texas*, 809 F.3d at 152–53.

**22.**     First, the Fifth Circuit has already held that the APA provides Texas the procedural right needed for special solicitude. *Id.* at 152 ("The Clean Air Act's review provision is more specific than the APA's, but the latter is easily adequate to justify 'special solicitude' here.").

**23.**     Second, the termination of MPP "affects the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to

App. 101

some aliens and subsidizing those licenses." *Id.* at 153. As the Supreme Court noted: "When a State enters the Union, it surrenders certain sovereign prerogatives." *Massachusetts v. EPA*, 549 at 519. Like Massachusetts, Texas and Missouri surrendered their power over immigration when they joined the Union. *See Arizona v. United States*, 567 U.S. 387, 394–400 (2012). Plaintiffs States, like Massachusetts, "now rely on the federal government to protect their interests." *Texas*, 809 F.3d at 154.

24.     Accordingly, "[t]hese parallels confirm that [the termination of MPP] affects the states 'quasi-sovereign' interests." *Id.*

25.     As a result, although unnecessary to the Court's finding of standing, the Court finds Texas and Missouri are entitled to special solicitude in its standing analysis.

### B.  There are no jurisdiction or procedural hurdles to judicial review

#### 1.  *The termination of MPP is final agency action*

26.     The APA states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. In the Fifth Circuit, "whether an agency action is final is a jurisdictional issue, not a merits question." *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004). "The Supreme Court has long taken a pragmatic approach to finality." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (internal marks omitted).

27.     Agency action is "final" only if it both (1) "consummate[es] the agency's decisionmaking process" and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

28.     The June 1 Memorandum meets both *Bennett* standards and is thus an action amenable to judicial review.

**29.**     First, the parties do not contest that the June 1 Memorandum marks the consummation of

the decisionmaking process. AR 002 (The June 1 Memorandum was published after the Secretary

"completed the further review undertaken pursuant to Executive Order 14010.").

**30.**     Second, the June 1 Memorandum produces legal consequences and determines rights and

obligations. *EEOC*, 933 F.3d at 445 ("[W]hether the agency action binds the *agency* indicates

whether legal consequences flow from that action.").

**31.**     The June 1 Memorandum had the immediate legal consequence of "terminating the MPP

program." AR 002.

**32.**     The June 1 Memorandum had the immediate legal consequence of rescinding "the

Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled 'Policy Guidance for

Implementation of the Migrant Protection Protocols,' and the Memorandum issued by Acting

Secretary Pekoske dated January 20, 2021 entitled 'Suspension of Enrollment in the Migrant

Protection Protocols Program.'" AR 007.

**33.**     The June 1 Memorandum directed "DHS personnel, *effective immediately*, to take all

appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing

guidance and other directives issued to carry out MPP." *Id.* (emphasis added).

**34.**     Moreover, the June 1 Memorandum determined rights and obligations. The June 1

Memorandum prevents DHS line officers from using MPP, a tool that was previously available to

them. "Where agency action withdraws an entity's previously-held discretion, that action alters

the legal regime, binds the entity, and thus qualifies as final agency action." *EEOC*, 933 F.3d at

442 (quoting *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016)).

**35.**     Accordingly, the June 1 Memorandum constitutes final agency action.

App. 103

### 2. *No statute precludes judicial review*

**36.** Judicial review is presumptively available under the APA "except to the extent that statutes preclude judicial review." 5 U.S.C 701(a)(1); *Texas*, 809 F.3d at 163 ("[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.'") (quoting *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 63–64 (1993)).

**37.** "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* at 164 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

**38.** First, 8 U.S.C. § 1252(g) does not preclude judicial review.

**39.** Section 1252(g) states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

**40.** Texas and Missouri are not bringing this case on "behalf of any alien." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("We have previously rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'") (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999)). This is further confirmed by the fact that the remedy ordered by the Court in this case does not affect the status of any alien or immigration proceeding.

**41.** Second, 8 U.S.C. § 1252(b)(9) does not preclude judicial review.

**App. 104**

**42.** Section 1252(b)(9) states: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from *any action taken or proceeding* brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this Section." (emphasis added). This Section functions as a limit on where aliens can seek judicial review of their immigration proceedings.

**43.** But the Supreme Court has recently stated: "As we have said before, § 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Regents*, 140 S. Ct. at 1907 (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 841, 875–76 (2018) (plurality opinion) (internal marks omitted)). "And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Id.*

**44.** Third, 8 U.S.C. § 1252(f)(1) does not preclude judicial review.

**45.** Section 1252(f)(1) states: "No court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."

**46.** But this section does not apply because Plaintiffs are not seeking to *restrain* Defendants from enforcing Section 1225. Plaintiffs are attempting to make Defendants *comply* with Section 1225.

**47.** Fourth, 8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude judicial review.

**48.** Section 1252(a)(2)(B)(ii) states: "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the

29

**App. 105**

Secretary of Homeland Security, other than the granting of relief under Section 1158(a) of this title."

49.     But Plaintiffs are not challenging the substantive exercise of the Attorney General's discretion. Instead, they are challenging whether the government complied with its legal obligations under the APA in terminating MPP. *See e.g.*, *Nora v. Wolf*, No. 20-0993, 2020 WL 3469670, at *7 (D.D.C. June 25, 2020) ("But Claim One does not take on the individual decisions made to return each plaintiff to Mexico; it is directed at an agency decision – the decision to "expand" MPP implementation to Tamaulipas."); *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 191 (3d Cir. 2020) (same); *Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *4 (D.D.C. Nov. 21, 2019) (same).

50.     This reading of the statute is further confirmed by Section 1252(a)(2)(B)(ii)'s title: "**Denials of discretionary relief**." This title indicates the objective of the statute is to prevent aliens from challenging the federal government's refusal to grant discretionary relief. *Texas*, 809 F.3d at 164.

51.     Lastly, the overall structure of the INA does not evidence a clear intent by Congress to preclude judicial review. *Texas*, 809 F.3d at 163. Congress's choice to expressly preclude certain types of claims does not show by "clear and convincing evidence" that Congress also meant to implicitly preclude all *other* types of claims. *Id.*; *see Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (An "express exception . . . implies that there are no other[s]"); ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law* 107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*).").

52.     Accordingly, no statute or statutory scheme precludes judicial review of Plaintiffs' APA claim.

**App. 106**

3. *The termination of MPP is not an agency action committed to agency discretion by law*

**53.**     The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); 5 U.S.C. § 701(a)(2).

**54.**     Section 1225(b)(2)(c) states: "In the case of an alien described in subparagraph (A) who is arriving on land . . . from a foreign territory contiguous to the United States, [DHS] *may* return the alien to that territory pending a proceeding under Section 1229a of this title." (emphasis added). But the mere presence of the word "may" does not place the agency's actions outside of the ambit of judicial review. *Regents*, 140 S. Ct. at 1905 ("The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.").

**55.**     Rather, "[t]o honor the presumption of review, [courts] read the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Id.* (internal citations omitted).

**56.**     First, this limited category of unreviewable actions includes an agency's decision not to institute enforcement proceedings. *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)). But the decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization. App. 337; *Texas*, 809 F.3d at 167 ("Likewise, to be reviewable agency action, DAPA *need not directly confer* public benefits.") (emphasis added).

**App. 107**

**57.**     Moreover, the MPP program is not about enforcement proceedings *at all*. Any alien eligible for MPP has already been placed into enforcement proceedings under Section 1229a. The only question MPP answers is *where* the alien will *be* while the federal government pursues removal — in the United States or in Mexico.

**58.**     Second, under Fifth Circuit precedent, agency decisions are "completely unreviewable under the committed to 'agency discretion by law' exception" if "the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Texas*, 809 F.3d at 168.

**59.**     The INA provides guidance as to how DHS should exercise its discretion "according to the general requirements of reasoned agency decisionmaking." *New York*, 139 S. Ct. at 2569. Section 1225 imposes mandatory-detention obligations on Defendants. § 1225(b)(2)(A) ("[T]he alien shall be detained"); AR 682 ("The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings."). To avoid violating Section 1225's obligations, DHS must use its authority to return aliens to Mexico when an influx of aliens exceeds DHS's detention capacity. These statutory obligations provide courts guidance on how DHS's contiguous-territory-return authority should be exercised.

**60.**     DHS does not *have* to use this authority; it could always detain every alien required by Section 1225. But if it is incapable of detaining such a large number, then the statute implicitly demands, or, at the very least, directs DHS use its authority to return certain aliens to Mexico.

**61.**     Accordingly, the decision to terminate MPP is "not one of those areas traditionally committed to agency discretion." *New York*, 139 S. Ct. at 2568.

**App. 108**

### 4.   *Plaintiffs are within the zone of interests of the INA*

**62.**      "Because the states are suing under the APA, they 'must satisfy not only Article III's standing requirements, but an additional test: The interest they assert must be arguably within the zone of interests to be protected or regulated by the statute that they say was violated.'" *Texas*, 809 F.3d at 162 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* 132 S. Ct. 2199, 2210 (2012) (internal marks omitted)).

**63.**      "That 'test . . . is not meant to be especially demanding' and is applied 'in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Id.* "The Supreme Court 'has always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" *Id.* "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.*

**64.**      First, the Court concludes that the proper scope of the zone-of-interest inquiry is the entirety of the INA. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987) ("In considering whether the "zone of interest" test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act."). The Court is "not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes." *Id.* And, historically, the Fifth Circuit's "treatment of APA claims in the immigration context [] considers the INA as a whole." *Texas v. United States*, No. 6:21-CV-003, 2021 WL 2096669, at *22 (S.D. Tex. Feb. 23, 2021); *Texas*, 809 F.3d at 193 n. 80.

33

**App. 109**

65.     Here, Plaintiffs are seeking to require the Secretary to engage in reasoned decisionmaking under the APA before the Secretary terminates MPP requiring the state to choose between "spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.*

66.     The INA and Section 1225 in particular protect the states' interest by mandating the detention or return to Mexico of aliens who would otherwise impose costs on the states.

67.     Accordingly, "[t]he interests the states seek to protect fall within the zone of interests of the INA." *Texas*, 809 F.3d at 193.

### C. The termination of MPP violated the APA

68.     The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). This means "[f]ederal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal marks omitted). To do so, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.* at 43.

69.     Review under the APA's arbitrary and capricious standard is "highly deferential." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). District courts must "accord the agency's decision a presumption of regularity" and "are prohibited from

**App. 110**

substituting [the court's] judgment for that of the agency." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985).

**70.**     "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Garner*, 767 F.2d at 116 (quoting *State Farm*, 463 U.S. at 50). This "record rule" normally dictates that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

**71.**     But courts allow extra-record evidence when it is necessary to determine whether the agency "considered all the relevant factors." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).[9]

**72.**     If a court finds that an administrative agency failed to engage in reasoned decisionmaking, the reviewing court "shall hold unlawful and set aside" such "agency action, findings, and conclusions" as arbitrary and capricious.  5 U.S.C. § 706(2)(A).

### 1. DHS ignored critical factors

**73.**     "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal marks omitted). Although the June 1 Memorandum claims that Defendants "reviewed all relevant evidence and weighed the costs and benefits of" their decision, AR 006, an agency merely "[s]tating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010).  Rather, the Court "must

---

[9] See ECF No. 76 at 11–12. There, the Court discussed the applicable exceptions to the "record rule" and found that Plaintiffs may submit extra-record evidence on its APA claims.

**App. 111**

make a "searching and careful" inquiry to determine if [DHS] actually *did* consider [the relevant factors]. *Getty*, 805 F.3d at 155 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)) (emphasis in original).

**74.**    Defendants failed to consider several critical factors.

**75.**    First, the Secretary failed to consider several of the main benefits of MPP. As the Court stated above in the findings of fact, DHS had previously found that "aliens without meritorious claims — which no longer constitute[d] a free ticket into the United States — [were] beginning to voluntarily return home." AR 684. DHS also found that MPP addressed the "perverse incentives" created by allowing "those with non-meritorious claims . . . [to] remain in the country for lengthy periods of time." AR 687.

**76.**    The June 1 Memorandum never once mentions these benefits. At the very least, the Secretary was required to show a reasoned decision for discounting the benefits of MPP. Instead, the June 1 Memorandum does not address the problems created by false claims of asylum or how MPP addressed those problems. Likewise, it does not address the fact that DHS previously found that "approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges," App. 303, and that MPP discouraged such aliens from traveling and attempting to cross the border in the first place.  AR 687.

**77.**    To be sure, DHS could have determined, "in the particular context before it, that other interests and policy concerns outweigh[ed] any [benefits MPP had]. Making that difficult decision was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914.

**78.**    By ignoring its own previous assessment on the importance of deterring meritless asylum applications without "a reasoned analysis for the change," Defendants acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 42.

App. 112

**79.**     Second, the Secretary also failed to consider the warnings by career DHS personnel that "the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally" cross the border. App. 399.[10] This is all the more important because the Secretary had the opportunity to see if the warnings were predictive because the Secretary suspended enrollments in MPP on January 20, 2021. From that date until June 1, 2021 when MPP was permanently terminated, the Secretary had the opportunity to observe the ever-increasing number of border encounters. U.S. Customs and Border Protection, *Southwest Land Border Encounters*, CBP (Aug. 3, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. But the Secretary never discussed the rise in border encounters in the June 1 Memorandum or discussed why the warnings by career DHS personnel were misguided or incorrect even as the data appeared to show that the career officials were, in fact, prescient.

**80.**     Third, the Secretary failed to consider the costs to Plaintiffs and Plaintiffs' reliance interests in the proper enforcement of federal immigration law. The Court has already found that the states face fiscal harm from the termination of MPP. But the fact that Plaintiffs suffer fiscal injuries does not indicate the June 1 Memorandum is arbitrary and capricious. Rather, it is the fact that the agency did *not* consider the costs to the States *at all*.

**81.**     Fiscal burdens on states are "one factor to consider" — even if the agency could conclude that "other interests and policy concerns outweigh" those costs. *Regents*, 140 S. Ct. at 1914 (listing possible valid reliance interests, including damage to a state's coffers; "State and local governments could lose $1.25 billion."). But once again, even though "[m]aking that difficult decision was the agency's job, [] the agency failed to do it." *Id.*

---

[10] The briefing materials from the career officials were not part of the administrative record.

**82.**     Moreover, the Secretary failed to address whether the States had any "reliance interests" in the ongoing implementation of MPP. "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* at 1913 (*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). "It would be arbitrary and capricious to ignore such matters." *Id.* (quoting *Encino Motorcars*, 136 S. Ct. at 1800).

**83.**     Fourth, the Secretary also failed to meaningfully consider more limited policies than the total termination of MPP. "When an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51) (internal marks omitted). The entirety of the Secretary's reasoning in not modifying MPP is contained in a single sentence: "I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources." AR 005. The Secretary does not identify a single example of what a modified MPP would look like or what kind of investment would be needed to modify or scale back MPP. Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp.*, 601 F.3d at 562.

### 2. *DHS's given reasons were arbitrary*

**84.**     On the other hand, one of the key reasons the Secretary gave for terminating for MPP is arbitrary. In discounting the expeditious pace at which MPP completed removal proceedings, the Secretary stated:

**App. 114**

> It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) *raises questions for me* about the design and operation of the program.

AR 004 (emphasis added).

85.    Certainly, the June 1 Memorandum was concerned about the rate of *in absentia* removals, which were around 44 percent under MPP. And that concern was a key factor in the Secretary's decision to terminate MPP.

86.    But the June 1 Memorandum never provides any reason why DHS determined that *in absentia* removals resulted from aliens abandoning *meritorious* asylum claims when DHS previously concluded that *in absentia* removals were a result of aliens abandoning *meritless* claims. AR 684 ("Moreover, aliens without meritorious claims . . . are beginning to voluntarily return home.")*.* Instead, the June 1 Memorandum states only that this data "raises questions." AR 004. But it is the Secretary's job to answer such questions. *Regents*, 140 S. Ct. at 1914.

87.    It is true that "the APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021).  But it is also true that the agency must *actually reach* some sort of conclusion. *State Farm*, 463 U.S. at 52 (("Rescission of [agency action] would not be arbitrary and capricious simply because there was no evidence in direct support of the agency's *conclusion* . . . the agency must then exercise its judgment in moving from the facts and probabilities on the record *to a policy conclusion*.") (emphasis added).

88.    Merely noting the presence of "questions" provides no "justification for rescinding [MPP] before engaging in a search for further evidence" that could answer those questions. *Id.*; *see also*

App. 115

*Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 44 (D.C. Cir. 2020) (finding agency action arbitrary when the agency "took no position whatsoever on the actual effects that a [policy change] would have").

**89.** Besides assuming without evidence that the 44% *in absentia* rate was attributable to MPP, the Secretary never explained why 44% is itself an unacceptably high number. The June 1 Memorandum does not consider any relevant comparator for determining whether the rate of in absentia removal orders under MPP was unusually high. *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data.").

**90.** The federal government's data shows similarly high rates of *in absentia* removals *prior to* implementation of MPP. Executive Office for Immigration Review, Adjudication Statistics: *Comparison of* In Absentia *Rates*, https://www.justice,gov/eoir/page/file/1153866/download. For example, the *in absentia* rate was 42% in 2015 and 43% in 2017. *Id.* Failing to exam the relevant data is arbitrary and capricious. Again, "the agency must examine the relevant data." *State Farm*, 463 U.S. at 43.

**91.** In their briefing, Defendants posit a new theory not mentioned in the June 1 Memorandum. ECF No. 63 at 32–33; *but see Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) (A court "may uphold agency action only on the grounds that the agency invoked when it took the action."). Defendants argue that 44 percent of MPP cases resulted in *in absentia* removal orders, while only 11 percent of non-MPP cases resulted in *in absentia* orders during the same time period. *Id.* at 33. And the disparity between MPP and non-MPP *in absentia* removal orders is evidence of the ineffectiveness of the program in deterring fraudulent claims. *Id.*

**92.** But even if the Court considered this argument, it is not persuasive. A higher rate of *in absentia* removal is consistent with DHS's findings that MPP reduced the "perverse incentives" to

App. 116

pursue meritless asylum applications. There is nothing in the record that provides any analysis or reasoning explaining how higher *in absentia* removals resulted from aliens abandoning meritorious, rather than unmeritorious, asylum claims as DHS had previously found. AR 684 ("Moreover, aliens without meritorious claims — which no longer constitute a free ticket into the United States — are beginning to voluntarily return home."); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("If the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy.").

93.     Another of the Secretary's stated conclusions is arbitrary. In the June 1 Memorandum, the Secretary justified, in part, terminating MPP because of the court closures caused by the COVID-19 pandemic:

> As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

94.     The Secretary's reasoning is without any merit. Even according to the June 1 Memorandum, immigration courts were reopened by the end of April 2021. *Past* problems with *past* closures are irrelevant to the decision to *prospectively* terminate MPP in June 2021. This is especially true when the Secretary admits DHS had maintained the facilities during the pandemic.

> 3.  *DHS failed to consider or acknowledge the effect terminating MPP would have on its compliance with Section 1225*

95.     As detailed more below, the June 1 Memorandum failed to consider the effect terminating MPP would have on DHS's ability to detain aliens subject to *mandatory* detention under Section 1225.

**App. 117**

96.     DHS had previously recognized that "[t]he law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings." AR 682. But "resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable." *Id.*

97.     MPP addressed the resource problem by reducing the number of aliens DHS would have to detain by returning certain aliens to Mexico. *Id.*; AR 687. In terminating MPP, the Secretary was required to consider whether DHS could meet its statutory obligation to detain aliens seeking asylum without MPP as a tool. This the Secretary did not do.

98.     Not once did the June 1 Memorandum discuss DHS's mandatory-detention obligation. In fact, a perusal of the *entire* administrative record shows *zero* evidence of DHS's detention capacity. Trial Tr. 114 (DHS counsel: "the [administrative] record doesn't contain *any* information about detention capacity.") (emphasis added). By "fail[ing] to consider an important aspect of the problem," the Secretary acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.

99.     For the above stated reasons, Defendants' termination of MPP was arbitrary and capricious and in violation of the APA. Accordingly, the Court concludes that Plaintiffs' APA claim is meritorious.

### D.  The termination of MPP causes Defendants to violate Section 1225

100.    The Court begins by quickly re-summarizing the relevant statutory framework.

101.    Section 1225 provides that if an immigration officer determines that an alien subject to expedited removal *does not* have a credible fear of persecution, the alien "*shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added).

42

**App. 118**

**102.**    An alien subject to expedited removal and determined by an immigration officer to have a credible fear of persecution "*shall be detained* for further consideration of the application for asylum." § 1225(b)(1)(B)(ii) (emphasis added).

**103.**    An alien seeking admission and not subject to expedited removal, whom an examining immigration officer determines is not clearly and beyond a doubt entitled to be admitted, "*shall be detained*" for removal proceedings. § 1225(b)(2)(A) (emphasis added).

**104.**    Aliens who are not subject to expedited removal and arrive on land from a foreign territory contiguous to the United States may be returned by the government to that territory pending asylum proceedings as an alternative to detention. § 1225(b)(2)(C); AR 682.

**105.**    MPP used this statutory authority to return aliens to Mexico pending their removal proceedings. AR 682.

**106.**    Accordingly, Section 1225 provides the government two options vis-à-vis aliens seeking asylum: (1) mandatory detention; or (2) return to a contiguous territory. Failing to detain or return aliens pending their immigration proceedings violates Section 1225.[11]

**107.**    Without MPP, Defendants only remaining option under Section 1225 is mandatory detention. But DHS admits it does not have the capacity to meet its detention obligations under Section 1225 because of "resource constraints." AR 682; App. 330 n. 7 ("Continued detention of

---

[11] DHS does have the discretion to parole some aliens. But parole is available "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Nor is parole intended "to replace established refugee processing channels." App. 336. By enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress "specifically narrowed the executive's discretion" to grant parole due to "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Any class-wide parole scheme that paroled aliens into the United States simply because DHS does not have the detention capacity would be a violation of the narrowly prescribed parole scheme in section 1182 which allows parole "only on a *case-by-case* basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). *See also* AR 184 ("The number of asylum seekers who will remain in potentially indefinite detention pending disposition of their cases will be almost entirely a question of DHS's detention capacity, and *not whether the individual circumstances* of individual cases warrant release or detention,' [according to UT law professor Steve] Vladeck.") (emphasis added).

a migrant who has more likely than not demonstrated credible fear is not in the interest of resource allocation or justice.").

**108.**     Under *these particular* circumstances, where Defendants cannot meet their detention obligations, terminating MPP necessarily leads to the systemic violation of Section 1225 as aliens are released into the United States because Defendants are unable to detain them.

**109.**     Accordingly, the Court concludes that Plaintiffs' statutory claim is meritorious as well.

### E. The Court does not need to decide Plaintiffs' Take Care Clause claim

**110.**     Because the Court will grant Plaintiffs full relief on their APA and statutory claims, there is no further relief related to the June 1 Memorandum that the Court can grant.

**111.**     Where the Court has made a full disposition of the case without addressing a constitutional claim, it will not address the issue. *See Matal v. Tam*, 137 S. Ct. 1744, 1755 ("We have often stressed that it is important to avoid the premature adjudication of constitutional questions and that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable.") (internal marks and citations omitted).

### F. The Agreement with Texas has expired and is therefore moot.

**112.**     Because the Court will grant Plaintiffs full relief on their APA and statutory claims, there is no further relief related to the June 1 Memorandum that the Court can grant.

**113.**     Any further agency action responsive to this opinion shall take place after August 1, 2021, which is when Texas agrees the Agreement was terminated. Therefore, the Agreement will not apply to any new agency action either.

**114.**     The Court accordingly dismisses this claim as moot.

**App. 120**

## V.     REMEDIES

**115.**     Having found Plaintiffs' APA and statutory claims are meritorious, it is the Court's remaining task to craft to proper relief.

### A. Vacatur and Remand

**116.**     The APA provides that "[t]he reviewing court *shall* . . . hold unlawful and *set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added).

**117.**     As a textual matter,[12] the mandatory language of the APA has led courts to make remand and vacatur the default remedy for agency action that violates the APA. *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1287 (D.C. 2019); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) ("[D]istrict courts have a duty to vacate unlawful agency actions."). Remand, without vacatur, is only "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Assoc. of Mfrs. v. US Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90.

**118.**     The D.C. Circuit considers two factors when deciding whether to remand without vacatur: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *United Steel*,

---

[12] Defendants aver that "nothing in section 706(2)'s text specifies whether a rule, if found invalid, should be set aside on its *face* or *as applied* to the challenger." ECF No. 93 at 11. And Defendants further argue the Court should adopt the narrower "as-applied" reading of the statute and only set aside agency action as to the named Plaintiffs. But that argument is in error. "The APA empowers courts to determine *rule validity*, not just whether the *application* of the rule is valid." Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. R. 1120, 1133 (2019); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012 (2018) ("[T]he APA and these organic statutes go further by empowering the judiciary to act directly against the challenged agency action. This statutory power to 'set aside' agency action is more than a mere non-enforcement remedy. It is a veto-like power that enables the judiciary to formally revoke an agency's rules, orders, findings, or conclusions — in the same way that an appellate court formally revokes an erroneous trial-court judgment."). The question of whether courts should extend relief beyond the named litigants *in the APA context* is a question of *severability*, not a question of whether the APA authorizes such relief — it does. Mitchell, *supra*, at 1013.

**App. 121**

925 F.3d at 1287; *accord Cent. & S. W. Servs., Inc. v. E.P.A.*, 220 F.3d 683, 692 n.6 (5th Cir. 2000) ("EPA gave ample reasons for its application of the Rule to the members of the regulated community in general. It simply failed to explain why it refused to grant the national variance to the electric utilities. We conclude that it would be disruptive to vacate application of the Rule to other segments of the industry.").

119.    Under the first prong, the Court finds that the deficiencies in the June 1 Memorandum are serious and are unlikely to be resolved on a simple remand. As the Court has found, Defendants failed to consider the main benefits of MPP: (1) MPP deterred aliens, especially from the Northern Triangle, from attempting to illegally cross the border, (2) MPP allowed DHS to avoid systemic violation of Section 1225's detention requirements, and (3) MPP reduced the burden on states caused by tens of thousands of aliens being released.

120.    Moreover, DHS *knew* of these failings when it issued the June 1 Memorandum because Plaintiffs first brought suit on April 13, 2021 — nearly two months earlier. DHS had the opportunity to consider Plaintiffs' suit and engage in reasoned decisionmaking to avoid the flaws the Court has identified in this opinion.

121.    Additionally, the June 1 Memorandum is not only arbitrary and capricious for a lack of reasoned decisionmaking, but it is also substantively unlawful because, in these circumstances, termination of MPP causes Defendants to systemically violate Section 1225. It will continue to be unlawful to terminate MPP until DHS has the capacity and willingness to detain immigrants claiming asylum under Section 1225.

122.    Under the second prong, the Court finds vacatur will not be unduly disruptive. In their supplemental briefs addressing remedies, Defendants emphasizes the "chaos" and "disruptive consequences" that would follow vacatur of the June 1 Memorandum. ECF Nos. 70, 93 at 4–7

**App. 122**

("An order interfering with DHS's termination of MPP, or otherwise requiring DHS to reinstitute the program, would wreak havoc on the Administration's approach to managing migration in the region, including by undermining the Government's ability to engage in the delicate bilateral (and multilateral) discussions and negotiations required to achieve a comprehensive solution."). The government further states "restarting MPP would 'come at tremendous opportunity cost,' 'draw resources from other efforts,' 'create doubt about the reliability of the United States as a negotiating partner,' 'hamstring the Federal Government's ability to conduct the foreign policy discussions' necessary to manage migration, and 'have significant resource implications and be damaging to our national and economic security.'" *Id.*

123.    But these problems are entirely self-inflicted. "Such inconveniences are common incidental effects of injunctions, and the government could have avoided them by delaying preparatory work until the litigation was resolved." *Texas*, 809 F.3d at 187. Here, Texas filed suit challenging the suspension of enrollments in MPP on April 13, 2021, which is nearly two months *before* DHS purported to terminate the program entirely in the June 1 Memorandum. DHS "could have avoided" any disruptions by simply informing Mexico that termination of MPP would be subject to judicial review "until the litigation was resolved." *Id.*[13] Mexico is capable of understanding that DHS is required to follow the laws of the United States which includes the APA and INA.

124.    And, as evidenced by Defendants' briefs, DHS seemingly relies on the premise that it *actually terminated* MPP back in January 2021 and has been dismantling the program ever since

---

[13] The Court notes that only slightly more than two months has passed between the issuance of the June 1 Memorandum and the Court's *final* disposition of this case on the merits.

then, even though the January 20 Memorandum only purported to suspend the enrollment of aliens in MPP.[14]

125.    DHS argues, in a brief dated July 7, 2021, that it began acting "to unwind MPP and its infrastructure," *before* the June 1 Memorandum terminating MPP, which is only two months old. ECF No. 70 at 8 ("[N]ew initiatives" to replace MPP have been "in place for nearly *six months*."). Similarly, in the same brief, Defendants stated that re-implementing MPP would be difficult because MPP "had been terminated for *some* time." *Id.* at 9 (emphasis added)

126.    Again, in the same brief, Defendants argues that "Mexico had already begun taking action to redeploy resources." *Id.* at 9. But Defendants' citation shows that Mexico was redeploying resources already by April 28, a month *before* DHS issued the June 1 Memorandum. ECF No. 64 at 14. In another portion, Defendants state MPP began being wound down on "February 11, 2021." *Id.* at 17–18.   Defendants also state that vacatur would nullify "more than four months of diplomatic and programmatic engagement," ECF No. 70 at 11, even though MPP had only been terminated for one month when that brief was submitted.

127.    In other words, DHS's apparent argument is that MPP has been in the process of termination for *months*, far preceeding the actual issuance of the June 1 Memorandum, and it is simply *too late* for a court to vacate their actions. But if the decision to terminate MPP was made far in advance of the June 1 Memorandum, that reduces the entire June 1 Memorandum into *post hoc* arguments for a decision that was already made. *Compare* ECF No. 64 at 5 ("Upon completion of the required review, the Secretary announced his decision to terminate MPP [on June 1, 2021.]") *with id.* at 17 ("[T]he U.S. government announced the wind-down of the MPP policy on February 11, 2021.").

---

[14] There is no question that the January 20, 2021 Memorandum would have been found to be arbitrary and capricious as there is *no* administrative record or any stated basis for agency action for the Court to review. *See* ECF No. 45.

**128.**     Additionally, DHS's arguments also only relate to the effect vacatur would have on its diplomatic engagements with foreign countries.[15] ECF No. 70 at 7–11.

**129.**     DHS's reliance on the effects of foreign affairs is unpersuasive. DHS's first duty is to uphold *American* law. It cannot just point at diplomatic efforts as an excuse to not follow the APA or fulfill its statutory obligations.

**130.**     Accordingly, Plaintiffs are entitled to vacatur and remand because the June 1 Memorandum violates the APA and is in substantive violation of Section 1225.

### B. Injunctive Relief is warranted

**131.**     "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. *eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006). The four factors are: "(1) that [Plaintiffs have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

**132.**     Regarding the first factor, as discussed in the Section on standing, *supra* § IV.A.1, Plaintiffs have shown that they are suffering ongoing and future injuries as a result of the termination of MPP.

---

[15] At various points, Defendants argue that the Court is unable to redress Plaintiffs' injuries because any relief would be dependent on Mexico's cooperation. *See, e.g.*, ECF No. 913 at 10–11.  This is not correct. The United States initiated MPP unilaterally pursuant to U.S. law, not pursuant to bilateral agreement or treaty with Mexico. App. 307. The program was then "implemented and expanded . . . through ongoing discussions with Mexico." *Id.* In other words, MPP was adopted and launched unilaterally, just as it was later terminated unilaterally. App.307; *see also* App.303. And even if Mexico's cooperation may be required to return an alien who has already been admitted, nothing prevents DHS from refusing to admit asylum applicants at ports of entry in the first place — before they ever enter the United States.

**App. 125**

**133.**   Regarding the second factor, Texas and Missouri are unable to recover the additional expenditures from the federal government. *Texas*, 2021 WL 2096669, at \*48 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *see also Texas*, 328 F. Supp. 3d at 737 (deeming an injury irreparable because "there [was] no source of recompense").

**134.**   Regarding the third and fourth factors,[16] the ongoing and future injuries sustained by Plaintiffs outweigh any harms to Defendants as Defendants have no "interest in the perpetuation of unlawful agency action." *League of Women Voters of United States, v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, there is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

**135.**   Moreover, the public interest favors Plaintiffs because the public has an "interest in stemming the flow of illegal immigration." *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620 at \*2 (S.D. Tex. Nov.  28, 2017) (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–58 (1976)). And the public has interest in the enforcement of immigration laws, including Section 1225. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115, 100 Stat 3359, 3384 (1986) ("[T]he immigration laws of the United States should be enforced vigorously and uniformly.")

---

[16] Federal courts may consider the third and fourth together as they overlap considerably.  *Texas*, 809 F.3d at 187; *Nken v. Holder,* 556 U.S. 418, 435 (2009) ("Once an applicant satisfies the first two factors [for a stay of an alien's removal pending judicial review], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.").

**136.**     Lastly, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless an injunction would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

**137.**     Here, an injunction is warranted for two reasons. First, an injunction is needed to prevent the continued systemic violation of Section 1225. Second, Defendants have indicated that, *even if* the June 1 Memorandum were declared invalid, they would not necessarily return any aliens to Mexico. ECF No. 63 at 9 ("Reinstating MPP would not *require* DHS to return anyone to Mexico.") (emphasis in original). ECF No. 92 at 47 ("DHS retains discretion to . . . release *all* noncitizens inspected for admission under Section 1225(b)(2)(A) or arrested while present in the United States under Section 1226.") (emphasis added).

**138.**     Defendants are correct in stating that this Court does not have the power to tell a DHS line officer which individual aliens are amenable to MPP and must be enrolled. But Defendants are *incorrect* in arguing this Court has no power to enjoin a "blanket policy" that removes all discretion from line officers to utilize MPP. *Texas*, 2021 WL 2096669, at *51 ("But this injunction does not enjoin *individual* removal decisions. As described above, it enjoins a *blanket* policy that is contrary to law. The Government makes much of its discretion in individual matters . . .. But nothing in this preliminary injunction changes that."); ECF No. 63 at 9 ("Reinstating MPP . . . would merely authorize line-level officers to [return aliens to Mexico] in their discretion.").

**139.**     Lastly, Fifth Circuit precedent dictates that, in immigration related cases, proper relief includes nationwide injunctions. A geographically limited injunction would be improper because federal *immigration* law must be uniform. *Texas*, 809 F.3d at 187–88; *see also Texas*, 2021 WL 2096669, at *52; *Texas*, 2021 WL 247877, at *7–8. Furthermore, a geographically limited

injunction would likely "be ineffective because [aliens] would be free to move among states." *Id.* at 188.

**140.** Accordingly, the Court will grant the narrowest injunction possible that afford Plaintiffs full relief on their claims.

      **VI.**    C<small>ONCLUSION</small>

For the reason stated above, the Court finds that Plaintiffs have proven their APA and statutory claims by the preponderance of the evidence. Accordingly, it is **ORDERED**:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **PERMANENTLY ENJOINED** and **RESTRAINED** from implementing or enforcing the June 1 Memorandum.

2. The June 1 Memorandum is **VACATED** in its entirety and **REMANDED** to DHS for further consideration.

3. Defendants are **ORDERED** to enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1255 without releasing any aliens *because of* a lack of detention resources.

4. To ensure compliance with this order, starting September 15th, 2021, the Government must file with the Court on the 15th of each month, a report stating (1) the total monthly number of encounters at the southwest border; (2) the total monthly number of aliens expelled under Title 42, Section 1225, or under any other statute; (3) Defendants' total detention capacity as well as current usage rate; (4) the total monthly number of "applicants for

**App. 128**

admission" under Section 1225; (5) the total monthly number of "applicants for admission" under Section 1225 *paroled* into the United States; and (6) the total monthly number of "applicants for admission" under Section 1225 released into the United States, *paroled or otherwise*.

5.    This injunction is granted on a nationwide basis.

6.    Nothing in this injunction requires DHS to take any immigration or removal action nor withhold its statutory discretion towards any individual that it would not otherwise take.

7.    The Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this permanent injunction.

8.    The Court **STAYS** the applicability of this opinion and order for **7 days** to allow the federal government time to seek emergency relief at the appellate level.

**SO ORDERED.**

August 13, 2021.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

**App. 129**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| THE STATE OF MISSOURI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-067-Z |
| | § | |
| JOSEPH R. BIDEN, JR. *et al.*, | § | |
| | § | |
| Defendants. | § | |

## JUDGMENT

On an equal date herewith, the Court entered findings of facts and conclusions of law in accordance with Fed. R. Civ. P. 52. The Court found Plaintiffs' APA and statutory claims meritorious while declining to rule on Plaintiffs' other claims. Accordingly, the Court **VACATED** and **REMANDED** the June 1 Memorandum and entered a **PERMANENT INJUNCTION** against Defendants.

Judgment is entered accordingly.

August 13, 2021.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*, *et al.*,<br><br>          Defendants. | Civ. Action No. 21-100(EGS) |

**MEMORANDUM OPINION**

Plaintiffs—a group of asylum-seeking families who fled to the United States—bring this lawsuit against Alejandro Mayorkas,[1] in his official capacity as Secretary of Homeland Security, and various other federal government officials ("Defendants" or the "government") for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, et seq.; the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note; and the Public Health Service Act of 1944, 42 U.S.C § 201, et seq. Pending before the Court are Plaintiffs' Motion for Class Certification and Motion for Classwide Preliminary

---

[1] Alejandro Mayorkas is substituted pursuant to Federal Rule of Civil Procedure 25(d).

1

App. 131

Injunction. *See* Pls.' Mot. Class Cert., ECF No. 23-1; Mem. Supp.

Pls.' Mot. Classwide Prelim. Inj. ("Pls.' Mot. Prelim. Inj."),

ECF No. 57-1.[2] Upon careful consideration of the motions, the

responses, and replies thereto, the applicable law, and the

entire record, the Court **GRANTS** Plaintiffs' Motion for Class

Certification and **GRANTS** Plaintiffs' Motion for Classwide

Preliminary Injunction.[3]

## I.   Background

### A. Factual Background

#### 1.    The U.S. Asylum Process

"For almost a century, Congress has recognized that

citizens of foreign states are sometimes forced to flee from

persecution in their home countries, and it has been the policy

of the United States government that this country ought to serve

---

[2]  When citing electronic filings throughout this Memorandum
Opinion, the Court cites to the ECF page number, not the page
number of the filed document.

[3] On August 11, 2021, Defendants filed a motion for oral argument
on Plaintiffs' motion for preliminary injunction. *See* Mot. Oral
Argument, ECF No. 117. Pursuant to Local Civil Rule 65(d), "[o]n
request of the moving party together with a statement of the
facts which make expedition essential, a hearing on an
application for preliminary injunction shall be set by the Court
no later than 21 days after its filing, unless the Court earlier
decides the motion on the papers or makes a finding that a later
hearing date will not prejudice the parties." Here, while
Plaintiffs filed their motion on February 5, 2021, briefing on
the motion was stayed until August 5, 2021. *See* Min. Order (Aug.
5, 2021). Thus, the Court finds that there is no prejudice to
the parties in declining to hold a hearing on Plaintiffs' motion
and shall instead decide the motion on the papers. Defendants'
motion for oral argument is therefore denied.

as a place of refuge for persons who are in such distress."
*Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 11-12 (D.D.C. 2020). In
keeping with this policy, Congress has codified various
procedures governing how the United States evaluates and
processes the admission requests of refugees. As relevant here,
there are three primary protections for asylum seekers in place
under current immigration laws.

First, in 1980, Congress passed the Refugee Act, Pub. L.
No. 96-212, 94 Stat. 102, which amended the INA, Pub. L. No. 82-
414, 66 Stat. 163 (1952) (codified as amended in sections of 8
U.S.C.). The Refugee Act created a statutory procedure for
refugees seeking asylum and established the standards for
granting such requests. The INA currently governs this
procedure, and it provides that "[a]ny alien who is physically
present in the United States or who arrives in the United States
(whether or not at a designated port of arrival . . . ),
irrespective of such alien's status, may apply for asylum." 8
U.S.C. § 1158(a)(1). The Attorney General is granted the
discretion to grant asylum. *Id.* § 1158 (b)(1)(A). However, that
relief can only be granted if the alien is a "refugee," as
defined by federal law. *Id.* Pursuant to the INA, a "refugee" is
"any person who is outside any country of such person's
nationality" and who is "unable or unwilling to return to . . .
that country because of persecution or a well-founded fear of

3

**App. 133**

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1101(a)(42)(A). "Thus, the 'persecution or well-founded fear of persecution' standard governs the Attorney General's determination [of] whether an alien is eligible for asylum." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 (1987). Furthermore, even when a noncitizen is subject to a rapid expulsion process known as "expedited removal" because they fit within an established category of persons who can be summarily removed without full hearings or other process, such noncitizen can only be so removed if she does not have "an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

Second, at the same time the Refugee Act of 1980 established the asylum process, it amended the statutory scheme governing a related form of relief—"withholding of deportation"—to remove the Attorney General's discretion to decide whether to grant that form of relief. *Cardoza-Fonseca*, 480 U.S. at 428–29. As amended by the 1980 Act, the INA "requires the Attorney General to withhold deportation of an alien who demonstrates that his 'life or freedom would be threatened' on account of one of [a list of factors] if he is deported." *Id*. at 423. A grant of withholding is mandatory if the individual meets the

4

statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

Third, Article 3 of the Convention Against Torture ("CAT") provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, p. 20, 1456 U.N.T.S. 114. Congress has implemented Article 3 of CAT as part of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"). *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011). FARRA further declares it "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.* (quoting Pub.L. No. 105-277, § 2242, 112 Stat. 2681-761, 822 (1998) (codified at 8 U.S.C. § 1231 note).

### 2. COVID-19 Pandemic and the CDC Orders

Since 1893, federal law has provided federal officials with the authority to stem the spread of contagious diseases from foreign countries by prohibiting, "in whole or in part, the introduction of persons and property from such countries." Act

**App. 135**

of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 ("1893

Act"). Under current law:

> Whenever the Surgeon General determines that
> by reason of the existence of any communicable
> disease in a foreign country there is serious
> danger of the introduction of such disease
> into the United States, and that this danger
> is so increased by the introduction of persons
> or property from such country that a
> suspension of the right to introduce such
> persons and property is required in the
> interest of the public health, the Surgeon
> General, in accordance with regulations
> approved by the President, shall have the
> power to prohibit, in whole or in part, the
> introduction of persons and property from such
> countries or places as he shall designate in
> order to avert such danger, and for such
> period of time as he may deem necessary for
> such purpose.

42 U.S.C. § 265 ("Section 265"). In 1966, the Surgeon General's

Section 265 authority was transferred to the Department of

Health and Human Services ("HHS"), which in turn delegated this

authority to the Centers for Disease Control and Prevention

("CDC") Director. *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 503

(D.D.C. 2020); 31 Fed. Reg. 8855 (June 25, 1966), 80 Stat. 1610

(1966).

On March 20, 2020, as the COVID-19 virus spread globally,

HHS issued an interim final rule pursuant to Section 265 that

aimed to "provide[] a procedure for CDC to suspend the

introduction of persons from designated countries or places, if

required, in the interest of public health." Interim Final Rule,

**App. 136**

Control of Communicable Diseases; Foreign Quarantine: Suspension

of Introduction of Persons Into United States From Designated

Foreign Countries or Places for Public Health Purposes, 85 Fed.

Reg. 16559-01, 2020 WL 1330968, (March 24, 2020) ("Interim Final

Rule"). Pursuant to the Interim Final Rule, the CDC Director

could "suspend the introduction of persons into the United

States." *Id.* at 16563. The Interim Final Rule stated, in

relevant part:

> (1) Introduction into the United States of
> persons from a foreign country (or one or more
> political subdivisions or regions thereof) or
> place means the movement of a person from a
> foreign country (or one or more political
> subdivisions or regions thereof) or place, or
> series of foreign countries or places, into
> the United States so as to bring the person
> into contact with persons in the United
> States, or so as to cause the contamination of
> property in the United States, in a manner
> that the Director determines to present a risk
> of transmission of a communicable disease to
> persons or property, even if the communicable
> disease has already been introduced,
> transmitted, or is spreading within the United
> States;
>
> (2) Serious danger of the introduction of such
> communicable disease into the United States
> means the potential for introduction of
> vectors of the communicable disease into the
> United States, even if persons or property in
> the United States are already infected or
> contaminated with the communicable disease;
> and
>
> (3) The term "Place" includes any location
> specified by the Director, including any

**App. 137**

> carrier, as that term is defined in 42 CFR
> 71.1, whatever the carrier's nationality.

*Id.* at 16566-67.

The CDC's Interim Rule went into effect immediately. *Id.* at 16565. The CDC explained that, pursuant to 5 U.S.C. 553(b)(3)(B) of the APA, HHS had concluded that there was "good cause" to dispense with prior notice and comment. *Id.* Specifically, the CDC stated that "[g]iven the national emergency caused by COVID-19, it would be impracticable and contrary to the public health—and, by extension, the public interest—to delay these implementing regulations until a full public notice-and-comment process is completed." *Id.*

Pursuant to the Interim Final Rule, the CDC Director issued an order suspending for 30 days the introduction of "covered aliens," which he defined as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land Port of Entry [("POE")] or Border Patrol station at or near the United States borders with Canada and Mexico." Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060-02, 17061, 2020 WL 1445906 (March 26, 2020) ("March 2020 Order"). The March 2020 Order declared that "[i]t is necessary for the public

8

health to immediately suspend the introduction of covered aliens" and "require[d] the movement of all such aliens to the country from which they entered the United States, or their country of origin, or another location as practicable, as rapidly as possible." *Id.* at 17067. The CDC Director then "requested that [the Department of Homeland Security ("DHS")] implement th[e] [March 2020 Order] because CDC does not have the capability, resources, or personnel needed to do so." *Id.* The CDC Director also noted that U.S. Customs and Border Protection ("CBP"), a federal law enforcement agency of DHS, had already "developed an operational plan for implementing the order." *Id.*

Soon thereafter, the CBP issued a memorandum on April 2, 2020 establishing its procedures for implementing the March 2020 Order. See Ex. E to Cheung Decl. ("CAPIO Memo"), ECF No. 57-5 at 15; *see also* Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 14-15. The CAPIO Memo instructed that agents may determine whether individuals are subject to the CDC's order "[b]ased on training, experience, physical observation, technology, questioning and other considerations." CAPIO Memo, ECF No. 57-5 at 15. If an individual was determined to be subject to the order, they were to be "transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit." *Id.* at 17. Those who are "not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility

**App. 139**

for limited holding prior to expulsion" to their home country. *Id.* The CAPIO Memo "provide[d] no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have COVID-19." Am. Compl., ECF No. 22 ¶ 60.

On April 22, 2020, the March 2020 Order was extended for an additional 30 days. *See* Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424-01, 2020 WL 1923282 (April 22, 2020) ("April 2020 Order"). The order was then extended again on May 20, 2020 until such time that the CDC Director "determine[s] that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health." Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02, 31504, 2020 WL 2619696 (May 26, 2020) ("May 2020 Order").

On September 11, 2020, the CDC published its final rule. *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424-01, 2020 WL 5439721, (Sept. 11, 2020) (Effective

**App. 140**

October 13, 2020) ("Final Rule"). The Final Rule "defin[ed] the
phrase to '[p]rohibit, in whole or in part, the introduction
into the United States of persons' to mean 'to prevent the
introduction of persons into the United States by suspending any
right to introduce into the United States, physically stopping
or restricting movement into the United States, or physically
expelling from the United States some or all of the persons.'"
*Id.* at 56445. The CDC Director then replaced the March, April,
and May 2020 Orders with a new order on October 13, 2020. Order
Suspending the Right To Introduce Certain Persons From Countries
Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg.
65806, 65808 (Oct. 16, 2020) ("October 2020 Order").

On August 2, 2021, the CDC issued its most recent order,
"Public Health Assessment and Order Suspending the Right to
Introduce Certain Persons from Countries Where a Quarantinable
Communicable Disease Exists," which replaced and superseded the
October 2020 Order. *See* Public Health Assessment and Order
Suspending the Right to Introduce Certain Persons from Countries
Where a Quarantinable Communicable Disease Exists (Aug. 2,
2021), Attach. A to Notice CDC Public Health Order ("August 2021
Order"), ECF No. 114. The August 2021 Order states that "CDC has
determined that an Order under 42 U.S.C. § 265 remains necessary
to protect U.S. citizens, U.S. nationals, lawful permanent
residents, personnel and noncitizens at the ports of entry (POE)

**App. 141**

and U.S. Border Patrol stations, and destination communities in
the United States during the COVID-19 public health emergency."
*Id.* at 5. Thus, the August 2021 Order continues to prohibit the
introduction of "covered noncitizens"—which is defined to
include "family units"—into the United States along the U.S.
land and adjacent coastal borders. *Id.* at 7. The Court will
refer to the process developed by the CDC and implemented by the
August 2021 Order as the "CDC Order" or the "Title 42 Process."

### 3.   CDC Order's Effect on Asylum Seekers

Plaintiffs and the proposed class member are families from
countries "that are among the most dangerous in the world due to
gang, gender, family membership, and other identity-based
violence." Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 31.
Plaintiffs are currently detained and in the custody of DHS. Am.
Compl., ECF No. 22 ¶¶ 14-19. As such, they are subject to
expulsion from the United States pursuant to the CDC Order.
Plaintiffs assert that prior to the Title 42 Process, and
"pursuant to longstanding immigration statutes protecting asylum
seekers, Plaintiffs were entitled to assert claims for asylum
and related forms of humanitarian protection, and to procedures
Congress established to ensure the fair determination of their
right to remain in the United States." *Id.* ¶ 4. Plaintiffs claim
that if they and others like them are expelled pursuant to the
CDC Order, they "would face grave danger in their home

countries." *Id.* ¶ 10. According to Plaintiffs, "Defendants subjected approximately 21,500 members of families to the Title 42 Process between March and December 2020." Pls.' Mot. Class Cert., ECF No. 23-1 at 10.

### B. Procedural History

#### 1.    Related Litigation

On November 18, 2020, this Court adopted Magistrate Judge Harvey's Report and Recommendation, provisionally granted the plaintiff's motion to certify class, and issued a preliminary injunction barring enforcement of the Title 42 Process as to unaccompanied minors in *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520-22 (D.D.C. 2020). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") later stayed the preliminary injunction pending appeal. Order, *P.J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir. Jan. 29, 2021).

In February 2021, the CDC issued a notice "temporarily except[ing] . . . unaccompanied noncitizen children" from expulsion under the Title 42 Process. CDC, Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9942-01, 2021 WL 600683 (Feb. 11, 2021). The notice stated that CDC was "in the process of reassessing" the Title 42 Order and that the temporary exception for unaccompanied minors would "remain in effect until CDC has

13

completed its public health assessment and published any notice or modified Order." *Id.* Magistrate Judge Harvey and the D.C. Circuit granted the parties' motion to hold the case in abeyance on February 24, 2021. *See* Min. Order (Feb. 24, 2021); Order, P.*J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir. Mar. 2, 2021).

In July 2021, the CDC issued an order "except[ing] unaccompanied noncitizen children . . . from the [CDC's] October [13, 2020] Order." *See* Order Under Sections 362 & 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40; Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 38717, 38718 (July 22, 2021). The CDC explained that the July 16 Order "supersede[s]" the notice issued on February 11, 2021. *Id.* at 38720. On August 2, 2021 the CDC issued another order that superseded the October 2020 Order. Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828-02 (Aug. 5, 2021). The July 16 Order was "made a part of [the August 2021 Order] and incorporated by reference as if fully set forth" in the August 2021 Order. *Id.* at 42829 n.5.

14

### 2.    Proceedings in this Case

Plaintiffs filed this action on January 12, 2021. *See* Compl., ECF No. 1. The same day, Plaintiffs filed an emergency motion to stay their removal from the United States, and Defendants orally objected to Plaintiffs' request during the hearing on the motion. *See* Pls.' Emergency Mot. Stay Removal, ECF No. 5. The Court entered a Minute Order granting Plaintiffs' emergency motion over objection "[i]n view of the arguments presented by Plaintiffs in their motion, the representations made by the Government, and for the reasons stated on the record at the January 12, 2021 Status Conference." Min. Order (Jan. 12, 2021). The Court also granted thirteen subsequent emergency motions to stay the removal of other families on January 19, 2021; January 27, 2021; January 29, 2021; February 1, 2021; February 4, 2021; February 5, 2021; February 6, 2021; February 9, 2021; February 18, 2021; February 19, 2021; and February 22, 2021. *See* Min. Orders (Jan. 19, 2021; Jan. 27, 2021; Jan. 29, 2021; Feb. 1, 2021; Feb. 4, 2021; Feb. 5, 2021; Feb. 6, 2021; Feb. 9, 2021; Feb. 18, 2021; Feb. 19, 2021; Feb. 22, 2021).

Plaintiffs filed a motion for class certification on January 28, 2021, *see* Mot. Certify Class, ECF No. 23; and they filed a motion for preliminary injunction on February 5, 2021, *see* Mot. Prelim. Inj., ECF No. 57. Defendants filed a combined opposition to both motions on February 17, 2021. *See* Defs.'

15

**App. 145**

Opp'n, ECF No. 76. On February 23, 2021, the Court granted the
parties' joint motion to hold in abeyance Plaintiffs' motions
for class certification and classwide preliminary injunction.
Min. Order (Feb. 23, 2021). The motions were held in abeyance
until August 5, 2021, when the Court granted the parties' motion
for a briefing schedule on Plaintiffs' motions. Min. Order (Aug.
5, 2021). On August 6, 2021, Defendants filed a supplemental
declaration in support of their combined opposition. *See*
Shahoulian Decl., ECF No. 116. Plaintiffs filed their combined
reply brief on August 11, 2021. *See* Pls.' Reply, ECF No. 118.
The motions are now ripe for the Court's adjudication.

## II.  Legal Standard

"A plaintiff seeking a preliminary injunction must
establish [1] that he is likely to succeed on the merits, [2]
that he is likely to suffer irreparable harm in the absence of
preliminary relief, [3] that the balance of equities tips in his
favor, and [4] that an injunction is in the public interest."
*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration
in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392
(D.C. Cir. 2011)). Where the federal government is the opposing
party, the balance of equities and public interest factors
merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A
preliminary injunction is an "extraordinary remedy that may only
be awarded upon a clear showing that the plaintiff is entitled

App. 146

to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555
U.S. 7, 22 (2008) (citation omitted). "The purpose of a
preliminary injunction is merely to preserve the relative
positions of the parties until a trial on the merits can be
held." *Univ. of Tex. V. Camenisch*, 451 U.S. 390, 395 (1981). In
this Circuit, the four factors have typically been evaluated on
a "sliding scale," such that if "the movant makes an unusually
strong showing on one of the factors, then it does not
necessarily have to make as strong a showing on another factor."
*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92
(D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v.
Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C.
Circuit has suggested that a positive showing on all four
preliminary injunction factors may be required." *Holmes v. FEC*,
71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644
F.3d at 393 ("[W]e read *Winter* at least to suggest if not to
hold that a likelihood of success is an independent,
freestanding requirement for a preliminary injunction.")
(citation and quotation marks omitted)). Nonetheless, "the
Circuit has had no occasion to decide this question because it
has not yet encountered a post-*Winter* case where a preliminary
injunction motion survived the less rigorous sliding-scale

17

analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C.
2014).

## III.   Analysis

### A. Plaintiffs' Motion for Class Certification

"The class action is an exception to the usual rule that
litigation is conducted by and on behalf of the individual named
parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)
(quotation marks omitted). Rule 23(a) establishes four
requirements for class certification: (1) that "the class is so
numerous that joinder of all members is impracticable"; (2) that
"there are questions of law or fact common to the class"; (3)
that "the claims or defenses of the representative parties are
typical of the claims or defenses of the class"; and (4) that
"the representative parties will fairly and adequately protect
the interests of the class." Fed. R. Civ. P. 23(a). In addition
to satisfying Rule 23(a), a putative class must also meet one of
the Rule 23(b) requirements. Here, Plaintiffs seek certification
under Rule 23(b)(2), claiming that Defendants have "acted or
refused to act on grounds that apply generally to the class, so
that final injunctive relief or corresponding declaratory relief
is appropriate respecting the class as a whole." Pls.' Mot.
Class Cert., ECF No. 23-1 at 8 (quoting Fed. R. Civ. P.
23(b)(2)).

**App. 148**

"The party seeking certification bears the burden of persuasion, and must show that the putative class[] meet[s] the requirements of Rule 23 by a preponderance of the evidence." *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 204 (D.D.C. 2018) (citing *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017)). To carry that burden, Plaintiffs must "affirmatively demonstrate . . . compliance with the Rule—that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Court must undertake a "rigorous analysis" to confirm that the requirements of Rule 23 have been satisfied. *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982).

Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs have sought certification of the following class: "All noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process." Pls.' Mot. Class Cert., ECF No. 23-1 at 7. For the reasons discussed below, the Court finds that Plaintiffs meet all of Rule 23(a) and Rule 23(b)(2)'s requirements. As Defendants' sole challenge to Plaintiffs' class certification motion is that the term "Title 42 Process" is not adequately

defined, Defs.' Opp'n, ECF No. 76 at 16; the Court shall first
address the sufficiency of the class definition before briefly
analyzing the remaining Rule 23(a) and Rule 23(b)(2)
requirements.

### 1.    Class Definition

"[I]t is far from clear that there exists in this
[D]istrict a requirement that a class . . . must demonstrate
ascertainability to merit certification." *Ramirez v. USCIS*, 338
F. Supp. 3d 1, 48 (D.D.C. 2018); *see also Hoyte v. District of
Columbia*, 325 F.R.D. 485, 489 n.3 (D.D.C. 2017) (noting that
"[t]he ascertainability requirement, while adopted by some
courts in this district, has been recently disavowed by four
federal appellate courts" and explaining that "the D.C. Circuit
has not opined on the requirement"). However, the requirement of
"definiteness" has been imposed by some courts as an "implied
requirement" for class certification, in addition to the express
requirements in Rule 23. *See DL v. District of Columbia*, 302
F.R.D. 1, 17 (D.D.C. 2013). This "common-sense requirement,"
*Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998); is
designed primarily to ensure the proposed class is
administratively manageable, *see Hartman v. Duffey*, 19 F.3d
1459, 1471 (D.C. Cir. 1994). "It is not designed to be a
particularly stringent test, but plaintiffs must at least be
able to establish that 'the general outlines of the membership

20

**App. 150**

of the class are determinable at the outset of the litigation.'"
*Pigford*, 182 F.R.D. at 346 (quoting 7A Charles Alan Wright,
Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure
§ 1760 at 118).

"[W]here the plaintiff seeks certification of an injunctive
class pursuant to Rule 23(b)(2), 'actual membership of the class
need not . . . be precisely delimited' because such cases will
not require individualized notice, opt-out rights, or individual
damage assessments, and the defendant will be required to comply
with the relief ordered no matter who is in the class.'" *Brewer
v. Lynch*, No. 08-1747, 2015 WL 13604257, at *6 (D.D.C. Sept. 30,
2015). In those cases, the definiteness requirement is satisfied
as long as plaintiffs can establish the "existence of a class"
and propose a class definition that "accurately articulates 'the
general demarcations' of the class of individuals who are being
harmed by the alleged deficiencies." *See, e.g.*, *Kenneth R. v.
Hassan*, 293 F.R.D. 254, 264 (D.N.H. 2013); *see also DL*, 302
F.R.D. at 17 ("Because the rationale for precise
ascertainability is inapposite in the 23(b)(2) context, . . . it
is not required in cases such as this where only injunctive
relief is sought and notice is not required.").

Defendants contend that Plaintiffs have failed to establish
that the proposed class satisfies the requirements of Rule 23(a)
and Rule 23(b)(2) because the phrase "Title 42 Process" is not

21

**App. 151**

defined within the class definition. Defs.' Opp'n, ECF No. 76 at
16. They argue that, due to the lack of a definition,
"Plaintiffs have not established that the conduct they seek to
enjoin or declare unlawful will be 'as to all of the class
members or as to none of them.'" *Id.* (quoting Fed. R. Civ. P.
23(b)(2)). While Defendants concede that "it is no secret that
Plaintiffs challenge the 'practice of summary expulsion under
the Title 42 Process' and the alleged lack of access to asylum,"
they argue that the Amended Complaint and Class Certification
Motion include statements that suggest that the "class
definition might include practices that Plaintiffs do not
challenge as unlawful." *Id.* at 17. Specifically, Defendants note
that Plaintiffs refer to the "Title 42 Process" as a "system
established in a set of agency documents—a new regulation,
several orders, and an implementation memo," and that the
Amended Complaint states that, "*[a]mong other things,* the Title
42 Process authorizes the summary expulsion of noncitizens,
including vulnerable families seeking asylum in this country,
without any of the procedural protections guaranteed by
Congress." *Id.* (quoting Am. Compl., ECF No. 22 ¶¶ 1, 3) (cleaned
up).

The Court disagrees. As an initial matter, the Court notes
that a "vague and ambiguous class definition" is not
automatically "fatal[]" to a motion for class certification.

22

**App. 152**

Defs.' Opp'n, ECF No. 76 at 15-17. The case law is clear that
the mere existence of a problematic class definition does not
automatically mandate denial of class certification. *See Brewer*,
2015 WL 13604257, at *7. Rather, "[w]hen appropriate, district
courts may redefine classes . . . sua sponte prior to
certification." *Borum v. Brentwood Village, LLC*, 324 F.R.D. 1, 8
(D.D.C. 2018); *see also Wagner v. Taylor*, 836 F.2d 578, 589-90
(D.C. Cir. 1987) (stating that district courts may "exercise . .
. broad discretion to redefine and reshape the proposed class to
the point that it qualifies for certification under Rule 23").

    Here, however, the proposed class is not so poorly defined
as to require sua sponte redefinition by the Court. First,
Plaintiffs' amended complaint, motions, and reply brief each set
forth a fairly descriptive definition of the Title 42 Process as
referring to the practice of summarily expelling asylum-seeking
families since late March 2020. *See* Pls.' Mot. Class Cert., ECF
No. 23-1 at 7 ("A class action lawsuit is appropriate to
challenge Defendants' unlawful practice of summarily expelling
vulnerable families with minor children under their shadow
deportation system, referred to here as the 'Title 42 Process'
or 'Title 42 Policy.'"); Pls.' Mot. Prelim. Inj., ECF No. 57-1
at 9 ("Defendants moved to summarily deport [Plaintiffs] based
on an unprecedented and unlawful expulsion process, invoking the
public health powers of the Centers for Disease Control and

Prevention ('CDC'), specifically 42 U.S.C. § 265 (the 'Title 42 Process').");  Pls.' Reply, ECF No. 118 at 29 ("Plaintiffs have identified and challenged 'a uniform policy or practice' of 'expulsion,' and sought relief enjoining application of the challenged CDC orders to the class.");  Am. Compl., ECF No. 22 ¶ 3 ("Among other things, the Title 42 Process authorizes the summary expulsion of noncitizens, including vulnerable families seeking asylum in this country, without any of the procedural protections guaranteed by Congress—even if the families show no signs of having COVID-19.").

Second, although Plaintiffs do use the phrase "among other things" in one sentence within their Amended Complaint, Defendants' argument is weakened by their own acknowledgment that the focus of this litigation is the "'practice of summary expulsion under the Title 42 Process' and the alleged lack of access to asylum." Defs.' Opp'n, ECF No. 76 at 16.

And third, Defendants' reliance on the Seventh Circuit case *Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008), is misplaced. In *Rahman*, the plaintiffs sought to certify a class of citizens defined as "[a]ll United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs." *Id*. at 625. However, the class definition did not specify what "defendants' contested policies,

24

practices and customs" were. *Id.* The Seventh Circuit therefore denied the plaintiffs' motion to certify, explaining that "[a] class of all persons now or in the future subject to unspecified practices may have nothing to do with the named representatives' injuries, or what caused them." *Id.* at 626. The court also noted that the undefined class was "hard to evaluate" and "incompatible" with the "typicality" requirement. *Id.* at 627.

Here, Defendants argue that Plaintiffs' class definition "suffers from similar infirmities." Defs.' Opp'n, ECF No. 76 at 16. But not only is *Rahman* non-binding on this Court, it is also distinguishable on the facts. Significantly, though Plaintiffs refer to the "Title 42 Process" generally as a "system established in a set of agency documents—a new regulation, several orders, and an implementation memo," *id.* at 17; Plaintiffs' Amended Complaint and motions briefing also separately identify and describe each regulation, order, and memo. *See, e.g.*, Am. Compl., ECF No. 22 ¶¶ 41-66. Thus, unlike in *Rahman*, the Court is able to easily evaluate the application of specific policies and procedures on the proposed class members, and any "administrative feasibility requirement" is satisfied because identifying the class members under this definition would not require much, if any, individual factual inquiry. *See Brewer*, 2015 WL 13604257, at *6.

25

2.     **Rule 23(a) Requirements**

a. **Numerosity**

Because of the general rule in favor of confining litigation to the named parties only, a class action is appropriate only when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although Plaintiffs need not clear any "specific threshold," as a general benchmark, "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007). Plaintiffs may satisfy the requirement by supplying estimates of putative class members, *see Pigford*, 182 F.R.D. at 347–48; "[s]o long as there is a reasonable basis for the estimate provided," *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).

Here, Defendants do not dispute that the proposed class satisfies the numerosity requirement. Plaintiffs have provided evidence that, between March 2020 and December 2020, approximately 21,515 members of family units[4] were subject to the CDC Order and its previous iterations, *see* Kang Decl., ECF No. 23-2 ¶ 4; and that, between April 2020 and December 2020,

---

[4] The CBP defines a "family unit" as "the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member." *See* Kang Decl., ECF No. 23-2 ¶ 3.

"approximately 21,018 members of family units (81%) were
expelled under Title 42," *id.* ¶ 6. Accordingly, the Court finds
that the numerosity requirement is met. *See O.A. v. Trump*, 404
F. Supp. 3d 109, 155 (D.D.C. 2019) (finding numerosity
established by evidence in the administrative record estimating
that the class consisted of "thousands of migrants who have
crossed and will cross the United States' southern border
outside ports of entry").

### b. Commonality

A plaintiff seeking class certification must also establish
that "there are questions of law or fact common to the class."
Fed. R. Civ. P. 23(a)(2). This requires more than the
identification of the purported violation of the same provision
of law. *See DL v. District of Columbia*, 713 F.3d 120, 127-30
(D.C. Cir. 2013) (vacating an order certifying a class composed
of students who were purportedly each denied a free appropriate
public education on the ground that plaintiffs had identified
only sufferers of a violation of the same provision of law and
had not met the commonality requirement). Instead, the claims
must depend on "a common contention [that] is capable of
classwide resolution—which means that determination of its truth
or falsity will resolve an issue that is central to the validity
of each one of the claims in one stroke." *Wal-Mart Stores*, 564

27

**App. 157**

U.S. at 350. "Even a single common question will do." *Id.* at 359 (cleaned up).

As the D.C. Circuit has explained, commonality is satisfied where there is "a uniform policy or practice that affects all class members." *DL*, 713 F.3d at 128; *see also O.A.*, 404 F. Supp. 3d at 156 (finding commonality satisfied where "[a]ll members of the proposed class, and all of the proposed class representatives, face the same threat of injury" and where "[a]ll challenge the same Rule on the same grounds, and all seek the same remedy—invalidation of the Rule"). Here, Plaintiffs are challenging the lawfulness of the Title 42 Process, which is a uniform policy that applies to each Plaintiff and all members of the proposed class. Moreover, "[n]ot only do all class members present the same challenge to the policy, but there also is no evident variation among them concerning their ultimate entitlement to relief: if any person in the class has a meritorious claim, they all do." *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019). The Court can, therefore, conclude that "common questions of law and fact" unite the class members' claims. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 332 (D.D.C. 2018) (finding that "the allegation that the five ICE Field Officers are no longer providing the 'individualized determinations' of parole eligibility and procedural protections required by the Parole Directive" satisfied the commonality requirement).

28

### c. Typicality

A class representative satisfies the typicality requirement if the representative's "claims are based on the same legal theory as the claims of the other class members" and her "injuries arise from the same course of conduct that gives rise to the other class members' claims." *Bynum*, 214 F.R.D. at 35. Put another way, a representative's claims are typical of those of the class when "[t]he plaintiffs allege that their injuries derive from a unitary course of conduct by a single system." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Here, Plaintiffs and all members of the proposed class face the same injury: the threat of expulsion pursuant to the Title 42 Process. All challenge the same policy on the same grounds, and all seek the same remedy—invalidation of the Title 42 Process. Thus, the typicality requirement is met.

### d. Adequacy

"The adequacy requirement aims to ensure that absent class members will not be bound by the outcome of a suit in which they were not competently and fairly represented." *J.D.*, 925 F.3d at 1312. "Adequacy embraces two components: the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class

**App. 159**

through qualified counsel.'" *Id.* (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

Defendants also do not dispute that Plaintiffs have satisfied the adequacy requirement. First, Defendants have not identified—and the Court is unaware of—any interest Plaintiffs have that is antagonistic to or conflicts with the putative class members. Rather, courts have found that where, as here, the plaintiffs "seek identical relief for all class members, . . . there are no conflicting interests that might derail certification on this prong." *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 84 (D.D.C. 2015). Second, the Court concludes that Plaintiffs' current counsel are "willing and have the ability vigorously to litigate this case and to protect the interests of absent class members." *O.A.*, 404 F. Supp. 3d at 157.

### 3.    Rule 23(b)(2) Requirement

Having determined that Plaintiffs meet the requirements of Rule 23(a), the Court must next determine whether they meet the requirements of Rule 23(b)(2). Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the

30

**App. 160**

injunctive or declaratory remedy warranted—the notion that the
conduct is such that it can be enjoined or declared unlawful
only as to all of the class members or as to none of them." *Wal-
Mart*, 564 U.S. at 360 (internal quotation marks and citations
omitted). Rule 23(b)(2) imposes "two requirements: (1) that
defendant's actions or refusal to act are 'generally applicable
to the class' and (2) that plaintiffs seek final injunctive
relief or corresponding declaratory relief on behalf of the
class." *Bynum*, 214 F.R.D. at 37.

Plaintiffs have satisfied both requirements here. The
relief Plaintiffs seek—among other things, a declaration that
the Title 42 Process is unlawful and an injunction prohibiting
Defendants from applying the Title 42 Process to Plaintiffs and
proposed class members—is "generally applicable to the class"
and is indivisible. *See Damus*, 313 F. Supp. 3d at 334–35
(finding Rule 23(b)(2) satisfied where plaintiffs were not
asking the court "to remedy discrete errors in their parole
determinations," but rather "only . . . address an alleged
systematic harm"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 182
(D.D.C. 2015) (finding Rule 23(b)(2) satisfied where plaintiffs
sought to enjoin ICE from consideration of particular factor in
making detention determination). Plaintiffs also do not seek
individualized relief, and thus this is not a case where "each
individual class member would be entitled to a *different*

31

injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360; *see also Ramirez*, 338 F. Supp. 3d at 48 (finding Rule 23(b) satisfied where plaintiffs "d[id] not seek a court order mandating any particular outcome with respect to any particular [individual plaintiff]").

For all these reasons, the Court grants Plaintiffs' motion for class certification.

### B. Plaintiffs' Motion for Preliminary Injunction

#### 1. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs argue that the CDC Orders instituting the Title 42 Process exceed the authority granted by Congress pursuant to Section 265 because "[n]othing in [Section] 265, or Title 42 more generally, purports to authorize any deportations, much less deportations in violation of" statutory procedures and humanitarian protections, including the right to seek asylum. Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 17-18. The Court agrees and finds that Plaintiffs have shown that they are likely to succeed on the merits of their claim.

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), provides the framework for reviewing an agency's interpretation of a statute that the agency is charged with administering. *See* 467 U.S. at 837. The first step in this review process is for the court to determine "whether Congress

32

has directly spoken to the precise question at issue." *Id.* at
842. "If the intent of Congress is clear, that is the end of the
matter; for the court, as well as the agency, must give effect
to the unambiguously expressed intent of Congress." *Id.* at 842–
43. In determining whether the statute unambiguously expresses
the intent of Congress, the court should use all the
"traditional tools of statutory construction," including looking
to the text and structure of the statute, as well as its
legislative history, if appropriate. *See id.* at 843 n.9; *see
also Bell Atlantic Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C.
Cir. 1997). If the court concludes that the statute is either
silent or ambiguous with respect to the precise question at
issue, the second step of the court's review process is to
determine whether the interpretation proffered by the agency is
"based on a permissible construction of the statute." *Chevron*,
467 U.S. at 843. The court must defer to agency interpretations
that are not "arbitrary, capricious, or manifestly contrary to
the statute." *Id.* at 844.

The Court's analysis begins with the statutory text. *See S.
Cal. Edison Co. v. FERC*, 195 F.3d 17, 22–23 (D.C. Cir. 1999).
Here, Section 265 states in full:

> Whenever the Surgeon General determines that
> by reason of the existence of any communicable
> disease in a foreign country there is serious
> danger of the introduction of such disease
> into the United States, and that this danger

33

**App. 163**

> is so increased by the introduction of persons
> or property from such country that a
> suspension of the right to introduce such
> persons and property is required in the
> interest of the public health, the Surgeon
> General, in accordance with regulations
> approved by the President, shall have the
> power to prohibit, in whole or in part, the
> introduction of persons and property from such
> countries or places as he shall designate in
> order to avert such danger, and for such
> period of time as he may deem necessary for
> such purpose.

42 U.S.C. § 265.

As Plaintiffs point out, Section 265 simply contains no mention of the word "expel"—or any synonyms thereof—within its text. *See* Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 18. The lack of express terms within the statute is significant: even "broad rulemaking power must be exercised within the bounds set by Congress," *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 92, 94 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020) (stating that "agencies are 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes'"); and the CDC "does not [have the] power to revise clear statutory terms," *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014).

Indeed, particularly where the statute in question regards such a "severe 'penalty'" as deportation, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yue Ting v. United*

**App. 164**

*States*, 149 U.S. 698, 740 (1893)); the Court is loathe to recognize an implied power of forced removal from the country, *see Util. Air Reg. Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"). Rather, as this Court explained in *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 512 (D.D.C. 2020), "when Congress wants to grant the power to expel individuals out of the United States, it does so plainly." *P.J.E.S.*, 502 F. Supp. 3d at 512; *see, e.g.*, 8 U.S.C. § 1225(b)(2)(A), (C) (allowing an alien who has arrived on land from a contiguous country and who is "not clearly and beyond a doubt entitled to be admitted" to be "return[ed] . . . to that territory pending a proceeding"); *id.* § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . ."); 18 U.S.C. § 3186 (authorizing a fugitive from another country found in the United States to be "take[n] . . . to the territory of such foreign government" by an agent of that government). Moreover, "Congress has made clear when public health concerns merit disallowing a non-citizen to remain in the United States." *P.J.E.S.*, 502 F. Supp. 3d at 539; *see* 8 U.S.C. § 1182(a)(1) (providing that "aliens who are inadmissible" are those determined "to have a communicable disease of public health

35

significance"); *id.* § 1222 (providing for medical detention and examination as part of immigration processing). As the Supreme Court "ha[s] stated time and again[,] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." (internal quotation marks omitted)). And here, the plain language of Section 265, particularly when read in conjunction with the above statutes governing immigration under Title 8 of the U.S. Code, evinces no intention to grant the Executive the authority to expel or remove persons from the United States.

The Court also finds that the plain text of Section 265 is supported by the statutory context. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 132-33 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). For example, in Section 271, Congress provided for specific "penalties" for those

36

persons who or vessels that violated public health regulations prescribed under the relevant sections, including Section 265. 42 U.S.C. § 271. For individuals, Section 271 states that any violation "shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both." *Id.* § 271(a). Removal from the United States, however, is not included as a penalty. Moreover, Section 271 refers to the regulations prescribed under Section 265 and others as "*quarantine* laws," further suggesting that the CDC's powers were limited to quarantine and containment. *Id.* § 271 (emphasis added).

Neither does neighboring Section 264 contemplate the removal of persons from the United States. Section 264 authorizes the Secretary to use various public health measures to "prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264. Although Defendants rely on Section 264 as evidence of the Secretary's "sweeping authority to protect the country from potentially devastating communicable diseases," Defs.' Opp'n, ECF No. 76 at 23; the provision only mentions regulations that provide for the "apprehension, detention, examination, or conditional release of individuals" if the individual is "coming into a State or possession from a foreign country or possession." 42 U.S.C. § 264(c). Again, the authority to remove is not mentioned. "That is, in a section where one would expect the term to appear—where

37

**App. 167**

Congress has delineated the government's power to prevent the
spread of contagious disease from individuals coming into the
United States from a foreign country—it does not." *P.J.E.S.*, 502
F. Supp. 3d at 537-38.

Furthermore, even beyond Sections 264 and 271, the statute
as a whole does not contain "a word about the power of the [CDC]
to expel anyone who has come into the country." *Id.* at 513-14
(citing 42 U.S.C., Chap. 6A, Subchap. II, Part G (entitled
"Quarantine and Inspection")); 42 U.S.C. § 267 (entitled
"Quarantine stations, grounds, and anchorages"); *id.* § 268
(entitled "Quarantine duties of consular and other officers");
*id.* § 270 (entitled "Quarantine regulations governing civil air
navigation and civil aircraft"); *id.* § 271 (entitled "Penalties
for violation of quarantine laws"); *id.* § 272 (entitled
"Administration of oaths by quarantine officers"). Rather, the
statutory scheme reflects Congress's focus on the public's
health, authorizing the CDC to create regulations that allow for
the "apprehension, detention, examination, or conditional
release of individuals" entering from foreign countries to stop
the spread of communicable diseases from those countries, *id.* §
264; and then in times of serious danger, to halt the
"introduction of persons" from designated foreign countries, *id.*
§ 265.

**App. 168**

Defendants argue, however, that the findings above
"ignore[] the purely public health purpose of the statute,"
because "[t]he absence of the terms 'expel' or 'removal' has no
special significance in the public health context even if its
absence might be meaningful in the immigration context." Defs.'
Opp'n, ECF No. 76 at 19-20. They further contend that Section
265's phrase "prohibit[ing] . . . the introduction" does not
demonstrate that Congress intended to limit the Executive's
authority at "stopping a person precisely at the Nation's
borders." *Id.* at 18. Instead, "the term 'introduction' refers to
a continuing process and is most naturally read to extend beyond
a person's immediate physical crossing of the border," and "to
'prohibit . . . the introduction' naturally means to intercept
or prevent such a process." *Id.* at 18-19. Thus, in Defendants'
view, "the Section 265 authority includes intercepting and
halting persons who have already crossed the border—but who are
in the process of being introduced—into the United States." *Id.*
at 19.

Defendants arguments are unpersuasive. First, regardless of
whether the words "expel" or "remove" are specific to the
immigration context, Defendants do not explain the lack of
synonyms of either word within the statute. Moreover, "[i]t is a
fundamental principle of statutory interpretation that absent
provision[s] cannot be supplied by the courts." *Rotkiske v.*

39

App. 169

*Klemm*, 140 S. Ct. 355, 360–61 (2019) (internal citations and quotation marks omitted) (alteration in original). "[W]hen Congress wants to mandate [certain] procedures[,] it knows exactly how to do so." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018). In view of current immigration laws, which speak to deportation by using words such as "remove" and "return," *see* 8 U.S.C. § 1182(d)(3)(A) ("The Attorney General shall prescribe conditions . . . to . . . *return* . . . inadmissible aliens . . . ." (emphasis added)); *id.* § 1182(h)(2) ("No waiver shall be granted . . . for a period of not less than 7 years immediately preceding the date of initiation of proceedings to *remove* the alien from the United States." (emphasis added)); this Court recognizes, as have other courts in this District, that "[t]here's a serious question about whether [Section 265's] power includes the power . . . to remove or exclude persons who are already present in the United States," Hr'g Tr., *J.B.B.C. v. Wolf*, No. 20-cv-1509, ECF No. 39 at 50 (June 26, 2020). Put simply, the "fact that Congress did not use [words such as 'return' or 'remove'] . . . suggests at a minimum that the power to remove is not granted by [S]ection 265." *Id.*[5]

---

[5] Citing to dicta in *Russello v. United States*, 464 U.S. 16, 25 (1983), the government argues that "language in one statute usually sheds little light upon the meaning of different language in another statute." Defs.' Opp'n, ECF No. 76 at 19–20.

**App. 170**

Second, even accepting the government's position that the phrase "prohibit . . . the introduction of" means "to intercept or prevent" the "process" of introduction, Defs.' Opp'n, ECF No. 76 at 18-19; this phrase also does not encompass expulsion from the United States, nor do any of the definitions provided by the Government contain the word "expel" or synonyms thereof. Rather, to "prohibit . . . the introduction of" merely means that the process of introduction can be halted. And "[e]xpelling persons, as a matter of ordinary language, is entirely different from interrupting, intercepting, or halting the process of introduction." *P.J.E.S.*, 502 F. Supp. at 512; *see also id.* at 536 (finding that the Merriam-Webster Dictionary definitions of "prohibit," "intercept," and "prevent" each "connote stopping something before it begins, rather than remedying it afterwards"). In other words, "interrupting, intercepting, or halting the process of introduction does [not] inexorably lead to expulsion." *Id.* at 512.

---

However, the Supreme Court routinely points to other statutes as evidence that Congress knows how to legislate in particular ways. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("A textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision. Congress has enacted statutes that expressly include the language [the petitioner] asks us to read in . . . ."); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) (explaining that "when Congress wants to mandate [certain] procedures[,] it knows exactly how to do so," and "Congress has spoken often and clearly" to the issue in other statutes).

The Government next contends that, "rather than specifying that the power to prohibit the introduction of persons is limited to the Nation's borders," Congress expressly delegated the power to issue regulations that accomplish Section 265's purpose. Defs.' Opp'n, ECF No. 76 at 20. But the government's argument is beside the point; if Section 265 does not provide the authority to expel persons, then it does not delegate the authority to issue regulations to expel persons. In addition, the Court also notes that the legislative history cited by the government—that Section 265's predecessor statute would have given the President the power to suspend "immigration," *see* Defs.' Opp'n, ECF No. 76 at 22—does not provide support for its position that Section 265 authorizes it to expel persons.

Finally, in view of the above discussion and finding that Section 265 is not ambiguous, the Court need not reach step two of the *Chevron* analysis. However, even if the statute was ambiguous, deference would not be justified. First, "the 'reconciliation' of distinct statutory regimes 'is a matter for the courts,' not agencies," *Epic Sys.*, 138 S. Ct. at 1629 (quoting *Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 685-86 (1975)); and here, "[t]he question for this claim is purely legal: does Section 265 authorize expulsions from the United States, or does it not?" *P.J.E.S.*, 502 F. Supp. 3d at 544 n.15. And while the government contends that the interpretation of

42

"introduction" is within the Secretary's expertise, *see* Defs.'
Opp'n, ECF No. 76 at 33-34; the Court disagrees. "The CDC's
'scientific and technical knowledge' . . . has no bearing on
that question of statutory interpretation." *P.J.E.S.*, 502 F.
Supp. 3d at 544 n.15. Moreover, government has not explained how
its scientific and technical expertise would lead it to
interpret "introduction" to encompass "expulsion." *Cf. Kisor v.
Wilkie*, 139 S. Ct. 2400, 2416 (2019) (noting that "[a] court
must make an independent inquiry into whether the character and
context of the agency interpretation entitled it to controlling
weight"); *see also NRDC v. Daley*, 209 F.3d 747, 755-56 (D.C.
Cir. 2000) ("The Service cannot rely on 'reminders that its
scientific determinations are entitled to deference' in the
absence of reasoned analysis 'to cogently explain' why its
additional recommended measures satisfied the Fishery Act's
requirements."). Accordingly, the CDC is not entitled to
deference with respect to its interpretation.[6]

### 2. Plaintiffs Face Irreparable Injury

"The failure to demonstrate irreparable harm is 'grounds
for refusing to issue a preliminary injunction, even if the

---

[6] Because the Court finds that Title 42 does not authorize
expulsion, the Court need not address Plaintiffs' additional
arguments that Section 265 was designed to regulation
transportation or that, even if Section 265 authorized
expulsions, the Title 42 Process would violate the immigration
statutes. *See* Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 21, 27.

**App. 173**

other three factors . . . merit such relief.'" *Nat'l Mining
Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (RBW)
(quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d
290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking
a preliminary injunction must satisfy 'a high standard' for
irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting
*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant
must demonstrate that it faces an injury that is "both certain
and great; it must be actual and not theoretical," and of a
nature "of such imminence that there is a clear and present need
for equitable relief to prevent irreparable harm." *Wis. Gas Co.
v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and
emphasis omitted).

Plaintiffs contend that they are likely to suffer
irreparable harm if they are expelled without the opportunity to
seek humanitarian relief pursuant to the Title 42 Process. Pls.'
Mot. Prelim. Inj., ECF No. 57-1 at 31. Plaintiffs have presented
as evidence United States Department of State reports and
multiple declarations asserting that the home countries of the
proposed class members "are among the most dangerous in the
world due to gang, gender, family membership, and other
identity-based violence." *Id.* at 32. The declarations submitted
to the Court specify in detail Plaintiffs' fear of violence,
persecution, and other victimization if they are removed, yet

44

**App. 174**

they remain subject to the Title 42 Process and face the threat
of removal prior to receiving any of the protections the
immigration laws provide. *See, e.g.*, Sealed Decl., ECF No. 9;
Sealed Decl., ECF No. 17; Sealed Decl., ECF No. 27; Sealed
Decl., ECF No. 32; Sealed Decls., ECF Nos. 63-67; Sealed Decl.,
ECF No. 70; Sealed Decls., ECF Nos. 84; Sealed Decls., ECF No.
88-89. Plaintiffs further assert that many of the families "are
expelled to Mexico, where they are often victimized by criminal
cartels and gang members and face numerous barriers to finding
safe places to shelter." Pls.' Mot. Prelim. Inj., ECF No. 57-1
at 33. Defendants do not dispute the potential harms that
Plaintiffs could face if removed from the United States.

The Court finds that Plaintiffs have sufficiently shown
they will likely suffer irreparable harm absent a preliminary
injunction. Plaintiffs' alleged injuries would likely be "beyond
remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at
297. First, pursuant to the Title 42 Process, Plaintiffs and the
proposed class members face the prospect of expulsion without
any opportunity to apply for asylum or withholding of removal.
And once expelled from the United States and outside the
jurisdiction of the Court, a judicial remedy may be unavailable.
*See Doe v. Mattis*, 928 F.3d 1, 22 (D.C. Cir. 2019) (finding
irreparable harm likely to flow from the transfer of a dual
citizen detained in Iraq to an unidentified third country

45

**App. 175**

because he would then be in the custody of that third country
"without any continuing oversight by—or recourse to—the United
States"); *P.J.E.S.*, 502 F. Supp. 3d at 545; *Tefel v. Reno*, 972
F. Supp. 608, 619–20 (S.D. Fla. 1997) ("[T]he Court finds . . .
that Plaintiffs and class members would suffer irreparable harm
if they are deported to their native countries after having been
denied an opportunity to have a hearing on their claims for
suspension of deportation."); *Velasquez v. Velasquez*, No. 14-cv-
1688, 2014 WL 7272934, at *5 (E.D. Va. Dec. 15, 2014) (finding
irreparable harm where children could be removed from
jurisdiction because that would "frustrate the effort of th[e]
Court in resolving the [dispute]"). Second, members of the
proposed class also do not seek monetary compensation for their
injuries; instead, they seek injunctive and declaratory relief
invalidating the Title 42 Process. Unlike economic harm, the
harm resulting from expulsion from the United States pursuant to
an unlawful policy likely cannot be remediated after the fact.
*Cf. Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295
(D.C. Cir. 2009) (explaining that economic losses are typically
not irreparable because compensation can be awarded after a
merits determination).

In addition, "[i]t is well-established that acts by
[g]overnment agencies in derogation of statutory rights of the
public or certain individual members of the public can

constitute irreparable injury." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 42 n.22 (D.D.C. 2017) (quoting *Gates v. Schlesinger*, 366 F. Supp. 797, 800 (D.D.C. 1973)). Here, the Court has explained that Section 265 likely does not authorize expulsion, thereby denying the proposed class members' the opportunity to seek humanitarian benefits pursuant to the immigration statutes.

Defendants argue, however, that the "inherently individualized nature" of Plaintiffs' potential harms does not demonstrate that the harms are "likely" to occur in the absence of a preliminary injunction. Defs.' Opp'n, ECF No. 76 at 35. But while the decision whether to eventually grant asylum to individuals is undoubtedly fact-intensive, as explained above, Plaintiffs have provided ample unrebutted evidence demonstrating that they are collectively deprived of certain statutory procedures to seek protection under the Title 42 Process, and they face real threats of violence and persecution if they were to be removed from the United States. *See, e.g.*, Neusner Decl., ECF No. 118-4 ¶ 8; Harbury Decl., ECF No. 118-5 ¶¶ 1, 10; Arvey Decl, ECF No. 118-7 ¶ 16; Pinheiro Decl., ECF No. 118-7 ¶ 37; Suppl. Levy Decl., ECF No. 118-3 ¶ 16; Rivas Decl., ECF No. 118-11 ¶ 16. In addition, as Plaintiffs point out, "Defendants offer no evidence that class members face materially disparate dangers once expelled." Pls.' Reply, ECF No. 118 at 20. As other courts

47

**App. 177**

have noted, "similar showings" of "bona fide clams for
humanitarian relief, including fear of persecution on the basis
of protected characteristics," have been found to be "sufficient
to demonstrate irreparable injury." *P.J.E.S.*, 502 F. Supp. 3d at
544 (citing cases); *see also J.B.B.C. v. Wolf*, No. 20-cv-1509,
2020 WL 6041870, at *2 (D.D.C. June 26, 2020) (stating that
sealed "declaration describing the possible harms that would
result from plaintiff's return to Honduras" was sufficient);
*Devitri v. Cronen*, 289 F. Supp. 3d 287, 296-97 (D. Mass. 2018)
(finding unrebutted evidence showing threat of persecution or
torture if deported established likely irreparable harm, despite
"no individualized evidence concerning the specific threats each
Petitioner faces in Indonesia"); *Grace v. Whitaker*, 344 F. Supp.
3d 96, 146 (D.D.C. 2018), *aff'd in part, rev'd in part on other
grounds sub nom.*, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)
("[P]laintiffs credibly alleged at their credible fear
determinations that they feared rape, pervasive domestic
violence, beatings, shootings, and death in their countries of
origin. Based on plaintiffs' declarations attesting to such
harms, they have demonstrated that they have suffered
irreparable injuries."); *Orantes-Hernandez v. Meese*, 685 F.
Supp. 1488, 1504-05 (C.D. Cal. 1988) (finding that plaintiffs
would suffer irreparable harm if they were summarily removed

App. 178

without being afforded the opportunity to exercise their right
to apply for asylum).

Defendants also contend that "the [g]overnment's
implementation of the Order provides a process for determining a
covered alien's claim for protection under the Convention
Against Torture. Thus, Plaintiffs would not be expelled without
some opportunity to seek humanitarian relief." Defs.' Opp'n, ECF
No. 76 at 35. However, Defendants do not dispute that Plaintiffs
and proposed class members would still be deprived of the
protections and procedures provided for under the immigration
statutes. *See id.*

Plaintiffs have thus shown a likelihood of suffering
irreparable harm.

### 3. The Balance of the Equities and Public Interest Favors an Injunction

The balance-of-equities factor directs the Court to
"balance the competing claims of injury and . . . consider the
effect on each party of the granting or withholding of the
requested relief." *ConverDyn*, 68 F. Supp. 3d at 52 (quoting
*Winter*, 555 U.S. at 24). "When the issuance of a preliminary
injunction, while preventing harm to one party, causes injury to
the other, this factor does not weigh in favor of granting
preliminary injunctive relief." *Id.; see also Serono Labs., Inc.
v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast,

the balance of equities may favor a preliminary injunction that serves only "to preserve the relative positions of the parties until a trial on the merits can be held." *Rufer v. FEC*, 64 F. Supp. 3d 195, 206 (D.D.C. 2014) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest'. . . ." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (second alteration in original) (citations omitted).

Plaintiffs contend that issuing a preliminary injunction "would not substantially injure the government and would be consistent with public health" because (1) "families who come to the border . . . can be processed quickly by Border Patrol agents and released to sponsors in the interior," where they can quarantine and be subject to local health restrictions; (2) "insofar as Defendants choose to detain families upon their apprehension at the border, Defendants operate family detention facilities where the family can be housed together," as well as tested and quarantined; and (3) "Defendants keep many families in custody for weeks before expulsion," where the families are tested for COVID-19. Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 34-35. Defendants, in opposition, argue that "an injunction will

increase the risk of COVID-19 transmission, which for some could have deadly consequences, and undoing the mitigation measures put in place by the Order is not in the public interest." Defs.' Opp'n, ECF No. 76 at 36.

Here, the Court ultimately finds that the balance of the equities and the public interest weigh in favor of an injunction.

First, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Ramirez v. ICE*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018) ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate."); *R.I.L-R*, 80 F. Supp. 3d at 191 ("The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.'"). As explained above, the Court has determined that Plaintiffs are likely to succeed on their claim that the Title 42 Process is unlawful. Accordingly, because "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate," *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977); the Court finds that Plaintiffs likelihood of success "is a strong indicator that a preliminary injunction would serve the public interest," *Newby*,

838 F.3d at 12; *see also A.B.-B. v. Morgan*, No. 20-cv-846, 2020
WL 5107548, at *9 (D.D.C. Aug. 31, 2020) ("[T]he Government and
public can have little interest in executing removal orders that
are based on statutory violations . . . .").

Second, "the public has an interest in 'ensuring that we do
not deliver aliens into the hands of their persecutors,' *Leiva-
Perez* [*v. Holder*], 640 F.3d [962,] 971 [(9th Cir. 2011)], and
'preventing aliens from being wrongfully removed, particularly
to countries where they are likely to face substantial harm,'
*Nken*, 556 U.S. at 436." *East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640, 678 (9th Cir. 2021). Here, the Title 42 Process
deprives Plaintiffs and the proposed class members of an
opportunity to seek humanitarian protections under the asylum
and withholding of removal statutes. Proceeding to the merits of
this litigation without preliminary injunctive relief thus
"risks [P]laintiffs being returned to home countries where they
face significant risk of physical harm." *A.B.-B.*, 2020 WL
5107548, at *9. Defendants do not question that Plaintiffs face
substantial harm if returned to their countries of origin.
Accordingly, "[t]hese life-or-death consequences weigh heavily
in favor of preliminary injunctive relief." *Id.; see also
Devitri*, 289 F. Supp. 3d at 297 (D. Mass. 2018) ("The public's
interest in providing due process for non-citizens to ensure
that they are not removed to a country where they will be

52

**App. 182**

persecuted is an extremely weighty one."); *Chaudhry v. Barr*, No. 19-cv-00682, 2019 WL 2009307, at *4 (E.D. Cal. May 7, 2019) ("[T]here is . . . 'a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" (quoting *Sied v. Nielsen*, No. 17-cv-06785, 2018 WL 1142202, at *27 (N.D. Cal. Mar. 2, 2018))).

Defendants argue, however, that "an injunction will increase the risk of COVID-19 transmission, which for some could have deadly consequences, and undoing the mitigation measures put in place by the Order is not in the public interest." Defs.' Opp'n, ECF No. 76 at 36. According to Defendants, (1) "CBP facilities 'are not structured or equipped for quarantine or isolation for COVID-19'"; (2) "[t]he numbers of aliens and the size and capacity of the congregate holding areas are not at all conducive to effective social distancing"; and (3) "CBP is not equipped to provide on-site care to infected persons." *Id.* (quoting March Order at 14; Final Rule, 85 Fed Reg. at 56,433). Due to these constraints, Defendants fear that U.S. Border Patrol's facilities "may rapidly become overcrowded" if the Title 42 Process is rescinded. *Id.* But despite the government's warnings regarding the capacity of its facilities and staff, the fact remains that "86% of families arriving at the southwest border are *already* allowed into the United States and processed

53

**App. 183**

for regular removal proceedings." Pls.' Reply, ECF No. 118 at

22. Moreover, although Defendants have expressed concerns

regarding its inability to provide for quarantine space or

"effective social distancing" if the Title 42 Process were not

in effect, expulsion pursuant to the CDC Orders still results in

"plac[ing] families on crowded planes and buses from the Rio

Grande Valley," without first testing the individuals and

isolating those who test positive, and transporting them "to

other locations in Texas, or places as far away as Arizona and

San Diego," before expelling them or releasing them into the

United States. Pls.' Reply, ECF No. 118 at 25.

Citing an increased number of "enforcement encounters" from

April 2020 to January 2021, Defendants further contend that an

injunction in this case could "create a 'pull factor' leading to

additional attempts to enter the United States and in turn more

apprehensions." Defs.' Opp'n, ECF No. 76 at 37 (citing Miller

Decl., ECF No. 76-2 ¶ 16). However, as Plaintiffs point out,

Defendants' only evidence in support of their prediction is "a

16% increase in encounters of unaccompanied children in the

weeks after entry of this Court's injunction in *P.J.E.S.* in

November 2020," which was actually "part of a larger upward

trend that predated the injunction by *many months*—and it was

smaller than the percentage increase for each month from April

to October 2020, when Title 42 was being enforced against

54

**App. 184**

unaccompanied children." Pls.' Reply, ECF No. 118 at 26 (citing Menjívar Decl., ECF No. 118-23 ¶ 15). Moreover, though Defendants contend that there has been a "historic" level of enforcement encounters at the border, the statistics Defendants cite "overstate the number of unique individuals arriving at the border." Reichlin-Melnick Decl., ECF No. 118-18 ¶¶ 15-16. For example, Plaintiffs have provided evidence that, after the implementation of the Title 42 Process, the recidivism rate of individuals crossing the border increased from less than 7% to 40%. *Id.* ¶ 11. In other words, under the Title 42 regime, individuals seeking an asylum hearing have attempted to cross the border multiple times, "sometimes 10 times or more, and each attempt is counted as a new 'encounter.'" Pls.' Reply, ECF No. 118 at 22. Such evidence casts doubt on Defendants' claims that an injunction in this matter would create a "pull factor." *See Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018) (finding argument that border crossings would surge due to court order lacked merit).

Defendants also note that "the pandemic has taken a toll on the CBP workforce," with many CBP employees contracting COVID-19 and several others dying from the virus. Defs.' Opp'n, ECF No. 76 at 37 (citing Miller Decl., ECF No. 76-2 ¶ 18). Defendants assert that "[w]ith personnel on sick leave or quarantining, the ability of CBP to perform its functions is diminished." *Id.*

55

**App. 185**

(citing Miller Decl., ECF No. 76-2 ¶ 14). The loss of life
resulting from COVID-19 contraction is undeniably tragic, and
the Court agrees that "promoting public health—especially during
a pandemic—is in the public interest." *Nat'l Immigration Project
of Nat'l Lawyers Guild v. Exec. Off. of Immigration Review*, 456
F. Supp. 3d 16, 34 (D.D.C. 2020). However, Defendants provide no
evidence that the CBP employees who tested positive for COVID-19
contracted the virus from any of the asylum seekers crossing the
border into the United States. And, significantly, since
Defendants filed its opposition brief in this matter, vaccines
protecting against the risk of serious disease and
hospitalization have become widely available in the United
States. *See* Pls.' Reply, ECF No. 118 at 25. The Court does not
doubt that a preliminary injunction issued in this matter would
force the government "to make difficult decisions about
allocation of resources to mitigate the risks caused by COVID-
19." *P.J.E.S.*, 502 F. Supp. 3d at 549. But in view of the wide
availability of testing, vaccines, and other minimization
measures, the Court is not convinced that the transmission of
COVID-19 during border processing cannot be significantly
mitigated. Indeed, the government has successfully implemented
mitigation measures with regard to processing unaccompanied
minors in order to minimize risk of COVID-19 transmission. *See*
Pls.' Reply, ECF No. 118 at 21-22.

Finally, Defendants argue that "[a]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Defs.' Opp'n, ECF No. 76 at 38 (quoting *Maryland v. King*, 133 S. Ct. 1, 3 (2012)). But, as explained above, the Title 42 Process is likely unlawful, and "[t]here is generally no public interest in the perpetuation of an unlawful agency action." *Newby*, 838 F.3d at 12.

### 4. The Court Will Not Require Plaintiffs to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). "Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)) (internal citation omitted). Here, Plaintiffs are families allegedly fleeing persecution in their home country and do not have the ability to post a bond. Additionally, they are seeking to vindicate

important procedures and protections under the immigration laws. Accordingly, the Court will waive the requirement for an injunction bond. *See id.*

### 5. The Court Shall Stay the Preliminary Injunction

Defendants request that the Court stay its Order enjoining the Title 42 Process for 14 days "to give Defendants sufficient time to explore their appellate options." Defs.' Opp'n, ECF No. 76 at 39. Plaintiffs do not oppose Defendants' request. Pls.' Reply, ECF No. 118 at 30. Accordingly, the Court shall stay its Order for 14 days from the date of its entry. However, the Court declines to stay this decision pending appeal for substantially the same reasons as those articulated in this Opinion.

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Class Certification, ECF No. 23, and **GRANTS** Plaintiffs' Motion for Preliminary Injunction, ECF No. 57. The preliminary injunction shall be stayed for 14 days. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan
          United States District Judge
          September 16, 2021**

App. 188

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*, *et al.*, <br><br> Defendants. | Civ. Action No. 21-100(EGS) |

<u>**ORDER**</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Class Certification is **GRANTED**; and it is further

**ORDERED** that the Court certifies a class pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure consisting of all noncitizens who: (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process; and it is further

**ORDERED** that Plaintiffs Nancy Gimena Huisha-Huisha and her minor child I.M.C.H.; Valeria Macancela Bermejo and her minor

App. 189

daughter, B.A.M.M.; Josaine Pereira-De Souza and her minor children H.N.D.S.; E.R.P.D.S.; M.E.S.D.S.; H.T.D.S.D.S.; Martha Liliana Taday-Acosta and her minor children D.J.Z.; J.A.Z.; Julien Thomas, Fidette Boute, and their minor children D.J.T.-B.; T.J.T.-B.; and Romilus Valcourt, Bedapheca Alcante, and their minor child, B.V.-A., are appointed as Class Representatives; and it is further

**ORDERED** that ACLU Immigrants' Rights Project is appointed Lead Class Counsel, and the Texas Civil Rights Project, the ACLU of Texas, the ACLU of the District of Columbia, the Refugee and Immigrant Center for Legal Education and Legal Services (RAICES), the Center for Gender & Refugee Studies, and Oxfam America are appointed as Class Counsel; and it is further

**ORDERED** that Defendants' Motion for Oral Argument is **DENIED**; and it is further

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that, pursuant to this Order, Defendants are **HEREBY ENJOINED** from applying the Title 42 Process, including the CDC's August 2021 Order, to the Class Members; and it is further

**ORDERED** that this Order shall be stayed for 14 days from the date of its entry; and it is further

2

**ORDERED** that any request to stay this Order pending appeal will be denied for the reasons stated in the accompanying Memorandum Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
                 **United States District Judge**
                 **September 16, 2021**

3

**App. 191**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,<br><br>Defendants. | Civ. A. No. 21-100 (EGS) |

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that all Defendants appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's September 16, 2021 Order (ECF No. 122) and Memorandum Opinion (ECF No. 123) granting a preliminary injunction.

Dated:  September 17, 2021

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

 /s/ Sean M. Tepe____
SEAN M. TEPE, DC Bar #1001323
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2533
Email: sean.tepe@usdoj.gov

**App. 192**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,<br><br>Defendants. | Civ. A. No. 21-100 (EGS) |

**DECLARATION OF DAVID SHAHOULIAN**

I, David Shahoulian, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, as well as documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.  I am the Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS or Department) and have been in this role since January 20, 2021.  I previously served as Deputy General Counsel at DHS from June 29, 2014 to January 19, 2017.

2.  I submit this declaration to alert the Court to the adverse consequences of a preliminary injunction prohibiting the Government from applying the Centers for Disease Control and Prevention's (CDC) Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists ["CDC Order"], 85 Fed. Reg. 65806 (Oct. 16, 2020), or any similar order, to the putative class in this case.

3.  As explained in more detail below, the United States is currently encountering record numbers of noncitizens, including families, at the border.  These encounter rates have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity,

1

impacting the ability to employ social distancing in these congregate settings.  At the same time, DHS is also experiencing significantly increased rates of noncitizens testing positive for COVID-19.  In light of these and other considerations, enjoining the application of the CDC Order to families would exacerbate overcrowding at DHS facilities and create significant public health risks.

4.  Since January 2021, the Department has engaged in extensive efforts to increase its capacity to safely process asylum seekers and other noncitizens.  Among other things, DHS has worked tirelessly to build capacity and to create innovative new approaches to allow asylum seekers and other noncitizens to be processed in a manner that ensures their health and safety, and that of DHS officers and the American public.  Those efforts—which are the product of extensive collaboration with other U.S. Government agencies, foreign governments, and non-governmental organization (NGO) partners—have been successful in significant respects as detailed below.

5.  The Department lacks sufficient capacity to safely hold and process all individuals seeking to enter the United States during the global pandemic if the U.S. Government were restricted in its ability to implement the CDC Order.  These capacity challenges are particularly acute with respect to families.  DHS continues to have severely limited capacity to hold and process families, and the current migrant surge and ongoing pandemic have only compounded these issues.

6.  If the CDC Order is enjoined with respect to families, the increased number of families seeking to enter the United States would each require additional processing related to admissibility, which would in turn require them to be held for longer periods in increasingly crowded conditions.  Moreover, due to such conditions and other capacity constraints, DHS would effectively need to release a growing number of families into border communities, which risks overwhelming the local testing, isolation, and quarantine infrastructure DHS has worked to create and will thus burden

**App. 194**

local healthcare systems and strain healthcare resources.  An injunction restricting implementation of the current CDC Order as to families will result in an immediate increased risk of harm from COVID-19 for noncitizens in DHS custody, DHS personnel, and potentially the public.

    **I.**       **The U.S. Government's Efforts to Build Capacity and Improve Processing**

7.  Since January 2021, the U.S. Government has engaged in extensive and varied efforts to improve the immigration processing systems at the border, while also dealing with challenges presented by the COVID-19 pandemic and the current influx of noncitizens seeking refuge in the United States.

8.  First, the Government has worked to significantly increase its ability to safely process and house individuals encountered between ports of entry after crossing into the United States.  U.S. Customs and Border Protection (CBP) and the Department of Health and Human Services, for example, have stood up numerous emergency facilities in the United States (and retrofitted existing ones) to increase their ability to safely hold and process individuals—particularly unaccompanied children (UCs) and families—encountered after crossing between ports of entry.  U.S. Immigration and Customs Enforcement (ICE) has transitioned existing facilities for the processing and testing of families, and it has entered into a contract with a non-profit social service organization to add over 1,200 additional beds to ICE's family housing capacity.  And the Department has transferred hundreds of personnel from various component agencies around the country to the southwest border to assist with the processing and care of individuals encountered at the border.

9.  Second, the Department has also taken significant steps to develop systems to facilitate testing, isolation, and quarantine of those individuals who are not immediately returned to their home countries after encounter.  Across most of the southwest border, these systems were developed by DHS in coordination with state and local jurisdictions, non-governmental

**App. 195**

organizations, and other private entities.  In the Del Rio sector, where there is limited non-governmental organization capacity, the Department set up a system for testing and non-congregate sheltering involving private contractors and ICE family facilities.  Due to infrastructure and resource limitations, it is not feasible to replicate this latter system across the border.

10. Third, the U.S. Government also engaged in several lines of effort to improve its capacity to safely process asylum seekers and other individuals through U.S. ports of entry.  For example, the U.S. Government—in collaboration with international organizations and domestic non-governmental organizations—rapidly developed an innovative system to register, test, and transport certain individuals previously returned to Mexico pursuant to the Migrant Protection Protocols (MPP) for safe and orderly processing into the United States through various ports of entry at the southwest border.  To date, the U.S. Government has processed approximately 13,000 individuals, including many families, pursuant to its Title 8 authorities through this program.

11. The U.S. Government has also engaged with international humanitarian organizations and non-governmental organizations to establish similar streamlined systems for the U.S. processing of other individuals, particularly families, who may qualify for an exception to the CDC Order for humanitarian reasons.  Under these systems, non-governmental organizations identify and refer families and other individuals in vulnerable situations in Mexico to DHS for possible exception from expulsion, based on the totality of the circumstances, on a case-by-case basis, as determined by DHS in accordance with the CDC Order.  Once they test negative for COVID-19, such individuals may be processed pursuant to Title 8 authorities at designated ports of entry.  To date, over 16,000 individuals have been processed into the United States through these CDC-authorized processes.

**App. 196**

12. DHS is committed to continuing to use mechanisms like those described above to allow the safe processing of vulnerable families under Title 8 for as long as Title 42 remains applicable to families.

**II.      An Injunction Would Result in Severe Capacity Limitations Endangering Non-Citizens, DHS Employees, and Others**

13. Despite the U.S. Government's efforts to build safe processing capacity, DHS's application of the CDC Order remains necessary, while the pandemic continues, to prevent COVID-19 exposure risks to DHS personnel, individuals seeking entry to the United States, and border communities.  This risk has recently increased due to the recent spread of the highly transmissible COVID-19 Delta variant.  The rates at which encountered noncitizens are testing positive for COVID-19 have increased significantly in recent weeks.  And although the rate of infection among CBP officers had been declining, this rate recently began increasing again, even though the percentage of officers and agents who have been fully vaccinated has grown significantly since January.  This has led to increasing numbers of CBP personnel being isolated and hospitalized.

14. Unlike at ports of entry, where DHS can better manage the volume and rate at which individuals are processed, there is substantially less ability to manage or control the volume and rate of encounters that may occur between the ports.  Without the CDC Order, DHS would likely encounter increased numbers of families crossing the border between the ports of entry.  And the Department would be faced with processing all such families under Title 8—which is significantly more extensive and time consuming than Title 42 processing—regardless of the number of individuals encountered on a given day.  DHS must often transport such noncitizens in passenger vehicles, including from remote locations, to U.S. Border Patrol stations or other CBP facilities for additional processing in congregate settings.  Each of these interactions—encounter, custody,

5

transportation, and holding in congregate setting—increases the risks of COVID-19 exposure and transmission.

15. As noted in the CDC Order itself, CBP facilities are designed for short-term holding and initial processing, generally prior to transfer to another agency, such as ICE or the Office of Refugee Resettlement (ORR) within HHS, which houses UCs until they can safely be placed with sponsors.  They are not designed to hold individuals for extended periods of time, particularly during a pandemic when social distancing and isolation are needed to limit the spread of disease. The congregate nature of these facilities restricts the ability to quarantine, isolate, and enable social distancing by persons who are or may be infected with COVID-19.  As these CBP facilities become overcrowded during a surge, bottlenecks in immigration processing develop, along with bottlenecks in ICE transportation, detention capacity for families and single adults, and ORR capacity for UCs.  As a result, noncitizens' length of stay in DHS custody extends significantly.

16. Moreover, CBP's already limited border processing capacity has been greatly reduced through the implementation of public-health protocols designed to mitigate COVID-19 transmission.  Under current protocols, CBP aims to maintain 25 percent capacity at many of its facilities, and up to 50 percent capacity at specialized central processing centers and soft sided facilities.  Loss of the ability to expel families pursuant to the CDC Order will directly contribute to the Department's inability to maintain critical COVID-19 capacity controls.

17. Importantly, the ability to expel certain covered noncitizens under the CDC Order does not result in the expulsion of every individual encountered at the border; DHS must still process noncitizens not covered by the Order, noncitizens excepted from the Order on a case-by-case basis, and noncitizens for whom expulsion is not available for other reasons.  Due to a variety of factors, including an historic surge in southwest border encounters in recent months, CBP has been

encountering a significant and growing number of individuals who must be held for processing in congregate facilities.

18. In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border.  During this period, CBP encountered over 6,000 individuals per day, including about 500 UCs and 1,650 individuals in family units.  These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations.  As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type.  Due to this combination of factors, many CBP facilities are already over that capacity—many significantly so, even with the CDC Order in place.

19. Based on preliminary data, the number of border encounters continued to increase in July 2021.  Over the first 29 days of July, CBP encountered an average of 6,779 individuals per day, including 616 unaccompanied children and 2,583 individuals in family units.  Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000.  July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.

20. Moreover, these historic encounter levels have not been evenly distributed across the southwest border.  Two Border Patrol sectors—Rio Grande Valley (RGV) and Del Rio—have experienced a disproportionate amount of these encounters.  For example, the RGV sector alone saw over 51,000 and 59,000 encounters in May and June 2021, respectively; and based on preliminary data, there appear to have been about 78,000 RGV encounters in July.  These two

App. 199

sectors have also experienced a disproportionate amount—about 71 percent—of family encounters.  As a result, facilities in these two sectors have been significantly more over-capacity relative to others.

21. As of August 1, 2021, the U.S. Border Patrol was at 389 percent of its overall COVID-19 adjusted capacity along the southwest border.  On that date, the Border Patrol had 17,778 noncitizens in custody (2,233 of whom were UCs) at its Border Patrol facilities, despite a COVID-19 adjusted capacity of 4,706.  More specifically, the Border Patrol was over capacity in seven of its nine southwest border sectors.  As of August 1, the RGV sector—which has been the epicenter of the current surge—was holding 10,002 noncitizens and was thus 783 percent over its COVID-19 adjusted capacity of 1,278 and 287 percent over its normal, non-adjusted capacity of 3,485.  Within RGV, noncitizen families and UCs are primarily transferred to a temporary processing facility in Donna, Texas in the RGV, which has a normal operating capacity of 1,625 and a COVID-19 adjusted capacity of 813 based on CDC recommended guidelines.  Within nine days of this facility opening on February 9, 2021, it had already exceeded its normal non-COVID-19 operating capacity with more than 1,000 noncitizens in custody.  As of August 1, this facility was operating at 446 percent of its COVID-19 adjusted capacity, and 223 percent of its normal non-COVID-19 operating capacity, with 3,623 noncitizens in custody.

22. These capacity figures are extremely worrisome, particularly because of the continued spread of the highly transmissible Delta variant.  Overcrowding challenges DHS's ability to effectively execute many of its core public health mitigation and countermeasure activities.  Additionally, higher rates of COVID-19 transmission within a DHS facility could quickly impede the Department's ability to utilize that facility's maximum capacity, further lowering the overall processing and holding capacity along the southwest border.  Indeed, the Department's operations

**App. 200**

have already been impacted by significantly increased positivity rates among individuals in its facilities, including families.

23. Monthly family encounter rates have generally been increasing since April 2020, rising 100-fold from 738 encounters in April 2020 to over 75,000 in July 2021.  Due to the impacts of the current pandemic, and the deteriorating economic conditions and increasing instability in the region from which the migrants originate, such encounters may increase further in the coming months.  Based on current trends, the Department expects that total encounters this fiscal year are likely to be the highest ever recorded.  The Department also expects that these numbers will climb even higher if the CDC Order is enjoined.

24. If an injunction is issued with respect to families, DHS will be required to process additional families under Title 8, requiring additional staff and space due to increased processing times.  Processing a family under Title 42 typically takes 10 to 15 minutes and is largely conducted outdoors, while processing a family for Title 8 can take 1.5 to 3 hours and is generally conducted indoors.  Processing all families under Title 8 will thus generally require DHS to hold significantly increased numbers of individuals in a variety of congregate settings, including during transportation to Border Patrol stations or other CBP facilities, and to process them at such facilities.  Because many Border Patrol stations and other CBP facilities along the southwest border are already over operating capacity, increasing the number of individuals required to be held at such facilities would further limit the ability to employ social distancing and other COVID-19 related countermeasures.

25. The CDC has determined that the expulsion of certain noncitizens is necessary to protect public health because DHS is simply unable to process all noncitizen families safely under current circumstances, and particularly in the event of a large-scale influx.   Enjoining DHS's

implementation of the CDC Order as to families would therefore endanger noncitizens in DHS facilities, DHS personnel, and ultimately the general public.

*           *           *

26. The United States has been built by generations of immigrants in search of refuge.  In line with that tradition, the Department is committed to ensuring that asylum seekers and other noncitizens seeking protection are treated with dignity and compassion. At the same time, the ongoing COVID-19 pandemic presents complex and dynamic challenges relating to public health that limit the Department's ability to process all such individuals safely under normal procedures. These challenges have been greatly exacerbated by the rise in novel COVID-19 variants, including the Delta variant.  The Department continues to work tirelessly to address those challenges as they emerge and implement procedures as needed to promote the health and safety of noncitizens, DHS personnel, border communities, and the American public.  During this period and given the unique public health danger posed by the ongoing pandemic, implementation of the CDC Order is critical to preventing overcrowding and the spread of infection within DHS facilities.

Executed on August 2, 2021.

*David Shahoulian*

David Shahoulian
Assistant Secretary for Border and Immigration Policy
U.S. Department for Homeland Security

**App. 202**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| STATE OF TEXAS,<br><br>    Plaintiff,<br><br> v.<br><br>JOSEPH R. BIDEN, JR, in his official capacity<br>as the President of the United States, et al.,<br><br>    Defendants. | Civil Action No. 4:21-cv-00579-P |

## DECLARATION OF DAVID SHAHOULIAN

I, David Shahoulian, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.   I am the Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS or Department) and have been in this role since January 20, 2021.  I also previously served at DHS as Deputy General Counsel from June 29, 2014, to January 19, 2017.

2.   I submit this declaration in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction filed in the above-captioned case.  Plaintiff alleges, among other things, that in processing noncitizen family units DHS fails to comply with an order issued by the Centers for Disease Control and Prevention (CDC) temporarily prohibiting the introduction of certain noncitizens traveling from Canada or Mexico into the United States.  *See* Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable

1

Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020) [hereinafter the "October CDC Order"], and 8 U.S.C. § 1222(a).

3.   The October CDC Order generally applies to noncitizens traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting at a port of entry or Border Patrol station at or near the U.S. borders with Canada or Mexico, and contains several exceptions.  As relevant here, "this [October CDC] Order does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  85 Fed Reg. at 65807.  The Order also "does not apply to any alien who must test negative for COVID–19 before they are expelled to their home country."  *Id.*

4.   DHS's processing of noncitizen family units complies with the October CDC Order. U.S. Customs and Border Protection (CBP) is assisting in enforcing the Order by expelling noncitizen family units at and between ports of entry.  It is important to note, however, that DHS cannot carry out the CDC Order without the cooperation of foreign governments—particularly the governments of Mexico and Canada—because our foreign partners have to agree to accept the return of the individuals whom the United States intends to expel.

5.   Along our Southern border, the Government of Mexico has placed various limitations on the nationalities and specific demographics (e.g., families with young children) that it will accept for return, which has in turn limited DHS's ability to assist in enforcing the October CDC Order with respect to certain noncitizen family units it encounters.  Mexico, for example, generally does not accept the return of individuals expelled from the United States unless they are nationals of Mexico, Guatemala, Honduras, or El Salvador.  At many Mexican ports along the

2

**App. 204**

border, Mexico also does not accept the return of non-Mexican families with children under the age of seven.

6.   In many cases in which expulsion to Mexico is unavailable, expulsion to an individual's home country under the October CDC Order is also unavailable due to one or more restrictions. For example, many countries require COVID-19 testing as a condition of accepting the return of their nationals.  But, as noted, the operative October 2020 CDC Order explicitly excludes "those who must test negative for COVID-19 before they are expelled to their home country."  85 Fed Reg. at 65807.  The CDC Order does not authorize expulsion in such cases.  Other countries impose practical limitations on the acceptance of repatriation flights—including travel document, identity verification, and manifest requirements that can take weeks to satisfy—that effectively prevent the timely expulsion of such persons under the October CDC Order.

7.   Approximately 80 percent of the non-citizen family units currently being encountered along the southwest border cannot be immediately expelled to either Mexico or their home country for these reasons.  Those individuals who cannot be expelled are instead placed into removal proceedings and processed under appropriate immigration authorities found at Title 8 of the U.S. Code.

8.   At select ports of entry, and pursuant to provisions in the October 2020 Order, DHS has exercised its discretion to except particularly vulnerable family units from application of the CDC Order, on a case-by-case basis, based on the totality of the circumstances.  DHS developed a process in which families identified as particularly vulnerable are referred to DHS by select non-governmental organizations (NGOs) for evaluation and consulted with CDC to ensure compliance with public health guidance.  Those who are excepted from the October CDC Order are instead processed under Title 8 authorities.  All such families are being required to have a

3

negative COVID-19 test administered within 72 hours before arrival at a designated port of entry.

9.   Unless expelled under the October CDC Order, other noncitizens who are encountered in the United States after crossing the border between the ports of entry are tested for COVID-19. For those ultimately transferred to ICE custody, COVID-19 testing occurs upon intake into an ICE facility.  At such facilities, noncitizen family units who test positive for, or who have been exposed to, COVID-19 are cohorted to reduce the possibility of transmission.  Noncitizen family units released directly from CBP facilities are provided testing either prior to or immediately after release from DHS custody.  For any of these family members who test positive for COVID-19 immediately after release, DHS has coordinated with appropriate state, local, and/or nongovernmental organizations for the provision of non-congregate accommodations so that the family members can properly isolate and/or quarantine consistent with public health protocols.

10. The above discussion shows that DHS is fully complying with the October CDC Order and is not categorically excepting family units from the Order.  Any preliminary injunction would harm DHS's interest.  First, it would put DHS in an untenable situation given the refusal of the Government of Mexico and restrictions imposed by other nations that practically prevent the expulsion of noncitizen family units that are currently being encountered.  Second, in implementing the October CDC Order, and as Order itself contemplates, DHS must balance various competing important governmental interests, including the ability to except noncitizens for humanitarian and other reasons from the Order on a case-by-case basis.

**App. 206**

11. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2021.

*David Shahoulian*

David Shahoulian
Assistant Secretary for Border and Immigration Policy
U.S. Department for Homeland Security

5

**App. 207**

# ERO Custody Management Division

## Population Counts from August 1, 2021 through August 31, 2021

Source: ICE Integrated Decision Support (IIDS), 09/06/2021

IIDS is a data warehouse that contains dynamic data extracts from the Enforcement Integrated Database (EID).

FY2021 data: IIDS as of 09/06/2021; EID data through 09/04/2021

Average Daily Population is calculated by the total daily population divided by the number of days in the month

Total Daily Population includes single adults and individuals in family units

ERO is currently appropriated sufficient funding for approximately 34,000 detention beds nationwide, to support its mission to enforce immigration law. ICE's access to its full inventory of bedspace is severely limited due to various court orders limiting the intake of noncitizen detainees, an increase in detention facility contract terminations, detention facility contract modifications, and the ongoing COVID-19 pandemic. Specifically, ICE's Pandemic Response Requirements (PRR) for its detention facilities, which are informed by the Centers for Disease Control and Prevention's COVID-19 guidelines, require that facilities undertake efforts to reduce populations to approximately 75% capacity. Last year, the U.S. District Court for the Central District of California issued a nationwide preliminary injunction recognizing the 75% capacity limit, and ordering ICE to maintain additional strict standards to reduce the risk of COVID-19 infection. See Fraihat v. ICE, 445 F.Supp.3d 709 (C.D. Cal. Apr. 20, 2020). In light of these mandates, ICE's currently available bedspace inventory is only approximately 26,800 beds

| Average Daily Population for the Month of August | 25,162 |
|---|---|

| Date | Total Daily Population |
|---|---|
| 8/1/2021 | 25,868 |
| 8/2/2021 | 26,260 |
| 8/3/2021 | 26,027 |
| 8/4/2021 | 25,527 |
| 8/5/2021 | 25,542 |
| 8/6/2021 | 25,514 |
| 8/7/2021 | 25,639 |
| 8/8/2021 | 26,106 |
| 8/9/2021 | 26,171 |
| 8/10/2021 | 25,946 |
| 8/11/2021 | 25,780 |
| 8/12/2021 | 25,412 |
| 8/13/2021 | 25,539 |
| 8/14/2021 | 25,653 |
| 8/15/2021 | 26,112 |
| 8/16/2021 | 25,810 |
| 8/17/2021 | 25,899 |
| 8/18/2021 | 25,609 |
| 8/19/2021 | 25,430 |
| 8/20/2021 | 24,838 |
| 8/21/2021 | 24,825 |
| 8/22/2021 | 25,019 |
| 8/23/2021 | 24,810 |
| 8/24/2021 | 24,438 |

| | |
|---|---|
| 8/25/2021 | 24,157 |
| 8/26/2021 | 23,680 |
| 8/27/2021 | 23,142 |
| 8/28/2021 | 23,438 |
| 8/29/2021 | 23,731 |
| 8/30/2021 | 24,070 |
| 8/31/2021 | 24,043 |