**Exhibit A**

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

**STATE OF TEXAS,**

        *Plaintiff,*

**v.**

**JOSEPH R. BIDEN, JR., in his official capacity as President of the United States,** *et al.*,

        *Defendants.*

**No. 4:21-cv-00579-P**

## BRIEF OF *AMICI CURIAE* 29 LEGAL SERVICE AND ADVOCACY ORGANIZATIONS IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION

Laura L. Smith
Texas Bar No. 24066039
Emma L. Persson
Texas Bar No. 24110219
O'MELVENY & MYERS LLP
2501 North Harwood Street
Suite 1700
Dallas, Texas 75201-1663
Telephone: +1 972 360 1900
Facsimile: +1 972 360 1901
lsmith@omm.com
epersson@omm.com

Daniel J. Tully*
California Bar No. 309240
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, California 90027
Telephone: +1 323 450 7275
daniel.tully@justiceactioncenter.org

*pro hac vice application forthcoming*

*Counsel for Amici Curiae 29 Legal Service and Advocacy Organizations*

**TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE* ................................................................. 1

INTRODUCTION ........................................................................................... 3

ARGUMENT ................................................................................................... 5

    I.     THE TITLE 42 POLICY IS UNLAWFUL AND CONTRARY TO THE PUBLIC INTEREST ............................................................................................ 6

    II.    THE PUBLIC INTEREST STRONGLY FAVORS DEFENDANTS' EXCEPTIONS FOR UNACCOMPANIED CHILDREN AND FAMILIES ....... 10

        A.    The Public Interest Supports Excluding Unaccompanied Children from Summary Expulsion Under the Title 42 Policy. ...................................... 11

        B.    The Public Interest Supports Defendants' Lawful Use of Humanitarian Parole to Families Subject to the Title 42 Policy .................................... 16

            1.    The Public Interest Is Furthered by Preventing the Removal of Families to Places Where They Risk Substantial Harm. ............. 17

            2.    The Public Interest Is Furthered by Policies that Support Family Unity. ..................................................................................... 20

                (a)    The Title 42 Policy Causes Family Separation Due to Gang Violence. ........................................................................... 20

                (b)    The Title 42 Policy Causes Family Separation Due to Hardship and Deprivation. ................................................. 22

                (c)    The Title 42 Policy Causes Family Separation by U.S. Immigration Officials ........................................................ 22

CONCLUSION ............................................................................................. 24

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdur-Rahman v. Napolitano*,
  814 F. Supp. 2d 1087 (W.D. Wash. 2010) .............................................................. 14

*Arizona v. United States*,
  567 U.S. 387 (2012) .............................................................................................. 16

*CAIR v. Trump*,
  No. 1:19-cv-02117 (D.D.C.) .................................................................................... 2

*Casarez v. Val Verde Cnty.*,
  957 F. Supp. 847 (W.D. Tex. 1997) ....................................................................... 13

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
  710 F.3d 579 (5th Cir. 2013) ............................................................................. 4, 9

*Flores v. Sessions*,
  862 F.3d 863 (9th Cir. 2017) ................................................................................ 12

*Grace v. Barr*,
  No. 1:18-cv-01853 (D.D.C.) .................................................................................... 2

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ................................................................................ 20

*Huisha-Huisha v. Mayorkas*,
  No. 21-CV-00100-EGS, 2021 WL 4206688 (D.D.C. Sept. 16, 2021) .......................... *passim*

*Immigrant Defenders Law Center v. U.S. Dep't of Homeland Security*,
  No. 2:21-cv-00395-FMO-RAO (C.D. Cal.) .................................................................. 2

*Immigrant Defenders Law Center v. Wolf*,
  No. 2:20-cv-09893 (C.D. Cal.) ................................................................................. 2

*Innovation Law Lab v. Wolf*,
  No. 3:19-cv-00807 (N.D. Cal.) ................................................................................. 2

*J.B.B.C. by and through Barrera Rodriguez v. Wolf*,
  No. 20-CV-1509-CJN, 2020 WL 6041870 (D.D.C. June 26, 2020) ................... 2, 4, 7, 8

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) ................................................................................ 16

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985) ................................................................................ 10

**TABLE OF AUTHORITIES**
**(CONTINUED)**

Page

*Ms. L. v. I.C.E.*,
310 F. Supp. 3d 1133 (S.D. Cal. 2018)..............................................................20, 24

*Nichols v. Alcatel USA, Inc.*,
532 F.3d 364 (5th Cir. 2008) ............................................................................5, 10

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................... *passim*

*Nobby Lobby, Inc. v. City of Dallas*,
767 F. Supp. 801 (N.D. Tex. 1991), *aff'd*, 970 F.2d 82 (5th Cir. 1992).................................14

*O.M.G. v. Wolf*,
No. 1:20-cv-00786 (D.D.C.) ........................................................................2

*P.J.E.S. by and through Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ...................................................... *passim*

*P.J.E.S. v. Pekoske*,
No. 20-5357, Doc. No. 1882899 (D.C. Cir. Jan. 29, 2021) ......................................9

*Pursuing America's Greatness v. Federal Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) ......................................................................10

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
667 F.3d 570 (5th Cir. 2012) ........................................................................6

*Texas v. United States*,
328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................................4, 5, 6

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
300 U.S. 515 (1937).................................................................................13

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA,
AFL-CIO*,
751 F.2d 721 (5th Cir. 1985) ......................................................................4, 9

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)...............................................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...............................................................................5, 10

**Statutes**

6 U.S.C. § 279(g) ...................................................................................2

iii

**TABLE OF AUTHORITIES**
**(CONTINUED)**

Page

8 U.S.C. § 1158(a)(1).................................................................................8, 19

8 U.S.C. § 1158(a)(2)(E)....................................................................................11

8 U.S.C. § 1158(b)(3)(C)....................................................................................11

8 U.S.C. § 1229a................................................................................................16

8 U.S.C. § 1231..............................................................................................8, 19

8 U.S.C. § 1231(b)(3)......................................................................................8, 19

8 U.S.C. § 1232(a)(5)(D).............................................................................11, 16

8 U.S.C. § 1232(c)(5).........................................................................................11

8 U.S.C. § 1232(d)(8).........................................................................................11

42 U.S.C. § 265...............................................................................................1, 7

**Other Authorities**

Fed. R. App. Proc. 29(a)(4)(E) ..........................................................................1

154 Cong. Rec. S10886-01 (daily ed. Dec. 10, 2008) ...............................11, 13

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.4 ..................................6

H.R. Rep. 110-430 (2007)...................................................................................12

H.R. Rep. No. 101-723, pt. 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 6710 .........................24

Hamed Aleaziz, *Border Officials Turned Away Unaccompanied Immigrant
    Children More Than 13,000 Times Under Trump's Pandemic Policy*,
    BuzzFeed News (Oct. 28, 2020), *available at*
    https://www.buzzfeednews.com/article/hamedaleaziz/border-officials-turned-
    away-unaccompanied-immigrants ...............................................................14

Human Rights Watch, Mexico: Abuses Against Asylum Seekers at US Border
    (Mar. 5, 2021), *available at* https://www.hrw.org/news/2021/03/05/mexico-
    abuses-against-asylum-seekers-us-border...................................................18

Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC
    Experts Refused*, AP News (Oct. 30, 2020), *available at*
    https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-
    health-4ef0c6c5263815a26f8aa17f6ea490ae.................................................8

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page**

*Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg. 65806 (Oct. 16, 2020) .................................................................................................................................1

*Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 38717-01 (July 22, 2021) ..........................................................12

*Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42828-02 (Aug. 5, 2021)...................................................................2, 10

v

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are 29 legal service and advocacy organizations who serve immigrant communities throughout the country, including many along the border in Texas, Arizona, and California.[2] *Amici* are invested in ensuring that all people, including immigrants, are treated with dignity and share a common mission of advancing and protecting the constitutional and statutory rights of individuals seeking asylum and legal status in the United States. *Amici* have worked for decades to improve immigrants' access to legal services and representation, to ensure immigrants arriving in the United States can pursue all relief they are entitled to seek under the law, and to ensure immigrants' constitutional due process and other rights are upheld.

Collectively, *amici* provide direct legal services to tens of thousands of immigrants annually. Relevant here, many of *amici*'s clients seek relief at the U.S.-Mexico border and have been subject to Defendants' policy of summarily expelling immigrants pursuant to a purported health order under 42 U.S.C. § 265 (the "Title 42 Policy"). *See* Appendix to Texas's Renewed Motion for Preliminary Injunction, Dkt. No. 69 ("App'x") at 4-11 (*Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg. 65806 (Oct.

---

[1] The parties have consented to the filing of this brief. *See* Unopposed Motion of Justice Action Center for Leave to File Brief of *Amici Curiae* 29 Legal Service and Advocacy Organizations in Opposition to Plaintiff's Renewed Motion for Preliminary Injunction at 5. No party's counsel authored this brief in whole or in part, and no person or entity other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. *Cf.* Fed. R. App. Proc. 29(a)(4)(E).

[2] *Amici* are Al Otro Lado; American Immigration Council; Asylum Access; Asylum Access México (AAMX) A.C.; Catholic Legal Immigration Network, Inc.; Center for Civic Policy; Center for Gender and Refugee Studies; Comunidad Maya Pixan Ixim; Disciples Immigration Legal Counsel; First Focus on Children; Florence Immigrant and Refugee Rights Project; FWD.us; Immigrant Defenders Law Center; Innovation Law Lab; International Mayan League; Justice Action Center; Justice for Our Neighbors El Paso; Kids in Need of Defense ("KIND"); Kino Border Initiative; La Raza Centro Legal SF; La Raza Community Resource Center; Migrant Center for Human Rights; National Immigration Law Center; National Immigration Project ("NIPNLG"); Project Corazon, Lawyers for Good Government; the Refugee and Immigrant Center for Education and Legal Services ("RAICES"); Refugees International; Student Clinic for Immigrant Justice, Inc.; and Taylor Levy Law.

1

16, 2020)), 16-30 (*Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42828-02 (Aug. 5, 2021)).  Also relevant to this case, several *amici* contract with the federal government to represent unaccompanied children,[3] a particularly vulnerable population to which Congress has afforded special substantive and procedural rights in immigration proceedings.

In addition to providing direct legal services, *amici* have litigated to protect immigrants' rights to access asylum and other relief under U.S. law and have appeared as *amici* in cases like this one that impact their organizational missions and ability to serve clients.  *E.g.*, *Immigrant Defenders Law Center v. U.S. Dep't of Homeland Security*, No. 2:21-cv-00395-FMO-RAO (C.D. Cal.); *J.B.B.C. v. Wolf*, No. 1:20-cv-01509 (D.D.C.); *Immigrant Defenders Law Center v. Wolf*, No. 2:20-cv-09893 (C.D. Cal.); *O.M.G. v. Wolf*, No. 1:20-cv-00786 (D.D.C.); *Innovation Law Lab v. Wolf*, No. 3:19-cv-00807 (N.D. Cal.); *CAIR v. Trump*, No. 1:19-cv-02117 (D.D.C.); *Grace v. Barr*, No. 1:18-cv-01853 (D.D.C.).

*Amici* have a strong interest in this case, which is a thinly veiled attempt to limit the ability of immigrants to request and access a legal process afforded to them by federal law.  Indeed, Plaintiff asks the Court to enjoin Defendants to summarily expel unaccompanied children and vulnerable families under the Title 42 Policy, which is subject to pending litigation in other courts and just last week was deemed "likely unlawful" by a federal court.  *Huisha-Huisha v. Mayorkas*, No. 21-CV-00100-EGS, 2021 WL 4206688, at *11-12, 18 (D.D.C. Sept. 16, 2021).  Given their work representing and advocating for immigrants in general, and unaccompanied children and families in particular, *amici* have a compelling interest in the outcome of this litigation.

*Amici* respectfully submit this brief to assist the Court in evaluating the merits of Plaintiff's pending Renewed Motion for Preliminary Injunction.  In light of their expertise and experience working with individuals subject to the Title 42 Policy, *amici* believe they will offer the Court a

---

[3] An "unaccompanied child" has "no lawful immigration status in the United States;" has not turned 18 years old; and has "no parent or legal guardian in the United States [] available to provide care and physical custody."  6 U.S.C. § 279(g).

unique perspective as to the public interest and why it overwhelmingly favors upholding Defendants' decisions to except unaccompanied children and families from the policy. Plaintiff's efforts to set aside Defendants' decisions jeopardize *amici*'s interests by potentially harming the tens of thousands of individuals whom *amici* represent.

## INTRODUCTION

In March 2020, former President Trump issued the Title 42 Policy, ostensibly on public health grounds, to effectively prevent any immigrant arriving at the southern border from requesting and accessing the legal process afforded to them under U.S. law. For the last year and a half, the policy has been used to categorically shut the door on tens of thousands of people seeking safety, even though the policy never has had a sound public health justification. Each individual, family, and unaccompanied child has their own story of the resolve, resourcefulness, and courage that compelled them to take the perilous journey that would enable them to seek protection and the promise of a better life in the United States. Because of the Title 42 Policy, however, most of these stories share a common thread: the federal government returns these vulnerable individuals to their home countries—and the very persecution they fled from—or to Mexico, where migrants are known to be deliberately targeted by gangs and cartels for kidnappings, rape, violent attacks, and death.

Despite a growing chorus of objections to the Title 42 Policy's purported public health rationale by advocates, the international community, and the federal government's own health experts, Defendants have continued to enforce the policy. Earlier this year, however, President Biden categorically excluded unaccompanied children from the Title 42 Policy and began granting case-by-case exceptions to families on humanitarian grounds. It is these exceptions that Plaintiff takes aim at in this case. In its Renewed Motion for Preliminary Injunction, Plaintiff asks the Court to set aside these exceptions. Put another way, Plaintiff seeks an order requiring Defendants to apply the Title 42 Policy to, and summarily expel, vulnerable unaccompanied children and families without exception. The public interest—a factor that "should be given considerable

weight" in the preliminary injunction analysis, *Texas v. United States*, 328 F. Supp. 3d 662, 740-41 (S.D. Tex. 2018)—weighs heavily against Plaintiff's requested injunction for at least two reasons.

*First*, Defendants' Title 42 Policy is unlawful, as several federal courts have recognized. *See Huisha-Huisha*, 2021 WL 4206688, at *18 (on motion for preliminary injunction, holding that "the Title 42 Process is likely unlawful"); *accord P.J.E.S. by and through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 511-16 (D.D.C. 2020); *J.B.B.C. by and through Barrera Rodriguez v. Wolf*, No. 20-CV-1509-CJN, 2020 WL 6041870, at *2 (D.D.C. June 26, 2020).  The public interest would not be served by expanding an unlawful policy as Plaintiff requests, *cf. Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013), particularly when such an order is likely to conflict with others issued in pending litigation elsewhere, *see W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 728 (5th Cir. 1985).

*Second*, Defendants' exceptions support the public interest by ensuring that unaccompanied children and certain vulnerable families are not wrongly expelled and are permitted to access the legal process, expressly afforded to them under U.S. law, to seek protection and legal status from this country.  This is not only lawful, but also moral and humane—especially given that the Title 42 Policy requires the return of these children and families to certain harm.  It is squarely within the public interest to prevent individuals "from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009).

For these reasons, set forth in greater detail below, the Court should deny Plaintiff's Renewed Motion for Preliminary Injunction.

4

## ARGUMENT

Plaintiff asks the Court to issue a preliminary injunction prohibiting Defendants from excepting unaccompanied children and family units from the Title 42 Policy if they would otherwise be subject to expulsion under Title 42 and requiring the detention of individuals arriving at the U.S.-Mexico border for a period sufficient to ensure they do not have COVID-19.  *See* Brief Supporting Renewed Motion for Preliminary Injunction, Dkt. No. 68 ("Mot.") at 32.  In other words, Plaintiff asks the Court to require Defendants to apply the Title 42 Policy to most, if not all, unaccompanied children and families arriving at the border and to expel them without affording them any due process or the ability to seek protections that Congress expressly granted them in the Immigration and Nationality Act.  To obtain such relief, Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that such threatened injury outweighs any damage that the injunction might cause; and (4) that the injunction will not disserve the public interest.  *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiff cannot satisfy its burden to justify the sweeping relief it seeks from this Court.  Defendants thoroughly explain why Plaintiff's claims lack merit and why the Amended Complaint's conclusory allegations similarly fail to substantiate any threat of injury absent an injunction, much less a *substantial* threat of *irreparable* harm, and *amici* will not repeat those arguments here.  *See* Consolidated Brief in Support of Defendants' Motion to Dismiss and Defendants' Response to Plaintiff's Renewed Motion for Preliminary Injunction, Dkt. No. 79 ("Opp.") at 36-49.  *Amici* instead address the final preliminary injunction factor relating to the public interest, which is of particular significance to them because of the effects the requested injunction would have on the tens of thousands of vulnerable immigrant children and families whom *amici* serve.

The public interest "should be given considerable weight" in the preliminary injunction analysis, and "[i]f no public interest supports granting preliminary relief, such relief should ordinarily be denied."  *Texas*, 328 F. Supp. 3d at 740-41.  Here, beyond repeating its allegation that

5

Defendants' conduct is purportedly unlawful, Plaintiff has not offered a single factual or legal argument to substantiate its otherwise bare assertion that a preliminary injunction is in the public interest. *See* Mot. at 31. This is not sufficient to carry Plaintiff's burden of persuasion. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) ("A preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."); *see also* Opp. at 49-50. Given Plaintiff's failure of proof on this critical factor, the Court need not even consider if the requested injunction would undermine the public interest. *See Texas*, 328 F. Supp. 3d at 740-41 (factor weighs against preliminary injunction if plaintiff fails to show injunction would support the public interest "even if the public interest would not be harmed by" the injunction) (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.4).

In any event, the public interest would be substantially harmed by the requested relief. As *amici* illustrate in the stories below, the Title 42 Policy has caused vulnerable children and families extreme suffering, including kidnapping, rape, violent attacks, and death. Plaintiff seeks an order that would: (i) expand the Title 42 Policy, which other federal courts have concluded is likely unlawful; and (ii) subject unaccompanied children and families to summary expulsions in a manner inconsistent with statutory requirements. Such an order threatens children and families with substantial harm and trauma in Mexico or their home countries, including possible forced *refoulement* and treaty violations, and undermines the public's interest in, among other things, the consistent application of the law and the protection of statutory and constitutional rights for vulnerable individuals seeking protection in the United States.

## I.    THE TITLE 42 POLICY IS UNLAWFUL AND CONTRARY TO THE PUBLIC INTEREST

As a threshold matter, Defendants' policy of summarily expelling immigrants under a purported public health rationale is a misuse of Title 42 and contrary to statutes enacted by Congress requiring the executive branch to provide procedural protections to individuals seeking

asylum.  Plaintiff's requested injunction asks the Court to engage in judicial overreach by forcing Defendants to expand this unlawful policy.  Judicially compelling the government to broaden the Title 42 Policy against unaccompanied children and vulnerable families is directly at odds with the public interest in upholding our laws and protecting vulnerable populations.

The statutory text is clear: Section 265 of Title 42—the provision upon which the Title 42 Policy rests—provides that the Surgeon General may, in the interest of public health, "prohibit, in whole or in part, the introduction of persons and property" from locations where a communicable disease exists to prevent the spread of such illness in the United States.  42 U.S.C. § 265.[4]  The statute does not, however, contain any language referencing removals or expulsions or suggesting that the federal government may summarily expel individuals from the United States.  This omission is critical.  Multiple federal courts have now been presented with challenges to Defendants' Title 42 Policy and have concluded that the policy is likely unlawful precisely because nothing in Section 265 of Title 42 authorizes the federal government to expel individuals from the United States.  *See Huisha-Huisha*, 2021 WL 4206688, at *18 (holding that "the Title 42 Process is likely unlawful" and certifying class of all family units with a minor child and parent or legal guardian); *accord P.J.E.S.*, 502 F. Supp. 3d at 511-16 (certifying class of unaccompanied children and granting classwide preliminary injunction enjoining application of the Title 42 Policy to unaccompanied children); *J.B.B.C.*, 2020 WL 6041870, at *2 (granting preliminary injunction enjoining expulsion of unaccompanied child subject to the Title 42 Policy).  Indeed, as a court explained last week when enjoining Defendants from doing exactly what Plaintiff asks this Court

---

[4] The full text of the statute provides:

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

7

to require, "the plain language of Section 265, particularly when read in conjunction with the above statutes governing immigration under Title 8 of the U.S. Code, evinces no intention to grant the Executive the authority to expel or remove persons from the United States." *Huisha-Huisha*, 2021 WL 4206688, at *11-12.

Beyond the lack of textual support for the Title 42 Policy, Defendants' expulsions of individuals under the policy contravene the specific protections that Congress has extended to vulnerable individuals seeking protection from persecution, including asylum, *see* 8 U.S.C. § 1158(a)(1), withholding of removal, *see id.* § 1231(b)(3), and protection from torture, *see* Note to 8 U.S.C. § 1231. *See, e.g.*, *P.J.E.S.*, 502 F. Supp. 3d at 514 (noting that "the Government's reading of Section 265 to include the power to expel unaccompanied minors . . . conflicts with various rights granted in the TVPRA and the INA"). Additionally, given that the border remains open to commercial and private transportation, and hundreds of thousands of people *not* subject to the Title 42 Policy cross every day, there is simply no public health justification for expelling the comparatively small number of individuals appearing at the border seeking asylum, a point Defendants' own health experts have recognized going back to the inception of the Title 42 Policy. *E.g.*, Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 30, 2020), *available at* https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae.

Against this backdrop, Plaintiff seeks to enjoin Defendants from excepting unaccompanied children and families from the Title 42 Policy. *See* Mot. at 32. In practical terms, Plaintiff asks to *expand* a federal policy that multiple courts have already held is likely unlawful in ways that will irreparably harm some of the most vulnerable among us. *See Huisha-Huisha*, 2021 WL 4206688, at *11-12; *P.J.E.S.*, 502 F. Supp. 3d at 511-16; *J.B.B.C.*, 2020 WL 6041870, at *2. Plaintiff's requested injunction would force Defendants to expel children and families either to their home countries, from which they fled in the first instance to avoid persecution or torture, or to Mexico, where they are at high risk of kidnapping, sexual assault, exploitation, torture, and death at the hands

of gangs and cartels.  If the public interest "is served when the law is followed," then it is most certainly undermined by an order that requires unlawful—and inhumane—expulsions of individuals under the Title 42 Policy.  *Daniels Health Scis., LLC*, 710 F.3d at 585.

Additionally, the injunction requested by Plaintiff would directly conflict with orders issued by other federal courts, which enjoined Defendants from applying the Title 42 Policy to unaccompanied children and families.  *See Huisha-Huisha*, 2021 WL 4206688, at *18 (issuing preliminary injunction enjoining application of the Title 42 Policy to families containing a minor child and parent or legal guardian); *P.J.E.S.*, 502 F. Supp. 3d at 520 (same as to unaccompanied children).[5]  As the Fifth Circuit acknowledged, "[t]he federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs."  *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 728 (5th Cir. 1985). As discussed above, the *Huisha-Huisha* and *P.J.E.S.* courts' conclusions are consistent with not only the statute's plain language and relevant legislative materials, but also the status quo, as unaccompanied children have been excepted from the Title 42 Policy for nearly a year, and families have been allowed to seek humanitarian exceptions to the policy for four months.  The public's interest in uniform construction and application of the law is likewise served by considering these rulings, which are grounded in the statutory text, and avoiding an order that would disturb the status quo and conflict with pending proceedings, and a classwide injunction, in another federal court.

---

[5] The D.C. Circuit subsequently stayed the *P.J.E.S.* court's preliminary injunction in a one-page, per curiam memorandum order without analysis.  *See P.J.E.S. v. Pekoske*, No. 20-5357, Doc. No. 1882899 (D.C. Cir. Jan. 29, 2021) (Mem.).  The appeal is currently pending.  After the D.C. Circuit's stay, Defendants issued a series of notices and public health determinations in February, July, and August 2021 recognizing an exception for unaccompanied children from the Title 42 Policy.  *See* App'x at 11-29.

9

## II.    THE PUBLIC INTEREST STRONGLY FAVORS DEFENDANTS' EXCEPTIONS FOR UNACCOMPANIED CHILDREN AND FAMILIES

Although several federal courts have now ruled that the Title 42 Policy is likely unlawful, Defendants have made clear that they intend to continue enforcing the policy.  *See* App'x at 16-29 (*Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42828-02 (Aug. 5, 2021)).[6]  As long as Defendants continue to summarily expel individuals under this policy, the public interest supports—and demands—the policies and practices Defendants have adopted to except unaccompanied children and families with minor children from this cruelty.

When evaluating whether an injunction against the federal government will "disserve the public interest," *Nichols*, 532 F.3d at 372, the impact that the requested relief will have on the general public is central to a court's analysis.  Both the Supreme Court and the Fifth Circuit have emphasized the importance of considering the broader consequences of an injunction on nonparties to litigation when weighing the public interest.  *See Winter*, 555 U.S. at 24 ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625-26 (5th Cir. 1985) (noting "judicial concern about the impact of legal decisions on society as a whole as opposed to the more limited interests of private litigants" and looking "beyond the immediate interests of the named litigants" when considering the public interest).[7]

_____

[6] Following the *Huisha-Huisha* court's order enjoining the Title 42 Policy as to most families with minor children, Defendants noticed their appeal to the D.C. Circuit and sought a stay of the district court's injunction.  *See Huisha-Huisha v. Mayorkas*, No. 21-05200 (D.C. Cir.).  Defendants' motion is currently pending.

[7] To be sure, the impact of Plaintiff's requested injunction on the parties is relevant to the Court's analysis.  *See Nken*, 556 U.S. 435 (in the stay context, noting that the harm to the opposing party and the public interest "merge when the Government is the opposing party").  Defendants have catalogued the harms likely to occur if Plaintiff's requested injunction is granted, *see* Opp. at 49-50, and such threatened injuries tip the public interest against Plaintiff.  *Cf. Pursuing America's Greatness v. Federal Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he FEC's harm

Here, Plaintiff seeks to displace Defendants' decisions to exclude unaccompanied children and certain vulnerable families from summary expulsion under the Title 42 Policy.  The public's interest, including that of the thousands of unaccompanied children and families who *amici* represent and advocate for, weighs decidedly against Plaintiff's requested injunction.

### A.    The Public Interest Supports Excluding Unaccompanied Children from Summary Expulsion Under the Title 42 Policy.

Defendants' practice of excepting unaccompanied children from expulsion under the Title 42 Policy is firmly supported by the public interest in ensuring that such children are treated humanely and permitted to access unique rights expressly granted to them under U.S. law.

Because unaccompanied children are among the most vulnerable of all immigrants, Congress has taken steps to guarantee such children the right to seek asylum and other relief through a more protective process than other noncitizens receive.  In 2008, Congress passed the Trafficking Victims Protection Reauthorization Act ("TVPRA") to fulfill our nation's "special obligation to ensure that these children are treated humanely and fairly."  154 Cong. Rec. S10886-01 (daily ed. Dec. 10, 2008) (Sen. Feinstein).  The statute provides a robust set of substantive and procedural rights designed to give unaccompanied children multiple opportunities to seek immigration relief and to safeguard their health and welfare as they do so.  Among other things, the TVPRA commands that unaccompanied children may not be removed from the country before they are placed in immigration proceedings that enable them to pursue all forms of immigration relief for which they are eligible.  8 U.S.C. § 1232(a)(5)(D).  It also guarantees these children access to counsel "to the greatest extent practicable;" exemption from typical deadlines to seek asylum; and access to an asylum adjudication process, including a non-adversarial interview with a trained USCIS asylum officer, that is governed by regulations accounting for the "specialized needs" of unaccompanied children.  *E.g.*, 8 U.S.C. §§ 1158(a)(2)(E), (b)(3)(C), 1232(c)(5), (d)(8).  Congress unmistakably sought to provide safeguards for these children that are unavailable to similarly-situated adults—thereby avoiding to

---

and the public interest are one and the same, because the government's interest *is* the public interest.") (citing *Nken*, 556 U.S. at 435).

11

the greatest extent possible the chance the United States would return these children to danger.  *See Flores v. Sessions*, 862 F.3d 863, 880 (9th Cir. 2017) (quoting H.R. Rep. 110-430, at 57 (2007)).

When promulgating an exception from the Title 42 Policy for unaccompanied children, Defendants recognized the unique protections afforded to these children and the humanitarian challenges facing them.  *See* App'x at 12, 15 (*Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 38717-01 (July 22, 2021)) (exception from the Title 42 Policy will "permit[ ] the government to better address the humanitarian challenges for these [unaccompanied] children").  Over the past months, an exception from the Title 42 Policy has been crucial to protecting thousands of unaccompanied children and promoting Congress's intent to treat these children humanely and fairly.

The story of **Nicolás**[8] is illustrative.  For years as he was growing up in Honduras, Nicolás was persecuted because of his sexual orientation.  As he faced increasing threats on his life and safety, he fled his home at the age of 17, embarking on a 2,000-mile journey to seek safety in the United States.  As he neared the U.S. border and prepared to request asylum, however, Nicolás was kidnapped in a Mexican border city by members of an organized crime cartel.  Although Nicolás was able to escape his captors and make it to the border, where he requested asylum, the federal government detained him and scheduled him for an expulsion flight back to Honduras.  It was only because the flight was delayed for several days due to Hurricane Hanna that an attorney called U.S. immigration officials in time to inquire on his behalf.  Through her advocacy, she persuaded the government to transfer Nicolás—as well as his cellmate, another Honduran boy booked onto the same expulsion flight—into the custody of the Office of Refugee Resettlement ("ORR"), a subagency of the U.S. Department of Health and Human Services, as unaccompanied children.

---

[8] *Amici* have used pseudonyms for all individuals whose stories are shared in this brief.  Supporting documentation for each story is held by the individual's attorney of record.

Nicolás was later united with a sponsor in the United States who provided care for him as he pursued the child-centric process guaranteed under the TVPRA. With the help of *pro bono* legal counsel, an asylum officer found that Nicolás was indeed entitled to asylum. He is now beginning his life in the United States, free from violence and persecution.

But for the stroke of luck that allowed him to prove he qualified for asylum, Nicolás's story is not otherwise unique. Many other children have fled violence and persecution in their home countries to seek security in the United States, only to be further traumatized on their perilous journeys to the U.S. border. **Samuel** fled his hometown in Mexico at the age of 15 after being repeatedly targeted by an organized crime cartel for his refusal to join the gang. Samuel was pursued by the cartel even while on his journey to the United States, and was kidnapped by cartel members in a border city as he prepared to ask for asylum. He, like Nicolás, was fortunate to escape and ultimately made it to a port of entry where he requested asylum. **Nora** and **Alma** fled their home countries in Central America at the age of 16 after being repeatedly sexually assaulted and tortured by cartel members. Both Nora and Alma were targeted by gangs on their journeys north, and were attacked and sexually assaulted before reaching the United States.

Because of Defendants' exception for unaccompanied children, Nicolás, Samuel, Nora, Alma, and countless others were able to pursue their asylum claims in the United States with the assistance of legal counsel rather than being returned to the violence and persecution they had escaped. This is precisely what Congress intended when it passed the TVPRA and imposed a "special obligation" to protect this "most vulnerable" group. 154 Cong. Rec. S10886. The public interest is undoubtedly served by the exception for unaccompanied children here, which is consistent with Congressional intent and ensures that vulnerable children are treated fairly and afforded the protections they are guaranteed under the law. *See, e.g.*, *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (recognizing that constitutional amendments and statutory enactments are "declaration[s] of public interest and policy"); *Casarez v. Val Verde Cnty.*, 957 F. Supp. 847, 865 (W.D. Tex. 1997) ("'[T]he public interest always is served when public officials act within the

13

bounds of the law and respect the rights of the citizens they serve.'") (quoting *Nobby Lobby, Inc. v. City of Dallas*, 767 F. Supp. 801, 821 (N.D. Tex. 1991), *aff'd*, 970 F.2d 82 (5th Cir. 1992)); *see also Abdur-Rahman v. Napolitano*, 814 F. Supp. 2d 1087, 1097 (W.D. Wash. 2010) ("The public interest is best served by the orderly and fair treatment of persons subject to the laws of this land, citizens and non-citizens alike.").

Without Defendants' exception, the result for these children would have been very different. This is not speculative.  Under the former Administration, before a district court required an exception for unaccompanied children, thousands of such children were turned back at the border or expelled without being given an opportunity to request asylum or to access any of the rights Congress specially created for them.  *E.g.*, *P.J.E.S.*, 502 F. Supp. 3d at 509 (more than 2,000 unaccompanied children were expelled under the Title 42 Policy between April and July 2020); Hamed Aleaziz, *Border Officials Turned Away Unaccompanied Immigrant Children More Than 13,000 Times Under Trump's Pandemic Policy*, BuzzFeed News (Oct. 28, 2020), *available at* https://www.buzzfeednews.com/article/hamedaleaziz/border-officials-turned-away-unaccompanied-immigrants (reporting that more than 13,000 unaccompanied children were expelled under Title 42 Policy through October 2020).  In some cases, U.S. officials returned children to the country, and persecution, from which they fled.  In others, the government expelled children to Mexico where the children had already encountered violence on their journey to the United States. Whatever the outcome, however, the circumstances for these children were dire.

For example, when the Title 42 Policy was still being applied to unaccompanied children, as Plaintiff asks this Court to reinstate, **Isaías**, a fifteen-year-old from Honduras, fled his home after he received death threats from gang members who had repeatedly targeted his family.  When he presented to U.S. immigration officials last summer to seek asylum, Isaías was detained and later placed on a plane.  Although Isaías had been led to believe he would be traveling to New York to reunite with a family member who was to be his sponsor in the United States, he was devastated to realize upon landing that he had been flown back to the very country he had just left out of fear for

his safety.  Since being returned to Honduras, Isaías has been pursued by the same gang members who had threatened to kill him.

Like Isaías, **Pablo** attempted to escape persecution in Honduras only to find himself returned to the same circumstances after being expelled under the Title 42 Policy.  Pablo left Honduras at the age of 13 after his father was murdered by cartel members.  After traveling by himself to the U.S. border to seek refuge, Pablo was detained for several days and then placed on a deportation flight to Honduras.  **Mateo** and **Ramón** have a similar story.  The sixteen- and fourteen-year-old brothers from Mexico fled their home after being repeatedly targeted by local cartels.  After one particularly severe attack, which placed the boys in the hospital for over a month, the brothers presented at the U.S. border to seek asylum.  But because the Title 42 Policy applied to unaccompanied children at the time, Mateo and Ramón were expelled back to Mexico.

Unfortunately, even after adopting an exception for unaccompanied children, the federal government has in some cases improperly and unlawfully applied the Title 42 Policy to these children, returning them to harm's way.  **Andrés**, for example, was only thirteen when he fled gang violence in Honduras with his older brother in the fall of 2020; the two brothers were displaced in Mexico for months.  Finally, after six months, Andrés's older brother attempted to cross the border with a coyote—but no one has seen or heard from him since, and Andrés fears that he either was killed by the cartels or perished in the desert.  Finally, after surviving nearly a year of displacement in Mexico and the disappearance of his older brother, Andrés went to the border by himself, where he told a U.S. Customs and Border Protection ("CBP") officer that he was a fourteen-year-old boy traveling alone and wanted to enter the United States.  The officer, however, told him that Hondurans could not enter the country without papers.  Although Andrés appealed to a second officer who came to investigate, the second officer likewise refused Andrés entry, and threatened to call the Mexican police on him.

As these and other stories demonstrate, the Title 42 Policy has resulted in the return of children and their families to the same violence and persecution that drove them to leave their homes

15

and seek protections afforded under U.S. law—without ever having the chance to be considered for immigration relief by a U.S. adjudicator.  This is not what Congress intended.  *See* 8 U.S.C. §§ 1232(a)(5)(D), 1229a (requiring DHS to place children in immigration proceedings, where they can seek all forms of immigration relief available to them, before they can be removed from the United States).  Moreover, the Supreme Court has recognized that there is a strong "public interest in preventing" children from being "wrongfully removed . . . to the countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436; *accord Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (the public has an interest in "ensuring that we do not deliver [individuals seeking asylum] into the hands of their persecutors").  Given this interest, and the humanitarian concerns central to immigration policy, *see Arizona v. United States*, 567 U.S. 387, 395-96 (2012) (noting that "immigration policy can affect," among other things "human concerns"), the public interest supports Defendants' decision to except unaccompanied children from the Title 42 Policy.  The public interest demands that this exception remain undisturbed.

**B.     The Public Interest Supports Defendants' Lawful Use of Humanitarian Parole to Families Subject to the Title 42 Policy.**

The public interest likewise requires an exception to the Title 42 Policy for families with minor children.  As noted above, the Supreme Court has recognized "a public interest in preventing [individuals] from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436.  This public interest applies with particular force to families with minor children, whom the federal government has returned under the Title 42 Policy either to abuse in their home countries or to Mexican border cities where cartels and gangs— sometimes abetted by Mexican authorities—are known to intentionally target migrants for kidnapping, rape, extortion, and torture.[9]

---

[9] The Title 42 Policy has had the unplanned, but latently foreseeable, consequence of strengthening the cartels and, as a result, makes the U.S. border region more dangerous for people on both sides of the border.  This includes U.S. citizens and others inside the country who may be victims of drug warfare and other crimes.  These consequences make the Title 42 Policy even less in the public interest.

In operation, the Title 42 Policy has also served as another engine of government-sanctioned family separation, inflicting irreparable harm as families have been separated by gang violence, deprivation and hardship, and the federal government itself.  Indeed, and as set out above, the Title 42 Policy is unlawful and should be set aside, but that issue is not before this Court.  But given the trauma and dangers that families suffer upon their expulsion, as well as the statutory right of families to seek protection from persecution in the United States, it is moral, humane, and undisputedly lawful for Defendants to allow case-by-case exceptions under the Title 42 Policy for families on humanitarian grounds.  Denying Plaintiff's requested injunction is overwhelmingly in the public interest.

**1.    The Public Interest Is Furthered by Preventing the Removal of Families to Places Where They Risk Substantial Harm.**

Unfortunately, the abuse of expelled immigrants at the hands of organized crime in Mexico is all too common.  Individuals expelled from the United States are easily identifiable, in many cases do not have basic access to shelter in the places where they are expelled, and lack sufficient resources to protect themselves.  Denied the opportunity to seek refuge under U.S. law, they are faced with the Hobson's choice of remaining in Mexico, vulnerable to exploitation, violence, and death, or returning to their home countries, which often presents an even graver threat to their safety.

**Gabriel**, for example, fled his home country of Honduras with his wife and three young children after gangs killed three of his wife's siblings, tried to kill his brother, broke into Gabriel's home and robbed him, severely beat him after he reported the robbery to the police, and threatened to kill him and his family.  Although Gabriel received asylum for himself and his family in Mexico, he was forced to flee yet again when the gangs from Honduras tracked him to Mexico to take revenge against Gabriel and his wife for reporting them to the police.  U.S. immigration officials expelled Gabriel, his wife and children, and his brother to Mexico under the Title 42 Policy in February 2021.

Because they feared for their lives in Honduras, Gabriel's family remained in Mexico, hoping that it would be less dangerous, even though they often went hungry and repeatedly were threatened

by gangs operating along the border.  In July 2021, gang members kidnapped Gabriel and his brother and held them for ransom, subjecting both men to physical abuse.  Although Gabriel and his brother were able to escape, Gabriel was forced to hide from the gangs in a garbage dump.  When it was finally safe for him to emerge from hiding, he found that his wife and children had disappeared. Despite searching for them for several days, he could only assume the worst—that they, too, had been kidnapped and likely abused and killed.  Gabriel was on the verge of suicide over losing his family when he learned that they had somehow made it to Ciudad Juárez, and had been allowed to enter the United States through a humanitarian exception to the Title 42 Policy—an exception that Plaintiffs are now trying to eliminate.  It is only through securing humanitarian exceptions of their own that Gabriel and his brother were allowed entry to the United States in August 2021, where Gabriel reunited with his wife and children and are pursuing immigration relief together.

The story of Gabriel's family is unfortunately typical of many families who have sought protection from persecution in the United States, only to be expelled to hardship and trauma in Mexico.  The abuse these families experience harms the entire family, with lasting repercussions. **Sebastian**, for instance, is a seven-year-old Black Honduran boy who witnessed the violent rape of his mother by a gang after they were expelled to Mexico under the Title 42 Policy.  When they finally escaped, Sebastian's mother turned to the Mexican police.  But as advocates have documented, Mexican authorities are known to discriminate against migrants, especially Black migrants.  *See, e.g.*, Human Rights Watch, Mexico: Abuses Against Asylum Seekers at US Border (Mar. 5, 2021), *available at* https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border ("Nearly half of those interviewed said Mexican police, immigration agents, or criminal groups targeted them for extortion.").  Rather than helping, the police taunted Sebastian's mother, asking how much she would charge to give them a turn.  Although the United States eventually

allowed Sebastian and his mother to enter on a humanitarian basis, Sebastian's post-traumatic stress and depression endure, and he has repeatedly told his mother that he wants to die.[10]

The experiences of **Luz**, a sixteen-year-old girl from Honduras, are similarly agonizing. Luz and her mother fled to the United States because the head of a local gang was trying to force Luz to have a sexual relationship with him. After nearly two months of perilous travel to seek safety in the United States, U.S. border authorities expelled Luz and her mother to Mexico under the Title 42 Policy in July 2021. Because they feared what would happen to them if they returned to Honduras, the family remained in Mexico, surviving on little to eat and finding places to sleep on the street and in abandoned homes. While in Mexico, they were assaulted and robbed by Mexican officials attempting to prevent immigrants from approaching the river. A group of men also attacked them, raping Luz and attempting to rape her mother. The Mexican police refused to provide any assistance. In August 2021, they were allowed to enter and pursue asylum in the United States based on humanitarian grounds. Luz still suffers emotionally and psychologically from her rape, and both she and her mother need counseling services to cope with the trauma they experienced in Mexico.

As the stories of Gabriel, Sebastian, Luz, and their families illustrate, the Title 42 Policy results in the summary expulsion of migrants from the United States, thereby depriving them of the specific protections that Congress has extended to vulnerable individuals seeking protection from persecution.[11] It also sends families into a nightmare that no one would wish on another human being. But Plaintiff seeks an order requiring the federal government to expel families to certain harm

---

[10] In another instance, **Graciela**, a Honduran mother also expelled under the Title 42 Policy with her eight-year-old daughter and six-year-old son, considers herself "lucky" because although she and her children were kidnapped in Mexico after their expulsion, the kidnappers gang-raped her in a separate room so that her children did not have to watch.

[11] *E.g.*, 8 U.S.C. § 1158(a)(1) (allowing any noncitizen physically present in the United States to apply for asylum); 8 U.S.C. § 1231(b)(3) (forbidding the Attorney General from removing a noncitizen if the Attorney General decides that the noncitizen's life or freedom would be threatened in her home country because of her race, religion, nationality, membership in a particular social group, or political opinion); Note to 8 U.S.C. § 1231 (declaring a U.S. policy not to remove a person to a country where there are substantial grounds for believing the person would be in danger of being subjected to torture).

19

and suffering.  The public interest weighs in favor of denying Plaintiff's motion and preventing that such harm be categorically imposed upon families wrongfully removed from the United States.  *See Nken*, 556 U.S. at 436.

> ### 2.      The Public Interest Is Furthered by Policies that Support Family Unity.

The public interest also weighs heavily in favor of humanitarian exceptions to the Title 42 Policy for families with minors, not least because the expulsion of families has all too often resulted in the traumatic separation of minor children from their only caregivers.  These separations have many causes, including violence in Mexico, the desperation to survive after being expelled, and the actions of U.S. immigration officials.  Regardless of the precise cruelty triggering each family separation, it is undeniable that any such separation is a result of the Title 42 Policy.  These family separations—and the concomitant trauma inflicted on all family members, especially minor children—can and should be avoided through the use of humanitarian exceptions to the policy that would prevent the categorical expulsion of families from the United States.  Family separation "is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development."  *Ms. L. v. I.C.E.*, 310 F. Supp. 3d 1133, 1147-48 (S.D. Cal. 2018).  The public interest favors not only preventing such traumatic harm to families, *Nken*, 556 U.S. at 436, but also "upholding and protecting" migrants' constitutionally protected right to "family integrity and association while their immigration proceedings are underway."  *Ms. L.*, 310 F. Supp. 3d at 1148; *see also Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017).

> ### (a)      The Title 42 Policy Causes Family Separation Due to Gang Violence.

**Isabel**, for example, was captured along with her husband by the Zetas cartel and separated from her two young daughters, ages four and nine, mere hours after she and her family were expelled from the United States.  While nearly nine months pregnant, this wife and mother initially fled Honduras with her family to save the lives of her husband, daughters, and unborn child.  Isabel made this impossible choice after a gang killed two of her brothers—including one who was only fourteen

years old—and violently attacked her husband because she told the gang that she could not pay them "protection" money.

When Isabel and her family attempted to seek safety in the United States in February 2021, they were expelled by U.S. border officials under the Title 42 Policy.  Immediately following their expulsion, Isabel's family walked along the riverbank for four hours in search of a safe place to cross, desperate to reach safety.  When they finally attempted to cross, they found that the river was quite deep—reaching up to Isabel's husband's chest—so, like any father, he carried their children across the river first.  But while her husband was bringing their girls across, a black pick-up truck approached Isabel.  Men jumped out of the truck, grabbed Isabel by the hair, and threw her to the ground.  When Isabel's husband tried to come to her aid, the gang attacked and subdued him, capturing them both.  They were held for ransom in Mexico for over two weeks, while Isabel was nine months pregnant—and with no idea what had happened to their daughters.

The cartel, which threatened constantly to kill Isabel's husband, eventually released Isabel after she broke from the stress and begged for the life of her unborn child.  She eventually gave birth to her baby girl in a Mexican hospital three weeks after her family had been expelled under the Title 42 Policy.  Isabel's third daughter, however, weighed only three pounds at birth and required intensive medical care because the cartel had starved Isabel for weeks before her daughter's delivery.  When Isabel's husband finally escaped the Zetas and found her and their new baby at the hospital, he was so thin and malnourished that she did not recognize him.

While in the hospital, Isabel and her husband saw one of their daughters on a news program featuring interviews with children who had been "abandoned" at the U.S.-Mexico border.  They were subsequently contacted by U.S. immigration officials who accused Isabel of abandoning her children at the border and stated that they could not allow Isabel and her husband to come to the United States to be with their children because of the Title 42 Policy.  Eventually, Isabel and her husband were granted a humanitarian exception and were allowed to reunite with their daughters.

After thinking she would never see her two daughters again, she says that seeing her girls again was the happiest moment of her life.

### (b)   The Title 42 Policy Causes Family Separation Due to Hardship and Deprivation.

The hardship and danger that families face after their expulsion to Mexico also predictably cause traumatic family separation.  **Javier**, for example, is a sixteen-year-old boy who was forced into labor by a gang in Honduras and, as the only means of escape, fled to the United States with his parents and older brother.  In April 2021, Javier's family attempted twice to enter the United States to seek asylum through the statutorily prescribed procedures, but they were expelled both times under the Title 42 Policy.  The conditions in Mexico were so dangerous that, out of desperation to protect their child, Javier's parents sent him across the border alone to keep him safe.  While in Mexico, the Mexican police harassed and extorted the family.  They also narrowly escaped an attempted kidnapping by the cartel in Ciudad Juárez.  Fortunately, Javier crossed the border safely, where he was apprehended by U.S. immigration officials, identified as a victim of trafficking because of the labor he had been forced to provide in Honduras, and taken into custody as an unaccompanied child.  In July 2021, his family was allowed to enter and reunite with Javier in the United States based on a humanitarian exception to the Title 42 Policy.  While relieved to now be reunited, Javier remains severely traumatized by their separation under the policy.

### (c)   The Title 42 Policy Causes Family Separation by U.S. Immigration Officials.

In addition to family separations wrought by the actions of gangs or by the hardship families suffer in Mexico after being expelled, the Title 42 Policy has caused—if not sanctioned—family separation at the hands of U.S. immigration officials.  U.S. CBP officers, for example, separated **Esperanza**, a thirteen-year-old girl, from her older sister, who had turned eighteen just one day before they attempted to enter the United States.  After a hurricane destroyed their home in Honduras and gangs started pursuing Esperanza's sister, the girls' mother sent them to the United States with their family's entire savings.  At the border, however, CBP officers took Esperanza into custody as

an unaccompanied child and expelled her sister, her only caregiver, to Mexico under the Title 42 Policy. Esperanza now has only limited contact with her sister, who has been unable to secure a humanitarian exception to the Title 42 Policy to reunite with Esperanza. Esperanza, distraught over the separation and terrified for her sister, cannot stop crying.

Beyond separating children from older siblings and other family members, CBP has also deliberately separated children from their parents under the Title 42 Policy. For instance, **Daniel** and his two-year-old daughter were separated from his wife and six-year-old stepson when they attempted to cross the border and seek asylum in August 2021. CBP admitted Daniel's wife and stepson pursuant to a humanitarian exception, but expelled him and his toddler to Mexico under the Title 42 Policy. CBP provided no explanation for why they divided the family in this way, and now Daniel and his daughter are staying in a crowded migrant shelter in a dangerous neighborhood in Tijuana while his wife and stepson have connected with extended family members in Virginia. The separation from her mother has been severely traumatic for Daniel's two-year-old daughter, who has lost five pounds in one month, suffers from diarrhea and vomiting, has contracted conjunctivitis, and displays extreme emotional swings from disconnect or withdrawal to tantrums where she cries hysterically, begging for her mother. Daniel is beside himself from seeing his daughter suffering so much and feeling powerless to alleviate her trauma.

The experience of **Marisa** and her separation from her children is equally harsh. After her husband was assassinated, Marisa fled El Salvador with her eleven- and fifteen-year-old sons to protect them. They went directly to the border, but were quickly expelled under the Title 42 Policy. After facing the conditions in Mexico, they attempted to enter the United States a second time. On this second attempt, Marissa and her children spent seven hours wading through the river, then another hour walking, as Marisa bled from a wound on her stomach from a recent surgery that had not yet healed. Along this harrowing journey, they were stopped by sheriffs, who handed the family over to CBP officials. When Marisa presented her sons' birth certificates to CBP, however, she was accused of being a coyote and trafficking her own children. She was expelled under the Title 42

23

Policy while her children were separated from her and taken into ORR custody. After she was expelled, Marisa was promptly taken into custody by the Mexican federal police and handed over to the cartels, who subjected her to extensive sexual, physical, and psychological abuse. The cartels tied her up and left her for dead with several other women, and she survived only because she found her way to safety after walking through the desert for multiple days with no water or food.

Although each of these families has suffered, and continues to suffer, trauma under the Title 42 Policy in their own unique way, the substantial harm of family separation is common to them all and stems directly from the use of the policy. A categorical application of the Title 42 Policy to families with minor children, as Plaintiff requests in its motion, would only amplify and multiply the harm of family separation. This contravenes not only the public interest but also Congressional intent, evinced by the Immigration and Nationality Act's longstanding legislative history regarding the United States' interest in the unity of families immigrating to this country. *See* H.R. Rep. No. 101-723, pt. 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 6710 (summarizing legislative history of the Immigration and Nationality Act); *see also Ms. L.*, 310 F. Supp. 3d at 1148 (discussing interest in "upholding and protecting" migrants' constitutionally protected right to "family integrity and association"). The Court should not accept Plaintiff's invitation to subject more vulnerable families to harm and the trauma of family separation.

## CONCLUSION

Plaintiff's request that this Court enjoin Defendants to summarily expel unaccompanied children and vulnerable families under the Title 42 Policy disserves the public interest. As discussed above, these individuals, *amici*, and the public at large have a compelling interest in ensuring that vulnerable children's and families' rights to access Congressionally created protections are respected and that these individuals are not unlawfully removed to countries where they are likely to be persecuted and experience extreme suffering and trauma. The Court should deny Plaintiff's Renewed Motion for Preliminary Injunction.

Dated:  September 24, 2021          O'MELVENY & MYERS LLP

By: */s/ Emma L. Persson*        
    Laura L. Smith
    Texas Bar No. 24066039
    Emma L. Persson
    Texas Bar No. 24110219

2501 North Harwood Street
Suite 1700
Dallas, Texas 75201-1663
Telephone: +1 972 360 1900
Facsimile: +1 972 360 1901
lsmith@omm.com
epersson@omm.com

Daniel J. Tully*
California Bar No. 309240
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, California 90027
Telephone: +1 323 450 7275
daniel.tully@justiceactioncenter.org

*pro hac vice application forthcoming*

*Counsel for Amici Curiae 29 Legal
Service Advocacy Organizations*

25

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 24, 2021, the foregoing motion was electronically submitted to the Clerk of Court for the U.S. District Court for the Northern District of Texas using the Court's CM/ECF system.  Accordingly, notice of this filing will be sent to all counsel of record.

*/s/ Emma L. Persson*
Emma L. Persson
