**United States District Court**
**Northern District of Texas**
**Fort Worth Division**

STATE OF TEXAS,
    *Plaintiff,*

v.

JOSEPH R. BIDEN, JR., *et al.*;
    *Defendants.*

Case 4:21-cv-00579-P

**Texas's Consolidated**
**Reply Supporting Its Renewed Motion for Preliminary Injunction**
<u>**and Opposition to Defendants' Motion to Dismiss**</u>

## Contents

Table of Authorities.................................................................................iii

Introduction...................................................................................... 1

Facts 1

    A.  Uncontested facts regarding the Defendants' general public-health operations. ............................................................ 1

    B.  Uncontested facts regarding the particular conditions surrounding the Defendants' release of illegal aliens. ................. 3

    C.  Facts arising since Texas renewed its motion. ............................ 4

Texas has standing to bring each of its claims,  the Court has jurisdiction to hear each of those claims, and  each claim is one on which relief can be granted......................................... 5

    A.  Texas has standing to bring its claims. ...................................... 5

        1.  Texas asserts particular financial grievances......................... 5

        2.  Texas asserts particular *parents patriae* grievances. ............. 7

        3.  Texas can trace its injuries to the Defendants' actions. ......... 8

        4.  Texas's injuries are redressable through a decree from the Court. ...................................................................... 8

    B.  Texas states a notice-and-comment claim. ................................ 10

    C.  Texas's mandatory-detention claims are not precluded. ........... 11

    D.  The Court has jurisdiction to hear the mandatory-detention claims. ...................................................................... 13

    E.  The Court has jurisdiction to hear the Take Care claims.......... 14

Texas remains entitled to a preliminary injunction........................ 15

    A.  The July Order was issued without required the required notice-and-comment period and states post-hoc justifications, not explanations and conclusions. ..................................................... 15

    B.  The facts published by the Defendants themselves support the existence of a *de facto* policy of excepting family-unit members from Title 42................................................................ 17

    C.  Section 1222(a) continues to mandate that the Defendants screen illegal aliens for COVID-19............................................. 19

    D.  The harm from Texas's injuries is irreparable, and the public interest favors an injunction. ..................................................... 21

**Prayer for Relief** ...................................................................................... **22**

**Certificate of Conference** ...................................................................... **23**

**Certificate of Service** ............................................................................. **23**

## Table of Authorities

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ................................................................. 5,7

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ................................................................. 15

*California v. Texas,*
   141 S. Ct. 2104 (2021) .............................................................. 8

*Capital Area Immigts.' Rights Coalition v. Trump,*
   471 F. Supp. 3d 25 (D.D.C. 2020) ............................................. 17

*Crane v. Johnson,*
   783 F.3d 185 (5th Cir. 2015) ...................................................... 5

*Ctr. for Biological Diversity v. Bernhardt,*
   946 F.3d 553 (9th Cir. 2019) ..................................................... 14

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
   710 F.3d 579 (5th Cir. 2013) ..................................................... 22

*Dept. of Homeland Sec. v. Regents of the Univ. of Calif.,*
   140 S. Ct. 1891 (2020) ....................................................... 9,10,15

*Free Enter. Fund v. Pub. Co. Acctg. Oversight Bd.,*
   561 U.S. 477 (2010) ................................................................. 14

*Gen. Land Office v. U.S. Dept. of the Interior,*
   947 F.3d 309 (5th Cir. 2020) ...................................................... 9

*Gibbons v. Ogden,*
   9 Wheat. [22 U.S.] ................................................................... 7

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ................................................................. 9

*Hou. Profl. Towing Assn. v. City of Houston,*
   812 F.3d 443 (5th Cir. 2016) ..................................................... 11

*INS v. Yang,*
   519 U.S. 26 (1996) .................................................................... 9

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) .............................................................................. 7

*Las Americas Immigrant Advocacy Ctr. v. Trump,*
    475 F. Supp. 3d 1194 (D. Or. 2020) ............................................ 14

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................... 22

*Leal v. Azar,*
    No. 2:20-cv-185, 2020 WL 7672177 (N.D. Tex. Dec. 23, 2020) ................ 12

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ......................................................................... 22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................... 5

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................................... 5

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ........................................................................... 14

*Myers v. United States,*
    272 U.S. 52 (1926) ........................................................................... 14

*Natl. Mining Assn. v. McCarthy,*
    758 F.3d 243 (2014) ......................................................................... 10

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019) ....................................................................... 13

*Perez v. Mortg. Bankers Assn.,*
    575 U.S. 92 (2015) ........................................................................... 10

*Petro-Hunt LLC v. U.S.,*
    365 F.3d 385 (5th Cir. 2004) ......................................................... 11

*Printz v. United States,*
    521 U.S. 898 (1997) ......................................................................... 14

*Reno v. Am.-Arab Anti-Discrim. Cmte.,*
    525 U.S. 471 (1999) ......................................................................... 13

*Rock Island, A. & L. R. Co. v. United States,*
    254 U.S. 141 (1920) ......................................................................... 15

*St. Regis Paper Co. v. United States,*
  368 U.S. 208 (1961) ..................................................................................15

*State v. Biden,*
  2021 WL 3603341................................................................... 11,12,13,19

*Stewart v. Azar,*
  313 F. Supp. 3d 237 (D.D.C. 2018) .........................................................10

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ...............................................................13,18

*Texas v. United States,*
  No. 21:____, ___ F. 4th ___, 2021 WL 4188102 (5th Cir. Sept.
  15, 2021) .................................................................................................19

*Texas v. United States,*
  No. 6:21-cv-16, ___ F. Supp. 3d ___, 2021 WL 3683913 (S.D.
  Tex. Aug. 19, 2021)...................................................................7,14,21,22

*Util. Air Reg. Grp. v. EPA,*
  573 U.S. 302 (2014) ................................................................................22

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Svc.,*
  139 S. Ct. 361 (2018) ...............................................................................9

**Statutes**

5 U.S.C. § 553 ...............................................................................................10

5 U.S.C. § 701 .................................................................................................9

8 U.S.C. § 1182 ....................................................................................11,19,22

8 U.S.C. § 1222 ....................................................................................11,19,20

8 U.S.C. § 1225 .............................................................................................11

8 U.S.C. § 1226 .............................................................................................19

8 U.S.C. § 1252 .............................................................................................13

18 U.S.C. § 207 ..............................................................................................16

42 U.S.C. § 265 ...............................................................................................9

**Regulations**

6 C.F.R. § 5.49 .......................................................................................... 16

42 C.F.R. § 71.40 ......................................................................................... 9

**Constitutions**

U.S. CONST. art. II, § 1, cl. 1 .................................................................... 14

**Treatises and Articles**

Daily Updates of Totals by Week and State, *COVID-19 Death
        Data and Resources*
        NATL. CTR. FOR HEALTH STATISTICS
        https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm ............................. 7

RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) ............................................... 11

*Southwest Border Land Encounters*, U.S. CUSTOMS & BORDER
        PATROL
        https://www.cbp.gov/newsroom/stats/southwest-land-border-
        encounters (last visited Oct. 8, 2021) ............................................... 5

**Other Authorities**

Adam Shaw
        *Mayorkas Says Haitian migrants under Del Rio bridge were
        not tested for COVID-19*
        FOX NEWS (Sept. 24, 2021) .................................................................. 4

Alejandro Mayorkas, Interview
        FOX NEWS SUNDAY (aired Sept. 26, 2021) ...................................... 4

David Shepardson and Andrea Shalal
        *U.S. to relax travel restrictions for vaccinated foreign air
        travelers in November*
        REUTERS (Sept. 20, 2021) ..................................................................... 4

## Introduction

The Defendants' opposition to Texas's preliminary-injunction motion is less notable for what it says than for what it does not: It leaves nearly every fact supporting Texas's motion for a preliminary injunction unchallenged. Its citations do not establish the points that the Defendants think they do. And its legal arguments boil down to an assertion of a right to exercise discretion that does not exist.

Texas has standing to bring every claim it has asserted, and the Court has jurisdiction to hear each of them. There are no legal barriers to the Court's considering either the claims or Texas's request for a preliminary injunction, and the Defendants cannot overcome the inferences that their own reports to the public establish about their violations of the immigration laws that mandate tasks that they are refusing to perform.

Texas is entitled to a preliminary injunction holding the Defendants to take care to faithfully enforce the laws that they have decided they would rather not. It respectfully requests that the Court issue that injunction.

## Facts

The Defendants do not challenge—and indeed admit to—many of the facts Texas cited to support its request for a preliminary injunction.

### A. Uncontested facts regarding the Defendants' general public-health operations.

- Legal entry of individuals from thirty-three countries across the world, including almost all of the nation's NATO allies, has been suspended based on the threat of COVID-19 (ECF No. 68 at 6);

- The Defendants, through their own orders, acknowledge "that the risk of continued transmission and spread of … COVID-19 between the

United States and Mexico poses an ongoing 'specific threat to human life or national interests'" that justifies the suspension of all non-essential legal entry into the United States from Mexico (*Id.* at 6–7);

- The Defendants, through their own regulations and orders, acknowledge a "serious danger" that COVID-19 will be spread at Border Patrol stations, at ports of entry, and "into the interior of the country as a whole" if aliens covered by the Title 42 process are introduced into the country (ECF No. 79 at 4);

- One effect of that introduction would be exhaustion, or at least reduced availability of, "local and regional healthcare resources" and "further expos[ure of] local and regional healthcare workers to COVID-19" (*Id.* at 4–5);

- The Defendants, the day after the stay preventing it from doing so was lifted, ordered the Border Patrol not to subject unaccompanied minor aliens to Title 42 (ECF No. 68 at 25);

- The Acting Commissioner of CBP, in a "significant departure from well-established practices and protocols," did not include the Chief of the Border Patrol "in detailed briefings and deliberations to facilitate informed decision-making" on "a significant policy decision such as this," nor did he explain to the Border Patrol's chief the reason for the order to stand down from applying Title 42 to those aliens (*Id.*);

- CDC guidance recommends a 14-day quarantine for unvaccinated people who "have been in close contact … with someone who has COVID-19" (*Id.* at 4);

- The Defendants do not follow that 14-day recommendation for unaccompanied minor aliens (ECF No. 79 at 11);

- The Defendants do not supervise COVID-positive illegal immigrants whom it releases into the country (*Id.* at 13); and

- The Defendants, indeed, do not detain illegal aliens until they can determine whether the aliens are COVID-positive, with DHS's assistant Secretary for Border and Immigration Policy declaring under oath not that family-unit aliens are required to test negative for COVID-19 before being released from CBP custody, but that those aliens "*are provided* testing *either* prior to" or *after* release (ECF No. 80 at 206).

## B. Uncontested facts regarding the particular conditions surrounding the Defendants' release of illegal aliens.

- Through July of this fiscal year, the Defendants released into the country roughly 225,000, or 96%, of the family-unit aliens it encountered (ECF No. 68 at 12–13), a number that presumably includes the family of four COVID-positive illegal immigrants, who were sitting maskless, coughing and sneezing in a booth in a Whataburger, rather than being supervised by DHS's nongovernmental "partner" (*Id.* at 19);

- Hidalgo County declared a state of disaster due to the number of illegal immigrants, "including individuals that are positive for COVID-19," that the Defendants had released into the county, which had "overwhelmed" local governments and hospitals (*Id.* at 18–19); and

- Webb County declared a state of disaster as a result of the Defendants' "transportation of large numbers" of illegal immigrants into the county, "overwhelm[ing] local resources and services," due in part to the fact that, in the estimation of the City of Laredo, 40 to 50 percent of the aliens were COVID-positive (*Id.* at 20).

**C. Facts arising since Texas renewed its motion.**

- The Defendants in September released into the United States more than 12,000 Haitians who had crossed the southwest border—without first testing them for COVID-19. Interview of Secy. Alejandro Mayorkas, FOX NEWS SUNDAY (aired Sept. 26, 2021);[1] Adam Shaw, *Mayorkas Says Haitian migrants under Del Rio bridge were not tested for COVID-19*, FOX NEWS (Sept. 24, 2021).[2]

- As it was releasing those thousands of untested illegal aliens into the country, the Defendants simultaneously announced plans to ease restrictions on legal travel from the thirty-three countries that include most of the nation's NATO allies—but only for persons who are fully vaccinated against COVID-19. *See* David Shepardson and Andrea Shalal, *U.S. to relax travel restrictions for vaccinated foreign air travelers in November*, REUTERS (Sept. 20, 2021).[3]

- In August 2021, ICE's encounters with family-unit members on the southwest border climbed to 86,487, up roughly 3,500 from July. That was the month after the Court heard argument on Texas's first preliminary-injunction motion, which may account for the Defendants' increasing the number of those aliens subject to Title 42 by roughly 6,000, rapidly expelling 16,240, or 18.8% of them—the first percentage increase in Title 42 expulsions of family-unit members in this fiscal

---

[1] Transcript available at http://www.foxnews.com/transcript/fox-news-sunday-on-september-26-2021.

[2] Available at http://www.foxnews.com/politics/mayorkas-migrants-del-rio-bridge-not-tested-covid-10.

[3] Available at http://www.reuters.com/world/uk/us-relax-travel-restrictions-passengers-uk-eu-november-source-2021-09-20.

year.[4] *See* ECF No. 68 at 12 (showing percentage of family-unit aliens expelled under Title 42 falling each month, from 84.6% in November 2020 to 12% in July 2021).

**Texas has standing to bring each of its claims,
the Court has jurisdiction to hear each of those claims, and
each claim is one on which relief can be granted.**

## A. Texas has standing to bring its claims.

Texas has alleged facts showing that it has suffered concrete injuries, both to its own financial interests and to its interests *parens patriae*. Those injuries are fairly traceable to the Defendants' actions. And those grievances are redressable through a decree that the Court has the power to issue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (elements of standing); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing). Especially given the "special solicitude" to which Texas is entitled when it seeks to "protect[] its quasi-sovereign interests," it has established standing to bring this suit. *See Mass. v. EPA*, 549 U.S. 497, 520 (2007).

### 1. Texas asserts particular financial grievances.

Texas's suit is no mere complaint that the Defendants' actions will increase the number of people in the State—a "generalized contention[] that 'illegal immigration is costing the state money,'" in their words. ECF No. 79 at 16 (quoting *Crane v. Johnson*, 783 F.3d 185, 202 (5th Cir. 2015). Rather, it attacks discrete federal-government action—the exemption of certain persons from the Title 42 process, whether by published order or *de facto* policy; the refusal to

---

[4]   Statistics drawn from *Sw. Border Land Encounters*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Oct. 8, 2021).

comply with statutory mandates to detain certain illegal aliens. *See* ECF No. 62 at ¶¶ 75–85 (exemption of minors from Title 42); ¶¶ 83–85 (*de facto* exemption of family-unit members from Title 42); ¶¶ 86–91 (statutory detention requirements); ¶¶ 92–93 (statutory limits on parole authority); ¶¶ 96–98 (Constitutional requirement to faithfully execute statutes). Texas describes the particular costs that these actions impose on it: It is not some general increase in the number of people in Texas that imposes some general increase in the amount of money that Texas must spend. Rather, as Texas described, DHS pays for illegal aliens' medical care only while they are in DHS's custody; once DHS releases those aliens into the State, through Emergency Medicaid and other programs that reimburse healthcare providers for otherwise uncompensated services, it is Texas that pays those costs—to the estimated tune of $80 million per year. ECF No. 68 at 21–22.

While Texas also incurs costs, for example, to furnish drivers licenses, furnish education, and incarcerate illegal aliens while they are present in the United States, *see* ECF No. 68 at 22, it is the healthcare costs that are most relevant. After all, it is the Defendants themselves who point out that "Title 42 orders are not immigration actions" but are instead "public health measures…." ECF No. 79 at 16. Texas's expenditures to treat illegal aliens for COVID-19 infections address the same public-health crisis. As Texas already pointed out, one need not take the State's word for it. The Defendants themselves justify their actions by referring to the impact that increased illegal immigration, particularly by illegal immigrants with COVID-19, has on the resources, healthcare, and public-health systems of "cities and states … located at or near U.S. borders[.]" *See* ECF No. 68 at 18; *see also, e.g.*, ECF 69 at Appx. 8, 22–23, 75. And that justification is amply borne out by the emergency

disaster declarations issued by at least two Texas border counties. ECF 69 at Appx. 52–53, 63–65.

### 2. Texas asserts particular *parents patriae* grievances.

Just as it has alleged offenses against its financial interests, Texas has alleged offenses against its quasi-sovereign interests as *parens patriae*. One of the quasi-sovereign interests entitling a State to sue to "vindicate the rights of [its] citizens-at-large" is its "'interest in the health and well-being—both physical and economic—of its residents in general.'" *Texas v. United States*, No. 6:21-cv-16, ___ F. Supp. 3d ___, 2021 WL 3683913, at *13 (S.D. Tex. Aug. 19, 2021) (quoting *Snapp*, 458 U.S. at 607). "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens" satisfies that test is whether the State, "if it could, would likely attempt to address [the injury] through its sovereign lawmaking powers." *Snapp*, 458 U.S. at 607.

If Texas has no interest in protecting its residents against infection with one of the most communicable viruses known to man, which according to the CDC itself has killed more than 700,000 Americans and nearly 70,000 Texans, it is hard to imagine when it would ever have an interest in Texans' physical health and well-being. *See* Daily Updates of Totals by Week and State, *COVID-19 Death Data and Resources*, NATL. CTR. FOR HEALTH STATISTICS (visited Oct. 8, 2021).[5] And, indeed, a State's power to "enact quarantine laws and 'health laws of every description' … as will protect the public health" was a "settled principle[]" at the turn of the 20th Century." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) (quoting *Gibbons v. Ogden*, 9 Wheat. [22 U.S.] 1, 203 (1824)). As described above, the disaster declarations of Texas counties and the Defendants' own invocations of the risk of further spread of COVID-19 due to

---

[5]   Available at https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.

increased illegal immigration establish both the existence of Texas's quasi-sovereign interest and the direct threat that the Defendants' actions pose to it.

### 3. Texas can trace its injuries to the Defendants' actions.

As described above, the Defendants' actions are directly traceable to Texas's injuries, both financial and quasi-sovereign. Contra the Defendants' argument, this case is not *California v. Texas*, 141 S. Ct. 2104 (2021). There, any potential injury depended on what third parties decided to do—if none of the affected individuals chose to enroll in Medicaid, Texas would suffer no injury. Not so here. Were the Defendants to rapidly expel all those to whom Title 42 could be applied, it would remove the risk of those persons' spreading their own COVID-19 infections to Texans or becoming vectors for the further spread of COVID-19 from some other person to Texans. Likewise, were the Defendants to detain all persons illegally arriving at the southwest border until they are determined not to carry the COVID-19 virus, that would remove the risk of those persons' spreading their own COVID-19 infections to Texans. Texas's injuries are directly traceable not to aliens' choices to cross the southwest border illegally, but to the Defendants' choice of how to respond.

### 4. Texas's injuries are redressable through a decree from the Court.

Finally, Texas's injuries can be redressed through an injunction that the Court is authorized to grant. Texas described immediately above how the Defendants' actions could either eliminate or ameliorate its injuries; an injunction from the Court requiring those actions would thus redress those injuries. The only question is whether the Court has the power to grant such an injunction. It does.

Neither the statutory detention requirements nor the Title 42 program itself invest so much discretion in the Defendants that the Court lacks a standard by which their actions can be judged. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). But to honor the APA's basic presumption of judicial review, that exception is read "quite narrowly[.]" *Dept. of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Svc.*, 139 S. Ct. 361, 370 (2018)). That narrow exception does not apply here.

First, the question is not over the statute, 42 U.S.C. § 265, empowering the CDC to promulgate the Final Rule, 42 C.F.R. § 71.40. Once the Final Rule was adopted, the CDC was limited not just by the statute, but by the Final Rule itself—and the Final Rule, by mandating what a Title 42 order must address, *see* 42 C.F.R. § 71.40(c), establishes the parameters for what the CDC must consider. Further, by establishing that the CDC may "consult with any State and local authorities" as deemed "appropriate in [its] discretion," it sets forth an obligation to justify why that discretion was, or was not, exercised. *See Regents*, 140 S. Ct. at 1913–1915 (secretary had discretion to determine how much weight to give reliance interests, but was required to explain her decision not to).

Second, the Final Rule and the statute each set forth sufficient criteria by which the Defendants' actions can be judged. By announcing in the Final Rule the "general policy by which its exercise of discretion will be governed," *INS v. Yang*, 519 U.S. 26, 32 (1996), the Defendants bound themselves to that policy. The Court can determine whether they adhered to that policy and, if not, whether they did so arbitrarily and capriciously. Further, the Court can determine whether the Defendants' promulgations of the July and August Orders were the result of "appli[cation] of an incorrect legal standard." *Gen.*

*Land Office v. U.S. Dept. of the Interior*, 947 F.3d 309, 320 (5th Cir. 2020); *Stewart v. Azar*, 313 F. Supp. 3d 237, 262 (D.D.C. 2018). And it can, of course, determine whether the Defendants considered all relevant factors or considered irrelevant factors in reaching its conclusions. *See, e.g.*, *Regents*, 140 S. Ct. at 1913–1915.

### B. Texas states a notice-and-comment claim.

Contrary to the Defendants' assertion, the July Order and the August Order were required to go through the APA's standard notice-and-comment procedures. The July and August Orders were not enforcement actions; they did not select persons to be removed from the country or decide who would or would not be placed into removal proceedings. Nor did they "advise the public of the [Defendants'] construction" of the Final Rule. *Perez v. Mortg. Bankers Assn.*, 575 U.S. 92, 97 (2015). Instead, they set announced the Defendants' determinations and set forth the parameters that governed when particular persons would be placed into removal proceedings and what would happen once those proceedings had commenced. *See* ECF No. 62 at ¶¶ 77–78. They were, that is, legislative rules—rules that "impose legally binding obligations or prohibitions on regulated parties" rather than "merely interpret[ing] a prior statute or regulation[.]" *Natl. Mining Assn. v. McCarthy*, 758 F.3d 243, 251–252 (2014). And those rules require notice and comment. 5 U.S.C. § 553(b).

That the October Order was issued without notice and comment is beside the point. For one, that order is not being challenged. For two, at that stage in the pandemic, such an order, despite not including the requisite language, was arguably justified by the APA's good-cause exceptions. 5 U.S.C. § 553(b)(B), (d)(3). But there was no such justification for the Defendants' decision to put Title 42 procedures on hold for unaccompanied minor aliens. The Defendants

decided on that policy the day after the D.C. Circuit lifted a stay that would have allowed them to resume applying Title 42 to those minors, did not announce the decision for several weeks, and then took five months to announce their (retroactive) justification. *See* ECF No. 62 at ¶¶ 49–51, 79; ECF No. 68 at 25–26.

## C. Texas's mandatory-detention claims are not precluded.

As Texas described in its First Amended Complaint, the Defendants are required to detain aliens claiming asylum until their claims have been adjudicated, and they are required to detain aliens for purposes of determining whether those aliens have a communicable disease of public-health significance. ECF No. 62 at ¶¶ 27–33, citing 8 U.S.C. §§ 1182, 1222(a), 1225(a)(1). Neither of those claims is subject to claim preclusion.

An assertion of claim preclusion—that a party is barred from bringing a claim because it was decided in a previous suit—requires four elements, the fourth of which is that the same claim was involved in both actions. *See Hou. Profl. Towing Assn. v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016). Whether the same claim was involved in both actions depends on whether the two cases are based on the same nucleus of operative facts. *Hou. Profl. Towing*, 812 F.3d at 447. (cleaned up). That, in turn, depends on a pragmatic determination that weighs whether the facts are related in time, space, origin, or motivation; whether they form a convenient trial unit; and whether treating them as a unit conforms to the parties' expectations. *Id.* (quoting *Petro-Hunt LLC v. U.S.*, 365 F.3d 385, 396 (5th Cir. 2004) and RESTATEMENT (SECOND) OF JUDGMENTS § 24(2)). It is that element on which the Defendants' assertion founders, because while this case and the *Texas v. Biden* case to which the

Defendants point both involve the detention of aliens, they are not based on the same nucleus of operative facts.

In this case, Texas challenges the Defendants' failure to detain asylum applicants pending completion of their asylum proceedings and to detain aliens pending the determination of whether they are inadmissible due to carrying COVID-19. On the other hand, *Texas v. Biden*—tried by another bench of this Court—involved suspension of the Migrant Protection Protocols, a program under which many aliens attempting to cross into the United States from Mexico to claim asylum were required to remain in Mexico pending their asylum determinations. *See* ECD No. 80 at Appx. 50–58 (*Texas v. Biden* complaint describing program). The requirement to detain aliens pending their asylum determinations was relevant there only because Section 1225 also allows the Defendants to comply with it by returning asylum applicants to a neighboring country—and the Defendants, who admitted they could not comply with Section 1225's detention mandate, were therefore willfully violated Section 1225 by willfully ending their ability to return asylum applicants to Mexico. *Id.* at Appx. 70–72, 118–120.

This case does not arise out of the Defendants' cancellation of the Migrant Protection Protocols. Nor did that case concern the Defendants' failure to detain aliens arriving at the southwest border until it determines whether they are carrying COVID-19. And this case does not attempt to re-litigate a case that Texas already won in an attempt to win additional relief that Texas forgot to seek the first time. *Cf.* ECF No. 79 at 28–29 (citing *Leal v. Azar*, No. 2:20-cv-185, 2020 WL 7672177 (N.D. Tex. Dec. 23, 2020)). And, by winning relief in full in *Texas v. Biden*, Texas ensures only that the Defendants will attempt to re-establish the Migrant Protection Protocols in good faith; it cannot require Mexico to agree to reconstitute the program on the same terms as previously

existed, and even if it could do so it could not bind Mexico to those terms in perpetuity. *See Texas v. Biden*, 10 F.4th 538, 557–559 (5th Cir. 2021).

Finally, to the extent that the Court determines that there is overlap between *Texas v. Biden* and this case, *see, e.g.*, ECF No. 79 at 52 (allowing Defendants to cease implementing Migrant Protection Protocols one they have "sufficient detention capacity to detain all aliens subject to mandatory detention under Section [1225]"), the proper remedy is a stay of the overlapping claims pending completion of that case.

## D. The Court has jurisdiction to hear the mandatory-detention claims.

According to the Defendants, the Court has been stripped of jurisdiction to hear Texas's mandatory-detention claims. ECF No. 79 at 31. Yet the statute it cites, 8 U.S.C. § 1252(f)(1), prohibits "enjoin[ing] or restrain[ing] the operation of" Section 1222 on a class-wide basis—that is, it "prohibits federal courts from granting classwide injunctive relief *against the operation*" of Section 1222, not mandating compliance with Section 1222's mandatory language *Reno v. Am.-Arab Anti-Discrim. Cmte.*, 525 U.S. 471, 481–482 (1999) (emphasis added). It was this exact language that Justice Thomas quoted in the passage that the Defendants cite—quoted to criticize the sophistry of an argument that would allow a class to enjoin operation of the statute by claiming it was only seeking to enjoin actions that exceeded the statute. *Nielsen v. Preap*, 139 S. Ct. 954, 975 (2019) (Thomas., J., concurring) (cited at ECF. No. 79 at 32).

As Judge Kaczmarek pithily put it, Section 1252(f)(1) "does not apply because [Texas is] not seeking to *restrain* Defendants from enforcing Section [1222]. Plaintiffs are attempting to make Defendants *comply* with Section [1222]." *Texas v. Biden*, 2021 WL 3603341, at *15. No more need be said.

**E. The Court has jurisdiction to hear the Take Care claims.**

The Defendants spend little time on this argument, and for good reason. Their first argument, that the President's subordinates cannot violate the Take Care Clause, *see* ECF No. 79 at 35, cannot be correct. The Constitution, after all, vests all executive power in the President, U.S. CONST. art. II, § 1, cl. 1; even the Defendants recognize that "[i]t is *his* responsibility to take care that the laws be faithfully executed." ECF No. 79 at 35 (quoting *Free Enter. Fund v. Pub. Co. Acctg. Oversight Bd.*, 561 U.S. 477, 493 (2010). "The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known," *Printz v. United States*, 521 U.S. 898, 922 (1997); the upshot of this unity is that executive officials exercise their power only through the authority of the President. They exercise their power, that is, under the same duty as the President from whom that power is delegated: a duty to take care that they are executing the laws faithfully. *See, e.g., Myers v. United States*, 272 U.S. 52, 117 (1926) (Taft, C.J.); *Texas v. United States*, 2021 WL 3683913, at *40.

Their second argument, that no court has found a Take Care Clause claim justiciable, is simply wrong. *See Las Americas Immigrant Advocacy Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1213 (D. Or. 2020) (Immergut, J.); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019) (Ikuta, J., joined by Tallman and R. Smith, JJ.). And their supporting citation, *Mississippi v. Johnson*, 71 U.S. 475 (1866), does not say what they think. The Supreme Court there both drew a distinction between mandatory duties and those that required the exercise of discretion, *id.* at 498–99, and held that it had no jurisdiction to accept an original petition for a writ of injunction against a sitting president, *id.* at 501.

14

Finally, the Defendants have no response to Texas's point that "a long history of judicial review of illegal executive action, tracing back to England," establishes that the Court's equitable jurisdiction allows it to grant injunctive relief under the Take Care Clause. *See* ECF No. 62 at ¶ 98 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015). The Defendants, after all, are as bound by the law as everyone else. *Cf. Regents*, 140 S. Ct. at 1909 ("Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920). But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.' *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting).")

**Texas remains entitled to a preliminary injunction.**

### A. The July Order was issued without required the required notice-and-comment period and states post-hoc justifications, not explanations and conclusions.

According to the Defendants, there is no basis to question its "fully explained" decision in the July Order to exempt unaccompanied minor aliens from the Title 42 process. ECF No. 79 at 37. The July Order, they say, "make[s] clear that [they] acknowledged the change in [their] position," "considered the relevant information," and "in an exercise of [their] scientific and medical judgment," determined that "changed circumstances support[ed]" their retroactive reversal. *Id.* at 38. Texas agrees that the face of the July Order makes it appear that way.

But that appearance requires leaning around the legs of the elephant-sized pretext in the room. The day after the injunction preventing the use of Title 42 procedures on unaccompanied minor aliens was lifted, the Defendants ordered

the Border Patrol not to put those procedures back into place. The Defendants skirted normal procedures to put that order into place. They did not inform the world of that order, instead announcing weeks later what appeared to the world to be a retroactive, unilateral decision to keep the now-lifted stay in place. When they did so, they announced that they were in the process of re-evaluating the procedures they had already announced they were not putting back into place. They refused to announce a formal proposal on which the public could have commented. And they waited five months—ample time for an agency acting in good faith to announce a proposal, accept comment on it, and revise the proposal to address those comments—before publishing the justifications for the stand-down they had decided on six months earlier. *See generally* ECF No. 68 at 10–11, 14–15, and 23–26.

Nor does the Court need to ignore this evidence of pretext. First, the Defendants have not asked the Court to strike that evidence; they merely complain about it in a footnote. *See* ECF No. 79 at 39–40 fn.17. Second, Rodney Scott's declaration regards specific facts and occurrences—an actual direction that was received, and actual question that was asked, and an actual practice of DHS. *See* ECF No. 69 at Appx. 34–41. He is not acting as an expert witness. *Cf.* 18 U.S.C. § 207(j)(6)(A); 6 C.F.R. § 5.49(a). He is specifically allowed to "giv[e this] testimony under oath[.]" *Id.* § 207(j)(6).

As Texas has already discussed, the July and August Orders were substantive, rights-affecting, enactments for which there was not good cause to dodge the APA's notice-and-comment requirements. *See* Opposition § B. And, again, as Texas already discussed, the foreign-affairs exception to the APA does not apply because the July and August Orders do not "involve the mechanisms through which the United States conducts relations with foreign states," nor are they the product of "an agreement between the United States

and another country[.]" *Capital Area Immigts.' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020); *see* ECF No. 68 at 26. Indeed, as the Defendants repeatedly point out, the July and August Orders involve public health, not immigration. *See, e.g.,* ECF No. 79 at 20–23, 37–41.

### B. The facts published by the Defendants themselves support the existence of a *de facto* policy of excepting family-unit members from Title 42.

As Texas pointed out in its supporting brief, the sheer numbers of family-unit aliens released into the United States makes it all but impossible for the Defendants to be conducting a true case-by-case analysis of whether those aliens should be placed in the Title 42 process and whether they should be paroled into the country. ECF No. 80 at 11–14, 26–29. The Defendants' counter is that Texas simply misunderstands what is actually going on: actually, they say, Title 42 cannot be applied to many of the aliens who are being released into the country, and, actually, for each of the hundreds of aliens per day who are arriving at the southwest border, they actually are conducting an individual, case-by-case analysis of whether they qualify for an exception to Title 42 or the statutory detention requirements. ECF No. 79 at 43–48. For this counter-argument, however, the defendants offer no facts.

The Government's support for its contentions is a brief declaration from David Shahoulian, DHS's Assistant Secretary for Border and Immigration Policy. *See* ECF No. 79 at 43–44 (citing ECF. No. 80 at Appx. 203–207). This declaration, however, speaks only in gross, repeating many of the terms of the July and August Orders, *id.* Appx. 204–205 ¶¶ 3–6, before stating flatly that Title 42 simply does not apply to "[a]pproximately 80% of the non-citizen family-units currently being encountered along the southwest border," *id.*

17

Appx. 205 ¶ 7. That conclusory statement explains little and, given its lack of support, is unworthy of credit:

- What time period is "currently"? *Id.* Appx. 205 ¶ 7. It wasn't until May that the number of family-unit members subjected to Title 42 fell to roughly 20%; even a month before that, more than a third of those aliens were being placed into Title 42 processes. *See* ECF No. 68 at 12.

- How many aliens has Mexico refused to accept them because of their nationality? *See* ECF No. 80 at Appx. 204–205 ¶ 5.

- How many aliens has Mexico refused to accept them because of the ages of the family members? *See* ECF No. 80 at Appx. 204–205 ¶ 5.

- How many aliens are excepted because their countries require them to test negative for COVID? *Id.* at Appx. 205 ¶ 6.

- How many aliens are excepted because of "practical limitations on the acceptance of repatriation flights … that effectively prevent the[ir] timely expulsion"? *Id.*

- How many aliens have the Defendants removed from Title 42 through the totality-of-the-circumstances exception? And what was the basis for that exception? *Id.* Appx. 205 ¶ 8–9.

The Defendants no doubt had this information available. Yet they choose, instead, to rest their argument on the very statistic that Texas pointed out supports the need for the injunction: As the number of family-unit members has rocketed, the number of Title 42 expulsions of those aliens has cratered.

It is this last number that is particularly important: The Defendants have repeatedly claimed—and continue to claim—that they simply are not capable of following the mandatory-detention laws. *See, e.g.*, ECF No. 80 at Appx. 200; *State v. Biden*, 10 F.4th 538, 558–559 (5th Cir. 2021). A "class-wide parole scheme that paroled aliens into the United States simply because DHS does

not have the detention capacity would be a violation of the narrowly prescribed parole scheme in section 1182 which allows parole 'only on a *case-by-case* basis.…'" *State v. Biden*, 2021 WL 3603341, *22 fn. 11 (emphasis in original). And this is what Texas has alleged: That Defendants' *de facto* policy is simply not to apply Title 42 to family-unit members. The Defendants' only response is that they are continuing to rapidly expel *some* family-unit aliens. ECF No. 79 at 44. That establishes only that there are also exceptions to the *de facto* policy, not that there is no such *de facto* policy in place. And without knowing *why* the family-unit aliens are being removed from Title 42—that is, without the information that the Defendants pointedly did not cite—the Defendants cannot overcome the inferences that their own whopping numbers establish.

## C. Section 1222(a) continues to mandate that the Defendants screen illegal aliens for COVID-19.

Neither do the Defendants' arguments against Section 1222(a) defeat Texas's entitlement to a preliminary injunction requiring them to enforce that section's mandatory requirements.

First, the Defendants are wrong that Section 1222(a)'s language is not mandatory; even the case they cite acknowledges that statutory language mandating detention does, in fact, create a mandatory obligation to detain. ECF No. 79 at 47 (citing *Texas v. United States*, No. 21:21-40618, ___ F. 4th ___, 2021 WL 4188102, at *7 (5th Cir. Sept. 15, 2021) (allowing injunction to go into effect to the extent it prevented officials from "refus[ing] to detain aliens described in [8 U.S.C. §] 1226(c)(1)," which mandates detention of certain aliens). Texas already discussed how this is both the most natural and the required reading of that language. *See* ECF No. 68 at 27–29.

Second, the Defendants' reading of Section 1222(a) to apply only to "aliens … arriving at ports of the United States" is wrong. Section 1222(a)'s operative

19

language, which describes what the Defendants must do, is unitary, covering all subject aliens: The Defendants must detain subject aliens "for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to inadmissible classes" (in this case, carriers of COVID-19). 8 U.S.C. § 1222(a). The prefatory language describing the subject aliens, however, covers two separate classes. The first class is "aliens (including alien crewmen) arriving at ports of the United States[.]" *Id.* The second class is "*any aliens*" whenever the Defendants have "received information showing that [they] are coming from a country or have embarked at a place where" a covered disease such as COVID-19 is "prevalent or endemic[.]" *Id.* It is this second group—any aliens coming from a country (here, Mexico) where a covered disease (here, COVID-19) is prevalent or endemic—whom the Defendants are not properly detaining and inspecting before releasing them into the country.

Third, the Defendants' complaint that Texas hasn't specified how long aliens should be detained to be cleared of potential COVID-19 infection is both irrelevant and incorrect. It is irrelevant because Section 1222(b) already describes how the Defendants are to treat detained aliens: They are to be examined by "medical officers of the United States Public Health Service," who "certify, for the information of the immigration officers and the immigration judges," the aliens' medical conditions. 8 U.S.C. § 1222(b). It is incorrect because Texas specifically requested that the Defendants be ordered to detain those aliens "for a period sufficient to determine, … with the guidance of the Department of Health and Human Services, that those aliens are not carriers of" COVID-19. The Defendants, who include the Department of Health and Human Services, HHS's Secretary, the CDC, and the CDC's Director are certainly as aware of their own guidance as is Texas.

**D. The harm from Texas's injuries is irreparable, and the public interest favors an injunction.**

Texas has already described why the harms the Defendants' actions are causing are irreparable—it cannot un-infect those who catch COVID-19; it cannot un-spend monies spent treating those with COVID-19; it cannot un-spread a virus that is brought into the country by the aliens the Defendants aren't screening; it cannot un-enroll those ill with COVID who are sapping healthcare providers and resources that would otherwise have been available. *See* ECF 68 at 29–31. And the Defendants cannot retreat to generalized claims about an injury to the way they have chosen to run the immigration system: The detention requirements on which Texas has sued are mandatory, not discretionary. The requirement to include qualifying aliens in the Title 42 procedures is mandatory, not discretionary. Removal of qualifying aliens from Title 42 is the exception, not the rule, as Defendants have made it.

The duty to see that the laws are faithfully executed does not give the Defendants the right to decide which laws are enforced; it does not authorize them to dispense with enforcing the law when it believes the situation warrants. And "[g]iven this duty to take care that the laws are faithfully executed, the Constitution's system of separation-of-powers, and the treatment of the dispensing power in American history and tradition, [one] is hard pressed … to see how the Government can suggest that the Constitution confers upon the Executive the 'discretion' to ignore clear congressional commands contained in Sections [1182] and [1222]." *Texas v. United States*, 2021 WL 3683913, at *40. Nor does the parole power authorize a wholesale exemption of qualifying aliens from mandatory detention or expulsion. "Instead, the Executive—and thus, the [Defendants]—must exercise any discretion accorded to it by statute in the manner in which Congress has

21

prescribed." *Id.* (citing, among others, *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014), and *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)). There is simply "no public interest in the perpetuation of unlawful agency action," here, disobeying a statutory command. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, "'the public is served when the law is followed,' *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013), and the public will be served if the Executive Branch is enjoined from implementing and enforcing a policy that instructs officials to violate a congressional command." *Texas v. United States*, 2021 WL 368913, at \*60.

## Prayer for Relief

Texas prays that the Court deny the Defendants' motion to dismiss. It further prays that the Court issue a preliminary injunction prohibiting the Defendants from excepting unaccompanied alien children from the Title 42 procedures solely on their status as unaccompanied alien children; prohibiting the Defendants from excepting from the Title 42 procedures those family-unit members who meet the definition of "covered aliens" given in the October Order; and requiring the Defendants to detain aliens arriving on the southwest border for a period sufficient to determine, in accordance with the requirements of 8 U.S.C. § 1182 and with the guidance of the Department of Health and Human Services, that those aliens are not carriers of the SARS-CoV-2 virus.

Dated October 11, 2021.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

/s/ *Aaron F. Reitz*
AARON F. REITZ
*Lead Counsel*

BRENT WEBSTER
First Assistant Attorney General

Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

aaron.reitz@oag.texas.gov

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801
leif.olson@oag.texas.gov

MATTHEW G. WHITAKER
Admitted *pro hac vice*
America First Legal Foundation
300 Independence Avenue SE
Washington, D.C. 20003
(202) 964-3721
info@aflegal.org

CHRISTOPHER J. HAJEC
Admitted *pro hac vice*
MATT A. CRAPO
Admitted *pro hac vice*
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(540) 205-7986
litigation@irli.org

*Counsel for the State of Texas*

## Certificate of Conference

I certify that I conferred with Brian Stoltz, counsel for the Defendants, on October 11, 2021, who informed me that the Defendants do not oppose this motion.

/s/ Leif A. Olson

## Certificate of Service

I certify that on October 11, 2021, I filed this motion with the Court's CM/ECF system, which will serve it on all counsel of record.

/s/ Leif A. Olson

23