UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**STATE OF TEXAS,**

   Plaintiff,

v.                                                     No. 4:21-cv-0579-P

**JOSEPH R. BIDEN, JR., IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE UNITED
STATES OF AMERICA ET AL.,**

   Defendants.

## OPINION & ORDER

The much-celebrated former occupant of this bench, the late Eldon B. Mahon, was appointed United States Attorney by President Lyndon B. Johnson and United States District Judge by President Richard M. Nixon. He vocally lamented the entry of politics and partisanship into federal litigation and judicial decision-making, frequently stating that "there is no such thing as a Republican or Democrat judge, we are all just judges and we are bound to follow the law."[1] Likewise, Judge Mahon

---

[1] At the investiture of Chief Justice William H. Rehnquist and Associate Justice Antonin Scalia on September 26, 1986, President Ronald Reagan expressed similar sentiments, stating:

> The Founding Fathers were clear on this issue. For them, the question involved in judicial restraint was not—as it is not—will we have liberal or conservative courts? They knew that the courts, like the Constitution itself, must not be liberal or conservative. The question was and is, will we have government by the people? And this is why the principle of judicial restraint has had an honored place in our tradition. Progressive, as well as conservative, judges have insisted on its importance—Justice [Oliver Wendell] Holmes, for example, and Justice Felix Frankfurter, who once said, "The highest exercise of judicial duty is to subordinate one's personal pulls and one's private views to the law."

observed after his three decades on the bench that "name-calling and personal attacks . . . do little to advance a party's position and only serve to cloud the real issues before the Court." *U.S. Fleet Servs. v. City of Fort Worth*, 141 F. Supp. 2d 631, 634 (N.D. Tex. 2001) (Mahon, J.). Decades later, Judge Mahon's sage warnings against the entry of partisanship and thinly veiled ad hominem attacks into important federal litigation apply with the equal force in this case.

Before the Court is Defendants' Motion to Disqualify (ECF No. 87) and Plaintiff's Response (ECF No. 95). By the Motion, Defendants seek the disqualification of Gene Hamilton and his legal organization, America First Legal Foundation. Unfortunately, the questionable Motion appears to be just the sort of filing Judge Mahon warned against, a mere shot across the bow meant to blur the real legal issue before the Court—that is, whether certain federal administrative orders violated the mandates of the Administrative Procedures Act. For reasons more fully set forth below, the Court concludes that Defendants have failed to carry their burden, the Motion is without merit, and so the Motion will be **DENIED.**

## BACKGROUND

### A. The Instant Lawsuit

On April 22, 2021, Plaintiff State of Texas filed a Complaint for Declaratory Relief against Defendants[2] arising out of alleged actions

---

Ronald Reagan Presidential Library, *President Reagan's Remarks at Swearing in of Chief Justice William Rehnquist and Associate Justice Antonin Scalia. East Room on September 26, 1986*, YOUTUBE (August 8, 2017), https://www.youtube.com/watch?v=3t3DQiMX8a0 (speaking at 14:48).

[2]Defendants are Joseph R. Biden, Jr. in his official capacity as President of the United States; United States of Americas; U.S. Department of Health & Human Services; Centers for Disease Control & Prevention ("CDC"); U.S. Department of Homeland Security; United States Customs & Border Protection; U.S. Immigration & Customs Enforcement; Xavier Becerra, Secretary of Health & Human Services, in his official capacity; Rochelle Walensky, Director Center for Disease Control & Prevention, in her official capacity; Alejandro Mayorkas, Secretary U.S. Department of Homeland

and inactions by various federal administrative agencies that resulted in an influx of potentially COVID-19-positive non-American citizens crossing the southern border. ECF No. 1. Texas argued that the CDC's February 2021 Order[3] was violative of the Administrative Procedures Act ("APA"). *Id.* Texas asserted the February 2021 Order improperly departed from the Title 42 process[4] and the CDC's October 2020 order[5] ("October 2020 Order") that had been used to prevent the introduction of potentially COVID-19-positive illegal aliens and unaccompanied alien children[6] ("UAC") from being placed in congregate care settings in Texas. *Id.* Texas further argued that Defendants were failing to enforce the Immigration Naturalization Act, 8 U.S.C. §1222(a), and uphold the

---

Security, in his official capacity; Troy Miller Senior Official Performing the Duties of the Commissioner, U.S. Customers & Border Protection, in his official capacity; and Tae Johnson, Acting Director, U.S. Immigration & Customs Enforcement, in his official capacity.

[3]The February 2021 Order (effective as of January 30, 2021) provided that the "CDC has decided to exercise its discretion to temporarily except from expulsion unaccompanied noncitizen children encountered in the United States pending the outcoming of its forthcoming public health reassessment of the [October 2020] Order." 86 Fed. Reg. 9,942 (Feb. 17, 2021).

[4]Title 42 refers to the statute, 42 U.S.C. § 265 relied upon by the CDC Director to issue the final rule—42 C.F.R. § 71.40—and orders at issue in this case. *See also* 42 C.F.R. § 71.40; 85 Fed. Reg. 56,424 (Sept. 11, 2020) (stating that the rule was implemented pursuant to 42 U.S.C. § 265).

[5]On October 13, 2020, pursuant to 42 C.F.R. § 71.40, the CDC Director issued the October 2020 Order entitled, "Order Suspending the Right to Introduce Certain Persons Where a Quarantinable Communicable Disease Exists." 85 Fed. Reg. 65,806–12 (Oct. 16, 2020). Because the CDC did not and does not have the personnel, equipment, or facilities to enforce the October Order, the CDC Director consulted with DHS and other federal departments and "requested that DHS aid in the enforcement of this Order . . . ." 85 Fed. Reg. 65,812.

[6]"Unaccompanied alien child" is statutorily defined as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Take Care Clause of the United States Constitution. *Id.* Texas sought eight counts of declaratory relief to this effect. *Id.*

Texas also sought preliminary injunctive relief, and the Court conducted a preliminary injunction hearing (ECF No. 49), during which counsel for Defendants informed the Court that the February 2021 Order was likely going to be superseded in a forthcoming CDC order. *Id.* Considering this development, the Court requested that Defendants' counsel promptly apprise the Court of the issuance of any such order. Shortly thereafter Defendants filed a Notice of New CDC Order and attached a July 16, 2021 Order ("July 2021 Order"). ECF No. 50. Defendants asserted that the July 2021 Order "supersedes the February [2021 Order] that is at issue in this litigation[,]" so Texas's claims challenging the February 2021 Order were moot and Texas's motion for preliminary injunction is "now moot in its entirety." *Id.*

The Court issued an order denying the motion for preliminary injunction as moot considering the issuance of the July 2021 Order. ECF No. 54. However, because the harm that Texas complained of was still occurring, the Court granted Texas leave to amend and seek injunctive relief. *Id.* Texas filed such an Amended Complaint (ECF No. 62) and now challenge the July 2021 Order as well as an August 3, 2021[7] ("August 2021 Order") for, *inter alia,* violations of the APA. *See* First Amend. Compl., ECF No. 62. Texas has filed a second motion for preliminary injunction, which remains pending. ECF No. 67.

### B. Recent Litigation involving Title 42

This is not the only case being litigated over Title 42. Defendants set forth five other legal challenges involving Title 42.

- In *J.B.B.C. v. Wolf,* a UAC challenged the government's attempt to expel him from the country under Title 42. *See* No. 20-CV-1509, 2020 WL 6041870 (D.D.C. June 26, 2020).

---

[7] The August 2021 Order superseded the October 2020 Order and incorporating by reference the July 2021 Order and continued excepting UAC. Pub. Health Reassessment and Order Suspending the Right to Introduce Certain Persons, 86 Fed. Reg. 48,828 (Aug. 5, 2021).

4

- In *P.J.E.S. v. Wolf*, a class of UAC challenged application of Title 42 proceedings to UAC. *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020).

- In *Texas Civil Rights Project v. Wolf*, 1:20-CV-02035 (D.D.C.), the plaintiff challenged the application of Title 42 to certain UAC who were held at some point in a Texas hotel.

- In *G.Y.J.P v. Wolf*, 1:20-CV-01511 (D.D.C.), the plaintiff challenged the application of the Title 42 order to an unaccompanied child who was expelled to her home country pursuant to the order.

- And in *Flores v. Barr*, the plaintiffs challenged the government's methods for holding minors under Title 42 as violative of a prior class action settlement agreement relating to the treatment of children in immigration custody. *See* No. CV-85-4544, 2020 WL 5491445 (C.D. Cal. Sept. 4, 2020).

At the July 13, 2021 preliminary injunction hearing, the undersigned asked Defendants' counsel about the status of one of the District of Columbia cases. While Defendants' counsel admittedly lacked detailed knowledge of the case, he neither hinted nor suggested it was related to the case before the Court and instead referred to it as "separate litigation":

> *THE COURT:* What is the status of the 42 CFR 71? Is that currently being challenged in the D.C. Circuit? And if so, what's the current status of that case?
>
> *MR. STOLTZ:* So, my understanding of the D.C. Circuit is, assigned from this whole issue of Texas is, essentially, saying that the Government is required under the October [2021] Order to expel children. There is separate litigation in the District of Columbia and the D.C. Circuit about – or my understanding, and I'm not involved personally with that, is that the plaintiffs there are arguing that Title 42 actually does not allow or authorize the Government to expel these children who are in the country. And I think the reasons for that is statutory reasons having to do with – the Title 42 statute talks about prohibiting the entry of persons or items, and I think there's an argument that, well, these children are already in the country and you can't expel them, that's not covered by Title 42.

Prelim. Inj. Hearing Transp. at 42–43, ECF No. 61.

### C. Mr. Hamilton's Activities as a Department of Justice ("DOJ") Attorney

It is undisputed that Mr. Hamilton served as Counselor to the Attorney General, providing legal advice and counsel for general policymaking matters related to Title 42. Resp. to Mot. to Disqualify at 1. It is also undisputed, that Mr. Hamilton's tenure as a DOJ attorney ended as of January 20, 2021. Mot. to Disqualify at 4.

Defendants present a list of activities that they allege Mr. Hamilton engaged in while he was an attorney at the DOJ. According to Defendants, the following demonstrates that Mr. Hamilton should be disqualified from the instant case:

- On March 13, 2020, as CDC was in the process of finalizing its initial Title 42 order, Mr. Hamilton was among a group of government officials provided with a "concept of operations" (CONOPS) document detailing DHS's plans for implementing and enforcing CDC's anticipated Title 42 order. This document was marked "privileged," "attorney work product," and "deliberative." The email by which this document was transmitted indicates that the persons on the email had participated in a conference call earlier that same day, and that a follow-up call would be held on the following day to discuss DHS's "operations plan."

- On March 20, 2020, the day that CDC issued its initial Title 42 order in connection with the COVID-19 pandemic, DHS provided a group of government officials, including Mr. Hamilton, with a draft version of a CBP operational document setting forth how CBP planned to implement the CDC order. Mr. Hamilton responded later that same day with comments on the draft, and in another email asked DHS about the classification of the document and was informed that it was "internal" and "LES," i.e., law enforcement sensitive.

- On March 27, 2020, Mr. Hamilton was provided with an internal DHS document marked "law enforcement sensitive" that provided various pieces of data collected by DHS detailing its "Title 42 efforts." Mr. Hamilton circulated this document to a group of DOJ attorneys offering his view as to the usefulness of the document in connection with any legal challenges to the government's Title 42 activities.

6

- On June 24, 2020, Mr. Hamilton was provided with an internal memorandum prepared by CDC setting forth the "pros" and "cons" of whether to renew and keep in place CDC's March 2020 Title 42 order. In an email to several other DOJ attorneys, Mr. Hamilton expressed his view as to the usefulness of the information contained in the memorandum "in litigation."

- On June 26, 2020, Mr. Hamilton exchanged several emails with a DHS attorney in which the two discussed COVID-19 data obtained from CBP for possible use in "DDC" (referring to litigation in federal district court in the District of Columbia). Mr. Hamilton asked several follow-up questions about DHS's protocols and operational issues relating to CBP's handling of noncitizens under Title 42 procedures. As a result of these questions, a CBP official sent Mr. Hamilton a two-page Word document marked "attorney-client privileged" providing CBP's responses to Mr. Hamilton's inquiry, including information about procedures followed by CBP in connection with its Title 42 activities and operational impacts.

- On July 1, 2020, in connection with the *J.B.B.C.* lawsuit in the District of Columbia, Mr. Hamilton was forwarded an email chain in which other DOJ and HHS attorneys were discussing legal and operational issues relating to the custody of an unaccompanied child who was challenging the use of Title 42 procedures as to him/her. Mr. Hamilton was asked to weigh in on a strategic question concerning the child's custody status and its possible effect on the lawsuit.

- On September 23, 2020, Mr. Hamilton emailed several attorneys at HHS to discuss the possible strategic benefits of a proposed course of action in the government's appeal of an order that had been issued in the *Flores* litigation relating to the government's custody of unaccompanied children. An HHS attorney informed Mr. Hamilton that he would be contacted by two identified attorneys within HHS's Office of General Counsel (presumably by phone).

- On September 30, 2020, Mr. Hamilton reviewed and edited a draft objection to a magistrate judge's report and recommendation that the government was planning to file (and ultimately did file) in the *P.J.E.S.* litigation.

- On October 20, 2020, Mr. Hamilton was among a group of government officials invited to participate in a conference call to discuss various legal and operational issues surrounding how unaccompanied children would be held in custody pending

- possible expulsion from the country pursuant to Title 42 authority.
- On December 16, 2020, Mr. Hamilton was among a group of government officials provided with the draft version of a reply brief the government was planning to file (and ultimately did file) in the *P.J.E.S.* litigation in the D.C. Circuit, and was on the email chain when DHS submitted its comments on the brief.
- On December 29, 2020, Mr. Hamilton was among a group of government officials provided with a draft Fed. R. App. P. 28(j) letter that the government was planning to file (and ultimately did file) in the *P.J.E.S.* litigation in the D.C. Circuit, and was on the email chain when DHS submitted its comments on the letter.
- On January 5, 2021, Mr. Hamilton was in contact with DHS by email seeking information about DHS's "encounters with [unaccompanied children] at the border" for possible use in the *P.J.E.S.* litigation in the D.C. Circuit.
- Also, on January 5, 2021, Mr. Hamilton and DHS officials were contacted by email by a White House policy advisor to schedule a conference call to discuss "Title 42 Litigation."

Mot. to Disqualify at 6–7.[8]

### D. Defendants' Grounds for Disqualification

Now, more than five months since this lawsuit has been on file, Defendants filed a Motion to Disqualify Mr. Hamilton. ECF No. 87. They allege that his representation in this matter violates American Bar Association ("ABA") Model Rules of Professional Conduct ("Model Rules") 1.09 and 1.11 and Texas Rule of Disciplinary Conduct ("Texas Rules") 1.10. *Id.* Defendants assert that these rules are ultimately designed to prevent "side switching" when a government attorney goes into private practice. *Id.* at 10. Defendants argue that Mr. Hamilton should be disqualified for either of two grounds: (1) as a DOJ attorney, he obtained confidential government information about the government's Title 42 public health and immigration related activities that are relevant and could be used to disadvantage the government,

---

[8]Defendants' Motion notes that these activities, and the e-mails supporting them, can be made available for the Court to review *in camera*. Mot. to Disqualify at 5 n.2. Because Defendants provide detailed descriptions of the activities, an *in-camera* review is unnecessary.

8

and (2) as a DOJ attorney, Mr. Hamilton participated personally and substantially in Title 42 litigation matters. *Id.* at 11. Because Mr. Hamilton was not screened, Defendants also seek to have his disqualification imputed to all lawyers at America First Legal Foundation. *Id.* at 8. As shown below, Defendants' arguments are wholly unsupported at worst and questionable at best.

## LEGAL STANDARDS

### A. Motion to Disqualify

Disqualification decisions in this Court are guided by state and national ethical standards adopted by the Fifth Circuit. *In re American Airlines*, 972 F.2d 605, 610 (5th Cir. 1992). In the Fifth Circuit, the source for the standards of the profession has been the canons of ethics developed by the ABA. *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992). Additionally, consideration of the Texas Disciplinary Rules of Professional Conduct is also necessary because they govern attorneys practicing in Texas generally. *See FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995); N.D. Tex. Civ. R. 83.8(e) (defining "unethical behavior" to mean conduct that violates the Texas Disciplinary Rules of Professional Conduct). District courts also consider, when applicable, local rules promulgated by the local court itself. *U.S. Fire Ins. Co.*, 50 F.3d at 1312. "On a motion to disqualify, the movant bears the ultimate burden of proof." *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 398 (N.D. Tex. 2013).

### B. Relevant ABA Model Rules and Texas Rules

ABA Model Rule of Professional Conduct 1.11 reads in relevant part as follows:

> (a) Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:
>
> > (1) is subject to Rule 1.9(c)[9]; and

---

[9] Rule 1.09(c) provides:

9

> (2) shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

MODEL RULES OF PROF'L CONDUCT R. 1.11(a).

Texas Disciplinary Rule of Professional Conduct 1.10 reads in relevant part as follows:

> (a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after consultation.
>
> . . . .
>
> (c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows or should know is confidential government information[10] about a person or other legal entity acquired when the lawyer was a public officer or employee may not represent a private

---

A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
>
> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

[10]TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(g) ("As used in this rule, the term confidential government information means information which has been obtained under governmental authority and which, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and which is not otherwise available to the public.").

> client whose interests are adverse to that person or legal entity.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(a), (c).

## ANALYSIS

### A. No Confidential Information

Defendants assert that "Texas Disciplinary Rule 1.10 requires Mr. Hamilton's disqualification in this case because of his receipt of relevant confidential information" while he was a DOJ attorney. Mot. to Disqualify at 11. Plaintiff rejoins that a formal ethics opinion from the ABA expressly rejects this position, but regardless, the information at issue in this lawsuit is not confidential information as described in the Rule. Resp. to Mot. to Disqualify at 3–8.

As an initial matter, the Court finds very persuasive the ABA's Formal Ethics Opinion 97-409 (1997) ("Ethics Opinion") that squarely addresses the application of Model Rule 1.11(b)—the predecessor to Model Rule 1.11(c) which is also related to Texas Rule 1.10(c)—to a lawyer who wanted to, *inter alia*, bring suit against her old agency on behalf of a private client to challenge the agency rules in whose development and implementation she was involved. The Ethics Opinion clarified that the rule "protects adverse third parties, **but does not protect the government client itself against the use of 'confidential government information' against it by its former lawyers**." *Id.* at § 1 n.7 (emphasis added). That is, Rule 1.11(b) "comes into play only if the lawyer acquired 'confidential government information' about an adverse third party while in government service, **and offers no protection to the former government client respecting its confidences**." *Id.* at § 1 (emphasis added). On this reasoning, Texas Rule 1.10 (and Model Rule 1.11) are inapposite to these facts.

But even if the Model Rule and Texas Rule were implicated, this lawsuit does not present any confidential information as contemplated by these rules. That is, the action Texas challenges here is the exemption of UAC from the Title 42 process through the July 2021 Order and

11

August 2021 Order. None of Mr. Hamilton's activities in planning and defending the prior administration's use of Title 42, as asserted by Defendants, concern the July 2021 or August 2021 Orders. Indeed, by Defendants' own assertion, "In August 2021, CDC issued a new Title 42 order that superseded its prior October 2020 order . . . ." Mot. to Disqualify at 9. The Court struggles to see how litigation over orders issued after Mr. Hamilton left government employment and that expressly supersede any orders issued during Mr. Hamilton's government employment would implicate confidential information obtained by Mr. Hamilton during his government employment.[11]

"'Confidential government information,' as used in [Texas] [R]ule 1.10(c), 'means information which has been obtained under governmental authority and which, at the time this rule is applied, the government is (1) prohibited by law from disclosing to the public or has a legal privilege not to disclose, and (2) which is not otherwise available to the public.'" *Smith v. Abbott*, 311 S.W.3d 62, 75 (Tex. App.—Austin 2010, pet. denied) (Pemberton, J.) (quoting TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(g)). Although Defendants allege that Mr. Hamilton received confidential information while he was a DOJ attorney, they set forth no evidence to support that Mr. Hamilton obtained confidential information **relevant to this lawsuit** that is not available to the public. Indeed, Mr. Hamilton makes a compelling case that the information relied upon by Texas has all been disclosed by Defendants and thus is not confidential as described by Texas Rule 1.10. Resp. to Mot. to Disqualify at 5, 7 (citing TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05(b)(3)). Defendants do not direct the Court to any filing or allegation in Texas's pleadings that implicate confidential information—the crux of Texas's lawsuit is simply that Defendants are failing to uphold their statutory and regulatory duties. Nor do Defendants point to a single case that applies Model Rule 1.11 or Texas Rule 1.10 in the manner Defendants seek for them to apply here.

---

[11]In the same way and as discussed below, the Court toils to see how these matters are substantially the same.

The Court concludes on this record, Defendants have utterly failed to demonstrate that Mr. Hamilton is in violation of ABA Model Rule 1.11 and Texas Rule 1.10 due to his obtaining confidential information. Thus, Defendants have not carried their burden to establish that Mr. Hamilton is in violation of ABA Model Rules or Texas Rules such that would require disqualification.

### B. Not the Same Matter

Defendants next argue the cases Mr. Hamilton participated in as a DOJ attorney and the instant case concern the same matter and thus require his disqualification under Texas Rule 1.10 and Model Rule 1.11. Mot. to Disqualify at 17. Defendants set forth a detailed bulleted list of thirteen instances from March 13, 2020, through January 5, 2021, in which they allege Mr. Hamilton was closely involved in matters regarding the CDC's Title 42 authority and related issues concerning DHS's role in Title 42's implementation and/or enforcement. Mot. to Disqualify at 5–6. Eight of those concerned Mr. Hamilton's work in connection with the litigation of unrelated cases in the District Court for the District of Columbia and District Court for the Central District of California. *Id.* The remaining five concerned general statements regarding strategy and implementation of Title 42. It is undisputed that Mr. Hamilton's tenure as a DOJ attorney ended on January 20, 2021. *Id.* at 4. Of Defendants' bulleted list, none of the activities of Mr. Hamilton are alleged to have engaged in concerned the July 2021 and August 2021 Orders that are currently being challenged in this lawsuit. Indeed, it is undisputed that all the challenged orders issued **after** Mr. Hamilton had left employment with the DOJ.

As explained above, the Court has already inquired about any potential relationship between the instant lawsuit and the District of Columbia lawsuits and whether the District of Columbia actions may render this action moot. *See* ECF No. 61 at 42–43. To that, Defendants' attorney stated, there was "separate litigation." Indeed, no party to this action has filed a notice of related case or in any way attempted to link these cases. In the Court's view, that is because Defendants' complaints of Mr. Hamilton's involvement with issues involving Title 42 generally,

13

or the cases cited by Defendants specifically, simply do not encompass the same matter as the instant lawsuit challenging whether the July 2021 and August 2021 Orders are arbitrary and capricious in violation of the APA. Indeed, they are all different cases. The issue in this case is whether the July 2021 and August 2021 Orders comply with or violate the APA and whether Defendants are in compliance with federal immigration law. That Mr. Hamilton may have been involved in a prior administration's immigration policy and rulemaking does not automatically mean it is the same matter as this case challenging whether an immigration-related action from an agency violates the APA. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(f) (defining "matter" to "not include regulation-making or rule-making proceedings or assignments"); *see also* ABA Formal Ethics Opinion 97-409 § 3 (1997) (concluding that "Rule 1.11 would not appear to bar [the attorney's] representation of a private client in a challenge to agency rules even where she was personally involved in their development and implementation while working for the government, since rulemaking is generally not deemed to be a 'particular matter'").

Therefore, Defendants have failed to carry their burden that Mr. Hamilton should be disqualified under Model Rule 1.11 and Texas Rule 1.10 because this lawsuit covers the same matter. Because the Court concludes Defendants failed to carry their burden as to Mr. Hamilton's disqualification, the Court need not address Defendants' attempt to disqualify Mr. Hamilton's firm.

## CONCLUSION

The Court concludes by noting that Defendants' complaint is essentially that Mr. Hamilton has recently switched sides and that the Model Rules and Texas Rules are designed to prevent "side switching" when a government attorney goes into private practice. Mot. to Disqualify at 10. To that, the Court would suggest that far from requiring disqualification, this case presents a garden-variety case of a former government attorney who develops an expertise while in government practice and who then litigates against the government in that area of expertise. This is not unusual in the history of the United

States. Indeed, Mr. Hamilton appears to follow a distinguished line of attorneys who have worked for the federal government and then returned to private practice to vehemently oppose the federal government—one of the most notable examples being President Lyndon Johnson's Attorney General, Ramsey Clark. In fact, one would be hard-pressed to think of how one could go be more of a "side-switcher" than a former Attorney General.

As one biographer recently explained, Clark "went from representing the United States and its citizens to defending and aligning himself with those deemed enemies of not only America but oftentimes the entire civilized world[.]" LONNIE T. BROWN, JR., DEFENDING THE PUBLIC'S ENEMY: THE LIFE AND LEGACY OF RAMSEY CLARK 9 (2019). Indeed, the front flap of the book further clarifies that Clark "switched sides" in a most egregious way:

> As a government insider, [Clark] worked to secure the civil rights of black Americans, resisting persistent, racist calls for more law and order. However, upon entering the private sector, Clark seemingly changed, morphing into the government's adversary by aligning with a mystifying array of demonized clients—among them, alleged terrorists, reputed Nazi war criminals, and brutal dictators, including Saddam Hussein.

The Court does not raise this to argue for or against Clark's approach, but merely to remind the parties that even in our highly-charged political times, there is nothing new under the sun.[12]

Finally, the Court warns the parties and their counsel that even in a contentious dispute involving state and federal interests, the attorneys appearing before the Court are still subject to their professional ethical obligations as well as the Local Rules of this Court, and the "Local, Local

---

[12]Another notable example is when former president and then-sitting Congressman John Quincy Adams represented African slaves—who had successfully revolted and taken control of a Spanish slave ship *Amistad*—before the United States Supreme Court in direct opposition to President Van Buren's administration. *See* AMERICA'S LAWYER-PRESIDENTS: FROM LAW OFFICE TO OVAL OFFICE 45–46 (Norman Gross ed., 2004). As one historian put it, during oral argument Quincy Adams "directed his most extensive and strident criticisms at the Van Buren administration[.]" *Id*. at 46.

Rules" of the undersigned. Moreover, although the attorneys in the instant case are exempted from the admission to practice and local counsel requirements of this Court, *see* N.D. TEX. CIV. R. 83.11, **the Court strongly advises** all counsel to read *Dondi Props. Corp. v. Comm. Savs. & Loan Ass'n,* 121 F.R.D. 284 (N.D. Tex. 1988) (en banc), which is otherwise required reading and sets the standards for all attorneys practicing in the Northern District.[13] If the Court has any indication that counsel for either side is not living up to these standards, further action will be taken. As Judge Mahon wisely admonished, this is not a proper forum to engage in unsupported personal attacks to further partisan causes, rather this Court will endeavor to follow the law and will require attorneys that appear in front of it to do the same.

## ORDER

Accordingly, it is **ORDERED** that the Motion to Disqualify should be and is hereby **DENIED.**

---

[13] Before making any future filings or appearances in this Court, all counsel are also encouraged to read and review the Texas Lawyer's Creed. It provides, among other things, that a lawyer: (1) "should always adhere to the highest principles of professionalism"; (2) "will always be conscious of [their] duty to the judicial system"; (3) "will be loyal and committed to [their] client's lawful objectives, but . . . will not permit that loyalty and commitment to interfere with [their] duty to provide objective and independent advice"; (4) "will advise [their] client that civility and courtesy are expected and are not a sign of weakness"; (5) "will advise [their] client of proper and expected behavior"; (6) "will treat adverse parties and witnesses with fairness and due consideration. A client has no right to demand that [a lawyer] abuse anyone or indulge in any offensive conduct"; (7) "will advise [their] client that we will not pursue conduct which is intended primarily to harass or drain the financial resources of the opposing party"; (8) "will advise [their] client that we will not pursue tactics which are intended primarily for delay"; and (9) "will advise [their] client that we will not pursue any course of action which is without merit." Texas Lawyer's Creed: A Mandate for Professionalism, *reprinted in* TEXAS RULES OF COURT, 763–65 (West 2019); *cf.* BENJAMIN FRANKLIN, GREAT QUOTES FROM GREAT LEADERS 46 (Peggy Anderson ed., 1990 ("If passion drives you, let reason hold the reins.").

**SIGNED** on this **3rd day** of **November 2021.**

_____
Mark T. Pittman
United States District Judge

17