UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

STATE OF TEXAS,

Plaintiff,

v.

No. 4:21-cv-0579-P

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE UNITED
STATES OF AMERICA, ET AL.,

Defendants.

## MEMORANDUM OPINION & ORDER

The Court is not blind to the current political division in this country. Or that the division often implicates matters of federalism. Despite the division and the scorched-earth politics, the Court is baffled at this proceeding's adversarial nature. That is, while a border state (like Texas) and the federal government may genuinely disagree whether various federal agencies are compliant with federal immigration law or what our immigration policy should be, there should be no disagreement that the current immigration policies should be focused on stopping the spread of COVID-19. Why a state and the federal government are litigating this issue—instead of working to solve it—is simply beyond the comprehension of the undersigned.[1]

---

[1] It is certainly not unusual (or seen as a sign of weakness) in our country's history for governors of border states and presidents from different political parties to work directly together on problems and issues along our border. Afterall, the goal of every governor or president ought to be what is best for the American people, despite their respective political parties. *See, e.g.*, SAM KINCH & STUART LONG, ALLAN SHIVERS: THE PIED PIPER OF TEXAS POLITICS 142–46 (1973) (discussing negotiations between Democratic Governor of Texas Allan Shivers, Republican President Dwight D. Eisenhower, and President Ruiz Cortines of Mexico to build a dam for flood control on the Lower Rio Grande River). Or, as President Lyndon B., Johnson was fond of saying: "Come now, and let us reason together." *See* Lyndon Baines Johnson, *in* JOHN BARTLETT, FAMILIAR QUOTATIONS 872 (15th ed., 1980) (quoting *Isaiah* 1:18 (NKJV)).

Before the Court is Plaintiff State of Texas's Motion for Preliminary Injunction (ECF No. 67); the Consolidated Response and Motion to Dismiss (ECF No. 76) filed by Defendants[2] Joseph R. Biden, Jr. in his official capacity as President of the United States of America; U.S. Department of Health & Human Services; Centers for Disease Control & Prevention; U.S. Department of Homeland Security; United States Customs & Border Protection; U.S. Immigration & Customs Enforcement; Xavier Becerra, Secretary of Health & Human Services, in their official capacity; Rochelle Walensky, Director Center for Disease Control & Prevention, in their official capacity; Alejandro Mayorkas, Secretary U.S. Department of Homeland Security, in their official capacity; Troy Miller Senior Official Performing the Duties of the Commissioner, U.S. Customers & Border Protection, in their official capacity; and Tae Johnson, Acting Director, U.S. Immigration & Customs Enforcement, in their official capacity; Plaintiff's Consolidated Response and Reply in Support of its Motion for Preliminary Injunction (ECF No. 89); and the Government's Reply in Support of its Motion to Dismiss (ECF No. 93). Having considered the supporting briefs and appendices, as well as the Briefs of Amici Curiae[3] (ECF Nos. 75, 84), and the applicable law, the Court concludes that the Motion to Dismiss will be **DENIED in part** and **GRANTED in part** and that the Renewed Motion for Preliminary Injunction will be **GRANTED in part.**

## BACKGROUND

### A. COVID-19 is loosed on the world and United States.

COVID-19 is a quarantinable, communicable respiratory disease caused by the SARS-CoV-2 virus, 86 Fed. Reg. 42,828, 42,830 (Aug. 5, 2021), that "began in the city of Wuhan in the Hubei Province of the

---

[2]Defendants will also be referred to collectively as "the Government" throughout.

[3]Plaintiff Robert A. Heghmann filed a Motion to Intervene. ECF No. 55. To intervene by right, the prospective intervenor must satisfy the four requirements of Rule 24(a)(2). Here, the Plaintiff argues that because this Court's decision could be reversed on appeal, Texas cannot adequately represent the Plaintiff's "personal interest in terminating illegal immigration across the Southern Border." *Id.* at 7. Although Plaintiff's burden is minimal, a hypothetical result based on a hypothetical appeal does not establish that the Plaintiff might be inadequately represented by Texas. *See Trbovich v. United Mine Works of Am.*, 404 U.S. 528, 538 n.10 (1972). The Court therefore **DENIES** Plaintiff's Motion to Intervene (ECF No. 55).

People's Republic of China." 85 Fed. Reg. 56,428 (Sept. 11, 2020). Since its emergence in late 2019, COVID-19 "has spread throughout the world, resulting in a pandemic." *Id.* The World Health Organization ("WHO") first classified COVID-19 as a pandemic on March 11, 2020. *Id.*

COVID-19 has fundamentally altered life in the United States, with governments banning church gatherings, closing businesses, and forcing children to attend school on a screen or with a mask. Since early 2020, there have been more than 66 million COVID-19 cases, including more than 5.5 million in Texas. Over 850,000 U.S. residents have died from COVID-related causes, more than 76,000 of them in Texas.[4]

## B. The CDC's actions to prevent the entry of COVID-19-positive aliens eventually culminated in the October 2020 Order.

Approximately two weeks after being classified as a pandemic by the WHO, the CDC promulgated an interim rule, 85 Fed. Reg. 16,559 (Mar. 24, 2020), as well as an initial 30-day order. 85 Fed. Reg. 17,060 (Mar. 26, 2020). The order's purpose was to "protect the public health from an increase in the serious danger of the introduction of Coronavirus Disease 2019 (COVID-19) into the land [ports of entry (POEs)], and the Border Patrol stations between POEs, at or near the United States borders with Canada and Mexico." 85 Fed. Reg. at 17,061. The order aimed to advance "the movement of all . . . aliens [covered by the order] to the country from which they entered the United States, or their country of origin . . . as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances." *Id.* at 17,067. The CDC extended the March order for an additional 30 days, 85 Fed. Reg. 22,424 (Apr. 22, 2020), and then amended it to cover the duration of the COVID-19 disaster, subject to internal 30-day review cycle, 85 Fed. Reg. 31,503, 31,507–08 (May 26, 2020).

On October 13, 2020, the CDC Director issued an order ("October 2020 Order") entitled, "Order Suspending the Right to Introduce Certain Persons Where a Quarantinable Communicable Disease Exists." 85 Fed.

---

[4]*See COVID Data Tracker*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker (last visited Jan. 18, 2021); *DSHS COVID-19 Dashboard*, TEX. DEPT. OF STATE HEALTH SERVS., https://dshs.texas.gov/coronavirus/cases.aspx (last visited Jan. 18, 2021).

Reg. 65,806–12 (Oct. 16, 2020); ECF No. 69 at 4–10.[5] The October 2020 Order was based on findings that:

- COVID-19 is a communicable disease that poses a danger to the public health;

- COVD-19 is present in numerous foreign countries, including Canada and Mexico;

- There is a serious danger of the introduction of COVID-19 into the land-based POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID-19 exists in Canada, Mexico, and other countries of origin of persons who migrate to the United States across its North and South borders;

- But for a suspension-of-entry order under 42 U.S.C. § 265, covered aliens would be subject to immigration processing at the land ports of entry and Border Patrol stations and, during that processing, many of them (typically aliens who lack valid travel documents and are therefore inadmissible) would be held in the congregate areas of the facilities, near one another, for hours or days; and

- Such introduction into congregate settings of persons from Canada or Mexico would increase the already serious danger to the public health of the United States to the point of requiring a temporary suspension of the introduction of covered aliens into the United States.

85 Fed. Reg. at 65,810; ECF No. 69 at 8.

Because the CDC does not have the personnel, equipment, or facilities to enforce the October 2020 Order, the CDC Director consulted with DHS and other federal departments and "requested that DHS aid in the enforcement of this Order." 85 Fed. Reg. at 65,812; ECF No. 69 at 10. By its own terms, the October 2020 Order applied, *inter alia*, to all "covered aliens," which were defined (with the aid of DHS) as "aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended at or near the border seeking to unlawfully enter the United States between POEs." 85 Fed. Reg. at 65,807; ECF

---

[5] By its own terms, the October 2020 Order states that it is "substantially the same" as the interim orders. *See* 85 Fed. Reg. at 65,807.

No. 69 at 39. The October 2020 Order did not apply to "persons whom custom officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.* In these instances, "DHS shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments." *Id.* The October 2020 Order suspended covered aliens until the CDC determined that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health." 85 Fed. Reg. at 65,810.

These interim rules and the October 2020 Order empowered DHS to prevent entry of, and to rapidly expel, covered aliens from congregate settings during the peak of the pandemic. The CDC Director stated in the October 2020 Order that the prior orders "reduced the risks of COVID-19 transmission in POEs and Border Patrol Stations, thereby reducing risks to DHS personnel and the U.S. health care system." 85 Fed. Reg. at 65,810; ECF No. 69 at 8.

### C. The Final Rule is published and worked in tandem with the October 2020 Order in the "Title 42" process.

Shortly before the issuance of the October 2020 Order, on September 11, 2020, the CDC published a final rule ("Final Rule") entitled, "Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons from Designated Countries or Places for Public Health Purposes." 42 C.F.R. § 71.40; 85 Fed. Reg. 56,424 (Sept. 11, 2020). The Final Rule became effective October 13, 2020, and it remains in effect as of the date of this order. *See* ECF No. 69 at 1–3.

The Final Rule and October 2020 Order worked together in what became known as the "Title 42" process.[6] The Title 42 process essentially

---

[6] Title 42 refers to the statute, 42 U.S.C. § 265, relied upon by the CDC Director to issue the Final Rule—42 C.F.R. § 71.40—and orders at issue in this case. *See* 42 C.F.R. § 71.40; 85 Fed. Reg. 56,424 (Sept. 11, 2020) (stating that the rule was implemented per 42 U.S.C. § 265). The statute is discussed in greater detail below.

acts as an expedited way to prevent and remove the introduction of COVID-19-positive illegal aliens that functions alongside the traditional means of detention and expulsion under the Immigration and Nationality Act. DHS used its Title 42 authority to expel illegal aliens in March 2020; over the next six months, nearly 200,000 aliens were rapidly expelled under Title 42.[7]

### D. The Title 42 process is temporarily stayed. After the stay was lifted, however, the CDC Director then issued the February 2021 Order, reassessing the public health risk at the border in a way that effectively stayed the Title 42 process.

On November 18, 2020, the District of Columbia District Court issued an injunction holding that unaccompanied alien children[8] ("UAC") were being improperly expelled pursuant to this Title 42 process. *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020). That injunction was then stayed on January 29, 2021, by the United States Court of Appeals for the D.C. Circuit. *See P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021).

Although no injunction prevented the Title 42 process from continuing, the CDC Director issued a new order ("February 2021 Order") that created an exception from the October 2020 Order regarding UAC, effective January 30, 2021. 86 Fed. Reg. 9,942 (Feb. 17, 2021); ECF No. 69 at 11. The February 2021 Order was only a few paragraphs long, yet it asserted that the "CDC has decided to exercise its discretion to temporarily except from expulsion [UAC] encountered in the United States pending the outcoming of its forthcoming public health reassessment of the [October 2020] Order." *Id.* The February 2021 Order further recognized that the COVID-19 pandemic "continues to be a highly dynamic public health emergency," and that the CDC is "in the process of reassessing the overall public health risk at the United

---

[7]*Sw. Border Land Encounters*, U.S. CUSTOMS & BORDER PATROL, https://www.cbp.gov/newsroom/stats/ southwest-land-border-encounters (last visited Dec. 2, 2021).

[8]"Unaccompanied alien child" is statutorily defined as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

States' borders and its [October Order] based on the most current information regarding the COVID-19 pandemic as well as the situation at the Nation's borders." *Id.*

There was a dramatic surge of illegal border crossings following the February 2021 Order, with 9,429 UAC encounters at the southwest border in February of 2021. The number of UAC encounters increased to 18,890 in March and has remained elevated ever since: more than 17,000 encounters in April; more than 14,000 in May; more than 15,000 in June; more than 18,500 in July; more than 18,000 in August; more than 12,000 in October; more than 13,500 in November; more than 11,500 in December; and more than 8,500 in January 2022. *See* ECF Nos. 68 at 18; 99 at 1.

There was also an increase of family-unit processing because Title 42 was used less frequently, despite an increase of family-unit encounters. ECF Nos. 68 at 19; 99 at 1–2. Texas sets forth the following chart that demonstrates these undisputed numbers regarding family-unit encounters:

| Title 42 applications to family units | | | |
|---|---|---|---|
| Month | Family-unit encounters | Absolute | Percentage |
| November 2020 | 4,302 | 3,641 | 84.6 |
| December 2020 | 4,406 | 3,332 | 75.6 |
| January 2021 | 7,296 | 4,546 | 62.3 |
| February 2021 | 19,590 | 9,478 | 48.4 |
| March 2021 | 54,132 | 21,572 | 39.9 |
| April 2021 | 50,094 | 17,930 | 35.8 |
| May 2021 | 44,747 | 9,320 | 20.8 |
| June 2021 | 55,896 | 8,028 | 14.4 |
| July 2021 | 83,499 | 10,110 | 12.1 |
| August 2021 | 86,631 | 17,070 | 19.7 |
| September 2021 | 64,388 | 17,599 | 27.3 |

| October 2021 | 42,799 | 13,359 | 31.2 |
| November 2021 | 45,062 | 11,566 | 25.7 |
| December 2021 | 51,736 | 11,503 | 22.2 |
| January 2022 | 31,795 | 8,333 | 26.2 |

ECF No. 68 at 12. Thus, Texas contends that while the total number of family unit encounters during this period increased greatly, the percentage of family-unit members rapidly expelled under Title 42 decreased significantly. *Id.*

### E. Texas files the instant lawsuit.

Alarmed by these figures, on April 22, 2021, Texas filed the instant lawsuit complaining that the actions and omissions of various federal administrative agencies caused an influx of potentially COVID-19-positive foreign aliens to cross the southern border. ECF No. 1. In its Complaint, Texas argued that the February 2021 Order violated the Administrative Procedures Act ("APA"). *Id.* Namely, Texas argued that the February 2021 Order arbitrarily departed from the Title 42 process and the October 2020 Order, both of which were previously used to prevent the entry of potentially-COVID-19-positive illegal aliens and UAC into congregate care settings in Texas. *Id.* Texas further argued that Defendants were failing to enforce the Immigration Nationality Act ("INA"), 8 U.S.C. §1222(a), and to uphold the Take Care Clause of the United States Constitution. *Id.* Texas sought eight counts of declaratory relief to this effect. *Id.*

Texas also sought a preliminary injunction. The Court conducted a preliminary injunction hearing on July 13, 2021. ECF No. 49. At this hearing, counsel for the Government informed the Court that the February 2021 Order would likely be superseded by an imminent CDC order. *Id.* Considering this development, the Court requested that the Government's counsel promptly apprise the Court of the issuance of any such order. Shortly thereafter the Government filed a Notice of New CDC Order and attached the July 2021 Order, which is detailed in the following section. ECF No. 50.

The Government asserted that the July 2021 Order "supersedes the February [2021 Order] that is at issue in this litigation," so Texas's claims challenging the February 2021 Order were moot and Texas's motion for preliminary injunction is "now moot in its entirety." *Id.* The Court agreed and issued an order denying the motion for preliminary injunction as moot considering the July 2021 Order. ECF No. 54. However, because the harm that Texas complained of was ongoing, the Court granted Texas leave to amend and seek renewed preliminary injunctive relief. *Id.*

### F. The CDC Director issues two orders to supersede the October 2020 Order: the July 2021 and the August 2021 Orders.

After issuing the July 2021 Order,[9] the CDC Director then issued the August 2021 Order, which superseded the October 2020 Order and incorporated, by reference, the July 2021 Order. The August 2021 Order continued excepting UAC from the Title 42 process. ECF No. 69 at 19–32. The August 2021 Order provides, in relevant part, as follows:

- "78 countries continue to experience high or substantial incidence rates (≥50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases." 86 Fed. Reg. at 42,831.

- In the week preceding the August 2021 Order, Mexico "experienced a 30.2% increase in new cases" of COVID-19. *Id.*

- "Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID-19 outbreaks." *Id.* at 42,833. CBP facilities have "[s]pace constraints [that] preclude implementation of cohorting and consequence management such as quarantine and isolation." *Id.* at 42,837.

- "The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States." *Id.* at 42,834.

- "Countries of origin for the majority of incoming covered [aliens] have markedly lower vaccination rates." Of the top five

---

[9]*See* 86 Fed. Reg. 38,718; ECF No. 69 at 13.

originating countries, El Salvador, at 22%, had the highest rate of vaccinated persons; Guatemala and Honduras, the two lowest, had 1.6% and 1.8%, respectively. *Id.* at 42,834 & n.57.

- "At the time [of the August 2021 Order], over 70% of U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission." *Id.* & fn. 61. Of Texas's border counties, fourteen two were "experiencing moderate levels of community transmission," while the other twelve were experiencing high levels of community transmission. *Id.*

It is noteworthy that the August 2021 Order concedes that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." *Id.* at 42,835.

Yet despite these persisting problems, the August 2021 Order found that testing, vaccines, and other mitigation measures are available. *Id.* at 42,833–34. CBP also "implemented a variety of mitigation efforts to prevent the spread of COVID-19 in POE and U.S. Border Patrol facilities." *Id.* at 42,835. Some of these mitigation efforts include:

> CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce. All noncitizens brought into CBP custody are subject to health intake interviews, including COVID-19 screening questions and temperature checks. If a noncitizen in custody displays symptoms of COVID-19 or has a known exposure, CBP facilitates referral to the local healthcare system for testing. Finally, in the event CBP decides to release a noncitizen prior to removal proceedings, the agency has coordinated with local governments and non-governmental organizations to arrange COVID-19 testing at release.

*Id.* The CDC "believes the COVID-19-related public health concerns associated with [UAC] introduction can be adequately addressed without [UAC] being subject to this Order." *Id.* 42,838. Thus, "[a]s outlined in the July [2021 Order] and incorporated herein, CDC is fully excepting [UAC] from this Order," because UAC "can be excepted from the Order without posing a significant health risk." *Id.*; *see also id.* at 42,840 ("Based on an assessment of the current COVID-19 epidemiologic landscape and the U.S. government's ongoing efforts to accommodate [UAC], CDC does not find public health justification for this Order to apply . . . to [UAC].").

## G. Texas files a renewed motion for preliminary injunction and the Government moves to dismiss.

Texas filed an Amended Complaint (ECF No. 62) and now challenges both the July 2021 and the August 2021 Orders for: violating the APA, failing to detain certain aliens as required by the INA, breaching an agreement between the Government and Texas, and violating the Take Care Clause. *See* ECF No. 62.

Texas also filed a renewed motion for preliminary injunction. ECF No. 67. The Government filed a consolidated response and motion to dismiss (ECF Nos. 76–77), Texas filed a consolidated reply in support of its renewed motion for preliminary injunction and response in opposition to the Government's motion to dismiss (ECF No. 89), and the Government filed a reply in support of its motion to dismiss (ECF No. 93).[10]

---

[10]Before the Court is a Brief of Amicus Curiae in Support of the Renewed Motion for Preliminary Injunction, by filed the State of Missouri. ECF No. 75. Also before the Court is a Brief of Amici Curiae in Opposition to the Renewed Motion for Preliminary Injunction, filed by Al Otro Lado, American Immigration Council, Asylum Access, Asylum Access Mexico A.C, Catholic Legal Immigration Network, Inc., Center for Civic Policy, Center for Gender and Refugee Studies, Comunidad Maya Pixan Ixim, Disciples Immigration Legal Counsel, FWD.us, First Focus on Children, Florence Immigrant and Refugee Rights Project, Immigrant Defenders Law Center, Innovation Law Lab, International Mayan League, Justice Action Center, Justice for Our Neighbors El Paso, Kids in Need of Defense, Kino Border Initiative, La Raza Centro Legal SF, La Raza Community Resource Center, Migrant Center for Human Rights, National Immigration Law Center, National Immigration Project, Project Corazon, Lawyers for Good Government, Refugees International, Student Clinic for Immigrant

After receiving the Parties' briefing and supporting appendices, the Court notified the Parties that it did not believe an evidentiary hearing was necessary to resolve the motion to dismiss and renewed motion for preliminary injunction but provided the parties an opportunity to file an objection and request an evidentiary hearing. ECF No. 94. No such objection was filed. Therefore, the Motion to Dismiss and Renewed Motion for Preliminary Injunction are now ripe for review.

## APPLICABLE LAW

### A. Immigration and Nationality Act, 8 USC. §§ 1101–1537

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). "The Immigration and Nationality Act . . . codified at 8 U.S.C. § 1101 *et seq.*, is the comprehensive statutory scheme governing immigration in the United States. It controls, among other things, the removal of illegal aliens found within the United States." *Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015). The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, charges DHS with enforcing the nation's immigration laws, including the removal of aliens who are not lawfully present in the United States. *See, e.g.*, *Arizona*, 567 U.S. at 397 ("Agencies in the Department of Homeland Security play a major role in enforcing the country's immigration laws. United States Customs and Border Protection (CBP) is responsible for determining the admissibility of aliens and securing the country's borders.").

Aliens who "are 'inadmissible' and therefore 'removable'" include those who lack a valid entry document when they apply for admission. *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. §§ 1182(a)(7)(A)(i)(l), 1229a(e)(2)(A)). Aliens who arrive in the United States without having been admitted and aliens who are present in the United States without having been lawfully admitted, are deemed to have applied for admission. 8 U.S.C. § 1225(a)(1). Expedited removal procedures for those illegal aliens are available if they: (1) are

Justice, Inc., Taylor Levy Law, The Refugee and Immigrant Center for Education and Legal Services. ECF No. 84.

inadmissible because they lack a valid entry document; (2) have not been continuously physically present in the United States for the two years preceding their inadmissibility determination; or (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer determines that such an alien is inadmissible, the alien is ordered to be "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

Whether subject to standard or expedited removal, aliens placed in removal proceedings must be detained until the proceedings are complete. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844–45 (2018) (citing 8 U.S.C. § 1225(b)(1), (2)). Similarly, aliens who intend to claim asylum or who claim a credible fear of persecution if deported must be detained until their bid for asylum is resolved. *See* 8 U.S.C. §§ 1158, 1225(b)(1)–(2). DHS may temporarily parole these aliens "for urgent humanitarian reasons or significant public benefit," but it may do so "only on a case-by-case basis." *Id.* § 1182(d)(5)(A).

Also inadmissible are aliens who have a "communicable disease of public health significance," as defined by "regulations prescribed by the Secretary of Health and Human Services." *Id.* § 1182(a)(1)(A)(i). Aliens must be detained to determine whether they are inadmissible for public-health reasons under two circumstances. *First*, they must be detained if DHS has reason to believe they are "afflicted with" such a disease. 8 U.S.C. § 1222(a). *Second*, they must be detained if DHS "has received information showing that [they] are coming from a country or have embarked at a place" where such a disease is "prevalent or epidemic." This detention must enable "immigration officers and medical officers" to conduct "observation and an examination sufficient to determine whether" the aliens are inadmissible. *Id.*

### B. Public Health Services Act, 42 U.S.C. § 265

Under 42 U.S.C. § 265, the CDC is authorized[11] to prohibit entry into the United States "such persons and property" that the CDC determines

---

[11]The authority originally granted to the Surgeon General was eventually delegated to the CDC Director.

will increase the danger and spread of a communicable disease from entering into the United States:

> Whenever the [CDC Director] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [CDC Director], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.

## C. The Administrative Procedures Act ("APA")

"The APA 'sets forth the procedures by which federal agencies are accountable . . . and their actions [are] subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (Roberts, C.J.) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), and provides that agency actions must be "set aside" if they are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks omitted). Rather, courts assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

### ANALYSIS OF MOTION TO DISMISS

Before addressing the substance of the Renewed Motion for Preliminary Injunction, the Court first addresses the Government's Motion to Dismiss.

**A. Texas has standing to bring Claims A and B.**

Texas asserts two claims against the Government for alleged violations of the APA. ECF No. 62 ¶¶ 75–85. *First*, Texas claims that the July 2021 and August 2021 Orders did not undergo notice-and-comment rulemaking (Claim A). *Id. Second*, Texas claims the August 2021 Order is "arbitrary and capricious" for failing to consider Texas's reliance interests and other relevant factors (Claim B). *Id.*

The Government moves to dismiss both claims on the grounds that: (1) Texas lacks standing to assert them, (2) the decisions are committed solely to agency discretion and are not subject to judicial review, and (3) Texas is not within the relevant "zone of interests." ECF No. 76 at 15. The Government argues that Texas makes mere general allegations that it will suffer injuries from increased illegal immigration and the associated increased costs. *Id.* at 16. The Government further argues that the authorities Texas cites are inapposite because "Title 42 orders are not immigration actions and do not represent the exercise of any form of immigration policymaking with an intended or expected effect to increase or decrease the long-term presence of non-citizens into the country." *Id.* Instead, the Government characterizes the challenged orders as "temporary health measures" that were issued "in an attempt to alleviate the effect of the COVID-19 pandemic, most primarily in connection with processing noncitizens in congregate settings at Ports of Entry and Border Patrol stations." *Id.*

Texas rejects the notion that its APA claims are merely generalized grievances on illegal immigration. ECF No. 89 at 5. Instead, Texas sets forth specific costs of increased healthcare spending. *See, e.g.*, ECF No. 69 at 84, 90, 98, 99. Texas argues these costs are practically admitted by the Government in the August 2021 Order, which acknowledges

> [t]he rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States. Ultimately, the flow of migration directly impacts not only border communities and regions, but also destination communities and the healthcare resources of both.

86 Fed. Reg. at 42,835, ECF No. 69 at 23.

1. <u>Traditional Standing</u>

Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). "The law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Thus, to establish standing, Texas must show an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 409 (citation omitted); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

a. *Injury in Fact*

A plaintiff seeking to establish injury-in-fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)). "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

"[T]he expenditure of state funds may qualify as an invasion of a legally protected interest sufficient to establish standing under the proper circumstances." *Crane v. Napolitano*, 920 F. Supp. 2d 724, 743 (N.D. Tex. 2013) (O'Connor, J.), *aff'd sub nom.*, 783 F.3d 244 (5th Cir. 2015); *see also Clinton v. City of N.Y.,* 524 U.S. 417, 430–31 (1998) (holding adverse effects on the "borrowing power, financial strength, and fiscal planning" of a governmental entity can constitute a sufficient injury-in-fact to establish constitutional standing); *Sch. Dist. of City of*

*Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (holding school districts and education associations had standing "based on their allegation that they must spend state and local funds" to comply with the challenged law).

Here, the Government contends that Texas's financial injuries are simply generalized grievances with current border policy. ECF No. 76 at 16 (relying on *Crane*, 783 F.3d at 252). The Court cannot agree with the Government on this record. That is, Texas proffers specific, uncontroverted evidence that it will experience increased financial hardship—most directly through healthcare spending. ECF No. 68 at 21. Included in Texas's appendix is a declaration from Lisa Kalakanis, the Data Dissemination and Reporting Director with the Texas Health and Human Services Commission's Office of Data Analytics and Performance. ECF No. 69 at 81. Kalakanis testifies that Texas HHSC provides three principal categories of services and benefits to undocumented aliens in Texas: (1) Texas Emergency Medicaid; (2) the Texas Family Violence Program; and (3) Texas Children's Health Insurance Program Perinatal Coverage. *Id.* at 82. Taking just one of those programs—Texas Emergency Medicaid—Kalakanis testifies that "[t]he total estimated cost to [Texas] for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62 million in SFY 2009, $71 million in SFY 2011, $90 million in SFY 2013, and $73 million in SFY 2015." *Id.* at 83. She estimates the cost in SFY 2019 at $80 million. *Id.* Kalakanis testifies that based on her knowledge and expertise of the benefits and services provided to undocumented migrants by the Texas HHSC, "the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year." *Id.* at 84.

Texas further establishes specific financial injuries through the costs of issuing of driver's licenses to illegal aliens (*Id.* at 96–107), providing education to UAC (*Id.* at 88–95), and incarcerating aliens convicted of crimes committed when they are not legally present in the United States (*Id.* at 108–10). The Fifth Circuit has found these types of specific

injuries sufficient to establish injury when a federal action would have enabled "500,000 illegal aliens in Texas" to receive such benefits. *See Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015).

Texas further supports its assertion of injuries by appending two disaster declarations issued by Hidalgo County and Webb County. ECF No. 68 at 18–20. Hidalgo County's declaration recited that an "alarmingly substantial number of immigrants" were being released into Hidalgo County, "including individuals that are positive for COVID-19," so "local Non-Governmental Organizations, and the City of McAllen are overwhelmed . . . and can no longer adequately feed, house, provide medical attention or otherwise accommodate the individuals being released." ECF No. 69 at 52. The Webb County disaster declaration similarly recites that Webb County has experienced the "organized transportation of large numbers of individuals (refugees, immigrants and/or migrants, a significant portion of whom are unvaccinated, untested for the COVID-19 virus and COVID positive) who have been . . . transported into Webb County." *Id.* at 63. The declaration stated that the "unanticipated influx of these individuals has overwhelmed local resources and services to the extent that they can no longer adequately feed, house, provide medical attention or otherwise accommodate these individuals entering Webb County." *Id.*

Finally, the Court highlights that the August 2021 Order *itself* acknowledges that "[s]igns of stress are already present in the southern regions of the United States," and that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." 86 Fed. Reg. at 42,835; ECF No. 69 at 23. Thus, in the Court's view, the August 2021 Order tacitly confirms that Texas is suffering the injuries alleged in its Complaint.

Based on the foregoing, the Court concludes that Texas easily satisfies its burden on the injury-in-fact prong of analysis.

### b. Traceability

The Government next argues that Texas cannot show that any of its alleged financial harms are fairly traceable to the July 2021 and August

2021 Orders. ECF No. 76 at 17. The Government's position is that Texas cannot establish harms that are fairly traceable because the causal relationship between the injury and challenged actions are dependent on the decisions of independent third parties. *Id.* (citing *California v. Texas*, 141 S. Ct. 2104, 2117 (2021)). The Court cannot agree with the Government's theory.

The injuries detailed above are directly attributable to the relevant Title 42 orders without intervention by third parties in the causal chain. Indeed, the Hidalgo County disaster declaration clearly shows the connection between "U.S. Customs and Border Protection . . . releasing an alarmingly substantial number of immigrants . . . within the County of Hidalgo, Texas," and local Non-Governmental Organizations and the City of McAllen being "overwhelmed with the unanticipated influx . . . and can no longer adequately feed, house, provide medical attention or otherwise accommodate the individuals being release." ECF No. 69 at 52. Similarly, the Webb County disaster declaration directly links the "unanticipated influx" of unvaccinated and COVID-19 positive refugees, immigrants and/or migrants to "overwhelmed local resources and services." *Id.* at 63. These injuries are directly attributable to the challenged orders and their immediate effects.

Given this evidence, the Court concludes that Texas satisfied its burden on the traceability prong of analysis.

### c. *Redressability*

The Government does not appear to challenge Texas on the redressability requirement of standing (*see* ECF No. 76 at 15–20), but Texas satisfies this element in any event. *See* ECF No. 89 at 8–10. That is, the Court has the power to grant an injunction that would eliminate or at least ameliorate the injuries discussed above. Thus, Texas has satisfied the requirement that its injuries could be redressable by a favorable ruling from the Court.

Accordingly, the Court concludes that Texas established each of the traditional standing requirements.[12]

## 2. APA Procedural Requirements

The Government next challenges Texas's standing to bring its APA claims because the challenged July 2021 and August 2021 Orders are committed to agency discretion and Texas's injuries do not fall within the appropriate zone of interests. ECF No. 76 at 20–25. The Court considers each challenge in turn.

### a. Agency Discretion

The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702). That presumption can be rebutted by a showing that the relevant statute "preclude[s]" review, § 701(a)(1), or that the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see also Qorane v. Barr*, 919 F.3d 904, 911–12 (5th Cir. 2019). This exception to the presumption of judicial review is to be read "quite narrowly." *Regents*, 140 S. Ct. at 1905. The Fifth Circuit instructs that agency decisions are "completely unreviewable under the committed to 'agency discretion by law' exception" if "the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Texas*, 809 F.3d at 168.

The Government contends that 42 U.S.C. § 265 only permits, and does not mandate, the CDC to prohibit the entry of persons into the United States, even if the CDC determines there is an accompanying danger of the introduction of a communicable disease into the United States. ECF No. 76 at 21.

---

[12]The Court notes that, as an alternative argument, Texas asserts *parens patriae* standing based on increased risks of COVID-19 to Texas citizens. ECF No. 68 at 30. The Government asserts that Supreme Court caselaw precludes a state from having *parens patriae* standing to bring an action against the federal government. ECF No. 76 at 17 (citing *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)). The Court need not address this alternative theory, as it concluded Texas established traditional standing.

The Court considers the Government's argument—that the July 2021 and August 2021 Orders are unreviewable because they were "committed to agency discretion"—to be based on a too-narrow framing of Texas's claims. That is, while Texas challenges both 42 U.S.C. § 265 and the Final Rule (42 C.F.R. § 71.40(a)), the Government focuses its argument exclusively on 42 U.S.C. § 265. *See* ECF No. 76 at 20–22. The Government's only argument dedicated to the Final Rule is a bald assertion that it "says nothing about what standards, if any, must be met in order for the CDC to withdraw a Title 42 order." *Id.* at 22. But as Texas rightly points out, 42 C.F.R. § 71.40(c) establishes the parameters the CDC must consider. ECF No. 89 at 9. Indeed, subsection (c) expressly states that "[a]ny order issued by the [CDC] Director under this section *shall* include" a statement of five matters. 42 C.F.R. § 71.40(c) (emphasis added). Moreover, subsection (d) expressly states that when issuing "any order under this section, the [CDC] Director *shall*, as practicable under the circumstances, consult with all Federal departments or agencies whose interests would be impacted by the order." *Id.* § 71.40(d) (emphasis added).[13]

Accordingly, the Court concludes that the statute and regulation, and any orders issued thereunder—specifically, the July 2021 and August 2021 Orders—are reviewable because they are not committed to agency discretion. Rather, these materials merely provide guidance as to how the CDC's discretion should be exercised.

### b. *Zone of Interests*

"The interest [Texas] asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that [Texas] says was violated." *Texas*, 809 F.3d at 162 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). That "test . . . is not meant to be especially demanding and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.* (cleaned up).

---

[13]By comparison, later in subsection (d), the regulation provides discretion so that the CDC Director "*may*, as practicable under the circumstances, consult with any State or local authorities that he or she deems appropriate in his or her discretion." *Id.* (emphasis added).

"The Supreme Court 'has always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" *Id.* "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.*

Here, Texas is a border state facing a healthcare crisis that is compounded by an immigration crisis. This clearly falls within the zone of interests to be protected by 42 U.S.C. § 265 and 42 C.F.R. § 71.40. Indeed, the Final Rule, October 2020 Order, and August 2021 Order all expressly recognize the challenges COVID-19-positive aliens pose to border states and border counties. The Final Rule states that the CDC Director may consult with state and local authorities to prohibit persons from entering the country if necessary, to avert introducing a dangerous communicable disease. 42 C.F.R. § 71.40(d). The October 2020 Order stated that its purpose was, *inter alia*, to mitigate the risk of transmission and spread of COVID-19 in the interior of the United States and the strain such transmission would put on the United States healthcare system. 85 Fed. Reg. at 65,808; *see also id.* at 65,810 (finding serious danger of introduction of COVID-19 into the interior of the country). The August 2021 Order found that at the time of its issuance, over 70% of United States counties along the southern United States–Mexico border had high or substantial levels of community COVID-19 transmission, 86 Fed. Reg. at 42,834, and that signs of stress to healthcare and public health capacities in border communities and regions are already present. *Id.* at 42,835. This demonstrates that Texas's interests asserted are within the zone of interests to be protected and regulated by 42 U.S.C. § 265, the Final Rule, and the October 2020, July 2021, and August 2021 Orders.

Thus, the Government's Motion to Dismiss Texas's Claims A and B will be **DENIED.**

## B. Texas's Claims C.1 and D are not barred by res judicata.

In its First Amended Complaint, Texas asserts claims that the Government is required by statute and regulation to detain rather than

parole UAC and family units. ECF No. 62 ¶¶ 86–88, 92–93. Texas argues that 8 U.S.C. § 1182(d)(5)(A)—the statute excepting mandatory detention—may only be exercised on a case-by-case basis for urgent humanitarian reasons. ECF No. 68 at 27–29. Accordingly, Texas seeks to compel the Government to follow the INA (8 U.S.C. § 1225) and to have the Court set aside any contrary action as arbitrary or capricious.

The Government asserts that these claims are barred by res judicata because Texas has already successfully litigated the same claims in *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), a case challenging the suspension of Migrant Protection Protocols ("MPP"). ECF No. 76 at 27.

Texas disagrees that the claims are fungible. ECF No. 89 at 11. That is, while the requested relief of detention is the same, the MPP case is distinguishable because it involved claims for individuals who are detained for the purpose of deportation. *Id.* at 12. Conversely, the instant case involves a claim that the Government should be detaining aliens to determine if they are afflicted with COVID-19. *Id.*

The Government responds that comparing the claims shows that both are titled, "Violation of Section 1225," and the only difference between them is on Texas's theory of causation. The injury, however, is the same. ECF No. 93 at 5. Thus, the Government argues that under the transactional test utilized by courts in the Fifth Circuit (detailed below), res judicata bar should Texas's claims C.1 and D. *Id.*

As a preliminary matter, "[a]lthough 'generally a res judicata contention cannot be brought in a motion to dismiss,' a district court may consider it in that posture when the plaintiff 'did not challenge [the defendants'] ability to argue res judicata in a motion to dismiss rather than in their response or a motion for summary judgment.'" *Stiel v. Heritage Numismatic Auctions, Inc.*, 816 F. App'x 888, 891–92 (5th Cir. 2020) (quoting *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 n.2 (5th Cir. 2005)). Thus, because Texas does not challenge the Government's assertion of res judicata in their Motion to Dismiss, and because the documents in the MPP case relied upon by the Government

are proper for the Court to judicially notice, the Court may consider res judicata in the context of a motion to dismiss.

"Four elements must be met for a claim to be barred by res judicata: '(1) the parties must be identical in the two actions; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same claim or cause of action must be involved in both cases.'" *Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398, 401 (5th Cir. 2009) (Haynes, J.) (quoting *In re Ark–La–Tex Timber Co.,* 482 F.3d 319, 330 (5th Cir.2007)). The first, second, and third elements are not in dispute, and the Court concludes that they are satisfied in any event. Thus, the Court must further analyze only the fourth element.

To determine if the same claim or cause of action is involved in two separate cases, the Fifth Circuit utilizes the "transactional test," which "requires that the two actions be based on the same 'nucleus of operative facts.'" *In re Ark–La–Tex Timber Co.*, 482 F.3d at 330; *see also In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir. 1999) ("To determine whether two suits involve the same claim under the fourth element, this court has adopted the transactional test of the RESTATEMENT (SECOND) OF JUDGMENTS, § 24."). "What constitutes a 'transaction' or a 'series of transactions' is determined by weighing various factors such as whether the facts are related in time, space, origin, or motivation; whether they form a convenient trial unit; and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Oreck Direct, LLC*, 560 F.3d at 402 (cleaned up). "It is the 'nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted' that defines the claim." *Hous. Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (Smith, J.) (quoting *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007)).

Applying the transactional test here, the Court concludes Texas's claims C.1 and D are not barred by res judicata because the nucleus of operative facts presented in the two cases are distinguishable. The facts of the MPP case involved aliens who were detained for the purpose of being deported back to Mexico. Conversely, the facts in this case involve

24

UAC and family units (who are allegedly not being detained) to determine if they are afflicted with COVID-19. In the Court's view, the Government's assertions improperly focus on the type of relief, theory advanced, and rights asserted by Texas. But that is not the proper focus of the transactional test. *See Hous. Prof'l Towing Ass'n*, 812 F.3d at 447. Instead, the Court concludes that the underlying facts of the two cases are not "related in time, space, origin, or motivation"; they do not "form a convenient trial unit"; and their "treatment as a unit" would not appropriately "conform to the parties' expectations." *See Oreck Direct, LLC*, 560 F.3d at 402.

The Court therefore concludes that Texas's claims C.1 and D are not barred by res judicata, and the Government's Motion to Dismiss these claims will be **DENIED**.

## C. Texas has standing to bring Claim C.2.

Next, Texas claims the Government is improperly refusing to detain aliens to determine if they have COVID-19—a communicable disease of public health significance. ECF No. 62 ¶¶ 89–91. Accordingly, Texas alleges the Government is violating 8 U.S.C. § 1222(a) of the INA by failing to detain UAC and family units. *Id.* The Government moves to dismiss this claim, arguing it is statutorily barred by 8 U.S.C. § 1252(f)(1), which provides that "[n]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." *See* ECF No. 76 at 30–33.

The Court rejects the Government's argument for the same reason Judge Kacsmaryk did when he decided that Section 1252(f)(1) "does not apply because Plaintiffs are not seeking to *restrain* Defendants from enforcing Section 1225. [Rather,] Plaintiffs are attempting to make Defendants *comply* with Section 1225." *Texas v. Biden*, 2021 WL 3603341, at *15 (emphasis in original). Here, Texas similarly seeks to require the Government to comply with Section 1222(a), not restrain the Government from enforcing it.

The Court therefore concludes that the Government's Motion to Dismiss Texas's Claim C.2 will be **DENIED**.

### D. Texas abandoned Claim E; regardless, this claim is no longer applicable because the relevant agreement has expired.

Texas asserts a claim for a violation of an agreement between Texas and the Government. ECF No. 62 ¶¶ 94–95. The Government challenges the claim by arguing it is barred by res judicata and in any event is unenforceable. ECF No. 76 at 33–34. The Government further argues that the agreement is inapplicable to these facts because it expired on August 1, 2021. *Id.* at 34. Texas did not respond to this argument. *See generally* ECF No. 89. Thus, the Court concludes that Texas has abandoned the claim. Even if the claim were not abandoned, the Court would conclude, like Judge Kacsmaryk, that the agreement has already expired and is thus inapplicable to the August 2021 Order. *See Texas v. Biden*, 2021 WL 3603341, at *7.

The Court will therefore **GRANT** the Government's Motion to Dismiss Texas's Claim E.

### E. Texas's Take-Care-Clause Claim (Claim F) is duplicative.

Finally, Texas alleges that the Court has inherent authority to enjoin the Government from disregarding the INA and from taking agency actions that violate the Take Care Clause of the United States Constitution and that the Court can enjoin such activity under its inherent authority. ECF No. 62 ¶¶ 96–98. The Government seeks to dismiss this claim as duplicative of Texas's other claims and because it is not justiciable. ECF No. 76 at 34–35. Texas responds with citations to two out-of-circuit cases to support that a Take-Care-Clause claim may be justiciable. ECF No. 89 at 14–15.

Here, the Court need not address whether a claim under the Take Care Clause is justiciable because the Court agrees with the Government that the claim is duplicative of claims A through D. *See, e.g.*, *King Aerospace Com. Corp., Inc. v. Al-Anwa Aviation, Inc.*, No. 3:08-CV-0999-L, 2010 WL 3582597, at *10 (N.D. Tex. Sept. 10, 2010) ("The court determines that these tort claims, like the breach of fiduciary duty claim, are duplicative of Al–Anwa's breach of contract claim and should therefore be dismissed.").

Therefore, the Court will **GRANT** the Government's Motion to Dismiss Texas's Claim F.

## ANALYSIS ON MOTION FOR PRELIMINARY INJUNCTION

Having resolved the Government's Motion to Dismiss, the Court limits its preliminary injunction analysis to the claims properly before the Court. The Court will therefore analyze claims: A, B, C, and D.

### A. Texas has established the requisite factors for a preliminary injunction.

A preliminary injunction is an "extraordinary and drastic remedy" that is to be granted "only when the movant, by a clear showing, carries the burden of persuasion" as to each element. *Digit. Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 772 (N.D. Tex. 2012) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).

To be entitled to a preliminary injunction, a movant must establish: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v. Livingston*, 766 F.3d 450, 451 (5th Cir. 2014)).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). If the movant fails to establish any one of the four essential elements, a district court may not grant a preliminary injunction. *See Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001).

### 1. Likelihood of Success on the Merits

Texas asserts that the July 2021 and August 2021 Orders, which are final agency actions, improperly amend the October 2020 Order and Title 42 process.[14] ECF No. 68 at 23–26. Texas therefore argues that the July 2021 and August 2021 Orders are arbitrary or capricious because they fail to offer a reasoned explanation for excepting UAC from the

---

[14] *See* 5 U.S.C. § 551(6), (13).

Title 42 process. *Id.* Further, Texas asserts that the July 2021 and August 2021 Orders are inconsistent with the October 2020 Order, they did not go through proper notice-and-comment proceedings, and there is a de facto policy excepting family units from the Title 42 process. *Id.* The Government rejoins that the challenged orders provide full explanations with citations that support the decision to except UAC from Title 42 removal. ECF No. 76 at 37.

Under the APA, a court must "hold unlawful and set aside agency action . . . found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Texas*, 809 F.3d at 178 (quoting 5 U.S.C. § 706(2)). The arbitrary or capricious standard requires that agency action be reasonable and reasonably explained. *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). This is a narrow and deferential standard of review, which prevents a court from substituting its own policy judgment for that of the agency. *Id.* The court's job is simply to determine if there is a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983).

### a.  No Reasoned Decisionmaking.

The Fifth Circuit requires that federal agencies "engage in 'reasoned decisionmaking.'" *Huawei Techn. USA, Inc. v. Fed. Commc'n Comm'n*, 2 F.4th 421, 433 (5th Cir. 2021) (quoting *Sierra Club v. U.S. Envtl. Prot. Agency*, 939 F.3d 649, 664 (5th Cir. 2019)). Accordingly, the CDC's process for issuing its July 2021 and August 2021 Orders had to be "logical and rational," and the CDC had to consider "the relevant factors" and make "a rational connection between the facts found and the choice made." *Sierra Club*, 939 F.3d at 664 (cleaned up). Under this standard, unexplained inconsistencies in the rulemaking records are grounds for striking down the action. *Id.*

The record before the Court demonstrates that nothing changed between the October 2020 Order, the July 2021, and the August 2021 Order. The COVID-19 virus (still) remains a threat. In fact, the orders

expressly recognize the unique strain that it places on border states and counties. As such, the Final Rule and October 2020 Order sought to address the potential harms COVID-19-positive illegal aliens pose to American citizens, including those who work for CBP and other immigration-related agencies.

Despite the continuous threat of COVID-19, and its potential increase in severity due to new variants, the CDC somehow concluded that it is appropriate to except UAC from the July 2021 and August 2021 Orders. In support, the CDC asserted that it chose to except UAC because there are better measures to prevent UAC from spreading COVID-19 *to each other*. 86 Fed. Reg. at 38,718; ECF No. 69 at 13. But the July 2021 Order concedes that UAC still spend, on average, more than a day clustered at a DHS facility, where they can expose other detainees, DHS personnel, and American citizens and residents to whatever viruses they are carrying. *Id.* at 38,719. And instead of trying to prevent UAC from spreading the viruses they are potentially carrying to the interior of the United States, the Government chose to send UAC away from the facilities where the Government could monitor them and their health. *Id.*

Nothing in the orders, however, attempts to explain how preventing the spread of COVID-19 *between* UAC can also prevent the spread of COVID-19 from the interior of the United States. Importantly, this decision is completely contrary to the October 2021 Order's purpose: "[T]o mitigate the continued risks of COVID-19 transmission and spread of COVID-19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border patrol stations," as well as "further transmission and spread of COVID-19 in the interior of the United States." 85 Fed. Reg. at 65,808; ECF No. 69 at 6. Indeed, as Texas points out, the CDC's own findings reveal that "more than 15,000 [UAC] have been diagnosed with COVID-19—roughly 8,500 of them in the custody of someone other than DHS." ECF No. 68 at 24–25 (citing 86 Fed. Reg. at 38,719; ECF No. 69 at 14). Of course, evidence might show that excepting UAC does not spread—or increase the risk of spreading—COVID-19 to the interior of the United States. But the Government failed to make that showing.

Moreover, Texas provides evidence that this development is intentional. That is, Rodney Scott, the former Chief of the U.S. Border Patrol, testifies that he was instructed to stand down from re-instating the Title 42 program for UAC the day after the stay preventing that re-instatement was lifted—18 days *before* the February 2021 Order created a backdated exception for UAC. ECF No. 69 at 37–38. When Scott asked the Acting Commissioner of CBP questions about the latest instruction to stand down, he was not answered. *Id.* at 38. Scott testifies that this represents a "significant departure from well-established practices and protocols," which would have included the Chief "in detailed briefings and deliberations to facilitate informed decision-making prior to implementing a significant policy decision such as this." *Id.*

It is generally arbitrary or capricious for an agency to depart from a prior policy *sub silentio*, so an agency's departure from a prior policy must have good reasons. *FCC v. Fox Television Stations, Inc.*, 572 U.S. 489, 510 (2014). That is, an agency has discretion to alter course, but it must give a reasonable explanation for doing so—the Government failed to do so here. *Id.*

Thus, the Court concludes that Texas has demonstrated a departure from a prior policy *sub silentio*, which further demonstrates that the Government failed to engage in reasoned decisionmaking. Its actions are therefore arbitrary or capricious.

### b.  *No Meaningful Consideration of Texas's Reliance Interest*

When an agency changes course, it must consider whether there was legitimate reliance on the status quo prior to the change. As directed by the Supreme Court, "[i]t would be arbitrary and capricious to ignore such matters." *Regents*, 140 S. Ct. at 1913 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

Here, neither the July 2021 nor the August 2021 Orders demonstrate any sort of specific, meaningful consideration of Texas's potential reliance interests. For example, the July 2021 Order merely states that the statistical numbers "indicate that the risk of overburdening the local healthcare systems by UC presenting with severe COVID-19 disease remains low." 86 Fed. Reg. at 38,720; ECF No. 69 at 18. But that alone

does not indicate that the agency considered all of Texas's potential reliance interests. In fact, the July 2021 Order considers only the local healthcare systems—nothing more. The local communities and border states are composed of much more than just healthcare systems.

And because the August 2021 Order merely incorporates the July 2021 Order, it commits the same fatal flaw. Thus, because the July 2021 Order failed to fully explore Texas's reliance interests, the August 2021 Order cannot be said to have explored those same interests. At most, the August 2021 Order states that "local and destination communities" are protected from elevated risks of COVID-19 transmission. 86 Fed. Reg. at 42,838; ECF No. 69 at 29.  But as stated above, and as demonstrated from the irreparable injuries that Texas is currently experiencing, the July 2021 and August 2021 Orders fail to offer any sort of reasoned decisionmaking. And "[g]iven the Supreme Court's explanation that border states 'bear[] many of the consequences of unlawful immigration,' one would expect a 'reasonable and reasonably explained' [order]" to explore those issues and reliance interests much more in depth.[15] *Texas v. Biden*, 20 F.4th 928, 989 (5th Cir. 2021) (internal citations omitted).

Accordingly, the Court concludes that Texas has demonstrated a likelihood of success that the July 2021 and August 2021 Orders are arbitrary or capricious in violation of the APA.[16]

---

[15]To skirt the issue of "state reliance interests," the Government argues that Texas must specify specific reliance interests. But *Regents* is clear, "consideration [of any reliance interests] must be undertaken by the agency in the *first* instance." 140 S. Ct. at 1913–14 (emphasis added). Thus, if the agency fails to (meaningfully) consider reliance interests, "[t]hat alone is fatal." *Texas*, 20 F.4th at 989. As the Government understands, "[w]hen an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Regents*, 140 S. Ct. at 1913 (quoting *Encino Motorcars*, 136 S. Ct. at 2126.

[16]Although Texas might be correct on the merits, the Court cannot conclude—based on the current record before the Court—that Texas has demonstrated a substantial likelihood of success that the Government is: (1) excepting families from Title 42 under a *de facto* policy and (2) failing to comply with its mandatory duty to detain. To support these claims, Texas relies on statistical "inferences." *See, e.g.*, ECF No. 26 at 19. But without any concrete facts demonstrating that the Government is operating under a *de facto* policy, rather than agency discretion, or failing to comply with its mandatory duty to detain, Texas's claim for a *mandatory* injunction must fail. *See* ECF No. 67. The Court will therefore **DENY** Texas's Motion for a Preliminary Injunction to the extent that Texas requests that the Government's *de facto* policy be

2.  <u>Substantial Threat of Irreparable Injury</u>

To satisfy the second preliminary injunction factor, Texas must demonstrate a likelihood of immediate and substantial irreparable injury that monetary damages would not fully repair. *Texas*, 86 F. Supp. 3d at 672 (citing *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)); *Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *6 (N.D. Tex. June 27, 2014) (Boyle, J.); *see also Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (noting that an injury is "irreparable" when the injury "cannot be undone through monetary remedies"). To satisfy this factor, Texas must show more than an unfounded fear or the possibility of some remote future injury. *Id.*

Texas alleges the harm has occurred and continues to occur every day as UAC come across the border at increasing rates. ECF No. 68 at 25–29, 36–38. Couple that with the COVID-19 pandemic—especially the highly contagious nature of the disease—and Texas further argues that there is harm in perpetuating a public health crisis. *Id.* at 27–28. The October 2020 Order expressly found that several cities and states at or near the borders bear the brunt of the increased rates of aliens, which has "strained" the states' "healthcare and public health systems." 85 Fed. Reg. at 65,812; ECF Nos. 69 at 13. The August 2021 Order also recognizes that the "flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources on both." 86 Fed. Reg. at 42,835; ECF No. 69 at 26.

Texas provides concrete examples of the harm it is incurring. *See* ECF No. 69 at 91–98 (explaining the costs of providing education to USC that is not recoverable from the federal government); *Id.* at 99–110 (explaining the costs of issuing limited-term drivers licenses or personal identification certificates); *Id.* at 84–87 (explaining the costs of providing healthcare services); *Id.* at 111–13 (explaining the costs and burdens placed on the state's criminal justice system).

---

enjoined and that "Defendants be ordered to detain those aliens 'for a period sufficient to determine, . . . with the guidance of the Department of Health and Human Services, that those aliens are not carriers' of COVID-19." ECF No. 89 at 27; *see also* ECF No. 68 at 39 (same). If Texas is correct on the merits, however, the Court would be deeply disturbed that the Government is operating under a *de facto* policy during a pandemic.

In addition, Texas is also suffering injuries to the State's interests as *parens patriae*. To this point, "the Supreme Court has determined that 'law enforcement and public safety interests' can constitute irreparable harm." *Texas v. United States*, --- F. Supp. 3d. ----, 2021 WL 3683913, at *59 (S.D. Tex. Aug. 19, 2021) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Here, Texas's *parens patriae* injuries are grounded in the "harms that Texas's local governments, each exercising Texas's delegated police power to ensure the health and welfare of their citizens" and in the harms to Texas healthcare workers. ECF No. 68 at 36–37. Accordingly, the Court concludes that Texas has demonstrated a likelihood of irreparable harm that monetary damages would not repair.

### 3. The Balance of the Equities and the Public's Interest

The Court now considers the balance-of-equities and public-interest elements together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging these two elements when the Government is the nonmoving party); *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015) (same). Specifically, the Court considers whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). These requirements recognize that an injunction is never a "matter of right" and is instead "a matter of sound judicial discretion." *Yakus v. United States*, 321 U.S. 414, 440 (1944).

To weigh the equities, the Court balances "the competing claims of injury and [] consider[s] the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, (2008). To determine whether an injunction would undermine the public interest, a court considers the public interests that may be injured and those that may be served by granting or denying the injunction. *Texas*, 2021 WL 3683913, at *59 (collecting cases).

Texas asserts that balancing the harms favors granting a preliminary injunction because Texas's harm is immediate, irreparable, and continues to occur. ECF No. 68 at 36–38. Conversely, the Government faces essentially no harm from resuming compliance with

the October 2020 Order to the extent that it applies to unaccompanied alien children. *See* 86 Fed. Reg. at 42,830; ECF No. 69 at 21 (explaining how the Title 42 process "remains necessary at this time" for single adults and family units).

The Government responds that Texas primarily challenges the CDC's actions implementing and administering laws that protect the public health. ECF No. 79 at 59. The Government further argues that an injunction "would harm DHS's interests in carrying out an efficient and effective immigration system." *Id.* at 60. This argument, however, has been rejected by other courts. For example, the Fifth Circuit has already "concluded that any inefficiency resulting from an injunction inhibiting the Executive's ability to prioritize certain immigration-enforcement actions is 'outweighed by the major financial losses [that] states face.'" *Texas*, 2021 WL 3683913, at *60 (citing *Texas*, 809 F.3d at 187.

And as already discussed above, Texas has experienced, and will continue to experience, significant financial loss. Furthermore, the injunction does nothing more than require the Executive to expend its resources in a manner consistent with the APA—i.e., a lawful manner. Thus, because the Government has no "interest in the perpetuation of unlawful agency action," the ongoing and future injuries to Texas outweigh any harms to the Government. *League of Women Votes of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

More to the point, "the public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Texans have a significant interest in maintaining the health and safety of their state. And the fact that the Government has a significant interest in implementing our immigration system without alteration does not change the analysis. Thus, because the Court has already concluded that the July 2021 and August 2021 Orders violate the APA—to the extent that they except unaccompanied alien children from the Title 42 procedures solely on their status as unaccompanied alien children—the public is "served if the Executive Branch is enjoined from implementing and enforcing a policy that

instructs officials to violate a congressional command." *Texas*, 2021 WL 368913, at \*60.

Accordingly, because the public has an "interest in stemming the flow of illegal immigration," the public interest favors an injunction. *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620, at \*2 (S.D. Tex. Nov. 28, 2017) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976)). The Court therefore concludes that the balance of the equities weighs in favor of an injunction.

## CONCLUSION

Nearly 70 years ago, the Supreme Court aptly observed that the political nature of immigration generally removes it from the ambit of judicial oversight:

> It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Harisiasdes v. Shaugnessy*, 342 U.S. 580, 588–89 (1952) (Jackson, J.); *see also, e.g.*, ROBERT DALLEK, FLAWED GIANT: LYNDON JOHNSON AND HIS TIMES 1961–1973 227–28 (1998) (discussing negotiations between the legislative and the executive branch regarding immigration legislation and quoting President Lyndon Johnson as telling Speaker Jon McCormack that "[t]here is no piece of legislation before Congress that in terms of decency and equity is more demanding of passage than the Immigration bill").

The problem is that this statement harkens back to a quaint age when our republican form of government included a legislature that *legislated*. And based on how they *legislated*, those members would then be held accountable by their constituents each election cycle. *See Speaker Sam Rayburn, quoted in* D.B. HARDEMAN & DONALD C. BACON, RAYBURN: A BIOGRAPHY 429 (1987) ("A [politician] who is not willing to get out and defend what he has done will ultimately find himself in poor

shape politically."). It is precisely because of the political accountability of the issue that Justice Jackson recognized judicial oversight is limited.

But for better or worse, these decisions are now decided by individuals within the administrative state with no political accountability. And because these administrative decisions are housed in the Executive Branch, all roads—for better or worse—lead back to the President of the United States. Here, the President has (arbitrarily) excepted COVID-19 positive unaccompanied alien children from Title 42 procedures—which were purposed with *preventing* the spread of COVID-19. As a result, border states such as Texas now uniquely bear the brunt of the ramifications. Yet, while policy decisions are beyond judicial review, those agency actions that are "arbitrary, capricious, . . . or otherwise not in accordance with law" will be set aside.

## ORDER

For the foregoing reasons, the Court **ORDERS** that the Government's Motion to Dismiss (ECF No. 76) is **GRANTED in part** and **DENIED in part.** The Court thus **DISMISSES** Claims E and F.

Further, the Court **GRANTS in part** Texas's Renewed Motion for Preliminary Injunction (ECF No. 67). Thus, the Court **ORDERS** that:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from enforcing the July 2021 and August 2021 Orders to the extent that they except unaccompanied alien children from the Title 42 procedures based solely on their status as unaccompanied alien children.

2. Nothing in this Preliminary Injunction requires DHS to take any immigration or removal action nor withhold its statutory discretion towards any individual that it would not otherwise take.

3. This Preliminary Injunction shall remain in effect pending a final resolution of the merits of this case or until further Order from this Court, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court.

4. The Court **STAYS** the applicability of this Memorandum Opinion
and Order for **7 days** to allow the federal government time to seek
emergency relief at the appellate level.

**SO ORDERED** on this **4th day** of **March, 2022.**


Mark T. Pittman
UNITED STATES DISTRICT JUDGE