IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

STATE OF TEXAS,

     Plaintiff,

v.                                                                     Civil Action No. 4:21-CV-579-P

JOSEPH R. BIDEN, JR. et al.,

     Defendants.

## <u>NOTICE OF NEW CDC ORDER</u>

The government files this notice to inform the Court and Texas that the Centers for Disease Control and Prevention (CDC) has issued a new order pursuant to 42 U.S.C. §§ 265, 268 and the implementing regulation, 42 C.F.R. § 71.40, terminating all prior CDC orders issued under those Title 42 authorities to the extent they apply to unaccompanied noncitizen children.  A copy of the new order is attached.

As fully set forth in the new CDC order, the termination of the August 2021 order and all prior CDC orders issued under Title 42 as to unaccompanied children is based on CDC's determination that a suspension of the right to introduce unaccompanied children into the United States is unwarranted under 42 U.S.C. § 265 given the significant steps taken over the past several months to mitigate the risk posed by such children, the more general improvement in the status of the COVID-19 pandemic at this time, and the significantly decreased public-health risks with respect to unaccompanied children as a result.

The government recognizes that this Court issued a preliminary injunction on March 4, 2022, enjoining and restraining the government from "enforcing [CDC's] July 2021 and August 2021 Orders to the extent that they except unaccompanied alien children from the Title 42 procedures based solely on their status as unaccompanied alien children," (Doc. 100 at 36), on the basis that CDC likely had not engaged in reasoned decisionmaking and adequately explained its decision for such exception.  CDC takes seriously the concerns expressed in the Court's opinion.  CDC has carefully considered each of these concerns and has responded to them in explaining its current public-health decision in the new order.  (See, e.g., pages 13 through 18 of the new order.)

As further explained in the new CDC order, at the time of the Court's preliminary injunction, CDC was already in the process of evaluating the status of the pandemic and the evolving public-health conditions.  As noted in CDC's August 2021 order, CDC reassesses "[t]he circumstances necessitating the [October] Order . . . *at least* every 60 days."  86 Fed. Reg. 42,828, 42,829 (Aug. 5, 2021) (emphasis added).  The August 2021 order further states that it "will remain in place until either the expiration of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID-19 into the United States has declined such that the continuation of the Order is no longer necessary to protect public health, whichever occurs first."  *Id.*  Accordingly, CDC is continually evaluating the public-health situation and the need for any Title 42 order, and the orders themselves make clear that CDC may take action to modify or terminate the orders before the end of the 60-day review period, if warranted.  Although the current 60-day periodic

review required by the August 2021 order does not end until March 30, 2022, CDC already has determined, after consideration of current conditions, improved protocols as applied to unaccompanied children, and this Court's opinion, that expulsion of unaccompanied children is not necessary to avert a serious danger to public health, and therefore has decided to immediately terminate the August 2021 order and all prior orders as applied to unaccompanied children.

Consistent with the terms of the Court's preliminary injunction, the government is thus no longer enforcing CDC's July 2021 unaccompanied children exception order, as incorporated in the August 2021 order. Instead, the treatment of unaccompanied children under Title 42 is now governed solely by CDC's new order terminating the prior Title 42 orders as to unaccompanied children based on CDC's most recent public-health assessment.

The government intends to promptly confer with Texas regarding potential next steps in this litigation in light of the new CDC order.

Respectfully submitted,

CHAD E. MEACHAM
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

<u>Certificate of Service</u>

On March 11, 2021, the ECF system does not appear to be working and I am

therefore filing this document using the clerk's office's "emergency filing" email address,

with service to Texas by cc'ing counsel on the email to the clerk's office.

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)**

**ORDER UNDER SECTIONS 362 & 365 OF THE PUBLIC HEALTH SERVICE ACT
(42 U.S.C. §§ 265, 268) and 42 CFR 71.40**

**PUBLIC HEALTH REASSESSMENT
AND
IMMEDIATE TERMINATION OF
ORDER SUSPENDING THE RIGHT TO INTRODUCE CERTAIN PERSONS FROM
COUNTRIES WHERE A QUARANTINABLE COMMUNICABLE DISEASE EXISTS
WITH RESPECT TO UNACCOMPANIED NONCITIZEN CHILDREN**

**Executive Summary**

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby terminating the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on August 2, 2021 (August Order),[1] and all related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service (PHS) Act (42 U.S.C. §§ 265, 268) and the implementing regulation at 42 C.F.R. § 71.40 (CDC Orders),[2] to the extent that they apply to Unaccompanied Noncitizen Children (UC). The August Order continued a suspension of the right to introduce "covered noncitizens," as defined in the Order,[3] into the United States along the U.S. land and adjacent coastal borders. The August Order specifically excepted UC and incorporated an exception for UC issued by CDC on July 16, 2021 (July Exception).[4] The August Order states that CDC will reassess at least every 60 days whether the Order remains necessary to protect the public health. CDC was in the process of assessing that question in light of the current public health situation. However, in response to an order of the U.S. District Court for the Northern District of Texas preliminarily enjoining the July Exception and the relevant portion of the August Order based on concerns about the adequacy of the CDC's explanation for those actions and consistent with CDC's continuing review, CDC has reopened this issue and reconsidered whether UC should be subject to the CDC Orders. CDC hereby concludes that UC should not be subject to the CDC Orders based on the current public health circumstances. Based on the public health landscape, the current status of the COVID-19

---

[1] Available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf (last visited Mar. 7, 2022); *see also* 86 Fed. Reg. 42828 (Aug. 5, 2021).
[2] The "CDC Orders" issued pursuant to these legal authorities are found at 85 Fed. Reg. 17060 (Mar. 26, 2020), 85 Fed. Reg. 22424 (Apr. 22, 2020), 85 Fed. Reg. 31503 (May 26, 2020), 85 Fed. Reg. 65806 (Oct. 16, 2020), and 86 Fed. Reg. 42828 (Aug. 5, 2021) (fully incorporating by reference 86 Fed. Reg. 38717 (July 22, 2021), see 86 Fed. Reg. 42828, 42829 at note 3).
[3] *See infra* I.
[4] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf (July 16, 2021); 86 Fed. Reg. 38717 (July 22, 2021); *see* 86 Fed. Reg. 42828, 42829 at note 1 (Aug. 5, 2021) (which fully incorporated by reference the July Exception relating to UC).

pandemic, the situation in congregate settings where UC seeking to enter the United States are processed and held, and the procedures in place for the processing of UC in such congregate settings, CDC has determined that a suspension of the right to introduce UC is not necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States at this time. This termination as to UC supersedes the July Exception incorporated in the August Order. The present termination does not address the application of the August Order to individuals in family units (FMU) or single adults (SA).

## Outline of Reassessment and Order

I.   Background

    A.  Public Health Landscape

    B.  Current Status of the COVID-19 Pandemic

        1.  Community COVID-19 Levels

        2.  Information Specific to UC

II.  Public Health Reassessment

    A.  Changing Public Health Conditions

    B.  Public Health Factors Specifically Relevant to UC Population

III. Legal Considerations

    A.  Concerns Raised by the District Court

    B.  Absence of Reliance Interests

    C.  Timing Considerations

    D.  Basis for Termination with Respect to UC under Sections 362 and 365 of the PHS Act and 42 C.F.R. § 71.40

IV.  Issuance and Implementation of the Termination

    A.  Termination as to UC

    B.  APA Review

## I.    Background

Coronavirus disease 2019 (COVID-19) is a quarantinable communicable disease[5] caused by the SARS-CoV-2 virus. As part of U.S. Government efforts to mitigate the introduction,

---

[5] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order 13295, as provided under § 361 of the Public Health Service Act (42 U.S.C. § 264), 42 C.F.R. § 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow

transmission, and spread of COVID-19, CDC issued the August Order,[6] replacing a prior order issued on October 13, 2020 (October Order) which continued a series of orders issued pursuant to 42 U.S.C. §§ 265, 268 and the implementing regulation at 42 C.F.R. § 71.40,[7] suspending the right to introduce[8] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID-19 (CDC Orders).[9] The August Order applied specifically to covered noncitizens, defined as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station[10] at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE."[11]

Three groups typically make up covered noncitizens—single adults (SA),[12] individuals in family units (FMU),[13] and unaccompanied noncitizen children (UC).[14] UC encountered in the United States were specifically excepted from the August Order[15] based on its explicit

---

fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East Respiratory Syndrome and COVID-19), influenza caused by novel or reemergent influenza viruses that are causing, or have the potential to cause, a pandemic, and measles. *See* Exec. Order 13295, 68 Fed. Reg. 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 Fed. Reg. 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 Fed. Reg. 45671 (July 31, 2014), 86 Fed. Reg. 52591 (Sep. 22, 2021).

[6] *See supra* note 1.

[7] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), which was subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020).

[8] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 C.F.R. § 71.40(b)(5).

[9] *See supra* note 2.

[10] POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within Department of Homeland Security (DHS).

[11] 86 Fed. Reg. 42828, 42841.

[12] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a "family unit." 86 Fed. Reg. 42828, 42830 at note 13.

[13] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). *Id.* at note 14.

[14] CDC understands UC to be a class of individuals similar to or the same as those individuals who would be considered "unaccompanied alien children" (*see* 6 U.S.C. § 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 Fed. Reg. 38717, 38718 at note 4.

[15] 86 Fed. Reg. 42828, 42829 at note 3.

incorporation by reference of CDC's July Exception of UC.[16] The August Order and July Exception distinguished the immigration processing available to SA and FMU from that available to UC.[17] While all three groups are processed by U.S. Customs and Border Protection (CBP), a component of the Department of Homeland Security (DHS), following that initial intake, UC are referred to HHS' Office of Refugee Resettlement (ORR) for care. At both the CBP and ORR stages, UC receive special attention.

The series of CDC Orders issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 were intended to reduce the risk of COVID-19 introduction, transmission, and spread at POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings and thereby reducing risks to U.S. citizens, U.S. nationals, lawful permanent residents, DHS/CBP personnel and noncitizens at the facilities, and local community healthcare systems. CDC has deemed the measures included in the CDC Orders necessary for the protection of public health during the ongoing COVID-19 pandemic.

In the August Order, CDC committed to reassessing the public health circumstances necessitating the Order at least every 60 days by reviewing the latest information regarding the status of the COVID-19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. borders.[18] Following a Preliminary Injunction issued by the U.S. District Court for the Northern District of Texas ordering that the July Exception for UC and its incorporation into the August Order be enjoined,[19] CDC determined that it was necessary to conduct an immediate reassessment with respect to UC. This reassessment takes into account the current status of the pandemic. For example, CDC recently released its COVID-19 Community Levels framework, which allows communities and individuals to make decisions and reduce COVID-19 mitigation measures as allowed by local context and unique needs.[20] This was followed by an updated National COVID-19 Preparedness Plan, which lays out the roadmap to help the nation continue to fight COVID-19 in the future, while also allowing resumption of more normal routines.[21]

Based on the reassessment below, the CDC Director finds that there is no longer a serious danger of the introduction, transmission, and spread of COVID-19 into the United States as a result of entry of UC and that a suspension of the introduction of UC is not required in the interest of public health. The CDC Director has determined that suspension of entry of UC is not necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at POE and U.S. Border Patrol stations, or destination communities in the United States. In light of that determination, and as described below, CDC is hereby terminating the CDC Orders issued pursuant to 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 as they apply to UC, effective immediately.

---

[16] See supra note 4.
[17] See 86 Fed. Reg. 42828, 42835-37 (describing the processing of noncitizen SA and FMU by DHS components, CBP and ICE, under both regular Title 8 immigration and under an order pursuant to 42 U.S.C. § 265).
[18] 86 Fed. Reg. 42828, 42841.
[19] See infra II.B.
[20] COVID-19 Community Levels, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html (updated Mar. 10, 2022).
[21] National COVID-19 Preparedness Plan – March 2022, available at https://www.whitehouse.gov/wp-content/uploads/2022/03/NAT-COVID-19-PREPAREDNESS-PLAN.pdf (last visited Mar. 9, 2022).

### A. Public Health Landscape

Since late 2019, SARS-CoV-2, the virus that causes COVID-19, has spread throughout the world, resulting in a pandemic. Since the beginning of the pandemic, the U.S. Government response has focused on taking actions and providing guidance based on the best available scientific information. As the waves of the pandemic have surged and ebbed, so too have actions taken in response to the pandemic. Earlier phases of the pandemic required extraordinary actions by the U.S. Government and society at large. However, epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted many of those early actions to be pulled back in favor of more nuanced, targeted, and narrowly-tailored guidance that provides a less restrictive means to prevent and control the SARS-CoV-2 virus and COVID-19.

As of March 11, 2022, there have been over 450 million confirmed cases of COVID-19 globally, resulting in over six million deaths.[22] The United States has reported over 79 million cases resulting in over 960,000 deaths due to the disease[23] and is currently averaging around 49,000 new cases of COVID-19 a day as of March 11, 2022.[24]

### B. Current Status of the COVID-19 Pandemic

The highly infectious SARS-CoV-2 variant B.1.1.529 (Omicron) is responsible for the currently receding wave of the pandemic. The Omicron variant resulted in an extraordinary and unparalleled increase in COVID-19 cases around the world.[25] The United States recorded its highest seven-day moving average number of cases on January 15, 2022.[26] Following this unprecedented peak, the number of COVID-19 cases in the United States began to rapidly decrease, falling by 95% as of March 9, 2022.[27] After a brief period of continued increases,[28]

---

[22] *Coronavirus disease (COVID-19) pandemic*, World Health Organization, https://covid19.who.int/ (last visited Mar. 11, 2022).

[23] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 11, 2022).

[24] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_community (last visited Mar. 11, 2022).

[25] Omicron was first reported to the World Health Organization (WHO) by South Africa on November 24, 2021, and on November 26, 2021, WHO designated it a Variant of Concern (VOC). On November 30, 2021, the U.S. also decided to classify Omicron as a VOC. This decision was based on a number of factors, including detection of cases attributed to Omicron in multiple countries, even among persons without travel history, transmission and replacement of Delta as the predominant variant in South Africa, changes in the spike protein of the virus, and concerns about potential decreased effectiveness of vaccination and treatments.

[26] *See Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailycases, citing a seven-day moving average of 809,202 cases on January 15, 2022 (last updated Mar. 9, 2022).

[27] *Id.* (noting a peak of 809,204 seven-day moving average number of cases to 40,433 seven-day moving average number of cases on March 7, 2022).

[28] *COVID Data Tracker Weekly Review: Stay Up to Date – Interpretive Summary for Jan. 28, 2022*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/01282022.html (Jan. 28, 2022).

deaths and hospitalizations also reversed course and began a swift descent.[29] These welcomed changes were due, in part, to widespread population immunity[30] and a generally lower overall risk of severe disease and are responsible for allowing the United States to return to more normal routines safely.[31]

### 1. Community COVID-19 Levels

During the first four waves of the pandemic, CDC relied on a particular formula to calculate community transmission levels and update COVID-19 prevention strategies accordingly.[32] These indicators reflected the goal of limiting transmission in anticipation of vaccines becoming available.[33] The CDC Director examined these indicators in conducting the public health assessment for the August Order.[34]

In February 2022, given increased levels of population immunity, available therapies, and overall milder disease associated with the Omicron variant,[35] CDC released a new framework, "COVID-19 Community Levels," reflecting a shift in focus from eliminating SARS-CoV-2 transmission toward disease control and infrastructure protection.[36] This new framework

---

[29] *See New Admissions of Patients with Confirmed COVID-19, United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions (last updated Mar. 10, 2022); *see also supra* note 25.

[30] In addition to vaccine-induced immunity, studies have consistently shown that infection with SARS-CoV-2 lowers an individual's risk of subsequent infection and an even lower risk of hospitalization and death. National estimates of both vaccine- and infection-induced antibody seroprevalence have been measured among blood donors; as of December 2021 these measures demonstrated 94.7% of persons 16 years and older showed antibody seroprevalence for COVID-19. *Science Brief: Indicators for Monitoring COVID-19 Community Levels and Making Public Health Recommendations*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/indicators-monitoring-community-levels.html (updated Mar. 4, 2022); *Nationwide COVID-19 Infection- and Vaccination-Induced Antibody Seroprevalence (Blood donations)*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#nationwide-blood-donor-seroprevalence (last updated Feb. 18, 2022).

[31] *Transcript for CDC Media Telebriefing: Update on COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2022/t0225-covid-19-update.html (Feb. 25, 2022). COVID-19 vaccines are highly effective against severe illness and death. Widespread uptake of these vaccines, coupled with higher rates of infection-induced immunity at the population level, as well as the broad availability of mitigation measures and effective therapeutics have moved the pandemic to a different phase. *See also State of the Union Address*, https://www.whitehouse.gov/state-of-the-union-2022/ (Mar. 1, 2022).

[32] In September 2020, CDC released the Indicators of Community Transmission framework, which incorporated two metrics to define community transmission: total new cases per 100,000 persons in the past seven days, and percentage of Nucleic Acid Amplification Test results that are positive during the past seven days. CDC also encouraged local decision-makers to also assess the following factors, in addition to levels of SARS-CoV-2, to inform the need for layered prevention strategies across a range of settings: health system capacity, vaccination coverage, capacity for early detection of increases in COVID-19 cases, and populations at risk for severe outcomes from COVID-19. *See* Christie A, Brooks JT, Hicks LA, et al. *Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage*. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7030e2.

[33] *Id.*

[34] *Supra* note 1.

[35] *Supra* note 31.

[36] *Indicators for Monitoring COVID-19 Community Levels and Implementing Prevention Strategies*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/downloads/science/Scientific-Rationale-summary_COVID-19-Community-Levels_2022.02.23.pptx (Feb. 23, 2022).

examines three currently relevant metrics: new COVID-19 hospital admissions per 100,000 population in the past seven days, the percent of staffed inpatient beds occupied by patients with COVID-19, and total new COVID-19 cases per 100,000 population in the past seven days.[37] CDC determined that data on disease severity and healthcare system strain complement case rates, and these data together are more informative for public health recommendations for individual, organizational, and jurisdictional decisions than data on community transmission rates alone.[38] This comprehensive approach to assessing COVID-19 Community Levels can inform decisions about layered COVID-19 prevention strategies, including vaccination and masking to reduce medically significant disease and limit strain on the healthcare system and other societal functions.[39]

Using these data, the COVID-19 Community Levels for each county are classified as low, medium, or high. CDC recommends using county COVID-19 Community Levels to help determine which mitigation measures, such as screening, testing, and mask use, should be implemented within a community.[40] As of March 10, 2022, 72.7% of U.S. counties are classified at the low COVID-19 Community Level, 21.2% of U.S. counties are classified at the medium COVID-19 Community Level, and 6% of U.S. counties are classified at the high COVID-19 Community Level.[41] Furthermore, 82.8% of the U.S. population lives in counties classified as "low," 15% live in counties classified as "medium," and 2.2% live in counties classified as "high."[42]

## 2. Information Specific to UC

Since the beginning of the pandemic, CBP has maintained myriad COVID-19 mitigation efforts in order to protect noncitizens and its workforce.[43] The DHS Office of the Chief Medical

---

[37] New COVID-19 admissions and the percent of staffed inpatient beds occupied represent the current potential for strain on the health system, while data on new cases acts as an early warning indicator of potential increases in health system strain in the event of a COVID-19 surge. Community vaccination coverage and other local information, like early alerts from surveillance, such as through wastewater or the number of emergency department visits for COVID-19, when available, can also inform decision making for health officials and individuals. *Supra* note 21.

[38] *Supra* note 31.

[39] *Id.*

[40] *See supra* note 21.

[41] *COVID-19 by County,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html (last updated Mar. 10, 2022). Furthermore, 82.8% of the U.S. population lives in counties classified as "low," 15% live in counties classified as "medium," and 2.2% live in counties classified as "high."

[42] Per internal CDC calculations.

[43] These mitigation efforts include installing plexiglass dividers in facilities, enhancing ventilation systems, adhering to CDC cleaning and disinfection guidance, and providing masks to migrants, as well as providing PPE to CBP personnel. These measures generally follow the infection prevention control referred to as the hierarchy of controls. *See Hierarchy of Controls*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/niosh/topics/hierarchy/default.html (last visited Mar. 9, 2022). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment). CBP also continues to update the CBP Job Hazard Analysis and the CBP COVID-19 toolkit based on the latest relevant public health guidance.

Officer has worked with local community partners whose work is critical to moving individuals safely out of CBP custody and through the appropriate immigration pathway. Through these partnerships, DHS has supported state, local, tribal, and territorial partners and NGOs in developing robust COVID-19 testing and quarantine programs along the Southwest Border. In addition, vaccine uptake among the CBP workforce has reached approximately 88% among personnel on the U.S.-Mexico border.

CDC understands that in the months between the issuance of the August Order and now, CBP has implemented a robust set of COVID-19 mitigation protocols that have substantially reduced the potential for COVID-19 spread among UC in CBP and ORR facilities. For many months, UC had been tested as they were leaving CBP facilities, prior to transfer to large ORR facilities. On August 25, 2021, CBP began testing UC during CBP's intake process as well, prior to placing UC in congregate settings. Intake testing of UC started with those encountered in the Rio Grande Valley (RGV) Sector of the U.S. Border Patrol—the Sector that has encountered more than 54% percent of UC over the past 12 months. This model has subsequently been expanded to other high-encounter Border Patrol Sectors, including Tucson (January 26, 2022), El Paso (February 3, 2022), and Del Rio (February 3, 2022). Taken together, these Sectors account for over 87% of UC encounters over the past 12 months—indicating that the large majority of UC are now going through this intake processing protocol.

Pursuant to these protocols, UC encountered by Border Patrol agents are tested for COVID-19 in a sheltered, open air location during intake processing prior to entering congregate settings, thus ensuring the ability to segregate UC by test results, provide appropriate care to UC who have tested positive, and minimize further spread. UC that test positive for COVID-19 are cohorted together and kept physically separate from UC who test negative. UC who test positive for COVID-19 go through a streamlined designation and referral process for ORR placement that is substantially faster than the process for other UC, generally resulting in transfers to ORR within 8 to 12 hours of encounter. UC who test positive are transported together (and separately from other UC) to designated ORR facilities that are designed to provide robust care for COVID-19 positive children and to minimize the chance of transmission. UC who test negative go through the normal processing, as applied to UC, and are tested again when they are discharged from CBP facilities prior to transport to large ORR facilities. UC who test positive at this second stage are routed to designated ORR facilities to minimize the potential for COVID-19 spread. All UC are subject to masking requirements while in CBP custody.

Since the inception of these intake processing protocols, CBP has tested more than 45,000 UC with an overall positivity rate of 10%. Consistent with the decline in COVID-19 positivity rates more generally, the UC overall positivity rate has been declining. During the first week of March 2022, the overall positivity rate for UC in CBP custody was around 6%, down from a high of nearly 20% in early February 2022.

CBP's intake processing protocols have also led to a significant decrease in COVID-19 positivity rates for UC in ORR care. Following the start of COVID-19 testing for UC as part of the CBP intake process in August, there was a significant decrease in the proportion of children referred to ORR from the RGV Sector testing positive for COVID-19 within the first four days of ORR custody, as compared to the pre-testing period. As of March 5, 2022, COVID-19

positivity rates in ORR shelter facilities ranged from 4% to 15% – a number that includes those in facilities designed specifically to house COVID-positive UC. Once UC are transferred to ORR care, ORR has in place a range of other mitigation measures, as detailed below, to include universal and proper wearing of masks, physical distancing, frequent hand washing, cleaning and disinfection, improved ventilation, staff vaccination, and cohorting UC according to their COVID-19 test status. Due to operational and facility constraints, CBP reports that it is not able to replicate this robust COVID-19 testing and isolation program for SA and FMU in its custody.

## II.    Public Health Reassessment

### A.  Changing Public Health Conditions

CDC continually reassesses the development of the COVID-19 pandemic and the need for continued measures under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40, the authorities that support the CDC Orders.[44] The public health reassessment for UC described herein is based upon the most recent science and data available to CDC. Based upon these data, CDC has determined that while the use of the CDC Orders to reduce the numbers of noncitizens held in congregate settings in POEs and Border Patrol stations has been part of the layered COVID-19 mitigation measures over the last two years, less restrictive measures than those outlined in prior CDC Orders are now available with respect to UC to mitigate the introduction, transmission, and spread of COVID-19. While the CDC Orders provided an important COVID-19 mitigation measure during certain phases of the pandemic by reducing the number of noncitizens held in congregate settings, other public health measures such as workforce testing, widespread vaccination, variant action plans, and mitigation measures specifically available for the UC population, are now available to provide necessary public health protection for noncitizens, Americans, and the DHS workforce.

CDC believes that the widespread availability of tests for the general public, in addition to other methods of surveillance, will permit the workforce to rapidly institute necessary mitigation measures in the event that cases of COVID-19 are detected. At the same time, vaccination rates are increasing both at home and abroad. Vaccination among the American public and the DHS workforce in particular has been largely successful and, as stated in the August Order, widespread vaccination of federal employees and personnel in congregate settings at POE and U.S. Border Patrol stations is a critical step toward the normalization of border operations.[45] Since August 2021, vaccination rates in the countries of origin for the current majority of UC have also increased dramatically.[46] Such increased global vaccination rates, as well as higher rates of infection-induced immunity globally, provide additional layers of protection. As a public health matter, CDC strongly recommends that all individuals, including

---

[44] *See supra* note 9.

[45] CBP most recently reported vaccination rates between 75% and 91% among its U.S. Border Patrol and Office of Field Operations personnel.

[46] El Salvador, Guatemala, and Honduras constitute the top three countries of origin for UC. Rates of vaccination for each country are as follows: El Salvador 65% fully vaccinated, 4.8% only partly vaccinated; Guatemala: 31% fully vaccinated, 8.5% only partly vaccinated; Honduras: 45% fully vaccinated, 8.5% only partly vaccinated. *Coronavirus (COVID-19) Vaccinations*, Our World in Data, https://ourworldindata.org/covid-vaccinations (last visited Mar. 11, 2022).

noncitizens, receive a COVID-19 vaccine. This aligns with CDC's emphasis on global vaccination. Even if full vaccination cannot be assured, CDC believes vaccination of as many people as possible provides some level of protection against severe illness and hospitalization, thereby protecting citizens, noncitizens and the U.S. healthcare system.

The August Order also highlighted the threat posed by emerging variants and the potential for a future vaccine-resistant variant, either of which could negatively impact U.S. communities and local healthcare resources.[47] Based in part on these threats, CDC concluded at that time that an Order under 42 U.S.C. § 265 should remain in place, pending further improvements in the public health situation, and subject to continual assessment.[48] Since the August Order, public health officials have learned a great deal about variants and how best to respond to them. In response to Omicron, the U.S. Government developed a comprehensive plan for monitoring COVID-19, swiftly adapting public health tools to combat a new variant, and deploying emergency resources to help communities.[49] This plan includes a commitment to ensuring that variant surveillance, vaccines, tests, and treatments can be updated and deployed quickly.[50]

As noted above, a significant majority of the U.S. population currently lives in an area classified as having a "low" COVID-19 Community Level,[51] meaning most of the population can operate under more relaxed COVID-19 mitigation strategies.[52] Noteworthy for purposes of this reassessment, as of March 10, 2022, of the 24 U.S. counties along the U.S.-Mexico border, 91% of counties on the Southwest Border are now classified as having a "low"or "medium" COVID-19 Community Level.[53]

## B.  Public Health Factors Specifically Relevant to UC Population

For all the reasons set forth above, it is CDC's assessment that there is no longer a public health rationale to apply to UC the August Order and all related prior orders issued pursuant to 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40. Moreover, as explained in the July Exception, UC are less likely than FMU and SA to introduce COVID-19.[54] In addition, UC as a population are

---

[47] 86 Fed. Reg. 42828, 42837.

[48] *Id*.

[49] *See supra* note 22.

[50] *Id*.

[51] *See supra* note 42.

[52] *See supra* note 31.

[53] *See supra* note 41 (noting 54% (n=13) of counties along the U.S.-Mexico border are considered "Low" (San Diego County, CA; Imperial County, CA; Luna, NM; Dona Ana County, NM; Otero County, NM; Eddy County, NM; Lea County, NM; Presidio County, TX; Brewster County, TX; Terrell County, TX; Webb County, TX; Zapata County, TX; Cameron County, TX); 37% of counties (n=9) along the U.S.-Mexico border are classified as having COVID-19 community levels ": Pima County, AZ; Santa Cruz County, AZ; Cochise County, AZ; El Paso County, TX; Hudspeth County, TX; Val Verde County, TX; Kinney County, TX; Maverick County, TX; and Starr County, TX); and 8% of counties (n=2) along the U.S.-Mexico border are classified as having COVID-19 community levels: Yuma, County, AZ and Hidalgo County, TX).

[54] 86 Fed. Reg. 38717 (July 22, 2021).

subject to unique care within CBP and ORR facilities.[55] These facilities are able to provide robust mitigation measures that have proven to be effective in managing COVID-19 and minimizing the risk of spread. These reasons serve as an additional basis to those outlined herein for immediately terminating the August Order and all prior Orders as to UC.

Following the temporary exception of UC from expulsion in January 2021, CDC formally excepted UC from the then-in-place October 2020 Order in July 2021. The July Exception was based on a public health assessment of the specific treatment of UC and the care available to them through ORR and was fully incorporated by reference into CDC's subsequent August Order.[56]

On March 4, 2022, the U.S. District Court for the Northern District of Texas granted a motion for Preliminary Injunction brought by the State of Texas and ordered that the July Exception for UC and its incorporation into the August Order be enjoined, with the injunction stayed through Friday, March 11, 2022. Even prior to that court order, CDC has been reviewing whether the August Order should remain in place as part of its regular public health reassessment every 60 days. Although CDC continues to complete the next regularly scheduled reassessment, CDC accelerated its ongoing and review determined an immediate completion of the assessment of the current public health situation with regard to UC was necessary due to the impending effective date of the injunction. Based on that reassessment, and after carefully considering the issues raised in the court's order, CDC has determined that the current public health situation does not support the application of the August Order to UC. Per the terms of 42 U.S.C. § 265 itself, this lack of public health justification means the suspension of the right to introduce UC is not an available measure. In addition, the COVID-19 public health mitigation measures already in place for UC described herein reinforce CDC's determination that the August Order and all related prior orders issued pursuant to 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 should be terminated as to UC.

Following the temporary exception of UC from the October Order in January 2021, the United States experienced an increase in the number of UC arriving daily at the Southwest Border. In response, HHS and ORR, in conjunction with the Federal Emergency Management Agency (FEMA) and with the assistance of the Department of Defense, greatly expanded the capacity for intake and processing of UC. At its height, ORR had capacity of over 30,000 beds[57] and nearly 23,000 children[58] were in its care. Currently, ORR has a capacity of nearly 14,000 beds and fewer than 10,000 children are in ORR care as of March 9, 2022.[59] ORR has

---

[55] UC not subject to an order under 42 U.S.C. § 265 are generally processed under immigration processes under Title 8 of the U.S. Code and referred from CBP to ORR for care and custody, according to the usual legal framework governing such referrals. Upon transfer to ORR custody, UC are transported to facilities that operate under cooperative agreements or contracts with HHS and must meet ORR requirements to ensure a high level of quality, child-focused care by appropriately trained staff. At these facilities, case managers work to identify and ultimately place UC with vetted sponsors (usually family members within the United States). 86 Fed. Red. 38717, 38719 (July 22, 2020).

[56] *See supra* at note 1.

[57] Per May 2021 monthly data from ORR.

[58] Per April 2021 monthly data from ORR.

[59] Per data from ORR.

successfully processed and discharged over 159,000 UC since January 2021.[60] The successful efforts to expand capacity for UC have resulted in sufficient capacity at ORR sites—both along the border and in the interior—and significantly reduced the length of time that UC remain in CBP custody. As of March 11, 2022, the average time a UC remained in CBP custody before transferring to ORR custody was 23 hours, and no UC have been in CBP custody for over 72 hours.[61] This represents a substantial improvement from early 2021.[62] While the number of UC encountered may remain at elevated levels, expanded ORR capacity and improved processing methods have resulted in UC remaining in CBP custody for shorter periods of time.

With CDC's assistance and guidance, ORR also has implemented COVID-19 testing protocols for UC in its care and continues to practice other mitigation measures to prevent and curtail transmission of the SARS-CoV-2 virus among UC in its care. These strategies include universal and proper wearing of masks, physical distancing, frequent hand washing, cleaning and disinfection, improved ventilation, staff vaccination, and cohorting UC according to their COVID-19 test status. Per a CDC recommendation, ORR conducts serial testing of staff, as feasible, to allow early detection of a possible outbreak.[63] ORR contract and grantee staff working in facilities serving UC are encouraged to receive the COVID-19 vaccine.[64] As advised by CDC, ORR also restricts movement of unvaccinated personnel between facilities to reduce potential outbreaks resulting from transfer of unvaccinated staff between shelters. These measures help reduce the spread of COVID-19 among UC prior to the UC being discharged to vetted sponsors in U.S. communities.

In addition to the mitigation measures at ORR facilities described above, CDC provided updated recommendations to ORR regarding the vaccination of UC ages 5 and older.[65] ORR subsequently approved the administration of COVID-19 vaccine for age-eligible children. Under ORR care, children ages 5 and over are offered a COVID-19 vaccine as soon as possible, as long as there are no contraindications and vaccination does not delay unification of UC with sponsors. Of the total population of UC in ORR care, approximately 98% are age-eligible for vaccination and, as of March 8, 2022, ORR has administered at least one dose of the COVID-19 vaccine to 62,644 UC and a second dose to 15,994, with a refusal rate under 1%.[66] CDC considers these vaccination efforts to be a critical risk reduction measure that supports excepting UC from the August Order.

---

[60] *Id*. From January 2021 through February 2022, 15,492 UC have been discharged from ORR care.
[61] As reported by ORR.
[62] For comparison, on March 29, 2021, nearly 5,500 UC were in CBP custody, with 3,540 of those UC in custody for longer than 72 hours; as of March 31, 2021, the average time in CBP custody for UC was 131 hours.
[63] In ORR facilities where the risk of transmission is moderate to high, public health officials working collaboratively with ORR facilities can determine the appropriateness of offering screening and repeat testing of randomly selected asymptomatic staff and children at the facility, as feasible, to identify cases and prevent secondary transmission.
[64] Additional criteria (e.g., continued symptom monitoring and correct and consistent wearing of masks) should be met by ORR as outlined on CDC's website. *See Science Brief: Options to Reduce Quarantine for Contacts of Persons with SARS-CoV-2 Infection Using Symptom Monitoring and Diagnostic Testing*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html (last updated Dec. 2, 2020).
[65] *Field Guidance #17 – COVID-19 Vaccination of Unaccompanied Children (UC) in ORR Care*, Internal Document (CDC memo to ORR, revised Nov. 8, 2021).
[66] Per data reported by ORR.

Although 20,682 UC total have tested positive for COVID-19 while at ORR shelters during the period of March 24, 2020 to March 3, 2022, 20,304 of those UC testing positive have successfully completed medical isolation, with few requiring medical treatment. Similarly, 13,148 cumulative COVID-19 cases have been reported from Emergency Intake Sites (EIS) as of March 2, 2022; however, only approximately 37 of the UC in this EIS group have required hospitalization.[67]

These numbers indicate that the risk of overburdening the local healthcare systems with UC presenting with severe COVID-19 disease remains low. Based on the robust network of ORR care facilities and the testing and medical care available therein, as well as COVID-19 mitigation protocols that include vaccination for personnel and eligible UC, there is very low likelihood that processing UC in accordance with existing Title 8 immigration procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor do not pose a significant level of risk for COVID-19 spread into the community because they are released after having undergone testing, quarantine or isolation, and vaccination when possible. UC sponsors also are provided with appropriate medical and public health direction.

Based on the public health reassessment set forth above, as well as the successful COVID-19 mitigation measures that were and continue to be in place for UC, there is no public health basis to resume the suspension of introduction of UC. Resuming the suspension of introduction of UC would not significantly decrease the risk of the introduction, transmission, or spread of COVID-19 at POE or Border Patrol stations. Nor does the introduction of UC into the United States pose a serious danger of the introduction of COVID-19 such that applying the August Order to UC is required in the interest of the public health.

## III.   Legal Considerations

### A.  Concerns Raised by the District Court

In enjoining CDC from enforcing the exception for UC set forth in the July Exception and August Order, the court in *Texas v. Biden* found that the July Exception and August Order likely were arbitrary or capricious in violation of the Administrative Procedure Act (APA) for several reasons.[68] CDC takes the court's concerns seriously and has considered each of them in issuing this Order. First, the court stated that "[t]he record before the Court demonstrates that nothing changed between the October 2020 Order, the July 2021 [Order], and the August 2021 Order. The COVID-19 virus (still) remains a threat."[69] Regardless of the public health conditions leading up to the July Exception and August Order, CDC's most recent reassessment of the status of the COVID-19 pandemic and associated public health risks makes clear that circumstances have now changed significantly. Case counts and hospitalization rates are decreasing, vaccination rates are increasing, and the availability of testing and treatments also are

---

[67] As reported by ORR.

[68] 2022 WL 658579, at *16-*18.

[69] *Id.* at *16.

increasing. These changes and continuing trends in the public health conditions since the conclusion of CDC's previous reassessment support the decision to terminate the Orders as to UC immediately.

Additionally, the court found that the July Exception and August Order did not adequately explain why UC were unlikely to spread COVID-19 to others when they spend, on average, more than a day[70] in congregate settings at DHS facilities "where they can expose other detainees, DHS personnel, and American citizens and residents to whatever viruses they are carrying."[71] CDC has considered the court's concern and concluded that because of the overall decrease in cases of COVID-19 throughout the country, including at the Southwest Border, coupled with the increase in vaccination rates, there is an extremely low likelihood that intake processing of UC in DHS facilities will pose a serious danger to the public health. Importantly, vaccines are now widely available and vaccination rates have increased among the American public in general and the DHS workforce in particular, as well as in the countries of origin for the current majority of UC.[72] Additionally, CBP continues to implement a variety of mitigation efforts to prevent the spread of COVID-19 in POE and U.S. Border Patrol facilities, as detailed above.[73]

Next, the court found that "instead of trying to prevent [UC] from spreading the viruses they are potentially carrying to the interior of the United States, the Government chose to send [UC] away from the facilities where the Government could monitor them and their health."[74] CDC clarifies that generally DHS is required by the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) to promptly transfer UC to ORR. Even after such transfer, UC remain in U.S. Government custody through ORR's network of providers where they are subject to robust COVID-19-mitigation protocols, including distancing, testing, masking, quarantining, cleaning and disinfection, improved ventilation, staff vaccination, and available vaccination for noncitizen children.[75] These mitigation measures allow ORR to identify COVID-19 cases, and the vast majority of UC who tested positive for COVID-19 while at ORR shelters successfully completed medical isolation. Unlike other covered noncitizens apprehended at the border, UC in ORR custody undergo COVID-19 testing twice before being released to the community. Accordingly, there very low risk that UC are COVID-19 positive when they are released into the community. Moreover, under ORR care, eligible children are offered a COVID-19 vaccine as soon as possible, as long as there are no contraindications and vaccination does not delay unification of UC with vetted sponsors. When UC are released to sponsors, ORR provides their sponsors with appropriate medical and public health direction, including information on how to obtain additional vaccination doses as needed as well as quarantine and isolation guidance when appropriate.

The court also found that the July Exception and August Order did not explain how "preventing the spread of COVID-19 *between*" UC can also "prevent the spread of COVID-19

---

[70] In contrast, SA and FMU spend, on average, 2-3 days in congregate settings at the border.

[71] *Id.* at *16.

[72] *See COVID-19 Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-onedose-pop-5yr (updated Mar. 11, 2022).

[73] *See supra* note 43.

[74] *Texas*, 2022 WL 658579, at *16.

[75] *See supra* II.B.

from the interior of the United States."[76] CDC has considered the court's concern and determined that preventing the spread of COVID-19 between UC does prevent the spread of COVID-19 into the interior because the fewer UC that test positive for COVID-19, the lower the transmission rates will be from any UC who is COVID-19 positive into the interior. In any event, as discussed above, CDC has determined that, given the testing of UC that occurs prior to transfer to ORR, as well as the robust mitigation measures implemented by CBP since the August Order and in place at ORR facilities, UC present very little risk of spreading of COVID-19 when they are released to their sponsors.

The court also noted a prior U.S. Border Patrol Chief's statement that CDC adopted the exception for UC before it issued the February 2021 Order pausing application of the October Order to UC. From this, the court concluded that CDC's July Exception and August Order constituted a "departure from prior policy." Regardless of whether there had been any defects in a prior unannounced decision or in the February 2021 Order that affected the July Exception and August Order, CDC is now providing a fuller explanation of its decision to terminate the Orders with respect to UC immediately given the outcome of its most recent public-health reassessment.

## B. Absence of Reliance Interests

As noted above, in issuing its July Exception, CDC considered the impact of excepting UC from the October 2020 Order on the local healthcare systems in light of, among other things, data showing that the number of UC presenting with severe COVID-19 disease remained low.[77] The U.S. District Court for the Northern District of Texas has found, however, that neither the July Exception nor the August Order "indicate that the agency considered all of Texas's potential reliance interests."[78] In issuing this Order, CDC has considered whether state or local governments, or their subdivisions, have any "legitimate reliance"[79] interests on the inclusion of UC in an Order under 42 U.S.C. § 265. No state or local government could have any reliance interest relating to the exclusion of UC arising from the August 2021 Order since it expressly excepted UC.[80] Because expulsions of UC under 42 U.S.C. § 265 have not been occurring since at least February 2021, no State could rely on UC being covered by the August Order, and CDC does not see a need to provide advance notice that it will continue excepting UC. We therefore focus on the October 2020 Order and its predecessors. CDC finds it useful to distinguish between potential long-term and short-term reliance interests.

On the issue of long-term reliance interests, CDC has determined that no state or local government could be said to have legitimately relied on the October 2020 Order to implement a long-term or permanent change to its operations because the October 2020 Order was by its very nature a short-term order subject to change at any time in response to an evolving public health crisis and is subject to regular review by CDC. Section 265 may be invoked only if there is a "serious danger of the introduction of [a communicable] disease into the United States, and [if]

---

[76] *Id.*
[77] *See* 86 Fed. Reg. at 38,720.
[78] *Texas v. Biden*, No. 4:21-cv-0579-P, Doc. 100 at 31.
[79] *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).
[80] *See* 86 Fed. Reg. at 42838 ("As outlined in the July Exception and incorporated herein, CDC is fully excepting UC from this Order.").

this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health."[81] The statute may be invoked only "for such period of time as [CDC] may deem necessary" to avert such a danger.[82] Thus, both Section 265 and HHS's implementing regulation recognize that in prohibiting the introduction of covered persons "in whole or in part,"[83] a CDC Order is effective "only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease."[84]

Accordingly, CDC's initial order issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 in March 2020 made clear that the order represented a "*temporary* suspension of the introduction of [covered] persons into the United States"[85] and that the order would remain effective only for "30 days, or until [CDC] determine[s] that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health, *whichever is shorter*."[86] The March 2020 Order was subsequently extended on April 20, 2020 and amended on May 19, 2020. The fact that the policy was frequently reviewed should have underscored that the use of the Section 265 authority was a temporary measure subject to change at any time. The October 2020 Order again confirmed this understanding of CDC's authority under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40, noting the "temporary" nature of the suspension of the introduction of covered persons, and the fact that the Order would be reviewed every 30 days based on "the latest information regarding the status of the COVID-19 pandemic and associated public health risks to ensure that the Order remains necessary," and that CDC "retain[ed] the authority to extend, modify, or terminate the Order, or implementation of [the] Order, at any time as needed to protect public health."[87]

In addition, in November 2020, the United States District Court for the District of Columbia enjoined the expulsion of UC on the ground that Section 265 likely did not authorize such expulsions.[88] Although the government appealed the injunction and obtained a stay of the injunction in January 2021,[89] there remained legal uncertainty over the government's authority to apply Section 265 to UC, thus further rendering it unreasonable for any state or local government to act in long-term reliance on the continued expulsion of UC under Section 265. Moreover, as a factual matter, CDC is not aware of, nor has any state or local government brought to CDC's attention, any reasonable or legitimate reliance on the continued expulsion of UC under 42 U.S.C. § 265. For example, no state or local government has indicated that it altered its operations, spending, or regulation in light of the prior application of Section 265 to UC. The total number of UC processed under Title 8 remains relatively small, rendering it unlikely that state or local governments would adversely rely on the application of Section 265 to UC by making any material changes.

---

[81] 42 U.S.C. § 265.

[82] *Id*.

[83] *Id*.

[84] 42 C.F.R. § 71.40(a).

[85] 85 Fed. Reg. at 17061 (emphasis added).

[86] 85 Fed. Reg. at 17068.

[87] 85 Fed. Reg. at 65807, 65812.

[88] *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020).

[89] Order, *P.J.E.S. v. Mayorkas, et al.*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), Doc. No. 1882899.

Additionally, CDC does not believe that the presence of UC poses a public health risk sufficient to justify continued application of 42 U.S.C. § 265 to UC. Because 42 U.S.C. § 265 authorizes the CDC to prevent the introduction of noncitizens only when necessary to address a public health risk, no state or local government could rely on Section 265 continuing to be applied in the absence of such a risk. Therefore, CDC's considered judgment is that no state or local government currently has a long-term reliance interest in the continued expulsion of UC under the October 2020 Order and that any long-term reliance interests that might be said to exist in connection with the continued expulsion of UC under the October 2020 Order are outweighed by CDC's determination that there is no public health justification to expel UC at this time.[90] To the extent that any state or local government did rely on the expulsion of UC for purposes of resource allocation despite the reasons cautioning against such reliance, CDC concludes that resource allocation concerns do not outweigh CDC's determination that expulsion of UC is not required to avert a serious danger to public health.

CDC has also considered whether there may be any short-term reliance on the continued expulsion of UC under the October 2020 Order.[91] Because CDC is unaware of any such reliance beyond the potential allocation of resources CDC already considered for local healthcare systems, CDC does not believe that any state or local government could have reasonably relied, even on a short-term basis, on the continued expulsion of UC. As noted above, any such reliance would not have been reasonable given the statutory requirement that 42 U.S.C. § 265 be invoked only if there is a "serious danger of the introduction of [a communicable] disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health," as well as the statutory mandate that Section 265 be utilized only "for such period of time as [CDC] may deem necessary" to avert such a danger. Any reliance also would have been particularly unwarranted because UC were subject to expulsion under 42 U.S.C. § 265 for only a very limited time—from March 2020 to November 2020, and then briefly from January 29, 2021 to shortly before the February 11, 2021 notice. As such, the exclusion of UC from 42 U.S.C. § 265 expulsions has been the status quo generally since November 2020 and certainly since at least February 2021. Thus, since the start of this public health emergency, the period of time during which UC have been excepted from expulsion under Section 265 is longer than the period of time during which they were subject to such expulsion. Even if an entity had reasonably relied on the inclusion of UC in an order under 42 U.S.C. § 265 prior to February 2021, it should have adjusted its position by now. Therefore, CDC does not believe that any potential short-term reliance interests can reasonably outweigh CDC's public health determination that there is no public health justification for expelling UC under 42 U.S.C. § 265 at this time.

Finally, Orders under 42 U.S.C. §§ 265; 268 and 42 C.F.R. § 71.40 are not, and do not purport to be, policy decisions about controlling immigration; rather, as explained, CDC's

---

[90] *See Regents*, 140 S. Ct. at 1913 (explaining that features evidencing the temporary and non-rights-conferring nature of a government program "surely are pertinent in considering the strength of any reliance interests," and can be considered by the agency).

[91] *See Regents*, 140 S. Ct. at 1913 (rejecting the government's argument that the fact that the DACA program provided benefits only in two-year increments and was said not to confer any substantive rights "automatically preclude[d] reliance interests," but noting that such disclaimers "are surely pertinent in considering the strength of any reliance interests").

exercise of its authority under Section 265 depends on the existence of a public health emergency. Thus, to the extent that border communities were relying on an order under 42 U.S.C. § 265 as a means of controlling immigration, such reliance would not be reasonable or legitimate. Even if such reliance were reasonable or legitimate, that reliance would not outweigh CDC's public health assessment.

In conclusion, any such reliance interests, whether short- or long-term, do not outweigh CDC's determination that expulsion of UC is not necessary to avert a serious danger to public health. Because disruption of ordinary processing of UC is a weighty action, CDC does not believe it is appropriate to resume expulsion when CDC has concluded that such action is not warranted under the terms of 42 U.S.C. § 265.

## C. Timing Considerations

As noted in the August Order, CDC reassesses "[t]he circumstances necessitating the Order . . . at least every 60 days."[92] Accordingly, CDC has been in the process of evaluating the status of the pandemic and the evolving public health conditions since the conclusion of its previous review on January 29, 2022, to determine whether the Order remains necessary in whole or part to protect the public health. The current 60-day review process is scheduled to end on March 30, 2022, and CDC will conclude its reassessment of whether the Order remains necessary in whole or part to protect the public health with respect to SA and FMU by that date.

CDC had previously excepted UC in its July Exception, as reiterated and incorporated in its August Order.[93] On March 4, 2022, the District Court for the Northern District of Texas issued a preliminary injunction "enjoining and restraining" CDC from enforcing the July Exception and August Order to the extent that they "except unaccompanied alien children from the Title 42 procedures based solely on their status as unaccompanied alien children" because, the court found, CDC had not adequately explained its decision to treat UC differently than other noncitizens subject to the October Order.[94] The court stayed its preliminary injunction for seven days.[95]

Because CDC has determined, after considering current public health conditions and recent developments, that expulsion of UC is not warranted to protect the public health, and in recognition of the unique vulnerabilities of UC, CDC is immediately terminating the CDC Orders to the extent they apply to UC. Because of their vulnerabilities, UC are generally treated differently than other individuals apprehended and processed at the border under the immigration laws. When Section 265 does not apply, UC generally are transferred to the care and custody of HHS's ORR pursuant to the TVPRA.[96] ORR is able to care for UC while implementing appropriate COVID-19 mitigation measures, given ORR's robust network of care facilities that provide testing and medical care, and DHS has already been excepting UC in accordance with

---

[92] *Supra* note 1.
[93] *See* 86 Fed. Reg. 38,717 (July 22, 2021); 86 Fed. Reg. at 42,837-38; *see also* 86 Fed. Reg. 9942 (Feb. 17, 2021).
[94] *Texas v. Biden*, No. 4:21-cv-579 (N.D. Tex. Mar. 4. 2022).
[95] *Id.*
[96] *See D.B. v. Cardall*, 826 F.3d 721, 738 (4th Cir. 2016) ("The intricate web of statutory provisions relating to [UC] reflects Congress's unmistakable desire to protect that vulnerable group.").

CDC's August Order. Because CDC has in its expert judgment determined again that, based on current circumstances, the expulsion of UC under Section 265 is not necessary to protect the public health, there is no justification for subjecting UC to the potentially significant harms they could suffer if the CDC Orders were to be applied to them.[97] For these reasons, CDC is terminating the CDC Orders to the extent they apply to UC.

### D. Basis for Termination with Respect to UC under Sections 362 and 365 of the PHS Act and 42 C.F.R. § 71.40

CDC is hereby immediately terminating the August Order[98] and all prior orders issued pursuant to sections 362 and 365 of the PHS Act (42 U.S.C. §§ 265, 268) and the implementing regulation at 42 C.F.R. § 71.40 to the extent they apply to UC.[99]

CDC is committed to using the least restrictive means necessary and avoiding the imposition of unnecessary burdens in exercising its communicable disease authorities. This aligns with the underlying legal authority in 42 U.S.C. § 265, which makes clear that this authority extends only for *such period of time* deemed necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States.[100] Such an order must also be predicated, in part, upon a determination that the danger of such introduction is so increased that a suspension of the right to introduce such persons into the United States is *required in the interest of public health*.[101]

CDC has considered these and other relevant factors in the foregoing reassessment with respect to UC, including the overall shift in the U.S. Government response to the pandemic, and in the context of reviewing the August Order with respect to UC, has determined that less restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID-19 into the United States. Although COVID-19 continues to spread within the United States, the numerous tools for disease prevention, mitigation, and treatment which have been implemented over the past two years (including those specific to UC in the custody of the federal government) are sufficient at this point in time to protect public health, such that an order suspending the right to introduce UC under 42 U.S.C. § 265 is no longer required in the interest of public health. CDC is not addressing application of the August Order to FMU and SA through this termination.

### IV.   Issuance and Implementation of Termination

### A.   Termination as to UC

---

[97] *See Huisha-Huisha v. Mayorkas*, -- F.4th --, 2022 WL 628061, *12 (D.C. Cir. Mar. 4, 2022) (noting that some migrants who are expelled could be subject to persecution and victimization).

[98] *See supra* notes 1 and 4.

[99] *See supra* note 7.

[100] 42 U.S.C. § 265; 42 C.F.R. § 71.40.

[101] 42 C.F.R. § 71.40.

Based on the foregoing public health reassessment, I hereby Terminate immediately with respect to UC the August Order and all previous orders issued pursuant to Sections 362 and 365 of the PHS Act (42 U.S.C. §§ 265, 268) and their implementing regulation at 42 C.F.R. § 71.40.[102]

Immediate termination of the August Order with respect to UC is based on the current status of the COVID-19 pandemic and the public health mitigation measures available for UC and the public. In making this determination, I have considered myriad facts, including epidemiological information regarding COVID-19, the emergence of SARS-CoV-2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, COVID-19 Community Levels, national levels of transmission and immunity, the availability and efficacy of vaccination and treatments, as well as care available to UC and public health concerns with congregate settings at border facilities. While holding UC in congregate settings with limited options for COVID-19 mitigation is accompanied by some inherent risk, the overall public health landscape in the United States has changed such that the justification for the August Order is no longer sustained with respect to UC particularly in light of the mitigation measures as applied to UC.

As noted previously, CDC is not addressing application of the August Order to FMU and SA through this termination. DHS will continue to exercise its discretion to issue exceptions pursuant to a DHS-approved process or on a case-by-case basis, based on the totality of the circumstances as set forth in the August Order to FMU and SA, as appropriate.

## B.    APA Review

This Termination shall be immediately effective with respect to UC. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS aid in the implementation of this Termination and continued aspects of the Order because CDC does not have the capability, resources, or personnel needed to do so.[103]

This Termination, like the preceding Orders issued under this authority, is not a rule subject to notice and comment under the APA. Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Termination; it would be impracticable and contrary to public health practices, the public interest, and immigration laws that apply in the absence of an order under 42 U.S.C. § 265 to delay the issuing and effective date of this Termination.[104] In addition, this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding how best to control COVID-19 transmission over shared borders and therefore directly "involve[s] . . . a . . . foreign affairs function of the United States."[105] Thus, for both of the foregoing reasons, notice and comment and a delay in effective date are not required.

---

[102] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424 (Sept. 11, 2020); 42 C.F.R. § 71.40.
[103] 42 U.S.C. § 268; 42 C.F.R. § 71.40(d).
[104] 5 U.S.C. § 553(a)(1).
[105] 5 U.S.C. § 553(a)(1).

With this Termination, I hereby determine that the danger of further introduction, transmission, or spread of COVID-19 into the United States from UC, as defined in the August Order, has ceased to be a serious danger to the public health and therefore the continuation of the August Order, and all previous orders issued under the same authority, with respect to UC is no longer necessary to protect public health. Nothing in this Termination will prevent me from issuing a new Order under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 based on new findings, as dictated by public health needs.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 11 day of March, 2022.

_____
Rochelle P. Walensky, MD, MPH
Director
Centers for Disease Control and Prevention